# ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 08 2003

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

### UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

-----------------------------------------------------------x

JEFFERY L. JOHNSON, on behalf of himself
and all others similarly situated,             :

            Plaintiff,                          :

        - against -                             :

AEGON USA, INC., WMA SECURITIES, INC.,         :
WORLD MONEY GROUP, INC., AEGON
FINANCIAL SERVICES GROUP, INC., AFSG           :
SECURITIES CORPORATION, PFL LIFE
INSURANCE COMPANY, AUSA LIFE                    :
INSURANCE COMPANY, INC., WESTERN
RESERVE LIFE ASSURANCE CO. OF OHIO,            :
WRL SERIES FUND, INC., BANKERS UNITED
LIFE ASSURANCE COMPANY, and                     :
TRANSAMERICA LIFE INSURANCE AND
ANNUITY COMPANY,                                :

            Defendants.                         :

-----------------------------------------------------------x

Civil Action No.
1-01-CV-2617-CAP

<u>CLASS ACTION</u>

<u>JURY TRIAL DEMANDED</u>

## <u>AMENDED CONSOLIDATED COMPLAINT</u>

Plaintiffs allege this class action complaint based upon personal

knowledge as to themselves, their own acts and the acts and statements of

defendants in which they participated directly; including the communications with,

representations made, and documentation and information provided to plaintiffs by

defendants in the ordinary course of business; and the investigation of their counsel.

Counsels' investigation conducted on plaintiffs' behalf, included, among other

things: (i) an analysis of publicly-available news articles and reports; (ii) a review

56

and analysis of public filings, including but not limited to any by defendants; (iii) press releases issued by defendants, and (iv) other matters of public record. The allegations as to all other matters are based upon investigation by plaintiffs' counsel.

## NATURE OF THE CASE

1.     This class action arises from defendant's sale of deferred annuities to members of the public. Deferred annuities are marketed to, and often purchased by, people who use them as investments for their retirement years. This type of investment has become extraordinarily popular. Sales of variable deferred annuities -- which offer investment returns linked to stock market performance, similar to mutual funds -- reportedly have increased from the $25 to $30 billion range in 1992 to approximately $100 billion or more in recent years.

2.     The variable annuities at issue here have been registered with the United States Securities and Exchange Commission under the Securities Act of 1933 and are subject to the securities laws.

3.     The retirement savings market in the United States has undergone a revolution over the last two decades. Instead of guaranteed lifetime pension benefits, calculated based on retirees' life expectancies, today's retirement plans focus on maximizing asset accumulation for retirement. Investment growth

2

on a tax-deferred basis accordingly has become an important goal.  An investor who

has contributed the annual maximum amount to his tax-deferred qualified plan(s)

can invest unlimited additional sums on a tax-deferred basis through the purchase of

a deferred annuity.

4.     A "deferred annuity" -- the type of annuity at issue in this

complaint -- has an accumulation (or investment) phase during which the purchaser

invests money and allows the value of the account to grow and then a payout period

during which the purchaser must redeem the amounts contributed and earned, with

one such payout option being an annuity.

5.     Deferred annuities typically contain two insurance features: an

annuity payout option, as described above (other payout options, such as lump-sum

or systematic withdrawal, are much more popular); and a "death benefit" to ensure

that, if the account owner dies during the investment period, the heirs receive some

defined investment value (usually, the principal amount invested) even if the

investment has declined in value during that time.  In practice, the circumstances

under which the insurance features of a deferred annuity will have value are remote

because (a) on average, fewer than 1 percent of deferred annuity owners choose to

exercise the annuity payout option at the end of the investment period and (b) of the

3

contracts "surrendered" during the investment phase due to the death of the account

owner, few, if any, suffered investment losses of such a magnitude that any

meaningful death benefit is paid.

6.      Because of their insurance features, deferred annuities are

deemed to be mortality products, and as such enjoy a privileged status under the

income tax laws. The Internal Revenue Code has provided that annuities are treated

as an instrument of insurance. Most significantly, all annuity earnings (interest,

dividends, and capital gains) accumulate on a tax-deferred basis regardless of

whether the contract owner elects to exercise his option to purchase an annuity at

the end of the investment period.

7.      Because of their tax-deferred status, deferred annuities are

potentially attractive financial products to people seeking tax-deferral for their

retirement investments, particularly for those who have already made their

maximum contributions to IRAs or other qualified retirement plans. However, the

price of such tax-deferral is the very substantial charges and fees charged by the

sellers of deferred annuities -- fees that substantially exceed the fees charged for

similar non-annuity investment products like mutual funds. Over time, these fees

can reduce the amounts earned in the account by as much as <u>one-third</u>.

4

8.     Although deferred annuities may be appropriate investments for some retirement plans, there is one category of retirement plans for which the deferred annuities sold by defendants are virtually never[1] appropriate:  contributory plans and accounts which themselves <u>already</u> enjoy tax-deferred status under the Internal Revenue Code ("qualified accounts"), and thus already have these very same tax benefits.  These include many of the most popular and common plans for retirement investing:  Individual Retirement Accounts (IRA), Keogh and 401 (k) plans, and other accounts treated similarly by the tax code.  Collectively, these are referred to as "qualified retirement plans."  **<u>The deferred variable annuities sold by defendants are generally not appropriate investments for placement in tax-deferred retirement plans</u>**, because earnings on <u>any</u> investment placed in such plans are already tax-deferred, and purchase of a deferred annuity increases costs without any material, additional economic benefit.

9.     Deferred annuities are even less appropriate for older persons who are required by law to commence withdrawing monies from their tax-deferred

---

[1] Whether tax-deferred variable annuities are "never appropriate", "virtually never appropriate" or "generally not appropriate" for placement in an already tax-deferred retirement account is simply a matter of semantics.  This is so because placing a tax-deferred variable annuity within an already tax-deferred retirement account is appropriate in so few instances (regardless of the exact percentage) that the fact (among others) that there is no additional tax benefit is material and

investment accounts by age seventy and one-half. Such forced withdrawals defeat
the entire purpose of the annuity and the front loading of expense in such accounts.

10.   Despite the fact that the deferred annuities sold by defendants
are generally not appropriate investments for qualified retirement plans, defendants
actively recommended and sold these products (including to less financially
sophisticated individuals) and small business owners for use in tax-deferred
retirement plans.

11.   Defendants specifically have their employees market and sell
deferred annuities to people who are investing for their IRAs, Keoghs, 401(k)s, or
other qualified retirement plans.

12.   Defendants' viewed as prime prospects investors who are
leaving employment and need a rollover IRA in which to place the proceeds of their
employers' qualified retirement plans while preserving its tax-deferred status.
Because the proceeds are substantial lump sums, such persons are prime targets.
Defendants also target: (a) small businesses, where decision-makers responsible for
setting up 401(k) and other qualified retirement plans are less likely to be
financially sophisticated, and (b) the employees of nonprofit organizations,

---

must be disclosed. Hereinafter, this complaint shall use the phrase "generally not appropriate."

hospitals, educational institutions, and state and local governmental units, who have lump sum payments funding 403(b) and 457 plans.

13.    Many people who are making investments for their retirement -- particularly those who have changed jobs and are rolling over a large lump-sum qualified plan distribution into an IRA -- are unaware of the financial, tax, and investment aspects of deferred annuities.  Defendants, who are advisors and fiduciaries with superior knowledge about these matters, are trusted by their customers but, nevertheless, mislead their customers into purchasing inappropriate deferred annuities for placement into qualified retirement plans.

14.    Defendants actively marketed, through written material misstatements and omissions, their deferred annuity products for placement in such already tax-deferred retirement plans.  Defendants' written documents including prospectuses, statements of additional information, disclosures (so-called), contracts, sales presentation materials, and other materials, affirmatively mislead prospective customers into believing that deferred annuities are appropriate investments for placement into qualified retirement plans, and failed to disclose the general inappropriateness of such investments and the highly remote circumstances in which the expensive insurance features can provide any value, as more fully

particularized below.  These practices violate the Securities Act of 1933.

15.     Plaintiffs seek to recover, among other things, damages (including but not limited to rescissory damages) caused to the Class by defendants' violations of Sections 11, 12 and 15 of the Securities Act of 1933.  Plaintiffs also seek declaratory and injunctive relief and reformation of the annuity contracts.

16.     Plaintiffs are among those who have been injured and damaged by defendants' unlawful conduct.

## PARTIES, JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §§ 78aa, Section 22 of the Securities Act of 1933 and 28 U.S.C. § 1331.

18.     Plaintiff brings this action pursuant to 15 U.S.C. §§ 77(k), 77(l) and 77(o) of the Securities Act.

19.     Venue is proper in this District because defendants conduct business in this District and many of the wrongful acts alleged herein took place in this District, and for the additional reasons set forth below.

20.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate

commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**Parties**

**Plaintiffs**

21.   Court appointed lead plaintiff Jeffery L. Johnson is a citizen and resident of the State of Georgia.

22.   On or about July 10, 2000, he purchased a tax-deferred variable annuity product of the "AEGON Defendants" (as defined below), whose marketing name was the WRL "Wealth Creator." (The broker-dealer through which he made this purchase was defendant WMAS, and the purchase was for his IRA account with WMAS, which already was tax-deferred.)  Mr. Johnson's plaintiff's certification previously filed with his original complaint in this action is attached hereto as Exhibit 1.

23.   Mr. Johnson invested $48,863.75.  The policy number was 15s3164004.

24.   The money Mr. Johnson used to fund the purchase of the variable annuity came from his 401(k) plan at his prior employer.

25.   Mr. Johnson understood that he was funding a Rollover IRA

with this variable annuity purchase.

26.    Plaintiff Mary Kathleen Hughes, an additional class representative, is a citizen and resident of the State of California.

27.    On or about October 21, 1999, Ms. Hughes purchased a tax-deferred variable annuity product of the "AEGON Defendants", whose marketing name was the "Wealth Creator" or the "Freedom Wealth Creator". Her initial purchase was for $1,500.

28.    In nine of the following months, from October or November 1999 through June or July 2000 inclusive, Ms. Hughes made additional purchases of the same variable annuity, in amounts of $166.66 per month, through automatic direct withdrawals from her bank account. These nine additional purchases combined were for approximately $1,489.94. Therefore, her total purchases of the variable annuity were $2,989.94.

29.    All of this money was invested in Ms. Hughes' IRA account, which was already tax-deferred.

30.    Plaintiff Carolyn Gerin, an additional class representative, is a citizen and resident of the State of California.

31.    Ms. Gerin made a number of purchases of the AEGON

10

Defendants' tax-deferred variable annuities for her already tax-deferred retirement account.

      32.     On or about December 27, 1996, Ms. Gerin purchased a tax-deferred variable annuity product of the "AEGON Defendants", whose marketing name was WRL "Freedom Conqueror". Her initial purchase was for $1,323.75.

      33.     Ms. Gerin purchased an additional $2,000.00 of the same variable annuity on July 19, 1999.

      34.     Ms. Gerin also purchased $2,000.00 of the same variable annuity on January 31, 2000.

      35.     Thus, her total investment in the variable annuity was $5,323.75.

      36.     All of this money was invested in Ms. Gerin's IRA account, which was already tax-deferred.

      **37.**     Each plaintiff purchased their variable annuity contract through a broker-dealer who at all relevant times was acting on behalf of the AEGON Defendants.

**Defendants**

**WMA Defendants**

38.    Defendant WMA Securities, Inc. ("WMAS") is incorporated under the laws of the State of Georgia and is a citizen of the State of Georgia with its principal place of business in Duluth, Georgia.

39.    During the relevant time period, WMAS was a licensed broker-dealer and a member of the NASD.

40.    During the relevant time period, WMAS was in the top one percent of all broker-dealers nationwide based on the number of its registered representatives.

41.    WMAS marketed and sold the variable annuity products at issue, which were developed, issued, underwritten and marketed by the AEGON Defendants.

42.    In its June 2002 report of disciplinary actions for May 2002, the NASD stated that by a letter of Acceptance, Waiver and Consent, WMAS was censured, fined $200,000, and required to pre-file with the NASD's Advertising Regulation Department all advertisements and sales literature ("ASL") prior to their use for a six month period.  Without admitting or denying the allegations, WMAS

consented to the described sanctions and the entry of findings that it engaged in

widespread breaches of NASD Advertising Regulations including "the use of ASL

omitting material facts" and "containing misleading statements."

43.    Defendant World Money Group, Inc. is the parent company of

WMAS.

## AEGON Defendants

44.    Defendant AEGON USA, Inc. ("AEGON USA") is

incorporated under the laws of the State of Iowa and has its headquarters in

Baltimore, Maryland.

45.    AEGON USA is the United States operating arm and a

subsidiary of AEGON N.V., a Netherlands-based multinational financial services

conglomerate. (For example, AEGON USA owns insurance giant Transamerica

Corporation.) AEGON N.V. is headquartered in The Hague, Netherlands and it is

one of the ten largest insurance groups worldwide.

46.    AEGON USA, through its subsidiaries, develops, issues,

underwrites and markets fixed and variable annuities for sale through a diverse

network of distribution channels. The variable annuities pertinent to this action are

offered for sale through certain of AEGON USA's affiliates and through banks,

brokerage houses (including defendant WMAS) and other financial institutions.

47.    AEGON USA transacts business throughout the United States, including the State of Georgia, through its subsidiaries which are its operating companies.

48.    AEGON USA (apparently a holding company) is the direct or indirect parent of all the other AEGON Defendants herein.

49.    Defendant Western Reserve Life Assurance Co. of Ohio ("WRL") is an indirect, wholly-owned subsidiary of AEGON USA.

50.    WRL is organized under the laws of the State of Ohio and is registered and in good standing with the Georgia Secretary of State.

51.    WRL issues variable annuities for AEGON USA and it was a principal issuer for AEGON USA of the disputed variable annuities.

52.    Defendant WRL Series Fund, Inc. is an issuer of the variable annuity accounts at issue here.

53.    Defendant PFL Life Insurance Company ("PFL") is an indirect, wholly-owned subsidiary of AEGON USA.

54.    PFL is organized under the laws of the State of Iowa, and as of July 2000 when certain of the disputed contracts were sold, it conducted business in

14

49 states including the State of Georgia.

55.    PFL issues variable annuities for AEGON USA and it was a principal issuer for AEGON USA of the disputed variable annuities.

56.    During the Class Period, AEGON USA changed PFL's name to Transamerica Life Insurance Company.

57.    Defendant Transamerica Life Insurance and Annuity Company (apparently a separate company from PFL/Transamerica Life Insurance Company) is an indirect, wholly-owned subsidiary of AEGON USA and offers variable annuity products in 49 states including the State of Georgia.

58.    Transamerica Life Insurance and Annuity Company issues variable annuities for AEGON USA and, upon information and belief, it was an issuer for AEGON USA of the disputed variable annuities.

59.    Defendant AFSG Securities Corporation ("AFSG Securities") is an indirect, wholly-owned subsidiary of AEGON USA.

60.    AFSG Securities is organized under the laws of the State of Pennsylvania and is headquartered in Iowa.

61.    AFSG Securities is a broker-dealer and a member of the NASD.

62.    AFSG Securities underwrites variable annuities for AEGON

USA. It is one of the principal underwriters of the variable annuity contracts at issue here which were sold within the State of Georgia and elsewhere.

63.     AFSG Securities is the principal underwriter for the variable annuities issued through (at least) the following accounts: Retirement Builder Variable Annuity Account, Separate Account VA A, Separate Account VA B, Separate Account VA C, Separate Account VA D, Separate Account VA E, Separate Account VA I, and Legacy Builder Variable Life Separate Account of Transamerica Life Insurance Company; the Separate Account VA BNY, Separate Account C, AUSA Series Life Account, AUSA Series Annuity Account, and AUSA Series Annuity Account B of AUSA Life Insurance Company, Inc.; the Separate Account I, Separate Account II, and Separate Account V of Peoples Benefit Life Insurance Company; the WRL Series Life Account, WRL Series Annuity Account, and WRL Series Annuity Account B of Western Reserve Life Assurance Co. of Ohio; and Transamerica Occidental Life Separate Account VUL-3 of Transamerica Occidental Life Insurance Company. (Source: E.g., WRL Series Annuity Account B, May 1, 2001, 033-63246).

64.     Upon information and belief, AFSG Securities also distributes variable annuities for the AEGON group.

16

65.   Defendant Bankers United Life Assurance Company ("Bankers Life") is an indirect, wholly-owned subsidiary of AEGON USA.

66.   Bankers Life is organized under the laws of the State of Iowa, is headquartered in Iowa, and is registered and in good standing with the Georgia Secretary of State.

67.   Bankers Life underwrites variable annuities for AEGON USA.

68.   Defendant AUSA Life Insurance Company, Inc. ("AUSA Life") is an indirect, wholly-owned subsidiary of AEGON USA.

69.   AUSA Life is domiciled in the State of New York and is registered and in good standing with the Georgia Secretary of State.

70.   AUSA Life markets annuities for AEGON USA.

71.   Defendant AEGON Financial Services Group, Inc. ("AEGON Financial") is an indirect, wholly-owned subsidiary of AEGON USA.

72.   AEGON Financial is organized under the laws of the State of Minnesota and transacts business throughout the United States, including the State of Georgia, through its operating company subsidiaries.

73.   AEGON Financial distributes and markets fixed and variable annuities for AEGON USA.  AEGON Financial focuses on serving major financial

17

institution accounts.

74.    All of the AEGON-related defendants (meaning all defendants other than WMAS and World Money Group), shall be referred to collectively as the "AEGON Defendants".

75.    All defendants will be referred to collectively as the "defendants."

76.    The AEGON Defendants are inextricably intertwined with each other.

77.    All written materials used in connection with the sale of the AEGON Defendants' insurance annuity products to the public, are developed, approved, and disseminated by the AEGON Defendants.

78.    AEGON USA refers to its subsidiaries as "operating divisions."

79.    The AEGON Defendants collectively conduct business in all 50 states including the State of Georgia.

80.    The variable annuity products at issue here are sold throughout the United States including within the State of Georgia.

## CLASS ACTION ALLEGATIONS

81.    Plaintiffs bring this action on behalf of themselves and all others

18

similarly situated as a class action pursuant to Federal Rules of Civil Procedure

23(a) and 23(b)(3) on behalf of the following Class:  a Class consisting of all

persons who, from October 1, 1998 through October 1, 2001 inclusive, purchased

an individual deferred annuity contract or who received a certificate to a group

deferred annuity contract: issued, underwritten, marketed or sold, either by, or

directly or indirectly on behalf of, any of the AEGON Defendants (so long as the

issuer or underwriter is a direct or indirect subsidiary of AEGON USA, but

irrespective of whether the issuer or underwriter is a named defendant herein)

which was used to fund a contributory (not defined benefit) retirement plan or

arrangement qualified for favorable income tax treatment pursuant to Internal

Revenue Code sections 401(a), 401(k), 403(a), 403(b), 408(a), 408(b), 408(k),

408(p), 408A, or 457.  Excluded from the class are defendants, subsidiaries or

parent companies of AEGON USA, officers and directors of the defendants,

members of their immediate families, their legal representatives, heirs, successors

or assigns, and any entity in which any of the defendants or any excluded person

has a controlling interest.

      82.    The Class is composed of at least thousands of individuals, the

joinder of whom in one action is impracticable, and the disposition of their claims

in a class action will provide substantial benefits both to the parties and the Court.

83.     This action is properly maintainable as a class action for the following reasons:

(a)     The class consists of at least thousands of people and is thus so numerous that joinder of all members is impracticable.

(b)     There is a well-defined community of interest among class members in the questions of law or fact affecting the class which predominate over questions affecting only individual members.  Those common questions include but are not limited to:

(i)     Whether defendants violated the federal securities law through the acts alleged herein and harmed the members of the Class;

(ii)     Whether each defendant participated in the course of conduct complained of herein;

(iii)     Whether each defendant profited by the wrongful conduct alleged herein;

(iv)     Whether plaintiffs and other members of the class have sustained damages, and the proper measure of damages;

(v)     Whether plaintiffs and other members of the class

are entitled to the injunctive and declaratory relief requested herein.

      (c)    The claims asserted by plaintiffs are typical of the claims of class members.

      (d)    Plaintiffs are members of the Class and will fairly and adequately protect the interests of the class. They have no interests antagonistic to those of the other class members. Plaintiffs have retained as counsel attorneys who are knowledgeable and experienced in securities litigation and in insurance industry trade practices and sales methods, as well as class and complex litigation.

      (e)    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

      (i)    Given the size of individual class members' claims, most class members could not afford to seek legal redress individually for the wrongs the defendants committed against them;

      (ii)    When defendants' liability has been adjudicated, claims of all class members can be determined by the Court;

      (iii)    This action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense

and ensure uniformity of decisions;

(iv)   Without a class action, many class members would continue to suffer damages, and defendants' violations of law will be without redress while defendants continue to reap and retain the substantial proceeds of their wrongful conduct; and

(v)   This action does not present any undue difficulties that would impede its management by the Court as a class action.

(vi)   The names and addresses of the members of the Class can be ascertained from the books and records of defendants or its agents. Plaintiffs seek damages, including but not limited to rescissory damages, including the return of the fees and charges paid by plaintiffs and other members of the class. Plaintiffs also seek injunctive relief prohibiting defendants from continuing to engage in such practices and from charging surrender fees (or contingent deferred sales charges) to any class member terminating a deferred variable annuity contract, and otherwise, as described below.

## DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS

84.   The defendants had a duty to the Class to disseminate written offering documents that did not contain material misstatements, and to disclose all

22

information about the variable annuities that would be material to the Class in determining whether to purchase the variable annuities.

85.     The National Association of Securities Dealers considers communications with the public about variable annuities to be so important, and unique, that in 1994 it adopted a specific rule concerning such communications entitled "Communications with the Public About Variable Life Insurance and Variable Annuities." NASD Conduct Rule IM-2210-2.

86.     Thereafter, in 1996, the NASD issued NASD Notice to Members 96-86, entitled "NASD Regulation *Reminds* Members and Associated Persons that Sales of Variable Contracts Are Subject to NASD Suitability Requirements" (emphasis added), which reiterated that the sale of variable annuities raised particularized concerns.

87.     In May 1999, the NASD issued NASD Notice to Members 99-35, entitled "The NASD *Reminds* Members of Their Responsibilities Regarding the Sales of Variable Annuities" (emphasis added), which expressly stated:

> When a registered representative recommends the purchase of a variable annuity for any tax-qualified retirement account (*e.g.*, 401(k) plan, IRA), the registered representative should disclose to the customer that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that **the tax deferred accrual feature of**

23

**the variable annuity is unnecessary**. . . .

**The registered representative should recommend a variable
annuity only when its other benefits, such as lifetime income
payments, family protection through the death benefit, and
guaranteed fees, support the recommendation.** (at 231 nos. 11, 16)
(emphasis added).

88.    According to Notice to Members 99-35, its requirements

"represent a compilation of industry practices in the supervision of the sale of

variable annuities." (at 230).

89.    In addition, NASD Rule 2210 (Communications with the

Public) provides, in pertinent part, that:

(d)    Standards Applicable to Communications with the Public

(1)    General Standards

(A) All member communications with the public shall be based
on principles of fair dealing and good faith and should provide a
sound basis for evaluating the facts in regard to any particular
security or securities or type of security, industry discussed, or
service offered. No material fact or qualification may be
omitted if the omission, in the light of the context of the material
presented, would cause the communication to be misleading.

(B) Exaggerated, unwarranted or misleading statements or
claims are prohibited in all public communications of members.
In preparing such communications, members must bear in mind
that inherent in investment are the risks of fluctuating prices and
the uncertainty of dividends, rates or return and yield, and no
member shall, directly or indirectly, publish, circulate or

distribute any public communication that the member knows or
has reason to know contains any untrue statement of a material
fact or is otherwise false or misleading.

90.    The NASD notices and rules concerning variable annuities cited

to or quoted from are incorporated herein by reference.

91.    The NASD rules concerning variable annuities apply to

wholesalers (who are the underwriters of the variable annuities) as well as retailers

of variable annuities. (Notice to Members 99-35 at no. 16).

92.    The NASD began issuing the Conduct Rules and Notices to

Members concerning variable annuities because there was ever-increasing

misconduct by issuers, underwriters and sellers of variable annuities.

93.    This misconduct included the sale of tax-deferred variable

annuities for already tax-deferred retirement accounts without notifying prospective

purchasers that purchasing a variable annuity for an already tax-qualified retirement

plan does not provide any additional tax advantage to those available through the

already tax-qualified retirement plan.

94.    The NASD did not change its position on the sale of tax-

deferred variable annuities for already tax-deferred retirement accounts (that is,

even before it began issuing these Rules and Notices, the NASD believed that a

material issue which should be disclosed to potential purchasers prior to their

purchase was that purchasing a variable annuity for an already tax-qualified

retirement plan did not provide any additional tax advantage to those available

through the already tax-qualified retirement plan.  See titles of Notice 96-86

("NASD Regulation Reminds Members and Associated Persons that Sales of

Variable Contracts Are Subject to NASD Suitability Requirements"; emphasis

added) and Notice 99-35 ("The NASD Reminds Members of Their Responsibilities

Regarding the Sales of Variable Annuities"; emphasis added).

   95.    On May 23, 2000, the Securities and Exchange Commission's

Division of Investment Management hosted an industry conference on investment

adviser regulatory issues.  A panel discussion concerning conflict of interest issues

was held.  The Moderator was Robert E. Plaze, the SEC Associate Director for the

Division of Investment Management.  Other participants on the panel included Guy

M. Cumbie, President-Elect, the Financial Planning Association and Susan

MacMichael John, Government Affairs Liaison, National Association of Personal

Financial Planners.  A relevant excerpt from their discussion follows:

> Moderator Plaze:  Our third topic deals with an area where our
> colleagues are involved in the financial planning process, dealing with
> transaction based fees. . . .

26

Moderator Plaze: This is a real serious problem in some ways. I don't want to besmirch the profession in general because I think there is always bad apples. <u>This is an area that is particularly harmful. When you are planning for a retirement and you're put into something. Let's say in [sic] the problem in the 80's was limited partnerships. That just blew up. Our examiners go in and they look in and they wonder why was this person put into that. The only explanation is, they're paying out an awful a lot more than the mutual funds. Today we are looking at similar things and we are saying, why would you put a variable annuity in a tax-advantaged plan. The only explanation our examiners walk away with is, they are a bigger pay out than a mutual funds.</u> The disclosures have been the traditional answer. Doesn't disclosure [by the retail financial planner], if properly affected, interfere with the relationship between a planner and its client. If the first thing your telling your client is, you have to watch me very carefully because I have all sorts of incentives. How do you deal with that with a client?  .
. . .

<u>When we go into financial planners' offices and we see things in accounts like the variable annuity in a taxed advantaged account. We really don't have the tools at that Commission to deal with that. Is it fraud?</u> How do you think we should deal with that? Is there a problem? Is this something that maybe a SRO could do or could deal with better than the SEC could? . . . .

Ms. John:  <u>I personally can't even imagine a justification for that.</u> . . .

Mr. Cumbie: I'm thinking a little bit in line with what Susan just suggested, realizing that I am surrounded by a bunch of institutional peers. <u>It seems like at a higher level is where that might be better approached, from the product manufacture[r]s.</u>  Securities and Exchange Commission, Division of Investment Management, SEC Roundtable on Investment Adviser Regulatory Issues, at pages 3, 64, 66-68 (when printed in HTML) (May 23, 2000) (emphasis added).

96.    Despite the NASD "*Reminders*", which in and of themselves

constituted a duty to disclose, the AEGON Defendants' (who are the "product manufacturers" here) prospectuses, statements of additional information (each an "SOAI") and other documents contained no such disclosures.

97.    Even if NASD notices and regulations do not constitute an express duty to disclose, the NASD would not have required that each of these facts be disclosed unless it thought each of these facts was "important" to the investment decision and would significantly alter the total mix of facts available to an investor.

98.    Defendants had a second independent duty to disclose under SEC Form N-4, which contains the prospectus requirements for variable annuities. Form N-4 states under the heading for Item J, "Preparation of the Registration Statement or Amendment (at 3):

> The purpose of the prospectus is to provide essential
> information about the Registrant in a way that will help investors
> decide whether to purchase the securities being offered. The
> prospectus should be clear, concise and understandable. . . .
> Responses to the items of Part A should be as simple and direct as
> possible and include only information needed to understand the
> essential characteristics of the Registrant.

99.    Further, under the heading Part A, "Information Required in Prospectus, Form N-4 states:

**Item 1. Cover Page**
(a) The outside cover page must contain the following information: . .
. .
(v) a statement or statements that: (A) the prospectus sets forth the information about the Registrant that a prospective investor ought to know before investing. . .

**Item 12. Taxes.**

(a) Briefly describe the tax consequences to investors of an investment in the variable annuity contracts being offered. . . . Instruction: . . . . If the tax consequences vary depending on the use of the variable annuity contract (i.e., to fund an individual retirement annuity or corporate plan), the variations should be briefly described.

100.   Third, even apart from the existence of the NASD Rules and

Notices and Form N-4, each of the undisclosed facts was material.

101.   Defendants had a number of virtually identical written

documents -- including registration statements, prospectuses, and statements of

additional information -- for variable annuities in effect during the Class Period,

which defendants used to sell the variable annuities to prospective purchasers.

102.   These written materials contained material misstatements and

material omissions under the NASD rules and Notices, under Form N-4 and under

general, federal securities law.

103.   Defendants selected as targets for their sales campaign persons

29

interested in funding qualified retirement plans. Sales of deferred annuities for

qualified retirement plans, based upon these uniform, written documents, have been

and continue to be an enormous marketing success for defendants. Defendants

have received and continue to receive millions, and probably billions, of dollars

from the sales of deferred annuities for qualified retirement plans, which sales were

predicated upon the materially misleading written documents.

104.   The prospectuses and statements of additional information were

written by the AEGON Defendants and contain on them the name and/or logo of

one or more of the AEGON Defendants.

105.   Since under federal law a variable annuity is always sold

pursuant to a prospectus, defendants were required to give a prospective purchaser a

prospectus prior to any purchase. (That prospectus either would contain or would

incorporate by reference the registration statement and the statement of additional

information.)

106.   Each of the uniform, written prospectuses and statements of

additional information, which are incorporated herein by reference, contained the

same or similar material misstatements (in essentially identical language), omitted

to state a material fact required to be stated therein, or failed to disclose certain

material facts necessary to make the statements therein not misleading, to plaintiff and the class members or their employers (who were prospective purchasers of the variable annuities at issue here).

107.   Defendants directly or by inference state that a tax-deferred variable annuity was, generally, an appropriate investment for placement in an already tax-deferred retirement account, such as an IRA or 401(k).

108.   The material misstatements included the following excerpt from a typical prospectus used during the Class Period:

> . . . . This Contract is available to individuals as well as to certain groups and individual retirement plans. . . .
>
> WHO SHOULD PURCHASE THE CONTRACT? We have designed this Contract for people seeking long-term tax deferred accumulation of assets, generally for retirement. This includes persons who have maximized their use of other retirement savings methods, such as 401(k) plans and individual retirement accounts. The tax-deferred feature is most attractive to people in high federal and state tax brackets. You should not buy this Contract if you are looking for a short-term investment or if you cannot take the risk of getting back less money than you put in. If you are purchasing the Contract through a tax-favored arrangement, including traditional IRAs and Roth IRAs, you should consider carefully the costs and benefits of the Contract (including annuity income benefits) before purchasing the Contract, since the tax-favored arrangement itself provides tax-sheltered growth. . . .
>
> INITIAL PURCHASE REQUIREMENTS  The initial purchase

*payment for nonqualified Contracts must be at least $5,000. However,* you may make a minimum initial purchase payment of $1,000, rather than $5,000, if you indicate on your application that you anticipate making minimum monthly payments of at least $100 by electronic funds transfer. For traditional or Roth IRAs, the minimum initial purchase payment is $1,000 and for qualified Contracts other than traditional or Roth IRAs, the minimum initial purchase payment is $50. . . .

QUALIFIED AND NONQUALIFIED CONTRACTS

If you purchase the [variable annuity] Contract under an individual retirement annuity, a 403(b) plan, 457 plan, or pension or profit sharing plan, your Contract is referred to as a qualified Contract.

If you purchase the Contract as an individual and not under a qualified Contract, your Contract is referred to as a nonqualified Contract.

Because variable annuity contracts provide tax deferral whether purchased as a qualified Contract or nonqualified Contract, you should consider whether the features and benefits unique to variable annuities are appropriate for your needs when purchasing a qualified Contract.

A qualified Contract may be used in connection with the following plans:

• Individual Retirement Annuity (IRA): A traditional IRA allows individuals to make contributions, which may be deductible, to the Contract. A Roth IRA also allows individuals to make contributions to the Contract, but it does not allow a deduction for contributions. Roth IRA distributions may be tax-free if the owner meets certain rules.

• Tax-Sheltered Annuity (403(b) Plan): A 403(b) plan may be made available to employees of certain public school systems and tax-exempt organizations and permits contributions to the Contract on a pre-tax basis.

• <u>Corporate Pension and Profit-Sharing and H.R. 10 Plans:</u> Employers and self-employed individuals can establish pension or profit-sharing plans for their employees or themselves and make contributions to the Contract on a pre-tax basis.

• <u>Deferred Compensation Plan (457 Plan):</u> Certain governmental and tax-exempt organizations can establish a plan to defer compensation on behalf of their employees through contributions to the Contract. (WRL Freedom Wealth Creator, prospectuses of May 1, 2000 at unnumbered first page, 7, 16, 28-29 and of May 1, 2001, at unnumbered first page, 6, 14, 23).

109.    According to the AEGON Defendants, lead plaintiff Johnson purchased his variable annuity under this May 1, 2000 prospectus.

110.    The above quoted excerpt from the prospectuses is a material misstatement because it directly or by inference recommended a tax-deferred variable annuity as generally appropriate for a tax-deferred retirement account.

111.    The above prospectus excerpt also directly or by inference recommended a tax-deferred variable annuity as generally appropriate for a tax-deferred retirement account by having a significantly lower initial purchase requirement of $1,000 for IRAs and other tax-deferred accounts rather than the minimum $5,000 requirement for non-qualified accounts.

112.    The prospectuses and statements of additional information also omitted to state material facts required to be stated therein or failed to disclose

certain material facts necessary to make the statements therein not misleading

(pursuant to the NASD Notices or otherwise) to plaintiffs and the class members or

their employers (who were prospective purchasers of the variable annuities at issue

here). These material omissions included the following.

113. Defendants failed to "disclose to the customer that the tax

deferred accrual feature is provided by the tax-qualified retirement plan and that the

tax deferred accrual feature of the variable annuity is <u>unnecessary</u>." (emphasis

added).

114. Defendants failed to disclose that the tax-deferred variable

annuities are almost always inappropriate investments for placement into the

purchasers' tax-deferred qualified retirement plans.

115. Defendants failed to disclose that a tax-deferred variable annuity

should not be recommended for a tax-deferred retirement account unless "its other

benefits, such as lifetime income payments, family protection through the death

benefit, and guaranteed fees, support the recommendation."

116. Defendants failed to disclose that a tax-deferred variable annuity

should not be purchased for a tax-deferred retirement account unless "its other

benefits, such as lifetime income payments, family protection through the death

benefit, and guaranteed fees, support the" purchase.

117.   Defendants failed to disclose that the purchase of a tax-deferred

annuity in an already tax-deferred retirement account almost always increases the

total amount paid by the investor (to the issuers, underwriters and sellers) while

providing only the same or lesser tax benefits to the investor.

**Incorporation of the AEGON Defendants' SEC Filings**

118.   The AEGON Defendants issued the following SEC filings,

which the defendants used to sell the variable annuities at issue here to plaintiffs

and other members of the Class.

119.   Plaintiffs incorporate herein by reference the following uniform,

written materials (prospectuses, statements of additional information, registration

statements and amendments, and other writings, and any document incorporated by

them) which were routinely used to sell the variable annuities at issue.

120.   Concerning the WRL Series Annuity Account (CIK

0000841056), all SEC filings used to sell the WRL Series Annuity Account are

incorporated by reference.  These include but are not limited to:  (1) WRL

Bellwether Variable Annuity (Prospectuses and Statements of Additional

Information dated May 1, 1998, May 1, 1999, May 1, 2000, and May 1, 2001);  (2)

WRL Freedom Attainer Variable Annuity (Prospectuses and Statements of Additional Information dated May 1, 1998, May 1, 1999, May 1, 2000, and May 1, 2001); (3) WRL Freedom Conqueror Variable Annuity (Prospectuses and Statements of Additional Information dated May 1, 1998, May 1, 1999, May 1, 2000, and May 1, 2001); (4) WRL Freedom Variable Annuity Variable Annuity (Prospectuses and Statements of Additional Information dated May 1, 1998, May 1, 1999, May 1, 2000, and May 1, 2001); (5) WRL Freedom Wealth Creator Variable Annuity (Prospectuses and Statements of Additional Information dated May 1, 1998, May 1, 1999, May 1, 2000, and May 1, 2001); (6) WRL Freedom Premier Variable Annuity (Prospectuses and Statements of Additional Information dated October 8, 1999, May 1, 2000, and May 1, 2001); (7) WRL Freedom Access Variable Annuity (Prospectuses and Statements of Additional Information dated November 9, 1999, May 1, 2000, and upon information and belief May 1, 2001); (8) WRL Freedom Enhancer Variable Annuity (Prospectuses and Statements of Additional Information dated May 17, 2000, and May 1, 2001); and (9) WRL Freedom Select Variable Annuity (Prospectuses and Statements of Additional Information dated September 15, 2000, and May 1, 2001).

    121.   Concerning the WRL Series Annuity Account B (CIK

0000906320), all SEC filings used to sell the WRL Series Annuity Account B are incorporated by reference.  These include but are not limited to:  Janus Retirement Advantage Variable Annuity (Prospectuses and Statements of Additional Information dated May 1, 1998; May 1, 1999; May 1, 2000; and May 1, 2001 as supplemented July 31, 2001).

122.    PFL issued variable annuities which are the subject of this action.

123.    Concerning PFL's variable annuities, all SEC filings used to sell the PFL issued variable annuities are incorporated herein by reference.  These include all prospectuses and other filings in (at least) the following CIK accounts: PFL Endeavor Target Account (CIK 0001046201); Retirement Builder Variable Annuity Account (CIK 0001016809); Separate Account VA A (CIK0001034624); Separate Account VA B (CIK 0000859607); Separate Account VA C (CIK 0001034621); Separate Account VA D (CIK 000103622); Separate Account VA E (CIK 000103623); and Separate Account VL A/IA (CIK 0000945412.

124.    Upon information and belief, Transamerica Life Insurance and Annuity Company issued variable annuities which are the subject of this action. Transamerica Life Insurance and Annuity Company does not have its own listing in

the SEC EDGAR database.  All relevant CIK numbers, prospectuses and other

offering documents are incorporated herein by reference.

125.   Concerning the WRL Series Fund, Inc. (CIK 0000778207), all

SEC filings used to sell the WRL Series Fund are incorporated by reference.  These

include but are not limited to:  Prospectus and Statement of Additional Information

(both dated May 1, 1998 and filed pursuant to Registration Statement); Prospectus

and Statement of Additional Information (both dated May 1, 1999); Prospectus as

supplemented September 10, 1999; Prospectus and Statement of Additional

Information (both dated May 1, 2000); Prospectus and Statement of Additional

Information (both as supplemented and amended as of August 30, 2000);

Prospectus and Statement of Additional Information (both dated December 1,

2000); Prospectus and Statement of Additional Information (both dated May 1,

2001); Registration Statement Under The Securities Act Of 1933, Post-Effective

Amendment No. 45 and Registration Statement Under The Investment Company

Act Of 1940, Amendment No. 46 (both filed and effective on May 1, 2001);

Registration Statement Under The Securities Act Of 1933, Post-Effective

Amendment No. 46 and Registration Statement Under The Investment Company

Act Of 1940, Amendment No. 47 (both filed May 2, 2001); Registration Statement

Under The Securities Act Of 1933, Post-Effective Amendment No. 47 and

Registration Statement Under The Investment Company Act Of 1940, Amendment

No. 48 (both filed July 13, 2001 and effective July 16, 2001); and Prospectus

supplement of August 27, 2001.

      126.   The prospectuses issued by the AEGON Defendants have

different names simply as marketing tools. The disclosures for variable annuities,

some of the written sales presentation materials disseminated with respect to certain

prospectuses, and the contracts given to each purchaser, do not necessarily identify

or identify correctly the particular prospectus which was given to the prospective

purchaser since name is merely a marketing tool and in many instances the invested

funds are put into the exactly the same subaccount/portfolios. (Accordingly, there

are additional prospectuses which are not readily identifiable because of defendants'

marketing terminology, and they are incorporated herein by reference.

      127.   Upon information and belief, there also are prospectuses which

are not available on the SEC's EDGAR Internet website.)

**Additional Uniform, Written Documents Disseminated**
**By Defendants Which Were Materially Misleading**

      128.   Prospective purchasers of the variable annuities routinely also

were given (and had to sign when purchasing) a document from WRL entitled
"Disclosure for Variable Annuities" which contained the same material
misstatements and/or material omissions. Such uniform disclosure for variable
annuities, signed by Mr. Johnson, is Exhibit 2 hereto and incorporated herein.

129.    Prospective purchasers of defendants' variable annuities
routinely also were given a document from WRL entitled "Disclosure Statement
and Application Supplement for Individual Retirement Annuity Flexible Payment
Variable Accumulation Deferred Annuity Contract" which contained the same
material misstatements and/or material omissions. A copy of such document, given
to Mr. Johnson, is Exhibit 3 hereto and incorporated herein by reference.


## DAMAGES

130.    As a direct result of defendants' misconduct, plaintiffs and other
members of the class also have paid commissions, fees and charges in excess of
what they would have paid for appropriate investments placed in an already  tax
qualified retirement plan. The damages suffered by class members include but are
not limited to the following.

131.    The initial costs and carrying costs of the already tax-deferred

retirement arrangements were materially lower than the initial costs and carrying

costs for the purchase of variable annuities.

132.    Sales commissions paid to those who sell deferred annuities are

at least <u>two to three times higher</u> than the commissions paid on pure investment

products, such as mutual funds or individual securities -- thus motivating

defendants' to target the qualified retirement plan market for selling defendants'

deferred annuity products.

133.    The mortality insurance features were optional, extra cost items

not necessary for qualified plan retirement investors to achieve a tax-favored basis

for their investment.

134.    Indeed, the mortality and expense charge itself could be

approximately 1.40%, or more, <u>annually</u>, which could easily exceed the <u>one-time</u>

<u>cost</u> to purchase individual stocks or mutual funds.

135.    The insurance features of their deferred annuities provided no

benefit or economic value except in the highly remote circumstances of a severe

and sudden market collapse of enormous proportions.  Moreover, the benefits of

annuitization can be obtained by any person at any time as an immediate annuity,

and the lock-in of a minimum annuitization rate offered by a deferred annuity at the

41

inception of the contract can have value only if human life expectancy dramatically increased during the annuity's investment phase, the likelihood of which is remote.

136.   When present, the death benefits could be purchased far more economically through a normal term life insurance policy. Moreover, the death benefit insurance feature is rarely invoked, because few of the contracts surrendered due to death during their investment phase involve losses that result in payment of any meaningful death benefit (i.e., investment losses depleting the account value to less than the principal amount invested).

137.   Deferred annuities also have back-end loads, or "surrender fees," which are assessed in the event that the contract owner elects to withdraw invested funds prior to the expiration of a contractually specified period. The fees are calculated as a percentage of the withdrawn funds and typically amount to 6 to 9 percent if the "surrender" occurs in the first year and on a declining scale thereafter for 7 to 10 years. With many contracts, the surrender fee period begins anew for each additional investment of principal after the initial investment. The surrender fees are an inherently unreasonable and excessive annuity fee. In some instances, the surrender fees are called a "contingent deferred sales charge," in which case the charge is calculated as a percentage of the funds invested.

138.    With respect to the fixed-rate account option in a variable

annuity, the exact amount of the insurer's fee for that annuity is generally the spread

between the return on general account investments (the return on the consumer's

invested funds) and the interest rate credited to contract owners.  These fees are

usually substantial, often 2 to 3 percent of the total account value annually.

139.    With a variable annuity, the annuity fees are typically in the

form of annual asset-based percentage charges assessed against the contract owner's

account value. These fees are in addition to the asset-based investment management

fees assessed by the managers of the investments.  The two major asset-based

annuity fees are the daily "mortality and expense-risk" (M&E) charge, which

averages 1.25 percent annually according to industry surveys, and the daily

"administration" charge, an additional 0.15 percent annually.

140.    In addition, a policy maintenance charge of $25 to $40 is

assessed annually against annuity accounts.

141.    Purchasing a tax-deferred variable annuity for a tax-deferred

IRA also requires the investor to incur, under federal law, forced withdrawals from

the IRA beginning at age 70 1/2.  Thus, for example, if the surrender fee period

were eight years, if someone 64 years old or older purchased a tax-deferred variable

43

annuity for a tax-deferred IRA, they would have to pay to defendants a surrender

fee on the amount(s) withdrawn each year (beginning at age 70 1/2) pursuant to the

mandatory forced withdrawal, and then they also would pay taxes on the amounts

withdrawn from the IRA.  Upon information and belief, they would have to pay

taxes on the amounts relinquished to defendants as a surrender fee, even though

they did not receive it, because it was part of the IRA-related forced withdrawal.

142.   The annuity fees collected by defendants are so high in part

because of the high commission rates defendants pay salespersons for the selling of

the deferred annuities.  If an annuity purchaser decides to terminate his or her

investment within the first six or eight years -- i.e., before defendants have had a

chance to collect enough in annual annuity fees to cover the sales commission paid

to the agent -- the additional surrender fee provides defendants with funds to cover

the full amount of commissions.  As a result, plaintiffs and the class members are

trapped: by the time they realize they are paying exorbitant annual asset-based

annuity fees out of their retirement accounts for unwanted "insurance" features

which are in fact hidden sales charges, the only way they can extract themselves

from the arrangement is to pay a further large asset-based surrender fee, which is

used to finance the compensation of the agent that recommended the inappropriate

deferred annuity investment in the first place.

143.   The compound effect (which also was not disclosed) of these unreasonable and excessive annuity fees, commissions and charges, paid by class members for defendants' tax-deferred variable annuities, over the course of a few decades -- not counting any surrender fees -- can consume as much as one-third of a retirement investor's account value compared to a regular investment.

**Plaintiff Johnson's Damages**

144.   On July 10, 2000, when he first purchased the WRL "Wealth Creator" variable annuity for his IRA, Mr. Johnson invested $48,863.75.

145.   The money he used to fund the purchase of the variable annuity came from his 401(k) plan at his prior employer.

146.   At the time this lawsuit was filed on October 1, 2001, Mr. Johnson's variable annuity was worth $20,174.03, which was substantially less than when he bought it.

147.   His annuity contract also states that he was to pay a $35.00 annual contract charge and a mortality and expense charge of 1.40% annually.

148.   WRL made the annual fee deductions (and possibly the other charges) by selling shares from Mr. Johnson's account.   Thus, the value of his

45

account declined as a direct result of these charges.

149.   Part of the decrease in Mr. Johnson's variable annuity was caused by the fees and charges which WRL charged to his variable annuity account and part of the decrease was caused by the decrease in the market value of the variable annuity portfolios.  In both instances, Mr. Johnson was damaged by defendants' wrongful conduct which caused him to purchase the variable annuity in the first place.

## Plaintiff Hughes' Damages

150.   Ms. Hughes' total variable annuity purchases were $2,989.94.

151.   On October 11, 2001, at about the time when this lawsuit was filed, the value of her annuity was $1,863.23.

152.   Ms. Hughes surrendered her variable annuity in or about April, 2002.  According to an April 29, 2002 statement she received from WRL, the net surrender amount she received was $1,646.80.

153.   Her prospectus stated that she was to pay a surrender fee of between 6% and 8%, depending upon the time which had elapsed from these purchases.

154.   Ms. Hughes' annuity contract also states that she was to pay a

$35.00 annual contract charge and a mortality and expense charge of 1.40%
annually.  WRL made the annual fee deductions (and possibly the other charges) by
selling shares from her account.  Thus, the value of her account declined as a direct
result of these charges.

155.   Part of the decrease in her variable annuity was caused by the
fees and charges which WRL charged to her variable annuity account and part of
the decrease was caused by the decrease in the market value of the variable annuity
portfolios.  In each instance, Ms. Hughes was damaged by defendants' wrongful
conduct which caused her to purchase the variable annuity in the first place.

**Plaintiff Gerin's Damages**

156.   Ms. Gerin's total investment in the variable annuity was
$5,323.75.

157.   On September 30, 2001, as this lawsuit was being filed, Ms.
Gerin's variable annuity was worth approximately $3,674, which was less than her
total investment of $5,323.75.

158.   During the whole time period Ms. Gerin has owned the variable
annuity, including at the end of the year for each the years 1998, 1999, 2000, and
2001, an annual charge of $35 was deducted from her account each year.  WRL

47

made these deductions by selling shares from her account. Thus, the value of her account declined as a direct result of these charges.

159.  Part of the decrease in her variable annuity was caused by the fees which WRL charged to her variable annuity account and part of the decrease was caused by the decrease in the market value of the variable annuity portfolios.

160.  In mid-October 2001, Ms. Gerin surrendered her variable annuity. She received $3,860.17. She was charged a surrender fee of $307.35.

161.  In each instance, Ms. Gerin was damaged by defendants' wrongful conduct which caused her to purchase the variable annuity in the first place.

162.  This action was brought within the statute of limitations by the lead plaintiff and by each additional plaintiff/class representative; that is, within three years after their respective cause of action accrued upon purchase of the variable annuity, and within one year after their respective discovery of the material misstatements and material omissions.

163.  Mr. Johnson learned about the material misstatements and omissions made to him in the following manner. Mr. Johnson had purchased a variable universal life insurance policy ("VUL") from defendant WRL (in addition

48

to the variable annuity which is the subject of this lawsuit).  The broker-dealer

through which he purchased both the VUL and the variable annuity was defendant

WMAS.

164.   In the last half of September 2000, he had the physical exam for

the VUL policy.  At that time, he also heard that WMAS had been accused of using

high-pressure sales tactics.  He then researched WMA and in so doing he learned

that WMA had been accused of being a pyramid scheme and he found disturbing

information about VUL policies.

165.   Toward the end of September, 2000, Mr. Johnson arranged a

meeting with representatives of the Georgia Department of Insurance at his office to

discuss his concerns about VUL policies and WMA.

166.   On October 2, 2000, Mr. Johnson met with Mr. Richard J.

Whalan and Mr. Douglas Gaddis, representatives of the Georgia Department of

Insurance.

167.   In addition to the VUL policy concerning which he arranged

this meeting, Mr. Johnson had also purchased from WRL the variable annuity

which is the subject matter of this lawsuit.  During the course of the October 2,

2000 meeting, he gave Mr. Whalan and Mr. Gaddis all the documentation he had

received from WRL and WMAS.

168.   Messrs. Whalan and Gaddis reviewed this documentation and then told Mr. Johnson that:  He was improperly sold the variable annuity for his IRA; he should mail a certified letter to WMAS demanding immediate reversal of the annuity, with the balance to be placed in cash in an IRA so that he could roll it over to another IRA; and he should state in the letter that he was aware he was sold the annuity through misrepresentation.

169.   Prior to this October 2, 2000 meeting, Mr. Johnson had not been aware that he even had a problem with the WRL variable annuity.

170.   Ms. Gerin and Ms. Hughes each learned that they might have a legal problem concerning their variable annuity purchase when they each were told that purchasing a tax-deferred variable annuity for an already tax-deferred retirement account was "a dog."  Ms. Gerin and Ms. Hughes each were told that this type of investment was a "dog" after this lawsuit was started on October 1, 2001. The reason each of them believes that they learned this information after October 1, 2001 is that learning this information caused them to promptly research variable annuity issues, and each of them recalls that they researched such issues after Thanksgiving, 2001 and into December, 2001.

171.   No events occurred prior to these respective dates which put each of the respective (lead) plaintiffs on notice of his or her claims.

## NO SAFE HARBOR

172.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Consolidated Complaint.  None of the allegedly false statements are forward-looking statements and none of the specific statements pleaded herein were identified by the AEGON Defendants as "forward-looking statements" when made.

## FIRST CLAIM FOR RELIEF
### For Violation of § 11 of the Securities Act and
### for Control Person Liability Under § 15 of the Securities Act

173.   Plaintiffs incorporate paragraphs 1-172 as if fully set forth herein.

174.   Plaintiffs do not allege that the material omissions and misstatements set forth herein were made intentionally or recklessly by defendants.  Rather, the conduct alleged herein was innocent, negligent or grossly negligent.

175.   The defendants in this claim under Section 11 of the Securities Act are AEGON USA, WRL, WRL Series Fund, PFL, Transamerica Life Insurance

and Annuity Company, AFSG Securities and Bankers Life.

176.   AEGON USA through its wholly-owned subsidiaries, whether directly or indirectly owned, as "operating divisions," was an issuer of the variable annuities.

177.   WRL, WRL Series Fund, PFL, and Transamerica Life Insurance and Annuity Company are issuers of the variable annuities.

178.   AFSG Securities and Bankers Life are underwriters of the variable annuities.

179.   The defendants participated in the preparation of, issued, caused to be issued and/or participated in the issuance of the registration statements, prospectuses and SOAIs, each of which was inaccurate and contained material misstatements; omitted to state a material fact required to be stated therein, or failed to disclose certain material facts necessary to make the statements therein not misleading, as set forth herein.

180.   Plaintiffs allege that all statutory affirmative defenses available to only underwriter defendants under Sections 11 and 12 (concerning which the defendant underwriter bears the burden of proof) are not available to the underwriter defendants in this action because all underwriter defendants herein are

"captive" underwriters, inextricably entwined with their issuers because all are wholly-owned, directly or indirectly, by AEGON USA. Further, even if available to the underwriter defendants, they are affirmative defenses which those defendants must plead and prove and which plaintiffs need not allege. Nevertheless, plaintiffs address the underwriter affirmative defenses below.

181.   None of the underwriter defendants made a reasonable investigation and possessed reasonable grounds to believe and did believe that the statements contained in the registration statements, prospectuses and SOAIs were true, without omissions of any material facts and were not misleading.

182.   Each of the underwriter defendants assisted in the preparation of the registration statements, prospectuses, and SOAIs, and were required to investigate with due diligence the representations contained therein to confirm that they did not contain material misstatements or omit to state material facts. Each of the underwriter defendants did not perform this investigation with due diligence. (Indeed, each underwriter defendant had a substantial direct interest in the success of the offering, as detailed above.)

183.   Each of the underwriter defendants, as the result of engaging in the routine conduct of their business or through common sense, was negligent

(without limitation) as follows:

(a) In not knowing that their misstatements and omissions were material;

(b) In not knowing that there was no additional tax benefit from purchasing a tax-deferred variable annuity for an already tax-deferred retirement account.

(c) In not knowing that the deferred annuities sold by defendants are generally not appropriate investments, and are almost always inappropriate investments, for placement in tax-deferred retirement plans.

(d) In not knowing that a tax-deferred variable annuity placed in an already tax-deferred retirement account generally was not an appropriate investment, under the NASD regulations and Notices, or otherwise.

(e) In not knowing that a tax-deferred variable annuity should not be recommended for a tax-deferred retirement account unless "its other benefits, such as lifetime income payments, family protection through the death benefit, and guaranteed fees, support the recommendation."

(f) In not knowing that a tax-deferred variable annuity should not be purchased for a tax-deferred retirement account unless "its other benefits, such as

54

lifetime income payments, family protection through the death benefit, and guaranteed fees, support the" purchase.

(g) In not knowing that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary.

(h) In not knowing that the compound effect of the unnecessary unreasonable and excessive commissions, fees and charges paid for defendants' tax-deferred variable annuities can -- not counting any surrender fees -- consume as much as one-third of a retirement investor's account.

(i) In not knowing that the purchase of a deferred annuity in an already tax-deferred retirement account merely (and generally) increases the costs, fees and commissions paid by the investor without any additional economic benefit to the investor.

(j) In not knowing that commission charges on the purchase of variable annuities generally were at least two to three times higher, and in many cases would be between 20 and 100 times higher, than the purchase for an IRA account of equity securities of the same value.

184. Variable annuities are subject to both federal and state

regulation including regulation under the federal securities laws.

185.   Each defendant was negligent in not knowing that it must obey the applicable laws, rules, and regulations under the federal securities laws, of the United States, including the rules and regulations of the SEC, NASD, and other self-regulatory organizations.

186.   Each defendant was negligent in not knowing that the marketing and sale of variable annuities was subject to NASD requirements.

187.   AFSG Securities and WMAS were members of the NASD.

188.   Upon information and belief, other AEGON-affiliated entities, either those specifically identified as a defendant herein or otherwise, are broker-dealers and members of the NASD.

189.   The NASD, as a matter of routine procedure, disseminates Notices to Members to its members and relevant entities.

190.   It is the responsibility of NASD member broker-dealers to obtain, review and comply with NASD Notices to Members.

191.   The AEGON Defendants (including but not limited to AFSG Securities) and WMAS had received NASD Notices to Members 96-86 and 99-35.

192.   During the Class Period, plaintiffs and the other members of the

56

Class purchased in the continuous offerings hundreds of millions and possibly
billions of dollars of the variable annuities at issue here.

193.   Although not required to be alleged with respect to this claim
because it is an affirmative defense to be alleged and proven by defendants,
nevertheless, plaintiffs allege that they purchased their variable annuities as a direct
and proximate result of, and without knowledge of, the material misstatements and
omissions in the registration statements, prospectuses and SOAIs.  Plaintiffs and
other members of the class would not have purchased their tax-deferred variable
annuities from defendants for placement in their tax-qualified retirement plans if the
material misstatements and omissions had not been made by defendants.

194.   With respect to the variable annuities sold during the Class
Period, defendants charged purchasers (usually by selling shares in the purchaser's
account and directly subtracting the amount from the account) at least tens of
millions and possibly hundreds of millions of dollars or billions of dollars in fees,
expenses, and surrender fees including but not limited to so-called deferred sales
charges.

195.   The variable annuities sold during the Class Period lost at least
hundreds of millions of dollars, and possible billions of dollars, in value.

196.    By virtue of the foregoing, each of the defendants on this Section 11 claim violated Section 11 of the Securities Act, and are liable to plaintiffs and the other members of the Class.

197.    As a direct and proximate result of these defendants' unlawful conduct as alleged herein, plaintiffs and the other members of the Class suffered damages in connection with their purchases of the variable annuities during the Class Period.

198.    The defendants in this claim for control person liability under Section 15 of the Securities Act are AEGON USA, WRL, WRL Series Fund, PFL, and Transamerica Life Insurance and Annuity Company.

199.    Each of these defendants is a control person under Section 15.

200.    AEGON USA is the chief United States parent company for AEGON N.V. and the ultimate owner of the other AEGON-affiliated defendants.

201.    AEGON USA: (a) wholly owns (directly or indirectly) and is the parent company of each of the other AEGON Defendants, including those AEGON Defendants who are defendants on the Section 11 claim and who are primarily liable under Section 11 in this litigation and (b) had the power to influence and control, directly or indirectly, the decision-making and conduct of

those subsidiaries primarily liable, including having and exercising the power and

influence to cause the defendants who are primarily liable to engage in the unlawful

conduct complained of herein (the subsidiaries' dissemination of the false and

misleading offering documents), and having the power and influence to cause the

defendants who are primarily liable to refrain from the conduct complained of

herein.

202.   AEGON USA, through its position of ownership, control, and

authority as the parent company of its subsidiaries which are primarily liable, had

the power to, and did, select the Board of Directors of those subsidiaries and

appoint their senior management; and influence and control, directly or indirectly,

the decision-making and conduct of those subsidiaries, including having and

exercising the power and influence to cause the defendants who are primarily liable

to engage in the unlawful conduct complained of herein (the subsidiaries'

dissemination of the false and misleading offering documents), and having the

power and influence to cause the defendants who are primarily liable to refrain

from the conduct complained of herein.

203.   WRL, WRL Series Fund, PFL, and Transamerica Life Insurance

and Annuity Company were issuers of the variable annuities.  Each issuer defendant

had the power to influence and control and did influence and control, directly or

indirectly, the decision-making and conduct of its underwriters (which underwrote

their issuer's respective annuities and who are primarily liable as underwriters on

the section 11 claim), including having and exercising the power and influence to

cause these underwriter defendants who are primarily liable to engage in the

unlawful conduct complained of herein (its affiliates' dissemination of the false and

misleading offering documents), and having the power and influence to cause these

underwriter defendants to refrain from the conduct complained of herein.

204.   As set forth above, each of the defendants on the Section 11

claim violated Section 11 of the Securities Act.

205.   Under Section 15 of the Securities Act, each of the defendants

on this Section 15 claim is liable as a control person of the other defendants who are

primarily liable under Section 11 of the Securities Act, and are liable to plaintiff

and the other members of the Class.

## SECOND CLAIM FOR RELIEF
### For Violation of § 12(a)(2) of the Securities Act and
### For Control Person Liability Under § 15 of the Securities Act

206.   Plaintiffs incorporate paragraphs 1-172 as if fully set forth

herein (and any additional paragraphs from the First Claim expressly noted in the

Second Claim).

207.   With respect to this count, plaintiffs do not allege that the material omissions and misstatements set forth herein were made intentionally or recklessly by defendants. Rather, the conduct alleged herein was innocent, negligent or grossly negligent.

208.   The defendants in this claim under Section 12 of the Securities Act are every defendant other than World Money Group, Inc.; that is, the defendants on the Section 12 claim are WMAS, and all of the AEGON Defendants which include AEGON USA, WRL, WRL Series Fund, PFL, Transamerica Life Insurance and Annuity Company, AFSG Securities, Bankers Life, AUSA Life, and AEGON Financial.

209.   WMAS was a broker-dealer which marketed and sold the disputed variable annuities.

210.   WRL, WRL Series Fund, PFL, and Transamerica Life Insurance and Annuity Company each was an issuer of the variable annuities.

211.   AFSG Securities and Bankers Life each was an underwriter of the variable annuities.

212.   AUSA Life and AEGON Financial each was a distributor and

marketer of the variable annuities to other wholesalers and retailers of annuities which are not affiliated with AEGON USA for sale to the retail purchaser.

213.   Each defendant was a seller, offeror, and/or solicitor of sales of the variable annuities for its own financial benefit pursuant to the registration statements, prospectuses, SOAIs, contracts, written disclosures and sales presentation materials, in connection with the offering.  Or, even if solicited by that defendant without financial benefit to itself, then that defendant solicited the variable annuity purchases for the financial benefit of the owner of the securities, that is, the issuer and underwriter of the annuities.

214.   Each defendant's acts of selling, offering and of solicitation included but were not limited to the preparation of the materially misleading registration statements, prospectuses, SOAIs, and other documents, disseminated to investors.

215.   The AEGON conglomerate and AEGON USA are mentioned in various offering documents as being the ultimate parents of the issuers and a world-wide financial services entity.

216.   WRL's website states that it sells variable annuities and identifies certain variable annuity products which are available.

217.   A Transamerica website states that Transamerica Life Insurance and Annuity Company sells variable annuities.

218.   The AEGON Defendants also sold the variable annuities through other broker-dealers not owned by the Aegon family.

219.   The registration statements, prospectuses, contracts, disclosures, SOAIs, and other documents, used to sell the variable annuities in connection with the continuous offering, contained material misstatements; omitted to state material facts required to be stated therein, or failed to disclose certain material facts necessary to make the statements therein not misleading, as set forth herein.

220.   While the following concerns an affirmative defense which can be raised by only the section 12 defendants, and concerning which they bear the burden of proof, nevertheless, plaintiff alleges that each of these defendants cannot prove that it: (a) did not know of such material untruth or omission and (b) in the exercise of reasonable care could not have known of such material untruth or omission.

221.   Plaintiff and the other members of the Class purchased in the continuous offering (which makes all variable annuity shares in and of themselves traceable to the offering) tens of millions (and possibly at least hundreds of

millions) of variable annuity shares.

222.    Plaintiffs purchased their variable annuity shares pursuant to the written documents identified herein, and without knowledge of the material misstatements and omissions in those documents.

223.    With respect to the variable annuities sold during the Class Period, defendants charged purchasers (usually by selling shares in the purchaser's account and directly subtracting the amount from the account) at least tens of millions and possibly hundreds of millions or billions of dollars in fees, expenses, and surrender fees including so-called deferred sales charges.

224.    The variable annuity shares sold to Class Members during the Class Period lost at least hundreds of millions of dollars, and possible billions of dollars, in value.

225.    The variable annuity shares sold to each plaintiff during the Class Period substantially declined in value.

226.    As a direct and proximate result of defendants' unlawful conduct as alleged herein, plaintiffs and the other members of the Class suffered damages in connection with their purchases during the Class Period of variable annuity shares.

227.    By virtue of the foregoing, each of the defendants on this

Section 12 claim is primarily liable under Section 12(a)(2) of the Securities Act, and each is primarily liable to plaintiffs and other members of the class.

228.   Plaintiffs, individually and representatively, hereby elect to rescind and tender those securities that plaintiff and the other members of the Class continue to own, in return for the consideration paid for those securities together with interest thereon. Plaintiffs and members of the Class who have sold their variable annuity shares are entitled to rescissory damages.

229.   The defendants in the claim for control person liability under Section 15, 15 U.S.C. § 77o, are AEGON USA, WRL, WRL Series Fund, PFL, Transamerica Life Insurance and Annuity Company and World Money Group, Inc.

230.   Each of the Section 15 defendants is a control person through stock ownership and otherwise, and/or because each controlled the dissemination of the prospectuses and other selling documents, and/or had and exercised the power and influence to cause the defendants it controlled to engage in the conduct complained of herein, and had the power to cause those other defendants to refrain from the conduct complained of herein.

231.   For the reasons stated in paragraphs 200-202 of the First Claim, AEGON USA is a control person pursuant to Section 15 of the Securities Act.

232.   For the reasons set forth in paragraph 203 of the First Claim, WRL, WRL Series Fund, PFL, and Transamerica Life Insurance and Annuity Company each is a control person pursuant to Section 15 of the Securities Act.

233.   In addition, WRL, WRL Series Fund, PFL, and Transamerica Life Insurance and Annuity Company (each an issuer of the variable annuities) each is a control person given the relationship between the issuer of the variable annuities and its distributors/marketers which are defendants on the Section 12 claim.  Although each issuer was an affiliate and not the parent of its distributor/marketers which are defendants on the Section 12 claim (AUSA Life and AEGON Financial), given that the distributor/marketer  defendants were captive of the AEGON Defendants, each issuer defendant on this control person claim had the power to influence and control and did influence and control, directly or indirectly, the decision-making and conduct of its distributors/ marketers which are primarily liable on the section 12 claim, including having and exercising the power and influence to cause these distributor/marketer defendants who are primarily liable to engage in the unlawful conduct complained of herein (its affiliates' dissemination of the false and misleading offering documents), and having the power and influence to cause these defendants to refrain from the

66

conduct complained of herein.

234.   World Money Group, Inc.: (a) is the parent of WMAS and (b) had the power to influence and control, directly or indirectly, the decision-making and conduct of WMAS which is primarily liable, including having and exercising the power and influence to cause the defendant which is primarily liable to engage in the unlawful conduct complained of herein (the subsidiary's dissemination of the false and misleading offering documents), and having the power and influence to cause the defendant to refrain from the conduct complained of herein.

235.   World Money Group, Inc., through its position of ownership, control, and authority as the parent company of its subsidiary which is primarily liable, had the power to, and did, select the Board of Directors of that subsidiary and appoint its senior management; and influence and control, directly or indirectly, the decision-making and conduct of that subsidiary, including having and exercising the power and influence to cause the defendant who is primarily liable to engage in the unlawful conduct complained of herein (the subsidiary's dissemination of the false and misleading offering documents), and having the power and influence to cause the defendant who is primarily liable to refrain from the conduct complained of herein.

236.   As set forth above, each of the Section 12 defendants violated section 12 of the Securities Act.

237.   Under Section 15 of the Securities Act, each of the Section 15 defendants is secondarily liable as a control person of the defendants who are primarily liable under Section 12 of the Securities Act, and thus are liable to plaintiffs and the other members of the Class.

### THIRD CLAIM FOR RELIEF
### Declaratory and Injunctive Relief, Against the AEGON Defendants

238.   The conduct alleged herein was innocent, negligent or grossly negligent.

239.   There is a real controversy between the parties which is justiciable in character as alleged in this complaint.  On each cause of action stated above, plaintiffs and other members of the class will be irreparably injured in the future by defendants' misconduct to the extent that defendants continue to impose surrender fees upon any plaintiff or class member's election to terminate a deferred annuity contract.

240.   Plaintiffs, on behalf of themselves and the other members of the class, seeks a judgment declaring that defendants must cease charging surrender

fees (however defined or named), and enjoining defendants from charging or collecting surrender fees with respect to any qualified annuity contract.

241.   Plaintiffs, for themselves and on behalf of the class, also seeks injunctive relief enjoining defendants from the solicitation or sale of qualified annuities, and the assessment or collection of fees on such annuities, as defined herein, based upon the conduct described herein.

242.   Plaintiffs and other members of the class do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this count, and will suffer irreparable injury as a result of defendants' misconduct unless injunctive and declaratory relief is granted.

243.   By reason of the foregoing, plaintiffs and other members of the class are entitled to declaratory and injunctive relief as set forth above.

## REQUESTS FOR RELIEF

WHEREFORE, plaintiffs demand judgment individually and on behalf of the Class against defendants jointly and severally as follows:

(a)   An order certifying that this action may be maintained as a class action on behalf of the Class;

(b)   Compensatory damages in an amount to proven at trial;

(c)  An award of prejudgment and post judgment interest.

(d)  An order providing for declaratory and injunctive relief, including the following:

(1)  An order declaring defendants' conduct to be in violation of law;

(2)  An order declaring that defendants' fees charged or assessed for deferred annuities invested in qualified retirement plans are unreasonable and excessive;

(3)  An order enjoining defendants from charging surrender fees with respect to any qualified annuity contract;

(4)  An order enjoining defendants from soliciting sales of or selling deferred annuities for placement in qualified retirement plans;

(5)  An order awarding such other and further relief as this Court may deem just and proper including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the defendants' assets to assure plaintiffs have an effective remedy; and

(6)  Other equitable relief that the Court may deem proper.

(e)  An award of attorneys' fees and the costs and expenses of this litigation, including experts' fees; and

(f)  Any other or further relief that this Court deems just and equitable.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.


DATED:  New York, New York
        September 8, 2003

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ, LLP


By: _Robert B. Weintraub / TAD_
                            _by permission_
Daniel W. Krasner
Robert B. Weintraub
270 Madison Avenue
New York, New York 10016
Tel:  (212) 545-4600
Fax:  (212) 545-4653

Lead Counsel for Plaintiffs and the Class

CHITWOOD & HARLEY


By: _____
Craig G. Harley, Georgia Bar No. 326813
Tobey A. Davis, Georgia Bar No. 213055
Promenade II, Suite 2900
1230 Peachtree Street, NE
Atlanta, Georgia 30309
Tel:  (404) 873-3900
Fax:  (404) 876-4476

Local Counsel for Plaintiffs and the Class
331515



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

## CERTIFICATION OF NAMED PLAINTIFF UNDER THE
## PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995

Plaintiff Jeffery L. Johnson certifies, as to the claims asserted under the federal securities laws that:

1. I have reviewed the Complaint and authorized the commencement of an action on my behalf.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. To be best of my current knowledge, my transactions in the WRL variable annuity during the Class Period are as follows:

| Date | Purchases | Sales | Price |
|------|-----------|-------|-------|
| 6/16/2000 | 48,863.75 units | — | $48,863.75 |

5. I have not sought to serve as a class representative in any case under the federal securities laws in the last three years.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare and certify under penalty of perjury that the foregoing is true and correct.

Executed this ___1___ day of __October__ , 2001

_Jeffery L. Johnson_
Jeffery L. Johnson



# EXHIBIT / ATTACHMENT

## 2

(To be scanned in place of tab)

## Western Reserve Life Assurance Co. of Ohio ("WRL")
### P.O. Box 9051 • Clearwater, FL 33758-9051
### DISCLOSURE FOR VARIABLE ANNUITIES

I have applied for a variable annuity contract ("Contract") from WRL. I have received prospectuses for the Contract ("Contract Prospectus") and for the WRL Series Fund, Inc. ("Fund Prospectus")

**Applicants**
**Initials**

My Representative has reviewed each of these items with me, and I understand

_____ A.    The following which the prospectuses describe in detail:

1.    What am I buying? A variable deferred annuity contract, not a mutual fund or a Certificate of Deposit or other type of bank obligation.

2.    Investment options. I can direct my payments to the investment account or to sub-accounts which I select. Each subaccount invests in a corresponding portfolio of an underlying mutual fund with a particular investment objective. In some states, WRL may deduct state premium tax from my payments first.

3.    Annual charge. Each year WRL will deduct an Annual Contract Charge, if applicable, from the cash value of the Contract.

4.    Subaccount and portfolio fees. Also, both the selected subaccounts and the portfolios in which they invest have certain charges and expenses.

5.    Surrender or Cash Withdrawals. These may have certain charges or limits. Withdrawal or surrender charges, if they apply, may be significant and last for several years.

6.    Can subaccount values go down? Yes. The investment performance will fluctuate due to market conditions and investment results. Subaccount units, when redeemed, may be worth more or less than when they were purchased.

7.    What else can affect my contract values and benefits? Future Contract cash values will also depend on the interest credited to the Fixed Account (if selected) and on the amount and timing of any payments and partial withdrawals I make. Partial withdrawals and any unpaid loans will reduce the amount of death benefit payable.

_____ B.    Am I replacing another policy? My application correctly states whether I intend to replace an existing policy or contract to buy this Contract. (To replace includes to surrender, end, change, reduce or withdraw from the existing contract or to borrow more than 25% of its loan value.) If so, I have
• considered
a) any withdrawal charge I may have to pay on the existing contract;
b) that there may be new withdrawal charges for several years under this Contract;
c) other fees, charges, investment options and features of both contracts; and
d) any tax consequences of the exchange.
• reviewed my existing contract with my representative and determined that the replacement is appropriate to my needs or objectives.

_____ C.    Taxes. WRL does not give tax or legal advice. I will consult with my own professional tax or legal advisor as I see fit. There is a 10% federal income tax penalty on income distributed before age 59½, subject to certain exceptions. The "Federal Tax Matters" section of the Contract Prospectus gives more information.

_____ D.    My needs and objectives. Variable deferred annuities are designed for long-term investors who seek a choice of investment options. I have reviewed my insurable needs and financial objectives with my Representative. I have determined that my Payments are affordable and the Contract is appropriate to my needs or objectives.


_____          _____
Signature of Applicant                                    Date
                                                                    I have reviewed each of these items with the applicant.

_____          Witness _____
Name of Applicant (Please Print)                         Agent                              Agent #


Original - WRL                    First Copy - Agent                    Second Copy - Applicant

LD1349-0/98



# EXHIBIT / ATTACHMENT

## 3

(To be scanned in place of tab)

QPD_____    DISCLOSU    STATEMENT AND APPLICATION SUPF    ∕ENT FOR
INDIVIDUAL RETIREMENT ANNUIT ᴛ
FLEXIBLE PAYMENT VARIABLE ACCUMULATION DEFERRED ANNUITY CONTRACT

I have applied for an Individual Retirement Annuity in an application from Western Reserve Life Assurance Co. of Ohio. I understand that this Individual Retirement Annuity may be revoked within seven days of receipt of this Disclosure Statement only by my written notice of revocation mailed or delivered to: IRA Administrator, Western Reserve Life Assurance Co. of Ohio, P.O. Box 5068. Clearwater, Florida 33756. In the event I so revoke this Individual Retirement Annuity. I am entitled to a return of the amount set forth under the Right to Examine Contract provision of the annuity.

By accepting this application supplement in conjunction with the contract, I am requesting that the contract be treated as an Individual Retirement Annuity under Section 408(b) of the Internal Revenue Code (hereafter referred to as the Code).

An IRA is an annuity contract that meets the following requirements: (1) the contract must be issued by an insurance company qualified to do business in the state in which the contract was sold; (2) the contract may not be transferable by the owner to any person other than the company selling the product; (3) except in the case of contributions to a simplified employee pension plan ("SEP"), a SIMPLE plan, or rollover contributions (described below), the annual premium for the annuity contract cannot exceed $2,000; (4) the premium must not be fixed; (5) any refund of premiums must be applied toward the payment of future premiums or the purchase of additional benefits before the close of the calendar year following the year of the refund; (6) the entire interest of the owner in the contract must be nonforfeitable; and (7) the contract must comply with certain minimum distribution requirements.

I understand payments must be paid in cash.   Payments may be treated as deductions (except in the case of a Rollover or a Transfer) from my gross income for Federal Income tax purposes.  I must also file IRS Form 5329 with my Federal Income tax return if tax is payable because of excess contributions, premature distributions or excess accumulations.

If I receive total distribution from my IRA and from any tax-qualified retirement plans and tax-sheltered annuities in excess of $150,000 for a calendar year, I may be subject to a 15% e excise tax on such excess distribution. This excise tax is suspended during the 1997, 1998, and 1999 calendar years.

A distribution to the beneficiary of my IRA will be included in my gross estate for federal estate tax purposes. My designation of a beneficiary to receive distributions from my IRA on or after my death will not be considered a transfer for federal gift tax purposes.

I also understand that:

1. In general, during any taxable year, I am allowed a deduction from my gross income for the amount of my contributions to my individual retirement program, up to the least of the following amounts:
   (a) for contributions that are not made under a savings incentive match plan for employees (SIMPLE), described in Code Section 408(p):
      (1) $2,000; or
      (2) 100% of compensation;
   (b) for contributions made under a SIMPLE plan. a percentage of compensation, as provided in Code Section 408(p)(2)(A). up to a maximum amount of $6,000. indexed for inflation under Code Section 415(d). See Code Section 408(p)(2)(E).

2. In general, if I do not qualify for a SIMPLE IRA and if I make a contribution to a separate individual retirement program for my unemployed spouse (or my employed spouse. if he or she elects to being treated as having no compensation), the total deduction is limited to the least of the following amounts:
   (a) $4,000 - - a maximum of $2,000 per person; or
   (b) 100% of compensation.

   It is my further understanding (except in the case of a Rollover or a transfer) that if I do not qualify for a SIMPLE IRA. no more than $2,000 can be contributed to the account of either spouse during any tax year and that a joint tax return must be filed to receive the full deduction.

3. (a) If I am not married, and not an active participant in an employer-sponsored retirement plan, I may make a fully-deductible contribution to my individual retirement program. up to the limit described in Item 1 above.  If I am married and neither I nor my spouse is an active participant in an employer-sponsored retirement plan, I may make a fully-deductible contribution to my individual retirement program, up to the limits described in Item 1 or 2, whichever is applicable.  If I (or my spouse, if I file a joint return) am covered by an employer-sponsored retirement plan, my contribution to my individual retirement program will be deductible only to the extent permitted by Item 4 below.

(b)  An employer-sponsored retirement plan includes any of the following:
- a qualified pension, profit-sharing or stock bonus plan described in Code Section 401(a) or 401(k);
- a qualified annuity plan described in Code Section 403(a);
- a tax-sheltered annuity or custodial account described in Code Section (403(b);
- a savings incentive match plan for employees (SIMPLE) described in Code Section 408(p);
- a plan established for its employees by the United States by a State or political subdivision thereof, or an employee or instrumentality of any of the foregoing;
- a Simplified Employed Pension (SEP) (established prior to January 1, 1997;

(c)  Whether I am an active participant in an employer-sponsored retirement plan depends on the type of plan that is sponsored  Generally, if my employer sponsored a defined benefit (pension) plan, I am considered to be an active participant if I am eligible to accrue a benefit under the plan. It does not matter for this purpose whether or not I actually do accrue a benefit. If my employer maintains a defined contribution plan, I am generally considered to be an active participant if an employer contribution or forfeiture is credited to my account during the year  I am also considered to be an active participant if I make either voluntary or mandatory contributions to a 401(k) plan or any other employer-sponsored retirement plan, whether or not such contribution is made on a pre-tax or after-tax basis and whether or not my employer contributes to that plan.

4. (a)  If I (or my spouse, if we file a joint return) am an active participant in an employer-sponsored retirement plan, my ability to deduct the contribution to my individual retirement program will be limited if my adjusted gross income exceeds (determined for IRA purpose) the "applicable amount". The "applicable amount" depends on my marital status and how I file my tax return.  If:
- I am single, the applicable amount is $25,000.
- I am married filing jointly, the applicable amount is $40,000.
- I am married filing separately, the applicable amount is $0.

(b)  If my adjusted gross income exceeds the "applicable amount" by not more than $10,000 I may still make a deductible contribution to my individual retirement program. However, the deductible amount will be less than $2,000 (or $4,000, if item 2 is applicable).  I will consult my tax advisor for details as to how to determine the deductible portion of my contribution.

(c)  If my adjusted gross income is less than $35,000 if I am single, $50,000 if I am married filing jointly, or $10,000 if I am married filing separately, then I may make a minimum deductible contribution to my individual retirement program of $200, regardless of the amount calculated above.

5. Even if my deductible contribution to my individual retirement program is limited, I may still contribute up to the limits described in items 1 or 2. The difference between those limits and the deductible amount will not be deductible. However, all earnings on my non-deductible contribution will be tax-deferred until distribution.

6. Contributions to my individual retirement program will be reported on my Form 1040 or 1040A.  I must designate the deductible and non-deductible portion of my distribution on that return, as well as the distributions received from my individual retirement programs during the year and the aggregate account balance of all of my individual retirement programs as of the end of the year.  If I overstate on my tax return the non-deductible amount, a penalty of $100 will be imposed on each overstatement, unless I can show that the overstatement was due to reasonable cause.

7. The contribution to my individual retirement program (whether or not deductible) must be made by the due date of my tax return, without regard to extensions.

8. For purposes of determining the size of the payments into this contract, only my compensation and earned income for personal services actually rendered may be used (including wages, salaries and professional fees and other amounts received as compensation).  If I received alimony or income from a separate maintenance agreement which is includable in my gross income, I may include these amounts as compensation.  Earnings from property such as interest, rents and dividends may not be used; neither may compensation not includable in gross income as income earned from sources outside the United States.

9. No deduction from gross income is allowed in respect to a payment in my taxable year in which I attain age 70 1/2 or thereafter.

10. If I make a contribution in excess of the amount that may be contributed to an individual retirement program for any taxable year, an excise tax of 6% of the amount of the excess contribution will be levied on me, unless the excess is refunded to me on or before that date (including any extensions) for filing my income tax return for that taxable year; the 6% excise tax will be levied in each subsequent taxable year as long as the excess contribution remains in the Annuity unless and until the excess is applied to a subsequent year's contribution.

11. This contract must be for the exclusive benefit of me and my beneficiary or beneficiaries.  The contract shall be nonforfeitable.

12. This contract is being purchased primarily for retirement purposes at or after my age 59 1/2, but I have the right to surrender it for its cash value prior to retirement.

13. (a) Any benefit payable under the contract will be treated as taxable income includable in gross income under the provisions of the Code, and any distribution prior to my attaining age 59 1/2 will be subject to an additional penalty tax of 10% of the amount of the distribution. If this is a SIMPLE IRA, the penalty tax for any distribution prior to age 59 1/2 will be increased to a total of 25% for distributions during the two year period beginning on the date I first participated in any qualified salary reduction arrangement maintained by my employer to fund the SIMPLE IRA. However, the distributions prior to age 59 1/2 under one of the following circumstances will not be subject to the 10% or 25% additional penalty tax. These include:
    * distributions after my death;
    * distributions made because of my disability;
    * distributions which are part of a scheduled series of substantially equal periodic payments for my life or life expectancy, or the joint lives (or life expectancies) of me and a beneficiary;
    * distributions for medical expenses in excess of 7 1/2% of Adjusted Gross Income for the tax year;
    * distributions for medical care insurance premiums for me and my spouse and my dependents. (To qualify, I must be separated from employment and have received unemployment compensation under any federal or state unemployment compensation law for 12 consecutive weeks.)
    (b) Distributions of my non-deductible contributions are not subject to the 10% additional penalty tax, but this tax will be assessed on the earnings on the non-deductible contributions.
    (c) To the extent permitted by applicable law, tax-free rollovers can be made from one SIMPLE IRA into:
        (1) another SIMPLE IRA; or
        (2) an IRA, after a two-year period has expired since I first participated in a SIMPLE IRA.
    (d) For contributions not made under a SIMPLE IRA, the entire proceeds from my contract can be transferred into an Individual Retirement Account at any time without tax penalty (but no more frequently than once a year, if I obtain possession of the funds and redeposit the funds in an IRA within the 60 day time period).

14. The contract and the benefits provided by it cannot be sold, assigned, alienated or pledged as collateral for a loan or as security for the performance of an obligation or for any other purpose to any person, provided that, if I should take any one of these actions (which are prohibited transactions under the Code), my Individual Retirement Annuity will be disqualified and the full value of it will be treated as taxable income under Item 13 above as of the beginning of my taxable year in which the action occurs. In addition, the additional 10% penalty tax may be applicable.

15. Notwithstanding the contents of item 14, the contract can be transferred to a former spouse under a divorce decree or written instrument incidental to such divorce, without such action being considered to be a prohibited transaction resulting in disqualification.

16. Notwithstanding any provision of this agreement to the contrary, the distribution of my interest shall be made in accordance with the minimum distribution requirements of section 408(a)(6) or section 408(b)(3) of the Code and the regulations thereunder, including the incidental death benefit provisions of section 1.401(a)(9)-2 of the proposed regulations, all of which are herein incorporated by reference.

17. My entire interest in the account must be distributed, or begin to be distributed, by my required beginning date, which is the April 1 following the calendar year in which I reach age 70 1/2. For each succeeding year, distribution must be made on or before December 31. By the required beginning date I may elect to have the balance in the account distributed in one of the following forms:
    (a) a single sum payment;
    (b) equal or substantially equal payments over my life;
    (c) equal or substantially equal payments over my life and the life of my designated beneficiary;
    (d) equal or substantially equal payments over a specified period that may not be longer than my life expectancy;
    (e) equal or substantially equal payments over a specified period that may not be longer than the joint life and last survivor expectancy of me and my designated beneficiary.

18. If I die before my entire interest is distributed, the entire remaining interest will be distributed as follows:
    (a) If I die on or after distributions have begun under Paragraph 17, the entire remaining interest must be distributed at least as rapidly as provided under Paragraph 17.
    (b) If I die before distributions have begun under Paragraph 17, the entire remaining interest must be distributed as elected by me or, if I have not so elected, as elected by the beneficiary or beneficiaries, as follows:
        (1) by December 31st of the year containing the fifth anniversary of my death; or
        (2) in equal or substantially equal payments over the life or life expectancy of the designated beneficiary or beneficiaries starting by December 31st of the year following the year of my death. If, however, the beneficiary is my surviving spouse, then this distribution is not required to begin before December 31st of the year in which I would have turned 70 1/2.

0010-12/92

Unless otherwise elected by me prior to the commencement of distributions under Paragraph 17, or, if applicable, by my surviving spouse where I die before distributions have commenced, life expectancies of me or my spouse as beneficiary shall be recalculated annually for the purpose of distributions under Paragraphs 17 and 18. An election not to recalculate shall be irrevocable and shall apply to all subsequent years. The life expectancy of my nonspouse beneficiary shall not be recalculated.

i. I may satisfy the minimum distribution requirements under section 408(a)(6) and 408(b)(3) of the Code by receiving a distribution from one IRA that is equal to the amount required to satisfy the minimum distribution requirements for two or more IRAs. For this purpose, as the owner of two or more IRAs I may use the "alternative method" described in Notice 88-38, 1988-1 C.B.24, to satisfy the minimum distribution requirements described above.

21. To the extent that a distribution to me constitutes a return of my non-deductible individual retirement program contributions, such amount will not be includable in income. I will consult my tax advisor for information as to how to determine the taxable portion of my distribution.

22. Taxable distributions from my annuity will be taxed as ordinary income in the year received regardless of their source. I will have Federal income tax withheld from an individual retirement program distribution unless I elect otherwise. Generally, if the distribution is to be delivered outside the United States, a 30% tax withholding must be applied.

23. The contract will be amended as and when necessary in order to comply with the provisions of the Code and regulations thereunder.

24. The value of my IRA is based upon the value of the Accumulation Units allocated to me, which depends on the amount of my Purchase Payment. The minimum initial Purchase Payment is the minimum initial purchase price as stated in the Prospectus. The Accumulation Unit value will vary from one Valuation Period to the next depending on the investment results experienced by each Sub-Account to which I have allocated Purchase Payments within the Series Account. The value of an Accumulation Unit per each Sub-Account at the close of a Valuation Period is determined by multiplying the Accumulation Unit Value for that Sub-Account at the close of the immediately preceding Valuation Period by the experience factor for that Sub-Account for the current Valuation Period. In calculating a Sub-Account's experience factor, the net asset value for each share of the Portfolio of the Fund at the end of the current Valuation Period is increased by the amount per Portfolio share of any dividend or capital gain distribution declared by the Portfolio during the current Valuation Period, and decreased by a per Portfolio share charge for taxes, if any. The total is divided by the net asset value per Portfolio share at the end of the preceding Valuation Period and decreased by a per Portfolio share charge for taxes, if any. A charge equal to either 1.25% or 1.40% as declared in the Contract, on an annual basis, of the net assets for each day in the Valuation Period is subtracted to compensate Western Reserve Life for certain mortality and expense risks. Earnings or growth in the value of my IRA, however, can neither be guaranteed nor projected.

25. A Contingent Deferred Sales Charge ("CDSC") may be imposed upon withdrawal from or Surrender of my IRA. The charge is a percentage of the amount withdrawn or surrendered and is stated in the Prospectus and the Variable Annuity Contract. The Prospectus includes an example of how to calculate the CDSC. (WRL Freedom Bellwether Variable Annuity has no CDSC.)

26. State premium taxes, if any, will be deducted from either the gross purchase payment, the amount surrendered or withdrawn, or from the annuity purchase value at distribution, as required by state law. Unless waived by Western Reserve Life, a collection fee of $1.25 will be deducted from purchase payments under payment modes other than annual or single pay plans. An administration fee of $30 will be deducted annually on the anniversary of the annuity or upon surrender of the annuity. After 12 free transfers of contract values from a Sub-Account each year, there will be a $10 transfer charge for additional transfers. The values of the annuity held in the Series Account can be neither guaranteed nor projected.

27. The WESTERN RESERVE LIFE Individual Retirement Annuity has not been filed with Internal Revenue Service for approval. A determination as to the form of the IRA Annuity does not represent a determination by the IRS of the merits of the annuity as an investment.

28. Additional information in respect to Individual Retirement annuities, accounts and bonds, may be obtained from any district office of the Internal Revenue Service (in the form of Publication 590 particularly).