# ORIGINAL

RECEIVED IN CLERK'S OFFICE
U.S.D.C.

SEP 26 2003

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JEFFERY L. JOHNSON, on behalf
of himself and all others
similarly situated, et al.,
                    Plaintiffs,

                                        Index No. 1-01-CV-2617-CAP

        v.

AEGON USA, INC , WMA
SECURITIES, INC., et al.,
                    Defendants.

## ORDER

This         day of          , 2003, on consideration

of the Motion to Dismiss the Amended Consolidated Complaint

filed by defendants AEGON USA, Inc., AEGON Financial Services

Group, Inc., AFSG Securities Corp., PFL Life Insurance Co., AUSA

Life Insurance Co., Inc., Western Reserve Life Assurance Co. of

Ohio, WRL Series Fund, Inc., Bankers United Life Assurance Co.

and Transamerica Life Insurance and Annuity Co., it is ORDERED

that the Motion is GRANTED and the Amended Consolidated

Complaint is DISMISSED WITH PREJUDICE.

                    BY THE COURT:

                    _____
                    CHARLES A. PANNELL, JR.
                    United States District Judge

RECEIVED IN CLERK'S OFFICE

SEP 2 6 2003

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

JEFFERY L. JOHNSON, on behalf
of himself and all others
similarly situated, <u>et al.</u>,
                Plaintiffs,

          v.

AEGON USA, INC., WMA
SECURITIES, INC., <u>et al.</u>,
              Defendants.

Index No. 1-01-CV-2617-CAP

## ORDER

This _____ day of _____, 2003, on consideration

of the Motion to Dismiss the Amended Consolidated Complaint

filed by defendants AEGON USA, Inc., AEGON Financial Services

Group, Inc., AFSG Securities Corp., PFL Life Insurance Co., AUSA

Life Insurance Co., Inc., Western Reserve Life Assurance Co. of

Ohio, WRL Series Fund, Inc., Bankers United Life Assurance Co.

and Transamerica Life Insurance and Annuity Co., it is ORDERED

that the Motion is GRANTED and the Amended Consolidated

Complaint is DISMISSED WITH PREJUDICE.

                         BY THE COURT:

                         _____
                         CHARLES A. PANNELL, JR.
                         United States District Judge

**ORIGINAL**

SEP 2b 2003

L... .. ...S, Clerk

By:

Deputy Clerk

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

---

JEFFERY L. JOHNSON, on behalf
of himself and all others
similarly situated, <u>et al.</u>,

              Plaintiffs,    Index No. 1-01-CV-2617-CAP

     v.

AEGON USA, INC., WMA
SECURITIES, INC., <u>et al.</u>,

              Defendants.

---

**MOTION OF DEFENDANTS AEGON USA, INC., AEGON FINANCIAL SERVICES
GROUP, INC., AFSG SECURITIES CORPORATION, PFL LIFE INSURANCE
COMPANY, AUSA LIFE INSURANCE COMPANY, INC., WESTERN RESERVE LIFE
ASSURANCE CO. OF OHIO, WRL SERIES FUND, INC., BANKERS UNITED
LIFE ASSURANCE COMPANY, AND
TRANSAMERICA LIFE INSURANCE AND ANNUITY COMPANY,
TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT**

Pursuant to the Court's Order dated August 18, 2003, which

allows defendants "to renew their motions to dismiss in response

to the recast complaint," defendants AEGON USA, Inc., AEGON

Financial Services Group, Inc., AFSG Securities Corp., PFL Life

Insurance Co., AUSA Life Insurance Co., Inc., Western Reserve

Life Assurance Co. of Ohio, WRL Series Fund, Inc., Bankers

United Life Assurance Co. and Transamerica Life Insurance and

Annuity Co. ("moving defendants"), hereby move to dismiss the amended consolidated complaint on the following grounds:

1.   Counts I-II of the amended consolidated complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted.  NASD Notice To Members 99-35 does not apply to moving defendants and does not establish requirements which apply to registration statements or prospectuses; plaintiffs have not alleged that defendants misrepresented material facts or omitted material facts they had a duty to disclose; and plaintiffs have not alleged recoverable damages.

2.   The amended consolidated complaint should be dismissed because it is a "shotgun complaint" and fails to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief," as required by Fed. R. Civ. P. 8(a).

3.   All claims of plaintiff Carolyn Gerin in Counts I-II should be dismissed on the ground that they are barred by the absolute three-year limitation period set forth in 15 U.S.C. § 77m.

4.   All claims in Counts I-II should be dismissed on the ground that they are barred by the one-year limitation provision set forth in 15 U.S.C. § 77m.  This action was filed more than one year after plaintiffs discovered, or, by the exercise of

2

reasonable diligence, should have discovered, the alleged untrue statements or omissions.

5.   All claims against defendants WRL Series Fund, Inc., and Transamerica Life Insurance and Annuity Company should be dismissed on the ground that those defendants were added to this action after the statute of limitations had expired, and the claims against those defendants do not relate back to the filing of the original complaint.

6.   All claims against defendants PFL, Bankers Life, AEGON Financial, AUSA Life, Transamerica Life and WRL Series Fund should be dismissed for lack of subject matter jurisdiction; plaintiffs do not have standing to assert claims against those defendants.

7.   All claims in Count I against defendants AEGON USA, PFL, WRL Series Fund, Transamerica Life and Bankers Life should be dismissed for failure to state a claim upon which relief can be granted; plaintiffs have not alleged that those defendants were issuers or underwriters of securities **plaintiffs** acquired.

8.   All claims in Count II against defendants AEGON USA, AEGON Financial, PFL, AUSA Life, WRL Series Fund, Bankers Life, Transamerica Life and AFSG Securities should be dismissed for failure to state a claim upon which relief can be granted;

3

plaintiffs have not alleged that those defendants sold variable annuities to them or successfully solicited their purchases.

9.  All claims based on allegedly defective registration statements or prospectuses for securities plaintiffs did not acquire should be dismissed for failure to state a claim upon which relief can be granted.

10.  All claims for "controlling person" liability in Counts I-II should be dismissed because plaintiffs have not stated a substantive claim for relief and have not alleged a sufficient factual basis for holding any defendant liable as a controlling person.

11.  Count III, for declaratory and injunctive relief, should be dismissed because plaintiffs have not stated a substantive claim for relief.

12.  The amended consolidated complaint should be dismissed with prejudice because it is a "shotgun" complaint in violation of the Court's August 18, 2003 Order; plaintiffs have already amended their complaint twice and have had ample opportunity to set forth their claims; and any further amendment would be futile.

These grounds were previously asserted in moving defendants' motion to dismiss the consolidated complaint and were set forth in full in their memoranda dated January 28 and

4

June 6, 2003, all of which moving defendants request be made part of the record on this motion.

Respectfully submitted,

*Michael J. Bowers*

Michael J. Bowers
Georgia Bar No. 07160
Christopher S. Anulewicz
Georgia Bar No. 020914
BALCH & BINGHAM, L.L.P.
14 Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, GA  30305
Phone (404) 261-6020
Fax (404) 261-3656

James J. Rohn
Patricia M. Hamill
Deborah J. Krabbendam
CONRAD O'BRIEN GELLMAN
& ROHN, P.C.
1515 Market Street
Sixteenth Floor
Philadelphia, PA  19102
Phone (215) 864-9600
Fax (215) 864-9620

Counsel for Defendants AEGON USA, Inc., AEGON
Financial Services Group, Inc., AFSG Securities
Corp., PFL Life Insurance Co., AUSA Life
Insurance Co., Inc., Western Reserve Life
Assurance Co. of Ohio, WRL Series Fund, Inc.,
Bankers United Life Assurance Co. and
Transamerica Life Insurance and Annuity Co.

Dated:   September 26, 2003

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

---

JEFFERY L. JOHNSON, on behalf
of himself and all others
similarly situated, <u>et al.</u>,

               Plaintiffs,     Index No. 1-01-CV-2617-CAP

     v.

AEGON USA, INC., WMA
SECURITIES, INC., <u>et al.</u>,

               Defendants.

---

**MEMORANDUM OF LAW OF MOVING DEFENDANTS AEGON USA, INC.,
AEGON FINANCIAL SERVICES GROUP, INC., AFSG SECURITIES
CORPORATION, PFL LIFE INSURANCE COMPANY, AUSA LIFE
INSURANCE COMPANY, INC., WESTERN RESERVE LIFE ASSURANCE CO.
OF OHIO, WRL SERIES FUND, INC., BANKERS UNITED LIFE
ASSURANCE COMPANY,
AND TRANSAMERICA LIFE INSURANCE AND ANNUITY COMPANY,
IN SUPPORT OF MOTION TO DISMISS
<u>THE AMENDED CONSOLIDATED COMPLAINT</u>**

Dated: September 26, 2003  Michael J. Bowers
                          Georgia Bar No. 071650
                          Christopher S. Anulewicz
                          Georgia Bar No. 020914
                          BALCH & BINGHAM, L.L.P.
                          14 Piedmont Center, Suite 1100
                          3535 Piedmont Road
                          Atlanta, GA 30305
                          Phone (404) 261-6020
                          Fax (404) 261-3656

                          James J. Rohn
                          Patricia M. Hamill
                          Deborah J. Krabbendam
                          CONRAD O'BRIEN GELLMAN & ROHN, P.C.
                          1515 Market Street, 16th Floor
                          Philadelphia, PA 19102

Phone (215) 864-9600
Fax (215) 864-9620

Counsel for Defendants AEGON USA, Inc.,
AEGON Financial Services Group, Inc.,
AFSG Securities Corp., PFL Life
Insurance Co., AUSA Life Insurance Co.,
Inc., Western Reserve Life Assurance
Co. of Ohio, WRL Series Fund, Inc.,
Bankers United Life Assurance Co., and
Transamerica Life Insurance and Annuity
Co.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . i

I.   INTRODUCTION AND BACKGROUND . . . . . . . . . . . . 1

II.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . .6

   A.   Plaintiffs' Amended Consolidated Complaint Is
        Even More of a "Shotgun" Pleading than the
        Complaint the Court Struck . . . . . . . . . . 6

   B.   Under the Principles Set Forth in Defendants'
        Previous Memoranda and Confirmed by the
        Opinions in Donovan, Plaintiffs Cannot
        State a Viable Cause of Action . . . . . . . . 8

        1.   NASD Notices Do Not Establish Disclosure
             Requirements for Prospectuses . . . . . . 8

        2.   The SEC Does Not Require the Disclosures
             at Issue . . . . . . . . . . . . . . . . .10

        3.   The Prospectuses Did Not Contain Material
             Misrepresentations or Omissions . . . . . 12

        4.   Plaintiffs' Claims Are Untimely . . . . . 14

III. CONCLUSION . . . . . . . . . . . . . . . . . . . .15

## TABLE OF AUTHORITIES

FEDERAL CASES

Anderson v. District Board of Trustees,
        77 F.3d 364 (11th Cir. 1996) . . . . . . . . . . . . .6

Byrne v. Nezhat,
        261 F.3d 1075 (11th Cir. 2001) . . . . . . . . . . . .8

Donovan v. American Skandia Life Assurance Corp.,
        No. 02 CV 9859(MP), 2003 WL 21757260
        (S.D.N.Y. July 31, 2003) . . . . . . . . . .3-5, 11-14

Donovan v. American Skandia Life Assurance Corp.,
        No. 02 CV 9859(MP), 2003 WL 22052879
        (S.D.N.Y. Sept. 2, 2003) . . . . . . . . . . .3, 5, 11

In re Merrill Lynch & Co. Research Reports Securities Lit.,
        No. 02 MDL 1484, 2003 21518833
        (S.D.N.Y. July 2, 2003) . . . . . . . . . . . . .10-11

Strategic Income Fund v. Spear, Leeds & Kellogg Corp.,
        305 F.3d 1293 (11th Cir. 2002) . . . . . . . . . . . .6

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JEFFERY L. JOHNSON, on behalf
of himself and all others
similarly situated,

                    Plaintiff,      Index No. 1-01-CV-2617-CAP

          v.

AEGON USA, INC., WMA
SECURITIES, INC., et al.
                    Defendants.

MEMORANDUM OF LAW OF MOVING DEFENDANTS AEGON USA, INC., AEGON
FINANCIAL SERVICES GROUP, INC., AFSG SECURITIES CORPORATION, PFL
LIFE INSURANCE COMPANY, AUSA LIFE INSURANCE COMPANY, INC.,
WESTERN RESERVE LIFE ASSURANCE CO. OF OHIO, WRL SERIES FUND,
INC., BANKERS UNITED LIFE ASSURANCE COMPANY, AND
TRANSAMERICA LIFE INSURANCE AND ANNUITY COMPANY, IN SUPPORT
OF MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

I.   INTRODUCTION AND BACKGROUND

     Plaintiffs in this purported class action contend that the

moving defendants misled them and other investors into

purchasing deferred variable annuities for tax-sheltered

retirement plans.  Their primary legal claims are based on

Sections 11 and 12(a)(2) of the Securities Act of 1933.

     On August 18, 2003, this Court struck the plaintiffs'

consolidated complaint as a "shotgun pleading" and ordered them

to recast it.  Aug. 18, 2003 Order at 1-2.  Plaintiffs' amended

consolidated complaint, unfortunately, is even more a "shotgun

pleading" than its predecessor.  The consolidated complaint, at

42 pages and 186 paragraphs, has grown to 72 pages and 243 paragraphs. The factual section alone is now 172 paragraphs (up from 136). In blatant disregard of the Court's Order, plaintiffs incorporate these paragraphs wholesale into Counts I and II. In Count III, they vaguely refer to "[t]he conduct alleged herein," without incorporating or specifically referencing *any* of the factual allegations. See Am. Cons. Cpt. ¶¶ 173, 206, 238.

Plaintiffs' maneuverings only confirm what moving defendants have already stated to the Court in support of their motion to dismiss the *consolidated complaint*: plaintiffs have not asserted and cannot assert a viable cause of action. Indeed, the amended consolidated complaint is essentially a restatement, in the form of a complaint, of the arguments and factual assertions plaintiffs made in response to moving defendants' initial motion to dismiss. Defendants' June 6, 2003 reply memorandum responds to plaintiffs' contentions, and defendants respectfully request that the Court consider that memorandum as an integral part of this motion.[1]

---

[1] Plaintiffs have now filed three complaints in this action, changing their theories and causes of action along the way. For example, they originally asserted claims under Section 10(b) of the Securities Exchange Act of 1934, then dropped those claims and substituted claims under Sections 11 and 12 of the 1933 Act (15 U.S.C. §§ 77k and 77l). Plaintiffs also retracted their

2

After moving defendants' initial motion to dismiss was
briefed, Senior District Judge Milton Pollack dismissed, *with
prejudice*, a nearly identical case brought by the same
plaintiffs' counsel in New York, and refused to permit a further
amendment.  Donovan v. American Skandia Life Assurance Corp.,
No. 02 CV 9859(MP), 2003 WL 21757260 (S.D.N.Y. July 31, 2003)
(Exh. 2); 2003 WL 22052879 (Sept. 2, 2003) (Exh. 3).  Both this
case and Donovan center on the contention that variable annuity
offering documents violated the federal securities laws because
the documents did not include the specific language found in
National Association of Securities Dealers Notice to Members 99-
35 (NASD NTM 99-35).  Through this Notice, the NASD informed its

theory that variable annuities are "never appropriate" for
qualified plans in favor of a theory that such investments are
"hardly ever appropriate."  See Mem. of Law of Defendants AEGON
USA, et al., in Support of Motion to Dismiss Consolidated
Complaint at 28-29 (dated Jan. 28, 2003) (Defs.' Jan. 28, 2003
Mem.) (copy included in appendix); Reply Mem. of Defendants
AEGON USA, et al., in Support of Motion to Dismiss Consolidated
Complaint at 1-4 (June 6, 2003) (Defs.' June 6, 2003 Mem.) (Exh.
1 hereto).  The amended consolidated complaint contains three
counts.  Count I alleges violation of § 11 and control person
liability under § 15 of the 1933 Act; Count II is based on §§
12(a)(2) and 15; and Count III seeks declaratory and injunctive
relief.  Plaintiffs dropped their claim under the Investment
Company Act of 1940, their reformation claim, and the 297 "John
Doe" defendants.  Defendants' previous motion and memoranda
demonstrate that none of plaintiffs' claims are viable.  The
Court's August 18, 2003 Order authorizes defendants to renew
their motion to dismiss; rather than repeat all their arguments,
defendants request that the Court consider their earlier motion
and memoranda as part of the record on this motion.

3

selling broker-dealer members that, as part of an individual
suitability analysis, registered representatives who recommend a
variable annuity should disclose that the tax deferred accrual
feature of the annuity is unnecessary when it is purchased for a
qualified plan.  The moving defendants here, like the defendants
in Donovan, are not the brokers who sold the policies at issue
but are companies allegedly involved in some way in developing
the prospectuses under which the variable annuities are sold.

In its July 31, 2003 decision, the Donovan court flatly
rejected the same claims and arguments plaintiffs assert in this
case, holding that:

- "NASD notices . . . are not law and noncompliance
  therewith cannot itself constitute a violation of the
  federal securities laws. . . . No duty of disclosure
  will arise directly from a NASD notice."  2003 WL
  21757260, at *1 (Exh. 2).

- Securities and Exchange Commission (SEC) regulations
  do not require variable annuity prospectuses "to state
  that certain uses are 'unnecessary' or offer advice as
  to when, for tax purposes or otherwise, to use a
  variable annuity in a retirement plan."  Id.

- Plaintiffs' contention that variable annuities are
  "never appropriate" investments for qualified plans is
  groundless.  Id. at *2.

- Statements in a prospectus indicating that "a variable
  annuity may be used as an investment vehicle for a
  qualified retirement plan" are not false or
  misleading.  Id.

4

- The disclosures in the prospectuses were "enough to alert all reasonable investors to the fact that it is unnecessary, if solely for tax reasons, to use a variable annuity to fund a tax-deferred retirement account," and the allegedly omitted information was immaterial as a matter of law. Id.

- Plaintiffs' claims were time-barred. Id.

The court therefore dismissed the entire case, including claims under Sections 11 and 12(a)(2) of the 1933 Act. Id. at *1-2. The Donovan plaintiffs reacted by seeking leave to amend their complaint to substitute a "generally not appropriate" theory for their discredited claim that variable annuities were "never appropriate" for qualified plans. The court described this change as "only a semantic difference" and rejected it, affirming the prior dismissal with prejudice. Donovan, 2003 WL 22052879, at *1 (Exh. 3).

The decision in Donovan is fully supported by Eleventh Circuit precedent and other authorities set forth in defendants' memoranda in support of their motion to dismiss the consolidated complaint. See Defs.' Jan. 28, 2003 Mem. at 5-11, 57-79; June 6, 2003 Mem. at 1-14. The amended consolidated complaint in this case, filed September 8, 2003, post-dates both Donovan rulings. As described below, the essential allegations in the amended consolidated complaint mirror those in Donovan. Under the principles set forth in defendants' previous memoranda, and

5

confirmed so forcefully by the Donovan court, the amended consolidated complaint should be dismissed with prejudice.

II.  ARGUMENT

A.  Plaintiffs' Amended Consolidated Complaint Is Even More of a "Shotgun" Pleading than the Complaint the Court Struck

As the Court noted in its August 18, 2003 Order, a "shotgun" complaint incorporates a mass of factual allegations into each count by reference, leaving it to the trial court to "'sift out the irrelevancies.'"  Aug. 18, 2003 Order at 1 (citation omitted).  The Eleventh Circuit has stated that a complaint must plead each claim for relief with "clarity and precision," identifying the factual allegations that support each claim.  Anderson v. District Board of Trustees, 77 F.3d 364, 366-67 (11th Cir. 1996).  See also, e.g., Strategic Income Fund v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1295-97 (11th Cir. 2002).

This Court ordered plaintiffs to recast their complaint according to the Eleventh Circuit's standards, but plaintiffs did not comply.  Instead, plaintiffs used the Court's Order as an opportunity to add new shotgun allegations.  They have increased the number of paragraphs in the factual section of the complaint from 136 to 172; incorporated *all* 172 paragraphs in Counts I and II; and based Count III on "[t]he conduct alleged

6

herein," leaving it to the Court to divine which allegations plaintiffs deem relevant.  Am. Cons. Cpt. ¶¶ 173, 206, 238.[2]

Thus, plaintiffs continue to refuse to tie their factual allegations to their claims.  Indeed, though their causes of action are based on alleged misrepresentations and omissions in offering documents, they still have not attached or identified the offering documents which governed the annuities *they* purchased.  Instead, plaintiffs have incorporated a broad range of additional SEC filings (some of which they say they cannot even identify, and none of which they allege had anything to do with their transactions) (id. ¶¶ 120-27).  Plaintiffs have also changed their proposed class definition (id. ¶ 81), and changed the basis of their claims against several defendants, still without stating what role each defendant allegedly played with respect to plaintiffs' *own* transactions (¶¶ 175, 198, 208, 229).[3]

_____

[2]  As noted above, most of plaintiffs' new allegations first surfaced in their response to defendants' motion to dismiss the consolidated complaint.  Defendants explained in their June 6, 2003 reply memorandum why plaintiffs' allegations did not save their groundless legal claims.

[3]  Plaintiffs' revised allegations do not change the fact that, under established standing principles and the provisions of Sections 11 and 12, plaintiffs may not bring claims against defendants who did not issue, underwrite, sell or solicit the sale of the variable annuities *plaintiffs* bought.  Nor may plaintiffs base claims on offering documents for securities they did not acquire.  See Defs.' Jan. 28, 2003 Mem. at 35-45; June 6, 2003 Mem. at 15-19.

Plaintiffs obviously have no intention of pleading their claims with "clarity and precision." Instead, they are trying to make their case as convoluted as possible, presumably hoping to avoid the fate of plaintiffs in Donovan. Plaintiffs' disregard of the Court's Order in itself justifies dismissal of their case. See, e.g., Byrne v. Nezhat, 261 F.3d 1075, 1133 (11th Cir. 2001). Moreover, their changes and additions do nothing to cure the fundamental substantive defects in their case. As set forth in defendants' previous motion and memoranda, plaintiffs have not identified *any* material misrepresentation or omission in *any* offering document, and there was no duty to disclose the information plaintiffs claim was omitted. The Donovan decision confirms that moving defendants' arguments are correct, any further amendment would be futile, and this case should be dismissed with prejudice.

B.   Under the Principles Set Forth in Defendants' Previous Memoranda and Confirmed by the Opinions in Donovan, Plaintiffs Cannot State a Viable Cause of Action

1.   NASD Notices Do Not Establish Disclosure Requirements for Prospectuses

Plaintiffs' basic contention remains that variable annuity prospectuses violated Sections 11 and 12(a)(2) of the 1933 Act because they did not contain specific language from NASD NTM 99-35. See Am. Cons. Cpt. ¶¶ 85-97; Plfs.' Opp. to Defs.' Motion

8

to Dismiss at 1-3, 5, 72-76 (Apr. 30, 2003).  As the <u>Donovan</u>
court recognized in dismissing virtually identical claims,
plaintiffs are wrong as a matter of law:  "NASD notices . . .
are not law and noncompliance therewith cannot itself constitute
a violation of the federal securities laws. . . . No duty of
disclosure will arise directly from a NASD notice."  2003 WL
21757260, at *1 (Exh. 2).  <u>See also</u> Defs.' Jan. 28, 2003 Mem. at
65-67; June 6, 2003 Mem. at 2-11.

Like the plaintiffs in <u>Donovan</u>, the <u>Johnson</u> plaintiffs have
made allegations concerning different NASD publications and the
NASD's supposed beliefs concerning variable annuities.  <u>See</u> Am.
Cons. Cpt. ¶¶ 85-94, 97; <u>compare</u> <u>Donovan</u> Am. Cpt. ¶¶ 52-59, 88-
89; Proposed Sec. Am. Cpt. ¶¶ 54-64.[4]  Those allegations are
irrelevant, as the <u>Donovan</u> court concluded.  The NASD does not
purport to establish general disclosure obligations for written
prospectuses and registration statements, which are within the
exclusive jurisdiction of the SEC.  NTM 99-35, the notice on
which plaintiffs primarily rely, does not even apply to the
moving defendants.  The notice merely provides guidelines for
registered representatives to consider in tailoring

---

[4] For the Court's information, copies of the amended complaint
which Judge Pollack dismissed on July 31, 2003 and the proposed
second amended complaint he rejected on September 2, 2003 are
included in the appendix to defendants' motion to dismiss.

individualized sales presentations in fulfillment of their

unique suitability requirements.  The complaint does not plead

that any of the moving defendants were NASD members who dealt

with the public or were involved in the suitability

determinations contemplated by NTM 99-35.  See Defs.' June 6,

2003 Mem. at 2-11 and chart attached thereto as Exh. B

(describing roles of moving defendants and demonstrating that

the NASD guidelines at issue do not apply to them).

In addition, the information on which plaintiffs rely to

support their arguments (including the NASD notices and other

publications) is all publicly available, as are the tax code

provisions and regulations pertaining to retirement plans and

annuities.  See Am. Cons. Cpt. ¶¶ 6, 8, 85-95.  "Sections 11 and

12(a)(2) do not require the disclosure of publicly available

information."  In re Merrill Lynch & Co. Research Reports

Securities Lit., No. 02 MDL 1484, 2003 WL 21518833, *5 (S.D.N.Y.

July 2, 2003).  See also Defs.' Jan. 28, 2003 Mem. at 52, 72.

2.  The SEC Does Not Require the Disclosures at Issue

Plaintiffs have also added references to SEC Form N-4 in

the amended consolidated complaint.  As set forth in moving

defendants' previous memoranda, Form N-4 specifies the

information that variable annuity prospectuses should include,

and it does not require the disclosures plaintiffs urge.  Defs.'

10

Jan. 28, 2003 Mem. at 57-65; June 6, 2003 Mem. at 12-13.

Plaintiffs now quote the following language from Form

N-4:

> Briefly describe the tax consequences to investors of
> an investment in the variable annuity contracts being
> offered. . . .  Instruction: . . . .  If the tax
> consequences vary depending on the use of the variable
> annuity contract (i.e., to fund an individual
> retirement annuity or corporate plan), the variations
> should be briefly described.

Am. Cons. Cpt. ¶ 99.  Compare Donovan Sec. Am. Cpt. ¶ 66.

As the Donovan court specifically held, this instruction

calls only for disclosure of "variations in tax consequences."

2003 WL 21757260, at *1.  Plaintiffs do not point to any SEC

regulation requiring prospectuses "to state that certain uses

are 'unnecessary' or offer advice as to when, for tax purposes

or otherwise, to use a variable annuity in a retirement plan."

Id.; see 2003 WL 22052879, at *1.  Given that both the SEC and

the Internal Revenue Code permit the use of variable annuities

to fund tax-sheltered retirement plans, and annuities have been

used in this way for over 50 years,[5] the fact that there is no

such disclosure requirement is particularly significant.  See

Merrill Lynch, 2003 WL 21518833, *4 (dismissing § 11 and

12(a)(2) claims and finding no duty to disclose; alleged

conflicts of interest had received "extensive congressional and

---

[5] See Defs.' Jan. 28, 2003 Mem. at 18-23.

11

regulatory oversight," yet "no statute or rule requires the type of disclosure Plaintiff advocates here").

### 3.   The Prospectuses Did Not Contain Material Misrepresentations or Omissions

The Donovan court also rejected both plaintiffs' "never appropriate" and "generally not appropriate" theories, and held that the variable annuity prospectuses at issue did not contain material misrepresentations or omissions.  See 2003 WL 21757260, at *2; 2003 WL 22052879.  The court's conclusions, again, are fully consistent with case law in the Eleventh Circuit and elsewhere.  See Defs.' Jan. 28, 2003 Mem. at 57-79; June 6, 2003 Mem. at 11-13.

In Donovan, as in this case, the prospectuses stated that a variable annuity may be used as an investment vehicle for qualified retirement plans.  That statement, however, is true as a matter of law, and SEC Form N-4 specifically requires the prospectuses to "[i]dentify the types of qualified plans for which the variable annuity contracts are intended to be used." Form N-4, Item 12, page 13.  See Defs.' Jan. 28, 2003 Mem. at 20-23, 63-64; June 6, 2003 Mem. at 12-13.

The Donovan court also found that the disclosures in the prospectuses "conclusively disprove the materiality of the alleged omissions and are thus fatal to the Plaintiffs' claims."

2003 WL 21757260, at *2.   The prospectuses in <u>Donovan</u> stated that both variable annuities and qualified retirement plans were tax deferrable, set forth the annuities' benefits and fees, and advised prospective purchasers to seek tax advice.   <u>Id.</u> at *2 & n.1.   According to the court, these disclosures were "enough to alert all reasonable investors to the fact that it is unnecessary, if solely for tax reasons, to use a variable annuity to fund a tax-deferred retirement account."   <u>Id.</u> at *2.

The prospectuses on which the <u>Johnson</u> plaintiffs rely in their amended consolidated complaint contained *all* of this information – and more.   *Indeed, as plaintiffs concede, the* prospectuses expressly advised customers to "'consider carefully the costs and benefits'" of an annuity before purchasing it through a tax-favored arrangement such as an IRA, "'since the tax-favored arrangement itself provides tax-sheltered growth. . . .'"   Am. Cons. Cpt. ¶ 108 (quoting prospectuses and claiming they are "typical"); <u>see also</u> disclosure statements attached to *complaint as Exhs. 2-3.*   The <u>Donovan</u> complaint did not allege that any of the challenged prospectuses in that case contained similar advice.   <u>See Donovan</u> Am. Cpt. at ¶¶ 67, 70.   Thus, even more clearly here than in <u>Donovan</u>, the information plaintiffs claim the prospectuses omitted was immaterial as a matter of law.

### 4.   Plaintiffs' Claims Are Untimely

Finally, as the court held in Donovan, the prospectus disclosures put plaintiffs on inquiry notice of their claims. Because the Johnson plaintiffs did not file suit within the one year limitation period set forth in 11 U.S.C. § 77m, their claims are time-barred.   See Donovan, 2003 WL 21757260, at *2; Defs.' Jan. 28, 2003 Mem. at 45-53; June 6, 2003 Mem. at 22-23; Reply Memorandum of Defendant WMA Securities (June 6, 2003).[6]

---

[6]  Because plaintiffs have no valid claims under §§ 11 and 12(a)(2), the Court should also dismiss the control person claims in Counts I and II and the claim for declaratory and injunctive relief (Count III).   See Defs.' Jan. 28, 2003 Mem. at 84-85, 89-91.   In addition, though the Court need not reach these issues, the case should be dismissed on all other applicable grounds raised in defendants' motion to dismiss the consolidated complaint, including:   (1) plaintiffs may not bring claims against defendants who did not issue, underwrite, sell or solicit the sale of the variable annuities plaintiffs bought, or claims based on offering documents that did not cover the annuities plaintiffs acquired (id. at 35-45; June 6, 2003 Mem. at 15-19); (2) plaintiff Gerin's claims are barred by the three-year limitation provision of § 77m (Defs.' Jan. 28, 2003 Mem. at 45-47; June 6, 2003 Mem. at 23); (3) the claims against WRL Series Fund and Transamerica Life Insurance and Annuity Company should be dismissed because those defendants were added after the statute of limitations had expired, and the claims against them do not relate back to the original complaint (Jan. 28, 2003 Mem. at 53-56; June 6, 2003 Mem. at 24-27); (4) the complaint should be dismissed because plaintiffs have not asserted damages recoverable under §§ 11 or 12(a)(2) (Jan. 28, 2003 Mem. at 79-84; June 6, 2003 Mem. at 27), and (5) plaintiffs' claims sound in fraud and do not pass muster under Fed. R. Civ. P. 9(b) (Jan. 28, 2003 Mem. at 32-33; June 6, 2003 Mem. at 20).

III. CONCLUSION

For the reasons stated in this memorandum and moving defendants' previously-filed memoranda, including the reply memorandum attached as Exhibit 1, moving defendants respectfully request that the amended consolidated complaint be dismissed with prejudice.

Respectfully submitted,

*Michael J. Bowers*

Michael J. Bowers
Georgia Bar No. 07160
Christopher S. Anulewicz
Georgia Bar No. 020914
BALCH & BINGHAM, L.L.P.
14 Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, GA 30305
Phone (404) 261-6020
Fax (404) 261-3656

James J. Rohn
Patricia M. Hamill
Deborah J. Krabbendam
CONRAD O'BRIEN GELLMAN
& ROHN, P.C.
1515 Market Street
Sixteenth Floor
Philadelphia, PA 19102
Phone (215) 864-9600
Fax (215) 864-9620

Counsel for Defendants AEGON USA, Inc., AEGON
Financial Services Group, Inc., AFSG Securities
Corp., PFL Life Insurance Co., AUSA Life
Insurance Co., Inc., Western Reserve Life
Assurance Co. of Ohio, WRL Series Fund, Inc.,
Bankers United Life Assurance Co. and
Transamerica Life Insurance and Annuity Co.

Dated: September 26, 2003



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JEFFERY L. JOHNSON, on behalf
of himself and all others
similarly situated, <u>et al.</u>,

               Plaintiffs,    Index No. 1-01-CV-2617-CAP

     v.                 MOTION TO DISMISS

AEGON USA, INC., WMA
SECURITIES, INC., <u>et al.</u>,

               Defendants.

REPLY MEMORANDUM OF MOVING DEFENDANTS AEGON USA, INC.,
AEGON FINANCIAL SERVICES GROUP, INC., AFSG SECURITIES
CORPORATION, PFL LIFE INSURANCE COMPANY, AUSA LIFE
INSURANCE COMPANY, INC., WESTERN RESERVE LIFE ASSURANCE CO.
OF OHIO, WRL SERIES FUND, INC., BANKERS UNITED LIFE
ASSURANCE COMPANY, AND
TRANSAMERICA LIFE INSURANCE AND ANNUITY COMPANY,
<u>IN SUPPORT OF MOTION TO DISMISS THE CONSOLIDATED COMPLAINT</u>

Dated:  June 6, 2003     Michael J. Bowers
                           Georgia Bar No. 071650
                           Christopher S. Anulewicz
                           Georgia Bar No. 020914
                           BALCH & BINGHAM, L.L.P.
                           14 Piedmont Center, Suite 1100
                           3535 Piedmont Road
                           Atlanta, GA 30305
                           Phone (404) 261-6020
                           Fax (404) 261-3656

                           James J. Rohn
                           Patricia M. Hamill
                           Deborah J. Krabbendam
                           CONRAD O'BRIEN GELLMAN & ROHN, P.C.
                           1515 Market Street, 16th Floor
                           Philadelphia, PA 19102
                           Phone (215) 864-9600

Fax (215) 864-9620

Counsel for Defendants AEGON USA, Inc.,
AEGON Financial Services Group, Inc.,
AFSG Securities Corp., PFL Life
Insurance Co., AUSA Life Insurance Co.,
Inc., Western Reserve Life Assurance
Co. of Ohio, WRL Series Fund, Inc.,
Bankers United Life Assurance Co., and
Transamerica Life Insurance and Annuity
Co.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES......................................i

I.   INTRODUCTION..........................................1

II.  ARGUMENT..............................................4

     A.   The Moving Defendants Cannot Be Held
          Liable for Violation of NASD Suitability
          Rules, Which Apply to Individual Sales
          Situations......................................4

          1.   The Suitability Rules Apply Only to
               the Broker-Dealer and its Registered
               Representative Who Sold the Variable
               Annuities.................................4

          2.   The NASD Guidelines Are Intended to
               Apply to the Unique Point of Sale
               Process and the Communications
               Between the Purchaser and the
               Registered Representative.................9

          3.   No Private Right of Action Exists for
               Violation of NTM 99-35...................10

          4.   The Offering Documents Are Not
               Required to Negatively Characterize
               Variable Annuities.......................11

          5.   Plaintiffs Cannot Show Defendants
               Had a Duty to Disclose More Than They
               Did......................................14

     B.   Plaintiff Have No Standing to Assert
          Securities Law Claims Against Defendants
          Who Did Not Issue, Underwrite, Sell or
          Solicit the Sale of the Variable Annuities
          Plaintiffs Purchased...........................15

     C.   The Consolidated Complaint Does Not
          Satisfy the Applicable Pleading
          Standards......................................20

D.   Plaintiffs' Claims Are Barred by the
     Statute of Limitations........................22

     1.   All Plaintiffs Were on Inquiry Notice
          of Their Claims When They Purchased
          Their Annuities.........................22

     2.   Ms. Gerin's Claims Are Barred by the
          Three Year Statute of Statute of Repose...23

E.   The Claims Against the Defendants Added
     in December 2002 Do Not Relate Back to the
     Original Complaint and Should
     Be Dismissed.................................24

F.   Plaintiffs Have Not Alleged Actionable
     Damages......................................27

G.   Plaintiffs' Controlling Person Claims and
     Counts III-V Should Be Dismissed for the
     Reasons Set Forth in Defendants'
     Initial Memorandum...........................28

III. CONCLUSION.......................................29

## TABLE OF AUTHORITIES

### FEDERAL CASES

Basic Inc. v. Levinson,
        485 U.S. 224 (1988)..................................10

Bryant v. Avado Brands,
        187 F.3d 1271 (11th Cir. 1999)......................21

Christiansen v. Beneficial Nat'l Bank,
        972 F. Supp. 681 (S.D. Ga. 1997)....................16

Demaria v. Andersen,
        318 F.3d 170 (2d Cir. 2003).........................17

Dodds v. CIGNA Sec., Inc.,
        12 F.3d 346 (2d Cir. 1993)..........................10

Dudek v. Prudential Sec., Inc.,-
        295 F.3d 875 (8th Cir. 2002).....................28-29

Fietelberg v. Merrill Lynch & Co.,
        234 F. Supp.2d 1043 (N.D. Cal. 2002)................28

Franze v. Equitable Assurance,
        296 F.3d 1250 (11th Cir. 2002)......................22

Frietsch v. Refco, Inc.,
        56 F.3d 825 (7th Cir. 1995).........................19

Goodman v. Sipos,
        259 F.3d 1327 (11th Cir. 2001)......................17

Itel Capital Corp. v. Cups Coal Co.,
        707 F.2d 1253 (11th Cir. 1983)......................26

James v. City of Dallas,
        254 F.3d 551 (5th Cir. 2001)........................16

In re McKesson HBOC, Inc. Sec. Litig.,
        126 F. Supp.2d 1248 (N.D. Cal. 2000)................27

Olmstead v. Pruco Life Ins. Co.,
        283 F.3d 429 (2d Cir. 2002).........................28

Oxford Asset Mgmt, Ltd. v. Jaharis,
    297 F.3d 1182 (11th Cir. 2002)......................14

In re PaineWebber Ltd. Partnerships Litig.,
    171 F.R.D. 104 (S.D.N.Y. 1997),
    aff'd, 117 F.3d 721 (2d Cir. 1997)...............19-20

Pinter v. Dahl,
    486 U.S. 622 (1988)...............................18

Retired Chicago Police Ass'n v. Chicago,
    141 F.R.D. 477 (N.D. Ill. 1992),
    aff'd in relevant part, 7 F.3d 584 (7th Cir.
    1993).........................................17, 18

Retired Chicago Police Ass'n v. Chicago,
    7 F.3d. 584 (7th Cir. 1993).......................19

Ryder v. Int'l Corp. v. First Am. Nat'l Bank,
    943 F.2d 1521 (11th Cir. 1991)....................18

Santa Fe Indus., Inc. v. Green,
    430 U.S. 462 (1977)...............................14

S.E.C. v. Vittor,
    323 F.3d 930 (11th Cir. 2003)......................5

Shaw v. Digital Equip. Corp.,
    82 F.3d 1194 (1st Cir. 1996)......................18

TSC Indus., Inc. v. Northway, Inc.,
    426 U.S. 438 (1976)...............................10

In re Unicapital Corp. Sec. Litig.,
    149 F. Supp.2d 1353 (S.D. Fla. 2001)..............18

In re VeriFone Sec. Litig.,
    11 F.3d 865 (9th Cir. 1993).......................11

VKK Corp. v. Nat'l Football League,
    244 F.3d 114 (2d Cir. 2001).......................26

Warth v. Seldin,
    422 U.S. 490 (1975)...............................16

Wayne v. Jarvis,
    197 F.3d 1098 (11th Cir. 1999).............24, 25, 26

DOCKETED CASES

Deaner v. Solomon,
      No. 02 Civ. 8772, 2003 WL 1565949 (S.D.N.Y.
      Mar. 12, 2003)......................................25

Diehl v. Twin Disc, Inc.,
      No. 94 C 50031, 1995 WL 330637 (N.D. Ill.
      May 30, 1995)......................................19

Frietsch v. Refco, Inc.,
      No. 92 C 6844, 1994 WL 10014 (N.D. Ill.
      Jan. 13, 1994).....................................18

Kunzweiler v. Zero.net, Inc.,
      No. 3:00-CV-2553-P, 2002 WL 1461732
      (N.D. Tex. July 3, 2002)...........................21

MEVC Draper Fiser Jurvetson Fund I, Inc. v. Millennium
      Partners,
      No. 03 Civ. 862, 2003 WL 941552
      (S.D.N.Y. March 6, 2003)...........................28

Northwestern Mut. Life Ins. Co. v. Banc of A. Sec. LLC,
      No. 02 Civ. 3788, 2003 WL 1738488
      (S.D.N.Y. March 31, 2003)..........................21

Randall's Family Golf Centers v. Acushnet Co.,
      No. 02-2278, 2002 WL 31496229
      (Bank. S.D.N.Y. Nov. 8, 2002)......................26

Seegars v. Adcox,
      No. CV101-82, 2002 WL 32079479
      (S.D. Ga. Sept. 2, 2002).......................25, 27

FEDERAL STATUTES

15 U.S.C. § 78o-3(g)....................................5-6

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JEFFERY L. JOHNSON, on behalf
of himself and all others
similarly situated, <u>et al.</u>,

                  Plaintiffs,    Index No. 1-01-CV-2617-CAP

       v.                 MOTION TO DISMISS

AEGON USA, INC., WMA
SECURITIES, INC., <u>et al.</u>,

                  Defendants.

**REPLY MEMORANDUM OF MOVING DEFENDANTS AEGON USA, INC., AEGON
FINANCIAL SERVICES GROUP, INC., AFSG SECURITIES CORPORATION, PFL
LIFE INSURANCE COMPANY, AUSA LIFE INSURANCE COMPANY, INC.,
WESTERN RESERVE LIFE ASSURANCE CO. OF OHIO, WRL SERIES FUND,
INC., BANKERS UNITED LIFE ASSURANCE COMPANY, AND
TRANSAMERICA LIFE INSURANCE AND ANNUITY COMPANY,
IN SUPPORT OF MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**

I.   INTRODUCTION

     Plaintiffs' response to defendants' Motion to Dismiss

illustrates their persistent - and futile - search for a viable

theory.  Their original complaint asserted securities law claims

under Section 10(b) of the Securities Exchange Act of 1934.  In

their consolidated complaint, plaintiffs abandoned those claims

and substituted claims under Sections 11 and 12(a)(2) of the

Securities Act of 1933, focusing exclusively on the written

offering documents (registration statements and prospectuses)
for the variable annuities.  In both complaints, however, the
starting point for all of their securities law claims was their
categorical declaration that "*[d]eferred annuities sold by*
*defendants are never appropriate investments for placement in*
*tax-deferred retirement plans* . . . ."  Cons. Cpt. ¶ 4 (bold,
italics and underlining original).  See also Cpt. ¶ 4.

    In defendants' initial memorandum, they demonstrated that
the "never appropriate" theory was simply plaintiffs' opinion.
That opinion is contradicted by over 50 years of federal tax and
securities regulation, which has long allowed the sales that
plaintiffs now want this Court to ban.  In response, plaintiffs
simply abandon their "never appropriate" theory and are trying
out a new one:  that variable annuities are "hardly ever"
appropriate investments for qualified plans.

    Plaintiffs now base their claims on the alleged failure of
the variable annuity offering documents to include language
contained in a National Association of Securities Dealers
("NASD") pronouncement, Notice To Members 99-35 ("NTM 99-35").[1]

---

[1]  See pages 1-5 of plaintiffs' Opposition, which summarize their
arguments and are devoted exclusively to a discussion of the
NASD and NTM 99-35.  In the concluding section of this summary,
plaintiffs argue that all defendants violated the alleged
"disclosure requirements established by the NASD."  Pls.' Opp.
at 5.  NTM 99-35 is attached as Exh. A.

Plaintiffs' efforts to salvage their claims are unavailing.  The
new "hardly ever appropriate" theory is invalid for the same
reasons as the "never appropriate" theory.  The NASD Notice on
which plaintiffs now rely does not apply to the moving
defendants because:   (1) none of them are alleged to be NASD
members dealing with the public; (2) the NASD Notice merely
provides guidelines for registered representatives to consider
in tailoring individualized sales presentations in fulfillment
of their unique suitability requirements; and (3) the NASD
Notice does not (and could not) purport to establish general
disclosure obligations for written registration statements and
prospectuses, which are within the exclusive jurisdiction of the
Securities and Exchange Commission ("SEC").

    For all of the above reasons and as more fully set forth
herein, plaintiffs' consolidated complaint must be dismissed.
In addition, as more fully stated below and in defendants'
initial memorandum, plaintiffs' claims should be dismissed
because (1) the prospectuses at issue set forth the facts, and
the law does not require defendants to (mis)characterize the
facts in the manner in which plaintiffs demand; (2) plaintiffs
lack standing to bring claims against defendants who did not
issue, underwrite, sell or solicit the sale of the variable
annuities plaintiffs bought; (3) plaintiffs have not adequately

3

pled their claims; (4) plaintiffs' claims are barred by the

statute of limitations; (5) the claims against WRL Series Fund

and Transamerica do not relate back to the date of the original

complaint and are therefore barred; and (6) plaintiffs seek

damages which are not recoverable.[2]  Because plaintiffs have now

made three unsuccessful efforts to state a claim, the Court

should dismiss this case with prejudice.[3]

II.  ARGUMENT

    A.  The Moving Defendants Cannot Be Held Liable for
        Violation of NASD Suitability Rules, Which Apply to
        Individual Sales Situations

        1.  The NASD Suitability Rules Apply Only to the
            Broker-Dealer and its Registered Representative Who
            Sold the Variable Annuities

The premise for plaintiffs' entire argument is that, if

they allege a violation of the NASD "Suitability Rule," the

alleged violation creates a claim of nondisclosure and

---

[2]  With respect to plaintiffs' controlling person claims and
their claims in Counts III-V, defendants rely primarily on their
initial memorandum.

[3]  The changes in plaintiffs' theory make it even more evident
that this case can never be certified as a class action.
Plaintiffs have abandoned the "never appropriate" theory and now
base their claims on the guidelines the NASD provides for
individual representatives to consider in conducting their
individual sales presentations.  Indeed, plaintiffs now
implicitly concede that in selecting a variable annuity for a
qualified plan, an investor might want its non-tax benefits.
See, e.g., Pls.' Opp. at 10 (quoting NTM 99-35).

misrepresentation grounded in the written offering documents for
the product.[4]  Plaintiffs do not and cannot cite support for this
argument.  The argument:  (1) disregards the purpose and scope
of the NASD Suitability Rule, which applies to the sale of a
variable annuity by a registered representative of an NASD
member; and (2) confuses the obligation of the issuer of the
variable annuity with that of the seller of the annuity and
ignores their distinct roles.

Plaintiffs acknowledge and cite cases holding that the NASD
is a self-regulatory organization **for securities broker-dealers.**
Pls.' Opp. at 1-2.  See also S.E.C. v. Vittor, 323 F.3d 930, 932
(11th Cir. 2003).  They also concede that NASD rules and notices
are "not binding upon firms other than NASD member broker-
dealers."  Pls.' Opp. at 76.  Although plaintiffs allege that
two of the defendants (WMA Securities and AFSG Securities) are
broker-dealers and members of the NASD (id. at 73), they concede
that only WMA Securities is a broker-dealer conducting a retail
business with the public.  They identify AFSG Securities only as
an underwriter, not as a broker-dealer selling products to the
public.  See id. at 8-9, 48-49.  As set forth in defendants'

---

[4]  NASD Rule 2310, referred to in NTM 99-35 as the "Suitability
Rule," addresses the information a member shall make reasonable
efforts to obtain from a customer when the member is making a
recommendation to a customer.

initial memorandum, and as plaintiffs concede, Western Reserve

and the other defendants are not and cannot be members of the

NASD.  See Defs.' Mem. at 66; see also 15 U.S.C. § 78o-3(g)

(association "shall deny membership to any person who is not a

registered broker or dealer").

Under plaintiffs' own concessions, NASD suitability rules

apply only to WMA Securities in its individual sales of variable

annuities.  Since plaintiffs state that their claims are based

solely on the contents of the written offering documents (Pls.'

Opp. at 64 & n.29), the NASD suitability rules have nothing to

do with this case.

Plaintiffs attempt to obfuscate the duties of the various

defendants by continually shifting their theories and lumping

together all of the defendants without delineating their roles,

if any, with respect to plaintiffs' own transactions.  As

plaintiffs concede, however, all of them purchased a variable

annuity that was issued by Western Reserve, underwritten by AFSG

and sold to them by WMA Securities or another broker-dealer

firm.  Cons. Cpt. ¶¶ 35, 45, 68, 70, 78; Pls.' Opp. at 8-9, 48-

49.  Below is a chart that provides a general outline of the

different roles the different companies played in the issuing,

underwriting, or sale of the variable annuities plaintiffs

purchased.  The chart shows that none of the provisions of NTM

6

99-35 applied to Western Reserve or any of the other moving defendants with respect to the variable annuities plaintiffs purchased and illustrates why defendants must be dismissed under plaintiffs' new theory based on NTM 99-35.[5]

## Variable Annuity Process -- Issuance to Sale



---

[5]   The roles reflected are those which are set forth in the registration statements and prospectuses at issue or which plaintiffs have conceded in their consolidated complaint or +memorandum.  Plaintiffs do not allege that AEGON, AEGON Financial, PFL, AUSA, Transamerica, or Bankers Life issued, underwrote or sold the annuities plaintiffs purchased.  See above at 5-6; Defs.' Mem. at 16, 39-43.  Those companies are therefore not included in the chart.  Since plaintiffs do not and cannot allege that those defendants are NASD members or selling broker-dealers, none of them can be subject to NASD rules.  A color version of the Chart is attached as Exh. B.

Plaintiffs base their suitability arguments on the alleged violation of NTM 99-35, which addresses the evaluation that registered representatives of NASD members are to conduct when recommending that an individual customer purchase a variable annuity.[6] Two fundamental premises from the NASD's Suitability Rule underpin NTM 99-35. First, the NASD *member* (i.e., a registered broker-dealer) must obtain adequate information from and consider making certain disclosures as may be appropriate to a particular customer. Second, the NASD *member* must not recommend a security to the customer without reasonable grounds for believing it is suitable for that customer.

With respect to the sale of variable annuities, NTM 99-35 addresses these points with some particularity in language which plaintiffs repeatedly cite:

> When a registered representative recommends the purchase of a variable annuity for any tax-qualified retirement account (*e.g.*, 401(k) plan, IRA), the registered representative should disclose to the customer that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary. The registered representative

---

[6] Plaintiffs also cite NASD Notice to Members 96-86, which reminds members that sales of variable annuities are subject to NASD suitability requirements, but plaintiffs do not argue that defendants violated any provision of that Notice. See Pls.' Opp. at 2-3.

> should recommend a variable annuity only when its
> other benefits, such as lifetime income payments,
> family protection through the death benefit, and
> guaranteed fees, support the recommendation.

Id. at 3, ¶ 11.  See Pls.' Opp. at 3.[7]

NTM 99-35 as a whole and this recommendation in particular
relate only to the point of sale obligations of the registered
representative.  The Notice and recommendations do not apply to
any of the moving defendants.  As the preceding chart indicates
(and as plaintiffs concede), WMA Securities was the only
defendant that was a NASD member, was a selling broker-dealer,
and had a registered representative dealing with any plaintiff.
Pls.' Opp. at 9, 48-49; Cons. Cpt. ¶¶ 68-70.  Under plaintiffs'
own concessions, NASD rules cannot bind Western Reserve or the
other moving defendants.

> 2.  The NASD Guidelines Are Intended to Apply to the
> Unique Point of Sale Process and the Communications
> Between the Purchaser and the Registered
> Representative

Even as to a selling broker-dealer, the very nature of the
guidelines belies plaintiffs' contention that the prospectus
must contain specific recommendations regarding the suitability
of a variable annuity for particular types of investors.  The

---

[7]  While plaintiffs claim the NASD "mandated" "across-the-board
disclosure requirements" in this Notice (Pls.' Opp. at 14), the
Notice itself makes clear that it is setting forth "guidelines"
for members, not mandatory procedures.  NTM 99-35 at 1, 2.

NASD notice directs that the issue be addressed at the point of individual sales. The discussion contemplated in NTM 99-35 envisions that the registered representative will inquire into each customer's individual circumstances and make disclosures tailored to the particular customer at the individual point of sale.

It would be impractical, if not impossible, to encumber issuers with that obligation. The Second Circuit has held that an issuer was not required to inform an investor that limited partnerships were unsuitable for a person in her position, reasoning that "[i]ssuers cannot be expected to anticipate in their prospectuses or other offering papers the financial needs of every potential investor, the investment alternatives before each potential investor, and the risk averseness of each potential investor." Dodds v. CIGNA Securities, Inc., 12 F.3d 346, 351 (2d Cir. 1993).

### 3. No Private Right of Action Exists for Violation of NTM 99-35

Plaintiffs admit there is no private right of action for violation of NASD rules. Pls.' Opp. at 74 n.34. They nevertheless seek to accomplish the same result indirectly, by arguing that violation of guidelines in a NASD notice "presumptively" establishes the materiality element of their

10

federal securities law claims.  Plaintiffs offer no authority to
support their argument.[8]  Since the NASD guidelines do not even
apply to the moving defendants, are not mandatory and do not
apply to prospectus contents, the argument is misleading and
must be rejected out of hand.  This kind of bootstrapping has
been rejected even in cases involving broker-dealers and conduct
subject to NASD rules.  See, e.g., In re VeriFone Securities
Litigation, 11 F.3d 865, 870 (9th Cir. 1993) (plaintiffs cannot
avoid obligation to prove materiality under federal securities
laws by alleging violation of NASD or stock exchange disclosure
requirements).

### 4.  The Offering Documents Are Not Required to Negatively Characterize Variable Annuities

Even assuming NTM 99-35 could conceivably provide a basis
for a cause of action against Western Reserve and the other
moving defendants, the offering documents still were not

---

[8]  After stating their "presumptive" materiality argument,
plaintiffs do cite two Supreme Court cases, but neither supports
the argument.  Both cases addressed general standards of
materiality and did not involve the NASD.  While the Court cited
the SEC's position in support of its view of materiality
standards, it did not state or suggest that materiality can be
"presumed" based on an agency's actions.  Basic Inc. v.
Levinson, 485 U.S. 224, 239-40 & n.16, 108 S. Ct. 978 (1988);
TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 &
n.10, 96 S. Ct. 2126 (1976) (both cited in Pls.' Opp. at 5, 75).
Regardless, plaintiffs' argument cannot apply here, since the
content of the prospectuses is not within the NASD's delegated
authority or area of expertise.

11

required to contain the language for which plaintiffs argue.

Plaintiffs contend that the prospectus language was inadequate

because it was "neutral," claiming the NASD language is

stronger.  Pls.' Opp. at 80.  But the case law holds that a

prospectus must provide facts, not characterizations of the

facts or descriptions of the implications of the facts.  <u>See</u>

Defs.' Mem. at 70-75.[9]

    While plaintiffs argue that the prospectuses affirmatively

misrepresented variable annuities as appropriate for qualified

retirement plans (Pls.' Opp. at 67), the statements plaintiffs

cite are indisputably true, and the *offering documents*

undeniably conform to SEC Form N-4, which specifies what

information they must include.  <u>See</u> Defs.' Mem. at 57-59.  In

particular, the law **does** allow annuities to be purchased for

qualified plans.  The SEC instructions for Form N-4 **require**

---

[9]   Plaintiffs also state that not all of the prospectuses contain
the disclosure that "the tax-favored arrangement itself provides
tax-sheltered growth."  Pls.' Opp. at 66.  They do not, however,
attach any other prospectuses and they argue repeatedly that all
the prospectuses on which they rely are virtually identical
(<u>e.g.</u>, <u>id.</u> at 15, 41).  Defendants disagree that the
prospectuses are "virtually identical," but the prospectuses did
adequately describe the material, actual facts.  Plaintiffs have
not denied that the prospectuses described the features and
costs of variable annuities, identified the qualified plans in
which the law allows variable annuities to be placed, and
advised customers to obtain their own tax or legal advice.
Finally, the tax code is publicly available information, and
investors are expected to obtain this kind of information for
themselves.  <u>See</u> Defs.' Mem. at 58, 72 (citing cases).

variable annuity prospectuses to identify the types of qualified

plans for which the annuities can be used, and that is what

Western Reserve's prospectuses did.  See id. at 20-23.

Plaintiffs' disclosure argument thus boils down to their

view that the prospectuses should negatively characterize

variable annuities as being "never" (or "hardly ever")

appropriate in qualified plans. Defendants readily acknowledge

that the offering documents do not so state, and for good

reason:  although defendants do not share, and indeed reject,

plaintiffs' opinion, the offering documents do not provide any

opinions.  Instead, the offering documents limit themselves to

the information required by the governing SEC disclosure rules.

Such matters of opinion are **not** an appropriate topic for the

offering documents.  Rather, whether a variable annuity is

appropriate for a particular investor is something each investor

must determine individually based on his or her individual

circumstances, with the assistance of a registered

representative.  This is the core teaching of NTM 99-35.  The

mere omission of the plaintiffs' attorneys' highly subjective

opinion is simply not deceptive conduct.[10]

---

[10]  At the same time, statements of opinion are not normally
actionable, especially considered in light of the cautionary
language in the prospectuses at issue here.  See Defs.' Mem. at
58-61, 68 n.40.

5.   Plaintiffs Cannot Show Defendants Had a Duty to
Disclose More than They Did

Finally, as set forth in defendants' initial memorandum,

materiality and duty to disclose are two separate elements, and

plaintiffs must properly plead both.  Oxford Asset Management,

Ltd. v. Jaharis, 297 F.3d 1182, 1189 (11th Cir. 2002).

Plaintiffs barely even mention duty to disclose, and have not

alleged anything which could give rise to such a duty.  See

Defs.' Mem. at 75-79.  Any argument based on the NASD notices

would fail because those notices do not create a duty which

could apply to prospectus disclosures.  Since plaintiffs have

not alleged that the prospectuses omitted material information

defendants had a duty to disclose, plaintiffs have no case.[11]

---

[11]   Plaintiffs suggest the broker may have owed them fiduciary
duties, but the federal securities laws do not regulate alleged
breaches of fiduciary duty.  See, e.g., Santa Fe Industries,
Inc. v. Green, 430 U.S. 462, 97 S. Ct. 1292 (1977).

B.   Plaintiffs Have No Standing to Assert Securities Law
Claims Against Defendants Who Did Not Issue, Underwrite,
Sell or Solicit the Sale of the Variable Annuities
Plaintiffs Purchased[12]

Defendants pointed out in their initial memorandum that

both under general principles of standing and the specific

limitations of Sections 11 and 12, plaintiffs cannot sue

entities which did not issue, underwrite, sell or solicit the

sale of the variable annuities plaintiffs themselves purchased.

In response, plaintiffs have alleged again that the issuer of

their variable annuities was Western Reserve, AFSG Securities

was the underwriter, and WMA Securities was the broker that sold

Mr. Johnson his variable annuity.  Pls.' Opp. at 8-9, 48-49.

Despite very clear case law to the contrary, however, plaintiffs

insist they can sue other defendants (six named and 297 unnamed)

that "were not involved in their personal transactions."  Id. at

37.  Indeed, they insist they can sue any entity that is related

---

[12]   This argument applies to the Section 11 claims against PFL,
WRL Series Fund, Bankers Life and ABC Corp. 1-99 and the Section
12 claims against AEGON Financial, PFL, AUSA Life, WRL Series
Fund, Bankers Life, Transamerica Life, AFSG, ABC Corp. 1-99, LMN
Corp. 1-99 and XYZ Corp. 1-99.  Plaintiffs also do not have
standing to assert claims based on products they did not buy,
including fixed annuity and group annuity products.  Plaintiffs
do not allege they participated in any group annuity plan, and
there is no basis whatsoever for them to include such claims in
this lawsuit.  See Defs.' Mem. at 17 n.15; 57 n.34.

to AEGON and allegedly issued, underwrote, sold or solicited the
sale of __any__ variable annuity - and that the court cannot address
the issue of their standing to sue these defendants until they
move for class certification.  See id. at 36-37, 41-42, 46-47.
Plaintiffs are wrong on all points as a matter of law.

First, "whether the plaintiff has made out a 'case or
controversy' between himself and the defendant within the
meaning of Article III . . . is the threshold question in every
federal case, determining the power of the court to entertain
the suit."  Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197
(1975).  Plaintiffs seem to think if they can show standing as
to one claim, they can bring any claim against anyone.  That
flatly contradicts the case law.  In a class action, if no named
plaintiff has standing to assert a particular claim or to sue
particular defendants, the court lacks subject matter
jurisdiction over those claims or defendants and must dismiss
them from the case.  See, e.g., Christiansen v. Beneficial
National Bank, 972 F. Supp. 681, 683 (S.D. Ga. 1997).  See also
Defs.' Mem. at 34-35, 43-45 (citing cases); James v. City of
Dallas, 254 F.3d 551, 563, 569 (5th Cir. 2001).[13]

---

[13]  Because lack of standing appears on the face of the
complaint, the issue can be resolved on a motion to dismiss.
See, e.g., Christiansen, 972 F. Supp. at 683.  See also Warth,
422 U.S. at 501.  If, however, this Court believes that factual

Second, Sections 11 and 12 limit the ability to sue.
Section 11 allows plaintiffs to sue issuers and underwriters of
the securities **they** acquired, and Section 12 provides that a
seller is only liable "to the person purchasing such security
from him." (Emphasis added). See Defs.' Mem. at 38-43.[14]
Plaintiffs have no trouble identifying Western Reserve as the
issuer of their variable annuities, AFSG as the underwriter, and
WMA Securities as the seller to Mr. Johnson. Pls.' Opp. at 48-
49. They label the other defendants as issuers, underwriters
and sellers, but since plaintiffs do not (and cannot) allege
those defendants were issuers, underwriters or sellers of the
annuities **they** purchased, plaintiffs' arguments are irrelevant.

Plaintiffs also suggest that they can base Section 12
claims on allegations that other defendants "participated" in
the sales process through alleged involvement in drafting
offering documents. Pls.' Opp. at 49-52. The Supreme Court,

---

development is necessary to decide the standing issue, the Court
can and should direct or allow the parties to submit the
evidence the Court needs to determine if it has subject matter
jurisdiction. See id.; Goodman v. Sipos, 259 F.3d 1327, 1331
n.6 (11th Cir. 2001) ("A federal court must always dismiss a case
upon determining that it lacks subject matter jurisdiction,
regardless of the stage of the proceedings, and facts outside of
the pleadings may be considered as part of that determination").

[14] See also Demaria v. Andersen, 318 F.3d 170, 178 (2d Cir.
2003).

however, has flatly rejected the position that a party can be held liable under Section 12 if it merely "participated in soliciting the purchase" or even was a "substantial factor" in causing the transaction to take place.  Pinter v. Dahl, 486 U.S. 622, 651 & n.27, 654, 108 S. Ct. 2063 (1988).  See also Defs.' Mem. at 42; Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1215-16 (1st Cir. 1996); Ryder International Corp. v. First American National Bank, 943 F.2d 1521, 1534 (11th Cir. 1991).

Finally, the cases plaintiffs cite do not support their unwarranted expansion of Sections 11 and 12.  At page 50 they cite cases which were allowed to proceed because of allegations that defendants sold securities to or had direct sales contacts with named plaintiffs.[15]  The cases plaintiffs discuss at pages 36-38 did not allow parties to sue companies that issued or sold

---

[15]   See, e.g., In re Unicapital Corp. Securities Lit., 149 F. Supp. 2d 1353, 1366-67 & n.19, 1368 & n.24, 1369 (S.D. Fla. 2001) (since § 12(a)(2) claimant "is limited to seeking recourse from those involved in the actual sale of the securities to him," court dismissed individual defendants who "were not purveyors of Unicapital stock" and stated that issuer was not subject to § 12 liability because it was not an offeror or seller; court also stated plaintiff must be able to "trace the purchase of his securities to the registration statement that allegedly violated § 11" to have standing under that section).

securities only to other people, and did not address either the

standing doctrine or the limitations of Sections 11 and 12.[16]

---

[16]   In <u>Frietsch v. Refco, Inc.</u>, No. 92 C 6844, 1994 WL 10014 (N.D.
Ill. Jan. 13, 1994), the named plaintiffs sued two brokerage
companies which had set up a series of investment pools in an
alleged "Ponzi scheme."   The court allowed plaintiffs to
represent a class including investors in all the pools.   The
court noted that defendants had used different promoters for
some pools, but plaintiffs were not seeking to sue entities with
which they themselves had no dealings.   <u>See id.</u> at *7.   (For
further description of facts see <u>Frietsch v. Refco, Inc.</u>, 56
F.3d 825 (7th Cir. 1995)).   <u>Retired Chicago Police Ass'n v.
Chicago</u>, 141 F.R.D. 477 (N.D. Ill. 1992), <u>aff'd in relevant
part</u>, 7 F.3d 584 (7th Cir. 1993), involved a class action against
a city and four employee pension funds that were participants in
the city's "annuitant healthcare plan," alleging breach of a
promise to give free benefits to retirees.   The court denied
class certification because there was not sufficient evidence of
uniform representations even to members of one fund, much less
all four funds.   <u>Id.</u> at 486-87.   The court did not address who
can be sued in a class action.   The Seventh Circuit also did not
address this issue when it affirmed the denial of class
certification.   <u>See</u> 7 F.3d at 596-99.   In <u>Diehl v. Twin Disc,
Inc.</u>, No. 94 C 50031, 1995 WL 330637 (N.D. Ill. May 30, 1995),
retirees brought a class action against their former employer
under ERISA, claiming the employer had breached a written
agreement not to reduce their insurance benefits.   The court
held the retirees could represent a class even though class
members were covered under a series of six insurance agreements.
The suit named only one defendant; all the agreements, including
those that covered named plaintiffs, had been established by
collective bargaining agreements between defendant and the
employees' union; and the claim for liability was based on the
defendant's written agreement not to reduce benefits.
Plaintiffs did not seek and were not allowed to sue a defendant
that was not a party to the insurance plan that covered them.
Finally, in <u>In re PaineWebber Ltd. Partnerships Litigation</u>, 171
F.R.D. 104 (S.D.N.Y.), <u>aff'd</u>, 117 F.3d 721 (2d Cir. 1997), the
court approved a class action settlement in a RICO and
securities law case involving limited partnerships organized,
marketed and operated by PaineWebber.   In that case, however,
PaineWebber allegedly sold shares in the partnerships to all the

C.   The Consolidated Complaint Does Not Satisfy the
Applicable Pleading Standards

Defendants took the position in their initial memorandum

that plaintiffs' claims sound in fraud and are governed by Fed.

R. Civ. P. 9(b).  Whether Rule 9(b) or the pleading standards of

Rule 8 apply, however, the consolidated complaint does not pass

muster because it does not identify the annuity products

plaintiffs purchased, the offering documents that covered those

products, or the specific alleged misrepresentations or

omissions in those documents.  See Defs.' Mem. at 32-37.

In response, plaintiffs try to minimize their pleading

burden in a way that disregards controlling Eleventh Circuit

precedent.  See id. at 13-14, 31 (citing cases).  Apparently

recognizing the inadequacies of the complaint, they now submit

verifications to flesh out the details of their own

transactions.  They say that if this is not enough, they will

seek leave to amend yet again, but they have not been willing to

commit themselves by submitting a proposed amended complaint.

Pls.' Opp. at 6 n.4, 43 n.21.

---

named plaintiffs and class members.  See id. at 106-07.
Although PaineWebber subsidiaries and affiliates were named as
defendants, the court was dealing with a stipulated settlement
and did not address the basis for any particular plaintiff's
claims against any particular defendant, or whether any
defendant was properly included in the lawsuit.

Neither plaintiffs' verifications nor the new "facts" in their memorandum should be considered in deciding a motion to dismiss.[17]   Whether or not this information is considered, this case should still be dismissed for failure to state a cause of action.   Plaintiffs now confirm the basic facts defendants submitted regarding their transactions.   Examples include:   (1) that each plaintiff purchased a variable annuity issued by Western Reserve; and (2) that defendants' Exhibit 2 is the prospectus governing Mr. Johnson's transaction.   See Pls.' Opp. at 43-46.   The verifications do not cure the other fundamental defects in the complaint, such as the failure to allege an actionable misrepresentation or omission of material fact, the inadequate allegations regarding standing, and the other points discussed here and in defendants' initial memorandum.

---

[17]   The Court may consider the prospectus and other documents defendants submitted because the complaint relies on them and they are publicly filed.   See Defs.' Mem. at 13.   Normally, however, a court may not consider information outside the complaint and its exhibits when it rules on a motion to dismiss. See, e.g., Bryant v. Avado Brands, 187 F.3d 1271, 1275-80 (11th Cir. 1999) (affidavits attached to motion to dismiss are "clearly the sort of evidentiary material that is not appropriate at the 12(b)(6) stage"); Northwestern Mut. Life Ins. Co. v. Banc of America Sec. LLC, No. 02 Civ. 3788, 2003 WL 1738488, at *1 n.3 (S.D.N.Y. Mar. 31, 2003) (declining to consider plaintiffs' affidavits in resolving motion to dismiss). This includes the new factual allegations in plaintiffs' memorandum of law.   See Kunzweiler v. Zero.net, Inc., No. 3:00-CV-2553-P, 2002 WL 1461732, *18 (N.D. Tex. July 3, 2002).

D.  Plaintiffs' Claims Are Barred By the Statute of
Limitations and Should Be Dismissed

1.  All Plaintiffs Were on Inquiry Notice of Their
Claims When They Purchased Their Annuities

As set forth in defendants' initial memorandum, all of

plaintiffs' claims are barred by the one-year limitation

provision set forth in Section 13.  Plaintiffs try to avoid

dismissal by misstating the Eleventh Circuit's standard and

arguing that the test for "inquiry notice" is simply a "rehash"

of defendants' arguments on the merits.  Pls.' Opp. at 100-02.

For statute of limitations purposes, however, the issue is not

whether the prospectus adequately set forth the facts plaintiffs

claim were omitted or misrepresented, but whether plaintiffs

were on notice of "'facts that would lead a reasonable person to

begin investigating the possibility that his legal rights had

been infringed.'"  Defs.' Mem. at 50 (quoting Franze v.

Equitable Assurance, 296 F.3d 1250, 1254 (11th Cir.

2002)(emphasis added)).

Plaintiffs contend (at page 100) that the standard is

"probability," not "possibility," but "possibility" is what the

Eleventh Circuit says.  See Franze, 296 F.3d at 1254.  The

documents here, at the very least, gave plaintiffs enough

22

information to alert them that they needed to investigate tax consequences and determine for themselves whether the annuity was suitable for their needs.  See Defs.' Mem. at 45-53.[18]

## 2.  Ms. Gerin's Claims Are Barred By the Three Year Statute of Repose

Ms. Gerin admits she purchased her variable annuity in 1996, but submits a verification alleging that she made "additional purchases of the WRL variable annuity" in 1999 and 2000.  Gerin verif., ¶¶ 3-7.  Even if her verification is considered, which it should not be in resolving this motion, it is clear even from her allegations that she did not purchase a new variable annuity.  Her variable annuity contract, dated December 30, 1996, authorized her to make additional "purchase payments" into her annuity account.  See Gerin contract (Exh. 3 to Defs.' motion).  Defendants' initial memorandum (pages 46-47) sets forth the different events that trigger the running of the statute of repose in Section 11 and Section 12(a)(2) law suits. Plaintiffs cite no authority for their argument that additional payments after the variable annuity was offered to the public and sold to Ms. Gerin bring her claims within the three-year statute of repose.  Ms. Gerin's claims should be dismissed.

---

[18]  Defendants also incorporate WMA Securities' Reply Memorandum.

E.    The Claims Against WRL Series Fund and Transamerica
Life, Added in December 2002, Do Not Relate Back to the
Original Complaint and Should Be Dismissed

Plaintiffs concede they added WRL Series Fund and

Transamerica Life as defendants after the one-year limitations

provision had run.  They argue that these companies fit within

the "John Doe" defendants named in the original complaint; that

they did not know the two companies were proper defendants; and

that their failure to name the companies earlier was therefore a

"mistake" allowing the amendment to relate back under Fed. R.

Civ. P. 15(c).[19]  Pls.' Opp. at 105-13.

These are precisely the arguments the Eleventh Circuit

rejected in Wayne v. Jarvis, 197 F.3d 1098 (11th Cir. 1999).  In

Wayne, plaintiff sued a sheriff's department and seven "John

Doe" deputies.  The Eleventh Circuit held that a later amendment

naming specific deputies did not relate back to the original

complaint.  Plaintiffs have (falsely) accused defendants of

---

[19]    The relevant parts of Rule 15(c) are quoted in Defs.' Mem. at
page 54.  Plaintiffs concede they must satisfy all the
requirements of the rule in order to add defendants.  Pls.' Opp.
at 106.  If the "mistake" requirement of the rule is not met,
"there can be no relation back regardless of whether other
requirements, such as notice and lack of prejudice to the joined
party, are met."  Wayne v. Jarvis, 197 F.3d 1098, 1103 & n.5
(11th Cir. 1999).  Defendants have focused on plaintiffs'
inability to meet the "mistake" requirement, but certainly do
not concede plaintiffs can meet the other requirements.

24

mischaracterizing Wayne, but the court unequivocally held that "[plaintiff's] lack of knowledge regarding the identities of the deputy sheriffs was not 'a mistake concerning the identity of the proper party;'" that "[b]ecause [plaintiff's] lack of knowledge was not an error, a misnomer, or a misidentification, his amendment does not come within Rule 15(c)(3)(B);" and that an "amended complaint replacing a 'John Doe' defendant with that defendant's correct name does not relate back under Rule 15(c)(3)." Id. at 1103-04. See also Seegars v. Adcox, No. CV101-82, 2002 WL 32079479, at *5 (S.D. Ga. Sept. 2, 2002).[20]

Under Wayne, the Court need not consider whether plaintiffs really did lack knowledge as they contend. However, as noted in defendants' initial memorandum, the registration statements and prospectuses that were the alleged basis for the original complaint also identified the defendants plaintiffs now seek to

---

[20] Plaintiffs totally misread Wayne and then try to escape it by citing a district court case from the Third Circuit which held that lack of information about a defendant's identity does qualify as a mistake. See Pls.' Opp. at 109 n.53, 111. But the Eleventh Circuit specifically rejected the Third Circuit's view, noting that the Third Circuit does not follow the majority on this issue. See Wayne, 197 F.3d at 1104. Plaintiffs' effort to distinguish Wayne by claiming their "John Doe" descriptions are more precise is absurd. In Wayne, the "John Does" were seven individual deputy sheriffs, all members of one county sheriff's department, who had been involved in a specific incident at a prison where plaintiff had been incarcerated. In this case, plaintiffs purport to sue 297 "John Doe" companies and their descriptions are anything but precise. See Cons. Cpt. ¶¶ 52-54.

add. See Defs.' Mem. at 53-56 (citing cases).[21] Plaintiffs also

cite cases from other jurisdictions in which a plaintiff sued a

party it believed was directly involved in its own transaction

or accident and later found out it had identified the party

incorrectly, often because two companies had similar or even

identical names.[22] That is nothing like what plaintiffs allege

here. As discussed above, their claims are based on the invalid

theory that they can sue any entity that they allege has some

relationship with AEGON USA and variable annuities. They had no

---

[21]  Contrary to plaintiffs' allegation, the first page of the
actual prospectus (the third page of Exh. 2 to defendants'
motion) did name WRL Series Fund and listed 29 portfolios under
its name. The prospectus defined "funds" as "[i]nvestment
companies which are registered with the U.S. Securities and
Exchange Commission. The Contract allows you to invest in the
portfolios of the funds through our subaccounts." Exh. 2 at 1.

[22]  See, e.g., VKK Corp. v. Nat'l Football League, 244 F.3d 114,
128-29 (2d Cir. 2001) (allowing relation back when plaintiff
made a mistake over which of two related and similarly named
entities had been party to an agreement); Deaner v. Solomon, No.
02 Civ. 8772, 2003 WL 1565949 (S.D.N.Y. Mar. 12, 2003)
(plaintiff in motor vehicle accident case sued Ford Motor Credit
Corporation, believing it owned the car, and later learned the
owner was Ford Credit Titling Trust); Randall's Family Golf
Centers v. Acushnet Co., No. 02-2278, 2002 WL 31496229, at *4-5
(Bankr. S.D.N.Y. Nov. 8, 2002) (plaintiffs filed preference
claims against insurance agents, mistakenly believing them to be
the transferees of the debtor's payments, and added insurance
company after learning it was the transferee). Plaintiffs cite
Itel Capital Corp. v. Cups Coal Co., 707 F.2d 1253 (11th Cir.
1983), for the proposition that "mistake" should be construed
liberally, but Itel did not discuss what constitutes "mistake"
and the Wayne court distinguished it because it did not involve
lack of knowledge. Wayne, 197 F.3d at 1104 n.6.

more bases for naming the other AEGON-related defendants than they have for adding the new defendants.[23]

### F. Plaintiffs Have Not Alleged Actionable Damages

Defendants' initial memorandum (pages 79-84) explained why the damages plaintiffs seek in their complaint are not recoverable under Section 11 or 12. Plaintiffs respond that they do not need to plead damages, but submit verifications to clarify their damage theory. Pls.' Opp. at 56-63. As before, plaintiffs' verifications should not be considered, but even with the additional information, their claims are not sufficient. Regardless of how they characterize their claims, it is clear that plaintiffs are seeking damages based on the annuity fees they paid – fees that were fully disclosed in their prospectuses and that they agreed to pay. Because these are not cognizable damages under Sections 11 and 12(a)(2), those claims should be dismissed. See, e.g., In re McKesson HBOC, Inc. Securities Litigation, 126 F. Supp. 2d 1248, 1262 (N.D. Cal. 2000) (dismissing § 11 claims when complaint showed on its face that plaintiffs were relying on an invalid measure of damages).

---

[23] The claims against the remaining "John Doe" defendants should also be dismissed. They have not been served with the complaint, and if plaintiffs try to name new defendants, their claims would be untimely for the reasons discussed above. See Seegars, 2002 WL 32079479, at *6. See also reasons for dismissal set forth in Defs.' Mem. at 45 n.32.

G. Plaintiffs' Controlling Person Claims and Counts III-V
Should Be Dismissed For the Reasons Set Forth in
Defendants' Initial Memorandum

Defendants' initial memorandum discusses the grounds for

dismissing the controlling person claims in Counts I and II, and

Counts III through V as a whole.

With respect to Count III, under Section 34(b) of the

Investment Company Act, the two most recent cases to have

addressed the issue have held there is no private right of

action under that section. Their holdings were based on a well-

reasoned Second Circuit opinion, Olmstead v. Pruco Life

Insurance Co., 283 F.3d 429, 432 (2d Cir. 2002). See Defs.'

Mem. at 86-89. The arguments plaintiffs make in an effort to

distinguish Olmstead were considered and rejected in MEVC Draper

Fisher Jurvetson Fund I, Inc., v. Millennium Partners, No. 03

Civ. 862, 2003 WL 941552, at *4-7 (S.D.N.Y. Mar. 6, 2003)

(finding no private right of action under ICA § 12(d)(1)).

With respect to Count V, plaintiffs argue that the

Securities Litigation Uniform Standards Act (SLUSA) does not bar

their reformation claim because it is not a claim for damages.

Plaintiffs are seeking damages in this action, however, and they

cannot circumvent SLUSA by characterizing their claims as

equitable. See, e.g., Fietelberg v. Merrill Lynch & Co., 234 F.

Supp. 2d 1043, 1048-49 (N.D. Cal. 2002). See also Dudek v.

Prudential Securities, Inc., 295 F.3d 675, 878 (8th Cir. 2002)
(dismissing state law claims including reformation claim).   In
addition, reformation is not an appropriate remedy under the
federal securities law.   <u>See</u> Defs.' Mem. at 91-92.

III.   CONCLUSION

For the reasons stated above and in their initial
memorandum, defendants respectfully request that the
consolidated complaint be dismissed with prejudice.

Respectfully submitted,

_____
Michael J. Bowers
Georgia Bar No. 07160
Christopher S. Anulewicz
Georgia Bar No. 020914
BALCH & BINGHAM, L.L.P.
14 Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, GA 30305
Phone (404) 261-6020
Fax (404) 251-3656

James J. Rohn
Patricia M. Hamill
Deborah J. Krabbendam
CONRAD O'BRIEN GELLMAN
& ROHN, P.C.
1515 Market Street
Sixteenth Floor
Philadelphia, PA 19102
Phone (215) 864-9600
Fax (215) 864-2620

Counsel for Defendants AEGON USA, Inc., AEGON
Financial Services Group, Inc., AFSG Securities
Corp., PFL Life Insurance Co., AUSA Life
Insurance Co., Inc., Western Reserve Life
Assurance Co. of Ohio, WRL Series Fund, Inc.,
Bankers United Life Assurance Co. and
Transamerica Life Insurance and Annuity Co.

Dated:   June 6, 2003

# Exhibit A

# NASD Notice to Members 99-35

The NASD Reminds Members Of Their Responsibilities Regarding The Sales Of Variable Annuities

## Suggested Routing

■ Senior Management
☐ Advertising
☐ Continuing Education
☐ Corporate Finance
■ Executive Representatives
☐ Government Securities
■ Institutional
■ Insurance
■ Internal Audit
■ Legal & Compliance
☐ Municipal
☐ Mutual Fund
■ Operations
☐ Options
■ Registered Representatives
☐ Registration
☐ Research
☐ Syndicate
■ Systems
■ Trading
☐ Training
■ Variable Contracts

## Executive Summary

National Association of Securities Dealers, Inc. (NASD®) Rule 3010 requires each member to establish and maintain a system to supervise the activities of each registered representative and associated person in order to achieve compliance with the securities laws, regulations, and NASD rules. Variable life insurance and variable annuities are securities and their distribution is subject to NASD rules. This *Notice* focuses on deferred variable annuity sales and provides a set of guidelines that are intended to assist members in developing appropriate procedures relating to variable annuity sales to customers.

The guidelines identify areas of concern that NASD Regulation, Inc. (NASD Regulation®) would expect to be addressed in the procedures of members that offer and sell variable annuities. Although the specific procedures described are not mandatory, members should consider supplementing their procedures to ensure that they will be adequately designed to achieve compliance with legal and regulatory requirements.

Questions concerning this *Notice* may be directed to Thomas M. Selman, Vice President, Investment Companies/Corporate Financing, NASD Regulation, at (202) 728-8068; Lawrence Kosciulek, Assistant Director, Advertising/Investment Companies, NASD Regulation, at (202) 728-8329; or Elliot R. Curzon, Assistant General Counsel, Office of General Counsel, NASD Regulation, at (202) 728-8451.

## Background

A variable annuity is an insurance contract that is subject to regulation under state insurance and securities laws. Although variable annuities offer investment features similar in many respects to mutual funds, a typical variable annuity offers three basic features not commonly found in mutual funds: (1) tax-deferred treatment of earnings; (2) a death benefit; and (3) annuity payout options that can provide guaranteed income for life.

A customer's premium payments to purchase a variable annuity are allocated to underlying investment portfolios, often termed subaccounts. The variable annuity contract may also include a guaranteed fixed interest subaccount that is part of the general account of the insurer. The general account is composed of the assets of the insurance company issuing the contract. The value of the underlying subaccounts that are not guaranteed will fluctuate in response to market changes and other factors. Because the contract owners assume these investment risks, variable annuities are securities and generally must be registered under the Securities Act of 1933.

The underlying subaccounts that are not guaranteed are funded by a separate account of a life insurance company that, absent an exemption, is required to be registered as an investment company under the Investment Company Act of 1940. Variable annuities assess various fees including fees related to insurance features, *e.g.*, lifetime annuitization and the death benefit. The fees are typically deducted from customer assets in the separate account.

A distributor of variable annuity contracts to individuals is required to register as a broker/dealer under the Securities Exchange Act of 1934 and become a member of the NASD. The distribution of variable annuity contracts is subject to NASD rules.

Typically, variable annuities are designed to be long-term

investments for retirement. Withdrawals before a customer reaches the age of 59 1/2 are generally subject to a 10 percent penalty under the Internal Revenue Code. In addition, many variable annuities assess surrender charges for withdrawals within a specified time period after purchase.

Generally, variable annuities have two phases: the "accumulation" phase when customer contributions are allocated among the underlying investment options and earnings accumulate; and the "distribution" phase when the customer withdraws money, typically as a lump-sum or through various annuity payment options.

The myriad features of variable insurance products make the suitability analysis required under NASD rules particularly complex. NASD Regulation has addressed suitability issues in variable insurance products sales in *Notice to Members 96-86*. In that *Notice*, NASD Regulation stated that when recommending variable annuities or variable life insurance, the member and its registered representatives are required to make reasonable efforts to obtain information concerning the customer's financial and tax status, investment objectives, and such information used or considered reasonable in making recommendations to the customer.[1] In addition, a recent NASD disciplinary action discussed members' responsibilities under Rule 2310 (Suitability Rule) as they apply to the sale of variable life insurance. (*See In the Matter of DBCC No. 8 v. Miguel Angel Cruz.*[2])

## Discussion

NASD Regulation has developed the following guidelines that represent a compilation of industry practices in the supervision of the sale of variable annuities. The guidelines do not

mandate any specific procedure. Rather, they are designed to assist members in developing appropriate procedures relating to variable annuity sales practices. The guidelines are not comprehensive and are not intended as a substitute for the member's responsibilities under NASD Rule 3010. Moreover, the Suitability Rule requires an associated person of a member to make an independent determination whether an investment is suitable for a particular customer, taking into account the customer's investment objectives and financial needs.

## Customer Information

The Suitability Rule requires members and their registered representatives to make reasonable efforts to obtain information concerning a customer's financial and tax status, investment objectives, and such other information used or considered in making recommendations to the customer.

1. When recommending a variable annuity, members and their registered representatives should make reasonable efforts to obtain comprehensive customer information, including the customer's occupation, marital status, age, number of dependents, investment objectives, risk tolerance, tax status, previous investment experience, liquid net worth, other investments and savings, and annual income. Retention of this customer information can be made in conjunction with the maintenance of basic customer account information that is required in NASD Rule 3110.

2. A registered representative should discuss all relevant facts with the customer, including liquidity issues such as potential surrender charges and the Internal Revenue Service (IRS) penalty; fees, including mortali-

ty and expense charges, administrative charges, and investment advisory fees; any applicable state and local government premium taxes; and market risk.

3. The registered representative should seek to ensure that the variable annuity application and any other information provided by the customer to the member is complete and accurate, and promptly forwarded to a registered principal for review.

4. When a variable annuity transaction is recommended to a customer, the registered representative and a registered principal should review the customer's investment objectives, risk tolerance, and other information to determine that the variable annuity contract as a whole and the underlying subaccounts recommended to the customer are suitable. The registered principal should compare the information in the account application with other relevant information sources, *e.g.*, an account information form, to check for apparent accuracy and consistency prior to approving the transaction.

## Product Information

5. The registered representative should have a thorough knowledge of the specifications of each variable annuity that is recommended, including the death benefit, fees and expenses, subaccount choices, special features, withdrawal privileges, and tax treatment.

6. To the extent practical, a current prospectus should be given to the customer when a variable annuity is recommended. Prospectus information about important factors, such as fees and expenses and the illiquidity of the product, should be discussed with the customer.

7. Under NASD Rule 2210, the registered representative may only use sales material that is approved by a registered principal of the member.

## Liquidity And Earnings Accrual

Lack of liquidity, which may be caused by surrender charges or penalties for early withdrawal under the Internal Revenue Code, may make a variable annuity an unsuitable investment for customers who have short-term investment objectives. Moreover, although a benefit of a variable annuity investment is that earnings accrue on a tax-deferred basis, a minimum holding period is often necessary before the tax benefits are likely to outweigh the often higher fees imposed on variable annuities relative to alternative investments, such as mutual funds.

8. The registered representative should inquire about whether the customer has a long-term investment objective and typically should recommend a variable annuity only if the answer to that question, with consideration of other product attributes, is affirmative. In general, the registered representative should make sure that the customer understands the effect of surrender charges on redemptions and that a withdrawal prior to the age of 59 1/2 could result in a withdrawal tax penalty. In addition, the registered representative should make sure that customers who are 59 1/2 or older are informed when surrender charges apply to withdrawals.

9. The member should develop special procedures to screen for any customer whose age may make a long-term investment inappropriate, such as any customer over a specific

age. Based on certain contract features, some customers of advanced age may be unsuitable for a variable annuity investment.

## Income, Net Worth, And Contract Size Thresholds

10. Members should establish procedures to require a principal's careful review of variable annuity investments that exceed a stated percentage of the customer's net worth, and any contract in which a customer is investing more than a stated dollar amount.

## Investment In Tax Qualified Accounts

Some tax-qualified retirement plans (e.g., 401(k) plans) provide customers with an option to make investment choices only among several variable annuities. While these variable annuities provide most of the same benefits to investors as variable annuities offered outside of a tax-qualified retirement plan, they do not provide any additional tax deferred treatment of earnings beyond the treatment provided by the tax-qualified retirement plan itself.

11. When a registered representative recommends the purchase of a variable annuity for any tax-qualified retirement account (e.g., 401(k) plan, IRA), the registered representative should disclose to the customer that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary. The registered representative should recommend a variable annuity only when its other benefits, such as lifetime income payments, family protection through the death benefit, and guaranteed fees, support the recommendation.

12. A member should conduct an especially comprehensive suitability analysis prior to approving the sale of a variable annuity with surrender charges to a customer in a tax-qualified account subject to plan minimum distribution requirements.

## Variable Annuity Replacements

13. The member firm may decide to develop an exchange or replacement analysis document or utilize an existing form authorized by a state insurance commission or other regulatory agency. If such a document is used, then (consistent with the requirements of various states) it should be completed for all variable annuity replacements and should include an explanation of the benefits of replacing one contract for another variable contract. The document also should be signed by the customer, the registered representative, and the registered principal.

14. The registered representative and the registered principal should determine, based on the information provided by the customer and their own knowledge of the product features, that replacing the existing contract with a new contract is suitable for the customer. Consideration should be given to such matters as product enhancements and improvements, lower cost structures, and surrender charges.

15. The member firm should consider developing compliance systems, such as computer programs, when available, that can monitor and identify those registered representatives whose clients have a particularly high rate of variable annuity replacements or rollovers. These compliance systems should provide the firm with "red flags" that

the firm can investigate to determine whether some of these replacements are unsuitable.

16. A retail member should adopt other measures reasonably designed to ensure that replacement sales activity by its registered representatives complies with NASD rules. Members that "wholesale" variable annuities are reminded that they are also subject to NASD rules, and that they should avoid marketing strategies that are designed primarily to encourage inappropriate replacement sales. Upon reasonable request and to the extent practical, wholesale members should assist retail broker/dealers in monitoring the replacement activity of their customers.

## Endnote

[1] *Notice to Members 96-86* also listed specific factors that could be considered when recommending variable annuities and variable life insurance contracts. These factors are:

• a representation by a customer that his or her life insurance needs were already met;

• the customer's express preference for an investment other than an insurance product, the customer's inability to appreciate fully how much of the purchase payment or premium is allocated to cover insurance or their costs, and a customer's ability to understand the complexity of variable products generally;

• the customer's willingness to invest a set amount on a yearly basis;

• the customer's need for liquidity and short-term investment;

• the customer's immediate need for retirement income; and

• the customer's investment sophistication and whether he or she is able to monitor the investment experience of the separate account.

[2] Complaint No. C8A930048 (NBCC Oct. 31, 1997)

© 1999, National Association of Securities Dealers, Inc. (NASD). All rights reserved.

# Exhibit B

# Variable Annuity Process -- Issuance to Sale



| | Applicable Regulation/Guideline | Role in Process |
|---|---|---|
| **Western Reserve Life** *(Issuer)* | State Insurance Laws<br>1933 Act – Disclosure<br>1940 Act –Investments | Issues Annuity -- Prepares and registers annuity by means of a registration statement with SEC. **THIS ROLE NOT PART OF SALES PROCESS.** |
| **WRL Series Fund** *(Mutual Fund)* | 1933 Act – Disclosure<br>1940 Act – Investments | Sells shares to issuer's separate account. **THIS ROLE NOT PART OF SALES PROCESS.** |
| **AFSG** *(Underwriter)* | 1940 Act – Contract<br>NASD and 1934 Act - Underwriter Activities | Contracts with issuer to obtain contracts with Broker-Dealers for distribution. **THIS ROLE NOT PART OF SALES PROCESS.** (AFSG acted as Western Reserve's underwriter; no contact with public.) |
| **WMA Securities** *(Broker-Dealer)* | NASD and 1934 Act – Broker-Dealer Rules<br>**NASD NTM 99-35** | Agrees to sell annuities through registered representatives and supervise registered representatives. (WMA Securities registered representative sold to Johnson; Hughes & Gerin purchased from unnamed Broker-Dealer.) |
| **Marcy Blochowiak; David Rosenthal** *(Registered Representatives)* | NASD and 1934 Act – Broker-Dealer Rules<br>**NASD NTM 99-35** | Holds NASD license. Complies with NASD "Suitability" rules in offering annuity to customer. (Annuities were sold by Blochowiak; Rosenthal.) |
| **Mr. Johnson; Ms. Hughes; Ms. Gerin** *(Annuity Purchasers)* | | |

Issuing/Underwriting Process

Sales Process



# EXHIBIT / ATTACHMENT

## 2

**(To be scanned in place of tab)**

1 of 1 DOCUMENT

**DIANE C. DONOVAN, on behalf of herself and all others similarly situated,
Plaintiff, - against - SKANDIA INVESTMENT HOLDING CORPORATION, ABC
CORP., INC. 1 through ABC CORP., INC. 99 and LMN CORP., INC. 1 through
LMN CORP., INC. 99, Defendants.**

**02 CV 9859(MP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2003 U.S. Dist. LEXIS 13129*

**July 31, 2003, Decided**

**COUNSEL:** [*1] For Diane C Conovan, on Behalf of Herself and All Others Similarly Situated Lead, Jay Hendrickson Lead, Rose Hendrickson Lead, Kathleen O'Brien Lead, PLAINTIFFS: Robert B Weintraub, Daniel W Krasner, Wolf, Haldenstein, Adler, Freeman & Herz LLP, New York, NY USA.

For American Skandia Life Assurance Corporation, DEFENDANT: James A Lico, Clifford Chance US LLP, New York, NY USA.

For American Skandia Marketing Incorporated, American Skandia Investment Holding Corporation, ABC Corp, Inc, ABC Corp, Inc 1 Through ABC Corp, Inc 99, LMN Corp, Inc 1 Through LMN Corp, Inc 99, DEFENDANTS: Catherine Duden-Kevane, James A Lico, Clifford Chance US LLP, New York, NY USA.

**JUDGES:** MILTON POLLACK, Senior United States District Judge.

**OPINIONBY:** MILTON POLLACK

**OPINION:**

### DECISION AND ORDER

#### I. PARTIES

Lead Plaintiffs are citizens and residents of the State of Utah who purchased deferred variable annuity products from the American Skandia Defendants in January and February of 2000. Plaintiffs seek to bring this action as members of a class consisting of all

persons who, between December 13, 1997 and October 22, 2000, were parties to a deferred annuity contract issued, underwritten, marketed [*2] or sold by defendants.

Defendant American Skandia Life Assurance Corp. ("American Skandia") is one of the largest insurance and variable annuity companies in the United States and the world. The other defendants (together with American Skandia, the "American Skandia Defendants") are holding companies or subsidiaries of American Skandia which develop, market and underwrite fixed and variable annuities.

#### II. FACTS

Plaintiffs bring this action individually and on behalf of all other persons similarly situated pursuant to the Securities and Exchange Act of 1934, *15 U.S.C. § § 78j*(b) and 78t(a), and Rule 10b-5, *17 C.F.R. § 240.10b-5*, promulgated thereunder; the Securities Act of 1933, *15 U.S.C. § § 77*(k), 77(l) and 77(o); and the Investment Company Act of 1940, *15 U.S.C. § 80a-33*(b).

According to Plaintiffs, the American Skandia Defendants misled prospective customers into believing that deferred annuities would be appropriate investments for placement into qualified retirement plans, while failing to disclose the alleged inappropriateness and unsuitability of such a combination. [*3]

Plaintiffs are not, however, bringing any charges against the broker from whom they purchased the

variable annuity. Instead, Plaintiffs bring claims against the American Skandia Defendants allegedly involved in creating the Prospectuses through which the annuities were ultimately sold.

Plaintiffs contend that as a result of defendants' misrepresentations, plaintiffs and other members of the class have incurred commissions, fees and charges in excess of what they would have paid for appropriate and suitable investments in an already tax qualified retirement plan.

## III. DISCUSSION

Plaintiffs note specifically that National Association of Securities Dealers ("NASD") Notice to Members 99-35, issued in May of 1999, requires members to disclose to the customer that the tax deferred accrual feature of the variable annuity is unnecessary where it is otherwise provided by a tax-qualified retirement plan. NASD notices, however, are not law and noncompliance therewith cannot itself constitute a violation of the federal securities laws. See *Max Marx Color & Chemical Co. Employees' Profit Sharing Plan v. Barnes, 37 F. Supp. 2d 248, 253 (S.D.N.Y. 1999); Merit Ins. Co. v. Leatherby, 714 F.2d 673, 680 [*4] (7th Cir.), cert. denied, 464 U.S. 1009, 104 S. Ct. 529, 78 L. Ed. 2d 711 (1983).* No duty of disclosure will arise directly from a NASD notice. See e.g., *Resnik v. Swartz, 303 F.3d 147 (2d Cir. 2002)* ("omission of information . . . will violate these provisions if either *the SEC regulations* specifically require disclosure . . . or the omission makes other statements . . . materially false or misleading") (emphasis added). Plaintiffs do not contend that the SEC requirements call for NASD mandated disclosures. As for Plaintiffs' reference to SEC Form N-4, only variations in tax consequences need be disclosed. The Prospectuses are not required to state that certain uses are "unnecessary" or offer advice as to when, for tax purposes or otherwise, to use a variable annuity in a retirement plan.

To be actionable, therefore, the omissions complained of must make other statements in the prospectus misleading and there must be a substantial likelihood that the disclosure of the omitted facts would have been viewed by the reasonable investor to have significantly altered the total mix of information made available. See *Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988).* [*5]

Although the Prospectuses undeniably indicate that a variable annuity may be used as an investment vehicle for a qualified retirement plan, it is not true, as Plaintiffs state, that this is never appropriate. NASD

Notice 99-35 itself states that a registered representative may recommend a variable annuity for a tax-qualified retirement account "when its other benefits, such as lifetime income payments, family protection through the death benefit, and guaranteed fees" support the recommendation.

Nor do the allegedly omitted facts significantly alter the total mix of information made available. The Prospectuses clearly state that both variable annuities and tax qualified retirement plans are tax deferrable. That is enough to alert all reasonable investors to the fact that it is unnecessary, if solely for tax reasons, to use a variable annuity to fund a tax-deferred retirement account. n1 See *In re NBTY, Inc. Sec. Litig., 224 F. Supp. 2d 482, 495 (E.D.N.Y. 2002); In re Ultimate Corp. Sec. Litig., No. 86 CIV. 5944 (CSH), 1989 WL 79372, at *5 (S.D.N.Y. July 11, 1989)* ("Liability does not arise from the failure to disclose that which should be obvious [*6] to the average investor."). The other benefits of variable annuities are also clearly set forth, as well as the fee structure for purchase of the annuities.

> n1 The Prospectuses further warn Plaintiffs that "before purchasing an Annuity for use in a qualified plan, you should obtain competent tax advice, both as to the tax treatment and suitability of such an investment." Gross Decl., Ex. B at 41.

The disclosures in the Prospectuses, taken in context, conclusively disprove the materiality of the alleged omissions and are thus fatal to the Plaintiffs' claims. Moreover, as the Prospectuses were issued more than two years before the filing of this suit, the disclosures therein also put the Plaintiffs on inquiry notice of their claims such that the statute of limitations bars their action. n2 And, having failed to allege a primary violation of the securities laws, Plaintiffs' claims of control person liability will also fail.

> n2 The claims of Diane C. Donovan, one of the four lead plaintiffs in this action, are further barred by the statute of limitations because Ms. Donovan appears to have been *actually aware* of the alleged fraud more than two years before the first complaint was filed on December 13, 2002. Her claim was voluntarily withdrawn by a letter to this Court received on July 29, 2003.

[*7]

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss with prejudice is granted.

**SO ORDERED.**

Dated: July 31, 2003

MILTON POLLACK

Senior United States District Judge



# EXHIBIT / ATTACHMENT

## 3

**(To be scanned in place of tab)**

Slip Copy
**(Cite as: 2003 WL 22052879 (S.D.N.Y.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

Diane C. DONOVAN, on behalf of herself and all
others similarly situated,
Plaintiff,
v.
AMERICAN SKANDIA LIFE ASSURANCE
CORPORATION, American Skandia Marketing,
Incorporated, American Skandia Investment Holding
Corporation. ABC Corp., Inc.
1 through ABC Corp., Inc. 99 and LMN Corp., Inc. 1
through LMN Corp., Inc. 99,
Defendants.

**No. 02 CV 9859(MP).**

Sept. 2, 2003.

*ON MOTION TO ALTER JUDGMENT AND
AMEND COMPLAINT*

POLLACK, Senior J.

*DECISION AND ORDER*

*1 Where a proposed amended complaint cannot itself survive a motion to dismiss, leave to amend would be futile and may clearly be denied. *See In re American Exp. Co. Shareholder Litig.*, 39 F.3d 395, 402 (2d Cir.1994)* ("leave to amend may be denied if the amendment would be futile"); *see also Emergent Capital Inv. Management, LLC v. Stonepath Group, Inc., 195 F.Supp.2d 551, 563 n. 4 (S.D.N.Y.2002)* (where plaintiff was given the opportunity to amend its complaint and submitted substantially the same complaint, the Court found no need to grant subsequent motion to submit yet another non-viable complaint). Plaintiffs themselves admit that "should the motion be granted, any motion to dismiss likely would present precisely the same arguments made in the first motion to dismiss." Plaintiff's Memo of Law in Support of Motion at 5

For the reasons set forth herein and in this Court's decision and order dated July 31, 2003, Plaintiffs'

motion to alter the judgment and amend the complaint is denied. Plaintiffs' main amendment would be to retract their hasty statement that it is "never appropriate" to fund a retirement savings account with a variable annuity. Instead, plaintiffs propose a formulation that is admittedly only a semantic difference. Plaintiffs' proposed amended complaint would now allege that it is "generally not appropriate" to fund a retirement savings account with a variable annuity. Nothing in plaintiffs' proposed amendment, however, does anything to challenge this Court's findings: (1) that NASD notices are not law and do not take the place of federal securities laws; (2) that SEC Form N-4 does not require a prospectus to state that certain uses of variable annuities are unnecessary or require a prospectus to offer advice as to when, for tax purposes or otherwise, to use a variable annuity in a retirement plan; (3) that the disclosures in the prospectus already served to alert all reasonable investors to the fact that it is unnecessary, if solely for tax reasons, to use a variable annuity to fund a tax-deferred retirement account; or (4) that because the prospectuses were issued more than two years before the filing of the suit, the disclosures therein also put the plaintiffs on inquiry notice of their claims such that the statute of limitations bars their action.

The motion to alter the judgment and amend the complaint is denied.

SO ORDERED.

2003 WL 22052879 (S.D.N.Y.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I certify that this brief has been typewritten in 12 point Courier New font and does not contain more than 10 characters per inch of type in accordance with Local Rule 5.1(B).

Dated:      September 26, 2003      *Michael J. Bowers*

Michael J. Bowers
Georgia Bar No. 071650
BALCH & BINGHAM, L.L.P.
14 Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, Georgia 30305
Phone (404) 261-6020
Fax (404) 261-3656

## CERTIFICATE OF SERVICE

I certify that on this date I caused the foregoing:

(1) MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT, SUBMITTED BY DEFENDANTS AEGON USA, INC., AEGON FINANCIAL SERVICES GROUP, INC., AFSG SECURITIES CORPORATION, PFL LIFE INSURANCE COMPANY, AUSA LIFE INSURANCE COMPANY, INC., WESTERN RESERVE LIFE ASSURANCE CO. OF OHIO, WRL SERIES FUND, INC., BANKERS UNITED LIFE ASSURANCE COMPANY, AND TRANSAMERICA LIFE INSURANCE AND ANNUITY COMPANY;

(2) MEMORANDUM OF LAW OF MOVING DEFENDANTS AEGON USA, INC., AEGON FINANCIAL SERVICES GROUP, INC., AFSG SECURITIES CORPORATION, PFL LIFE INSURANCE COMPANY, AUSA LIFE INSURANCE COMPANY, INC., WESTERN RESERVE LIFE ASSURANCE CO. OF OHIO, WRL SERIES FUND, INC., BANKERS UNITED LIFE ASSURANCE COMPANY, AND TRANSAMERICA LIFE INSURANCE AND ANNUITY COMPANY, IN SUPPORT OF MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT, with exhibits;

(3) APPENDIX TO THE MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT; and

(4) Proposed ORDER

to be served by Federal Express on the parties listed below:

Craig G. Harley, Esq.
Jeffrey H. Konis, Esq.
CHITWOOD & HARLEY
2900 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309

Daniel W. Krasner, Esq.
Robert B. Weintraub, Esq.
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ, LLP
270 Madison Avenue
New York, NY 10016

John J. Soroko, Esq.
Wayne A. Mack, Esq.
DUANE MORRIS, LLP
One Liberty Place
Philadelphia, PA 19103

Charles W. Whitney, Esq.
James P. Hermance, Esq.
DUANE MORRIS, LLP
1180 Peachtree Street, N.W.
Atlanta, GA 30309-3448

Dated: September 26, 2003

_Patricia M. Hamill_
Patricia M. Hamill, Esq.
CONRAD O'BRIEN GELLMAN & ROHN, P.C.

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

ORIGINAL

SEP 2 6 2003

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

## INDEX TO APPENDIX

A.   Donovan v. American Skandia Life Assurance Corp., 02-CV-9859, Amended Complaint

B.   Hendrickson v. American Skandia Life Assurance Corp., 02-CV-9859, Second Amended Complaint

C.   Motion to Dismiss Consolidated Complaint and Memorandum of Law in Support of Motion to Dismiss Consolidated Complaint, submitted by Moving Defendants AEGON USA, Inc., AEGON Financial Services Group, Inc., AFSG Securities Corporation, PFL Life Insurance Company, AUSA Life Insurance Company, Inc., Western Reserve Life Assurance Co. of Ohio, WRL Series Fund, Inc., Bankers United Life Assurance Company, and Transamerica Life Insurance and Annuity Company

58



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DIANE C. DONOVAN, on behalf of herself
and all others similarly situated,

               Plaintiff,

    - against -

AMERICAN SKANDIA LIFE ASSURANCE
CORPORATION, AMERICAN SKANDIA
MARKETING, INCORPORATED,
AMERICAN SKANDIA INVESTMENT
HOLDING CORPORATION, ABC CORP.,
INC. 1 through ABC CORP., INC. 99, and
LMN CORP., INC. 1 through LMN CORP.,
INC. 99,

               Defendants.

02 CV 9859  (MP)

AMENDED COMPLAINT

CLASS ACTION

JURY TRIAL DEMANDED

Plaintiff alleges this class action complaint based upon personal knowledge as to herself, her own acts and the acts and statements of defendants in which she participated directly; including the communications with, representations made, and documentation and information provided to plaintiff by defendants in the ordinary course of business; and the investigation of her counsel. Counsel's investigation conducted on plaintiff's behalf, included, among other things: (i) an analysis of publicly-available news articles and reports; (ii) a review and analysis of public filings, including but not limited to any by defendants; (iii) press releases issued by defendants, and (iv) other matters of public record. The allegations as to all other matters are based upon investigation by plaintiff's attorneys and research of the applicable law with respect to the claims asserted herein.

## NATURE OF THE CASE

1.     This class action arises from defendants' sale of deferred annuities to members of the public. Deferred annuities are marketed to, and often purchased by, people who use them as investments for their retirement years. This type of investment has become extraordinarily popular. Sales of variable deferred annuities -- which offer investment returns linked to stock market performance, similar to mutual funds -- reportedly have increased from the $25 to $30 billion range in 1992 to approximately $100 billion or more.

2.     The variable annuities at issue here are securities which have been registered with the United States Securities and Exchange Commission under the Securities Act of 1933 and the Investment Company Act of 1940. Hence, they are subject to the Securities Act, the Securities Exchange Act of 1934, and to the Investment Company Act of 1940.

3.     The retirement savings market in the United States has undergone a revolution over the last two decades. Instead of guaranteed lifetime pension benefits, calculated based on retirees' life expectancies, today's retirement plans focus on maximizing asset accumulation for retirement. Investment growth on a tax-deferred basis accordingly has become an important goal. An investor who has contributed the annual maximum amount to his tax-deferred qualified plan(s) can invest unlimited additional sums on a tax-deferred basis through the purchase of a deferred annuity.

4.     A "deferred annuity" -- the type of annuity at issue in this complaint -- has an accumulation (or investment) phase during which the purchaser invests money and allows the value of the account to grow (depending on the type of investment vehicle that is chosen); and then a payout period during which the purchaser must redeem the amounts contributed and earned, with one such payout option being an annuity.

2

5.     Deferred annuities typically contain two insurance features: an annuity payout option, as described above (other payout options, such as lump-sum or systematic withdrawal, are much more popular); and a "death benefit" to ensure that, if the account owner dies during the investment period, the heirs receive some defined investment value (usually, the principal amount invested) even if the investment has declined in value during that time.  In practice, the circumstances under which the insurance features of a deferred annuity will have value are remote because (a) on average, fewer than 1 percent of deferred annuity owners choose to exercise the annuity payout option at the end of the investment period and (b) of the contracts "surrendered" during the investment phase due to the death of the account owner, few, if any, suffered investment losses of such a magnitude that any meaningful death benefit is paid.

6.     Because of their insurance features, deferred annuities are deemed to be mortality products, and as such enjoy a privileged status under the income tax laws.  Beginning with the Income Tax Law of 1913 (the first income tax statute promulgated pursuant to the Sixteenth Amendment) and continuously at all times thereafter, the Internal Revenue Code has provided that annuities are treated as an instrument of insurance.  Most significantly, this means that annuity earnings (interest, dividends, or capital gains) accumulate on a tax-deferred basis.  I.R.C. §72. This is true regardless of whether the contract owner elects to exercise his option to purchase an annuity at the end of the investment period.

7.     The main selling point of deferred annuities is that earnings on investments contained in such annuities accumulate on a tax-deferred basis.  Because of their tax-deferred status, deferred annuities are potentially attractive financial products to people seeking tax-deferral for their retirement investments (and may be appropriate for those who have already made their maximum contributions to IRAs or other qualified retirement plans available

3

to them). However, the price of such tax-deferral is the very substantial fees charged by the sellers of deferred annuities -- fees and charges that substantially exceed the fees charged for similar non-annuity investment products like mutual funds. Over time, these fees and charges can reduce the amounts earned in the account by as much as <u>one-third</u>.

        8.     *Although deferred annuities may be appropriate investments for some* retirement plans, there is one category of retirement plans for which the deferred annuities sold by defendants are never appropriate:  contributory plans and accounts which themselves <u>already</u> enjoy tax-deferred status (and are hence "qualified") under the Internal Revenue Code, and thus already have these very same tax benefits. These include many of the most popular and common plans for retirement investing:  Individual Retirement Accounts (IRA), Keogh and 401 (k) plans, and other accounts treated similarly by the tax code. Collectively, these are referred to as "qualified retirement plans." (An individual purchases an annuity "contract," and a participant in a group retirement plan invested in a deferred annuity holds a "certificate," evidencing his rights to an account balance in the contract's fixed accounts and/or unit interests in variable subaccounts offered within the deferred annuity.)  **The deferred variable annuities sold by defendants are never appropriate investments for placement in tax-deferred retirement plans**, because earnings on <u>any</u> investment placed in such plans are already tax-deferred, and purchase of a deferred annuity increases costs without any material, additional economic benefit.

        9.     Deferred annuities are even less appropriate for older persons who are required by law to commence withdrawing monies from their tax-deferred investment accounts by age seventy and one-half. Such forced withdrawals defeat the entire purpose of the annuity and the front loading of expense in such accounts.

        10.     Despite the fact that the deferred annuities sold by defendants are never

4

appropriate investments for qualified retirement plans, defendants actively recommended and sold these products to less financially sophisticated individuals and small business owners for use in tax-deferred retirement plans.

11.    Some companies, including defendants in this action, specifically have their employees market and sell deferred annuities to people who are investing for their IRAs, Keoghs, 401(k)s, or other qualified retirement plans.

12.    Defendants' viewed as prime prospects investors who are leaving employment and need a rollover IRA in which to place the proceeds of their employers' qualified retirement plans while preserving its tax-deferred status. Because the proceeds are substantial lump sums, such persons are prime targets. Defendants also target: (a) small businesses, where decision-makers responsible for setting up 401(k) and other qualified retirement plans are less likely to be financially sophisticated, and (b) the employees of nonprofit organizations, hospitals, educational institutions, and state and local governmental units, who have lump sum payments funding 403(b) and 457 plans.

13.    Many people who are making investments for their retirement -- particularly those who have changed jobs and are rolling over a large lump-sum qualified plan distribution into an IRA -- are unaware of the financial, tax, and investment aspects of deferred annuities. Defendants, who are advisors and fiduciaries with superior knowledge about these matters and accordingly are trusted by their customers, nevertheless mislead these customers into purchasing inappropriate and unsuitable deferred annuities for placement into qualified retirement plans. (It should be noted that companies other than defendants that sell deferred annuities, the Fidelity group of companies for example, are careful not to market their deferred annuities for placement in any qualified retirement plan.)

5

14.     Defendants actively marketed, through written material misrepresentations and omissions, their deferred annuity products for placement in such already tax-deferred retirement plans. Defendants' written documents including prospectuses, statements of additional information, disclosures (so-called), contracts, sales presentation materials, and other materials, affirmatively mislead prospective customers into believing that deferred annuities may be appropriate investments for placement into qualified retirement plans, and failed to disclose the inappropriateness and unsuitability of such investments and the highly remote circumstances in which the expensive insurance features can provide any value, as more fully particularized below. Defendants have entered into a common course of conduct to effectuate these profitable sales throughout the nation. These practices violate the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Company Act of 1940.

15.     Plaintiff seeks to recover damages caused to the Class by defendants' violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder, Section 20(a) of the Exchange Act; Sections 11, 12 and 15 of the Securities Act of 1933, and Section 80a-33(b) of the Investment Company Act of 1940.

16.     Plaintiff is among those who have been injured and damaged by defendants' unlawful conduct.

## PARTIES. JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78aa, Section 22 of the Securities Act of 1933, 15 U.S.C. § 80a-43 of the Investment Company Act of 1940, and 28 U.S.C. § 1331.

18.     Plaintiff brings this action pursuant to the Exchange Act, as amended, 15

6

U.S.C. §§ 78j(b), 78t(a), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; 15 U.S.C. §§ 77(k), 77(l) and 77(o) of the Securities Act and 15 U.S.C. § 80a-33(b) of the Investment Company Act of 1940.

19.     Venue is proper in this District because defendants conduct business in this District and many of the wrongful acts alleged herein took place in this District.

20.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**Parties**

### Plaintiffs

21.     Named and Lead Plaintiff Diane C. Donovan is a citizen and resident of the State of Utah. On or about January 31, 2000, she purchased from defendants, for an IRA account, a deferred variable annuity product (the American Skandia XTra Credit variable annuity) of the "American Skandia Defendants" (as defined below). Each lead plaintiff's certification is attached hereto as part of Exhibit 1.

22.     Lead Plaintiff Kathleen O'Brien is a citizen and resident of the State of Utah. On or about January 31, 2000 and then again on February 28, 2000, she purchased for an IRA account a deferred variable annuity product (Imperium Variable Annuity) of the "American Skandia Defendants." Ms. O'Brien's plaintiff's certification is attached hereto.

23.     Lead Plaintiff Jay Hendrickson is a citizen and resident of the State of Utah. On or about January 17, 2000, he purchased for an IRA account a deferred variable annuity product of the "American Skandia Defendants." Mr. Hendrickson's plaintiff's

certification is attached hereto.

24.     Lead Plaintiff Rose Hendrickson is a citizen and resident of the State of Utah. On or about January 17, 2000, she purchased for an IRA account a deferred variable annuity product of the "American Skandia Defendants." Mrs. Hendrickson's plaintiff's certification is attached hereto.

25.     The lead plaintiffs sometimes will be collectively referred to as "plaintiff".

**Defendants**

26.     Defendant American Skandia Life Assurance Corporation ("American Skandia") is one of the largest insurance and variable annuity companies in the United States and the world. American Skandia is the issuer of the variable annuity contracts at issue here. American Skandia is the principal operating subsidiary of Skandia's ultimate United States parent company, defendant American Skandia Investment Holding Corporation. American Skandia is headquartered in the State of Connecticut.

27.     On January 4, 2000, Business Wire ran an article entitled "American Skandia maintains No. 1 ranking as distributor of variable annuities."

28.     Defendant American Skandia Investment Holding Corporation ("ASIHC") wholly owns both American Skandia and ASM (see immediately below). (American Skandia's ultimate parent is Skandia Insurance Company Ltd., a Swedish company.)

29.     Defendant American Skandia Marketing, Incorporated ("ASM"), a Delaware Corporation, is an affiliate of American Skandia and a wholly-owned subsidiary of ASIHC. ASM is the principal underwriter, and distributor, of the variable annuities at issue here. ASM is headquartered in Connecticut.

30.     ASM is a registered broker-dealer and a member of the NASD, and is

8

licensed to do business within the State of New York.

31.     American Skandia markets its products to broker-dealers and financial planners through an internal field marketing staff. In addition, it markets its products through and in conjunction with financial institutions such as banks that are permitted directly, or through affiliates, to sell annuities.

32.     ASM enters into distribution agreements with independent broker-dealers who are registered under the Exchange Act and with entities that may offer the annuity but are exempt from registration. Applications for the annuity are solicited by registered representatives of those firms. ASM, upon information and belief, has offered the annuities directly to potential purchasers.

33.     The American Skandia defendant entities, upon information and belief, conduct business and transact tens of millions of dollars of business within this State and this District.

34.     ASIHC, American Skandia, and ASM, each of them and through their subsidiaries and affiliates, develops, markets, issues and underwrites fixed and variable annuities for sale through a diverse network of distribution channels. The variable annuities pertinent to this action are offered for sale through banks, brokerage houses and other financial institutions.

35.     Defendants ABC Corp., Inc. 1 through ABC Corp., Inc. 99 are the other entities, owned or controlled directly or indirectly by the American Skandia group entities, which also underwrite annuity policies for American Skandia (and sometimes also enter into contracts with broker-dealers and other financial institutions for them to distribute these annuity policies).

36.     Defendants LMN Corp., Inc. 1 through LMN Corp., Inc. 99 are the other entities, owned or controlled directly or indirectly by the American Skandia group entities, which

9

distribute and market fixed and variable annuities for the American Skandia entities.

37.     American Skandia, ASIHC, ASM, ABC Corp., Inc. 1 through ABC Corp., Inc. 99, and LMN Corp., Inc. 1 through LMN Corp., Inc. 99, hereinafter shall be referred to collectively as the "American Skandia Defendants" or "defendants".

38.     The American Skandia Defendants are inextricably intertwined with each other. All defendants (with the possible exception of ASIHC) function as operating entities.

39.     Written advertising materials, sales presentation materials, prospectuses, statements of additional information, disclosures, and other written materials used in connection with the sale of the defendants' insurance annuity products to the public, are developed, approved, and disseminated by the American Skandia Defendants.

40.     The American Skandia Defendants collectively conduct business in all 50 states including within the State of New York and this District.

41.     The American Skandia Defendants have affiliated entities which are registered with the New York State Department of State to conduct business in New York State.

42.     The American Skandia Defendants have affiliated entities which have their principal executive office within this judicial District within New York County.

43.     The variable annuity products at issue here are sold throughout the United States including within the State of New York and this District.

## CLASS ACTION ALLEGATIONS

44.     Plaintiff bring this action on behalf of herself and all others similarly situated as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class: a Class consisting of all persons who, beginning on December 13, 1997, purchased an individual tax-deferred annuity contract or who received a certificate to a

10

group tax-deferred annuity contract, issued, underwritten, marketed or sold by any or all of the defendants, which was used to fund a contributory (not defined benefit) retirement plan or arrangement qualified for favorable income tax treatment pursuant to Internal Revenue Code sections 401(a), 401(k), 403(a), 403(b), 408(a), 408(b), 408(k), 408(p), 408A, or 457. The Class Period ends, and includes as Class Members: (a) those who received the variable annuity with an Issue Date no later than October 22, 2000, inclusive, or (b) those who received or purchased the variable annuity whose applications were dated no later than October 22, 2000, inclusive, or if and only if the application was undated then that application was received by any defendant or any agent for defendant (for example, received by the financial institution, unaffiliated with any defendant, which sold the annuity to the Class Member) no later than October 22, 2000, inclusive. Excluded from the class are defendants, officers, directors, and agents of the defendants, members of their immediate families, their legal representatives, heirs, successors or assigns, and any entity in which any of the defendants or any excluded person has a controlling interest.

45. The Class is composed of at least thousands of individuals, the joinder of whom in one action is impracticable, and the disposition of their claims in a class action will provide substantial benefits both to the parties and the Court.

46. This action is properly maintainable as a class action for the following reasons:

a. The class consists of at least thousands of people and is thus so numerous that joinder of all members is impracticable.

b. There is a well-defined community of interest among class members in the questions of law or fact affecting the class which predominate over questions affecting only

11

individual members. Those common questions include but are not limited to:

(i)     Whether defendants violated the federal securities law through the acts alleged herein and harmed the members of the Class;

(ii)    Whether defendants violated the Investment Company Act of 1940 through the acts alleged herein and harmed the members of the Class;

(iii)   Whether each defendant participated in the course of conduct complained hereof;

(iv)    Whether each defendant profited by the wrongful conduct alleged herein;

(v)     Whether plaintiff and the other members of the class have sustained damages, and the proper measure of damages; and

(vi)    Whether plaintiff and the other members of the class are entitled to the injunctive and declaratory relief, and the reformation of the annuities, requested herein.

c.      The claims asserted by plaintiff are typical of the claims of class members.

d.      Plaintiff is a member of the Class and will fairly and adequately protect the interests of the class. She has no interests antagonistic to those of the other class members. Plaintiff has retained as counsel attorneys who are knowledgeable and experienced in securities litigation and in insurance industry trade practices and sales methods, as well as class and complex litigation.

e.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(i)     Given the size of individual class members' claims, most class members could not afford to seek legal redress individually for the wrongs the defendants

12

committed against them;

(ii)     When defendants' liability has been adjudicated, claims of all class members can be determined by the Court;

(iii)     This action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense and ensure uniformity of decisions;

(iv)     Without a class action, many class members would continue to suffer damages, and defendants' violations of law will be without redress while defendants continue to reap and retain the substantial proceeds of their wrongful conduct;

(v)     This action does not present any undue difficulties that would impede its management by the Court as a class action; and

(vi)     The names and addresses of the members of the Class can be ascertained from the books and records of defendants or its agents.

47.     Plaintiff seeks damages, including but not limited to rescissory damages, return of the fees and charges paid by plaintiff and other members of the class, and reformation of the investment contracts of plaintiff and the other members of the Class to place them in the investment positions they would enjoy if they had not purchased defendants' inappropriate and unsuitable deferred variable annuities.  Plaintiff also seeks injunctive relief prohibiting defendants from continuing to engage in such practices and from charging surrender fees (or contingent deferred sales charges) to any class member terminating a deferred variable annuity contract, and otherwise, as described below.

13

### The Solicitation and Sale of the Lead Plaintiffs' Variable Annuity Contracts

48.    Each lead plaintiff purchased their variable annuity contract, which was issued, underwritten and sold by defendants, through an independent broker-dealer (WMA Securities, Inc.), which at all relevant times was acting on behalf of the defendants.

49.    The uniform, written prospectuses, statements of additional information, disclosures (so-called), contracts, sales materials, and other written materials, given to each lead plaintiff by the American Skandia Defendants (in some instances given through the broker-dealer) stated or inferred that a tax-deferred variable annuity was an appropriate and suitable investment for placement in an IRA.

50.    The defendants did not disclose to plaintiff in either the uniform, written prospectus, statement of additional information, disclosure, contract, sales materials, or other written documents, the following (among other) material facts:

(a)    a deferred annuity is always an inappropriate and unsuitable investment for placement in a tax-deferred retirement plan, because among other things earnings on any investment placed in such plans are already tax-deferred.

(b)    the deferred annuities defendants sell are never appropriate investments for, and are always unsuitable investments for, placement into the purchasers' tax-deferred qualified retirement plans.

(c)    tax benefits (at least as great as those obtained from a variable annuity) were available from an investment in every one of the following types of contributory (not defined benefit) retirement plans or arrangements qualified for favorable income tax treatment pursuant to Internal Revenue Code sections 401(a), 401(k), 403(a), 403(b), 408(a), 408(b), 408(k), 408(p), 408A, or 457 (all of which are part of the Class definition and include IRAs and 401ks).

(d) the tax deferred accrual feature is provided by the tax-qualified retirement plan and, therefore, the tax deferred accrual feature of the variable annuity is unnecessary.

(e) the compound effect of the unnecessary, unreasonable and excessive commissions, fees and charges paid for defendants' tax-deferred variable annuities, over the course of a few decades -- not counting any surrender fees -- can consume as much as one-third of a retirement investor's account.

51.     Each lead plaintiff purchased from defendants a tax-deferred variable annuity product of the American Skandia Defendants.

## DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS

52.     The National Association of Securities Dealers considers communications with the public about variable annuities to be so important, and unique, that in 1994 it adopted a specific rule concerning such communications entitled "Communications with the Public About Variable Life Insurance and Variable Annuities." NASD Conduct Rule IM-2210-2.

53.     Thereafter, in 1996, the NASD issued NASD Notice to Members 96-86, entitled "NASD Regulation *Reminds* Members and Associated Persons that Sales of Variable Contracts Are Subject to NASD Suitability Requirements" (emphasis added).

54.     NASD Notice to Members 96-86 expressly stated that:

NASD Regulation, Inc. (NASD Regulation) reminds NASD members and their associated persons who sell variable life insurance contracts and variable annuity contracts (Variable Contracts) of their obligations with respect to the suitability requirements of the NASD Conduct Rules. Variable Contracts are regulated as securities under federal securities laws and NASD rules. Members and their associated persons are reminded that the suitability requirements of NASD Conduct Rule 2310 (formerly Article III, Section 2 of the NASD Rules of Fair Practice) apply to the recommendation of any security, including a Variable Contract. Thus, a member and its associated persons must have reasonable grounds for believing that a Variable Contract recommended to a customer is suitable for that customer. (emphasis added).

15

55.    In May 1999, the NASD issued NASD Notice to Members 99-35, entitled "The NASD *Reminds* Members of Their Responsibilities Regarding the Sales of Variable Annuities" (emphasis added).

56.    NASD Notice to Members 99-35 expressly stated that it "should [be] disclose[d] to the customer that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary." (at 231 no. 11).

57.    NASD Notice to Members 99-35 stated that purchasing a tax-deferred variable annuity for a tax-deferred retirement account should never be recommended unless "its other benefits, such as lifetime income payments, family protection through the death benefit, and guaranteed fees, support the recommendation." Id.

58.    The NASD notices and rules concerning variable annuities cited to or quoted from are incorporated herein by reference.

59.    The NASD rules concerning variable annuities apply to wholesalers as well as retailers of variable annuities. (Notice to Members 99-35 at no. 16).

60.    Defendants had a number of virtually identical written documents -- including registration statements, prospectuses, statements of additional information, disclosures (so-called), sales presentation materials and contracts -- for variable annuities in effect during the Class Period, which defendants used to sell the variable annuities to prospective purchasers.

61.    These written materials contained material misrepresentations and material omissions.

62.    Defendants selected as targets for their sales campaign persons interested in funding qualified retirement plans. Sales of deferred annuities for qualified retirement plans,

based upon these uniform, written documents, have been and continue to be an enormous marketing success for defendants. Defendants have received and continue to receive millions, and probably billions, of dollars from the sales of deferred annuities for qualified retirement plans, which sales were predicated upon the materially misleading written documents.

63.    The prospectuses, statements of additional information, contracts, disclosures for variable annuities, written sales presentation materials and other written documents, were written by the defendants and often contain on them the name and/or logo of one or more of the defendants.

64.    Since under federal law a variable annuity is always sold pursuant to a prospectus, defendants were required to give a prospective purchaser a prospectus prior to any purchase. (That prospectus either would contain or would incorporate by reference the registration statement and the statement of additional information.)

65.    The defendants issued the following SEC filings, which the defendants used to sell the variable annuities at issue here to plaintiff and other members of the Class.

66.    Plaintiff incorporates herein by reference the following uniform, written materials (prospectuses, statements of additional information, registration statements and amendments, and other writings, and any document incorporated by them) which were routinely used by the defendants to sell the variable annuities at issue.

(a) The following SEC filings, which are incorporated by reference, were issued and used to sell the variable annuities in American Skandia Life Assur Corp Var Acct B Cl 1 Sub Accts (CIK number 0000826734):

An unnamed flexible premium deferred annuity: prospectus and SOAI dated May 1, 1997; prospectus and SOAI dated May 1, 1998; prospectus and SOAI dated May 3, 1999; and

17

upon information and belief a prospectus and SOAI dated May 1, 2000.

American Skandia Advisor PlanSM NY: prospectus and SOAI dated May 1, 2000.

American Skandia Advisor PlanSM II: undated prospectus.

American Skandia Advisor PlanSM II Premier: prospectus and SOAI dated May 1, 2000.

American Skandia LifeVest: prospectus and SOAI dated May 1, 2000.

American Skandia ProtectorSM: prospectus and SOAI dated May 1, 2000.

American Skandia XTra CreditSM: prospectus and SOAI dated May 1, 2000.

American Skandia XTra CreditSM II (dates unknown).

American Skandia XTra CreditSM Premier: prospectus and SOAI dated May 1, 2000.

Evergreen Skandia Harvester Variable Annuity: prospectus and SOAI dated February 14, 2000.

Evergreen Skandia Harvester XTra Credit Variable Annuity: prospectus and SOAI dated February 14, 2000.

Stagecoach Extra Credit Variable Annuity: prospectus and SOAI dated May 1, 1997; upon information and belief prospectus and SOAI dated May 1, 1998; prospectus and SOAI dated May 3, 1999; prospectus and SOAI dated October 18, 1999; prospectus and SOAI dated May 1, 2000.

Stagecoach Variable Annuity Flex: prospectus and SOAI dated May 1, 1998; prospectus and SOAI dated May 3, 1999; prospectus and SOAI dated October 18, 1999; prospectus and SOAI dated May 1, 2000.

18

Stagecoach Variable Annuity Plus:  prospectus and SOAI dated May 1, 1997; prospectus and SOAI dated May 1, 1998; prospectus and SOAI dated May 3, 1999; prospectus and SOAI dated October 18, 1999; prospectus and SOAI dated May 1, 2000.

Alliance Capital Navigator Annuity:  prospectus and SOAI dated May 1, 1997; prospectus and SOAI dated May 1, 1998.

(b) The following SEC filings, which are incorporated by reference, were issued and used to sell the variable annuities in American Skandia Life Assur Corp Var Acct B Cla 3 Sub Acct, CIK number 0000933426:

An unnamed deferred annuity (registration number 033-86866, possibly American Skandia Impact):  prospectus and SOAI filed with the SEC on May 4, 1999, at first substantive page before table of contents and 36-37[1].

American Skandia ImpactSM: prospectus filed with the SEC on April 26, 2000, at first substantive page before table of contents and 39-40.

Defined Investments Annuity: prospectus and SOAI filed with the SEC on September 30, 1999, at first substantive page before table of contents and 30-31.

Galaxy Variable Annuity:  prospectus and SOAI filed with the SEC on April 27, 1999, at first substantive page before table of contents and 31-32; prospectus filed with the SEC on April 26, 2000, at first substantive page before table of contents and 33-34.

(c) The following SEC filings, which are incorporated by reference, were issued and used to sell the variable annuities in American Skandia Life Assuran Corp Var Acc B Class

---

[1] All page numbers in prospectuses and other SEC filings cited in this Complaint are approximations based upon the locations of relevant headings or subheadings in the table of contents in the relevant documents, as a result of the omission of page numbers from these documents as filed on the SEC Edgar filing system. Plaintiff expects that there are many instances in which a portion of the language described extends onto the page after the cited pages. Plaintiff does not intend to omit language that extends in this manner and, in fact, incorporates such language by reference.

2 Sub Acc, CIK number 0000916725:

Advisors Choice(R) 2000: prospectus and SOAI filed with the SEC on April 26, 2000, at first substantive page before table of contents and 38-39.

An unnamed deferred annuity (registration number 333-08853, possibly Advisors Choice(R) 2000): prospectus and SOAI filed with the SEC on May 3, 1999, at first substantive page before table of contents and 31-32.

(d) The following SEC filings, which are incorporated by reference, were issued and used to sell the variable annuities in American Skandia Life Assurance Corp Variable Account E, CIK number 0000887588:

Galaxy Variable Annuity: prospectus and SOAI filed with the SEC on April 27, 1999, at first substantive page before table of contents and 21-22; prospectus and SOAI filed with the SEC on April 26, 2000, at first substantive page before table of contents and 22-23.

(e) The following SEC filings, which are incorporated by reference, were issued and used to sell the variable annuities in American Skandia Life Assurance Corp/Ct, CIK number 0000881453:

American Skandia Advisor PlanSM NY: prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 34-35.

An unnamed deferred annuity (registration number 333-25733): prospectus and SOAI filed with the SEC on May 3, 1999, at first substantive page before table of contents and 35-36; prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 38-39.

Evergreen Skandia Harvester Variable Annuity: prospectus and SOAI filed with the SEC on February 10, 2000, at first substantive page before table of contents and 30-31;

prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 32-33.

American Skandia Advisor PlanSM II Premier: prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 41-42

American Skandia XTra CreditSM: prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 40-41.

Stagecoach Extra Credit Variable Annuity: prospectus and SOAI filed with the SEC on May 4, 1999, at first substantive page before table of contents and 32-33; prospectus and SOAI filed with the SEC on October 14, 1999, at first substantive page before table of contents and 34-35; prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 36-37.

Evergreen Skandia Harvester XTra Credit Variable Annuity: prospectus and SOAI filed with the SEC February 10, 2000, at first substantive page before table of contents and 32-33; prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 33-34.

American Skandia XTra CreditSM Premier: prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 45-46.

American Skandia LifeVest(R): prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 37-38.

Stagecoach Variable Annuity Flex: prospectus and SOAI filed with the SEC on May 3, 1999, at 29-30; prospectus and SOAI filed with the SEC on October 14, 1999, at first substantive page before table of contents and 30-31; prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 32-33.

21

American Skandia LifeVest(R) Premier: prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 37-38.

American Skandia ProtectorSM: prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 38-39.

Stagecoach Variable Annuity Plus: prospectus and SOAI filed with the SEC on May 1, 1999, at first substantive page before table of contents and 33-34; prospectus and SOAI filed with the SEC on October 14, 1999, at first substantive page before table of contents and 34-35; prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 36-37.

Advisors Choice(R) 2000: prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 38-39.

Galaxy Variable Annuity: prospectus and SOAI filed with the SEC on May 3, 1999, at first substantive page before table of contents and 21-22; prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 22-23.

Galaxy Variable Annuity:  prospectus and SOAI filed with the SEC on May 3, 1999, at first substantive page before the table of contents and 31-32; prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 33-34.

American Skandia ImpactSM: prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 39-40.

Defined Investments Annuity: prospectus and SOAI filed with the SEC on September 30, 1999, at first substantive page before table of contents and 30-31; prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 30-31.

An unnamed deferred annuity (registration number 333-24989), prospectus and SOAI filed with the SEC on May 3, 1999, at first substantive page before table of contents and 31-32.

An unnamed deferred annuity (registration number 333-77213): prospectus and SOAI filed with the SEC on May 4, 1999, at first substantive page before table of contents and 36-37.

An unnamed deferred annuity (registration number 033-91400, possibly American Skandia Impact): prospectus and SOAI filed with the SEC on May 4, 1999, at first substantive page before table of contents and 36-37.

An unnamed deferred annuity (registration number 333-00995): prospectus and SOAI filed with the SEC on May 3, 1999, at first substantive page before table of contents and 34-35.

An unnamed deferred annuity (registration number 033-62953): prospectus and SOAI filed with the SEC on May 3, 1999, at first substantive page before table of contents and 32-33.

67.    Concerning (a) through (e) immediately above, the prospectuses cited therein contain the following language or language substantially similar thereto.  For example, two typical prospectuses (American Skandia Life Assurance Corporation Variable Account B Cl 1 Sub Accts dated May 3, 1999, and American Skandia XTra Credit dated May 1, 2000) used

23

during the Class Period state in substantially identical language on the very first substantive page
of each prospectus:

### WHY WOULD I CHOOSE TO PURCHASE THIS ANNUITY?

This Annuity is frequently used for retirement planning. It may be used as an
investment vehicle for an IRA, SEP-IRA, Roth IRA or Tax Sheltered Annuity (or
403(b)). It may also be used for other purposes that are not "qualified"
investments. The Annuity allows you to invest your money in a number of
variable investment options as well as in one or more fixed investment options.
You are not taxed on any investment gains the Annuity earns until you make a
withdrawal from the Annuity or begin to receive annuity payments. This feature,
referred to as "tax-deferral", can be beneficial to the growth of your Account
Value because money that would otherwise be needed to pay taxes on investment
gains each year remains invested and can earn additional money. However,
because the Annuity is designed for long-term retirement savings, a 10% penalty
tax may be applied on withdrawals you make before you reach age 59 1/2.

. . . . [and then each prospectus continues in substantially similar
language at its respective pages identified in (a) through (e) above]

### WHAT TAX CONSIDERATIONS ARE THERE FOR TAX-QUALIFIED RETIREMENT PLANS OR QUALIFIED CONTRACTS?

An annuity may be suitable as a funding vehicle for various types of tax-
qualified retirement plans. We have provided summaries of the types of tax-
qualified retirement plans with which we may issue an Annuity. These
summaries provide general information about the tax rules and are not intended
to be complete discussions. The tax rules regarding qualified plans are complex.
These rules may include limitations on contributions and restrictions on
distributions, including additional taxation of distributions ad additional
penalties. The terms and conditions of the tax-qualified retirement plan may
impose other limitations and restrictions that are in addition to the terms of the
Annuity. The application of these rules depends on individual facts and
circumstances. Before purchasing an Annuity for use in a qualified plan, you
should obtain competent tax advice, both as to the tax treatment and suitability of
such an investment. American Skandia does not offer all of its annuities to all of
these types of tax-qualified retirement plans.

Corporate Pension and Profit-sharing Plans: Annuities may be used to fund
employee benefits of various corporate pension and profit-sharing plans
established by corporate employers under Sections 401(a) and 401(k) of the Code.
Contributions to such plans are not taxable to the employee until distributions are
made from the retirement plan. The Code imposes limitations on the amount
that may be contributed and the timing of distributions. The tax treatment of

distributions is subject to special provisions of the Code, and also depends on the design of the specific retirement plan. There are also special requirements as to participation, nondiscrimination, vesting and nonforfeitability of interests.

H.R. 10 Plans: Annuities may also be used to fund benefits of retirement plans established by self-employed individuals for themselves and their employees. These are commonly known as "H.R. 10 Plans" or "Keogh Plans". These plans are subject to most of the same types of limitations and requirements as retirement plans established by corporations. However, the exact limitations and requirements may differ from those for corporate plans.

Tax Sheltered Annuities: Under Section 403(b) of the Code a tax sheltered annuity ("TSA") is a contract into which contributions may be made by certain qualifying employers such as public schools and certain charitable, educational and scientific organizations specified in Section 501(c)(3) for the benefit of their employees. Such contributions are not taxable to the employee until distributions are made from the TSA. The Code imposes limits on contributions, transfers and distributions.
Nondiscrimination requirements also apply.

-----------------------------------------------------------------
Under a TSA, you may be prohibited from taking distributions from the contract attributable to contributions made pursuant to a salary reduction agreement unless the distribution is made:
-----------------------------------------------------------------

|X|    After the participating employee attains age 59 1/2;
|X|    Upon separation from service, death or disability; or
|X|    In the case of financial hardship (subject to restrictions).

Section 457 Plans: Under Section 457 of the Code, deferred compensation plans established by governmental and certain other tax exempt employers for their employees may invest in annuity contracts. The Code limits contributions and distributions, and imposes eligibility requirements as well. Contributions are not taxable to employees until distributed from the plan. However, plan assets remain the property of the employer and are subject to the claims of the employer's general creditors until such assets are made available to participants or their beneficiaries.

Individual Retirement Programs or "IRAs": Section 408 of the Code allows eligible individuals to maintain an individual retirement account or individual retirement annuity ("IRA"). IRAs are subject to limitations on the amount that may be contributed, the contributions that may be deducted from taxable income, the persons who may be eligible to establish an IRA and the time when distributions must commence. Further, an Annuity may be used to "roll-over" distributions from certain tax-qualified retirement plans and maintain their tax-deferral.

25

Roth IRAs: A form of IRA is also available called a "Roth IRA". Contributions to a Roth IRA are not tax deductible. However, distributions from a Roth IRA are free from Federal income taxes and are not subject to the 10% penalty tax if five (5) tax years have passed since the first contribution was made or any conversion from a traditional IRA was made and the distribution is made (a) once the taxpayer is age 59 1/2 or older, (b) upon the death or disability of the taxpayer, or (c) for qualified first-time home buyer expenses, subject to certain limitations. Distributions from a Roth IRA that are not "qualified" as described above may be subject to Federal income and penalty taxes.

Purchasers of IRAs and Roth IRAs will receive a special disclosure document, which describes limitations on eligibility, contributions, transferability and distributions. It also describes the conditions under which distributions from IRAs and qualified plans may be rolled over or transferred into an IRA on a tax-deferred basis and the conditions under which distributions from traditional IRAs may be rolled over to, or the traditional IRA itself may be converted into, a Roth IRA.

SEP IRAs: Eligible employers that meet specified criteria may establish Simplified Employee Pensions or SEP IRAs. Employer contributions that may be made to employee SEP IRAs are larger than the amounts that may be contributed to other IRAs, and may be deductible to the employer.

HOW ARE DISTRIBUTIONS FROM QUALIFIED CONTRACTS TAXED?

Distributions from Qualified Contracts are generally taxed under Section 72 of the Code. Under these rules, a portion of each distribution may be excludable from income. The excludable amount is the proportion of a distribution representing any investment gain on the after-tax contributions. Generally, a 10% penalty tax applies to the taxable portion of a distribution from a Qualified Contract made prior to age 59 1/2. However, the 10% penalty tax does not apply when the distribution:

|X| is part of a properly executed transfer to another IRA or another eligible qualified account;
|X| is subsequent to the death or disability of the taxpayer (for this purpose disability is as defined in Section 72(m)(7) of the Code);
|X| is part of a series of substantially equal periodic payments to be paid not less frequently than annually for the taxpayer's life or life expectancy or for the joint lives or life expectancies of the taxpayer and a designated beneficiary;
|X| is subsequent to a separation from service after the taxpayer attains age 55*;
|X| does not exceed the employee's allowable deduction in that tax year for medical care*; and
|X| is made to an alternate payee pursuant to a qualified domestic relations order*.

26

The exceptions above which are followed by an asterisk (*) do not apply to IRAs.

Minimum Distributions after age 70 1/2: A participant's interest in a Qualified Contract must generally be distributed, or begin to be distributed, by the "required beginning date". This is April 1st of the calendar year following the later of:

|X| the calendar year in which the individual attains age 70 1/2; or
|X| the calendar year in which the individual retires from service with the employer sponsoring the plan. The retirement option is not available to IRAs.

68.    The above quoted excerpt from the prospectuses is a material

misrepresentation because it directly or by inference recommended tax-deferred variable

annuities for tax-deferred retirement accounts.

69.    In addition, plaintiff incorporates herein by reference the following

prospectuses and SOAIs.

(a) The following SEC filings, which are incorporated by reference, were issued

and used to sell the variable annuities in American Skandia Life Assur Corp Var Acct B Cla 3

Sub Acct, CIK number 0000933426:

An unnamed deferred annuity (registration number 033-88362, possibly Galaxy

Variable Annuity): prospectus and SOAI filed with the SEC on April 30, 1997, at 9, 22;

prospectus and SOAI filed with the SEC on April 27, 1998, at 9, 21.

An unnamed deferred annuity (registration number 033-86866): prospectus and

SOAI filed with the SEC on April 30, 1997, at 9, 19; prospectus and SOAI filed with the SEC on

April 24, 1998 at 9, 24.[2]

---

[2] In addition, a number of the prospectuses at issue, including this one, at 24, contain the following language. The language shows that defendants encouraged purchasing tax-deferred variable annuities for already tax-deferred retirement plans because the minimum dollar amount required for purchases in already tax-deferred retirement accounts was lower than for purchases in non-qualified plans.

(continued...)

(b) The following SEC filings, which are incorporated by reference, were issued and used to sell the variable annuities in American Skandia Life Assuran Corp Var Acc B Class 2 Sub Acc, CIK number 0000916725, are incorporated by reference herein:

An unnamed deferred annuity (probably Advisors Choice (R) 2000): prospectus and SOAI filed with the SEC on April 27, 1998, at 9, 23.

An unnamed deferred annuity (registration number 333-08853): prospectus and SOAI filed with the SEC on June 25, 1997, at pages 9, 21[3]

An unnamed deferred annuity (registration number 033-56770): prospectus and SOAI filed with the SEC on April 29, 1997, at pages 9, 21.

(c) The following SEC filings, which are incorporated by reference, were issued and used to sell the variable annuities in American Skandia Life Assurance Corp Variable Account E, CIK number 0000887588:

---

(...continued)

"Periodic Purchase Payments: . . . We may also require an initial Purchase Payment to be submitted by check or wire before agreeing to such a program. Our minimum requirements may differ based on the usage of the Annuity, such as whether it is being used in conjunction with certain retirement plans."

[3] In addition, it should be noted that Defendants issued certain materials, for example those filed with the SEC for a number of unnamed annuities on March 10, 1998 (including those with registration numbers 333-24989 and 333-00995) that contained the following or substantially similar language:

Roth IRA/SEP IRA/SIMPLE IRA
The section of the Prospectus entitled "Purchasing Annuities - Uses of the Annuity" is amended as follows:

The Annuity may be issued in connection with or purchased as a funding vehicle for certain retirement plans designed to meet the requirements of various sections of the Code. These include, but are not limited to: (a) Section 401 (corporate, association, or self-employed individuals' retirement plans); (b) Section 403(b) (tax-sheltered annuities available to employees of certain qualifying employers); (c) Section 408 (individual retirement accounts and individual retirement annuities - "IRAs"; Simplified Employee Pensions - "SEPs"; and Savings Incentive Match Plans for Employees - "SIMPLE IRAs"); and (d) Section 408A (Roth IRAs).

The above quoted excerpt from the prospectuses is a material misrepresentation because it directly or by inference recommended tax-deferred variable annuities for tax-deferred retirement accounts.

An unnamed deferred annuity (registration number 033-47976, possibly Galaxy Variable Annuity): prospectus and SOAI filed with the SEC on April 29, 1997, at pages 9, 17; prospectus and SOAI filed with the SEC on April 27, 1998, at pages 9, 17.

(d) The following SEC filings, which are incorporated by reference, were issued and used to sell the variable annuities in American Skandia Life Assurance Corp/Ct, CIK number 0000881453:

An unnamed deferred annuity (registration number 333-00995): and SOAI filed with the SEC on May 1, 1997, at pages 9, 24; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 10, 24.

An unnamed deferred annuity (registration number 333-25733): prospectus and SOAI filed with the SEC on May 2, 1997, at pages 9, 24; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 24.

An unnamed deferred annuity (registration number 033-62791): prospectus and SOAI filed with the SEC on May 2, 1997, at pages 9, 23; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 7.

Stagecoach Variable Annuity Flex; prospectus and SOAI filed with the SEC on May 1, 1998, at 9, 21.

Stagecoach Extra Credit Variable Annuity: prospectus and SOAI filed with the SEC on May 2, 1997 at 9, 20; prospectus and SOAI filed with the SEC on May 1, 1998, at 9, 22.

Stagecoach Variable Annuity Plus: prospectus and SOAI filed with the SEC on May 1, 1997, at 9, 21; prospectus and SOAI filed with the SEC on May 1, 1998, at 9, 22.

An unnamed deferred annuity (registration number 333-25761): prospectus and SOAI filed with the SEC on May 1, 1997, at pages 9, 17; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 22.

Alliance Capital Navigator Annuity: prospectus and SOAI filed with the SEC on May 1, 1997, at pages 9, 20; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 21.

An unnamed deferred annuity (registration number 333-24989): prospectus and SOAI filed with the SEC on June 26, 1997, at pages 9, 21; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 23.

An unnamed deferred annuity (registration number 033-91400): prospectus and SOAI filed with the SEC on May 1, 1997, at pages 9, 22; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 24.

An unnamed deferred annuity (registration number 033-88360, possibly Galaxy Variable Annuity): prospectus and SOAI filed with the SEC on May 1, 1997, at pages 9, 19; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 21.

An unnamed deferred annuity (registration number 333-02867): prospectus and SOAI filed with the SEC on May 1, 1997, at pages 9, 17; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 17.

An unnamed deferred annuity (registration number 333-26695):  prospectus filed with the SEC on July 22, 1997 at pages 9, 23; prospectus and SOAI filed with the SEC on July 28, 1997, at pages 9, 23; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 26.

An unnamed deferred annuity (registration number 033-62953): prospectus and SOAI filed with the SEC on May 1, 1997, at 9, 22; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 7.

An unnamed deferred annuity (registration number 333-00941): prospectus and SOAI filed with the SEC on December 27, 1996 at pages 9, 22.

70.   Concerning (a) through (d) immediately above, the prospectuses cited therein contain the following language or language substantially similar thereto:

> Purchasing Annuities: Annuities are available for multiple uses, including as a funding vehicle for various retirement programs which qualify for special treatment under the Code. . . .

> Uses Of The Annuity: The Annuity may be issued in connection with or purchased as a funding vehicle for certain retirement plans designed to meet the requirements of various sections of the Code. These include, but are not limited to: (a) Section 401(a) (defined benefit plans and defined contribution plans such as 401(k), profit sharing and money purchase plans); (b) Section 403(b) (tax-sheltered annuities available to employees of certain qualifying employers); (c) Section 408 (individual retirement accounts and individual retirement annuities - "IRAs"; and Simplified Employee Pensions "SEPs"; and (d) Section 408A (Roth IRAs).

71.   The above quoted excerpt from the prospectuses is a material misrepresentation because it recommended tax-deferred variable annuities for tax-deferred retirement accounts.

72.   The prospectuses have different names simply as marketing tools. The disclosures for variable annuities, some of the written sales presentation materials disseminated with respect to certain prospectuses, and the contracts given to each purchaser, do not necessarily identify the particular prospectus which was given to the prospective purchaser given that the name is merely a marketing tool and in many instances the invested funds are put into the exactly the same subaccount/portfolios. (Accordingly, there may be additional prospectuses which are

not readily identifiable because of defendants' marketing terminology, and they are incorporated herein by reference. Upon information and belief, there are prospectuses which are not available on the Securities and Exchange Commission's EDGAR Internet site.)

73.     Prospective purchasers of defendants' variable annuities routinely also were given (and had to sign when purchasing) a document entitled "Disclosure for Variable Annuities" which contained the same material misrepresentations and/or material omissions. This document was a uniform variable annuity disclosure used by issuers, underwriters and marketers throughout the insurance industry to sell variable annuities. The disclosure was given to plaintiff, on behalf of the American Skandia defendants, by the broker-dealer through which plaintiff purchased the variable annuity. The defendants knew it was being given to purchasers. The disclosure refers the purchaser to the materially defective prospectuses issued by defendants. Such uniform disclosure for variable annuities signed by Ms. Donovan and Ms. O'Brien are exhibit 2 hereto and are incorporated herein by reference.

74.     Each of these prospectuses, statements of additional information, written sales presentation materials, contracts and written disclosures for variable annuities, which have been incorporated herein by reference, contained the same or similar material misrepresentations (in essentially identical language), omitted to state a material fact required to be stated therein, or failed to disclose certain material facts necessary to make the statements therein not misleading, to plaintiff and the class members or their employers (who were prospective purchasers of the variable annuities at issue here). Defendants unlawfully presented their tax-deferred variable annuities as appropriate for placement into (among other options) tax-deferred plans or accounts, such as IRAs and 401(k)s.

75.     For example, none of the prospectuses, statements of additional

32

information (pursuant to the NASD requirement or otherwise) "disclose[d] to the customer that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is <u>unnecessary</u>." (emphasis added).

76. None of the prospectuses, statements of additional information (pursuant to the NASD requirement or otherwise) disclosed that a tax-deferred variable annuity should not be purchased for a tax-deferred retirement account unless "its other benefits, such as lifetime income payments, family protection through the death benefit, and guaranteed fees, support the purchase."

77. All of the prospectuses, statements of additional information, contracts and written disclosures incorporated herein failed to disclose (pursuant to the NASD Notice or otherwise) the following material facts (among others).

78. Defendants failed to disclose that tax benefits (at least as great as those obtained from a variable annuity) were available from an investment in every one of the following types of contributory (not defined benefit) retirement plans or arrangements qualified for favorable income tax treatment pursuant to Internal Revenue Code sections 401(a), 401(k), 403(a), 403(b), 408(a), 408(b), 408(k), 408(p), 408A, or 457 (which is the Class definition herein, and includes IRAs and 401ks).

79. Defendants failed to disclose that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary.

80. Defendants failed to disclose that the deferred variable annuities defendants sell are not appropriate investments for, and are unsuitable investments for, placement into the purchasers' tax-deferred qualified retirement plans.

81.     Defendants failed to disclose that a tax-deferred variable annuity should not be purchased for a tax-deferred retirement account unless "its other benefits, such as lifetime income payments, family protection through the death benefit, and guaranteed fees, support the purchase."

82.     Defendants failed to disclose that the purchase of a tax-deferred annuity in an already tax-deferred retirement account increases the total amount paid by the investor while providing only the same or lesser tax benefit to the investor.

83.     The material misrepresentations and omissions described above were contained in the uniform, written, advertising and sales presentation materials, prospectuses, contracts, disclosures, and other written documents, prepared, approved, and disseminated by defendants in selling deferred variable annuities to plaintiff and other members of the class.

84.     The misrepresentations and omissions described above were material. Plaintiff and other members of the class would not have purchased deferred variable annuities from defendants for placement in their qualified retirement plans if they had been told the truth, instead of having been told the material misrepresentations and material omissions identified above in this section entitled "Defendants' Material Misrepresentations and Omissions."

85.     Defendants' own conduct demonstrates that the misrepresentations and omissions described above were both material and in violation of law. On October 23, 2000, defendants amended the wording of its prospectus language, on information and belief in all of its relevant prospectuses, to include the following language:

> However, when an Annuity is purchased as a "qualified" investment, you receive preferential tax treatment under the Internal Revenue Code. Purchasing an Annuity as an investment vehicle for a "qualified" investment does not provide any additional tax advantages to that already available through your retirement plan under the Internal Revenue Code. (emphasis added)

86.     As one example, this language was inserted into the October 23, 2000 prospectus for American Skandia XTra Credit. The language was inserted at the end of the first paragraph (quoted hereinabove) in that product's prospectus dated May 1, 2000. See paragraph 70 herein.

87.     This language was never included in a variable annuity prospectus issued by the defendants before October, 2000.

88.     The issuance by the NASD of those Rules and Notices (cited and quoted herein) in and of itself demonstrates that these undisclosed facts were material.

89.     The NASD would not have required that each of these facts be disclosed unless it thought each of these facts was "important" to the investment decision and would significantly alter the total mix of facts available to an investor.

90.     Even apart from the existence of the NASD Rules and Notices, each of the undisclosed facts was material, as a matter of fact, for the same reason -- it was "important" to the investment decision and would significantly alter the total mix of facts available to an investor.

91.     Hence, a duty to disclose these facts existed under the NASD regulations and under federal securities law generally.

92.     Variable annuities are subject to both federal and state regulation including regulation under the federal securities laws.

93.     Each defendant knew or was negligent in not knowing that it must obey the applicable laws, rules, and regulations under the federal securities laws, of the United States, including the rules and regulations of the SEC, NASD, and other self-regulatory organizations.

94.     Each defendant knew or was negligent in not knowing that the marketing

and sale of variable annuities was subject to NASD requirements including but not limited to the NASD's unsuitability standard.

95.   ASM was a member of the NASD.

96.   Upon information and belief, other American Skandia-affiliated entities, including certain unknown "John Doe" defendant(s) generally identified herein, are broker-dealers and members of the NASD.

97.   ASM also has compliance, operational, and other manuals.

98.   The respective manuals state that the firm and its employees are subject to and must obey all applicable laws, rules and regulations, including those of the NASD.

99.   The compliance, operational, and other manuals of a registered broker-dealer routinely require all employees to read the manual and to follow the rules contained therein.

100.   The NASD, as a matter of routine procedure, disseminates Notices to Members to its members and relevant entities.

101.   It is the responsibility of NASD member broker-dealers to obtain, review NASD, and comply with, Notices to Members.

102.   The defendants routinely received NASD Notices to Members, including those identified herein.

## DAMAGES

103.   As a direct result of defendants' misconduct, plaintiff and other members of the class also have paid commissions, fees and charges in excess of what they would have paid for appropriate and suitable investments placed in an already tax qualified retirement plan. The damages suffered by class members include but are not limited to the following.

104.    The initial costs and carrying costs of the already tax-deferred retirement arrangements were materially lower than the initial costs and carrying costs for the purchase of variable annuities.

105.    Sales commissions paid to those who sell deferred annuities are two to three times higher than the commissions paid on pure investment products, such as mutual funds or individual securities -- thus motivating defendants' to target the qualified retirement plan market for selling defendants' deferred annuity products.

106.    The mortality insurance features were optional, extra cost items not necessary for qualified plan retirement investors to achieve a tax-favored basis for their investment.

107.    Indeed, the mortality and expense charge itself could be approximately 1.40%, or more, annually, which could easily exceed the cost to purchase individual stocks or mutual funds.

108.    The insurance features of their deferred annuities provided no benefit or economic value except in the highly remote circumstances of a severe and sudden market collapse of enormous proportions.  Moreover, the benefits of annuitization can be obtained by any person at any time as an immediate annuity, and the lock-in of a minimum annuitization rate offered by a deferred annuity at the inception of the contract can have value only if human life expectancy dramatically increased during the annuity's investment phase, the likelihood of which is remote.

109.    When present, the death benefits could be purchased far more economically through a normal term life insurance policy.  Moreover, the death benefit insurance feature is rarely invoked, because few of the contracts surrendered due to death during their

investment phase involve losses that result in payment of any meaningful death benefit (i.e., investment losses depleting the account value to less than the principal amount invested).

110.    Deferred annuities also have back-end loads, or "surrender fees," which are assessed in the event that the contract owner elects to withdraw invested funds prior to the expiration of a contractually specified period. The fees are calculated as a percentage of the withdrawn funds and typically amount to the 6 to 9 percent if the "surrender" occurs in the first year and on a declining scale thereafter for 7 to 10 years. With many contracts, the surrender fee period begins anew for each additional investment of principal after the initial investment. The surrender fees are an inherently unreasonable and excessive annuity fee. In some instances, the surrender fees are called a "contingent deferred sales charge," in which case the charge is calculated as a percentage of the funds invested.

111.    With respect to the fixed-rate account option in a variable annuity, the exact amount of the insurer's fee for that annuity, is generally the spread between the return on general account investments (the return on the consumers invested funds) and the interest rate credited to contract owners. These fees are usually substantial, often 2 to 3 percent of the total account value annually.

112.    With a variable annuity, the annuity fees are typically in the form of annual asset-based percentage charges assessed against the contract owner's account value. These fees are in addition to the asset-based investment management fees assessed by the managers of the investments. The two major asset-based annuity fees are the daily "mortality and expense-risk" (M&E) charge, which averages 1.25 percent annually according to industry surveys, and the daily "administration" charge, an additional 0.15 percent annually.

113.    In addition, a policy maintenance charge of $25 to $40 is assessed

annually against annuity accounts.

114.    Purchasing a tax-deferred variable annuity for a tax-deferred IRA also requires the investor to incur, under federal law, forced withdrawals from the IRA beginning at age 70 1/2. Thus, for example, if the surrender fee period were eight years, if someone 63 years old or older purchased a tax-deferred variable annuity for a tax-deferred IRA, they would have to pay to defendants a surrender fee on the amount withdrawn pursuant to the mandatory forced withdrawal, and then they also would pay taxes on the amount withdrawn from the IRA.  Upon information and belief, they would have to pay taxes on the amount relinquished to defendants as a surrender fee, even though they did not receive it, because it was part of the IRA-related forced withdrawal.

115.    The annuity fees collected by defendants are so high in part because of the high commission rates defendants pay salespersons for the selling of the deferred annuities.  If an annuity purchaser decides to terminate his or her investment within the first six or eight years -- i.e., before defendants have had a chance to collect enough in annual annuity fees to cover the sales commission paid to the agent -- the additional surrender fee provides defendants with funds to cover the full amount of commissions.  As a result, plaintiff and the class members are trapped: by the time they realize they are paying exorbitant annual asset-based annuity fees out of their retirement accounts for unwanted "insurance" features which are in fact hidden sales charges, the only way they can extract themselves from the arrangement is to pay a further large asset-based surrender fee, which is used to finance the compensation of the agent that recommended the inappropriate and unsuitable deferred annuity investment in the first place.

116.    The compound effect of these unreasonable and excessive annuity fees, commissions and charges, paid by class members for defendants' tax-deferred variable annuities,

39

over the course of a few decades -- not counting any surrender fees -- can consume as much as one-third of a retirement investor's account value compared to a regular investment.

117.    At the time this lawsuit was commenced, lead plaintiffs Donovan and O'Brien's respective variable annuities were worth substantially less than at their time of purchase.

118.    As a matter of routine policy, defendants deducted charges such as the annual fees from Mesdames Donovan's and O'Brien's accounts. Defendants made these deductions by selling shares from their accounts. Thus, the value of their accounts declined as a direct result of these charges. Upon information and belief, the same direct deductions were made from the Hendrickson's accounts.

119.    Part of the decrease in value in the variable annuity accounts of each of the lead plaintiffs was caused by the fees which defendants charged to these variable annuity accounts and part of the decrease was caused by the decrease in the market value of the variable annuity portfolios.

120.    After the commencement of this action, Ms. Donovan surrendered her variable annuity. Ms. Donovan paid a surrender fee, which her annuity called a contingent deferred sales charge, of $5,551.42 (which was slightly more than 8.5%). She was charged this percentage not upon the gross amount she received at surrender (which was approximately $26,000), but upon the gross amount she initially invested (which was more than $63,000).

121.    Lead Plaintiffs Jay Hendrickson and Rose Hendrickson each had their accounts similarly decrease in value. Each of them made a forced withdrawal from their IRA of part of their variable annuity because they were over 70 1/2 years of age. In the Spring of 2001, each of them complained about their variable annuity purchase to the broker-dealer which sold

them the variable annuity. Upon information and belief, the broker-dealer then had each of them reimbursed for part but not all of their loss. They were not reimbursed for their forced withdrawals, nor for the taxes paid on the forced withdrawals.

122.    This action was brought within the respective statutes of limitations; that is, within either three years or five years after the cause of action accrued upon purchase of the variable annuity, and within either one year or two years after the discovery of the material misstatements and material omissions. Ms. Donovan did not learn of the material misrepresentations and omissions until no earlier than December 21, 2000 when she complained to WMA Securities, Inc. about certain aspects of the variable annuity. Mr. and Mrs. Hendrickson did not learn of the material misrepresentations and omissions until in or about May, 2001 when they complained to WMA Securities, Inc. about certain aspects of the variable annuity. Ms. O'Brien did not learn of the material misrepresentations and omissions until in or about December, 2002 when Ms. Donovan told her that she (Ms. Donovan) was about to or had just filed this lawsuit. No events occurred prior to these respective dates which put the respective lead plaintiff on notice of his or her claims.

## NO SAFE HARBOR

123.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Complaint. First, none of the allegedly false statements are forward-looking statements. Further, none of the specific statements pleaded herein were identified as "forward-looking statements" when made. To the extent there were any forward-looking statements upon which plaintiff bases her claims, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly

41

forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of defendants who knew that those statements were false when made.

### FIRST CLAIM FOR RELIEF
### Against All Defendants for Violations of
### Section 10(b) of the Exchange Ac' and Rule 10b-5

124.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

125.    With respect to this claim, the defendants are American Skandia as issuer of the variable annuities at issue here; ASM as underwriter and distributor of the variable annuities at issue here; ABC Corp., Inc. 1 through ABC Corp. Inc. 99, and LMN Corp., Inc. 1 through LMN Corp. Inc. 99 (both as defined above).

126.    During the Class Period, Defendants American Skandia, ASM, ABC Corp., Inc. 1 through ABC Corp. Inc. 99, and LMN Corp., Inc. 1 through LMN Corp. Inc. 99, and each of them, with scienter, employed devices, schemes, and artifices to defraud, made untrue statements of material fact, omitted to disclose material facts, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the variable annuities in violation of section (b) of the Exchange Act and Rule 10b-5.

127.    These devices, schemes and artifices, misstatements and omissions, and acts practices and course of business were intended to and did among other things: (i) deceive the investing public, including plaintiff and other class members, as alleged herein; (ii) cause

42

plaintiff and other members of the Class to purchase variable annuities in the belief that such

annuities were proper vehicles for investment in already-tax deferred retirement accounts; and

(iii) thereby obtain fees, charges and other monetary benefits for defendants that would have

been otherwise unavailable to them.

128.    The uniform written materials, including but not limited to the registration

statements, prospectuses, statements of additional information, disclosures, sales presentation

materials and contracts, were inaccurate and misleading, contained untrue statements of material

fact and omitted to state other material facts necessary to make the statements made, in light of

the circumstances under which they were made, not misleading, as described above.

129.    The above named defendants were responsible for the contents and

dissemination of the written, uniform materials (given to prospective purchasers) including but

not limited to the prospectuses, SOAIs and disclosures.

130.    Defendants' omissions and misrepresentations, all in violation of Section

10(b) of the Exchange Act and Rule 10b-5(b) concerned, among other things, their assertion that:

tax-deferred variable annuities were suitable vehicles for investment in already tax-deferred

retirement accounts, despite Defendants' knowledge that exactly the opposite was true.

Defendants' material misrepresentations and/or omissions were made knowingly or recklessly,

for the purpose and effect of obtaining lucrative charges, fees, and other benefits relating to the

sale of these annuities.

131.    Defendants clearly had actual knowledge of, or acted with severe reckless

disregard with respect to, the misrepresentations and omissions of material fact set forth herein.

Such defendants' material misrepresentations or omissions were done knowingly and for the

purpose and effect of having plaintiff and other members of the Class purchase the more

expensive but unsuitable variable annuities instead of suitable but less expensive alternative investment products.

132.    As the result of engaging in the routine conduct of their business and/or through common sense, each defendant knew -- indeed, had to know -- the following.

133.    Each defendant knew that there was no additional tax benefit from purchasing a tax-deferred variable annuity for an already tax-deferred retirement account.

134.    Each defendant knew that the tax-deferred variable annuities sold by defendants are never appropriate investments, and are unsuitable investments, for placement in tax-deferred retirement plans, because defendants knew that earnings on any investment placed in such plans are already tax-deferred.

135.    Each defendant knew (even before 1994 when the NASD issued NASD Conduct Rule IM-2210-2 entitled "Communications with the Public About Variable Life Insurance and Variable Annuities) that it did not have reasonable grounds to believe that a tax-deferred variable annuity placed in an already tax-deferred retirement account could be a suitable investment, under NASD rules or otherwise.

136.    The NASD began issuing the Conduct Rules and Notices to Members (including those cited, quoted and discussed hereinabove) concerning variable annuities because it had become aware that there was generalized and ever-increasing widespread misconduct by issuers, underwriters and sellers of variable annuities.

137.    This misconduct included the sale of tax-deferred variable annuities for already tax-deferred retirement accounts without (among other things) notifying prospective purchasers that purchasing a variable annuity as an investment vehicle for an already tax-

44

qualified retirement plan (such as an IRA) does not provide any additional tax advantage to those available through the already tax-qualified retirement plan.

138.    The NASD did not change its position on the sale of tax-deferred variable annuities for already tax-deferred retirement accounts (that is, even before it began issuing these Rules and Notices, the NASD believed that a material issue which should be disclosed to potential purchasers prior to their purchase was that purchasing a variable annuity as an investment vehicle for an already tax-qualified retirement plan (such as an IRA) did not provide any additional tax advantage to those available through the already tax-qualified retirement plan.

139.    Thus, for example, the 1996, NASD Notice to Members 96-86 was entitled "NASD Regulation Reminds Members and Associated Persons that Sales of Variable Contracts Are Subject to NASD Suitability Requirements" (emphasis added), meaning that the Notice did not change the law or signal a change in the NASD's view of the law, but that the Notice was intended to remind members of their legal obligations which existed prior to 1996.

140.    Likewise, the May 1999, NASD Notice to Members 99-35 was entitled "The NASD Reminds Members of Their Responsibilities Regarding the Sales of Variable Annuities" (emphasis added), similarly meaning that the Notice did not change the law or signal a change in the NASD's view of the law, but that the Notice was intended to remind members of their legal obligations which existed prior to May, 1999.

141.    Each defendant knew that the NASD required it to "disclose to the customer that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary."

142.    Each defendant knew that tax benefits (at least as great as those obtained from a variable annuity) were available from an investment in every one of the following types

45

of contributory (not defined benefit) retirement plans or arrangements qualified for favorable

income tax treatment pursuant to Internal Revenue Code sections 401(a), 401(k), 403(a), 403(b),

408(a), 408(b), 408(k), 408(p), 408A, or 457 (which is the Class definition herein, and includes

IRAs and 401ks).

143.    Each defendant knew that the tax deferred accrual feature is provided by

the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity

is unnecessary.

144.    Each defendant knew that the compound effect of the unnecessary

unreasonable and excessive commissions, fees and charges paid for defendants' tax-deferred

variable annuities can, over the course of a few decades -- not counting any surrender fees --

consume as much as one-third of a retirement investor's account.

145.    Each defendant knew that the purchase of a deferred annuity in an already

tax-deferred retirement account merely increases the costs, fees and commissions paid by the

investor without any additional economic benefit to the investor.

146.    Each defendant knew that commission charges on the purchase of variable

annuities generally were at least two to three times higher, and in many cases would be between

20 and 100 times higher, than the commission charge on the purchase for an IRA account of

equity securities of the same value.

147.    Each defendant knew that the purchase of a tax-deferred annuity in an

already tax-deferred retirement account materially increases the total amount paid by the investor

while providing only the same or lesser tax benefit to the investor.

148.    Each defendant knew that the purchase of a tax-deferred variable annuity

in an already tax-deferred retirement account caused the American Skandia Defendants to make

substantial additional revenues above the revenues they would have made if individual securities or mutual funds had been bought in the same tax-deferred retirement account.

149.    Defendants' failure to issue objective and accurate prospectuses and other documents, reflecting their true opinions and beliefs, violated numerous, specific industry regulations. In addition to those Rules and Notices discussed above, NASD Rule 2210 (Communications with the Public) provides, in pertinent part, that:

(1)    General Standards

(A) All member communications with the public shall be based on principles of fair dealing and good faith and should provide a sound basis for evaluating the facts in regard to any particular security or securities or type of security, industry discussed, or service offered. No material fact or qualification may be omitted if the omission, in the light of the context of the material presented, would cause the communication to be misleading.

(B) Exaggerated, unwarranted or misleading statements or claims are prohibited in all public communications of members. In preparing such communications, members must bear in mind that inherent in investment are the risks of fluctuating prices and the uncertainty of dividends, rates or return and yield, and no member shall, directly or indirectly, publish, circulate or distribute any public communication that the member knows or has reason to know contains any untrue statement of a material fact or is otherwise false or misleading.

150.    Similarly, NASD Rule 2120 (Use of Manipulative, Deceptive or Other Fraudulent Devices) provides that:

No member shall effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance.

151.    NASD Rule IM-2310-2 (Fair Dealing with customers) provides, in pertinent part, that "[i]mplict in all member and registered representative relationships with customers and others is the Fundamental responsibility for fair dealing."

152.    Throughout the Class Period, these defendants' material misrepresentations and omissions deceived plaintiff and the members of the Class with respect to

47

whether a tax-deferred variable annuity was a suitable investment for an already tax-deferred retirement account. In ignorance of the truth, and relying directly or indirectly on the false and misleading statements made by Defendants, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants (and not disclosed by Defendants in the prospectuses, statements of additional information, contracts and written disclosures used by defendants during the Class Period), plaintiff and the other members of the Class acquired tax-deferred variable annuities that they would not have otherwise purchased, and were damaged thereby.

153.   Moreover, in support of their unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the investing public, in connection with the purchase of the variable annuities. The fraudulent devices, schemes and artifices and deceptive acts, practices and courses of business of defendants American Skandia, ASM, ABC Corp., Inc. 1 through ABC Corp. Inc. 99, and LMN Corp., Inc. 1 through LMN Corp. Inc. 99, and each of them, included, *inter alia*, the following: (i) repeatedly and consistently issuing prospectuses, statements of additional information, disclosures, sales presentation information, and other materials, relating to tax-deferred variable annuity products, all designed to mislead investors into believing that tax-deferred variable annuities were appropriate vehicles for placement into qualified retirement plans; (ii) acting in concert, or separately, with the combined effect of, in fact, leading investors to believe that each of these numerous variable annuity products had the benefits suggested by defendants; and (iii) accepting money in the form of fees, charges and other payments from investors who would

not have purchased annuities had they known the true impropriety of including such annuities within qualified retirement programs.

154.    Defendants acted knowingly, purposely, and with intent to defraud investors when they issued false and misleading statements regarding the tax-deferred variable annuities as part of a scheme to obtain variable annuity customers for Skandia entities.

155.    Plaintiff and the other members of the Class were ignorant of Defendants' fraudulent scheme.  Had plaintiff and the other members of the Class known of Defendants' unlawful scheme, they would not have purchased or otherwise acquired the variable annuities at issue.

156.    In connection with their misrepresentations, unlawful plan, scheme and course of conduct alleged herein Defendants used the means or instrumentalities of interstate commerce and the mails.

157.    By virtue of the foregoing, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

158.    As a direct and proximate result of the wrongful conduct of the defendants, plaintiff and the other members of the Class suffered damages in connection with their purchases of the variable annuities during the Class Period.

## SECOND CLAIM FOR RELIEF
### for Violations of Section 20(a) of The Exchange Act

159.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

160.    The defendants on this Section 20(a) claim are ASIHC and American Skandia.

161.    ASIHC is a controlling person pursuant to Section 20(a) of the Exchange

Act, 15 U.S.C. § 78t(a), because ASIHC: (a) wholly owns and is the parent company of American Skandia, ASM, and the ABC Corp. and LMN Corp. defendants, who are those defendants primarily liable under Section 10(b) in this litigation and (b) had the power to influence and control, directly or indirectly, the decision-making and conduct of those subsidiaries primarily liable, including having and exercising the power and influence to cause the defendants who are primarily liable to engage in the unlawful conduct complained of herein (the subsidiaries' dissemination of the false and misleading offering documents and their engaging in the events that constituted the unlawful plan, scheme and course of conduct at issue), and having the power and influence to cause the defendants who are primarily liable to refrain from the conduct complained of herein.

162.    ASIHC, through its position of ownership, control, and authority as the parent company of its subsidiaries which are primarily liable, had the power to, and did, select the Board of Directors of those subsidiaries and appoint their senior management; and influence and control, directly or indirectly, the decision-making and conduct of those subsidiaries, including having and exercising the power and influence to cause the defendants who are primarily liable to engage in the unlawful conduct complained of herein (the subsidiaries' dissemination of the false and misleading offering documents and their engaging in the events that constituted the unlawful plan, scheme and course of conduct at issue), and having the power and influence to cause the defendants who are primarily liable to refrain from the conduct complained of herein.

163.    American Skandia is a controlling person pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), because as the issuer of the variable annuities it had the power to influence and control and did influence and control, directly or indirectly, the decision-making

and conduct of ASM, and the ABC Corp. and LMN Corp. defendants, including having and exercising the power and influence to cause the defendants who are primarily liable to engage in the unlawful conduct complained of herein (its affiliates' dissemination of the false and misleading offering documents and their engaging in the events that constituted the unlawful plan, scheme and course of conduct at issue), and having the power and influence to cause the defendants who are primarily liable to refrain from the conduct complained of herein.

164.    Moreover, upon information and belief, American Skandia had direct and supervisory involvement in the operations of ASM, ABC Corp., Inc. 1 through ABC Corp. Inc. 99, and LMN Corp., Inc. 1 through LMN Corp. Inc. 99, and, therefore, is presumed to have had the power to control or influence, directly or indirectly, the particular transactions giving rise to the securities violations as alleged herein (its affiliates dissemination of the false and misleading offering documents and their engaging in the events that constituted the unlawful plan, scheme and course of conduct at issue), and exercised the same.

165.    As set forth above, American Skandia, ASM, ABC Corp., Inc. 1 through ABC Corp. Inc. 99, and LMN Corp., Inc. 1 through LMN Corp. Inc. 99, each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged herein.

166.    By virtue of their positions as controlling persons of primary violators, the defendants on this claim are also liable pursuant to Section 20(a) of the Exchange Act.

167.    By virtue of the foregoing, American Skandia and ASIHC are each liable for the aforesaid wrongful conduct, and are liable to plaintiff and to the other members of the Class for the substantial damages suffered in connection with their purchases of the variable annuities.

## THIRD CLAIM FOR RELIEF
### For Violation of § 11 of the Securities Act and
### for Control Person Liability Under § 15 of the Securities Act

168.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein (except plaintiff does not incorporate those allegations which concern only fraud and scienter).

169.    With respect to this count, plaintiff does not allege that the material omissions and misstatements set forth herein were made intentionally or recklessly by defendants. Rather, the conduct alleged herein was innocent, negligent or grossly negligent.

170.    The defendants in this claim under Section 11 of the Securities Act are American Skandia, ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99.

171.    American Skandia was the issuer of the variable annuities at issue here, which were sold pursuant to the registration statements, prospectuses and SOAIs.

172.    ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 were the underwriters of the variable annuities at issue here, which were sold pursuant to the prospectuses and other written materials.

173.    The defendants on this section 11 claim participated in the preparation of, issued, caused to be issued and/or participated in the issuance of the registration statements, prospectuses and SOAIs, each of which was inaccurate and contained material misstatements; omitted to state a material fact required to be stated therein, or failed to disclose certain material facts necessary to make the statements therein not misleading, as set forth herein.

174.    While the following concerns an affirmative defense which can be raised by only the following defendants, and concerning which they bear the burden of proof, nevertheless, plaintiff alleges that concerning ASM and ABC Corp., Inc. 1 through ABC Corp.,

Inc. 99, none of these defendants made a reasonable investigation and possessed reasonable grounds to believe and did believe that the statements contained in the registration statements, prospectuses and SOAIs were true, without omissions of any material facts and were not misleading.

175. While the following concerns an affirmative defense which can be raised by only the following defendants, and concerning which they bear the burden of proof, nevertheless, plaintiff alleges that ASM and ABC Corp., Inc. 1 through ABC Corp. assisted in the preparation of the registration statements, prospectuses, and SOAIs, and were required to investigate with due diligence the representations contained therein to confirm that they did not contain material misstatements or omit to state material facts. ASM and ABC Corp., Inc. 1 through ABC Corp. each did not perform this investigation with due diligence. (Indeed, ASM and ABC Corp., Inc. 1 through ABC Corp. each had a substantial direct interest in the success of the offering, as detailed above.)

176. While the following concerns an affirmative defense which can be raised by only the following defendants, and concerning which they bear the burden of proof, nevertheless, plaintiff alleges that the underwriter defendants, ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99, were each negligent (without limitation) as follows.

177. ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that there was no additional tax benefit from purchasing a tax-deferred variable annuity for an already tax-deferred retirement account.

178. ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that the deferred annuities sold by defendants are never appropriate investments, and are unsuitable investments, for placement in tax-deferred retirement plans,

because defendants knew that earnings on <u>any</u> investment placed in such plans are already tax-deferred.

179.    ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that it did not have reasonable grounds to believe that a tax-deferred variable annuity placed in an already tax-deferred retirement account could be a suitable investment, under the NASD regulations and Notices, or otherwise.

180.    ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that tax benefits (at least as great as those obtained from a variable annuity) were available from an investment in every one of the following types of contributory (not defined benefit) retirement plans or arrangements qualified for favorable income tax treatment pursuant to Internal Revenue Code sections 401(a), 401(k), 403(a), 403(b), 408(a), 408(b), 408(k), 408(p), 408A, or 457 (which is the Class definition herein, and includes IRAs and 401ks).

181.    ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary.

182.    ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that the compound effect of the unnecessary unreasonable and excessive commissions, fees and charges paid for defendants' tax-deferred variable annuities can, over the course of a few decades -- not counting any surrender fees -- consume as much as one-third of a retirement investor's account.

183.    ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that the purchase of a deferred annuity in an already tax-deferred

retirement account merely increases the costs, fees and commissions paid by the investor without any additional economic benefit to the investor.

184.    ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that commission charges on the purchase of variable annuities generally were at least two to three times higher, and in many cases would be between 20 and 100 times higher, than the purchase for an IRA account of equity securities of the same value.

185.    ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that the purchase of a deferred annuity in an already tax-deferred retirement account materially increases the total amount paid by the investor while providing only the same or lesser tax benefit to the investor.

186.    During the Class Period, plaintiff and the other members of the Class purchased in the continuous offerings hundreds of millions and possibly billions of dollars of the variable annuities at issue here.

187.    Although not required to be alleged with respect to this claim because it is an affirmative defense to be alleged and proven by defendants, nevertheless, plaintiff alleges that she purchased her variable annuities as a direct and proximate result of, and without knowledge of, the material misrepresentations and omissions in the registration statements, prospectuses and SOAIs.

188.    With respect to the variable annuities sold during the Class Period, defendants charged purchasers (usually by selling shares in the purchaser's account and directly subtracting the amount from the account) at least tens of millions and possibly hundreds of millions or billions of dollars in fees, expenses, and surrender fees including so-called deferred sales charges.

189.   The variable annuities sold during the Class Period lost at least hundreds of millions of dollars, and possible billions of dollars, in value.

190.   By virtue of the foregoing, the defendants on this Section 11 claim violated Section 11 of the Securities Act, and are liable to plaintiff and the other members of the Class.

191.   As a direct and proximate result of these defendants' unlawful conduct as alleged herein, plaintiff and the other members of the Class suffered damages in connection with their purchases of the variable annuities during the Class Period.

192.   The defendants in this claim for control person liability under Section 15 of the Securities Act are ASIHC and American Skandia.

193.   ASIHC and American Skandia each is a controlling person pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o.

194.   ASIHC: (a) wholly owns and is the parent company of American Skandia, ASM, and the ABC Corp. defendants, who are those defendants primarily liable under Section 11 in this litigation and (b) had the power to influence and control, directly or indirectly, the decision-making and conduct of those subsidiaries primarily liable, including having and exercising the power and influence to cause the defendants who are primarily liable to engage in the unlawful conduct complained of herein (the subsidiaries' dissemination of the false and misleading offering documents), and having the power and influence to cause the defendants who are primarily liable to refrain from the conduct complained of herein.

195.   ASIHC, through its position of ownership, control, and authority as the parent company of its subsidiaries which are primarily liable, had the power to, and did, select the Board of Directors of those subsidiaries and appoint their senior management; and influence

and control, directly or indirectly, the decision-making and conduct of those subsidiaries, including having and exercising the power and influence to cause the defendants who are primarily liable to engage in the unlawful conduct complained of herein (the subsidiaries' dissemination of the false and misleading offering documents), and having the power and influence to cause the defendants who are primarily liable to refrain from the conduct complained of herein.

196.   American Skandia, as the issuer of the variable annuities, had the power to influence and control and did influence and control, directly or indirectly, the decision-making and conduct of ASM and the ABC Corp. defendants, who are primarily liable on the section 11 claim, including having and exercising the power and influence to cause these defendants who are primarily liable to engage in the unlawful conduct complained of herein (its affiliates' dissemination of the false and misleading offering documents), and having the power and influence to cause these defendants to refrain from the conduct complained of herein.

197.   Moreover, upon information and belief, American Skandia had direct and supervisory involvement in the operations of ASM and ABC Corp., Inc. 1 through ABC Corp. Inc. 99, and, therefore, is presumed to have had the power to control or influence, directly or indirectly, the particular transactions giving rise to the securities violations as alleged herein (its affiliates dissemination of the false and misleading offering documents), and exercised the same.

198.   As set forth above, American Skandia, ASM, and ABC Corp., Inc. 1 through ABC Corp. Inc. 99, each violated Section 11 of the Securities Act.

199.   Under Section 15 of the Securities Act, ASIHC and American Skandia each is secondarily liable as a control person of the other defendants who are primarily liable under Section 11 of the Securities Act, and are liable to plaintiff and the other members of the

Class.

## FOURTH CLAIM FOR RELIEF
### For Violation of § 12(a)(2) of the Securities Act and
### For Control Person Liability Under § 15 of the Securities Act

200.    Plaintiff incorporates each of the foregoing allegations as if fully set forth herein (except plaintiff does not incorporate those allegations which concern only fraud and scienter).

201.    With respect to this count, plaintiff does not allege that the material omissions and misstatements set forth herein were made intentionally or recklessly by defendants. Rather, the conduct alleged herein was innocent, negligent or grossly negligent.

202.    The defendants in this claim under Section 12 of the Securities Act are American Skandia, ASM, ABC Corp., Inc. 1 through ABC Corp., Inc. 99, and LMN Corp., Inc. 1 through LMN Corp., Inc. 99.

203.    Each defendant was a seller, offeror, and/or solicitor of sales of the variable annuities for their financial benefit pursuant to the registration statements, prospectuses, SOAIs, contracts, written disclosures and sales presentation materials, in connection with the offering; or, even if solicited by one of these defendants without financial benefit to itself, then that defendant solicited the purchases for the owner's financial benefit.

204.    Defendants' acts of selling, offering and of solicitation included but were not limited to the preparation of the materially misleading registration statements, prospectuses, SOAIs, and other documents, disseminated to investors.

205.    Defendants sold the variable annuities through other broker-dealers not owned by the Skandia family.

206.    The registration statements, prospectuses, contracts, disclosures, SOAIs,

and other documents, used to sell the variable annuities in connection with the continuous

offering, contained material misstatements; omitted to state material facts required to be stated

therein, or failed to disclose certain material facts necessary to make the statements therein not

misleading, as set forth herein.

207.    While the following concerns an affirmative defense which can be raised

by only the section 12 defendants, and concerning which they bear the burden of proof,

nevertheless, plaintiff alleges that each of these defendants cannot prove that it: (a) did not know

of such material untruth or omission and (b) in the exercise of reasonable care could not have

known of such material untruth or omission.

208.    Plaintiff and the other members of the Class purchased in the continuous

offering (which makes all variable annuity shares in and of themselves traceable to the offering)

tens of millions (and possibly at least hundreds of millions) of variable annuity shares.

209.    Each plaintiff purchased their variable annuity shares pursuant to the

written documents identified herein, and without knowledge of the material misstatements and

omissions in those documents.

210.    With respect to the variable annuities sold during the Class Period,

defendants charged purchasers (usually by selling shares in the purchaser's account and directly

subtracting the amount from the account) at least tens of millions and possibly hundreds of

millions or billions of dollars in fees, expenses, and surrender fees including so-called deferred

sales charges.

211.    The variable annuity shares sold to Class Members during the Class

Period lost at least hundreds of millions of dollars, and possible billions of dollars, in value.

212.    The variable annuity shares sold to each lead plaintiff during the Class Period substantially declined in value.

213.    As a direct and proximate result of defendants' unlawful conduct as alleged herein, plaintiff and the other members of the Class suffered damages in connection with their purchases during the Class Period of variable annuity shares.

214.    By virtue of the foregoing, American Skandia, ASM, ABC Corp., Inc. 1 through ABC Corp., Inc. 99, and LMN Corp., Inc. 1 through LMN Corp., Inc. 99, are each primarily liable under Section 12(a)(2) of the Securities Act, and are each liable to plaintiff and the other members of the Class.

215.    Plaintiff, individually and representatively, hereby elects to rescind and tender those securities that plaintiff and the other members of the Class continue to own, in return for the consideration paid for those securities together with interest thereon. Plaintiff and members of the Class who have sold their variable annuity shares are entitled to rescissory damages.

216.    The defendants in the claim for control person liability under Section 15 are ASIHC and American Skandia.

217.    For the reasons set forth above, ASIHC and American Skandia each is a controlling person pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o.

218.    While the following concerns an affirmative defense which can be raised by only these control person defendants, and concerning which they bear the burden of proof, nevertheless, plaintiff alleges that each of these defendants, as a controlling person, cannot prove that it: (a) had no knowledge of the existence of the facts by reason of which the liability of the

controlled person is alleged to exist; or (b) had no reasonable grounds to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

219. As set forth above, American Skandia, ASM, ABC Corp., Inc. 1 through ABC Corp., Inc. 99, and LMN Corp., Inc. 1 through LMN Corp., Inc. 99, each violated section 12 of the Securities Act.

220. Under Section 15 of the Securities Act, ASIHC and American Skandia each is secondarily liable as a control person of the other defendants who are primarily liable under Section 12 of the Securities Act, and are liable to plaintiff and the other members of the Class.

### FIFTH CLAIM FOR RELIEF
#### for Violation of § 80a-33 of the Investment Company Act of 1940 and for Control Person Liability under the '40 Act

221. Plaintiff incorporates each of the foregoing allegations as if fully set forth herein (except plaintiff does not incorporate those allegations which concern only fraud and scienter).

222. With respect to this count, plaintiff does not allege that the material omissions and misstatements set forth herein were made intentionally or recklessly by defendants. Rather, the conduct alleged herein was innocent, negligent or grossly negligent.

223. The defendants in this claim for primary liability under the Investment Company Act of 1940 are American Skandia (the issuer) and ASM (the underwriter) of the variable annuities.

224. As set forth above, in the registration statements, prospectuses and SOAIs, which were used to sell the variable annuities in connection with the continuous offering, each defendant made misstatements of material fact; omitted to state material facts required to be

stated therein, or failed to disclose certain material facts necessary to make the statements therein not misleading, as set forth herein.

225.   By virtue of the foregoing, each defendant on this claim has violated Section 80a-33(b) of the Investment Company Act of 1940, and is liable to plaintiff and the other members of the Class.

226.   As a direct and proximate result of defendants' unlawful conduct as alleged herein, plaintiff and the other members of the Class suffered damages in connection with their purchases of variable annuities during the Class Period, as set forth above.

227.   Concerning this claim for control person liability under the Investment Company Act, the defendants are ASIHC and American Skandia.

228.   ASIHC is a controlling person as defined under the Investment Company Act of 1940.

229.   For the reasons set forth above, ASIHC and American Skandia each is a controlling person pursuant to the Investment Company Act of 1940.

230.   Under the Investment Company Act of 1940, ASIHC and American Skandia each is secondarily liable as a control person of the other defendants who are primarily liable under the Investment Company Act, and are liable to plaintiff and the other members of the Class.

### SIXTH CLAIM FOR RELIEF
### Declaratory and Injunctive Relief, Against All Defendants

231.   Plaintiff incorporates each of the foregoing allegations as if fully set forth herein (except plaintiff does not incorporate those allegations which concern only fraud and scienter).

232.    With respect to this count, plaintiff does not allege that the material omissions and misstatements set forth herein were made intentionally or recklessly by defendants. Rather, the conduct alleged herein was innocent, negligent or grossly negligent.

233.    There is a real controversy between the parties which is justiciable in character as alleged in this complaint. On each cause of action stated above, plaintiff and other members of the class will be irreparably injured in the future by defendants' misconduct to the extent that defendants continue to impose surrender fees upon any plaintiff or class member's election to terminate a deferred annuity contract.

234.    Plaintiff, on behalf of herself and the other members of the class, seeks a judgment declaring that defendants must cease charging surrender fees, and enjoining defendants from charging or collecting surrender fees with respect to any qualified annuity contract.

235.    Plaintiff, for herself and on behalf of the class, also seeks injunctive relief enjoining defendants from the solicitation or sale of qualified annuities, and the assessment or collection of fees on such annuities, as defined herein, based upon the conduct described herein.

236.    Plaintiff and other members of the class do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this complaint, and will suffer irreparable injury as a result of defendants' misconduct unless injunctive and declaratory relief is granted.

237.    By reason of the foregoing, plaintiff and other members of the class are entitled to declaratory and injunctive relief as set forth above.

### SEVENTH CLAIM FOR RELIEF
### Reformation, Against All Defendants

238.    Plaintiff repeat and reallege the allegations set forth above as if fully set forth herein (except plaintiff does not incorporate those allegations concerning fraud and

scienter).

239.   With respect to this count, plaintiff does not allege that the material omissions and misstatements set forth herein were made intentionally or recklessly by defendants. Rather, the conduct alleged herein was innocent, negligent or grossly negligent.

240.   As alleged herein, defendants uniformly represented to plaintiff and other members of the class or their employers that plaintiff and other members of the class were purchasing or receiving investment products appropriate for placement into plaintiff's and class members' qualified retirement plans.

241.   The deferred annuities provided by defendants contained characteristics and values defendants did not adequately disclose to plaintiff and other members of the class and which were inconsistent with the parties' agreement, as alleged above. Plaintiff's and class members' deferred annuity contracts have now been partially performed.

242.   As alleged herein, the contracts were procured from plaintiff and other members of the class or their employers by defendants as a result of defendants' material misrepresentations and omissions.

243.   As a result of the foregoing, plaintiff and other members of the class are entitled to equitable reformation of the contracts, to provide an appropriate investment product agreed to by the parties.

## REQUESTS FOR RELIEF

WHEREFORE, plaintiff demands judgment individually and on behalf of the Class against defendants jointly and severally as follows:

(a)   An order under the Federal Rules of Civil Procedure certifying that this action may be maintained as a class action on behalf of the Class;

(b)     Against defendants, jointly and severally, for damages suffered as a result of defendants' violations of the Securities Act of 1933, the Securities Exchange Act of 1934 and Rules promulgated thereunder, and the Investment Company Act of 1940, and/or awarding rescission under Section 12 of the Securities Act of 1933 against defendants jointly and severally, in an amount to proven at trial;

(c)     An award of prejudgment and postjudgment interest.

(d)     An order providing for declaratory and injunctive relief, including the following:

(1)     An order declaring defendants' conduct to be in violation of law;

(2)     An order declaring that defendants' fees charged or assessed for deferred annuities invested in qualified retirement plans are unreasonable and excessive;

(3)     An order enjoining defendants from charging surrender fees with respect to any qualified annuity contract;

(4)     An order declaring that defendants must remove unreasonable and excessive fees charged to plaintiff and other members of the class and restore their contract values accordingly;

(5)     An order enjoining defendants from soliciting sales of or selling deferred annuities for placement in qualified retirement plans;

(6)     An order reforming plaintiff and other members of the class' contracts with defendants in accordance with the parties' agreement as described above;

(7)     An order awarding such other and further relief as this Court may deem just and proper including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the defendants' assets to assure that plaintiff

and the other members of the Class have an effective remedy; and

        (8)    Other equitable relief that the Court may deem proper.

        (e)    An award of attorneys' fees and the costs and expenses of this litigation, including experts' fees; and

        (f)    Any other or further relief that this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable before a jury.

DATED: April 16, 2003
       New York, New York

                   WOLF HALDENSTEIN ADLER
                   FREEMAN & HERZ LLP

                   By: _____
                   Daniel W. Krasner (DK 6381)
                   Robert B. Weintraub (RW 2897)
                   270 Madison Avenue
                   New York, NY 10016
                   Telephone (212) 545-4600
                   Attorneys for Lead Plaintiffs and the Class

314106

<u>Declaration of Service</u>

I, Robert B. Weintraub, Esq. declare under the penalty of perjury that on April 16,

2003, I caused to be served the Amended Complaint, by hand delivery, upon James N. Benedict,

Esq., Clifford Chance LLP, 200 Park Avenue, New York, NY 10166, attorneys for defendants.


Robert B. Weintraub, Esq.
for Lead Plaintiffs

67

# Exhibit 1

## CERTIFICATION
## PURSUANT TO THE FEDERAL SECURITIES LAWS

Diane C. Donovan certifies, as to the claims asserted under the federal securities laws that:

1. I have reviewed the Complaint and authorized the commencement of an action on my behalf.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. To the best of my current knowledge, my transactions in American Skandia variable annuities during the Class Period are as follows:

| Date | Purchases | Sales | Price |
|------|-----------|-------|-------|
| 1/31/2000 | 63,310.90 units | C | $63,310.90 |

5. I have not sought to serve as a class representative in any case under the federal securities laws in the last three years.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare and certify under penalty of perjury that the foregoing is true and correct.

Executed this __12__ day of December, 2002

_____
Diane C. Donovan

# CERTIFICATION

## PURSUANT TO FEDERAL SECURITIES LAWS

*Kathleen O'Brien* declares, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint and authorized the commencement of an action on my behalf.

2. I did not purchase the security that is the subject of this action at the direction of plaintiffs' counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transactions in the tax-deferred variable annuities of American Skandia Life Assurance Corporation during the Class Period are as follows:

→ 2 seperate VA accounts     $2000 (1)
  Rolled over from IRA        $16000 (2)

| Date | Purchases | Sales | Price |
|------|-----------|-------|-------|
|      |           |       |       |
|      |           |       |       |
|      |           |       |       |
|      |           |       |       |
|      |           |       |       |
|      |           |       |       |

See attached

5. *I have not sought to serve as a class representative in any case under the federal securities laws in the last three years. [Or, I have served as a class representative in the action(s) listed below:]*

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _29_ day of _January_ _09_, 2002.



# Service Online

Log Out   Main   Contact Us   Help

## Historical Contract Inquiry

| | |
|---|---|
| Product Name | IMPERIUM VARIABLE ANNUITY |
| Contract # | IM-000406558 |
| Type of Annuity | IRA |
| Issue Date | 02/28/2000 |
| Owner Name | O'Brien, Kathleen |

To view a previous contract value, select a date and click Search.
If the date selected occurred on a weekend or holiday, the value
of the prior business day will be displayed.

Contract Summary as of: 03 ♦ / 31 ♦ / 2000 ♦   Search

|  | Year to Date |
|---|---|
| Total Purchase Payments | $18,948.63 |
| Total Gross Withdrawals | $0.00 |
| Total Valuation | $18,948.63 |

Contract Status as of: 03/31/2000

| Variable Investments | # of Variable Units | Value Per Unit | Value |
|---|---|---|---|
| AST Goldman Sachs Conc Grwth | 43.811145 | 67.056451 | $2,937.82 |
| AST Marsico Capital Growth | 186.090914 | 21.276337 | $3,959.33 |
| INVESCO VIF Technology | 124.349330 | 20.747344 | $2,579.92 |
| INVESCO VIF Telecommunication | 143.771009 | 19.009639 | $2,733.03 |
| ProFund VP UltraOTC | 92.323245 | 30.457029 | $2,811.89 |
| Rydex Nova | 197.278977 | 10.959161 | $2,162.01 |
| Rydex OTC | 95.212585 | 20.070652 | $1,910.96 |
| Total | | | $19,094.98 |

| Fixed Investments | Maturity Date | Interest Rate | Interim Value |
|---|---|---|---|
| Total | | | $0.00 |

| Total Value | |
|---|---|
| Total | $19,094.98 |

Click Download, to export the contract value information to Microsoft Excel®.

Previous Contract

Download   Contract Selection   Annuity Options

Contract values are available as far back as 01/02/1996. The information on a previous contract
value will show all contract activity up to and including the date you have selected.

The Contract Value shown is based on the unit value(s) and the number of units in each applicable Sub-
account as of the indicated Valuation Date and the Interim Value of any Fixed Account Allocation(s).
Contract Value figures do not reflect any applicable contingent deferred sales charges or market value



# Service Online

Log Out   Main   Contact Us   Help

## Contract Inquiry

| | |
|---|---|
| Product Name | IMPERIUM VARIABLE ANNUITY |
| Contract # | IM-000404375 |
| Type of Annuity | Roth IRA |
| Issue Date | 01/28/2000 |
| Owner Name | O'Brien, Kathleen |
| Surrender Value | $1,540.64 |
| CDSC Remaining | $247.75 |
| Optional Benefits | Performance Advantage Benefit, Performance Advantage Credit |
| Special Program Participation | Static Rebalancing |

### Contract Summary as of: 02/14/2003

| | Year to Date | Inception to Date |
|---|---|---|
| Total Purchase Payments | $0.00 | $3,710.00 |
| Total Gross Withdrawals | $0.00 | $0.00 |
| Total Valuation | $0.00 | $3,710.00 |

### Credits Issued as of: 02/14/2003

| Type of Credit | Total Vested | Total Non Vested |
|---|---|---|
| Other Credit | $0.00 | $18.76 |

### Contract Status as of: 02/14/2003

| Variable Investments | # of Variable Units | Value Per Unit | Value |
|---|---|---|---|
| AST Alliance Growth | 25.443242 | 9.382386 | $238.72 |
| AST Goldman Sachs Conc Grwth | 5.570248 | 17.853508 | $99.45 |
| AST Goldman Sachs Sm-Cap Val | 20.345552 | 12.935814 | $263.19 |
| AST Marsico Capital Growth | 20.689972 | 10.836885 | $224.21 |
| AST PBHG Small-Cap Growth | 18.370949 | 11.734609 | $215.58 |
| AST Sanford Bernstein CoreVal | 32.800603 | 8.146219 | $267.20 |
| INVESCO VIF Technology | 17.214632 | 3.464486 | $59.64 |
| INVESCO VIF Telecommunication | 19.447091 | 2.380797 | $46.30 |
| ProFund VP Real Estate | 28.226620 | 10.044114 | $283.53 |
| ProFund VP UltraOTC | 21.434291 | 0.571585 | $12.25 |
| Rydex Nova | 20.197998 | 3.724642 | $75.23 |
| Rydex OTC | 13.033119 | 3.978326 | $51.85 |
| Total | | | $1,837.15 |

| Fixed Investments | Maturity Date | MVA | Interest Rate | Interim Value |
|---|---|---|---|---|
| Total | | | | $0.00 |

| Total Current Value | | | | |
|---|---|---|---|---|
| Total | | | | $1,837.15 |

Next Contract

Click Download, to export the contract value information to Microsoft Excel®. To access historical values for the selected contract, click Past Values.

Daily Prices | Download | Contract Selection | Annuity Options | Past Values

The Contract Value shown is based on the unit value(s) and the number of units in each applicable Sub-account as of the indicated Valuation Date and the Interim Value of any Fixed Account Allocation(s). Contract Value figures do not reflect any applicable contingent deferred sales charges or market value adjustments (fixed account allocations) that may apply upon withdrawal. Please refer to the current Prospectus for a description of these charges. Withdrawals are subject to ordinary income tax and may be subject to a 10% IRS tax penalty. Your investment return and principal will fluctuate with changes in the market value of the underlying securities. Investors' units, when redeemed, may be worth more or less than the original investment. Past performance is no guarantee of future results.

Log Out | Main | Contact Us | Help

℗ Copyright 2003 American Skandia Marketing, Incorporated. All Rights Reserved.

L'autriad

1/12/03 1 40 PM

# CERTIFICATION

## PURSUANT TO FEDERAL SECURITIES LAWS

<u>Jay Hendrickson</u> declares, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint and authorized the commencement of an action on my behalf.

2. I did not purchase the security that is the subject of this action at the direction of plaintiffs' counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transactions in American Skandia Life Assurance Corporation during the Class Period are as follows:

| Date | Purchases | Sales | Price |
|------|-----------|-------|-------|
| 1-17. 2000 | AST Alliance Growth | 115. 229851 | 3193.80 |
| | AST Invesco | 151. 444405 | 3081.27 |
| | ABT Neurberger | 143. 342990 | 2771.99 |
| | ABT Gabelli | 325. 462007 | 3273.68 |
| | | | |
| | | | |

5. I have not sought to serve as a class representative in any case under the federal securities laws in the last three years. [Or, I have served as a class representative in the action(s) listed below:]

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

1/12/03 1:40 PM

Untitled

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19 day of January 2002 2003 .

X _Jay L. Hendrickson_

## CERTIFICATION

## PURSUANT TO FEDERAL SECURITIES LAWS

Rose Hendrickson declares, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint and authorized the commencement of an action on my behalf.

2. I did not purchase the security that is the subject of this action at the direction of plaintiffs' counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transactions in American Skandia Life Assurance Corporation during the Class Period are as follows:

| Date | Purchases | Sales | Price |
|------|-----------|-------|-------|
| 1 17 2000 | AST Alliance Growth/Ink | 75.266 723 | 2086.17 |
| 1 17 2000 | " Invesco Equity Ink | 98.922421 | 2012.66 |
| 1 17 2000 | " Neub Beerm Mid Cap | 93.630636 | 1810.64 |
| 1 17 2000 | " Gabelli All Cap | 212.590136 | 2138.35 |
| | | | |
| | | | |

5. I have not sought to serve as a class representative in any case under the federal securities laws in the last three years. [Or, I have served as a class representative in the action(s) listed below:]

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

Untitled                                                                    1/19/03 1:49 PM

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19 day of January, ~~2002~~. 2003 .

*Ross Hendrickson*

# Exhibit 2

## World Marketing Alliance, Inc. ("WMA")
### DISCLOSURE FOR VARIABLE ANNUITIES

I understand I have applied for a variable annuity contract ("Contract") through my WMA Associate from the insurance company named in the application for my Contract ("the Insurance Company"). I have received prospectuses for the Contract ("Contract Prospectus") and for the underlying mutual fund ("Fund Prospectus"). The following disclosure is based on typical variable annuity contracts in general. The details will vary by product and Insurance Company. See the Policy Prospectus and Fund Prospectus for the specific terms of your Contract.

**Applicant's Initials**

My WMA Associate has reviewed each of these items with me, and I understand:

1. **What am I buying?** A variable deferred annuity contract. I am not investing directly into a mutual fund. I am not buying a Certificate of Deposit or other type of bank obligation.

2. **Investment Options.** I can direct my payments to the Fixed Account (available in most products) or to subaccounts which I select. Each subaccount invests in a corresponding portfolio of an underlying mutual fund. The Fund Prospectus describes the investment objective of each portfolio. In certain states, some insurance companies may deduct state premium tax from payments first, as may be described in the Contract Prospectus.

3. **Annual Charges.** Each year the Insurance Company will deduct an Annual Contract Charge, if applicable, from the cash value of the Contract, as described in the Contract Prospectus.

4. **Subaccount and Portfolio Fees.** In addition, both the selected subaccounts and the portfolios in which they invest have certain charges and expenses as described in the Contract Prospectus and Fund Prospectus.

5. **Surrender or Cash Withdrawals.** These may have certain charges or limits, as described in the Contract Prospectus. Withdrawal or surrender charges, if they apply, may be significant and last for several years.

6. **Can subaccount values go down?** Yes. The investment performance and unit value of the subaccount(s) I select will fluctuate due to market conditions and investment results. Subaccount units, when redeemed, may be worth more or less than when they were purchased.

7. **What else can affect my contract values and benefits?** Future contract cash values will also depend on the interest credited to the Fixed Account (if selected) and on the amount and timing of payments and any partial withdrawals I make. Partial withdrawals and, if available, unpaid loans will reduce the amount of death benefit payable.

8. **Am I replacing another policy?** My application correctly states whether I intend to replace an existing policy or contract to buy this Contract. (To "replace" includes to surrender, end, change, reduce or withdraw from the existing contract or to borrow more than 25% of its loan value.) If so, I have:
   - considered:
     - a) any withdrawal charge I may have to pay on the existing contract or policy;
     - b) that there may be new withdrawal charges for several years under this Contract;
     - c) other fees, charges, investment options and features of both contracts; and
     - d) any tax consequences of the exchange.
   - reviewed my existing contract with my representative and determined that the replacement is appropriate to my needs or objectives.

9. **Taxes.** Neither WMA nor the Insurance Company gives tax or legal advice. I will consult with my own professional tax or legal advisor as I see fit. How the Contract values or distributions will be taxed depends on the tax status of the Contract and of the taxpayer. There is a 10% federal income tax penalty on income distributed before age 59 1/2, subject to certain exceptions. The Contract Prospectus gives more information.

10. **My needs and objectives.** Variable deferred annuities are designed for long-term investors who seek a choice of investment options. I have reviewed my insurable needs and financial objectives with my WMA Associate. I have determined that my Payments are affordable and the Contract is appropriate to my needs or objectives.

Signature of Applicant _____

Name of Applicant (Please Print)  Diane C Donskin

Date  12-17-99

I have reviewed each of these items with the applicant:

Witness: _____

Agent _____   7860 M

Agent #

ORIGINAL-INSURANCE COMPANY

FIRST COPY-WMA AGENT

SECOND COPY-APPLICANT

World Marketing Alliance, Inc. is an independent marketing company offering life insurance and a broad array of additional financial services and products.
Headquarters: 11315 Johns Creek Parkway, Duluth, GA 30097-1517, PO Box 100035, Duluth, GA 30096-0403 • Phone 770.453.9300 • http://www.wmaa.com
Securities offered through WMA Securities, Inc. Member NASD/SIPC.

© 1998 World Marketing Alliance, Inc.℠

137773.99

**World Marketing Alliance, Inc. ("WMA")**
**DISCLOSURE FOR VARIABLE ANNUITIES**

I understand I have applied for a variable annuity contract ("Contract") through my WMA Associate from the insurance company named in the application for my Contract ("the Insurance Company"). I have received prospectuses for the Contract ("Contract Prospectus") and for the underlying mutual fund ("Fund Prospectus"). The following disclosure is based on typical variable annuity contracts in general. The details will vary by product and Insurance Company. See the Policy Prospectus and Fund Prospectus for the specific terms of your Contract.

| Applicant's Initials | | My WMA Associate has reviewed each of these items with me, and I understand: |
|---|---|---|
| *KB* | 1. | **What am I buying?** A variable deferred annuity contract. I am not investing directly into a mutual fund. I am not buying a Certificate of Deposit or other type of bank obligation. |
| *KB* | 2. | **Investment Options.** I can direct my payments to the Fixed Account (available in most products) or to subaccounts which I select. Each subaccount invests in a corresponding portfolio of an underlying mutual fund. The Fund Prospectus describes the investment objective of each portfolio. In certain states, some insurance companies may deduct state premium tax from payments first, as may be described in the Contract Prospectus. |
| *KB* | 3. | **Annual Charge.** Each year the Insurance Company will deduct an Annual Contract Charge, if applicable, from the cash value of the Contract, as described in the Contract Prospectus. |
| *KB* | 4. | **Subaccount and Portfolio Fees.** In addition, both the selected subaccounts and the portfolios in which they invest have certain charges and expenses as described in the Contract Prospectus and Fund Prospectus. |
| *KB* | 5. | **Surrender or Cash Withdrawals.** These may have certain charges or limits, as described in the Contract Prospectus. Withdrawal or surrender charges, if they apply, may be significant and last for several years. |
| *KB* | 6. | **Can subaccount values go down?** Yes. The investment performance and unit value of the subaccount(s) I select will fluctuate due to market conditions and investment results. Subaccount units, when redeemed, may be worth more or less than when they were purchased. |
| *KB* | 7. | **What else can affect my contract values and benefits?** Future contract cash values will also depend on the interest credited to the Fixed Account (if selected) and on the amount and timing of payments and any partial withdrawals I make. Partial withdrawals and, if available, unpaid loans will reduce the amount of death benefit payable. |
| *KB* | 8. | **Am I replacing another policy?** My application correctly states whether I intend to replace an existing policy or contract to buy this Contract. (To "replace" includes to surrender, end, change, reduce or withdraw from the existing contract or to borrow more than 25% of its loan value.) If so, I have:<br>• considered:<br>    a) any withdrawal charge I may have to pay on the existing contract or policy;<br>    b) that there may be new withdrawal charges for several years under this Contract;<br>    c) other fees, charges, investment options and features of both contracts; and<br>    d) any tax consequences of the exchange.<br>• reviewed my existing contract with my representative and determined that the replacement is appropriate to my needs or objectives. |
| ___ | 9. | **Taxes.** Neither WMA nor the Insurance Company gives tax or legal advice. I will consult with my own professional tax or legal advisor as I see fit. How the Contract values or distributions will be taxed depends on the tax status of the Contract and of the taxpayer. There is a 10% federal income tax penalty on income distributed before age 59 1/2, subject to certain exceptions. The Contract Prospectus gives more information. |
| ___ | 10. | **My needs and objectives.** Variable deferred annuities are designed for long-term investors who seek a choice of investment options. I have reviewed my insurable needs and financial objectives with my WMA Associate. I have determined that my Payments are affordable and the Contract is appropriate to my needs or objectives. |

X _Kathy O'Brien_        _1-20-2000_
Signature of Applicant            Date

_KATHLEEN O'BRIEN_
Name of Applicant (Please Print)

I have reviewed each of these items with the applicant:

Witness _____       _7860M_
      Agent                   Agent #

ORIGINAL-INSURANCE COMPANY      FIRST COPY-WMA AGENT      SECOND COPY-APPLICANT

World Marketing Alliance, Inc. is an independent marketing company offering life insurance and a broad array of additional financial services and products. Headquarters: 11315 Johns Creek Parkway, Duluth, GA 30097-1517, PO Box 100055, Duluth, GA 30096-9400 • Phone 770.453.9300 • http://www.wmas.com
Securities offered through WMA Securities, Inc. Member NASD/SIPC.

© 1996 World Marketing Alliance, Inc.   1377/3.98



# EXHIBIT / ATTACHMENT

## B

**(To be scanned in place of tab)**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAY HENDRICKSON, ROSE
HENDRICKSON, and KATHLEEN
O'BRIEN, on behalf of themselves and all
others similarly situated,

                          Plaintiffs,

        - against -

AMERICAN SKANDIA LIFE ASSURANCE
CORPORATION, AMERICAN SKANDIA
MARKETING, INCORPORATED,
AMERICAN SKANDIA INVESTMENT
HOLDING CORPORATION, ABC CORP.,
INC. 1 through ABC CORP., INC. 99, and
LMN CORP., INC. 1 through LMN CORP.,
INC. 99,

                          Defendants.

02 CV 9859 (MP)

SECOND AMENDED COMPLAINT

CLASS ACTION

JURY TRIAL DEMANDED

Plaintiff alleges this class action complaint based upon personal knowledge as to

herself, her own acts and the acts and statements of defendants in which she participated directly;

including the communications with, representations made, and documentation and information

provided to plaintiff by defendants in the ordinary course of business; and the investigation of

her counsel. Counsel's investigation conducted on plaintiff's behalf, included, among other

things:  (i) an analysis of publicly-available news articles and reports; (ii) a review and analysis

of public filings, including but not limited to any by defendants; (iii) press releases issued by

defendants, and (iv) other matters of public record. The allegations as to all other matters are

based upon investigation by plaintiffs attorneys and research of the applicable law with respect

to the claims asserted herein.

## NATURE OF THE CASE

1.      This class action arises from defendants' sale of deferred annuities to members of the public. Deferred annuities are marketed to, and often purchased by, people who use them as investments for their retirement years. This type of investment has become extraordinarily popular. Sales of variable deferred annuities -- which offer investment returns linked to stock market performance, similar to mutual funds -- reportedly have increased from the $25 to $30 billion range in 1992 to approximately $100 billion or more.

2.      The variable annuities at issue here are securities which have been registered with the United States Securities and Exchange Commission under the Securities Act of 1933 and the Investment Company Act of 1940. Hence, they are subject to the Securities Act, the Securities Exchange Act of 1934, and to the Investment Company Act of 1940.

3.      The retirement savings market in the United States has undergone a revolution over the last two decades. Instead of guaranteed lifetime pension benefits, calculated based on retirees' life expectancies, today's retirement plans focus on maximizing asset accumulation for retirement. Investment growth on a tax-deferred basis accordingly has become an important goal. An investor who has contributed the annual maximum amount to his tax-deferred qualified plan(s) can invest unlimited additional sums on a tax-deferred basis through the purchase of a deferred annuity.

4.      A "deferred annuity" -- the type of annuity at issue in this complaint — has an accumulation (or investment) phase during which the purchaser invests money and allows the value of the account to grow (depending on the type of investment vehicle that is chosen); and then a payout period during which the purchaser must redeem the amounts contributed and earned, with one such payout option being an annuity.

2

5.     Deferred annuities typically contain two insurance features: an annuity payout option, as described above (other payout options, such as lump-sum or systematic withdrawal, are much more popular); and a "death benefit" to ensure that, if the account owner dies during the investment period, the heirs receive some defined investment value (usually, the principal amount invested) even if the investment has declined in value during that time. In practice, the circumstances under which the insurance features of a deferred annuity will have value are remote because (a) on average, fewer than 1 percent of deferred annuity owners choose to exercise the annuity payout option at the end of the investment period and (b) of the contracts "surrendered" during the investment phase due to the death of the account owner, few, if any, suffered investment losses of such a magnitude that any meaningful death benefit is paid.

6.     Because of their insurance features, deferred annuities are deemed to be mortality products, and as such enjoy a privileged status under the income tax laws. Beginning with the Income Tax Law of 1913 (the first income tax statute promulgated pursuant to the Sixteenth Amendment) and continuously at all times thereafter, the Internal Revenue Code has provided that annuities are treated as an instrument of insurance. Most significantly, this means that annuity earnings (interest, dividends, or capital gains) accumulate on a tax-deferred basis. I.R.C. §72. This is true regardless of whether the contract owner elects to exercise his option to purchase an annuity at the end of the investment period.

7.     The main selling point of deferred annuities is that earnings on investments contained in such annuities accumulate on a tax-deferred basis. Because of their tax-deferred status, deferred annuities are potentially attractive financial products to people seeking tax-deferral for their retirement investments (and may be appropriate for those who have already made their maximum contributions to IRAs or other qualified retirement plans available

3

to them).  However, the price of such tax-deferral is the very substantial fees charged by the sellers of deferred annuities -- fees and charges that substantially exceed the fees charged for similar non-annuity investment products like mutual funds.  Over time, these fees and charges can reduce the amounts earned in the account by as much as one-third.

8.    Although deferred annuities may be appropriate investments for some retirement plans, there is one category of retirement plans for which the deferred annuities sold by defendants are virtually never[1] appropriate:  contributory plans and accounts which themselves already enjoy tax-deferred status (and are hence "qualified") under the Internal Revenue Code, and thus already have these very same tax benefits.  These include many of the most popular and common plans for retirement investing:  Individual Retirement Accounts (IRA), Keogh and 401 (k) plans, and other accounts treated similarly by the tax code.  Collectively, these are referred to as "qualified retirement plans."  (An individual purchases an annuity "contract," and a participant in a group retirement plan invested in a deferred annuity holds a "certificate," evidencing his rights to an account balance in the contract's fixed accounts and/or unit interests in variable subaccounts offered within the deferred annuity.)  **The deferred variable annuities sold by defendants are generally not appropriate investments for placement in tax-deferred retirement plans,** because earnings on any investment placed in such plans are already tax-deferred, and purchase of a deferred annuity increases costs without any material, additional economic benefit.

9.    Deferred annuities are even less appropriate for older persons who are

---

[1] Whether tax-deferred variable annuities are "never appropriate", "virtually never appropriate" or "generally not appropriate" for placement in an already tax-deferred retirement account is simply a matter of semantics.  This is so because placing a tax-deferred variable annuity within an already tax-deferred retirement account is appropriate in so few instances (regardless of the exact percentage) that the fact (among others) that there is no additional tax benefit is material and must be disclosed.  Hereinafter, this complaint shall use the phrase "generally not appropriate."

required by law to commence withdrawing monies from their tax-deferred investment accounts by age seventy and one-half. Such forced withdrawals defeat the entire purpose of the annuity and the front loading of expense in such accounts.

10.     Despite the fact that the deferred annuities sold by defendants are generally not appropriate investments for qualified retirement plans, defendants actively recommended and sold these products to less financially sophisticated individuals and small business owners for use in tax-deferred retirement plans.

11.     Some companies, including defendants in this action, specifically have their employees market and sell deferred annuities to people who are investing for their IRAs, Keoghs, 401(k)s, or other qualified retirement plans.

12.     Defendants' viewed as prime prospects investors who are leaving employment and need a rollover IRA in which to place the proceeds of their employers' qualified retirement plans while preserving its tax-deferred status. Because the proceeds are substantial lump sums, such persons are prime targets. Defendants also target: (a) small businesses, where decision-makers responsible for setting up 401(k) and other qualified retirement plans are less likely to be financially sophisticated, and (b) the employees of nonprofit organizations, hospitals, educational institutions, and state and local governmental units, who have lump sum payments funding 403(b) and 457 plans.

13.     Many people who are making investments for their retirement -- particularly those who have changed jobs and are rolling over a large lump-sum qualified plan distribution into an IRA -- are unaware of the financial, tax, and investment aspects of deferred annuities. Defendants, who are advisors and fiduciaries with superior knowledge about these matters and accordingly are trusted by their customers, nevertheless mislead these customers into

purchasing inappropriate deferred annuities for placement into qualified retirement plans. (It should be noted that companies other than defendants that sell deferred annuities, the Fidelity group of companies for example, are careful not to market their deferred annuities for placement in any qualified retirement plan.)

14.    Defendants actively marketed, through written material misrepresentations and omissions, their deferred annuity products for placement in such already tax-deferred retirement plans. Defendants' written documents including prospectuses, statements of additional information, disclosures (so-called), contracts, sales presentation materials, and other materials, affirmatively mislead prospective customers into believing that deferred annuities are appropriate investments for placement into qualified retirement plans, and failed to disclose the general inappropriateness of such investments and the highly remote circumstances in which the expensive insurance features can provide any value, as more fully particularized below. Defendants have entered into a common course of conduct to effectuate these profitable sales throughout the nation. These practices violate the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Company Act of 1940.

15.    Plaintiff seeks to recover damages caused to the Class by defendants' violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder, Section 20(a) of the Exchange Act; Sections 11, 12 and 15 of the Securities Act of 1933, and Section 80a-33(b) of the Investment Company Act of 1940.

16.    Plaintiff is among those who have been injured and damaged by defendants' unlawful conduct.

## PARTIES, JURISDICTION AND VENUE

17.    This Court has jurisdiction over the subject matter of this action pursuant

to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78aa,

Section 22 of the Securities Act of 1933, 15 U.S.C. § 80a-43 of the Investment Company Act of

1940, and 28 U.S.C. § 1331.

18.     Plaintiff brings this action pursuant to the Exchange Act, as amended, 15

U.S.C. §§ 78j(b), 78t(a), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; 15 U.S.C.

§§ 77(k), 77(l) and 77(o) of the Securities Act and 15 U.S.C. § 80a-33(b) and 47 of the

Investment Company Act of 1940.

19.     Venue is proper in this District because defendants conduct business in

this District and many of the wrongful acts alleged herein took place in this District.

20.     In connection with the acts alleged in this Complaint, defendants, directly

or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national

securities markets.

**Parties**

**Plaintiffs**

21.     Lead Plaintiff Kathleen O'Brien is a citizen and resident of the State of

Utah.

22.     Ms. O'Brien made a number of purchases, in two tax-deferred accounts, of

a deferred variable annuity product (Imperium Variable Annuity) of the "American Skandia

Defendants" (as defined below).

23.     In one account, she made purchases on February 28, 2000 and March 13,

2000 totaling approximately $19,000.

24.     In a separate Roth IRA account, Ms. O'Brien made monthly purchases of

7

the variable annuity for each of the seven months from April 2000 through October 2000 (the last purchase on October 16, 2000), inclusive, purchasing $166.00 of the annuity in each month. She also made subsequent, additional purchases as detailed below. Each lead plaintiff's certification is attached hereto as part of Exhibit 1.

25.     Lead Plaintiff Jay Hendrickson is a citizen and resident of the State of Utah. On or about January 17, 2000, he purchased for an IRA account a deferred variable annuity product of the "American Skandia Defendants." Mr. Hendrickson's plaintiff's certification is attached hereto.

26.     Lead Plaintiff Rose Hendrickson is a citizen and resident of the State of Utah. On or about January 17, 2000, she purchased for an IRA account a deferred variable annuity product of the "American Skandia Defendants." Mrs. Hendrickson's plaintiff's certification is attached hereto.

27.     The lead plaintiffs sometimes will be collectively referred to as "plaintiff".

**Defendants**

28.     Defendant American Skandia Life Assurance Corporation ("American Skandia") is one of the largest insurance and variable annuity companies in the United States and the world. American Skandia is the issuer of the variable annuity contracts at issue here. American Skandia is the principal operating subsidiary of Skandia's ultimate United States parent company, defendant American Skandia Investment Holding Corporation. American Skandia is headquartered in the State of Connecticut.

29.     On January 4, 2000, Business Wire ran an article entitled "American Skandia maintains No. 1 ranking as distributor of variable annuities."

30.     Defendant American Skandia Investment Holding Corporation ("ASIHC")

8

wholly owns both American Skandia and ASM (see immediately below).  (American Skandia's

ultimate parent is Skandia Insurance Company Ltd., a Swedish company.)

31.     Defendant American Skandia Marketing, Incorporated ("ASM"), a

Delaware Corporation, is an affiliate of American Skandia and a wholly-owned subsidiary of

ASIHC.  ASM is the principal underwriter, and distributor, of the variable annuities at issue here.

ASM is headquartered in Connecticut.

32.     ASM is a registered broker-dealer and a member of the NASD, and is

licensed to do business within the State of New York.

33.     American Skandia markets its products to broker-dealers and financial

planners through an internal field marketing staff.  In addition, it markets its products through

and in conjunction with financial institutions such as banks that are permitted directly, or through

affiliates, to sell annuities.

34.     ASM enters into distribution agreements with independent broker-dealers

who are registered under the Exchange Act and with entities that may offer the annuity but are

exempt from registration.  Applications for the annuity are solicited by registered representatives

of those firms.  ASM, upon information and belief, has offered the annuities directly to potential

purchasers.

35.     The American Skandia defendant entities, upon information and belief,

conduct business and transact tens of millions of dollars of business within this State and this

District.

36.     ASIHC, American Skandia, and ASM, each of them and through their

subsidiaries and affiliates, develops, markets, issues and underwrites fixed and variable annuities

for sale through a diverse network of distribution channels.  The variable annuities pertinent to

9

this action are offered for sale through banks, brokerage houses and other financial institutions.

37.     Defendants ABC Corp., Inc. 1 through ABC Corp., Inc. 99 are the other entities, owned or controlled directly or indirectly by the American Skandia group entities, which also underwrite annuity policies for American Skandia (and sometimes also enter into contracts with broker-dealers and other financial institutions for them to distribute these annuity policies).

38.     Defendants LMN Corp., Inc. 1 through LMN Corp., Inc. 99 are the other entities, owned or controlled directly or indirectly by the American Skandia group entities, which distribute and market fixed and variable annuities for the American Skandia entities.

39.     American Skandia, ASIHC, ASM, ABC Corp., Inc. 1 through ABC Corp., Inc. 99, and LMN Corp., Inc. 1 through LMN Corp., Inc. 99, hereinafter shall be referred to collectively as the "American Skandia Defendants" or "defendants".

40.     The American Skandia Defendants are inextricably intertwined with each other.  All defendants (with the possible exception of ASIHC) function as operating entities.

41.     Written advertising materials, sales presentation materials, prospectuses, statements of additional information, disclosures, and other written materials used in connection with the sale of the defendants' insurance annuity products to the public, are developed, approved, and disseminated by the American Skandia Defendants.

42.     The American Skandia Defendants collectively conduct business in all 50 states including within the State of New York and this District.

43.     The American Skandia Defendants have affiliated entities which are registered with the New York State Department of State to conduct business in New York State.

44.     The American Skandia Defendants have affiliated entities which have their principal executive office within this judicial District within New York County.

10

45.    The variable annuity products at issue here are sold throughout the United States including within the State of New York and this District.

## CLASS ACTION ALLEGATIONS

46.    Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Classes:  (1) For the claims under the 1934 Act, a Class consisting of all persons who, beginning on December 13, 1997, purchased an individual tax-deferred annuity contract or who received a certificate to a group tax-deferred annuity contract, issued, underwritten, marketed or sold by any or all of the defendants, which was used to fund a contributory (not defined benefit) retirement plan or arrangement qualified for favorable income tax treatment pursuant to Internal Revenue Code sections 401(a), 401(k), 403(a), 403(b), 408(a), 408(b), 408(k), 408(p), 408A, or 457.  The Class Period ends, and includes as Class Members: (a) those who received the variable annuity with an Issue Date no later than October 22, 2000, inclusive, or (b) those who received or purchased the variable annuity whose applications were dated no later than October 22, 2000, inclusive, or if and only if the application was undated then that application was received by any defendant or any agent for defendant (for example, received by the financial institution, unaffiliated with any defendant, which sold the annuity to the Class Member) no later than October 22, 2000, inclusive.  Excluded from the class are defendants, officers, directors, and agents of the defendants, members of their immediate families, their legal representatives, heirs, successors or assigns, and any entity in which any of the defendants or any excluded person has a controlling interest.  (2) For the claims under the 1933 Act, an identical Class, with the difference that the Class Period begins on December 13, 1999.

47.    The Class is composed of at least thousands of individuals, the joinder of

whom in one action is impracticable, and the disposition of their claims in a class action will provide substantial benefits both to the parties and the Court.

48.    This action is properly maintainable as a class action for the following reasons:

a.    The class consists of at least thousands of people and is thus so numerous that joinder of all members is impracticable.

b.    There is a well-defined community of interest among class members in the questions of law or fact affecting the class which predominate over questions affecting only individual members. Those common questions include but are not limited to:

(i)    Whether defendants violated the federal securities law through the acts alleged herein and harmed the members of the Class;

(ii)    Whether defendants violated the Investment Company Act of 1940 through the acts alleged herein and harmed the members of the Class;

(iii)    Whether each defendant participated in the course of conduct complained hereof;

(iv)    Whether each defendant profited by the wrongful conduct alleged herein;

(v)    Whether plaintiff and the other members of the class have sustained damages, and the proper measure of damages; and

(vi)    Whether plaintiff and the other members of the class are entitled to the injunctive and declaratory relief, and the reformation of the annuities, requested herein.

c.    The claims asserted by plaintiff are typical of the claims of class members.

d.    Plaintiff is a member of the Class and will fairly and adequately protect

12

the interests of the class. She has no interests antagonistic to those of the other class members.

Plaintiff has retained as counsel attorneys who are knowledgeable and experienced in securities

litigation and in insurance industry trade practices and sales methods, as well as class and

complex litigation.

      e.    A class action is superior to other available methods for the fair and

efficient adjudication of this controversy for at least the following reasons:

      (i)    Given the size of individual class members' claims, most class

members could not afford to seek legal redress individually for the wrongs the defendants

committed against them;

      (ii)    When defendants' liability has been adjudicated, claims of all class

members can be determined by the Court;

      (iii)    This action will cause an orderly and expeditious administration of

the class claims and foster economies of time, effort and expense and ensure uniformity of

decisions;

      (iv)    Without a class action, many class members would continue to

suffer damages, and defendants' violations of law will be without redress while defendants

continue to reap and retain the substantial proceeds of their wrongful conduct;

      (v)    This action does not present any undue difficulties that would

impede its management by the Court as a class action; and

      (vi)    The names and addresses of the members of the Class can be

ascertained from the books and records of defendants or its agents.

      49.    Plaintiff seeks damages, including but not limited to rescissory damages,

return of the fees and charges paid by plaintiff and other members of the class, and reformation

13

of the investment contracts of plaintiff and the other members of the Class to place them in the

investment positions they would enjoy if they had not purchased defendants' inappropriate

deferred variable annuities.  Plaintiff also seeks injunctive relief prohibiting defendants from

continuing to engage in such practices and from charging surrender fees (or contingent deferred

sales charges) to any class member terminating a deferred variable annuity contract, and

otherwise, as described below.

### The Solicitation and Sale of the Lead Plaintiffs' Variable Annuity Contracts

50.     Each lead plaintiff purchased their variable annuity contract, which was

issued, underwritten and sold by defendants, through an independent broker-dealer (WMA

Securities, Inc.), which at all relevant times was acting on behalf of the defendants.

51.     The uniform, written prospectuses, statements of additional information,

disclosures (so-called), contracts, sales materials, and other written materials, given to each lead

plaintiff by the American Skandia Defendants (in some instances given through the broker-

dealer) stated or inferred that a tax-deferred variable annuity was an appropriate investment for

placement in an IRA.

52.     The defendants did not disclose to plaintiff in either the uniform, written

prospectus, statement of additional information, disclosure, contract, sales materials, or other

written documents, the following (among other) material facts:

(a)  a deferred annuity is generally not an appropriate investment for placement in

a tax-deferred retirement plan, because among other things earnings on any investment placed in

such plans are already tax-deferred.

(b)  the deferred annuities defendants sell are generally not appropriate

investments for, and are almost always inappropriate investments for, placement into the

14

purchasers' tax-deferred qualified retirement plans.

(c) tax benefits (at least as great as those obtained from a variable annuity) were available from an investment in every one of the following types of contributory (not defined benefit) retirement plans or arrangements qualified for favorable income tax treatment pursuant to Internal Revenue Code sections 401(a), 401(k), 403(a), 403(b), 408(a), 408(b), 408(k), 408(p), 408A, or 457 (all of which are part of the Class definition and include IRAs and 401ks).

(d) the tax deferred accrual feature is provided by the tax-qualified retirement plan and, therefore, the tax deferred accrual feature of the variable annuity is unnecessary.

(e) the compound effect of the unnecessary, unreasonable and excessive commissions, fees and charges paid for defendants' tax-deferred variable annuities, over the course of a few decades -- not counting any surrender fees -- can consume as much as one-third of a retirement investor's account.

53.     Each lead plaintiff purchased from defendants a tax-deferred variable annuity product of the American Skandia Defendants.

### DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS

54.     The National Association of Securities Dealers considers communications with the public about variable annuities to be so important, and unique, that in 1994 it adopted a specific rule concerning such communications entitled "Communications with the Public About Variable Life Insurance and Variable Annuities." NASD Conduct Rule IM-2210-2.

55.     Thereafter, in 1996, the NASD issued NASD Notice to Members 96-86, entitled "NASD Regulation *Reminds* Members and Associated Persons that Sales of Variable Contracts Are Subject to NASD Suitability Requirements" (emphasis added).

56.     NASD Notice to Members 96-86 expressly stated that:

NASD Regulation, Inc. (NASD Regulation) reminds NASD members and their associated persons who sell variable life insurance contracts and variable annuity contracts (Variable Contracts) of their obligations with respect to the suitability requirements of the NASD Conduct Rules. Variable Contracts are regulated as securities under federal securities laws and NASD rules. Members and their associated persons are reminded that the suitability requirements of NASD Conduct Rule 2310 (formerly Article III, Section 2 of the NASD Rules of Fair Practice) apply to the recommendation of any security, including a Variable Contract. <u>Thus, a member and its associated persons must have reasonable grounds for believing that a Variable Contract recommended to a customer is suitable for that customer.</u>  (emphasis added).

57.    In May 1999, the NASD issued NASD Notice to Members 99-35, entitled

"The NASD *Reminds* Members of Their Responsibilities Regarding the Sales of Variable

Annuities" (emphasis added), which expressly stated:

> When a registered representative recommends the purchase of a variable annuity for any tax-qualified retirement account (*e.g.*, 401(k) plan, IRA<u>), the registered representative should disclose to the customer that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that **the tax deferred accrual feature of the variable annuity is unnecessary**</u>. . . .
>
> **The registered representative should recommend a variable annuity only when its other benefits, such as lifetime income payments, family protection through the death benefit, and guaranteed fees, support the recommendation.** (at 231 nos. 11, 16) (emphasis added).

58.    Thus, NASD Notice to Members 99-35 expressly stated that it "should

[be] disclose[d] to the customer that the tax deferred accrual feature is provided by the tax-

qualified retirement plan and that the tax deferred accrual feature of the variable annuity is

unnecessary." (at 231 no. 11).

59.    Thus, NASD Notice to Members 99-35 stated that purchasing a tax-

deferred variable annuity for a tax-deferred retirement account should never be recommended

unless "its other benefits, such as lifetime income payments, family protection through the death

benefit, and guaranteed fees, support the recommendation." <u>Id</u>.

60.     According to Notice to Members 99-35, its requirements "represent a compilation of industry practices in the supervision of the sale of variable annuities." (at 230).

61.     In addition, NASD Rule 2210 (Communications with the Public) provides, in pertinent part, that:

(d)     Standards Applicable to Communications with the Public

(1)     General Standards

(A) All member communications with the public shall be based on principles of fair dealing and good faith and should provide a sound basis for evaluating the facts in regard to any particular security or securities or type of security, industry discussed, or service offered. No material fact or qualification may be omitted if the omission, in the light of the context of the material presented, would cause the communication to be misleading.

(B) Exaggerated, unwarranted or misleading statements or claims are prohibited in all public communications of members. In preparing such communications, members must bear in mind that inherent in investment are the risks of fluctuating prices and the uncertainty of dividends, rates or return and yield, and no member shall, directly or indirectly, publish, circulate or distribute any public communication that the member knows or has reason to know contains any untrue statement of a material fact or is otherwise false or misleading.

62.     The NASD notices and rules concerning variable annuities cited to or quoted from are incorporated herein by reference.

63.     Despite these repeated *"Reminders"*, defendants' prospectuses, statements of additional information ("SOAI"s) and other documents contained no such disclosures.

64.     The NASD rules concerning variable annuities apply to wholesalers as well as retailers of variable annuities. (Notice to Members 99-35 at no. 16).

65.     Defendants had a second independent duty to disclose under SEC Form N-4, which contains the prospectus requirements for variable annuities. Form N-4 states under the heading for Item J, "Preparation of the Registration Statement or Amendment (at 3):

17

The purpose of the prospectus is to provide essential information about the Registrant in a way that will help investors decide whether to purchase the securities being offered. The prospectus should be clear, concise and understandable. . . . Responses to the items of Part A should be as simple and direct as possible and include only information needed to understand the essential characteristics of the Registrant.

66.    Further, under the heading Part A, "Information Required in Prospectus,

Form N-4 states:

**Item 1. Cover Page**
(a)  The outside cover page must contain the following information: . . . .
(iii) the types of variable annuity contracts offered by the prospectus (e.g., group, individual, single premium immediate, flexible premium deferred); . . . .
(v)  a statement or statements that: (A) the prospectus sets forth the information about the Registrant that a prospective investor ought to know before investing. . .

**Item 12. Taxes.**

(a)  Briefly describe the tax consequences to investors of an investment in the variable annuity contracts being offered. . . . <u>Instruction</u>: . . . . If the tax consequences vary depending on the use of the variable annuity contract (<u>i.e.</u>, to fund an individual retirement annuity or corporate plan), the variations should be briefly described.

67.    Defendants had a number of virtually identical written documents --

including registration statements, prospectuses, statements of additional information, disclosures

(so-called), sales presentation materials and contracts -- for variable annuities in effect during the

Class Period, which defendants used to sell the variable annuities to prospective purchasers.

68.    These written materials contained material misrepresentations and

material omissions under the NASD rules and Notices, under Form N-4 and under general,

federal securities law.

69.    Defendants selected as targets for their sales campaign persons interested

in funding qualified retirement plans. Sales of deferred annuities for qualified retirement plans,

based upon these uniform, written documents, have been and continue to be an enormous

marketing success for defendants. Defendants have received and continue to receive millions, and probably billions, of dollars from the sales of deferred annuities for qualified retirement plans, which sales were predicated upon the materially misleading written documents.

70.    The prospectuses, statements of additional information, contracts, disclosures for variable annuities, written sales presentation materials and other written documents, were written by the defendants and often contain on them the name and/or logo of one or more of the defendants.

71.    Since under federal law a variable annuity is always sold pursuant to a prospectus, defendants were required to give a prospective purchaser a prospectus prior to any purchase. (That prospectus either would contain or would incorporate by reference the registration statement and the statement of additional information.)

72.    The defendants issued the following SEC filings, which the defendants used to sell the variable annuities at issue here to plaintiff and other members of the Class.

73.    Plaintiff incorporates herein by reference the following uniform, written materials (prospectuses, statements of additional information, registration statements and amendments, and other writings, and any document incorporated by them) which were routinely used by the defendants to sell the variable annuities at issue.

(a) The following SEC filings, which are incorporated by reference, were issued and used to sell the variable annuities in American Skandia Life Assur Corp Var Acct B Cl 1 Sub Accts (CIK number 0000826734):

An unnamed flexible premium deferred annuity: prospectus and SOAI dated May 1, 1997; prospectus and SOAI dated May 1, 1998; prospectus and SOAI dated May 3, 1999; and prospectus and SOAI dated May 1, 2000, for the following variable annuities whose marketing

names include LifeVest Personal Security Annuity; American Skandia Advisors Plan Annuity;

American Skandia Advisors Plan II Annuity; Imperium Annuity; American Skandia Protector

Annuity; Emerald Choice Annuity; American Skandia XTra Credit Annuity; American Skandia

LifeVest Annuity and Alliance Capital Navigator Annuity.

American Skandia Advisor PlanSM NY:  prospectus and SOAI dated May 1,
2000.

American Skandia Advisor PlanSM II:  undated prospectus.

American Skandia Advisor PlanSM II Premier:  prospectus and SOAI dated May
1, 2000.

American Skandia LifeVest: prospectus and SOAI dated May 1, 2000.

American Skandia ProtectorSM: prospectus and SOAI dated May 1, 2000.

American Skandia XTra CreditSM: prospectus and SOAI dated May 1, 2000.

American  Skandia XTra CreditSM II (dates unknown).

American Skandia XTra CreditSM Premier: prospectus and SOAI dated May 1,
2000.

Evergreen Skandia Harvester Variable Annuity:  prospectus and SOAI dated
February 14, 2000.

Evergreen Skandia Harvester XTra Credit Variable Annuity:  prospectus and
SOAI dated February 14, 2000.

Stagecoach Extra Credit Variable Annuity:  prospectus and SOAI dated May 1,
1997; upon information and belief prospectus and SOAI dated May 1, 1998; prospectus and
SOAI dated May 3, 1999; prospectus and SOAI dated October 18, 1999; prospectus and SOAI
dated May 1, 2000.

Stagecoach Variable Annuity Flex:  prospectus and SOAI dated May 1, 1998; prospectus and SOAI dated May 3, 1999; prospectus and SOAI dated October 18, 1999; prospectus and SOAI dated May 1, 2000.

Stagecoach Variable Annuity Plus:  prospectus and SOAI dated May 1, 1997; prospectus and SOAI dated May 1, 1998; prospectus and SOAI dated May 3, 1999; prospectus and SOAI dated October 18, 1999; prospectus and SOAI dated May 1, 2000.

Alliance Capital Navigator Annuity:  prospectus and SOAI dated May 1, 1997; prospectus and SOAI dated May 1, 1998; prospectus and SOAI dated May 3, 1999; and prospectus and SOAI dated May 1, 2000.

(b)  The following SEC filings, which are incorporated by reference, were issued and used to sell the variable annuities in American Skandia Life Assur Corp Var Acct B Cla 3 Sub Acct, CIK number 0000933426:

An unnamed deferred annuity (registration number 033-86866, possibly American Skandia Impact):  prospectus and SOAI filed with the SEC on May 4, 1999, at first substantive page before table of contents and 36-37[2].

American Skandia ImpactSM: prospectus filed with the SEC on April 26, 2000, at first substantive page before table of contents and 39-40.

Defined Investments Annuity: prospectus and SOAI filed with the SEC on September 30, 1999, at first substantive page before table of contents and 30-31.

Galaxy Variable Annuity:  prospectus and SOAI filed with the SEC on April 27,

---

[2] All page numbers in prospectuses and other SEC filings cited in this Complaint are approximations based upon the locations of relevant headings or subheadings in the table of contents in the relevant documents, as a result of the omission of page numbers from these documents as filed on the SEC Edgar filing system. Plaintiff expects that there are many instances in which a portion of the language described extends onto the page after the cited pages. Plaintiff does not intend to omit language that extends in this manner and, in fact, incorporates such language by reference.

1999, at first substantive page before table of contents and 31-32; prospectus filed with the SEC on April 26, 2000, at first substantive page before table of contents and 33-34.

(c)  The following SEC filings, which are incorporated by reference, were issued and used to sell the variable annuities in American Skandia Life Assuran Corp Var Acc B Class 2 Sub Acc, CIK number 0000916725:

Advisors Choice(R) 2000: prospectus and SOAI filed with the SEC on April 26, 2000, at first substantive page before table of contents and 38-39.

An unnamed deferred annuity (registration number 333-08853, possibly Advisors Choice(R) 2000):  prospectus and SOAI filed with the SEC on May 3, 1999, at first substantive page before table of contents and 31-32.

(d)  The following SEC filings, which are incorporated by reference, were issued and used to sell the variable annuities in American Skandia Life Assurance Corp Variable Account E, CIK number 0000887588:

Galaxy Variable Annuity:  prospectus and SOAI filed with the SEC on April 27, 1999, at first substantive page before table of contents and 21-22; prospectus and SOAI filed with the SEC on April 26, 2000, at first substantive page before table of contents and 22-23.

(e)  The following SEC filings, which are incorporated by reference, were issued and used to sell the variable annuities in American Skandia Life Assurance Corp/Ct, CIK number 0000881453:

American Skandia Advisor PlanSM NY: prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 34-35.

An unnamed deferred annuity (registration number 333-25733):  prospectus and SOAI filed with the SEC on May 3, 1999, at first substantive page before table of contents and

22

35-36; prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 38-39.

Evergreen Skandia Harvester Variable Annuity: prospectus and SOAI filed with the SEC on February 10, 2000, at first substantive page before table of contents and 30-31; prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 32-33.

American Skandia Advisor PlanSM II Premier: prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 41-42

American Skandia XTra CreditSM: prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 40-41.

Stagecoach Extra Credit Variable Annuity:  prospectus and SOAI filed with the SEC on May 4, 1999, at first substantive page before table of contents and 32-33; prospectus and SOAI filed with the SEC on October 14, 1999, at first substantive page before table of contents and 34-35; prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 36-37.

Evergreen Skandia Harvester XTra Credit Variable Annuity: prospectus and SOAI filed with the SEC February 10, 2000, at first substantive page before table of contents and 32-33; prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 33-34.

American Skandia XTra CreditSM Premier: prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 45-46.

American Skandia LifeVest(R): prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 37-38.

Stagecoach Variable Annuity Flex: prospectus and SOAI filed with the SEC on May 3, 1999, at 29-30; prospectus and SOAI filed with the SEC on October 14, 1999, at first substantive page before table of contents and 30-31; prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 32-33.

American Skandia LifeVest(R) Premier: prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 37-38.

American Skandia ProtectorSM: prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 38-39.

Stagecoach Variable Annuity Plus: prospectus and SOAI filed with the SEC on May 1, 1999, at first substantive page before table of contents and 33-34; prospectus and SOAI filed with the SEC on October 14, 1999, at first substantive page before table of contents and 34-35; prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 36-37.

Advisors Choice(R) 2000: prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 38-39.

Galaxy Variable Annuity: prospectus and SOAI filed with the SEC on May 3, 1999, at first substantive page before table of contents and 21-22; prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 22-23.

Galaxy Variable Annuity:  prospectus and SOAI filed with the SEC on May 3, 1999, at first substantive page before the table of contents and 31-32; prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 33-34.

American Skandia ImpactSM: prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 39-40.

Defined Investments Annuity: prospectus and SOAI filed with the SEC on September 30, 1999, at first substantive page before table of contents and 30-31; prospectus and SOAI filed with the SEC on May 1, 2000, at first substantive page before table of contents and 30-31.

An unnamed deferred annuity (registration number 333-24989), prospectus and SOAI filed with the SEC on May 3, 1999, at first substantive page before table of contents and 31-32.

An unnamed deferred annuity (registration number 333-77213): prospectus and SOAI filed with the SEC on May 4, 1999, at first substantive page before table of contents and 36-37.

An unnamed deferred annuity (registration number 033-91400, possibly American Skandia Impact): prospectus and SOAI filed with the SEC on May 4, 1999, at first substantive page before table of contents and 36-37.

An unnamed deferred annuity (registration number 333-00995): prospectus and SOAI filed with the SEC on May 3, 1999, at first substantive page before table of contents and 34-35.

An unnamed deferred annuity (registration number 033-62953): prospectus and SOAI filed with the SEC on May 3, 1999, at first substantive page before table of contents and 32-33.

74.     Concerning (a) through (e) immediately above, the prospectuses cited therein contain the following language or language substantially similar thereto.  For example, four typical prospectuses (the Imperium Variable Annuity, dated May 3, 1999 (033-62933); the Imperium Variable Annuity, dated May 1, 2000 (033-87010); American Skandia Life Assurance

Corporation Variable Account B Cl 1 Sub Accts dated May 3, 1999; and American Skandia

XTra Credit dated May 1, 2000), which were used during the Class Period to sell the variable

annuities at issue here, state in substantially identical language on the very first substantive page

of each prospectus:

### WHY WOULD I CHOOSE TO PURCHASE THIS ANNUITY?

This Annuity is frequently used for retirement planning. It may be used as an investment vehicle for an IRA, SEP-IRA, Roth IRA or Tax Sheltered Annuity (or 403(b)). It may also be used for other purposes that are not "qualified" investments. The Annuity allows you to invest your money in a number of variable investment options as well as in one or more fixed investment options. You are not taxed on any investment gains the Annuity earns until you make a withdrawal from the Annuity or begin to receive annuity payments. This feature, referred to as "tax-deferral", can be beneficial to the growth of your Account Value because money that would otherwise be needed to pay taxes on investment gains each year remains invested and can earn additional money. However, because the Annuity is designed for long-term retirement savings, a 10% penalty tax may be applied on withdrawals you make before you reach age 59 1/2.

. . . . [and then each prospectus continues in substantially similar language at its respective pages identified in (a) through (e) above]

### WHAT TAX CONSIDERATIONS ARE THERE FOR TAX-QUALIFIED RETIREMENT PLANS OR QUALIFIED CONTRACTS?

An annuity may be suitable as a funding vehicle for various types of tax-qualified retirement plans. We have provided summaries of the types of tax-qualified retirement plans with which we may issue an Annuity. These summaries provide general information about the tax rules and are not intended to be complete discussions. The tax rules regarding qualified plans are complex. These rules may include limitations on contributions and restrictions on distributions, including additional taxation of distributions ad additional penalties. The terms and conditions of the tax-qualified retirement plan may impose other limitations and restrictions that are in addition to the terms of the Annuity. The application of these rules depends on individual facts and circumstances. Before purchasing an Annuity for use in a qualified plan, you should obtain competent tax advice, both as to the tax treatment and suitability of such an investment. American Skandia does not offer all of its annuities to all of these types of tax-qualified retirement plans.

Corporate Pension and Profit-sharing Plans: Annuities may be used to fund employee benefits of various corporate pension and profit-sharing plans

established by corporate employers under Sections 401(a) and 401(k) of the Code. Contributions to such plans are not taxable to the employee until distributions are made from the retirement plan. The Code imposes limitations on the amount that may be contributed and the timing of distributions. The tax treatment of distributions is subject to special provisions of the Code, and also depends on the design of the specific retirement plan. There are also special requirements as to participation, nondiscrimination, vesting and nonforfeitability of interests.

H.R. 10 Plans: Annuities may also be used to fund benefits of retirement plans established by self-employed individuals for themselves and their employees. These are commonly known as "H.R. 10 Plans" or "Keogh Plans". These plans are subject to most of the same types of limitations and requirements as retirement plans established by corporations. However, the exact limitations and requirements may differ from those for corporate plans.

Tax Sheltered Annuities: Under Section 403(b) of the Code a tax sheltered annuity ("TSA") is a contract into which contributions may be made by certain qualifying employers such as public schools and certain charitable, educational and scientific organizations specified in Section 501(c)(3) for the benefit of their employees. Such contributions are not taxable to the employee until distributions are made from the TSA. The Code imposes limits on contributions, transfers and distributions.
Nondiscrimination requirements also apply.

-------------------------------------------------------------

Under a TSA, you may be prohibited from taking distributions from the contract attributable to contributions made pursuant to a salary reduction agreement unless the distribution is made:

-------------------------------------------------------------

|X|     After the participating employee attains age 59 1/2;
|X|     Upon separation from service, death or disability; or
|X|     In the case of financial hardship (subject to restrictions).

Section 457 Plans: Under Section 457 of the Code, deferred compensation plans established by governmental and certain other tax exempt employers for their employees may invest in annuity contracts. The Code limits contributions and distributions, and imposes eligibility requirements as well. Contributions are not taxable to employees until distributed from the plan. However, plan assets remain the property of the employer and are subject to the claims of the employer's general creditors until such assets are made available to participants or their beneficiaries.

Individual Retirement Programs or "IRAs": Section 408 of the Code allows eligible individuals to maintain an individual retirement account or individual retirement annuity ("IRA"). IRAs are subject to limitations on the amount that may be contributed, the contributions that may be deducted from taxable income,

the persons who may be eligible to establish an IRA and the time when distributions must commence. Further, an Annuity may be used to "roll-over" distributions from certain tax-qualified retirement plans and maintain their tax-deferral.

Roth IRAs: A form of IRA is also available called a "Roth IRA". Contributions to a Roth IRA are not tax deductible. However, distributions from a Roth IRA are free from Federal income taxes and are not subject to the 10% penalty tax if five (5) tax years have passed since the first contribution was made or any conversion from a traditional IRA was made and the distribution is made (a) once the taxpayer is age 59 1/2 or older, (b) upon the death or disability of the taxpayer, or (c) for qualified first-time home buyer expenses, subject to certain limitations. Distributions from a Roth IRA that are not "qualified" as described above may be subject to Federal income and penalty taxes.

Purchasers of IRAs and Roth IRAs will receive a special disclosure document, which describes limitations on eligibility, contributions, transferability and distributions. It also describes the conditions under which distributions from IRAs and qualified plans may be rolled over or transferred into an IRA on a tax-deferred basis and the conditions under which distributions from traditional IRAs may be rolled over to, or the traditional IRA itself may be converted into, a Roth IRA.

SEP IRAs: Eligible employers that meet specified criteria may establish Simplified Employee Pensions or SEP IRAs. Employer contributions that may be made to employee SEP IRAs are larger than the amounts that may be contributed to other IRAs, and may be deductible to the employer.

HOW ARE DISTRIBUTIONS FROM QUALIFIED CONTRACTS TAXED?

Distributions from Qualified Contracts are generally taxed under Section 72 of the Code. Under these rules, a portion of each distribution may be excludable from income. The excludable amount is the proportion of a distribution representing any investment gain on the after-tax contributions. Generally, a 10% penalty tax applies to the taxable portion of a distribution from a Qualified Contract made prior to age 59 1/2. However, the 10% penalty tax does not apply when the distribution:

|X| is part of a properly executed transfer to another IRA or another eligible qualified account;
|X| is subsequent to the death or disability of the taxpayer (for this purpose disability is as defined in Section 72(m)(7) of the Code);
|X| is part of a series of substantially equal periodic payments to be paid not less frequently than annually for the taxpayer's life or life expectancy or for the joint lives or life expectancies of the taxpayer and a designated beneficiary;
|X| is subsequent to a separation from service after the taxpayer attains age 55*;

|X| does not exceed the employee's allowable deduction in that tax year for medical care*; and
|X| is made to an alternate payee pursuant to a qualified domestic relations order*.

The exceptions above which are followed by an asterisk (*) do not apply to IRAs.

Minimum Distributions after age 70 1/2: A participant's interest in a Qualified Contract must generally be distributed, or begin to be distributed, by the "required beginning date". This is April 1st of the calendar year following the later of:

|X| the calendar year in which the individual attains age 70 1/2; or
|X| the calendar year in which the individual retires from service with the employer sponsoring the plan. The retirement option is not available to IRAs.

75.    The above quoted excerpt from the prospectuses is a material misrepresentation because it directly or by inference recommended tax-deferred variable annuities for tax-deferred retirement accounts.

76.    In addition, plaintiff incorporates herein by reference the following prospectuses and SOAIs.

(a) The following SEC filings, which are incorporated by reference, were issued and used to sell the variable annuities in American Skandia Life Assur Corp Var Acct B Cla 3 Sub Acct, CIK number 0000933426:

An unnamed deferred annuity (registration number 033-88362, possibly Galaxy Variable Annuity): prospectus and SOAI filed with the SEC on April 30, 1997, at 9, 22; prospectus and SOAI filed with the SEC on April 27, 1998, at 9, 21.

An unnamed deferred annuity (registration number 033-86866): prospectus and SOAI filed with the SEC on April 30, 1997, at 9, 19; prospectus and SOAI filed with the SEC on

April 24, 1998 at 9, 24.[3]

      (b)  The following SEC filings, which are incorporated by reference, were issued

and used to sell the variable annuities in American Skandia Life Assuran Corp Var Acc B Class

2 Sub Acc, CIK number 0000916725, are incorporated by reference herein:

      An unnamed deferred annuity (probably Advisors Choice (R) 2000):  prospectus

and SOAI filed with the SEC on April 27, 1998, at 9, 23.

      An unnamed deferred annuity (registration number 333-08853): prospectus and

SOAI filed with the SEC on June 25, 1997, at pages 9, 21[4]

      An unnamed deferred annuity (registration number 033-56770): prospectus and

SOAI filed with the SEC on April 29, 1997, at pages 9, 21.

---

[3] In addition, a number of the prospectuses at issue, including this one, at 24, contain the following language. The language shows that defendants encouraged purchasing tax-deferred variable annuities for already tax-deferred retirement plans because the minimum dollar amount required for purchases in already tax-deferred retirement accounts was lower than for purchases in non-qualified plans.

"Periodic Purchase Payments: . . . We may also require an initial Purchase Payment to be submitted by check or wire before agreeing to such a program. Our minimum requirements may differ based on the usage of the Annuity, such as whether it is being used in conjunction with certain retirement plans."

[4] In addition, it should be noted that Defendants issued certain materials, for example those filed with the SEC for a number of unnamed annuities on March 10, 1998 (including those with registration numbers 333-24989 and 333-00995) that contained the following or substantially similar language:

> Roth IRA/SEP IRA/SIMPLE IRA
> The section of the Prospectus entitled "Purchasing Annuities - Uses of the Annuity" is amended as follows:
>
> The Annuity may be issued in connection with or purchased as a funding vehicle for certain retirement plans designed to meet the requirements of various sections of the Code. These include, but are not limited to: (a) Section 401 (corporate, association, or self-employed individuals' retirement plans); (b) Section 403(b) (tax-sheltered annuities available to employees of certain qualifying employers); (c) Section 408 (individual retirement accounts and individual retirement annuities - "IRAs"; Simplified Employee Pensions - "SEPs"; and Savings Incentive Match Plans for Employees - "SIMPLE IRAs"); and (d) Section 408A (Roth IRAs).

The above quoted excerpt from the prospectuses is a material misrepresentation because it directly or by inference recommended tax-deferred variable annuities for tax-deferred retirement accounts.

(c) The following SEC filings, which are incorporated by reference, were issued and used to sell the variable annuities in American Skandia Life Assurance Corp Variable Account E, CIK number 0000887588:

An unnamed deferred annuity (registration number 033-47976, possibly Galaxy Variable Annuity):  prospectus and SOAI filed with the SEC on April 29, 1997, at pages 9, 17; prospectus and SOAI filed with the SEC on April 27, 1998, at pages 9, 17.

(d) The following SEC filings, which are incorporated by reference, were issued and used to sell the variable annuities in American Skandia Life Assurance Corp/Ct, CIK number 0000881453:

An unnamed deferred annuity (registration number 333-00995): and SOAI filed with the SEC on May 1, 1997, at pages 9, 24; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 10, 24.

An unnamed deferred annuity (registration number 333-25733): prospectus and SOAI filed with the SEC on May 2, 1997, at pages 9, 24; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 24.

An unnamed deferred annuity (registration number 033-62791): prospectus and SOAI filed with the SEC on May 2, 1997, at pages 9, 23; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 7.

Stagecoach Variable Annuity Flex; prospectus and SOAI filed with the SEC on May 1, 1998, at 9, 21.

Stagecoach Extra Credit Variable Annuity: prospectus and SOAI filed with the SEC on May 2, 1997 at 9, 20; prospectus and SOAI filed with the SEC on May 1, 1998, at 9, 22.

Stagecoach Variable Annuity Plus: prospectus and SOAI filed with the SEC on May 1, 1997, at 9, 21; prospectus and SOAI filed with the SEC on May 1, 1998, at 9, 22.

An unnamed deferred annuity (registration number 333-25761): prospectus and SOAI filed with the SEC on May 1, 1997, at pages 9, 17; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 22.

Alliance Capital Navigator Annuity: prospectus and SOAI filed with the SEC on May 1, 1997, at pages 9, 20; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 21.

An unnamed deferred annuity (registration number 333-24989): prospectus and SOAI filed with the SEC on June 26, 1997, at pages 9, 21; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 23.

An unnamed deferred annuity (registration number 033-91400): prospectus and SOAI filed with the SEC on May 1, 1997, at pages 9, 22; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 24.

An unnamed deferred annuity (registration number 033-88360, possibly Galaxy Variable Annuity): prospectus and SOAI filed with the SEC on May 1, 1997, at pages 9, 19; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 21.

An unnamed deferred annuity (registration number 333-02867): prospectus and SOAI filed with the SEC on May 1, 1997, at pages 9, 17; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 17.

An unnamed deferred annuity (registration number 333-26695): prospectus filed with the SEC on July 22, 1997 at pages 9, 23; prospectus and SOAI filed with the SEC on July

28, 1997, at pages 9, 23; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 26.

An unnamed deferred annuity (registration number 033-62953): prospectus and SOAI filed with the SEC on May 1, 1997, at 9, 22; prospectus and SOAI filed with the SEC on May 1, 1998, at pages 9, 7.

An unnamed deferred annuity (registration number 333-00941): prospectus and SOAI filed with the SEC on December 27, 1996 at pages 9, 22.

77.     Concerning (a) through (d) immediately above, the prospectuses cited therein contain the following language or language substantially similar thereto:

> Purchasing Annuities: Annuities are available for multiple uses, including as a funding vehicle for various retirement programs which qualify for special treatment under the Code. . . .
>
> Uses Of The Annuity: The Annuity may be issued in connection with or purchased as a funding vehicle for certain retirement plans designed to meet the requirements of various sections of the Code. These include, but are not limited to: (a) Section 401(a) (defined benefit plans and defined contribution plans such as 401(k), profit sharing and money purchase plans); (b) Section 403(b) (tax-sheltered annuities available to employees of certain qualifying employers); (c) Section 408 (individual retirement accounts and individual retirement annuities - "IRAs"; and Simplified Employee Pensions "SEPs"; and (d) Section 408A (Roth IRAs).

78.     The above quoted excerpt from the prospectuses is a material misrepresentation because it recommended tax-deferred variable annuities for tax-deferred retirement accounts.

79.     The prospectuses have different names simply as marketing tools. The disclosures for variable annuities, some of the written sales presentation materials disseminated with respect to certain prospectuses, and the contracts given to each purchaser, do not necessarily identify the particular prospectus which was given to the prospective purchaser given that the

name is merely a marketing tool and in many instances the invested funds are put into the exactly the same subaccount/portfolios. (Accordingly, there are additional prospectuses which are not readily identifiable because of defendants' marketing terminology, and they are incorporated herein by reference. Upon information and belief, there are prospectuses which are not available on the Securities and Exchange Commission's EDGAR Internet site.)

80.    Prospective purchasers of defendants' variable annuities routinely also were given (and had to sign when purchasing) a document entitled "Disclosure for Variable Annuities" which contained the same material misrepresentations and/or material omissions. This document was a uniform variable annuity disclosure used by issuers, underwriters and marketers throughout the insurance industry to sell variable annuities. The disclosure was given to plaintiff, on behalf of the American Skandia defendants, by the broker-dealer through which plaintiff purchased the variable annuity. The defendants knew it was being given to purchasers. The disclosure refers the purchaser to the materially defective prospectuses issued by defendants. Such uniform disclosure for variable annuities signed by Ms. O'Brien is exhibit 2 hereto and is incorporated herein by reference.

81.    Each of these prospectuses, statements of additional information, written sales presentation materials, contracts and written disclosures for variable annuities, which have been incorporated herein by reference, contained the same or similar material misrepresentations (in essentially identical language), omitted to state a material fact required to be stated therein, or failed to disclose certain material facts necessary to make the statements therein not misleading, to plaintiff and the class members or their employers (who were prospective purchasers of the variable annuities at issue here). Defendants unlawfully presented their tax-deferred variable annuities as appropriate for placement into (among other options) tax-deferred plans or accounts,

34

such as IRAs and 401(k)s.

82.    For example, none of the prospectuses, statements of additional information (pursuant to the NASD requirement or otherwise) "disclose[d] to the customer that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is <u>unnecessary</u>." (emphasis added).

83.    None of the prospectuses, statements of additional information (pursuant to the NASD requirement or otherwise) disclosed that a tax-deferred variable annuity should not be purchased for a tax-deferred retirement account unless "its other benefits, such as lifetime income payments, family protection through the death benefit, and guaranteed fees, support the purchase."

84.    All of the prospectuses, statements of additional information, contracts and written disclosures incorporated herein failed to disclose (pursuant to the NASD Notice or otherwise) the following material facts (among others).

85.    Defendants failed to disclose that tax benefits (at least as great as those obtained from a variable annuity) were available from an investment in every one of the following types of contributory (not defined benefit) retirement plans or arrangements qualified for favorable income tax treatment pursuant to Internal Revenue Code sections 401(a), 401(k), 403(a), 403(b), 408(a), 408(b), 408(k), 408(p), 408A, or 457 (which is the Class definition herein, and includes IRAs and 401ks).

86.    Defendants failed to disclose that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary.

87.    Defendants failed to disclose that the deferred variable annuities

35

defendants sell are generally not appropriate investments for, and are almost always inappropriate investments for, placement into the purchasers' tax-deferred qualified retirement plans.

88.   Defendants failed to disclose that a tax-deferred variable annuity should not be purchased for a tax-deferred retirement account unless "its other benefits, such as lifetime income payments, family protection through the death benefit, and guaranteed fees, support the purchase."

89.   Defendants failed to disclose that the purchase of a tax-deferred annuity in an already tax-deferred retirement account increases the total amount paid by the investor while providing only the same or lesser tax benefit to the investor.

90.   The material misrepresentations and omissions described above were contained in the uniform, written, advertising and sales presentation materials, prospectuses, contracts, disclosures, and other written documents, prepared, approved, and disseminated by defendants in selling deferred variable annuities to plaintiff and other members of the class.

91.   The misrepresentations and omissions described above were material. Plaintiff and other members of the class would not have purchased deferred variable annuities from defendants for placement in their qualified retirement plans if they had been told the truth, instead of having been told the material misrepresentations and material omissions identified above in this section entitled "Defendants' Material Misrepresentations and Omissions."

92.   Defendants' own conduct demonstrates that the misrepresentations and omissions described above were both material and in violation of law. On October 23, 2000, defendants amended the wording of its prospectus language, on information and belief in all of its relevant prospectuses, to include the following language:

However, when an Annuity is purchased as a "qualified" investment, you receive preferential tax treatment under the Internal Revenue Code. <u>Purchasing an Annuity as an investment vehicle for a "qualified" investment does not provide any additional tax advantages to that already available through your retirement plan under the Internal Revenue Code.</u> (emphasis added)

93.     As one example, this language was inserted into the October 23, 2000 prospectus for American Skandia XTra Credit. The language was inserted at the end of the first paragraph (quoted hereinabove) in that product's prospectus dated May 1, 2000. See paragraph 70 herein.

94.     This language was never included in a variable annuity prospectus issued by the defendants before October, 2000.

95.     The issuance by the NASD of those Rules and Notices (cited and quoted herein) in and of itself demonstrates that these undisclosed facts were material.

96.     The NASD would not have required that each of these facts be disclosed unless it thought each of these facts was "important" to the investment decision and would significantly alter the total mix of facts available to an investor.

97.     Even apart from the existence of the NASD Rules and Notices, each of the undisclosed facts was material, as a matter of fact, for the same reason -- it was "important" to the investment decision and would significantly alter the total mix of facts available to an investor.

98.     Hence, a duty to disclose these facts existed under the NASD regulations and under federal securities law generally.

## DAMAGES

99.     As a direct result of defendants' misconduct, plaintiff and other members of the class also have paid commissions, fees and charges in excess of what they would have

37

paid for appropriate investments placed in an already tax qualified retirement plan. The damages suffered by class members include but are not limited to the following.

100.    The initial costs and carrying costs of the already tax-deferred retirement arrangements were materially lower than the initial costs and carrying costs for the purchase of variable annuities.

101.    Sales commissions paid to those who sell deferred annuities are two to three times higher than the commissions paid on pure investment products, such as mutual funds or individual securities -- thus motivating defendants' to target the qualified retirement plan market for selling defendants' deferred annuity products.

102.    The mortality insurance features were optional, extra cost items not necessary for qualified plan retirement investors to achieve a tax-favored basis for their investment.

103.    Indeed, the mortality and expense charge itself could be approximately 1.40%, or more, annually, which could easily exceed the cost to purchase individual stocks or mutual funds.

104.    The insurance features of their deferred annuities provided no benefit or economic value except in the highly remote circumstances of a severe and sudden market collapse of enormous proportions. Moreover, the benefits of annuitization can be obtained by any person at any time as an immediate annuity, and the lock-in of a minimum annuitization rate offered by a deferred annuity at the inception of the contract can have value only if human life expectancy dramatically increased during the annuity's investment phase, the likelihood of which is remote.

105.    When present, the death benefits could be purchased far more

economically through a normal term life insurance policy. Moreover, the death benefit insurance feature is rarely invoked, because few of the contracts surrendered due to death during their investment phase involve losses that result in payment of any meaningful death benefit (i.e., investment losses depleting the account value to less than the principal amount invested).

106.    Deferred annuities also have back-end loads, or "surrender fees," which are assessed in the event that the contract owner elects to withdraw invested funds prior to the expiration of a contractually specified period. The fees are calculated as a percentage of the withdrawn funds and typically amount to the 6 to 9 percent if the "surrender" occurs in the first year and on a declining scale thereafter for 7 to 10 years. With many contracts, the surrender fee period begins anew for each additional investment of principal after the initial investment. The surrender fees are an inherently unreasonable and excessive annuity fee. In some instances, the surrender fees are called a "contingent deferred sales charge," in which case the charge is calculated as a percentage of the funds invested.

107.    With respect to the fixed-rate account option in a variable annuity, the exact amount of the insurer's fee for that annuity, is generally the spread between the return on general account investments (the return on the consumers invested funds) and the interest rate credited to contract owners. These fees are usually substantial, often 2 to 3 percent of the total account value annually.

108.    With a variable annuity, the annuity fees are typically in the form of annual asset-based percentage charges assessed against the contract owner's account value. These fees are in addition to the asset-based investment management fees assessed by the managers of the investments. The two major asset-based annuity fees are the daily "mortality and expense-risk" (M&E) charge, which averages 1.25 percent annually according to industry surveys, and

39

the daily "administration" charge, an additional 0.15 percent annually.

109.    In addition, a policy maintenance charge of $25 to $40 is assessed annually against annuity accounts.

110.    Purchasing a tax-deferred variable annuity for a tax-deferred IRA also requires the investor to incur, under federal law, forced withdrawals from the IRA beginning at age 70 1/2. Thus, for example, if the surrender fee period were eight years, if someone 63 years old or older purchased a tax-deferred variable annuity for a tax-deferred IRA, they would have to pay to defendants a surrender fee on the amount withdrawn pursuant to the mandatory forced withdrawal, and then they also would pay taxes on the amount withdrawn from the IRA. Upon information and belief, they would have to pay taxes on the amount relinquished to defendants as a surrender fee, even though they did not receive it, because it was part of the IRA-related forced withdrawal.

111.    The annuity fees collected by defendants are so high in part because of the high commission rates defendants pay salespersons for the selling of the deferred annuities. If an annuity purchaser decides to terminate his or her investment within the first six or eight years -- i.e., before defendants have had a chance to collect enough in annual annuity fees to cover the sales commission paid to the agent -- the additional surrender fee provides defendants with funds to cover the full amount of commissions. As a result, plaintiff and the class members are trapped: by the time they realize they are paying exorbitant annual asset-based annuity fees out of their retirement accounts for unwanted "insurance" features which are in fact hidden sales charges, the only way they can extract themselves from the arrangement is to pay a further large asset-based surrender fee, which is used to finance the compensation of the agent that recommended the inappropriate deferred annuity investment in the first place.

112.    The compound effect of these unreasonable and excessive annuity fees, commissions and charges, paid by class members for defendants' tax-deferred variable annuities, over the course of a few decades -- not counting any surrender fees -- can consume as much as one-third of a retirement investor's account value compared to a regular investment.

113.    At the time this lawsuit was commenced, each of the lead plaintiffs' respective variable annuities were worth substantially less than at their time of purchase.

114.    As a matter of routine policy, defendants deducted charges such as the annual fees from Ms. O'Brien's accounts. Defendants made these deductions by selling shares from their accounts. Thus, the value of their accounts declined as a direct result of these charges.

115.    Upon information and belief, the same direct deductions were made from the Hendrickson's accounts.

116.    Part of the decrease in value in the variable annuity accounts of each of the lead plaintiffs was caused by the fees which defendants charged to these variable annuity accounts and part of the decrease was caused by the decrease in the market value of the variable annuity portfolios.

117.    Lead Plaintiffs Jay Hendrickson and Rose Hendrickson each had their accounts similarly decrease in value. Each of them made a forced withdrawal from their IRA of part of their variable annuity because they were over 70 1/2 years of age. In the Spring of 2001, each of them complained about their variable annuity purchase to the broker-dealer which sold them the variable annuity. Upon information and belief, the broker-dealer then had each of them reimbursed for part but not all of their loss. They were not reimbursed for their forced withdrawals, nor for the taxes paid on the forced withdrawals.

118.    This action was brought within the respective statutes of limitations; that

is, within either three years or five years after the cause of action accrued upon purchase of the variable annuity, and within either one year or two years after the discovery of the material misstatements and material omissions.

119.    Mr. and Mrs. Hendrickson did not learn of the material misrepresentations and omissions until possibly in or about May, 2001 when they complained to WMA Securities, Inc. about certain other aspects of the variable annuity.

120.    After October 2000, Ms. O'Brien continued to make monthly purchases of the variable annuity in her Roth IRA from November 2000 through February 2001, inclusive, purchasing $166.00 for each month except for an $124.00 for the month of February 2001. Thereafter, she made an additional purchase of $1,700 for this account on April 11, 2002. Ms. O'Brien did not learn of the material misrepresentations and omissions until, at the earliest, approximately in or about December, 2002 when Ms. Diane C. Donovan told her that she (Ms. Donovan) was about to or had just filed this lawsuit.

121.    No events occurred prior to these respective dates which put each of the respective lead plaintiffs on notice of his or her claims.

## NO SAFE HARBOR

122.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Complaint. First, none of the allegedly false statements are forward-looking statements. Further, none of the specific statements pleaded herein were identified as "forward-looking statements" when made. To the extent there were any forward-looking statements upon which plaintiff bases her claims, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly

42

forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of defendants who knew that those statements were false when made.

**FIRST CLAIM FOR RELIEF**
**Against All Defendants for Violations of**
**Section 10(b) of the Exchange Act and Rule 10b-5**

123.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

124.    With respect to this claim, the defendants are American Skandia as issuer of the variable annuities at issue here; ASM as underwriter and distributor of the variable annuities at issue here; ABC Corp., Inc. 1 through ABC Corp. Inc. 99, and LMN Corp., Inc. 1 through LMN Corp. Inc. 99 (both as defined above).

125.    During the Class Period, Defendants American Skandia, ASM, ABC Corp., Inc. 1 through ABC Corp. Inc. 99, and LMN Corp., Inc. 1 through LMN Corp. Inc. 99, and each of them, with scienter, employed devices, schemes, and artifices to defraud, made untrue statements of material fact, omitted to disclose material facts, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the variable annuities in violation of section (b) of the Exchange Act and Rule 10b-5.

126.    These devices, schemes and artifices, misstatements and omissions, and acts practices and course of business were intended to and did among other things: (i) deceive the investing public, including plaintiff and other class members, as alleged herein; (ii) cause

43

plaintiff and other members of the Class to purchase variable annuities in the belief that such annuities were proper vehicles for investment in already-tax deferred retirement accounts; and (iii) thereby obtain fees, charges and other monetary benefits for defendants that would have been otherwise unavailable to them.

127.    The uniform written materials, including but not limited to the registration statements, prospectuses, statements of additional information, disclosures, sales presentation materials and contracts, were inaccurate and misleading, contained untrue statements of material fact and omitted to state other material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, as described above.

128.    The above named defendants were responsible for the contents and dissemination of the written, uniform materials (given to prospective purchasers) including but not limited to the prospectuses, SOAIs and disclosures.

129.    Defendants' omissions and misrepresentations, all in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) concerned, among other things, their assertion that: tax-deferred variable annuities were appropriate vehicles for investment in already tax-deferred retirement accounts, despite Defendants' knowledge that as a general matter exactly the opposite was true. Defendants' material misrepresentations and/or omissions were made knowingly or recklessly, for the purpose and effect of obtaining lucrative charges, fees, and other benefits relating to the sale of these annuities.

130.    Defendants clearly had actual knowledge of, or acted with severe reckless disregard with respect to, the misrepresentations and omissions of material fact set forth herein. Such defendants' material misrepresentations or omissions were done knowingly and for the purpose and effect of having plaintiff and other members of the Class purchase the more

expensive but inappropriate variable annuities instead of appropriate but less expensive alternative investment products.

131.    As the result of engaging in the routine conduct of their business and/or through common sense, each defendant knew -- indeed, had to know -- (or, at the least, acted with severe reckless disregard with respect to) the following.

132.    Each defendant knew that there was no additional tax benefit from purchasing a tax-deferred variable annuity for an already tax-deferred retirement account.

133.    Each defendant knew that the tax-deferred variable annuities sold by defendants are generally not appropriate investments, and are almost always inappropriate investments, for placement in tax-deferred retirement plans, because defendants knew that earnings on any investment placed in such plans are already tax-deferred.

134.    Each defendant knew (even before 1994 when the NASD issued NASD Conduct Rule IM-2210-2 entitled "Communications with the Public About Variable Life Insurance and Variable Annuities) that it did not have reasonable grounds to believe that a tax-deferred variable annuity placed in an already tax-deferred retirement account generally could be an appropriate investment, under NASD rules or otherwise.

135.    The NASD began issuing the Conduct Rules and Notices to Members (including those cited, quoted and discussed hereinabove) concerning variable annuities because it had become aware that there was generalized and ever-increasing widespread misconduct by issuers, underwriters and sellers of variable annuities.

136.    This misconduct included the sale of tax-deferred variable annuities for already tax-deferred retirement accounts without (among other things) notifying prospective purchasers that purchasing a variable annuity as an investment vehicle for an already tax-

qualified retirement plan (such as an IRA) does not provide any additional tax advantage to those available through the already tax-qualified retirement plan.

137.    The NASD did not change its position on the sale of tax-deferred variable annuities for already tax-deferred retirement accounts (that is, even before it began issuing these Rules and Notices, the NASD believed that a material issue which should be disclosed to potential purchasers prior to their purchase was that purchasing a variable annuity as an investment vehicle for an already tax-qualified retirement plan (such as an IRA) did not provide any additional tax advantage to those available through the already tax-qualified retirement plan.

138.    Thus, for example, the 1996, NASD Notice to Members 96-86 was entitled "NASD Regulation Reminds Members and Associated Persons that Sales of Variable Contracts Are Subject to NASD Suitability Requirements" (emphasis added), meaning that the Notice did not change the law or signal a change in the NASD's view of the law, but that the Notice was intended to remind members of their legal obligations which existed prior to 1996.

139.    Likewise, the May 1999, NASD Notice to Members 99-35 was entitled "The NASD Reminds Members of Their Responsibilities Regarding the Sales of Variable Annuities" (emphasis added), similarly meaning that the Notice did not change the law or signal a change in the NASD's view of the law, but that the Notice was intended to remind members of their legal obligations which existed prior to May, 1999.

140.    Each defendant knew or was reckless in not knowing that the NASD required it to "disclose to the customer that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary."

141.   Each defendant knew or was reckless in not knowing that tax benefits (at least as great as those obtained from a variable annuity) were available from an investment in every one of the following types of contributory (not defined benefit) retirement plans or arrangements qualified for favorable income tax treatment pursuant to Internal Revenue Code sections 401(a), 401(k), 403(a), 403(b), 408(a), 408(b), 408(k), 408(p), 408A, or 457 (which is the Class definition herein, and includes IRAs and 401ks).

142.   Each defendant knew or was reckless in not knowing that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary.

143.   Each defendant knew or was reckless in not knowing that the compound effect of the unnecessary unreasonable and excessive commissions, fees and charges paid for defendants' tax-deferred variable annuities can, over the course of a few decades -- not counting any surrender fees -- consume as much as one-third of a retirement investor's account.

144.   Each defendant knew or was reckless in not knowing that the purchase of a deferred annuity in an already tax-deferred retirement account merely increases the costs, fees and commissions paid by the investor without any additional economic benefit to the investor.

145.   Each defendant knew or was reckless in not knowing that commission charges on the purchase of variable annuities generally were at least two to three times higher, and in many cases would be between 20 and 100 times higher, than the commission charge on the purchase for an IRA account of equity securities of the same value.

146.   Each defendant knew or was reckless in not knowing that the purchase of a tax-deferred annuity in an already tax-deferred retirement account materially increases the total amount paid by the investor while providing only the same or lesser tax benefit to the investor.

47

147. Each defendant knew or was reckless in not knowing that the purchase of a tax-deferred variable annuity in an already tax-deferred retirement account caused the American Skandia Defendants to make substantial additional revenues above the revenues they would have made if individual securities or mutual funds had been bought in the same tax-deferred retirement account.

148. Variable annuities are subject to both federal and state regulation including regulation under the federal securities laws.

149. Each defendant knew or was reckless in not knowing that it must obey the applicable laws, rules, and regulations under the federal securities laws, of the United States, including the rules and regulations of the SEC, NASD, and other self-regulatory organizations.

150. Each defendant knew or was reckless in not knowing that the marketing and sale of variable annuities was subject to NASD requirements.

151. ASM was a member of the NASD.

152. Upon information and belief, other American Skandia-affiliated entities, including certain unknown "John Doe" defendant(s) generally identified herein, are broker-dealers and members of the NASD.

153. ASM also has compliance, operational, and other manuals.

154. The respective manuals state that the firm and its employees are subject to and must obey all applicable laws, rules and regulations, including those of the NASD.

155. The compliance, operational, and other manuals of a registered broker-dealer routinely require all employees to read the manual and to follow the rules contained therein.

156. The NASD, as a matter of routine procedure, disseminates Notices to

48

Members to its members and relevant entities.

157.    It is the responsibility of NASD member broker-dealers to obtain, review NASD, and comply with, Notices to Members.

158.    The defendants routinely received NASD Notices to Members, including those identified herein.

159.    In addition to those Rules and Notices discussed above, the NASD Conduct Rules explicitly warn sellers that knowingly making indiscriminate recommendations will subject them to anti-fraud enforcement.

160.    NASD Rule 2120 (Use of Manipulative, Deceptive or Other Fraudulent Devices) provides that:

> No member shall effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance.

161.    Defendants knowingly or with severe reckless disregard did not issue objective and materially accurate prospectuses and other documents (and thus the prospectuses and other documents which the defendants issued did not reflect their true opinions and beliefs).

162.    In so doing, the defendants knowingly or with severe reckless disregard violated numerous, specific industry regulations as well as general, federal securities law.

163.    Throughout the Class Period, these defendants' material misrepresentations and omissions deceived plaintiff and the members of the Class with respect to whether a tax-deferred variable annuity was an appropriate investment for an already tax-deferred retirement account. In ignorance of the truth, and relying directly or indirectly on the false and misleading statements made by Defendants, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants (and not disclosed by Defendants in the prospectuses, statements of additional information, contracts and written

49

disclosures used by defendants during the Class Period), plaintiff and the other members of the Class acquired tax-deferred variable annuities that they would not have otherwise purchased, and were damaged thereby.

164.   Moreover, in support of their unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the investing public, in connection with the purchase of the variable annuities.  The fraudulent devices, schemes and artifices and deceptive acts, practices and courses of business of defendants American Skandia, ASM, ABC Corp., Inc. 1 through ABC Corp. Inc. 99, and  LMN Corp., Inc. 1 through LMN Corp. Inc. 99, and each of them, included, *inter alia*, the following: (i) repeatedly and consistently issuing prospectuses, statements of additional information, disclosures, sales presentation information, and other materials, relating to tax-deferred variable annuity products, all designed to mislead investors into believing that tax-deferred variable annuities were appropriate vehicles for placement into qualified retirement plans; (ii) acting in concert, or separately, with the combined effect of, in fact, leading investors to believe that each of these numerous variable annuity products had the benefits suggested by defendants; and (iii) accepting money in the form of fees, charges and other payments from investors who would not have purchased annuities had they known the true impropriety of including such annuities within qualified retirement programs.

165.   Defendants acted knowingly, purposely, and with intent to defraud investors when they issued false and misleading statements regarding the tax-deferred variable annuities as part of a scheme to obtain variable annuity customers for Skandia entities.

50

166.   Plaintiff and the other members of the Class were ignorant of Defendants' fraudulent scheme. Had plaintiff and the other members of the Class known of Defendants' unlawful scheme, and had plaintiff known the truth, they would not have purchased or otherwise acquired the variable annuities at issue.

167.   In connection with their misrepresentations, unlawful plan, scheme and course of conduct alleged herein Defendants used the means or instrumentalities of interstate commerce and the mails.

168.   By virtue of the foregoing, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

169.   As a direct and proximate result of the wrongful conduct of the defendants, plaintiff and the other members of the Class suffered damages in connection with their purchases of the variable annuities during the Class Period.

## SECOND CLAIM FOR RELIEF
### for Violations of Section 20(a) of The Exchange Act

170.   Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

171.   The defendants on this Section 20(a) claim are ASIHC and American Skandia.

172.   ASIHC is a controlling person pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), because ASIHC: (a) wholly owns and is the parent company of American Skandia, ASM, and the ABC Corp. and LMN Corp. defendants, who are those defendants primarily liable under Section 10(b) in this litigation and (b) had the power to influence and control, directly or indirectly, the decision-making and conduct of those subsidiaries primarily liable, including having and exercising the power and influence to cause

51

the defendants who are primarily liable to engage in the unlawful conduct complained of herein

(the subsidiaries' dissemination of the false and misleading offering documents and their

engaging in the events that constituted the unlawful plan, scheme and course of conduct at issue),

and having the power and influence to cause the defendants who are primarily liable to refrain

from the conduct complained of herein.

173.    ASIHC, through its position of ownership, control, and authority as the

parent company of its subsidiaries which are primarily liable, had the power to, and did, select

the Board of Directors of those subsidiaries and appoint their senior management; and influence

and control, directly or indirectly, the decision-making and conduct of those subsidiaries,

including having and exercising the power and influence to cause the defendants who are

primarily liable to engage in the unlawful conduct complained of herein (the subsidiaries'

dissemination of the false and misleading offering documents and their engaging in the events

that constituted the unlawful plan, scheme and course of conduct at issue), and having the power

and influence to cause the defendants who are primarily liable to refrain from the conduct

complained of herein.

174.    American Skandia also is a controlling person pursuant to Section 20(a) of

the Exchange Act, 15 U.S.C. § 78t(a), because as both ASIHC's principal operating subsidiary

and as the issuer of the variable annuities it had the power to influence and control and did

influence and control, directly or indirectly, the decision-making and conduct of ASM, and the

ABC Corp. and LMN Corp. defendants, including having and exercising the power and influence

to cause the defendants who are primarily liable to engage in the unlawful conduct complained

of herein (its affiliates' dissemination of the false and misleading offering documents and their

engaging in the events that constituted the unlawful plan, scheme and course of conduct at issue),

and having the power and influence to cause the defendants who are primarily liable to refrain from the conduct complained of herein.

175.    Moreover, upon information and belief, American Skandia (as ASIHC's principal operating subsidiary and as the issuer of the variable annuities) had direct and supervisory involvement in the operations of ASM, ABC Corp., Inc. 1 through ABC Corp. Inc. 99, and LMN Corp., Inc. 1 through LMN Corp. Inc. 99, and, therefore, is presumed to have had the power to control or influence, directly or indirectly, the particular transactions giving rise to the securities violations as alleged herein (its affiliates dissemination of the false and misleading offering documents and their engaging in the events that constituted the unlawful plan, scheme and course of conduct at issue), and exercised the same.

176.    As set forth above, American Skandia, ASM, ABC Corp., Inc. 1 through ABC Corp. Inc. 99, and LMN Corp., Inc. 1 through LMN Corp. Inc. 99, each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged herein.

177.    By virtue of their positions as controlling persons of primary violators, the defendants on this claim are also liable pursuant to Section 20(a) of the Exchange Act.

178.    By virtue of the foregoing, American Skandia and ASIHC are each liable for the aforesaid wrongful conduct, and are liable to plaintiff and to the other members of the Class for the substantial damages suffered in connection with their purchases of the variable annuities.

### THIRD CLAIM FOR RELIEF
#### For Violation of § 11 of the Securities Act and
#### for Control Person Liability Under § 15 of the Securities Act

179.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein (except plaintiff does not incorporate those allegations which concern only fraud and scienter).

180.    With respect to this count, plaintiff does not allege that the material omissions and misstatements set forth herein were made intentionally or recklessly by defendants. Rather, the conduct alleged herein was innocent, negligent or grossly negligent.

181.    The defendants in this claim under Section 11 of the Securities Act are American Skandia, ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99.

182.    American Skandia was the issuer of the variable annuities at issue here, which were sold pursuant to the registration statements, prospectuses and SOAIs.

183.    ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 were the underwriters of the variable annuities at issue here, which were sold pursuant to the prospectuses and other written materials.

184.    The defendants on this section 11 claim participated in the preparation of, issued, caused to be issued and/or participated in the issuance of the registration statements, prospectuses and SOAIs, each of which was inaccurate and contained material misstatements; omitted to state a material fact required to be stated therein, or failed to disclose certain material facts necessary to make the statements therein not misleading, as set forth herein.

185.    While the following concerns an affirmative defense which can be raised by only the following defendants, and concerning which they bear the burden of proof, nevertheless, plaintiff alleges that concerning ASM and ABC Corp., Inc. 1 through ABC Corp.,

Inc. 99, none of these defendants made a reasonable investigation and possessed reasonable grounds to believe and did believe that the statements contained in the registration statements, prospectuses and SOAIs were true, without omissions of any material facts and were not misleading.

186.   While the following concerns an affirmative defense which can be raised by only the following defendants, and concerning which they bear the burden of proof, nevertheless, plaintiff alleges that ASM and ABC Corp., Inc. 1 through ABC Corp. assisted in the preparation of the registration statements, prospectuses, and SOAIs, and were required to investigate with due diligence the representations contained therein to confirm that they did not contain material misstatements or omit to state material facts.  ASM and ABC Corp., Inc. 1 through ABC Corp. each did not perform this investigation with due diligence.  (Indeed, ASM and ABC Corp., Inc. 1 through ABC Corp. each had a substantial direct interest in the success of the offering, as detailed above.)

187.   While the following concerns an affirmative defense which can be raised by only the following defendants, and concerning which they bear the burden of proof, nevertheless, plaintiff alleges that the underwriter defendants, ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99, were each negligent (without limitation) as follows.

188.   ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that there was no additional tax benefit from purchasing a tax-deferred variable annuity for an already tax-deferred retirement account.

189.   ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that the deferred annuities sold by defendants are generally not appropriate investments, and are almost always inappropriate investments, for placement in tax-

55

deferred retirement plans, because defendants knew that earnings on any investment placed in such plans are already tax-deferred.

190.   ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that it did not have reasonable grounds to believe that a tax-deferred variable annuity placed in an already tax-deferred retirement account could be an appropriate investment, under the NASD regulations and Notices, or otherwise.

191.   ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that tax benefits (at least as great as those obtained from a variable annuity) were available from an investment in every one of the following types of contributory (not defined benefit) retirement plans or arrangements qualified for favorable income tax treatment pursuant to Internal Revenue Code sections 401(a), 401(k), 403(a), 403(b), 408(a), 408(b), 408(k), 408(p), 408A, or 457 (which is the Class definition herein, and includes IRAs and 401ks).

192.   ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary.

193.   ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that the compound effect of the unnecessary unreasonable and excessive commissions, fees and charges paid for defendants' tax-deferred variable annuities can, over the course of a few decades -- not counting any surrender fees -- consume as much as one-third of a retirement investor's account.

194.   ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that the purchase of a deferred annuity in an already tax-deferred

retirement account merely increases the costs, fees and commissions paid by the investor without any additional economic benefit to the investor.

195.    ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that commission charges on the purchase of variable annuities generally were at least two to three times higher, and in many cases would be between 20 and 100 times higher, than the purchase for an IRA account of equity securities of the same value.

196.    ASM and ABC Corp., Inc. 1 through ABC Corp., Inc. 99 each was negligent in not knowing that the purchase of a deferred annuity in an already tax-deferred retirement account materially increases the total amount paid by the investor while providing only the same or lesser tax benefit to the investor.

197.    During the Class Period, plaintiff and the other members of the Class purchased in the continuous offerings hundreds of millions and possibly billions of dollars of the variable annuities at issue here.

198.    Although not required to be alleged with respect to this claim because it is an affirmative defense to be alleged and proven by defendants, nevertheless, plaintiff alleges that she purchased her variable annuities as a direct and proximate result of, and without knowledge of, the material misrepresentations and omissions in the registration statements, prospectuses and SOAIs.

199.    With respect to the variable annuities sold during the Class Period, defendants charged purchasers (usually by selling shares in the purchaser's account and directly subtracting the amount from the account) at least tens of millions and possibly hundreds of millions or billions of dollars in fees, expenses, and surrender fees including so-called deferred sales charges.

200.    The variable annuities sold during the Class Period lost at least hundreds of millions of dollars, and possible billions of dollars, in value.

201.    By virtue of the foregoing, the defendants on this Section 11 claim violated Section 11 of the Securities Act, and are liable to plaintiff and the other members of the Class.

202.    As a direct and proximate result of these defendants' unlawful conduct as alleged herein, plaintiff and the other members of the Class suffered damages in connection with their purchases of the variable annuities during the Class Period.

203.    The defendants in this claim for control person liability under Section 15 of the Securities Act are ASIHC and American Skandia.

204.    ASIHC and American Skandia each is a controlling person pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o.

205.    ASIHC: (a) wholly owns and is the parent company of American Skandia, ASM, and the ABC Corp. defendants, who are those defendants primarily liable under Section 11 in this litigation and (b) had the power to influence and control, directly or indirectly, the decision-making and conduct of those subsidiaries primarily liable, including having and exercising the power and influence to cause the defendants who are primarily liable to engage in the unlawful conduct complained of herein (the subsidiaries' dissemination of the false and misleading offering documents), and having the power and influence to cause the defendants who are primarily liable to refrain from the conduct complained of herein.

206.    ASIHC, through its position of ownership, control, and authority as the parent company of its subsidiaries which are primarily liable, had the power to, and did, select the Board of Directors of those subsidiaries and appoint their senior management; and influence

and control, directly or indirectly, the decision-making and conduct of those subsidiaries, including having and exercising the power and influence to cause the defendants who are primarily liable to engage in the unlawful conduct complained of herein (the subsidiaries' dissemination of the false and misleading offering documents), and having the power and influence to cause the defendants who are primarily liable to refrain from the conduct complained of herein.

207.    American Skandia, as both ASIHC's principal operating subsidiary and as the issuer of the variable annuities, had the power to influence and control and did influence and control, directly or indirectly, the decision-making and conduct of ASM and the ABC Corp. defendants, who are primarily liable on the section 11 claim, including having and exercising the power and influence to cause these defendants who are primarily liable to engage in the unlawful conduct complained of herein (its affiliates' dissemination of the false and misleading offering documents), and having the power and influence to cause these defendants to refrain from the conduct complained of herein.

208.    Moreover, upon information and belief, American Skandia (as both ASIHC's principal operating subsidiary and as the issuer of the annuities) had direct and supervisory involvement in the operations of ASM and ABC Corp., Inc. 1 through ABC Corp. Inc. 99, and, therefore, is presumed to have had the power to control or influence, directly or indirectly, the particular transactions giving rise to the securities violations as alleged herein (its affiliates dissemination of the false and misleading offering documents), and exercised the same.

209.    As set forth above, American Skandia, ASM, and ABC Corp., Inc. 1 through ABC Corp. Inc. 99, each violated Section 11 of the Securities Act.

210.    Under Section 15 of the Securities Act, ASIHC and American Skandia

59

each is secondarily liable as a control person of the other defendants who are primarily liable under Section 11 of the Securities Act, and are liable to plaintiff and the other members of the Class.

## FOURTH CLAIM FOR RELIEF
### For Violation of § 12(a)(2) of the Securities Act and
### For Control Person Liability Under § 15 of the Securities Act

211.    Plaintiff incorporates each of the foregoing allegations as if fully set forth herein (except plaintiff does not incorporate those allegations which concern only fraud and scienter).

212.    With respect to this count, plaintiff does not allege that the material omissions and misstatements set forth herein were made intentionally or recklessly by defendants. Rather, the conduct alleged herein was innocent, negligent or grossly negligent.

213.    The defendants in this claim under Section 12 of the Securities Act are American Skandia, ASM, ABC Corp., Inc. 1 through ABC Corp., Inc. 99, and LMN Corp., Inc. 1 through LMN Corp., Inc. 99.

214.    Each defendant was a seller, offeror, and/or solicitor of sales of the variable annuities for their financial benefit pursuant to the registration statements, prospectuses, SOAIs, contracts, written disclosures and sales presentation materials, in connection with the offering; or, even if solicited by one of these defendants without financial benefit to itself, then that defendant solicited the purchases for the owner's financial benefit.

215.    Defendants' acts of selling, offering and of solicitation included but were not limited to the preparation of the materially misleading registration statements, prospectuses, SOAIs, and other documents, disseminated to investors.

216.    Defendants sold the variable annuities through other broker-dealers not

owned by the Skandia family.

217.    The registration statements, prospectuses, contracts, disclosures, SOAIs, and other documents, used to sell the variable annuities in connection with the continuous offering, contained material misstatements; omitted to state material facts required to be stated therein, or failed to disclose certain material facts necessary to make the statements therein not misleading, as set forth herein.

218.    While the following concerns an affirmative defense which can be raised by only the section 12 defendants, and concerning which they bear the burden of proof, nevertheless, plaintiff alleges that each of these defendants cannot prove that it:  (a) did not know of such material untruth or omission and (b) in the exercise of reasonable care could not have known of such material untruth or omission.

219.    Plaintiff and the other members of the Class purchased in the continuous offering (which makes all variable annuity shares in and of themselves traceable to the offering) tens of millions (and possibly at least hundreds of millions) of variable annuity shares.

220.    Each plaintiff purchased their variable annuity shares pursuant to the written documents identified herein, and without knowledge of the material misstatements and omissions in those documents.

221.    With respect to the variable annuities sold during the Class Period, defendants charged purchasers (usually by selling shares in the purchaser's account and directly subtracting the amount from the account) at least tens of millions and possibly hundreds of millions or billions of dollars in fees, expenses, and surrender fees including so-called deferred sales charges.

222.    The variable annuity shares sold to Class Members during the Class Period lost at least hundreds of millions of dollars, and possible billions of dollars, in value.

223.    The variable annuity shares sold to each lead plaintiff during the Class Period substantially declined in value.

224.    As a direct and proximate result of defendants' unlawful conduct as alleged herein, plaintiff and the other members of the Class suffered damages in connection with their purchases during the Class Period of variable annuity shares.

225.    By virtue of the foregoing, American Skandia, ASM, ABC Corp., Inc. 1 through ABC Corp., Inc. 99, and LMN Corp., Inc. 1 through LMN Corp., Inc. 99, are each primarily liable under Section 12(a)(2) of the Securities Act, and are each liable to plaintiff and the other members of the Class.

226.    Plaintiff, individually and representatively, hereby elects to rescind and tender those securities that plaintiff and the other members of the Class continue to own, in return for the consideration paid for those securities together with interest thereon. Plaintiff and members of the Class who have sold their variable annuity shares are entitled to rescissory damages.

227.    The defendants in the claim for control person liability under Section 15 are ASIHC and American Skandia.

228.    For the reasons set forth above, ASIHC and American Skandia each is a controlling person pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o.

229.    While the following concerns an affirmative defense which can be raised by only these control person defendants, and concerning which they bear the burden of proof, nevertheless, plaintiff alleges that each of these defendants, as a controlling person, cannot prove

that it: (a) had no knowledge of the existence of the facts by reason of which the liability of the

controlled person is alleged to exist; or (b) had no reasonable grounds to believe in the existence

of the facts by reason of which the liability of the controlled person is alleged to exist.

230.   As set forth above, American Skandia, ASM, ABC Corp., Inc. 1 through

ABC Corp., Inc. 99, and LMN Corp., Inc. 1 through LMN Corp., Inc. 99, each violated section

12 of the Securities Act.

231.   Under Section 15 of the Securities Act, ASIHC and American Skandia

each is secondarily liable as a control person of the other defendants who are primarily liable

under Section 12 of the Securities Act, and are liable to plaintiff and the other members of the

Class.

## FIFTH CLAIM FOR RELIEF
### for Violation of § 80a-33 of the Investment Company Act of 1940
### and for Control Person Liability under the '40 Act

232.   Plaintiff incorporates each of the foregoing allegations as if fully set forth

herein (except plaintiff does not incorporate those allegations which concern only fraud and

scienter).

233.   With respect to this count, plaintiff does not allege that the material

omissions and misstatements set forth herein were made intentionally or recklessly by

defendants. Rather, the conduct alleged herein was innocent, negligent or grossly negligent.

234.   The defendants in this claim for primary liability under the Investment

Company Act of 1940 are American Skandia (the issuer) and ASM (the underwriter) of the

variable annuities.

235.   As set forth above, in the registration statements, prospectuses and SOAIs,

which were used to sell the variable annuities in connection with the continuous offering, each

defendant made misstatements of material fact; omitted to state material facts required to be stated therein, or failed to disclose certain material facts necessary to make the statements therein not misleading, as set forth herein.

236.   By virtue of the foregoing, each defendant on this claim has violated Section 80a-33(b) of the Investment Company Act of 1940, and is liable to plaintiff and the other members of the Class.

237.   As a direct and proximate result of defendants' unlawful conduct as alleged herein, plaintiff and the other members of the Class suffered damages in connection with their purchases of variable annuities during the Class Period, as set forth above.

238.   Concerning this claim for control person liability under the Investment Company Act, the defendants are ASIHC and American Skandia.

239.   ASIHC is a controlling person as defined under the Investment Company Act of 1940.

240.   For the reasons set forth above, ASIHC and American Skandia each is a controlling person pursuant to the Investment Company Act of 1940.

241.   Under the Investment Company Act of 1940, ASIHC and American Skandia each is secondarily liable as a control person of the other defendants who are primarily liable under the Investment Company Act, and are liable to plaintiff and the other members of the Class.

### SIXTH CLAIM FOR RELIEF
### Declaratory and Injunctive Relief, Against All Defendants

242.   Plaintiff incorporates each of the foregoing allegations as if fully set forth herein (except plaintiff does not incorporate those allegations which concern only fraud and scienter).

64

243.     With respect to this count, plaintiff does not allege that the material omissions and misstatements set forth herein were made intentionally or recklessly by defendants. Rather, the conduct alleged herein was innocent, negligent or grossly negligent.

244.     There is a real controversy between the parties which is justiciable in character as alleged in this complaint. On each cause of action stated above, plaintiff and other members of the class will be irreparably injured in the future by defendants' misconduct to the extent that defendants continue to impose surrender fees upon any plaintiff or class member's election to terminate a deferred annuity contract.

245.     Plaintiff, on behalf of herself and the other members of the class, seeks a judgment declaring that defendants must cease charging surrender fees, and enjoining defendants from charging or collecting surrender fees with respect to any qualified annuity contract.

246.     Plaintiff, for herself and on behalf of the class, also seeks injunctive relief enjoining defendants from the solicitation or sale of qualified annuities, and the assessment or collection of fees on such annuities, as defined herein, based upon the conduct described herein.

247.     Plaintiff and other members of the class do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this complaint, and will suffer irreparable injury as a result of defendants' misconduct unless injunctive and declaratory relief is granted.

248.     By reason of the foregoing, plaintiff and other members of the class are entitled to declaratory and injunctive relief as set forth above.

### SEVENTH CLAIM FOR RELIEF
### Reformation, Against All Defendants

249.     Plaintiff repeat and reallege the allegations set forth above as if fully set forth herein (except plaintiff does not incorporate those allegations concerning fraud and

scienter).

250.     With respect to this count, plaintiff does not allege that the material omissions and misstatements set forth herein were made intentionally or recklessly by defendants. Rather, the conduct alleged herein was innocent, negligent or grossly negligent.

251.     As alleged herein, defendants uniformly represented to plaintiff and other members of the class or their employers that plaintiff and other members of the class were purchasing or receiving investment products appropriate for placement into plaintiff's and class members' qualified retirement plans.

252.     The deferred annuities provided by defendants contained characteristics and values defendants did not adequately disclose to plaintiff and other members of the class and which were inconsistent with the parties' agreement, as alleged above. Plaintiff's and class members' deferred annuity contracts have now been partially performed.

253.     As alleged herein, the contracts were procured from plaintiff and other members of the class or their employers by defendants as a result of defendants' material misrepresentations and omissions.

254.     As a result of the foregoing, plaintiff and other members of the class are entitled to equitable reformation of the contracts, to provide an appropriate investment product agreed to by the parties.

## REQUESTS FOR RELIEF

WHEREFORE, plaintiff demands judgment individually and on behalf of the Class against defendants jointly and severally as follows:

(a)     An order under the Federal Rules of Civil Procedure certifying that this action may be maintained as a class action on behalf of the Class;

66

(b)     Against defendants, jointly and severally, for damages suffered as a result of defendants' violations of the Securities Act of 1933, the Securities Exchange Act of 1934 and Rules promulgated thereunder, and the Investment Company Act of 1940, and/or awarding rescission under Section 12 of the Securities Act of 1933 against defendants jointly and severally, in an amount to proven at trial;

(c)     An award of prejudgment and postjudgment interest.

(d)     An order providing for declaratory and injunctive relief, including the following:

(1)     An order declaring defendants' conduct to be in violation of law;

(2)     An order declaring that defendants' fees charged or assessed for deferred annuities invested in qualified retirement plans are unreasonable and excessive;

(3)     An order enjoining defendants from charging surrender fees with respect to any qualified annuity contract;

(4)     An order declaring that defendants must remove unreasonable and excessive fees charged to plaintiff and other members of the class and restore their contract values accordingly;

(5)     An order enjoining defendants from soliciting sales of or selling deferred annuities for placement in qualified retirement plans;

(6)     An order reforming plaintiff and other members of the class' contracts with defendants in accordance with the parties' agreement as described above;

(7)     An order awarding such other and further relief as this Court may deem just and proper including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the defendants' assets to assure that plaintiff

and the other members of the Class have an effective remedy; and

> (8)     Other equitable relief that the Court may deem proper.

> (e)     An award of attorneys' fees and the costs and expenses of this litigation,

including experts' fees; and

> (f)     Any other or further relief that this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable before a jury.

DATED:  August 14, 2003
         New York, New York

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By: _____
Daniel W. Krasner (DK 6381)
Robert B. Weintraub (RW 2897)
270 Madison Avenue
New York, NY 10016
Telephone (212) 545-4600
Attorneys for Lead Plaintiffs and the Class

328932

68



# EXHIBIT / ATTACHMENT

C

**(To be scanned in place of tab)**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

---

JEFFERY L. JOHNSON, on behalf
of himself and all other
similarly situated,
                    Plaintiff,

                                        Index No. 1-01-CV-2617-CAP

        v.

                                        MOTION TO DISMISS
AEGON USA, INC., WMA
SECURITIES, INC., et al.
                    Defendants.

---

MOTION TO DISMISS THE CONSOLIDATED COMPLAINT,
SUBMITTED BY DEFENDANTS AEGON USA, INC., AEGON FINANCIAL
SERVICES GROUP, INC., AFSG SECURITIES CORPORATION, PFL LIFE
INSURANCE COMPANY, AUSA LIFE INSURANCE COMPANY, INC.,
WESTERN RESERVE LIFE ASSURANCE CO. OF OHIO, WRL SERIES
FUND, INC., AND BANKERS UNITED LIFE ASSURANCE COMPANY,
TRANSAMERICA LIFE INSURANCE AND ANNUITY COMPANY

        The above-listed defendants hereby move to dismiss the

Consolidated Complaint in this Action on the following

grounds[1]:

        1.   Counts I and II of the consolidated complaint

should be dismissed for any or all of the following

reasons:

---

[1]  In addition to the reasons for dismissal set forth below,
the defendants submitting this motion adopt the arguments
contained in the "Motion to Dismiss the Consolidated
Complaint of Defendants of WMA Securities, Inc. and World
Money Group, Inc.," and their accompanying memorandum of
law, to the extent the arguments contained therein apply to
the defendants submitting this motion.

a.  All claims of plaintiff Carolyn Gerin in
Counts I and II should be dismissed on the ground that they
are barred by the absolute three-year limitation period set
forth in 15 U.S.C. § 77m.

b.  All claims against defendants WRL Series
Fund, Inc., and Transamerica Life Insurance and Annuity
Company should be dismissed on the ground that those
defendants were added to this action after the statute of
limitations had expired, and the claims against those
defendants do not relate back to the filing of the original
complaint.

c.  All claims of plaintiffs Jeffery Johnson and
Mary Hughes in Counts I and II should be dismissed on the
ground that they are barred by the one-year limitation
provision set forth in 15 U.S.C. § 77m.  This action was
filed more than one year after those plaintiffs discovered,
or, by the exercise of reasonable diligence, should have
discovered, the alleged untrue statements or omissions.

d.  All claims of plaintiffs Jeffery Johnson and
Mary Hughes in Counts I and II should be dismissed for
failure to set forth a "short and plain statement of the
claim showing that the pleader is entitled to relief," as
required by Fed. R. Civ. P. 8(a).  Plaintiffs' causes of
action in Counts I and II (asserted under Sections 11,

12(a)(2) and 15 of the Securities Act of 1933), are based upon alleged misrepresentations and omissions in registration statements and prospectuses, but plaintiffs have failed to plead facts identifying the securities plaintiffs purchased; the registration statements and prospectuses covering the securities they purchased; the particular misrepresentations or omissions in those documents; or the defendants who allegedly issued, sold or solicited the sale of the securities plaintiffs purchased.

e. All claims of plaintiffs Jeffery Johnson and Mary Hughes in Counts I and II should be dismissed because the complaint is grounded in fraud but fails to comply with the requirements of Fed. R. Civ. P. 9(b), which requires that all averments of fraud shall be stated with particularity.

f. All claims of plaintiffs Jeffery Johnson and Mary Hughes in Counts I and II should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted. Plaintiffs have not alleged that defendants misrepresented material facts or omitted facts they had a duty to disclose, and plaintiffs have not alleged damages recoverable under Sections 11, 12(a(2) or 15 of the Securities Act of 1933.

2.  All claims for "controlling person" liability in
Counts I-III should be dismissed because plaintiffs have
not stated a substantive claim for relief and have not
alleged a sufficient factual basis for holding any
defendant liable as a controlling person.

3.  Count III, under Section 80a-33 of the Investment
Company Act of 1940, should be dismissed on the ground that
there is no private right of action under that section.
Count III should also be dismissed pursuant to Fed. R. Civ.
P. 12(b)(6) for failure to state a claim on which relief
can be granted.  Count III is defective for the same
reasons as Counts I and II, including plaintiffs' failure
to identify the particular securities or registration
statements on which they base this claim, failure to assert
an adequate factual basis for holding any defendant liable
under this section, and failure to assert that defendants
misrepresented material facts or omitted material facts
they had a duty to disclose.

4.  Count IV, for declaratory and injunctive relief,
should be dismissed because plaintiffs have not stated a
substantive claim for relief.

5.  Count V, for reformation, should be dismissed
because plaintiffs have not stated a substantive claim for
relief.  Count V should also be dismissed because it seeks

relief not authorized by the securities laws, and because
it is a state law claim preempted by the Securities
Litigation Uniform Standards Act of 1998 (SLUSA).

6.  All claims against AEGON USA, Inc. should be
dismissed, because this Court lacks *in personam*
jurisdiction over AEGON USA, Inc.

7.  The consolidated complaint should be dismissed
with prejudice because plaintiffs have already amended
their complaint and have had ample opportunity to set forth
their claims, and because any further amendment would be
futile.

Respectfully submitted,

Dated: January 28 , 2003

Michael J. Bowers
Georgia Bar No. 071650
Christopher S. Anulewicz
Georgia Bar No. 020914
MEADOWS, ICHTER & BOWERS, P.C.
14 Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, GA 30305
Phone (404) 261-6020
Fax (404) 261-3656

James J. Rohn
Patricia M. Hamill
Deborah J. Krabbendam
CONRAD O'BRIEN GELLMAN & ROHN, P.C.
1515 Market Street
Sixteenth Floor
Philadelphia, PA   19102
Phone (215) 864-9600

Fax (215) 864-9620

Counsel for Defendants AEGON
USA,Inc., AEGON Financial
Services Group, Inc., AFSG
Securities Corp., PFL Life
Insurance Co., AUSA LIFE
Insurance Co., Inc., Western
Reserve Life Assurance Co. of
Ohio, WRL Series Fund, Inc.,
Bankers United Life Assurance
Co. and Transamerica Life
Insurance and Annuity Co.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JEFFERY L. JOHNSON, on behalf
of himself and all others
similarly situated,
                    Plaintiff,

                                        Index No. 1-01-CV-2617-CAP

            v.

                                        MOTION TO DISMISS

AEGON USA, INC., WMA
SECURITIES, INC., et al.
                    Defendants.

MEMORANDUM OF LAW OF DEFENDANTS AEGON USA, INC., AEGON FINANCIAL
    SERVICES GROUP, INC., AFSG SECURITIES CORPORATION, PFL LIFE
  INSURANCE COMPANY, AUSA LIFE INSURANCE COMPANY, INC., WESTERN
    RESERVE LIFE ASSURANCE CO. OF OHIO, WRL SERIES FUND, INC.,
         BANKERS UNITED LIFE ASSURANCE COMPANY, AND
       TRANSAMERICA LIFE INSURANCE AND ANNUITY COMPANY,
    IN SUPPORT OF MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

January 28, 2003                   Michael J. Bowers
                                   Georgia Bar No. 071650
                                   Christopher S. Anulewicz
                                   Georgia Bar No. 020914
                                   MEADOWS, ICHTER & BOWERS, P.C.
                                   14 Piedmont Center, Suite 1100
                                   3535 Piedmont Road
                                   Atlanta, GA 30305
                                   Phone (404) 261-6020
                                   Fax (404) 261-3656

                                   James J. Rohn
                                   Patricia M. Hamill
                                   Deborah J. Krabbendam
                                   CONRAD O'BRIEN GELLMAN & ROHN, P.C.
                                   1515 Market Street
                                   Sixteenth Floor
                                   Philadelphia, PA   19102
                                   Phone (215) 864-9600

Fax (215) 864-9620

Counsel for Defendants AEGON USA,
Inc., AEGON Financial Services
Group, Inc., AFSG Securities
Corp., PFL Life Insurance Co.,
AUSA Life Insurance Co., Inc.,
Western Reserve Life Assurance Co.
of Ohio, WRL Series Fund, Inc.,
Bankers United Life Assurance Co.
and Transamerica Life Insurance
and Annuity Co.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...........................................................iv

I.    INTRODUCTION..............................................................1

      A.    Plaintiffs Have Not Adequately Pled a
            Factual Basis for their Claims.............................2

      B.    Plaintiffs Cannot Show Material
            Misrepresentations or Omissions of Fact in
            The Offering Documents for the Annuities
            They Purchased.............................................5

      C.    Legal Bases for Dismissal of the Complaint.............9

II.   STANDARDS FOR MOTION TO DISMISS............................12

III.  STATEMENT OF FACTS...........................................14

      A.    The Parties...............................................14

      B.    Variable Annuities.......................................17

      C.    The Documents.............................................23

            1.    The Prospectus......................................24

            2.    The Disclosure Statements...........................26

      D.    Plaintiffs' Legal Claims................................28

IV.   LEGAL DISCUSSION

      A.    Plaintiffs' Claims Under Sections
            11, 12(a)(2)and 15 of the 1933 Act Must Be
            Dismissed.................................................29

            1.    Legal Standards.....................................29

                  (a)  Elements of Plaintiffs' 1933 Act
                       Claims.........................................29

                  (b)  Applicability of Rule 9(b)...................32

2.   Whether or Not Rule 9(b) Applies,
     Plaintiffs Have Not Satisfied Basic
     Pleading Requirements.................................................33

     (a)   Plaintiffs Have Not Specified the
           Documents on Which They Purport to
           Base Their Claims..........................................35

     (b)   Plaintiffs Have Not Pled Facts
           to Show That Defendants Could Be
           Persons Liable Within the Meaning
           Of Sections 11 and 12....................................38

           (1)   Plaintiffs Have Not
                 Adequately Pled Their
                 Claims Under Section 11..........................38

           (2)   Plaintiffs Have Not Adequately
                 Pled Their Claim Under
                 Section 12(a)(2) .................................42

     (c)   Plaintiffs Do Not Have Standing To
           Sue Defendants Whose Products They
           Did Not Purchase..........................................43

3.   Plaintiffs' Claim Are Barred By The Statute
     Of Limitations......................................................45

     (a)   Plaintiff Gerin's Claims Are
           Barred By The Three Year Statute of
           Repose....................................................46

     (b)   Plaintiffs Johnson and Hughes' Claims
           Are Barred by the One Year Limitation
           Provision.................................................47

           (1)   Plaintiffs Have Not Adequately
                 Alleged Compliance With the
                 Statute of Limitations...........................47

           (2)   Plaintiffs Were on Inquiry Notice
                 Of Their Claims More than One Year
                 Before this Action Was Filed........49

     (c)   The Claims Against New Defendants
           Do Not Relate Back to the Original

Complaint ................................................................53

4.   Plaintiffs Have Not Alleged
     Misrepresentations or Omissions of
     Material Fact ......................................................57

     (a)   Plaintiffs Do Not State an Actionable
           Misrepresentation Claim ..............................61

     (b)   Plaintiffs Do Not Allege an Actionable
           Omission Claim ...........................................69

           (1)   Opinions, Projections and
                 Pejorative Characterizations
                 Are Not Material Facts ........................70

           (2)   Plaintiffs Have Not Articulated
                 Any Other Basis For a Duty
                 To Disclose ......................................75

5.   Plaintiffs Have Not Alleged Damages
     Recoverable Under Sections 11 and
     12(a)(2) ............................................................79

     (a)   Section 11 Damages .....................................80

     (b)   Section 12(a)(2) .........................................82

6.   Plaintiffs' Section 15 Claim Should Be
     Dismissed on the Same Grounds as Their
     Other 1933 Act Claims ........................................84

B.   Count III Must Be Dismissed for the Same
     Reasons As Counts I and II, and Because the
     Statute on Which It Is Based Does Not Provide
     Right of Action ........................................................86

C.   Count IV, for Declaratory and Injunctive Relief,
     Should Be Dismissed for Failure to State
     A Claim ....................................................................89

D.   Count V, for Reformation, Seeks Relief Not
     Cognizable Under the Federal Securities
     Laws ........................................................................91

V.   CONCLUSION ........................................................................94

## TABLE OF AUTHORITIES

### FEDERAL CASES

In re Adams Golf, Inc. Securities Litigation,
   176 F. Supp. 2d 216 (D. Del. 2001) .............. 30, 74

Basic, Inc. v. Levinson,
   485 U.S. 224 (1988) ................................ 70

Behlen v. Merrill Lynch,
   311 F.3d 1087 (11th Cir. 2002) ................... 92-94

Bresson v. Thomson McKinnon Securities, Inc.,
   641 F. Supp. 338 (S.D.N.Y. 1986) .......... 35, 36, 46-48

Brooks v. Blue Cross and Blue Shield of Florida, Inc.,
   116 F.3d 1364 (11th Cir. 1997) ...................... 36

Broussard v. Meineke Disc. Muffler Shops, Inc.,
   155 F.3d 331 (4th Cir. 1998) ......................... 4

Brown v. Enstar Group, Inc.,
   84 F.3d 393 (11th Cir. 1996) ..................... 81, 85

Bryant v. Avado Brands,
   187 F.3d 1271 (11th Cir. 1999) ..................... 13

Byrne v. Nezhat,
   261 F.3d 1075 (11th Cir. 2001) ..................... 13

Central Bank v. First Interstate Bank,
   511 U.S. 164 (1994) ............................. 39, 87

Christiansen v. Beneficial National Bank,
   972 F. Supp. 681 (S.D. Ga. 1997) ................... 44

Cooperman v. Individual Inc.,
   171 F.3d 43 (1st Cir. 1999) ..................... 77, 84

Correctional Services Corp. v. Malesko,
   534 U.S. 61, 122 S. Ct. 515 (2001) ........... 84, 87-88

Dodds v. CIGNA Securities, Inc.,
   12 F.3d 346 (2d Cir. 1993) ..................... 50, 59

iv

In re Donald J. Trump Casino Securities Litigation,
   7 F.3d 357 (3d Cir. 1993) ................... 32, 60, 73

Dorchester Investors v. Peak International Ltd.,
   134 F. Supp. 2d 569 (S.D.N.Y. 2001) ....... 48, 52, 87-88

Dudek v. Prudential Securities, Inc.,
   295 F.3d 875 (8th Cir. 2002) ..................... 93-94

Ehlert v. Singer,
   245 F.3d 1313 (11th Cir. 2001) ... 30, 31, 39, 42, 68, 84

Fershtman v. Schectman,
   450 F.2d 1357 (2d Cir. 1971) ........................ 91

Franze v. Equitable Assurance,
   296 F.3d 1250 (11th Cir. 2002) ...................... 50

Glassman v. Computervision Corp.,
   90 F.3d 617 (1st Cir. 1996) ............. 36, 60, 64, 78

Griffin v. Dugger,
   823 F.2d 1476 (11th Cir. 1987) ...................... 44

Harris v. Ivax Corp.,
   182 F.3d 799 (11th Cir. 1999) ................... 65, 68

Heliotrope General, Inc. v. Ford Motor Co.,
   189 F.3d 971 (9th Cir. 1999) ....................... 72

Hornor, Townsend & Kent, Inc. v. Hamilton,
   218 F. Supp. 2d 1369 (N.D. Ga. 2002) ............ 63, 66

Issen v. GSC Enterprises, Inc.,
   508 F. Supp. 1278 (N.D. Ill. 1981) .............. 36, 75

Jackson National Life Insurance Co. v. Merrill Lynch & Co.,
   32 F.3d 697 (2d Cir. 1994) .......................... 46

In re Joint Eastern and Southern District Asbestos
   Litigation,
   14 F.3d 726 (2d Cir. 1993) .......................... 90

Joseph v. Wiles,
   223 F.3d 1155 (10th Cir. 2000) ..................... 34

Klein v. General Nutrition Companies, Inc.,
   186 F.3d 338 (3d Cir. 1999) ..................... 73, 95

Kramer v. Time Warner Inc.,
   937 F.2d 767 (2d Cir. 1991) ......................... 73

Krim v. BancTexas Group, Inc.,
   989 F.2d 1435 (5th Cir. 1993) ....................... 73

Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,
   501 U.S. 350 (1991) ................................. 46

Lander v. Hartford Life & Annuity Insurance Co.,
   251 F.3d 101 (2d Cir. 2001) ....................... 92-93

Lewis v. Casey,
   518 U.S. 343, 116 S. Ct. 2174 (1996) ............. 33, 35

Local Acceptance Co. v. John Doe,
   962 F. Supp. 1495 (S.D. Fla. 1997) .................. 45

Malone v. Addison Insurance Marketing, Inc.,
   225 F. Supp. 2d 743 (E.D. Ky. 2002) ............. 17, 18

Mathews v. Kidder, Peabody & Co.,
   260 F.3d 239 (3d Cir. 2001) ...................... 50-51

McMahan & Co. v. Wherehouse Entertainment, Inc.,
   65 F.3d 1044 (2d Cir. 1995) ................... 81-82, 91

O'Brien v. National Property Analysts Partners,
   719 F. Supp. 222 (S.D.N.Y. 1989) ................ 41, 48

Olmstead v. Pruco Life Insurance Co.,
   283 F.3d 429 (2d Cir. 2002) .............. 83, 84, 87-88

Oxford Asset Management, Ltd. v. Jaharis,
   297 F.3d 1182 (11th Cir. 2002)31, 65, 67, 69, 75-77, 94-95

Patenaude v. Equitable Life Assurance Society,
   290 F.3d 1020 (9th Cir. 2002) ....................... 94

Pelletier v. Zweifel,
   921 F.2d 1465 (11th Cir. 1991) ...................... 14

Pharo v. Smith,
   621 F.2d 656, modified on other grounds, 625 F.2d 1226
   (5th Cir. 1980) .................................. 81, 85

Pinter v. Dahl,
    486 U.S. 622 (1988) ................................. 40

Powers v. Graff,
    148 F.3d 1223 (11th Cir. 1998) ................... 54-55

Prado-Steiman v. Bush,
    221 F.3d 1266 (11th Cir. 2000) .............. 34, 35, 44

Preston v. Settle Down Enterprises, Inc.,
    90 F. Supp. 2d 1267 (N.D. Ga. 2000) ................ 56

Railcar, Ltd. v. Southern Illinois Railcar Co.,
    42 F. Supp. 2d 1369 (N.D. Ga. 1999) ................ 86

Rhodes v. Omega Research, Inc.,
    38 F. Supp. 2d 1353 (S.D. Fla. 1999) ............ 37, 79

Riccard v. Prudential Insurance Co.,
    307 F.3d 1277 (11th Cir. 2002) ..................... 66

Romine v. Acxiom Corp.,
    296 F.3d 701 (8th Cir. 2002) ....................... 73

Royal American Managers v. IRC Holding Corp.,
    885 F.2d 1011 (2d Cir. 1989) ................... 79, 83

Rudd v. Suburban Lodges of America, Inc.,
    67 F. Supp. 2d 1366 (N.D. Ga. 1999) ...... 31, 68, 77, 79

In re S1 Corp. Securities Litigation,
    173 F. Supp. 2d 1334 (N.D. Ga. 2001) .......... 68, 70-71

SEC v. Carillo,
    115 F.3d 1540 (11th Cir. 1997) ..................... 85

Salisbury v. Purdue Pharma, L.P.,
    166 F. Supp. 2d 546 (E.D. Ky. 2001) ................ 44

Securities & Exch. Comm'n v. Variable Ann. Life Ins. Co.,
    359 U.S. 65 (1959) ................................. 18

Sikes v. Teleline, Inc.,
    281 F.3d 1350 (11th Cir. 2002) ...................... 4 --

Spottsville v. Barnes,
    135 F. Supp. 2d 1316 (N.D. Ga. 2001), aff'd mem., 2002 WL
    369911 (11th
    Cir. Feb 20, 2002) ................................ 90-91

In re Stac Electronics Securities Litigation,
    89 F.3d 1399 (9th Cir. 1996) ... 41, 55-56, 68, 71-72, 78

Steinberg v. PRT Group, Inc.,
    88 F. Supp. 2d 294 (S.D.N.Y. 2000), 64, 68, 72, 75, 78, 84

Strategic Income Fund v. Spear, Leeds & Kellogg Corp.,
    305 F.3d 1293 (11th Cir. 2002) ................... 14, 41

Suez Equity Investors, L.P. v. Toronto-Dominion Bank,
    250 F.3d 87 (2d Cir. 2001) ....................... 81, 85

Summer v. Land & Leisure, Inc.,
    664 F.2d 965 (5th Cir. 1981) ......................... 46

SunAmerica Corp. v. Sun Life Assurance Co.,
    890 F. Supp. 1559 (N.D. Ga. 1994), remanded on other
    grounds .............................................. 14

TSC Industries, Inc. v. Northway, Inc.,
    426 U.S. 438, 96 S. Ct. 2126 (1976)]] ................ 58

Theoharous v. Fong,
    256 F.3d 1219 (11th Cir. 2001) ................... 50, 85

Thompson v. Smith Barney, Harris Upham & Co.,
    709 F.2d 1413 (11th Cir. 1983) ....................... 66

Tillman v. R.J. Reynolds Tobacco,
    253 F.3d 1302 ........................................ 44

In re VeriFone Securities Litigation,
    11 F.3d 865 (9th Cir. 1993) ............. 32, 58, 60, 78

Wayne v. Jarvis,
    197 F.3d 1098 (11th Cir. 1999) ................... 54-55

Wielgos v. Commonwealth Edison  Co.,
    892 F.2d 509 (7th Cir. 1989) ..................... 58, 72

Wigand v. Flo-Tek, Inc.,
    609 F.2d 1028 (2d Cir. 1980) ..................... 79, 83

Wilkinson v. Paine, Webber, Jackson & Curtis, Inc.,
   585 F. Supp. 23 (N.D. Ga. 1983) ...................... 48

## DOCKETED CASES

Azcuy v. Amoco Oil Co.,
   Civ. A. No. C85-1884A., 1985 WL 5849 (N.D. Ga. Jan. 15,
   1986) ................................................ 90

Castillo v. Nationwide Financial Services, Inc.,
   No. 98CVH10-8393 (C.P. Franklin Cty., Ohio Nov. 5,
   2002)........................... ................. 22, 57

Goldkrantz v. Griffin,
   No. 97 Civ 9075 (DLC), 1999 WL 191540 (S.D.N.Y. Apr. 6,
   1999), aff'd
   mem., 201 F.3d 431 (2d Cir. 1999) ........... 77, 81, 83

Taam Associates Inc. v. Housecall Medical Resources, Inc.,
   No.1: 96CV2214 ........................... 31, 37, 76-77

White v. Heartland High-Yield Municipal Bond Fund,
   No. 00-C-1388, 2002 WL 31769162 (E.D. Wis. Dec. 10, 2002)8

## FEDERAL STATUTES

15 U.S.C. § 77d . .................................... 29

15 U.S.C. § 77e . .................................... 29

15 U.S.C. § 77g .................................. 29, 57

15 U.S.C. § 77j ....................................29, 57

15 U.S.C. § 77k................................29, 36, 80

15 U.S.C. § 77l ............................... 36, 82-83

15 U.S.C. § 77m .................................... 43

15 U.S.C. § 77o .........................................31

15 U.S.C. § 77p ...................................... 92

15 U.S.C. § 77aa.......................................29

15 U.S.C. § 77v ...................................... 85

26 U.S.C. § 402. ....................................... 21

26 U.S.C. § 403... ..................................... 21

26 U.S.C. 408 .............................. 21-22, 27, 52

26 U.S.C. § 72    ....................................... 18

Fed. R. Civ. P. 8 ...................................... 33

Fed. R. Civ. P. 9 ................................... 2, 32

Fed. R. Civ. P. 15 .................................... 54

Fed. R. Civ. P. 21 ................................. 14, 16
15 U.S.C. §
   78u-4 ............................................... 14

15 U.S.C. § 77z-2 ..................................... 68

Rev. Rul. 68-116, 1968-1 C.B. 177 .................... 21

28 U.S.C. § 2201 .................................... 2201

15 U.S.C. § 80a-33(b) .................... 12, 29, 86-88

## FEDERAL REGULATIONS

17 C.F.R. § 239.17b....................................58

17 C.F.R. § 274.11c....................................58

26 C.F.R. §§ 1.408-1-8.................................21

50 Fed. Reg. 26145 (June 25, 1985) (available at 1985 WL
   106936)...............................................63

## LAW REVIEW

David A. Pratt, *Very Serious Business: Sense and Nonsense
   under Section
   403(b) of the Internal Revenue Code of 1986*,
   59 Alb. L. Rev. 1197, 1204 (1996) .................... 20

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JEFFERY L. JOHNSON, on behalf
of himself and all others
similarly situated,
                    Plaintiff,

                                        Index No. 1-01-CV-2617-CAP

            v.

                                        MOTION TO DISMISS
AEGON USA, INC., WMA
SECURITIES, INC., et al.
                    Defendants.

MEMORANDUM OF LAW OF DEFENDANTS AEGON USA, INC., AEGON FINANCIAL
    SERVICES GROUP, INC., AFSG SECURITIES CORPORATION, PFL LIFE
  INSURANCE COMPANY, AUSA LIFE INSURANCE COMPANY, INC., WESTERN
   RESERVE LIFE ASSURANCE CO. OF OHIO, WRL SERIES FUND, INC.,
       BANKERS UNITED LIFE ASSURANCE COMPANY, AND
      TRANSAMERICA LIFE INSURANCE AND ANNUITY COMPANY,
  IN SUPPORT OF MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

I.   INTRODUCTION

     The plaintiffs in this purported class action have filed an

amended, "consolidated" complaint contending that defendants

misled them and other investors into purchasing deferred

variable annuities for tax-sheltered retirement plans.  While

they make broad-ranging accusations against a number of

companies, including insurance companies, underwriters and a

securities broker-dealer, their primary legal claims are

asserted under Sections 11 and 12(a)(2) of the Securities Act of

1933.  Those sections are limited in scope and require

plaintiffs to prove very specific elements, including that they acquired the annuities at issue pursuant to a registration statement or prospectus that contained misrepresentations or omissions of material fact.   Sections 11 and 12 also limit the parties against which suit may be brought.

## A.   Plaintiffs Have Not Adequately Pled a Factual Basis for their Claims

Plaintiffs' claims are governed by Fed. R. Civ. P. 9(b), but even under basic rules of notice pleading their consolidated complaint does not pass muster.   The complaint alleges that each of the plaintiffs purchased one variable annuity product issued by one of the defendants, Western Reserve Life Assurance Co. of Ohio.   Plaintiffs have not, however, identified either the particular annuity products they purchased or the offering documents (registration statements and prospectuses) that covered those products, much less identified specific misrepresentations or omissions in those documents.   Instead, plaintiffs simply "incorporate by reference" more than 50 "SEC filings," covering four years and a number of different annuity products.   They make no attempt to tie any particular documents to their purchases, attach no copies of SEC filings, and provide no detail concerning the documents other than a quote from one

2

prospectus which was issued **after** they bought their annuities.[1]
The "incorporated by reference" documents could number thousands
of pages; the prospectus plaintiffs quote from is itself at
least 60 pages long.

Plaintiffs have also asserted claims against seven
companies - plus 297 "John Doe" defendants – that did not issue
or sell the variable annuities plaintiffs purchased, without
articulating any appropriate basis for doing so.  Plaintiffs'
only apparent reason for including all these companies is that
they are allegedly related in various ways to defendant AEGON
USA.  Essentially, plaintiffs are trying to launch a class
action attacking a whole group of companies and a range of
different products, but without pleading the facts they need to
plead to make out even their own individual causes of action.
The named plaintiffs' individual standing, however, is a
prerequisite to any class action:  named plaintiffs cannot
assert claims based on things that allegedly happened to other
people, or against defendants with whom plaintiffs had no
dealings.[2]

---

[1]   See Cons. Cpt. ¶¶ 91-94.
[2]   See below, Section IV(A)(2).  This motion to dismiss is
directed to the named plaintiffs' claims and does not address
any issues relating to class certification.  While defendants
accept plaintiffs' averments of fact for purposes of this motion
**only**, defendants do not concede that this case could ever be

These deficiencies alone are a sufficient reason to dismiss the complaint.  The Eleventh Circuit has repeatedly condemned "shotgun" pleadings - i.e., pleadings that simply present a mass of facts and then incorporate all the facts into each count by reference.  What plaintiffs have done here is much worse - in addition to repeatedly incorporating all of the rambling allegations in the complaint itself, plaintiffs incorporate thousands of pages of documents which are neither attached to the complaint nor described in any but the most conclusory terms.  Defendants and the court should not have to parse

---

certified as a class action.  As the complaint itself shows, these variable annuities were sold in individual, face to face transactions, through different broker-dealer firms and based on the representations of different registered representatives.  See Cons. Cpt. ¶¶ 68-81.  Many of the issues are inherently individualized, including whether variable annuities are suitable for particular investors.  In addition, plaintiffs now rely on conclusory allegations about uniform documentation and a prospectus they claim is "typical."  Ultimately, however, they will have to show the documents really were uniform - and they will be unable to do so.  Their own list, in ¶ 91, identifies documents for many different products and different years.  See generally, e.g., Sikes v. Teleline, Inc., 281 F.3d 1350, 1364 (11th Cir. 2002) (in ruling on class certification motion, court cannot presume that promotional materials seen by each class member were the same, or that they were all misleading); Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 343-45 (4th Cir. 1998) (when plaintiffs entered into different contracts, claims based on "fictional composite" were not suitable for class action treatment).

4

through all these documents to try to decipher what plaintiffs
might think is relevant.[3]

### B. Plaintiffs Cannot Show Material Misrepresentations or Omissions of Fact in the Offering Documents for the Annuities They Purchased

Even if plaintiffs' claims are pared down to the annuities
they purchased, the offering documents that governed those
annuities, and the defendants involved in plaintiffs'
transactions (all of which defendants have had to determine for
themselves), plaintiffs cannot state a cause of action.

The factual and regulatory backdrop of this case is not in
dispute.  A deferred variable annuity is a product that combines
investment and insurance features.  Variable annuities enjoy
tax-favored status under the Internal Revenue Code.  Many
investors have purchased variable annuities, and many of those
have used the annuities to fund retirement plans which already
provided tax deferral benefits, also known as "qualified"
retirement plans.  See, e.g., Cons. Cpt. ¶¶ 1, 9-11, 87.

Plaintiffs take the facts - that both variable annuities
and qualified retirement plans provide tax deferral benefits -
and leap to a conclusion - that deferred variable annuities are    --
**never appropriate investments** for placement in retirement plans

---

[3]  See below, Section II.

that are already tax sheltered.  Because the only securities law

claims they assert are for alleged misrepresentations and

omissions in offering documents, plaintiffs then have to make

one more leap - they claim defendants should have disclosed in

those documents that variable annuities are inappropriate for

qualified plans.[4]  Plaintiffs' allegations are simply their own

opinions, not factual averments the Court needs to accept for

purposes of ruling on a motion to dismiss.

Moreover, the history of variable annuity regulation shows

that plaintiffs' opinions are wrong as a matter of law.  As

plaintiffs concede in their complaint, variable annuities are

heavily regulated products.  They are securities, registered

with the United States Securities and Exchange Commission (SEC).

They are subject to the federal securities laws and to SEC

regulations prescribing the form and content of registration

statements and prospectuses.  Because of their tax benefits,

annuities are also subject to the tax laws and Internal Revenue

Service (IRS) regulations.[5]

Publicly available statutes and regulations demonstrate

that both the SEC and the IRS recognize annuities as legitimate

---

[4]  See Cons. Cpt. ¶¶ 73, 92, 97.
[5]  See Cons. Cpt. ¶¶ 2, 11.  Variable annuities are also
regulated by state insurance laws (see Securities & Exch. Comm'n
v. Variable Ann. Life Ins. Co., 359 U.S. 65, 67-69 (1959)),
though that is not pertinent to this motion.

funding vehicles for tax-sheltered retirement plans.  For
example, the section of the Internal Revenue Code that provides
for individual retirement accounts also specifically authorizes
the use of **individual retirement annuities** as tax-sheltered
retirement plans.  A disclosure statement attached to the
complaint identified plaintiffs' annuity contracts as individual
retirement annuities under the tax code.  The SEC's regulations
acknowledge that tax-sheltered retirement plans can be funded
with variable annuities; the SEC specifically requires that
prospectuses for variable annuities "[i]dentify the types of
qualified plans for which the variable annuity contracts are
intended to be used."[6]

Given this regulatory context, plaintiffs' contention that
defendants should have disclosed that variable annuities are
**never** appropriate for qualified plans is obviously baseless.
Plaintiffs also allege, however, that the offering documents
should have disclosed that variable annuities do not provide any
additional tax benefits beyond those already provided by tax-
sheltered plans.  Plaintiffs quote from a single prospectus in
support of their claim.  But the language plaintiffs quote
specifically disclosed what they say should have been disclosed,

---

[6]   SEC Form N-4, Item 12, at page 13 (Exh. 1).  See below,
Section III(B).

stating: "'If you are purchasing the Contract through a tax-
favored arrangement, including traditional IRAs and Roth IRAs,
you should consider carefully the costs and benefits of the
Contract (including annuity income benefits) before purchasing
the Contract, since the tax-favored arrangement itself provides
tax-sheltered growth. . . .'" Cons. Cpt. ¶ 94.  In addition, in
the signed disclosure statement plaintiffs attach to their
complaint, purchasers agreed to consult with their own tax or
legal advisor and to make their own determination as to whether
the annuity was appropriate for them.  Cons. Cpt. Exh. 1.

Plaintiffs also claim the offering documents failed to
disclose the effect of the annuities' "unreasonable and
excessive" fees on future investment results and compare them to
fees for other investment products such as mutual funds.  A
review of sample documents, however, shows that the annuity fees
were repeatedly and fully disclosed, and plaintiffs do not claim
otherwise.  The offering documents gave plaintiffs the facts
about variable annuities, their tax features, how they operate,
and how much they cost.  Plaintiffs are essentially claiming
that giving the facts is not enough – defendants must also
provide opinions on the value of the investment to individual
investors and offer a comparative analysis between their

8

products and others available in the market. As set forth in
detail in the legal discussion below, that is not the law.[7]

## C. Legal Bases for Dismissal of the Complaint

Defendants move to dismiss the consolidated complaint on
the following grounds.

First, Counts I and II, asserted under Sections 11 and
12(a)(2) of the Securities Act of 1933 (1933 Act), should be
dismissed because plaintiffs' allegations do not pass muster
under the basic pleading rules of Federal Rule of Civil
Procedure 12(b)(6), much less under Rule 9(b). Plaintiffs'
claims are based on alleged misrepresentations and omissions in
offering documents, yet they have not adequately identified
either the documents on which their claims are based or the
alleged defects in those documents. See below, Section
IV(A)(2).

Second, Sections 11 and 12(a)(2) limit the parties who may
be sued. Section 11 allows a plaintiff to sue only the issuer
of the security plaintiff purchased and certain other designated
persons involved with the offering documents. Section 12(a)(2)
allows a plaintiff to sue only the person(s) who sold him the
security or successfully solicited that sale. Plaintiffs have

---

[7] See below, Section IV(A)(4).

9

not alleged facts to show which, if any, of the defendants fall within those limits. In addition, under general principles of standing, plaintiffs cannot sue defendants who allegedly sold annuities only to other people. See below, Section IV(A)(2)(b)-(c).

Third, Counts I and II are barred by the applicable statute of limitations. Securities law claims must be brought within one year of discovery or within three years after the security at issue was offered to the public or sold to plaintiff. The three year provision is an absolute limitation, and it bars the claims of plaintiff Carolyn Gerin, who purchased her annuity in 1996. The allegations of the complaint show that when plaintiffs Jeffery Johnson and Mary Hughes bought their annuities, in June 2000 and October 1999 respectively, they received documents which described their investments and put them on inquiry notice of their claims. Since this action was filed more than a year after their purchases, their claims are barred by the one year limitation. See below, Section IV(A)(3).

Fourth, at the very least, the claims against defendants WRL Series Fund, Inc., and Transamerica Life Insurance and Annuity Company should be dismissed on the ground that those defendants were added after the statute of limitations had expired, and the claims against them do not

relate back to the filing of the original complaint.  See below, Section IV(A)(3)(c).

Fifth, even if plaintiffs' claims are limited to the offering documents for the products they purchased and the defendants who played a role in their transactions, Counts I and II should be dismissed because plaintiffs have not alleged that defendants misrepresented material **facts** or omitted **facts** they had a duty to disclose.  As noted above, plaintiffs' underlying theory is an opinion which they do not support with facts, and which the regulatory context demonstrates is wrong.  The offering materials presented the facts about the variable annuities.  The securities laws do not require that the documents include opinions concerning whether an investment is appropriate for particular investors, much less require an issuer to disparage its products.  See below, Section IV(A)(4).

Sixth, plaintiffs have not asserted damages recoverable under Sections 11 or 12(a)(2).  See below, Section IV(A)(5).

Seventh, plaintiffs' claims for "controlling person" liability under Section 15 of the 1933 Act must be dismissed because plaintiffs have not stated a claim under Sections 11 or 12 and have not alleged a sufficient factual basis for holding any defendant liable as a controlling person.  See below, Section IV(A)(6).

Eighth, Count III must be dismissed because the statute on which it is based, Section 80a-33 of the Investment Company Act of 1940, does not provide a private right of action.  Count III is also insufficient for the same fundamental reasons as Counts I and II, including plaintiffs' failure to allege misstatements or omissions of material **fact**.  See below, Section IV(B).

Ninth, Count IV, for declaratory and injunctive relief, must be dismissed because plaintiffs have not stated a substantive claim for relief.  See below, Section IV(C).

Tenth, Count V, for reformation, must be dismissed because plaintiffs have not stated a substantive claim for relief. Count V must also be dismissed because it seeks relief not authorized by the securities laws and because it is a state law claim preempted by the Securities Litigation Uniform Standards Act of 1998 (SLUSA).  See below, Section IV(D).

Finally, since this action has now been pending for well over a year and plaintiffs have already had ample opportunity to amend their complaint, the consolidated complaint should be dismissed with prejudice.

II.  STANDARDS FOR MOTION TO DISMISS

A court ruling on a motion to dismiss under Rule 12(b)(6) must accept the plaintiffs' factual allegations as true.

12

However, much of plaintiffs' case is built on legal conclusions

and opinions which the Court is free to disregard.

"[C]onclusory allegations, unwarranted deductions of facts or

legal conclusions masquerading as facts will not prevent

dismissal." Oxford Asset Management, Ltd. v. Jaharis, 297 F.3d

1182, 1188 (11th Cir. 2002). The Court may also consider

documents on which plaintiffs rely in their complaint, even if

plaintiffs did not attach those documents, and **any** relevant

documents, including prospectuses, which are legally required

and publicly filed with the SEC. See id. See also Bryant v.

Avado Brands, 187 F.3d 1271, 1280 (11th Cir. 1999) (summarizing

relevant standards for judicial notice in securities cases).

If it is plain that plaintiffs cannot allege facts to

support the claims in the complaint, the complaint should be

dismissed. Oxford, 297 F.3d at 1188 (affirming dismissal with

prejudice of claims under Sections 11, 12(a)(2) and 15). At the

very least, the Court should not tolerate the "shotgun" nature

of plaintiffs' pleadings and its incorporation of multiple

documents by reference. See, e.g., Byrne v. Nezhat, 261 F.3d

1075, 1128-32 (11th Cir. 2001). The Eleventh Circuit has

directed that both the parties and the district court must take

steps early in a case to ensure that the issues are narrowly

defined and only meritorious claims and defenses are asserted.

Id. at 1128-29.[8]  See also Strategic Income Fund v. Spear, Leeds

& Kellogg Corp., 305 F.3d 1293, 1295-97 (11th Cir. 2002);

Pelletier v. Zweifel, 921 F.2d 1465, 1518 (11th Cir. 1991)

(defendants and the court should not be forced to "sift through

the facts presented and decide for themselves which were

material to the particular cause of action asserted, a difficult

and laborious task indeed.")

## III. STATEMENT OF FACTS

### A.  The Parties

According to the consolidated complaint, plaintiffs Jeffery

Johnson, Mary Hughes and Carolyn Gerin each purchased a deferred

variable annuity issued by defendant Western Reserve Life

Assurance Co. of Ohio (Western Reserve).[9]

---

[8]  As the court warned, if the issues are not defined early on,
discovery disputes are inevitable, and the district court will
have to confront at the summary judgment stage "the
time-consuming tasks it avoided earlier - rearranging the
pleadings and discerning whether the plaintiff has stated a
claim, or claims, for relief, and whether the defendant's
affirmative defenses are legally sufficient."  Id. at 1129.
[9]  In the original complaint in this action, Mr. Johnson was the
only plaintiff, and the Court appointed him lead plaintiff by
order dated August 12, 2002.  This procedure is required by the
Private Securities Litigation Reform Act of 1995 (PSLRA), 15
U.S.C. § 78u-4(a)(3), which does not authorize a lead plaintiff
simply to add new plaintiffs after he is appointed.  At the very
least, plaintiffs should have sought a court order under Fed. R.
Civ. P. 21 to add new parties.

Jeffery Johnson is a citizen of Georgia.  The complaint
avers that in June 2000, Mr. Johnson asked Marcy Blochowiak, a
registered account representative for defendant WMA Securities,
Inc., to recommend a good investment for Mr. Johnson's "IRA
rollover account."  Cons. Cpt. ¶ 68.  Ms. Blochowiak allegedly
recommended that Mr. Johnson fund his IRA with a tax-deferred
variable annuity product offered by Western Reserve.  According
to the complaint, Ms. Blochowiak told Mr. Johnson a tax-deferred
variable annuity was an "appropriate and suitable investment"
for an IRA, and gave him documents which stated the same thing.
Id. ¶¶ 70-72.  On June 16, 2000, Mr. Johnson allegedly opened an
IRA account with WMA Securities and purchased a Western Reserve
deferred variable annuity "for his WMAS IRA account," "in the
amount of approximately $48,863.75."  Id. ¶¶ 74-75.

The allegations respecting the newly added plaintiffs, Mary
Hughes and Carolyn Gerin, are much sparser.  Both allege they
are citizens of California.  Id. ¶¶ 20-21.  The complaint states
only that a registered representative, who was initially with a
company called First Associated Securities Group and then with
First Securities USA, recommended to each of them that they
"fund their tax-deferred IRA with a WRL [Western Reserve] tax-
deferred variable annuity."  Id. ¶ 76.  The complaint then
alleges that each purchased a Western Reserve tax-deferred

15

variable annuity for her IRA, Ms. Hughes in October 1999 and Ms.
Gerin in December 1999.  Id. ¶¶ 80-81.  The documents for Ms.
Gerin's variable annuity show, however, that she purchased it in
December 1996, not December 1999.[10]

The consolidated complaint names as defendants WMA
Securities, the registered broker-dealer through which Mr.
Johnson purchased his variable annuity;[11] its alleged parent
company World Money Group, Inc.; Western Reserve, an issuer of
the variable annuities which the named plaintiffs purchased; WRL
Series Fund, Inc., which is alleged to be an issuer of variable
annuity accounts, but which the offering documents show is in
fact the mutual fund that includes the portfolios in which
annuity purchasers can choose to invest their money;[12] and
Western Reserve's parent company AEGON USA.  Cons. Cpt. ¶¶ 22-
23, 25-29, 43-45.[13]  The complaint also names several other
companies which are allegedly related to AEGON USA and allegedly

---

[10] See Exh. 2 (variable annuity contract for Carolyn Hughes,
later Carolyn Gerin).  Ms. Gerin's claims are based on her
purchase of an annuity contract, and the Court is free to
consider her contract in connection with this motion to dismiss.
See above, Section II.

[11] Plaintiffs have not sought to join the broker-dealer firms
through which Ms. Gerin and Ms. Hughes bought their annuities.

[12] See below at 40.

[13] The original complaint, filed October 1, 2001, did not
include claims against World Money Group, Transamerica Life or
WRL Series Fund.  Again, plaintiffs should at least have sought
a court order under Fed. R. Civ. P. 21 to add these new parties.

either marketed, sold, or underwrote variable annuity products, though plaintiffs do not allege facts to show they themselves purchased products from or through any of these defendants.[14]

B. Variable Annuities

The investment products at issue in this case are deferred variable annuities.[15] As stated in the consolidated complaint, variable annuities are securities which have been registered with the SEC and are subject to federal securities laws.  Cons.

---

[14]  Besides Western Reserve and AEGON USA, the defendants plaintiffs label as "insurance company defendants" are AEGON Financial Services Group, Inc., AFSG Securities Corp., PFL Life Insurance Co., AUSA Life Insurance Co., Bankers United Life Assurance Co. and Transamerica Life Insurance and Annuity Co. In addition, plaintiff has named three groups of John Doe corporations ("ABC," "LMN" and "XYZ" Corp.), 297 in all, which allegedly underwrite, distribute or market annuity policies for AEGON USA.  Cons. Cpt. ¶¶ 26-55.

[15]  All variable annuities are not alike, though they tend to share certain basic features.  In this section, defendants use the prospectus relating to the product Mr. Johnson purchased as an example to discuss generally the features of a variable annuity.  The complaint occasionally also refers to "fixed" annuities, which are very different products from variable annuities.  A "fixed" annuity generally is not considered a security and is not subject to the federal securities laws, because the insurer guarantees a rate of return and the purchaser does not bear investment risks.  See Malone v. Addison Insurance Marketing, Inc., 225 F. Supp. 2d 743, 749-51 (E.D. Ky. 2002).  All three plaintiffs allege they purchased deferred variable annuities, not fixed annuities.  See Cons. Cpt. ¶¶ 70, 80, 81.  Plaintiffs do not and cannot allege a factual or legal basis for including fixed annuities in this case.  See also below, Section IV(A)(2) (plaintiffs cannot assert claims based on products they did not buy); page 57 n.34.

Cpt. ¶ 2.  Plaintiffs allege that "under federal law a variable annuity is always sold pursuant to a prospectus."  Id. ¶ 89.[16]

Variable annuities were first introduced around 1952 as a retirement plan vehicle for teachers.[17]  An annuity is a contract between a purchaser and an insurance company.  The purchaser agrees to pay a premium and, in return, the insurance company pays the purchaser a stream of income for a specified period of time.  See Prospectus for WRL Freedom Wealth Creator, May 1, 2000, at 3 (Exh. 3) (hereinafter, May 2000 prospectus).[18]

If an annuity is deferred, it has an accumulation phase during which the purchaser's money is invested, and then a payout period during which the purchaser receives payments. Cons. Cpt. ¶ 9.  If the annuity is variable, the purchaser can

---

[16]  Federal law requires that insurers who sell variable annuity products file a registration statement and provide policyholders with a prospectus describing the features of the policy.  The contents of these documents are prescribed by statute and regulation.  See below at Section IV(A)(1)(a), (A)(4).  The products must be sold by registered broker-dealer firms and the securities registered representatives they supervise.  See SunAmerica Corp. v. Sun Life Assurance Co., 890 F. Supp. 1559, 1566 n.4 (N.D. Ga. 1994) ("[v]ariable annuities are 'securities' and can be sold to the public only by a 'registered representative,' a person licensed by the National Association of Securities Dealers [NASD]"), remanded on other grounds, 77 F.3d 1325 (11th Cir. 1996).

[17]  For background concerning the development and nature of variable annuities, see generally Securities & Exch. Comm'n v. Variable Ann. Life Ins. Co., 359 U.S. 65, 69-71 (1959).

[18]  This prospectus covered the variable annuity Mr. Johnson purchased in June 2000.  It is essentially the same as the May 2001 prospectus plaintiffs quote in paragraph 94.

choose to allocate his contract value among a range of "subaccounts" with different investment objectives and levels of risk. Each subaccount invests money in a particular fund portfolio. The amount the purchaser will eventually receive depends on the investment performance of the subaccounts he chooses. See May 2000 prospectus at cover sheet, 3-4 (Exh. 3). The purchaser may also invest part or all of his money in a "fixed" account which provides a guaranteed interest rate of no less than 3% per year. If the purchaser chooses this option, the insurance company guarantees both the interest and the principal. Id. at 3. The annuity gives the purchaser flexibility to transfer money between the various investment choices, including the fixed account. Id.

The deferred variable annuities at issue in this case also provide two kinds of insurance benefits. Cons. Cpt. ¶ 10. The first is a guaranteed minimum death benefit. Even if the stock market goes down and the purchaser's subaccounts decline in value, the death benefit protects the purchaser's beneficiaries by locking in the highest annuity value as calculated pursuant to four different methods. Beneficiaries are guaranteed to receive at least the amount the purchaser paid the company. See May 2000 prospectus at 6, 39. The second insurance benefit is an annuity payment option that allows the purchaser to receive

19

guaranteed payments for life, thereby protecting against the risk he will run out of money during retirement.  Id. at 14-15. The annuitization rates are guaranteed for the life of the contract.  This means that an investor who purchases an annuity today can, when he retires, choose a lifetime payment option at today's guaranteed rates.  See id. at 14, 23.

Annuities receive preferred tax treatment under the Internal Revenue Code.  Annuity earnings accumulate on a tax-deferred basis, and purchasers do not have to pay taxes on the earnings until funds are distributed under the contract.  Cons. Cpt. ¶ 11; 26 U.S.C. § 72.  Tax deferral is not a feature for which purchasers pay the insurance company; it is provided by law.  Plaintiffs concede that deferred variable annuities may be attractive to people seeking tax-deferred investments for their retirement.  Cons. Cpt. ¶ 12.  Plaintiffs insist, however, that deferred variable annuities are never suitable investments for IRAs and other retirement plans that already receive tax-deferred treatment under the Internal Revenue Code (also known as "qualified retirement plans").  Id. ¶ 13.  Their entire lawsuit depends on this theory.

Plaintiffs' theory is their opinion, not a fact.  Moreover, a review of relevant Internal Revenue Code provisions and regulations shows that plaintiffs are wrong.  Several provisions

of the Internal Revenue Code recognize the use of annuities to fund qualified retirement plans. In fact, the section of the tax code that provides for individual retirement **accounts** also contains a separate provision allowing individuals to purchase individual retirement **annuities** as tax-sheltered retirement plans. See 26 U.S.C. § 408(a) and (b). The IRS's regulations contain detailed provisions which define and prescribe rules to govern individual retirement annuities (and include provisions dealing with variable annuities). See 26 C.F.R. §§ 1.408-1 - 8. The IRS's Publication 590 uses the term IRA to mean individual retirement **arrangements**, stating that a "traditional IRA can be an individual retirement account or annuity." It advises that a taxpayer "can set up an individual retirement annuity by purchasing an annuity contract or an endowment contract from a life insurance company." Publication 590 at 10 (Exh. 4).[19]

---

[19] The tax code also authorizes use of annuities in other kinds of qualified retirement plans. See, e.g., 26 U.S.C. § 403(a) (provides for "qualified annuity plan[s]" purchased by employers for employees); § 403(b) (provides for annuity contracts purchased as retirement plans by certain organizations and public schools). "A variable annuity contract is considered an annuity contract for purposes of section 403(b) . . . provided that it meets all the other requirements of that section." Rev. Rul. 68-116, 1968-1 C.B. 177 (Exh. 5). From 1958, when § 403(b) was added to the tax code, until 1974, § 403(b) plans could **only** be funded by annuity contracts. See David A. Pratt, *Very Serious Business: Sense and Nonsense under Section 403(b) of the Internal Revenue Code of 1986*, 59 ALB. L. REV. 1197, 1204 (1996). See also 26 U.S.C. § 402(c)(1),(2), and (8)(B)

The document plaintiffs attach to their complaint as Exhibit 2, which they allege was routinely given to purchasers (Cons. Cpt. ¶ 91(e)), is a disclosure statement which specifically stated that the contracts at issue qualified as individual retirement annuities under section 408(b) of the Internal Revenue Code. See Cons. Cpt. Exh. 2 ("Disclosure Statement and Application Supplement for Individual Retirement Annuity"). In other words, the products plaintiffs purchased were stand-alone products specifically authorized by the tax code.[20]

---

(authorizing rollover contributions into an "eligible retirement plan," defined to include individual retirement accounts, individual retirement annuities, and annuity plans covered by §§ 403(a) and (b)).

[20] As the above summary shows, the term "IRA" can have three different meanings, with the A standing for arrangement, account or annuity. Plaintiffs use the term "IRA" without defining it, and appear to contend their IRA accounts and their variable annuities were two separate things. See Cons. Cpt. ¶¶ 74-75 (Johnson "opened an IRA account with WMAS" and "purchased from defendants for his WMAS IRA a WRL qualified annuity."); id. ¶¶ 80-81 (similar averments regarding other plaintiffs). The documents on which plaintiffs' claims are based and the statutes and regulations governing individual retirement annuities demonstrate that this view of the transactions is not correct. See Castillo v. Nationwide Financial Services, Inc., No. 98CVH10-8393, slip op. at 5-6 (C.P. Franklin Cty., Ohio Nov. 5, 2002) (granting summary judgment on state law claims based on theories similar to those in this case, in part because the documents showed that the plaintiff - like plaintiffs here - purchased an individual retirement annuity, not an annuity which was then used to fund a tax-deferred retirement account) (Exh. 6).

22

The SEC also recognizes the use of variable annuities to fund qualified plans.  SEC Form N-4, which sets forth the SEC's requirements for registration statements and prospectuses for variable annuities, specifically requires that the prospectus "[i]dentify the types of qualified plans for which the variable annuity contracts are intended to be used."  Form N-4, Item 12, at page 13 (Exh. 1).

C.  The Documents

Plaintiffs' legal claims are based on federal statutes that provide remedies for material misrepresentations and omissions in registration statements and prospectuses.  However, as discussed in the Introduction, plaintiffs make no effort to specify what registration statements or prospectuses covered the annuities they purchased.  Instead, they incorporate by reference a broad range of written materials and make the conclusory allegation that all of these documents "contained the same or similar material misrepresentations (in essentially identical language) and/or omitted to disclose material facts to plaintiffs and the class members."  Id. ¶¶ 91-92.  They present specific language from only one prospectus, and the only documents they attach to their complaint are two disclosure statements given to Mr. Johnson.  See id. ¶ 94 and Exhs. 1-2.

1.   The Prospectus

The one prospectus from which plaintiffs quote is dated May 1, 2001, well after any of the named plaintiffs allegedly made their purchases.  The language plaintiffs quote, however, is essentially the same language that was included in the prospectus given to Mr. Johnson, and plaintiffs characterize it as "typical."  See Cons. Cpt. ¶ 94.[21]  The lengthy block quote in paragraph 94 includes the following information:

- It states that the variable annuity is available both to individuals and to certain retirement plans.

- It states that the annuity is designed for people seeking long-term tax-deferred accumulation of assets, including those who have maximized the use of other retirement savings methods such as 401(k) plans and individual retirement accounts.

- It states:  "If you are purchasing the Contract through a tax-favored arrangement, including traditional IRAs and Roth IRAs, you should consider carefully the costs and benefits of the Contract (including annuity income

_____

[21]  The prospectus for Mr. Johnson's annuity, dated May 1, 2000, is attached as Exhibit 2.  A complete copy of the May 1, 2000 Registration Statement and Prospectus, downloaded from the SEC's web site, is attached as Exhibit 7.  In the document attached to the consolidated complaint as Exhibit 1, the purchaser acknowledges receipt of the prospectus.  Because plaintiffs' claims are based on what they claim is a "typical" prospectus – the May 2001 prospectus which is essentially the same as the one given to Mr. Johnson – defendants will also focus on the language in that prospectus for purposes of this motion to dismiss.  Ultimately, however, defendants do not concede that they used uniform documents or that any of the 50 plus "SEC filings" plaintiffs list can be considered "typical."

24

benefits) before purchasing the Contract, since the tax-favored arrangement itself provides tax-sheltered growth."

- It states that a variable annuity contract purchased under an individual retirement annuity or other specified retirement plan is referred to as a "qualified Contract."

- It states:  "Because variable annuity contracts provide tax deferral whether purchased as a qualified Contract or nonqualified Contract, you should consider whether the features and benefits unique to variable annuities are appropriate for your needs when purchasing a qualified contract."

- It states that a "qualified Contract may be used in connection with" several plans which allow tax deferral, including individual retirement annuities, tax-sheltered annuities and certain deferred compensation plans.

See id. (quoting from Freedom Wealth Creator prospectus, May 1, 2001, at unnumbered first page, 6, 14, 23).[22]

Immediately after the language plaintiffs quote, the prospectus went on to say:

> There are limits on the amount of annual contributions you can make to these plans.  Other restrictions may apply. The terms of the plan may limit your rights under a qualified Contract.  **You should consult your legal counsel or tax advisor if you are considering purchasing a Contract for use with any retirement plan.**  We have provided more detailed information on these plans and the tax consequences associated with them in the SAI.

E.g., May 2000 prospectus at 29 (emphasis added) (Exh. 2).

---

[22] The same language is in the May 2000 prospectus, on the cover page and on pages 7, 16 and 28-29.

Plaintiffs also did not quote the prospectus' extensive and specific disclosures regarding the features of a variable annuity and the associated fees and costs.   The prospectus described the insurance features in the summary section at pages 3 and 6, and in more detail at pages 13-15 and 37-39 (Exh. 2). It disclosed each specific fee in the summary section (pages 4-5) and listed the fees on an "Annuity Contract Fee Table" (pages 9-10).   In the main body of the prospectus, a separate section (pages 23-28) described the fees again in more detail, starting with the warning that "[t]here are charges and expenses associated with your Contract that reduce the return on your investment in the Contract" (page 23) (emphasis added).  See also id. at 27 ("The value of the assets in each subaccount is reduced by the management fees and expenses paid by the portfolios.") (emphasis added).

### 2.    The Disclosure Statements

The "Disclosure for Variable Annuities" document plaintiffs attach to their complaint as Exhibit 1 gave purchasers a one-page summary of the annuity's terms.   Mr. Johnson signed the document plaintiffs use as an exhibit, and initialed a list of contract features and other information.   Plaintiffs claim purchasers were routinely given this document and required to

sign it.  Cons. Cpt. ¶ 91(d).  By signing this document,

purchasers acknowledged that they had received the prospectus,

understood what they were buying, and had determined that the

annuity was appropriate for them.  In particular:

- Purchasers agreed to the fees they would be charged.

- They agreed that withdrawal or surrender charges "may be
  significant and last for several years."

- They understood that their investments could go down in
  value, and that performance "will fluctuate due to market
  conditions and investment results."

- They agreed that Western Reserve "does not give tax or
  legal advice.  I will consult with my own professional tax
  or legal advisor as I see fit."

- They agreed that "Variable deferred annuities are designed
  for long-term investors who seek a choice of investment
  options.  I have reviewed my insurable needs and financial
  objectives with my Representative.  I have determined that
  my Payments are affordable and the Contract is appropriate
  to my needs or objectives."

See Cons. Cpt. Exh. 1.

    Plaintiffs also allege that purchasers received the

document attached to the consolidated complaint as Exhibit 2,

titled "Disclosure Statement and Application Supplement for

Individual Retirement Annuity."  Id. ¶ 91(e).  This document

stated that the annuity contract was an individual retirement

annuity under § 408(b) of the tax code and contained detailed

disclosures concerning individual retirement annuities,
including their tax features.[23]

D. Plaintiffs' Legal Claims

This action was originally filed on October 1, 2001.  Mr.
Johnson was the sole named plaintiff, and he filed his complaint
15 ½ months after he purchased his annuity.  The main claims in
the original complaint were for securities fraud under Section
10(b) of the Securities Exchange Act of 1934 and for alleged
breach of fiduciary duty under state law.  The complaint alleged
defendants had defrauded investors by representing that deferred
variable annuities were appropriate for placement into qualified
plans and by failing to disclose that annuities were never
appropriate investments for qualified plans and provided no
additional tax benefits, that the insurance features were of
little or no value, that annuity fees were high, and that
annuities cost more than mutual funds.  See, e.g., Cpt. ¶¶ 3, 5-
7, 10, 12-13, 73, 92, 96-100, 124-36.

---

[23]  This document is required by IRS regulation.  See 26 C.F.R.
§§ 1.408-6 ("[t]rustees and issuers of individual retirement
accounts and annuities are, under the authority of section
408(i), required to provide disclosure statements.  This section
sets forth these requirements.")  It is not a document required
by the securities laws, and is not a proper basis for a claim
under the securities law statutes on which plaintiffs rely in
this complaint.  See generally below at 37 n. 28.

The consolidated complaint, filed more than a year later on December 10, 2002, adds two new plaintiffs, changes the list of defendants, and changes the causes of action.  Instead of a Section 10(b) securities fraud claim, plaintiffs now assert claims under the Securities Act of 1933 (1933 Act), Sections 11 and 12(a)(2), and the Investment Company Act of 1940, Section 80a-33.  Plaintiffs also drop their fiduciary duty claim.[24]

IV.   LEGAL DISCUSSION

   A.  Plaintiffs' Claims Under Sections 11, 12(a)(2) and 15 of the 1933 Act Must Be Dismissed

      1.  Legal Standards

         a)  Elements of Plaintiffs' 1933 Act Claims

The 1933 Act imposes registration and disclosure obligations in connection with certain offerings of securities.  When a company makes a public offering of securities, it must file a registration statement with the SEC and must issue a prospectus.  See 15 U.S.C. §§ 77d, 77e.  Sections 7 and 10 of the Act set forth the information required in those documents.  See id. §§ 77g, 77j, 77aa.  Section 11 provides a cause of action to

---

[24] Plaintiffs continue to assert claims for declaratory and injunctive relief (Count IV) and for the common law remedy of reformation (Count V).

one who purchases a security pursuant to a registration statement when:  "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . (unless it is proved that at the time of such acquisition [the purchaser] knew of such untruth or omission)."  Id. § 77k(a).[25]  Persons who can be held liable under this section include the issuer, persons who signed the registration statement, the issuer's directors, and every underwriter.  Id.

Section 12(a)(2) allows a purchaser to recover from one who sells a security to him "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission) . . . ."[26]  This section imposes liability only upon "those who transfer title to the security and to those who successfully solicit the purchase."  Ehlert v.

---

[25]  The SEC's regulations require that prospectuses for variable annuities be filed as part of the registration statements.  See SEC Form N-4 (Exh. 1).

[26]  This section was renumbered in 1995, from section 12(2) to 12(a)(2), but there is no substantive difference between 12(2) and 12(a)(2) claims.  In re Adams Golf, Inc. Securities Litigation, 176 F. Supp. 2d 216, 224 (D. Del. 2001)

Singer, 245 F.3d 1313, 1316 (11th Cir. 2001).  Section 15 extends

Section 11 and 12 liability to persons who control entities

liable under those sections.  See 15 U.S.C. § 77o.

   To state a claim under any of these sections, plaintiffs

must plead facts to show that they purchased securities pursuant

to a registration statement or prospectus which:  "1) contained

an untrue statement of a material fact; 2) omitted to state a

material fact required to be stated therein; or 3) omitted to

state a material fact necessary to make the statements therein

not misleading."  Rudd v. Suburban Lodges of America, Inc., 67 F.

Supp. 2d 1366, 1369-70 (N.D. Ga. 1999).  See also Oxford, 297

F.3d at 1188-89 (to state a claim under sections 11, 12 or 15,

plaintiffs "must properly allege a material misrepresentation or

a material omission"); Taam Associates Inc. v. Housecall Medical

Resources, Inc., No.1: 96CV2214 A JEC, 1998 WL 1745361, at *5

(N.D. Ga. Mar. 30, 1998) (Exh. 8).  "Further, in order to

survive a motion to dismiss, the plaintiff's amended complaint

must plead facts establishing that the prospectus contained a

material misrepresentation or omission on the date it was

issued."  Id.; Rudd, 67 F. Supp. 2d at 1370.[27]

---

[27]   Sections 11 and 12 of the 1933 Act are much more limited in
scope than Section 10(b) of the 1934 Act, which was the basis
for the securities fraud claims in the original complaint.
Section 10(b) is a "'catchall' antifraud provision," requiring

b)  Applicability of Rule 9(b)

When a claim under the 1933 Act sounds in fraud, it is also

governed by the requirements of Fed. R. Civ. P. 9(b).  Taam

Associates, 1998 WL 1745361, at *10 (majority view is that "Rule

9(b)'s particularity requirement applies to claims brought under

the 1933 Act if the claim 'sounds in fraud,' or has 'fraud at

its core.'") (citing cases) (Exh. 8).

Plaintiffs' consolidated complaint in this case clearly

sounds in fraud.  They allege defendants "actively marketed"

their annuities for placement in qualified plans by

misrepresenting and omitting material facts.  They allege

defendants targeted unsophisticated investors, and deceived them

---

proof of intent to deceive.  Taam, 1998 WL 1745361, at *4
(quoting Herman & MacLean v. Huddleston, 495 U.S. 375, 103 S.
Ct. 683, 686 (1983)).  In contrast, the 1933 Act focuses on
registration statements and prospectuses.  Sections 11 and 12
provide causes of action only to plaintiffs who "purchased a
security issued pursuant to a registration statement," and the
persons who may be sued are limited to "parties who play a
direct role in a registered offering."  Id. (quoting Herman, 103
S. Ct. at 687).  The different parties subject to suit under
each of the sections will be discussed below in Section IV(A)
(2)(b).  Although Sections 11 and 12, unlike Section 10(b), do
not require proof of scienter, the requirements that plaintiffs
establish falsity, materiality, and, in the case of an omission,
duty to disclose, are the same under all three statutes.  Thus,    --
cases addressing these requirements under Section 10(b) are
equally applicable to Section 11 and 12(a)(2) claims.  See,
e.g., In re VeriFone Securities Litigation, 11 F.3d 865, 869
(9th Cir. 1993); In re Donald J. Trump Casino Securities
Litigation, 7 F.3d 357, 369 n.10 (3d Cir. 1993).

into buying variable annuities that were unsuitable and
unreasonably expensive.  Cons. Cpt. ¶¶ 3, 15-17, 67, 72-73, 87,
92-100.  And they allege a motive - they claim defendants
"target[ed] the qualified retirement plan market" in order to
obtain higher commissions and higher fees.  Id. ¶ 126; see id.
¶¶ 124-36.  According to plaintiffs, "[d]efendants have entered
into a common course of conduct to effectuate these profitable
sales throughout the nation" (id. ¶ 17) and have received
"millions of dollars" from sales "predicated upon the materially
misleading written documents."  (id. ¶ 87).

"'The substance of a plaintiff's allegations, not . . . the
guise in which he portrays them,' controls whether Rule 9(b)
applies."  Taam, 1998 WL 1745361, at *11 (Exh. 8) (citation
omitted).  Here, the substance of plaintiffs' complaint accuses
defendants of knowingly deceiving unsophisticated customers in
order to make sales.  Accordingly, the complaint sounds in fraud
and must comply with Rule 9(b).  See id. at *12-16.

### 2.  Whether or Not Rule 9(b) Applies, Plaintiffs Have Not Satisfied Basic Pleading Requirements

The consolidated complaint does not pass muster under the
most basic pleading requirements of Fed. R. Civ. P. 8(a), which
requires a "short and plain statement of the claim showing that

the pleader is entitled to relief."   Instead, it is a
quintessential "shotgun" pleading, presenting a rambling mass of
facts and legal conclusions with no effort to delineate what
alleged facts are relevant to what claims for relief.

As discussed above, the complaint alleges that each
plaintiff purchased one variable annuity product issued by one
of the defendants, Western Reserve. Cons. Cpt. ¶¶ 75, 80, 81.
Mr. Johnson purchased his annuity in June 2000, and Ms. Hughes
and Ms. Gerin purchased their annuities in October 1999 and
December 1996, respectively.  Plaintiff Johnson purchased his
annuity through defendant WMA Securities, a registered broker-
dealer.  Id. ¶¶ 68-75, 23.  Yet plaintiffs attempt to bring a
broad range of claims against a broad range of defendants with
whom they do not allege any dealings, based on products they did
not buy, offering documents that could not have had anything to
do with the annuities they did buy, and practices which they do
not claim had any effect on them.

The fact that plaintiffs are trying to represent a class
does not give them license to bring suit based on transactions
that did not involve them.  A named plaintiff must have
individual standing to assert **each** of the claims being raised on
behalf of the class.  Prado-Steiman v. Bush, 221 F.3d 1266,
1279-80 (11th Cir. 2000).  See also Franze v. Equitable

Assurance, 296 F.3d 1250, 1254 (11th Cir. 2002). Plaintiffs do
not have standing to assert claims based on practices that
allegedly injured someone else, even if those practices are
similar to conduct that allegedly injured them. Prado-Steiman,
221 F.3d at 1279. See also Lewis v. Casey, 518 U.S. 343, 357,
116 S. Ct. 2174, 2183 (1996) (citations omitted) ("[N]amed
plaintiffs who represent a class must allege and show that they
personally have been injured, not that injury has been suffered
by other, unidentified members of the class to which they belong
and which they purport to represent."). The named plaintiffs'
claims "must stand or fall on their own," and "[e]ach must plead
the specifics of his own fraud or claims." Bresson v. Thomson
McKinnon Securities, Inc., 641 F. Supp. 338, 343, 347 (S.D.N.Y.
1986). Plaintiffs "cannot rest the viability of their fraud
pleadings on vague class allegations." Id. at 347.

### a) Plaintiffs Have Not Specified the Documents on Which They Purport to Base Their Claims

Plaintiffs have made little or no effort to plead the
specifics of their own individual claims. Under the plain
language of sections 11 and 12, plaintiffs' causes of action
require them to show misrepresentations or misleading omissions
in the registration statements or prospectuses **that governed**

securities they purchased.  See 15 U.S.C. §§ 77k, 77l; see also, e.g., Joseph v. Wiles, 223 F.3d 1155, 1159 (10th Cir. 2000) (addressing § 11 claims; "the natural reading of 'any person acquiring such security' is simply that the buyer must have purchased a security issued under the registration statement at issue, rather than some other registration statement").

In paragraph 91, however, plaintiffs incorporate over 50 "SEC filings" dating from 1998 to 2002, and covering a number of different annuity products.  They do not even identify which Western Reserve annuity product they purchased, much less specify which of the listed "SEC filings" applied to their annuities.

When the complaint does not specify "the particular registration statements that underlay the plaintiffs' purchases," section 11 and 12 claims cannot survive a motion to dismiss.  Bresson, 641 F. Supp. at 342.  The Bresson court reached this conclusion under basic pleading rules, without considering whether or not Rule 9(b) applied to these claims. See also Glassman v. Computervision Corp., 90 F.3d 617, 629 (1st Cir. 1996) ("it is plaintiffs' responsibility to plead factual allegations, not hypotheticals, sufficient to reasonably allow the inference" they seek to make); Issen v. GSC Enterprises, Inc., 508 F. Supp. 1278, 1294-95 (N.D. Ill. 1981) (bald

allegations that defendants made wrongful and false statements
in SEC filings are insufficient to state a cause of action even
under notice pleading criteria).

Under Rule 9(b), the inadequacy of the complaint is even
more apparent.  Rule 9(b) requires that allegations of fraud be
stated with particularity and include: "(1) the precise
statements, documents, or misrepresentations made; (2) the time,
place, and person responsible for the statement; (3) the content
and manner in which these statements misled the plaintiffs; and
(4) what the defendants gained by the alleged fraud."  Brooks v.
Blue Cross and Blue Shield of Florida, Inc., 116 F.3d 1364,
1380-81 (11th Cir. 1997).  The consolidated complaint does not
satisfy these requirements and should therefore be dismissed.
See, e.g., Taam, 1998 WL 1745361, at *16 (where plaintiffs fail
"to plead particular facts substantiating their claim," their
complaint does not satisfy Rule 9(b)) (Exh. 8).[28]

---

[28]   Plaintiffs also refer to "contracts, disclosures for variable
annuities, written sales presentation materials and other
written documents" (see, e.g., Cons. Cpt. ¶ 88 and 92), again
without providing specifics about the documents given to them.
Regardless, their claims under the 1933 Act must be based on the
registration statements and prospectuses underlying their
purchases.  Sections 11 and 12 do not give a cause of action for
alleged misrepresentations or omissions in other documents.
See, e.g., Rhodes v. Omega Research, Inc., 38 F. Supp. 2d 1353,
1360 n.8 (S.D. Fla. 1999) ("Section 11 concerns only
registration statements" and other documents or statements "are
generally outside the reach of section 11").

b)  Plaintiffs Have Not Pled Facts to Show That
Defendants Could Be Persons Liable Within the
Meaning of Sections 11 and 12

Plaintiffs' allegations concerning the defendants are also

deficient.  From the face of the complaint, it is plain that

most of the defendants had nothing to do with plaintiffs'

transactions.  Sections 11 and 12 authorize suit against a

limited group of persons, and plaintiffs have not alleged facts

to show which, if any, of the defendants fall within those

limits.  Plaintiffs try to lump together all the so-called

"insurance company defendants" on the sole ground that they are

"operating subsidiaries of AEGON USA" and that AEGON allegedly

refers to them as "operating divisions."  Cons. Cpt. ¶¶ 58, 60.

But the complaint alleges that each of the defendants is a

separately incorporated entity (see id. ¶¶ 26-51), and

plaintiffs' conclusory allegations do not justify ignoring the

corporate distinctions.  In addition, plaintiffs do not have

standing to sue companies which may have been involved in the

sale of annuities plaintiffs did not purchase themselves.

(1)  Plaintiffs Have Not Adequately Pled
Their Claims Under Section 11

Section 11 allows a person who purchased a security issued

under a registration statement containing material

misrepresentations or omissions to sue a limited list of
persons, including "the issuer of the securities, the issuer's
directors or partners, the underwriters of the offering, and
accountants who are named as having prepared or certified the
registration statement." Ehlert, 245 F.3d at 1315.[29]  Count I of
the consolidated complaint asserts a Section 11 claim against
AFSG Securities, Western Reserve, WRL Series Fund, PFL, Bankers
Life, and 99 "John Doe" defendants.  Cons. Cpt. ¶ 138.[30]  The
consolidated complaint makes the conclusory assertions that
these defendants were "the issuers and underwriters of the
variable annuities at issue here" (id. ¶ 139) and that they
"assisted in the preparation" of the offering documents (id. ¶
143).  Plaintiffs do not, however, offer any facts to show what
roles the defendants allegedly played with respect to the
offering documents for the annuities plaintiffs purchased.

Plaintiffs suggest that registration statements are issued
under the name or logo of multiple defendants (Cons. Cpt. ¶ 88).

---

[29]  The list of persons subject to suit under Section 11 (and
Section 12 as well) "does not include aiders and abettors,"
i.e., persons who allegedly provided "substantial assistance" to
a violator.  Central Bank v. First Interstate Bank, 511 U.S.
164, 179, 168 (1994) (holding that there is no aiding and
abetting claim under § 10(b) and noting that Congress "did not
attach private aiding and abetting liability to any of the
express causes of action in the securities Acts.").
[30]  The Section 15 (control person) claims in Counts I and II
will be addressed separately below in Section IV(A)(6).

However, plaintiffs allege no facts to support this and a review
of registration statements publicly available on the SEC's web
site shows they are wrong.  For example, the May 2000
registration statement (which includes the prospectus) that
covers the product Mr. Johnson purchased identifies Western
Reserve as an issuer and AFSG Securities, Inc. as principal
underwriter.  Exh. 7, prospectus title page (page 3 of 115) and
page 41 (page 57 of 115).  The references in the registration
statement to other companies named in the Section 11 claim make
clear that those companies are not within the limited group of
persons liable under Section 11.  For example:

- WRL Series Fund, Inc. is referenced as the mutual fund that
  includes the portfolios to which purchasers of the annuity
  can choose to allocate their money, and as a wholly owned
  subsidiary of Western Reserve.  See, e.g., May 2000
  Registration Statement at prospectus title page (page 3 of
  115) and Part C, Item 26 (page 100 of 115) (Exh. 7).
  Plaintiffs have not raised any issues in this case
  regarding the portfolios.  In particular, they have not
  alleged that shares of the Fund (as opposed to the variable
  annuity itself) are not an appropriate investment for
  qualified retirement plans.

- PFL and Bankers Life are listed in Part C as wholly owned
  subsidiaries of an AEGON USA subsidiary.  E.g., id. (pages
  99-100 of 115).

Plaintiffs' bare allegations are, at the least, not a
sufficient basis for their Section 11 claims against PFL,
Bankers Life or WRL Series Fund.  Plaintiffs who join multiple
defendants in a claim under the securities laws cannot just lump
them all together; they must specify what role each defendant
played in the alleged wrongdoing.  See, e.g., In re Stac
Electronics Securities Litigation, 89 F.3d 1399, 1411 (9th Cir.
1996); O'Brien v. National Property Analysts Partners, 719 F.
Supp. 222, 225-26 (S.D.N.Y. 1989) (dismissing § 10(b) claims).
The Eleventh Circuit recently affirmed dismissal of a federal
securities law complaint in part because "[m]aterial facts that
detail the exact nature of the relationship between the
individual plaintiffs [and the different companies named in the
complaint were] conspicuously absent."  Strategic Income, 305
F.3d at 1296-97.  Here, as in Strategic Income, one cannot tell
from the complaint "what allegedly transpired between and among"
the various parties, and plaintiffs' claims should be dismissed.
See id. at 1296.

41

(2)   Plaintiffs Have Not Adequately Pled
Their Claim Under Section 12(a)(2)

Plaintiffs' allegations in Count II, under Section

12(a)(2), are equally inadequate.  Under Section 12(a)(2), a

person who "offers or sells" a security may be liable "to the

person purchasing such security from him."  15 U.S.C. § 77l(a)

(emphasis added).  This section authorizes claims only against

"those who transfer title to the security and . . . those who

successfully solicit the purchase."  Ehlert, 245 F.3d at 1316

(citing Pinter v. Dahl, 486 U.S. 622, 642-46, 108 S. Ct. 2063,

2075-78 (1988)).  In Pinter, the Supreme Court rejected an

argument that would allow imposition of Section 12 liability on

persons whose participation in a securities transaction was a

"substantial factor" in causing the transaction to occur.

Pinter, 486 U.S. at 643-44.  The Court also made clear that a

plaintiff may seek recourse only from those involved in the

actual sale of securities to him.  In the Court's words, "[t]he

'purchase from' requirement of § 12 focuses on the defendant's

relationship with the plaintiff-purchaser," and Section 12

"imposes liability on only the buyer's immediate seller."  Id.

at 651, 644 n. 21.

Plaintiffs have not even tried to plead facts to show

which, if any, of the defendants could qualify as a seller or

42

solicitor within the limited scope of Section 12. In Count II,
their Section 12 claim, they have tried to name every company
affiliated with AEGON USA that might have sold, underwritten or
been involved in the distribution of any variable annuities
(including 297 John Does). Cons. Cpt. ¶¶ 154, 52-54. They do
not plead that any of those companies either (a) directly sold a
variable annuity to them or (b) directly solicited their
purchase of stock. Instead, they simply make the conclusory
statement that each defendant was "a seller, offeror, and/or
solicitor of sales" of variable annuities. Cons. Cpt. ¶ 155.
That is not adequate to state a claim under Section 12, and the
Section 12 claims should be dismissed for that reason alone.[31]

### c) Plaintiffs Do Not Have Standing to Sue Defendants Whose Products They Did Not Purchase

Even apart from the specific provisions of Sections 11 and
12, the court should dismiss the claims against the defendants
as to which plaintiffs have not alleged facts to show that they

---

[31] The specific defendants named in plaintiffs' Section 12 claim
are WMA Securities, AEGON Financial, AFSG Securities, PFL, AUSA
Life, Western Reserve, WRL Series Fund, Bankers Life and
Transamerica Life. Plaintiffs have not even tried to explain
what role, if any, these companies played in the sale of the
variable annuities they purchased, other than alleging that a
representative of WMA Securities solicited Mr. Johnson's
purchase and that each plaintiff bought an annuity issued by
Western Reserve. Id. ¶¶ 68-75, 80-81.

were involved in plaintiffs' own transactions - i.e., at the

least AEGON Financial, PFL, AUSA Life, WRL Series Fund, Bankers

Life and Transamerica Life.  As set forth above at 34-35, the

named plaintiffs can only assert claims they have individual

standing to assert.  See, e.g., Prado-Steiman, 221 F.3d at 1279-

80.  See also Griffin v. Dugger, 823 F.2d 1476, 1483 (11th Cir.

1987) (named plaintiff "who cannot establish the requisite case

or controversy between himself and the defendants simply cannot

seek relief for anyone--not for himself, and not for any other

member of the class.").  Plaintiffs simply do not have standing

to bring actions against companies that sold variable annuities

only to other people.  See, e.g., Christiansen v. Beneficial

National Bank, 972 F. Supp. 681, 683 (S.D. Ga. 1997) (plaintiffs

do not have standing to bring usury claims against banks from

which they did not obtain loans, or to represent purported class

of people who did obtain loans from the banks); Salisbury v.

Purdue Pharma, L.P., 166 F. Supp. 2d 546, 549-50 (E.D. Ky. 2001)

(absent any allegation that particular defendants sold products

to plaintiffs, the complaint does not state a cause of action

against them; complaint cannot simply lump all defendants

together and attribute all the acts to "defendants" generally).

See also Tillman v. R.J. Reynolds Tobacco, 253 F.3d 1302, 1305

(11th Cir. 2001) (defendants with whom plaintiff did not deal were fraudulently joined and were properly dismissed).[32]

### 3. Plaintiffs' Claims Are Barred By the Statute of Limitations

Under Section 13 of the 1933 Act, lawsuits under Sections 11 and 12(a)(2) must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." In addition, the statute provides that "**[i]n no event**" may Section 11 claims be brought "more than three years after the security was bona fide offered to the public," or Section 12(a)(2) claims "more than three years after the sale." 15 U.S.C. § 77m (emphasis added). Compliance with this section

---

[32] The arguments in subsection 2 (a)-(c) also require the dismissal of the 297 "John Doe" defendants. The only basis plaintiffs give for suing these defendants is their alleged relationship with AEGON USA. Cons. Cpt. ¶¶ 52-54. Plaintiffs have not alleged facts to suggest that the "John Does" had any involvement in issuing or selling the annuities plaintiffs purchased, or in preparing the prospectuses which governed plaintiffs' annuities. Plaintiffs have not even alleged facts to suggest that the "John Does" are real companies. The "John Doe" claims merely "serve as a casting off point for a fishing expedition," and should be dismissed. Local Acceptance Co. v. John Doe, 962 F. Supp. 1495, 1496 (S.D. Fla. 1997) (dismissing claims brought against John Doe defendants; plaintiffs alleged a conspiracy but did "not know the conspirators' identities, only that some of its own employees (unidentified) are in cahoots with third parties (also unidentified) to obtain loan financing through the submission to Plaintiff of fraudulent documents (which are also unidentified).")

"is an essential substantive ingredient of a private cause of action" under Sections 11 and 12.  Bresson, 641 F. Supp. at 343; see also Wilkinson v. Paine, Webber, Jackson & Curtis, Inc., 585 F. Supp. 23, 27 (N.D. Ga. 1983).

As set forth below, plaintiff Gerin's claims are barred by Section 13's three year statute of repose, and plaintiffs Johnson and Hughes' claims are barred by the one year limitation.  At the very least, the claims against the new defendants added in December 2002 are time barred as a matter of law, since they do not relate back to the original complaint.

> a)  Plaintiff Gerin's Claims Are Barred By the
> Three Year Statute of Repose

The three year provision of Section 13 is a statute of repose, and is not subject to tolling.  Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 363 (1991). (three year limitation serves as a cutoff).  Under that provision, any Section 11 claim brought more than three years after a security was offered to the public, and any Section 12(a)(2) claim brought more than three years after the security was sold to the plaintiff, is absolutely barred.  See, e.g., Summer v. Land & Leisure, Inc., 664 F.2d 965, 967-68 (5th Cir. 1981); Jackson National Life Insurance Co. v. Merrill Lynch &

Co., 32 F.3d 697, 703 (2d Cir. 1994).  Plaintiff Gerin's

variable annuity contract shows that she purchased it in

December of 1996.  See Exh. 3.  Since the annuity was obviously

offered to the public before she purchased it, the three year

absolute limitations period expired, at the latest, in December

of 1999.  This lawsuit was plainly untimely as to her claims,

and they should be dismissed with prejudice.

### b) Plaintiffs Johnson and Hughes' Claims Are Barred by the One Year Limitation Provision

#### (1) Plaintiffs Have Not Adequately Alleged Compliance With the Statute of Limitations

Mr. Johnson and Ms. Hughes allege that they purchased their

variable annuities in June 2000 and October 1999, respectively.

Again, the annuities were obviously offered to the public before

plaintiffs purchased them.  See, e.g., May 2000 Registration

Statement (governing Johnson's purchase) (Exh. 7).  Both the

original complaint in this action (filed October 1, 2001) and

the consolidated complaint adding Ms. Hughes as a plaintiff

(December 10, 2002) were filed more than one year after the

offer or sale of their annuities.  Since compliance with Section

13 "is an essential substantive ingredient" of plaintiffs'

Section 11 and 12 claims, Bresson, 641 F. Supp. at 343, they were

required to "affirmatively plead sufficient facts to

demonstrate" that their claims were timely, including:  "(1) the time and circumstances of the discovery of the untrue statement or omission; (2) the reasons why the alleged fraud was not discovered sooner; and (3) plaintiff's diligence in making such discovery."  Id.  See also Dorchester Investors v. Peak International Ltd., 134 F. Supp. 2d 569, 578 (S.D.N.Y. 2001).

Plaintiffs' allegations regarding the statute of limitations are conclusions, not facts.  In Count I, they claim they purchased their annuities without knowing of the omissions and misstatements, and state flatly:  "This action was brought within one year after the discovery of the material misstatements and material omissions and within three years after the variable annuities were offered to the public through the relevant prospectuses."  Cons. Cpt. ¶¶ 148-49.  In Count II, they allege they "did not know, or in the exercise of due diligence could not have known, of the materially misleading statements and omissions contained in these documents."  Id. ¶ 164.  These allegations are not sufficient.  See Wilkinson, 585 F. Supp. at 27; Bresson, 641 F. Supp. at 343 (§§ 11 and 12 claims dismissed when plaintiffs did not allege "when they discovered the fraud, how they diligently sought discovery, and why the discovery was not made earlier").  See also O'Brien, 719 F. Supp. at 231 (dismissing § 10(b) claims; plaintiff must

48

specify when fraud was discovered and facts that led to

discovery, so court can determine if facts were available

earlier).[33]

### (2)   Plaintiffs Were on Inquiry Notice of Their Claims More than One Year Before this Action Was Filed

Even apart from the inadequate pleading, the Johnson and

Hughes claims should be dismissed because the facts alleged in

the complaint show they are untimely.  The complaint says

purchasers were given prospectuses.  Cons. Cpt. ¶¶ 89-91.  The

prospectus language plaintiffs quote (¶ 94) shows that when they

bought their annuities, they received sufficient information to

put them on inquiry notice of the alleged misrepresentations and

omissions.  Since plaintiffs bought their annuities and received

this information more than one year before they filed suit,

their claims are time-barred.

For purposes of the applicable statute of limitations,

"discovery" occurs when a plaintiff has either actual or

"inquiry" notice of a possible violation of his rights.

---

[33]   In the cited cases, plaintiffs were given leave to amend their complaints.  Leave to amend should not be granted in this case because plaintiffs have already had ample opportunity to attempt to state their claims.  See below, Section V.  In addition, as explained in the next Section, the facts as pleaded show their claims are time-barred.

According to the Eleventh Circuit, inquiry notice is "'the term used for knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed. . . . Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself.'" Franze v. Equitable Assurance, 296 F.3d 1250, 1254 (11th Cir. 2002) (quoting Theoharous v. Fong, 256 F.3d 1219, 1228 (11th Cir. 2001)). The standard is an objective one. Id.

In Franze, the court held that the statute of limitations barred a securities law class action filed by plaintiffs who alleged that they were misled into purchasing variable life insurance policies. Plaintiffs purchased their policies more than one year before they filed suit, and received a prospectus and policy documents which disclosed the nature and cost of the policies. According to the court, plaintiffs "could have discovered the alleged misrepresentations simply by reading the documents," and they were therefore on inquiry notice as of the date they received the documents. Id. at 1254-55. See also Theoharous, 256 F.3d at 1228 (public notice of company's bankruptcy filing put plaintiffs on notice that reports of financial health had been inaccurate and triggered statute of limitations for § 10(b) claims, even though plaintiffs did not receive individual notice); Mathews v. Kidder, Peabody & Co.,

260 F.3d 239, 252 (3d Cir. 2001) (for inquiry notice, "investors
are presumed to have read prospectuses, quarterly reports, and
other information relating to their investments"); Dodds v.
CIGNA Securities, Inc., 12 F.3d 346, 350-52 (2d Cir. 1993)
(prospectus which disclosed investment risks placed plaintiff on
inquiry notice of her claim that defendants violated § 10(b) by
recommending an unsuitable investment; "for statute of
limitations purposes, the issue is not whether appellant was
given inadequate information about the advisability of
investments in multiple limited partnerships but whether she had
a duty to inquire further into that matter").

Under the standards set forth in these cases, plaintiffs'
claims are time-barred.  Each of them purchased his or her
variable annuity more than one year before suit was filed.
According to the complaint, "defendants were legally mandated to
always give a prospective purchaser a prospectus prior to
purchase."  Cons. Cpt. ¶ 89.  Plaintiffs attach a disclosure
statement, which they claim purchasers routinely received and
signed.  In that document, purchasers acknowledged they received
the prospectus, acknowledged that Western Reserve did not give
tax or legal advice, and agreed to consult their own tax or
legal advisor as they saw fit.  Cons. Cpt. Exh. 1.

Plaintiffs allege that the so-called "typical" prospectus included a provision stating that a tax-favored arrangement such as a traditional IRA or Roth IRA "'in itself provides tax sheltered growth.'"  Cons. Cpt. ¶ 94 (quoting May 2001 prospectus).  In addition, plaintiffs concede that qualified retirement plans, including individual retirement accounts, are tax deferred because of provisions of the Internal Revenue Code. Id. ¶ 13.  Plaintiffs even attach the "Disclosure Statement and Application Supplement for Individual Retirement Annuity" and claim purchasers received it.  Id. ¶ 91(e).  That document disclosed that the annuities at issue were individual retirement annuities under 26 U.S.C. § 408(b) and disclosed the tax features of individual retirement annuities.  Cons. Cpt. Exh. 2. The Internal Revenue Code, and the IRS's regulations pertaining to individual retirement accounts and annuities, are publicly available.  See Heliotrope General, Inc. v. Ford Motor Co., 189 F.3d 971, 976-77 (9th Cir. 1999); Dorchester, 134 F. Supp. 2d at 5787 ("Plaintiffs are deemed to be on notice of facts giving rise to a fraud claim that are in the public domain.")

Based on the information in the governing documents, combined with the publicly available statutes and regulations regarding qualified plans, plaintiffs were on inquiry notice of their claims when they purchased their annuities.  Because they

filed suit more than a year later, Counts I and II should be dismissed as untimely.

### c) The Claims Against New Defendants Do Not Relate Back to the Original Complaint

At the very least, the claims against the newly-added defendants should be dismissed as untimely, since those claims do not relate back to the filing of the original complaint. The original complaint was filed on October 1, 2001. More than a year later, on December 10, 2002, plaintiffs filed a "consolidated complaint" and added three new defendants, including WRL Series Fund, Inc. and Transamerica Life. The complaint alleges that WRL Series Fund is "an issuer of the variable annuity accounts at issue here" and that Transamerica Life is an indirect wholly-owned subsidiary of AEGON USA which sells variable annuities. Cons. Cpt. ¶¶ 46, 50-51.

Plaintiffs do not plead any facts to show why they took so long to assert claims against these defendants, or to show they could not have identified them before. Indeed, the cover page of the prospectus given to Mr. Johnson identifies WRL Series Fund, Inc. as the mutual fund that includes the portfolios available to variable annuity investors. May 2000 prospectus, cover page and 4 (Exh. 2). The registration statement

identifies "Transamerica Corporation and subsidiaries" as

companies owned by AEGON USA's ultimate parent.  May 2000

Registration Statement (page 99 of 115) (Exh. 7).

Fed. R. Civ. P. 15(c)(3), which governs whether an

amendment naming a new party may "relate back" to the original

complaint and avoid dismissal on timeliness grounds, provides:

> (c) An amendment of a pleading relates back to the
> date of the original pleading when
> . . . .
> (2) the claim or defense asserted in the amended
> pleading arose out of the conduct, transaction, or
> occurrence set forth or attempted to be set forth in
> the original pleading, or
>
> (3) the amendment changes the party or the naming of
> the party against whom a claim is asserted if the
> foregoing provision (2) is satisfied and, within the
> period provided by Rule 4(m) for service of the
> summons and complaint, the party to be brought in by
> amendment (A) has received such notice of the
> institution of the action that the party will not be
> prejudiced in maintaining a defense on the merits, and
> (B) knew or should have known that, but for a mistake
> concerning the identity of the proper party, the
> action would have been brought against the party.

Plaintiffs cannot satisfy these requirements here.

According to the Eleventh Circuit, "[t]he purpose of Rule 15(c)

is to permit amended complaints to relate back to original

filings for statute of limitations purposes when the amended

complaint is correcting a mistake about the identity of the

defendant."  Powers v. Graff, 148 F.3d 1223, 1226 (11th Cir.

1998).  See also Wayne v. Jarvis, 197 F.3d 1098, 1103 n.5 (11th

Cir. 1999) (if plaintiff cannot show mistake, "there can be no relation back regardless of whether other requirements, such as notice and lack of prejudice to the joined party, are met.")

In Powers, the court held that a proposed amendment to a securities class action complaint adding alleged "control persons" after the statute of limitations expired did not relate back to the original complaint. Plaintiffs knew the identity of the new defendants early in the litigation, and their argument that they did not know defendants could be proper parties was not a basis for allowing relation back. Powers, 148 F.3d at 1227.

The court noted that allowing relation back too liberally would circumvent the important policy reasons for limitations periods. Id. at 1226. "'A potential defendant who has not been named in a lawsuit by the time the statute of limitations has run is entitled to repose--unless it is or should be apparent to that person that he is the beneficiary of a mere slip of the pen, as it were.'" Id. at 1227 (quoting Rendall-Speranza v. Nassim, 107 F.3d 913, 918 (D.C. Cir. 1997)). See also Wayne, 197 F.3d at 1103 (amended complaint replacing "John Doe" defendants with a name does not relate back under Rule 15(c)(3); alleged lack of knowledge is not a misidentification or "mistake" within the meaning of that rule) (citing cases); Stac

55

Electronics, 89 F.3d at 1411 (affirming dismissal of Section 11
claims against new defendants who were added one year and four
months after original complaints were filed; "[g]iven . . . that
plaintiffs were clearly aware of or suspected fraud at the time
they filed their first complaint, and given further that all of
the new defendants were named in the Prospectus and added to the
[Second Amended Complaint] on the basis of their corporate
positions alone, the district court correctly found that
plaintiffs had adequate notice"); Preston v. Settle Down
Enterprises, Inc., 90 F. Supp. 2d 1267, 1278 (N.D. Ga. 2000)
(plaintiffs' alleged lack of knowledge that defendant would be a
proper party to lawsuit is not a "mistake" that supports
relation back under Rule 15).

   The holdings of these cases apply fully here.  The original
complaint named a whole group of defendants whose only alleged
connection with the lawsuit was some relationship with AEGON USA
and the distribution of variable annuities.  The documents at
issue identified WRL Series Fund and the Transamerica companies.
Plaintiffs had no more grounds for naming the other AEGON USA-
related defendants than for naming these two companies.  Since
plaintiffs do not and cannot articulate any basis for relation
back, their claims against WRL Series Fund and Transamerica Life
should be dismissed as untimely.

4. <u>Plaintiffs Have Not Alleged Misrepresentations or Omissions of Material Fact</u>

At the very least, plaintiffs' claims should be limited to the products they purchased, the registration statements and prospectuses which underlay their purchases, and the defendants with which they transacted.[34]   Even so limited, however, the consolidated complaint does not state a cause of action for violation of Sections 11 and 12(a)(2).  While the complaint repeats the same theories over and over again in slightly different words, it does not allege any actionable misrepresentations or omissions **of fact**.

The securities laws and SEC regulations specify what information must be included in offering documents.  <u>See, e.g.</u>, 15 U.S.C. §§ 77g, j.  Registration statements and prospectuses for variable annuities must conform to SEC Form N-4, which sets

---

[34]   Under the principles set forth in Section IV(A)(1)-(2) above, the Court should at the very least dismiss all claims based on products plaintiffs did not buy (including fixed annuities) and offering documents for products plaintiffs did not buy, since plaintiffs have not alleged **any** factual basis which would allow them to assert such claims.  The overbroad list of "SEC filings" in paragraph 91(a)-(c) should be stricken.  The Court should also strike the allegations that defendants targeted small businesses and employees of nonprofit organizations (Cons. Cpt. ¶ 15), since plaintiffs do not allege they fall into those categories.  <u>See</u> <u>Castillo</u>, slip op. at 7 (refusing to consider plaintiff's arguments which "concern annuities and sales practices in general . . . and not specifically conduct which concerns [her.]") (Exh. 6).

forth a detailed list of the information required. See 17

C.F.R. §§ 239.17b, 274.11c; Form N-4 (Exh. 1). The federal

securities laws require issuers of securities to disclose

"material, actual facts," not matters of opinion and not

forecasts of what might happen in the future. See, e.g., In re

VeriFone Securities Litigation, 11 F.3d 865, 869 (9th Cir.

1993); Steinberg v. PRT Group, Inc., 88 F. Supp. 2d 294, 307

(S.D.N.Y. 2000). Moreover, the securities laws only require

companies to disclose **firm-specific** information. See, e.g.,

Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 515 (7th Cir.

1989).[35]

Investors are then expected to take that factual

information and combine it "with knowledge about the

competition, regulatory conditions, and the economy as a whole

to produce a value for stock." Id. In the words of the Second

Circuit, "[i]ssuers cannot be expected to anticipate in their

prospectuses or other offering papers the financial needs of

every potential investor, the investment alternatives before

_____

[35] The SEC's instructions for Form N-4 specifically direct
registrants to avoid excessive detail and detailed discussions
of the law. "Responses to the items of Part A [the prospectus]
should be as simple and direct as possible and include only
information needed to understand the fundamental characteristics
of the Registrant." Form N-4 at 3 (Exh. 1).

each potential investor, and the risk averseness of each

potential investor." Dodds, 12 F.3d at 351 (rejecting argument

that issuer should have informed plaintiff limited partnerships

were unsuitable for a person in her position). The documents

plaintiffs quote and attach to their complaint told them this

was their responsibility, and plaintiffs even signed documents

agreeing to obtain their own tax advice and determine for

themselves whether the variable annuities were appropriate for

them. See above at 25-27; Cons. Cpt. Exh. 1.

As discussed above, all of plaintiffs' claims are grounded

on their opinion that a practice allowed by the IRS and SEC -

selling annuities to fund qualified plans - should not be

allowed. This kind of opinion is not within the scope of

Sections 11 and 12, which provide carefully circumscribed

remedies for material misrepresentations or omissions of fact.

With respect to plaintiffs' claims that defendants should

have disclosed more about the tax features of qualified plans or

the effect of annuity fees on investment returns, the tax

features and fees themselves were adequately disclosed in the

prospectus. "If a plaintiff's claims of misstatement or

omission conflict with the plain language of the prospectus, the

prospectus controls and the court need not accept as true the

allegations of the complaint. In such a situation, dismissal of

the complaint is proper, for no additional facts can prove the claims." Steinberg, 88 F. Supp. 2d at 300 (dismissing with prejudice claims under §§ 11, 12(a)(2) and 15). See also Glassman, 90 F.3d at 626, 634-35 (affirming denial of leave to file second amended complaint after dismissal of §§ 11 and 12 claims; amendment would be futile since prospectus plainly contradicted plaintiffs' claims).

Finally, the laws also do not require defendants to offer opinions about disclosed facts, to characterize their products negatively, or compare their products in unfavorable ways to those of others. See, e.g., In re Donald J. Trump Casino Securities Litigation, 7 F.3d 357, 375-76 (3d Cir. 1993) (affirming dismissal of claims under §§ 11, 12, 15 and 10(b)). In Trump, the Third Circuit held that a prospectus which disclosed the facts regarding a casino's debt-equity ratio was not required to describe the ratio as "unwarranted" or "excessive," or to compare it with that of other casinos. The court's words are equally applicable here:

> The federal securities laws do not ordain that the issuer of a security compare itself in myriad ways to its competitors, whether favorably or unfavorably, for at least three reasons. First, such a requirement would impose an onerous if not insurmountable obstacle on issuers of securities to ensure they obtain accurate information on all aspects of their competitors which a reasonable investor might find material. Second, were we to announce such a

60

> requirement, the likely result would be to inundate
> the investor with what the Supreme Court disparaged as
> "an avalanche of trivial information." [TSC
> Industries, Inc. v. Northway, Inc., 426 U.S. 438, 448,
> 96 S. Ct. 2126, 2132 (1976))]. **Third--and of greatest
> consequence--it is precisely and uniquely the function
> of the prudent *investor, not* the issuer of securities,
> to make such comparisons among investments.**

Id. (italics original; bold emphasis added).

### a) Plaintiffs Do Not State an Actionable Misrepresentation Claim

According to the complaint, the documents "recommended tax-deferred variable annuities for tax-deferred retirement accounts." Cons. Cpt. at ¶ 95. The excerpts plaintiffs quote for that contention, however, do not support it. As set forth below, the prospectus did state that variable annuities "**may be used**" in qualified plans (see id. ¶ 94), but plaintiffs do not and cannot allege any facts to show this is false.

The prospectus on which plaintiffs rely contained a section titled "WHO SHOULD PURCHASE THE CONTRACT?," which plaintiffs quote in the complaint. This section read:

> We have designed this Contract for people seeking
> long-term tax-deferred accumulation of assets,
> generally for retirement. This includes persons who
> have maximized their use of other retirement savings
> methods, such as 401(k) plans and individual
> retirement accounts. The tax-deferred feature is most
> attractive to people in high federal and state tax
> brackets. You should not buy this Contract if you are
> looking for a short-term investment or if you cannot

> take the risk of getting back less money than you put
> in.  If you are purchasing the Contract through a tax-
> favored arrangement, including traditional IRAs and
> Roth IRAs, you should consider carefully the costs and
> benefits of the Contract (including annuity income
> benefits) before purchasing the Contract, since the
> tax-favored arrangement itself provides tax-sheltered
> growth. . . .

Cons. Cpt. ¶ 94 (quoting from May 2001 prospectus).

This paragraph did not recommend the purchase of variable annuities for qualified plans.  Instead it made the following distinct points.

First, the paragraph stated that the annuities were designed "for people seeking long-term tax deferred accumulation of assets, generally for retirement," including "persons who have maximized their use of other retirement savings methods, such as 401(k) plans and individual retirement accounts."  Id. In paragraph 12 of the complaint, plaintiffs expressly admit this is true:  "Because of their tax-deferred status, deferred annuities are potentially attractive financial products to people seeking tax-deferral for their retirement investments (and may be appropriate investments for those who have already made their maximum contributions to IRAs or other qualified retirement plans available to them)."  Cons. Cpt. ¶ 12.

Second, the quoted paragraph said who should **not** buy an annuity - someone who is "looking for a short-term investment"

62

or who "cannot take the risk of getting back less money than you put in." Plaintiffs have not quarreled with this statement.

Third, the paragraph stated expressly that anyone contemplating purchasing an annuity for a tax-qualified plan should consider the costs and benefits carefully, "since the tax-favored arrangement itself provides tax-sheltered growth." Cons. Cpt. ¶ 94. This directly contradicts plaintiffs' assertion that defendants did not disclose the fact that qualified retirement plans are already tax deferred.

Plaintiffs then quote prospectus language which stated that a qualified annuity contract "may be used in connection with the following plans," including an Individual Retirement Annuity, a Tax-Sheltered Annuity, and certain pension and deferred compensation plans. Cons. Cpt. ¶ 94. This was not a "recommendation:" it was a disclosure the SEC specifically requires. Under the SEC's instructions for Form N-4, the prospectus must "[i]dentify the types of qualified plans for which the variable annuity contracts are intended to be used." Form N-4, Item 12, at page 13 (Exh. 1).[36] The tax code and

---

[36] In comments issued when it adopted Form N-4, the SEC noted it had modified an earlier draft and would "require identification, rather than a brief description, of the types of tax-qualified plans for which the contracts will be used." 50 Fed. Reg. 26145, *26153 (June 25, 1985) (available at 1985 WL 106936).

regulations do in fact allow annuities to be used in these kinds of plans. See above, Section III(B).

Finally, the plaintiffs do **not** quote the prospectus language which cautioned purchasers to consult their own lawyer or tax advisor before purchasing an annuity for a retirement plan. See, e.g., Exh. 2 at 29. Plaintiffs do attach a disclosure statement which provided a similar caveat: purchasers acknowledged that Western Reserve "does not give tax or legal advice," that they must "consult with [their] own professional tax or legal advisor as [they] see fit," and that they had determined that the annuity was "appropriate for [their] needs and objectives." Cons. Cpt. Exh. 1.

Plaintiffs' claim that the prospectus recommended the placement of variable annuities in qualified plans is thus belied by the prospectus itself, and should be dismissed. See Steinberg, 88 F. Supp. 2d at 300;[37] Glassman, 90 F.3d at 626,

---

[37] Among the many individual claims the court rejected in Steinberg was a misrepresentation claim very similar to that asserted here. Plaintiffs in that case argued that the prospectus represented that non-compete covenants in defendant's employment contracts "provided a secure base of IT professional personnel for [defendant] and provided [defendant] with a competitive advantage." According to the court, "[a]n examination of the actual text of the prospectus reveals no such representations; rather, the prospectus provided a subdued description of the non-compete covenants, without touting any kind of advantage produced by the contract provisions." Id. at 307. The court also noted the disclaimers in the prospectus

634-35 (prospectus plainly contradicted misrepresentation and
omission claims and did not represent that securities were
"appropriately priced").

Read in context, the language plaintiffs quote simply
stated that a variable annuity may be purchased in connection
with a qualified retirement plan. Plaintiffs do not and cannot
allege any facts to establish that this was false, as they must
do to survive a motion to dismiss. See Oxford, 297 F.3d at
1192-94. As set forth above, the tax laws expressly allow
investors to purchase "individual retirement annuities" and to
place annuities in other qualified plans. The SEC's
instructions for variable annuity registration statements
**require** variable annuity prospectuses to identify the types of
qualified plans for which the annuities can be used. The SEC
instructions do not say that variable annuities are
inappropriate for qualified plans, or that companies must tell
people not to buy variable annuities for qualified plans.

The National Association of Securities Dealers, Inc. (NASD)
"Notice to Members" 99-35, upon which plaintiffs rely (Cons.
Cpt. ¶¶ 82-84, 93), also does not support their position.

concerning the scarcity of IT professionals. Id. See also id.
at 303 (information in prospectus showing that most of company's
business came from long-term customers "refute[s] [plaintiffs']
conclusory allegation that [company] misrepresented its ability
to build 'long-term relationships'").

First, the NASD is a private corporation and a self-regulatory organization for securities broker-dealer firms.  See, e.g., Riccard v. Prudential Insurance Co., 307 F.3d 1277, 1282 n.1 (11th Cir. 2002).  Notice 99-35 is addressed to members and provides guidelines, not mandatory procedures.  See NASD Notice 99-35 at 1 (Exh. 9).  Plaintiffs do not and cannot allege that the NASD can impose requirements on companies that issue securities, or that the NASD can prescribe the contents of prospectuses.  See, e.g., Cons. Cpt. ¶¶ 23, 36 (only the broker-dealer firm defendants are alleged to be NASD members; Western Reserve and the other so-called "insurance company defendants" are not – and cannot be – members of NASD).  Moreover, it is well established that even NASD members are not subject to private claims for violation of NASD rules.  See, e.g., Thompson v. Smith Barney, Harris Upham & Co., 709 F.2d 1413, 1419 (11th Cir. 1983); VeriFone, 11 F.3d at 870 (alleged violation of NASD disclosure rules does not support a private claim and may not "be imported as a surrogate for straight materiality analysis.").[38]

---

[38] The NASD provides an arbitration process for investors who claim violations of its rules.  See Hornor, Townsend & Kent, Inc. v. Hamilton, 218 F. Supp. 2d 1369, 1375 (N.D. Ga. 2002).

Second, the NASD notice itself contradicts plaintiffs'
assertion that variable annuities are "never appropriate"
investments for qualified plans. By its terms the notice
suggests guidelines for sales of variable annuities,
specifically including sales of annuities for tax-qualified
accounts. NASD Notice 99-35 at 1-2, 4 (Exh. 9). The notice
recommends that its members (broker-dealers) disclose that
qualified plans themselves provide tax-deferral. See Cons. Cpt.
¶ 83. As plaintiffs concede, however, the notice then states
that a variable annuity should be recommended for a qualified
retirement account "'only when its other benefits, such as
lifetime income payments, family protection through the death
benefit, and guaranteed fees, support the recommendation.'" Id.
¶ 84 (quoting from NASD Notice 99-35, at 4). Plainly, the NASD
recognizes that a qualified plan investor might want a variable
annuity for reasons other than its tax deferral features.[39]

Because plaintiffs have not alleged facts to show that
defendants made false statements about the use of variable
annuities in qualified plans, their claims based on alleged
misrepresentations must be dismissed. See Oxford, 297 F.3d at
1192-94 (affirming dismissal of claims that defendants

---

[39] As noted above, in footnote 2, this is an inherently
individualized determination.

misrepresented prescription drugs' safety, efficacy, or revenue;
plaintiffs failed to allege any specific facts or studies to
support bald legal conclusion that representations were false);
Rudd, 67 F. Supp. 2d at 1370-72 (dismissing claims under §§ 11,
12(a)(2) and 15 when plaintiffs failed to plead facts to support
allegation that prospectus statements were false); Stac
Electronics, 89 F.3d at 1409 (affirming dismissal of claims
under §§ 11, 15 and 10(b); plaintiff failed to make "precise
allegations explaining how the alleged misstatements were
misleading or untrue when made"); Steinberg, 88 F. Supp. 2d at
300-11 (dismissing §§ 11, 12 and 15 claims when information
plaintiff claimed was misrepresented or omitted was adequately
set forth in prospectus and plaintiffs did not plead facts to
show statements were false).[40]

---

[40] Courts in the Eleventh Circuit have reached a similar result by
applying the "bespeaks caution" doctrine or the "safe harbor
provision" of the Private Securities Litigation Reform Act
(PSLRA), 15 U.S.C. § 77z-2. Under both of these concepts,
statements in a prospectus which are forward looking, and which
allegedly either misstate or omit material information, are not
actionable if they are accompanied by meaningful cautionary
statements. See, e.g., Ehlert, 245 F.3d at 1318; Harris v. Ivax
Corp., 182 F.3d 799, 805, 807 (11th Cir. 1999)); In re Sl Corp.
Securities Litigation, 173 F. Supp. 2d 1334, 1352 (N.D. Ga.
2001). These cases reinforce the basic principle that alleged
misrepresentations and omissions are not actionable if the
overall nature and risks of the investment are adequately
disclosed in the prospectus, and that the information need not
be disclosed in precisely the manner plaintiffs wish.

### b) Plaintiffs Do Not Allege an Actionable Omission Claim

The rest of plaintiffs' claims relate to alleged omissions. The facts and legal principles that defeat plaintiffs' efforts to allege an actionable misrepresentation also require dismissal of the omission claims.

To avoid dismissal of their 1933 Act omission claims "plaintiffs must properly allege:  1) the prospectus contained an omission;  2) the omission was material;  3) defendants were under a duty to disclose the omitted material information; and 4) that such information existed at the time the prospectus became effective."  Oxford, 297 F.3d at 1189.

Although the plaintiffs repeat their omission claims many times in many different ways, the heart of their claims is that the documents failed to disclose the following:

- That "a deferred annuity is always an inappropriate and unsuitable investment for placement in a tax-deferred retirement plan."

- That qualified plans such as IRAs and 401(k) plans already provide tax deferral and that the tax deferred accrual feature of a variable annuity is "unnecessary."

- That the annuity fees, which plaintiffs characterize as

  "unnecessary, unreasonable and excessive," will reduce

  investment returns over time, and plaintiffs could have

  obtained lower fees by buying mutual funds for their IRAs.

See, e.g., Cons. Cpt. ¶ 73.  See also id. ¶¶ 93, 97-100.

None of these alleged omissions is actionable.  The points

plaintiffs say should have been disclosed are not facts and are

not material; they are opinions, suggested projections, and

negative characterizations, disclosure of which is not required

under the securities laws.  Moreover, plaintiffs' theories are

general to the variable annuity industry, not specific to

defendants' products or sales practices.

### (1)  Opinions, Projections and Pejorative Characterizations Are Not Material Facts

A statement or omission is "material" only if its

disclosure would significantly alter the total mix of facts

available to an investor and "if there is a substantial

likelihood that a reasonable shareholder would consider it

important" to the investment decision.  Basic, Inc. v. Levinson,

485 U.S. 224, 231, 108 S. Ct. 978, 983 (1988); see also In re S1

Corp. Securities Litigation, 173 F. Supp. 2d 1334, 1350 (N.D.

Ga. 2001).  If it is plain that reasonable investors would not

have been swayed by information allegedly omitted, the court may

declare the omission immaterial as a matter of law and dismiss

the claim under Rule 12(b)(6).  Id.  The alleged omissions here

are, as a matter of law, not material facts, and thus cannot

satisfy the second requirement of the test set forth in Oxford.

See above at 69.

As discussed above, the contention that a deferred annuity

is **always** inappropriate for tax-deferred retirement plans is

simply plaintiffs' opinion - and a baseless one, at that.  With

respect to the tax implications of putting a variable annuity in

a qualified plan, the prospectus on which plaintiffs rely

plainly disclosed both that tax deferral is a feature of

variable annuities and that qualified plans provide tax deferral

in and of themselves.  The prospectus and the disclosure

statement attached to the complaint also cautioned that

investors needed to obtain their own tax advice and make their

own assessment of whether the annuity was appropriate for them.[41]

As with misrepresentation claims, plaintiffs cannot state a

claim for omissions when the prospectus discloses the

information plaintiffs say is missing.  See, e.g., Stac

---

[41] The IRS-mandated disclosure statement plaintiffs attach to
their complaint as Exhibit 2 also provided a detailed
description of individual retirement annuities and their tax
features.

Electronics, 89 F.3d at 1409 (no omission claim when prospectus "adequately disclosed the information [plaintiff] alleges [defendant] to have concealed"); Steinberg, 88 F. Supp. 2d at 300 (same).  In addition, the tax code is publicly available information.  See Heliotrope, 189 F.3d at 977 (plaintiff cannot claim fraud on the market based on alleged failure to disclose tax code provision, even though plaintiff claimed it was obscure; "[t]he Tax Code is publicly available information"); see also Wielgos, 892 F.2d at 517 ("Issuers needn't print the Code of Federal Regulations").

With respect to the annuity fees, the prospectus repeatedly and fully disclosed the nature and amount of each fee that was charged.  The prospectus also specifically disclosed that the fees would reduce investment returns.  May 2000 prospectus at 23, 27 (Exh. 2).  Plaintiffs even signed documents stating that they understood and agreed to the fees.  See Cons. Cpt. Exh. 1.

Plaintiffs do not, and cannot, say the fee explanations were inaccurate.  Instead, they offer their opinion that the disclosed fees were "unnecessary, unreasonable and excessive," and claim defendants should have told them how the fees would affect their investment over time in comparison to fees charged for other companies' products, such as mutual funds.

The securities laws do not require defendants to
characterize their products as inappropriate or unnecessary, or
their fees as "unnecessary, unreasonable and excessive."  The
laws also do not require defendants to compare their products
with the competition, or to volunteer projections regarding how
their products might perform in the future.  When defendants
disclose the facts, plaintiffs cannot state a claim under
Sections 11 and 12(a)(2) by claiming, in hindsight, that the
defendants should have explained the significance of the facts
in ways plaintiffs consider acceptable.  See Trump, 7 F.3d at
375-76.  See also, e.g.:

- Romine v. Acxiom Corp., 296 F.3d 701, 708 (8th Cir. 2002)
  (affirming dismissal of § 11 claims; when company disclosed
  the facts about a contract, it was not required to predict
  the impact of the contract on its business; "company has no
  duty to disparage its own competitive positions in the
  market where it has provided accurate hard data from which
  analysts and investors can draw their own conclusions about
  the company's conditions and the value of its stock.")

- Klein v. General Nutrition Companies, Inc., 186 F.3d 338,
  343 (3d Cir. 1999) (affirming dismissal of §§ 11, 12(a)(2),
  and 15 claims; federal securities laws require companies to

disclose "private, internal information," not information that affects an industry generally).

- <u>Krim v. BancTexas Group, Inc.</u>, 989 F.2d 1435, 1448 (5th Cir. 1993) (affirming grant of summary judgment on §§ 11, 12 and 15 claims; when prospectus warned about investment risks and disclosed facts about overdue loans, defendant's failure to characterize them as "potential problem loans" was not a material omission or misrepresentation).

- <u>Kramer v. Time Warner Inc.</u>, 937 F.2d 767, 776 (2d Cir. 1991) (when purchase offer disclosed company's intention to adjust equity plan, allegation that offer failed to characterize adjustment as "illegal" did not state claim under securities laws; "The disclosure required . . . is not a rite of confession. . . . What is required is the disclosure of material objective factual matters.")

- <u>In re Adams Golf, Inc. Securities Litigation</u>, 176 F. Supp. 2d 216, 234 (D. Del. 2001) ("The securities laws require that companies disclose known material facts; they do not require companies to disclose speculative facts that might have some material albeit unknown impact on future earnings.")

- Steinberg, 88 F. Supp. 2d at 307 (plaintiffs' proposition
  that IT companies often ignore non-compete covenants "is a
  debatable one--a matter of opinion, as opposed to a
  'fact,'" and is not something defendants were required to
  disclose).

- Issen, 508 F. Supp. at 1290, 1292 (dismissing § 10(b)
  claims; defendants were not obligated to "draw adverse
  inferences from the facts disclosed" and, in particular,
  "were not obligated 'to say that their deal was a bad one,'
  if in fact it was, as long as all the terms of the
  transaction were disclosed").

### (2) Plaintiffs Have Not Articulated Any Other Basis For a Duty to Disclose

Plaintiffs also cannot satisfy the third Oxford
requirement, since they cannot show any basis for imposing a
duty to disclose the information at issue.  In Oxford, the
Eleventh Circuit held that mere possession of material
information does not create a duty to disclose it.  Oxford, 297
F.3d at 1190.  To proceed on an omission claim under Sections 11
and 12, plaintiffs must allege a factual basis for a duty to
disclose.  "The duty question is properly stated as 'whether the
defendants had a specific obligation to disclose information of

the type that the plaintiffs complain was omitted from the registration statement and prospectus.'" Id. at 1190 (quoting Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1202 (1st Cir. 1996)). Plaintiffs are required to allege either that the securities laws specifically required disclosure of the information at issue or that a particular affirmative statement in the prospectus is made misleading by the claimed omission. See id.; Taam, 1998 WL 1745361, at *6 (Exh. 8).

Plaintiffs have not satisfied these requirements for any of the alleged omissions. The cases set forth above establish that the securities laws do not impose a general duty to disclose opinions, projections, negative characterizations and the like. Plaintiffs do not cite any statute or regulatory provision requiring disclosure of such information in prospectuses or registration statements.

Nor have plaintiffs pointed to any affirmative statement that could reasonably be considered misleading due to the alleged omissions. The affirmative statements in the prospectus regarding the use of variable annuities in qualified plans and the fees that investors would be charged do not, as a matter of law, obligate defendants to provide a more detailed analysis of the implications of using variable annuities in qualified plans or the potential long-term impact of the fees. See, e.g.:

- <u>Oxford</u>, 297 F.3d at 1190-94 (pharmaceutical company was not required to disclose prescription volume history of its only publicly available drug; the prospectus explained the risks of investing in the company, the applicable regulations did not require disclosure of the information, and the information did not make the affirmative statements in the prospectus materially misleading).

- <u>Rudd</u>, 67 F. Supp. 2d at 1373 (accurate statements in prospectus regarding hotel occupancy rate for certain months were not made misleading by failure to disclose less favorable data occupancy rate for other months).

- <u>Taam</u>, 1998 WL 1745361, at *6 (claim that defendants knew they would not be able to operate under Medicare cost caps due to cancellation of a contract was "nothing more than an allegation of failing to disclose an economic forecast," which defendants had no duty to disclose) (Exh. 8).

- <u>Cooperman v. Individual Inc.</u>, 171 F.3d 43, 51 (1st Cir. 1999) (affirming dismissal of §§ 11, 12 and 15 claims; disclosures regarding company's business strategy did not obligate company to disclose internal board dispute regarding that strategy).

- *Glassman*, 90 F.3d at 633, 635-36 (general statement that
  backlog was usually low was not made materially misleading
  by failure to disclose specific numbers; statements of hope
  that product would be accepted "did not rise to the level
  of optimism or certainty that would make them materially
  misleading in the absence of disclosure of initial
  developmental problems the product was facing,"
  particularly in view of risk disclosures).

- *Stac Electronics*, 89 F.3d at 1409 (omission claims must be
  "historical in nature, as companies are not required to
  predict the future").

- *VeriFone*, 11 F.3d at 869-70 (failure to forecast future
  events did not make prospectus misleading; inclusion of
  customer list did not obligate defendant to disclose that
  it did not have current orders with some of the customers).

- *Steinberg*, 88 F. Supp. 2d at 304, 308-09 (defendants had no
  duty to disclose activities of competitors or to state in
  prospectus that company was losing ground to competitors;
  providing list of major customers, required by SEC
  regulation, did not obligate defendants to disclose
  unsuccessful bids made to some of those customers).

- Rhodes v. Omega Research, Inc., 38 F. Supp. 2d 1353, 1363-64 (S.D. Fla. 1999) (dismissing §§ 11, 12 and 15 claims; company was not required to state in prospectus that stock offering "was held primarily for the benefit of the Individual Defendants who pocketed approximately 70% of the proceeds" or that the offering price "was an unreasonable price which was not reflective of the actual value of the shares sold.")

- Castillo v. Dean Witter Discover & Co., No. 97 Civ. 1272 (RPP), 1998 WL 342050, at *8-9 (S.D.N.Y. June 25, 1998) (Exh. 10) (dismissing § 10(b) claims; investment company had no duty to disclose information about the products of competitors and no duty to disclose that it paid its brokers substantially more for selling its proprietary funds over other funds).

### 5. Plaintiffs Have Not Alleged Damages Recoverable Under Sections 11 and 12(a)(2)[42]

Sections 11 and 12 each provide a specific and exclusive measure of damages. Plaintiffs' failure to allege damages

---

[42]  If the Court agrees that plaintiffs have not alleged actionable misrepresentations or omissions, the complaint should be dismissed, and the Court need not consider the arguments in this subsection and subsection 6, addressing control person liability. See, e.g., Rudd, 67 F. Supp. 2d at 1374.

cognizable under those sections provides another independent basis for dismissal of Counts I and II.

### a) Section 11 Damages

Section 11(e), entitled "Measure of damages," governs the damages available in suits under Section 11.  Under that subsection, three alternative measures of damages are recoverable:  the difference between the amount paid for the security at issue and (1) the value of the security at the time suit was filed; (2) the price at which the plaintiff sold the security before suit was filed; or (3) the price at which the plaintiff sold the security after suit was filed but before judgment if such damages would be less than under (1).  Id. Defendants can eliminate or reduce damages by showing that "any portion or all of such damages represents other than the depreciation in value of such security resulting from" the alleged misrepresentation or omission in the registration statement.  Id.  The amount of damages recoverable under Section 11 can never exceed the price at which the security was offered to the public.  Id. at (g).

The remedy set forth in Section 11(e) is exclusive.  "The plain language of section 11(e) prescribes the method of calculating damages . . . and the court must apply that method

in every case." McMahan & Co. v. Wherehouse Entertainment,
Inc., 65 F.3d 1044, 1048 (2d Cir. 1995). See also Goldkrantz v.
Griffin, No. 97 Civ. 9075 (DLC), 1999 WL 191540, at *3 (S.D.N.Y.
Apr. 6, 1999) (Exh. 11) (language of § 11(e) "is exclusive and
precludes recovery on other theories"), aff'd mem., 201 F.3d 431
(2d Cir. 1999).

Plaintiffs have not included any allegations relevant to
the measure of damages prescribed by Section 11(e).  They have
not alleged that the value of the annuity is now less than what
they paid for it, or that they sold it for less than they paid.
They also have not alleged that any depreciation that may have
occurred in the annuities' value is attributable to the claimed
misrepresentations or omissions.

Plaintiffs' theory is completely different.  In the section
of the consolidated complaint labeled "Damages," plaintiffs aver
that the damages they are seeking are based on their alleged
payment of "commissions, fees and charges in excess of what they
would have paid for appropriate and suitable investments placed
in an already tax qualified retirement plan."  Cons. Cpt. ¶ 124.
Plaintiffs claim that over the long term the higher fees will
eat into their investment returns, id. ¶ 136, and they
apparently want to be compensated both for the fees and the
alleged "compound effect" of the fees.  Essentially, therefore,

they are seeking "benefit of the bargain" damages.  Section
11(e) does not authorize such damages, and they cannot be
recovered in actions under Section 11.  See McMahan, 65 F.3d at
1048 ("the term 'value' in section 11(e) was intended to mean
the security's true value after the alleged misrepresentations
are made public;" alleged "promised value is irrelevant to this
calculation.")

Moreover, under the plain language of Section 11(e), if a
defendant "proves that the decline in the value of the security
in question was not caused by the material omissions or
misstatements in the registration statement, plaintiff is not
entitled to recover any damages."  Id.  It follows that if
plaintiffs do not even **allege** their securities depreciated in
value because of misrepresentations or omissions, plaintiffs do
not state a claim for damages recoverable under Section 11.

### b)  Section 12(a)(2)

Section 12(a)(2), which provides a cause of action against
sellers and direct solicitors of the securities plaintiffs
purchased, also prescribes a limited, though somewhat different,
remedy.  The section allows a prevailing purchaser to "recover
the consideration paid for such security with interest thereon,
less the amount of any income received thereon, upon the tender

of such security, or for damages if he no longer owns the security." 15 U.S.C. § 77l(a)(2). "Section 12(2) is explicit in allowing the plaintiff no choice of remedy. If plaintiff owns the stock, he is entitled to rescission but not damages. If plaintiff no longer owns the stock, he is entitled to damages but not rescission." Wigand v. Flo-Tek, Inc., 609 F.2d 1028, 1035 (2d Cir. 1980). See also Royal American Managers v. IRC Holding Corp., 885 F.2d 1011, 1019 n.4 (2d Cir. 1989); Goldkrantz, 1999 WL 191540, at *5 (Exh. 11).

Plaintiffs have again failed to allege a factual basis for obtaining relief under this section. They do not even state whether they still own their annuities. Instead, they allege that they are seeking rescission if they do own the securities, and "rescissory damages" if they do not. Cons. Cpt. ¶ 166.

Regardless of whether plaintiffs are seeking rescission or "rescissory damages," their claims are subject to Section 12(b), which is modeled after the loss causation provision in Section 11(e). See Goldkrantz, at *6-7. Section 12(b) prohibits recovery to the extent that "the person who offered or sold such security proves that any portion or all of the amount recoverable . . . represents other than depreciation in the value of the subject security resulting from" the alleged misrepresentations or omissions. 15 U.S.C. § 77l(b). As with

their Section 11 claims, since plaintiffs do not even allege

that their annuities depreciated in value because of the claimed

misrepresentations or omissions, their complaint does not assert

damages recoverable under Section 12(a)(2).

### 6. Plaintiffs' Section 15 Claim Should Be Dismissed on the Same Grounds as Their Other 1933 Act Claims

In Counts I and II, plaintiffs assert that AEGON USA and

AEGON Financial are liable as "control persons" under Section 15

of the 1933 Act, 15 U.S.C. § 77o.  Section 15 liability is

predicated on the existence of an underlying violation of

Sections 11 or 12.  Because plaintiffs fail to state a claim

under those sections, they also fail to state a claim under

Section 15.  See Ehlert, 245 F.3d at 1320; Cooperman, 171 F.3d

at 52; Steinberg, 88 F. Supp. 2d at 311.

In addition, plaintiffs have failed to allege a factual

basis for their "controlling person" claims.  To state a claim

for controlling person liability against a defendant, plaintiffs

must allege the defendant had (1) the power to control the

general affairs of the entity primarily liable for the Section

11 or 12 violation at the time of the violation and (2) the

power to control or influence the specific policy that resulted

84

in primary liability under Section 11 or 12.  See <u>Brown v.</u>
<u>Enstar Group, Inc.</u>, 84 F.3d 393, 396 (11th Cir. 1996).[43]

Plaintiffs have pleaded no specific facts which would tend
to show that the named defendants had the power to control the
affairs of the other entities in general, much less to control
the specific conduct which resulted in the alleged securities
violations at issue.  See <u>Theoharous v. Fong</u>, 256 F.3d 1219,
1227-28 (11th Cir. 2001).  Plaintiffs merely state in conclusory
fashion that AEGON USA (in Count I) and AEGON USA and AEGON
Financial (in Count II) had ownership interests in and power
over other defendants.  Cons. Cpt. ¶¶ 145, 160-61.  As the
Eleventh Circuit has held, however, allegations that one company
had an ownership interest in another are not sufficient to state
a claim under Section 15.  See <u>Theoharous</u>, 256 F.3d at 1228.
See also <u>Suez Equity Investors, L.P. v. Toronto-Dominion Bank</u>,
250 F.3d 87, 102 (2d Cir. 2001).  Plaintiffs' Section 15 claims
should therefore be dismissed.[44]

---

[43]   <u>Brown</u> involved controlling person liability under § 20(a) of
the 1934 Securities Exchange Act.  However, courts have applied
the same analysis to controlling person claims under § 15 of the
1933 Act.  See, e.g., <u>Pharo v. Smith</u>, 621 F.2d 656, 673,
<u>modified on other grounds</u>, 625 F.2d 1226 (5th Cir. 1980).
[44]   Additionally, AEGON USA should be dismissed for lack of
personal jurisdiction.  Although the 1933 Act provides for
nationwide service of process, see 15 U.S.C. § 77v, interpreted
by courts to create a relaxed "national contacts" test for <u>in</u>
<u>personam</u> jurisdiction, see, e.g., <u>SEC v. Carillo</u>, 115 F.3d 1540,

B.  Count III Must Be Dismissed for the Same Reasons As
Counts I and II, and Because the Statute on Which It Is
Based Does Not Provide a Private Right of Action

Count III of the consolidated complaint asserts a claim

against Western Reserve, AFSG Securities and WRL Series Fund

under the Investment Company Act of 1940 (ICA), 15 U.S.C. § 80a-

33(b), and a "controlling person" claim against AEGON USA.

Section 80a-33(b) provides, in relevant part:

Untrue statements or omissions

It shall be unlawful for any person to make any untrue
statement of a material fact in any registration
statement, application, report, account, record, or
other document filed or transmitted pursuant to this
subchapter or the keeping of which is required
pursuant to section 80a-30(a) of this title.  It shall

---

1544 (11th Cir. 1997), AEGON USA has never performed any function
relevant to the development, issuance, underwriting or sale of
securities.  See Declaration of James Beardsworth, at ¶¶ 4, 5, 6
(Exh. 14).  Accordingly, AEGON USA, Inc. cannot be subject to
jurisdiction under the relaxed standards of the securities laws,
and, if there is in personam jurisdiction over the company, it
can only be as a result of traditional forum contacts
principles.  Under such analysis, this Court lacks both specific
and general jurisdiction over AEGON USA.  Since AEGON USA has
never performed functions relating to securities, it cannot be
subject to this Court's specific jurisdiction for purposes of
this lawsuit, which is based on alleged securities law
violations.  See, e.g., Railcar, Ltd. v. Southern Illinois
Railcar Co., 42 F. Supp. 2d 1369, 1371 (N.D. Ga. 1999).
Moreover, AEGON USA completely lacks the sort of "continuous and
systematic" contacts with the state of Georgia that would
subject it to the general jurisdiction of this Court.  Exh. 14,
¶¶ 7, 8, 9, 10, 12, 13, 15.  Railcar Ltd., 42 F. Supp. 2d at
1377 (citations omitted).  Because AEGON USA is not subject to
the jurisdiction of this Court, it must be dismissed with
prejudice from this lawsuit.

> be unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.

This Count should be dismissed because there is no private right of action under Section 80a-33. The ICA does not expressly authorize private claims, and courts have held that a private right of action should not be implied under this section. See White v. Heartland High-Yield Municipal Bond Fund, No. 00-C-1388, 2002 WL 31769162, *4-5 (E.D. Wis. Dec. 10, 2002) (Exh. 12); Dorchester Investors v. Peak International Ltd., 134 F. Supp. 2d 569, 581 (S.D.N.Y. 2001). See also Olmstead v. Pruco Life Insurance Co., 283 F.3d 429, 432 (2d Cir. 2002) (rejecting private causes of action under other ICA sections).

While the United States Supreme Court has not explicitly decided whether private rights of action are available under any provisions of the ICA, the Supreme Court has adopted a strong presumption against implying such rights under federal securities laws that do not specifically provide them. See Central Bank, 511 U.S. at 184-88 (overruling lower court decisions which had, for many years, been implying private rights of action for aiding and abetting violations under Section 10(b) of the 1934 Act). See also Correctional Services Corp. v. Malesko, 534 U.S. 61, 122 S. Ct. 515, 519 n.3 (2001)

(Supreme Court has "retreated from our previous willingness to imply a cause of action where Congress has not provided one.").

After the Central Bank decision, the Second Circuit held that Sections 26(f) and 27(i) of the ICA did not give rise to an implied private right of action. Olmstead, 283 F.3d at 431. The court reasoned that Congress' failure to include express language creating a right of action raised a presumption that it did not intend to create one. Id. at 432. That presumption was strengthened by three factors. First, the sections at issue focused on prohibited actions (stating "[i]t shall be unlawful . . ."), and did not mention investors or create any rights for them. Second, Section 42 of the ICA explicitly provided that all ICA provisions would be enforced by the SEC. This suggested that Congress intended to preclude other enforcement methods. Third, in a different ICA section (§ 36(b), dealing with fiduciary breaches by investment advisors), Congress specifically authorized a private cause of action, suggesting it intentionally omitted a private right to enforce other sections. Id. at 432-33.

The factors which were the basis for the Olmstead holding apply equally to Section 80a-33. Accordingly, plaintiffs' claims under that section should be dismissed. See White, 2002 WL 31769162, *4-5; Dorchester, 134 F. Supp. 2d at 569.

In the alternative, Count III should be dismissed for the same reasons as Counts I and II. Plaintiffs have not identified the registration statements on which they base this claim and have not asserted an adequate factual basis for holding any defendant liable under this section. Moreover, the section refers to untrue statements and omissions of material fact, and plaintiffs have not asserted any misrepresentations or omissions of material fact.

C.   Count IV, for Declaratory and Injunctive Relief, Should Be Dismissed for Failure to State a Claim

In Count IV, plaintiffs seek "Declaratory and Injunctive Relief, Against All Defendants." Plaintiffs ask this Court to declare that defendants "must cease charging surrender fees," Cons. Cpt. ¶ 178, and to enter judgments "enjoining defendants from charging or collecting surrender fees with respect to any qualified annuity contract," id., and from the solicitation or sale of qualified annuities, and the assessment or collection of fees on such annuities." Id. ¶ 179. Plaintiffs are entitled to no such relief, because they have not stated claims under their substantive causes of action.

The Declaratory Judgment Act, 28 U.S.C. § 2201, confers

power on the federal courts to enter declaratory judgments.[45]  By

its terms, the Declaratory Judgment Act has no effect on the

court's constitutional inability to resolve controversies that

are not justiciable or claims that have not been adequately

pled.   In other words, the Act "does not provide an independent

cause of action."   In re Joint Eastern and Southern District

Asbestos Litigation, 14 F.3d 726, 731 (2d Cir. 1993).

**"Therefore, a court may only enter a declaratory judgment in**

**favor of a party who has a substantive claim of right to such**

**relief."**  Id. (emphasis added.)

The same constraint limits the grant of injunctive relief.

"A party is entitled to injunctive relief only if s/he

establishes that there has been some violation of her/his rights

or a violation of a statute, and s/he has no adequate remedy at

law."  Azcuy v. Amoco Oil Co., Civ. A. No. C85-1884A., 1985 WL

5849, *7 (N.D. Ga. Jan. 15, 1986) (Exh. 13) (citing Lewis v.

S.S. Baune, 534 F.2d 1115, 1124 (5th Cir. 1976)).   See also

Spottsville v. Barnes, 135 F. Supp. 2d 1316, 1318 (N.D. Ga.

2001) (to obtain permanent injunctive relief, plaintiff must

---

[45]   The Declaratory Judgment Act provides, in pertinent part, "In
a case of actual controversy within its jurisdiction, . . . any
court of the United States . . . may declare the rights and
other legal relations of any interested party seeking such
declaration, whether or not further relief is or could be
sought."  28 U.S.C. § 2201(a).

show actual success on the merits of his substantive claims, as well as irreparable injury), aff'd mem., 2002 WL 369911 (11th Cir. Feb 20, 2002).

This means that plaintiffs may seek declaratory and/or injunctive relief only if they have stated claims for their substantive causes of action; in other words, if they have stated claims for violations of the securities laws. Since they have not done so, their claims for injunctive and declaratory relief must be dismissed as well.

D.   Count V, for Reformation, Seeks Relief Not Cognizable Under the Federal Securities Laws

In Count V, plaintiffs assert a claim for reformation, "to provide an appropriate investment product agreed to by the parties." Cons. Cpt. ¶ 186. This is a request for a remedy which is not available under the applicable securities laws. As set forth in section IV(A)(5) above, both Sections 11 and 12 provide limited, exclusive remedies. These statutes do not authorize reformation or any type of "benefit of the bargain" relief. See, e.g., McMahan, 65 F.3d at 1048 (Section 11(e) does not authorize "benefit of the bargain" damages and alleged "promised value is irrelevant"); Fershtman v. Schectman, 450 F.2d 1357, 1361 (2d Cir. 1971) (amount of damages recoverable

under Section 12(a)(2) is "the excess of what [the plaintiff]

paid over the value of what he got, not . . . the difference

between what he got and what it was represented he would be

getting"; plaintiffs seeking reformation of agreement may have a

state law claim, but not a federal securities law claim).

To the extent plaintiffs are seeking to assert a state law

reformation claim, their claim is barred by the Securities

Litigation Uniform Standards Act of 1998 (SLUSA).  SLUSA

provides, in relevant part:

> No covered class action based upon the statutory or
> common law of any State or subdivision thereof may be
> maintained in any State or Federal court by any
> private party alleging—
> (1)  an untrue statement or omission of a material
> fact in connection with the purchase or sale of a
> covered security; or
> (2)  that the defendant used or employed any
> manipulative or deceptive device or contrivance in
> connection with the purchase or sale of a covered
> security.

15 U.S.C. § 77p(b).

SLUSA is part of a group of statutes intended to ensure

"national, uniform standards for the securities market and

nationally marketed securities."  Lander v. Hartford Life &

Annuity Insurance Co., 251 F.3d 101, 111 (2d Cir. 2001).  To

maintain this uniformity, SLUSA mandates that all securities

class actions within its purview "be based exclusively on

federal law."  Id. at 104; Behlen v. Merrill Lynch, 311 F.3d

1087, 1092 (11th Cir. 2002).  SLUSA preempts a claim where "(1) the suit is a 'covered class action,' (2) the plaintiffs' claims are based on state law, (3) one or more 'covered securities' has been purchased or sold, and (4) the defendant misrepresented or omitted a material fact 'in connection with the purchase or sale of such security.'"  Id. (quoting Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 292 F.3d 1334, 1342 (11th Cir.), cert. denied, 123 S. Ct. 395 (2002)).

Each of these elements is met here.  Because plaintiffs are suing on behalf of a purported class composed of "at least thousands of people," and they allege that common questions of law and fact predominate over individual issues (Cons. Cpt. ¶ 66(a)-(b)), the case is a "covered class action."  See Behlen, 311 F.3d at 1092-93 (SLUSA applies to prospective class actions).  Plaintiffs allege they purchased variable annuities, which are "covered securities" under SLUSA.  Dudek v. Prudential Securities, Inc., 295 F.3d 875, 878 (8th Cir. 2002); Lander, 251 F.3d at 104.  The complaint, including Count V, is grounded on plaintiffs' allegations that defendants made misrepresentations and omissions in connection with the sale of variable annuities.  See, e.g., Cons. Cpt. ¶¶ 3, 17, 183-85 (alleging omissions and misrepresentations in support of Count V).

The three federal courts of appeals that have considered the issue have held that SLUSA preempts state law claims in class actions based on allegations that insurance companies improperly marketed tax-deferred annuities to accounts that were already tax-deferred. Dudek, 295 F.3d at 878 (dismissing state law claims, including reformation claim); Patenaude v. Equitable Life Assurance Society, 290 F.3d 1020, 1024 (9th Cir. 2002); Lander, 251 F.3d at 104. The Eleventh Circuit used a similar analysis in holding that SLUSA preempts state law claims charging that brokers wrongly sold Class B shares to investors in order to increase their own fees and commissions, even though the plaintiffs in that case amended their complaint to delete specific fraud claims. Behlen, 311 F.3d at 1094. Under this authority, any state law claim plaintiffs are attempting to bring is preempted by SLUSA and should be dismissed.

## V. CONCLUSION

For the foregoing reasons, defendants respectfully request that the consolidated complaint be dismissed. This case has now been pending for well over a year. Plaintiffs have already amended their complaint, and have had ample opportunity to plead their claims. Defendants therefore request that the Court dismiss the complaint with prejudice. See, e.g., Oxford, 297

F.3d at 1186; <u>Klein</u>, 186 F.3d at 346.  "As plaintiffs have already had one opportunity to amend their complaint, and because all of the claims contained in that amended complaint are 'belied by the plain language of the prospectus, it would be an exercise in futility as well as a waste of judicial resources to allow further amendment.'"  <u>Steinberg</u>, 88 F. Supp. 2d at 311.

Respectfully submitted,

Dated:   January 28, 2003

Michael J. Bowers
Georgia Bar No. 071650
Christopher S. Anulewicz
Georgia Bar No. 020914
MEADOWS, ICHTER & BOWERS, P.C.
14 Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, GA 30305
Phone (404) 261-6020
Fax (404) 261-3656

James J. Rohn
Patricia M. Hamill
Deborah J. Krabbendam
CONRAD O'BRIEN GELLMAN & ROHN, P.C.
1515 Market Street
Sixteenth Floor
Philadelphia, PA   19102
Phone (215) 864-9600
Fax (215) 864-9620

Counsel for Defendants AEGON USA,
Inc., AEGON Financial Services
Group, Inc., AFSG Securities
Corp., PFL Life Insurance Co.,
AUSA Life Insurance Co., Inc.,
Western Reserve Life Assurance Co.
of Ohio, WRL Series Fund, Inc.,
Bankers United Life Assurance Co.

95

and Transamerica Life Insurance
and Annuity Co.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I certify that this brief

has been typewritten in 12 point Courier New font and does not

contain more than 10 characters per inch of type in accordance

with Local Rule 5.1(B).

Dated:      January, 2003

Michael J. Bowers
Georgia Bar No. 071650
MEADOWS, ICHTER & BOWERS, P.C.
14 Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, Georgia 30305
Phone (404) 261-6020
Fax (404) 261-3656

## CERTIFICATE OF SERVICE

I certify that on this date I caused the foregoing:

(1) MEMORANDUM OF LAW OF DEFENDANTS AEGON USA, INC., AEGON
FINANCIAL SERVICES GROUP, INC., AFSG SECURITIES CORPORATION, PFL
LIFE INSURANCE COMPANY, AUSA LIFE INSURANCE COMPANY, INC.,
WESTERN RESERVE LIFE ASSURANCE CO. OF OHIO, WRL SERIES FUND,
INC., BANKERS UNITED LIFE ASSURANCE COMPANY AND TRANSAMERICA
LIFE INSURANCE AND ANNUITY COMPANY IN SUPPORT OF MOTION TO
DISMISS THE CONSOLIDATED COMPLAINT, with exhibits;

(2) MOTION TO DISMISS THE CONSOLIDATED COMPLAINT, SUBMITTED BY
DEFENDANTS AEGON USA, INC., AEGON FINANCIAL SERVICES GROUP, INC.
AFSG SECURITIES CORPORATION, PFL LIFE INSURANCE COMPANY, AUSA
LIFE INSURANCE COMPANY, INC., WESTERN RESERVE LIFE ASSURANCE CO.
OF OHIO, WRL SERIES FUND, INC. BANKERS UNITED LIFE ASSURANCE
COMPANY, TRANSAMERICA LIFE INSURANCE AND ANNUITY COMPANY; and

(3) Proposed ORDER,

to be served by Federal Express on the parties listed below:

Craig G. Harley, Esq.                Daniel W. Krasner, Esq.
Jeffrey H. Konis, Esq.               Robert B. Weintraub, Esq.
CHITWOOD & HARLEY                    WOLF HALDENSTEIN ADLER
2900 Promenade II                    FREEMAN & HERZ, LLP
1230 Peachtree Street, N.E.          270 Madison Avenue
Atlanta, GA 30309                    New York, NY 10016

John J. Soroko, Esq.                 Charles W. Whitney, Esq.
Wayne A. Mack, Esq.                  James P. Hermance, Esq.
DUANE MORRIS, LLP                    DUANE MORRIS, LLP
One Liberty Place                    1180 Peachtree Street, N.W.
Philadelphia, PA 19103               Atlanta, GA 30309-3448

Dated: January 2*8* , 2003

Patricia M. Hamill, Esq.
CONRAD O'BRIEN GELLMAN & ROHN, P.C.