ORIGINAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JEFFREY L. JOHNSON,<br>on behalf of himself and all others<br>similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) | Civil Action File |
| v. | ) ) | No. 1:01-CV-2617-CAP |
| AEGON USA, INC., et al., | ) ) | |
| Defendants. | ) ) | |

## MOTION OF DEFENDANTS WMA
## SECURITIES, INC. AND WORLD MONEY GROUP, INC.
## TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

Defendants, WMA Securities, Inc. and World Money Group, Inc., by their

undersigned counsel, hereby move, pursuant to Rule 12(b)(6) of the Federal Rules

of Civil Procedure, to dismiss the Amended Consolidated Complaint in this action,

for the reasons set forth in the accompanying Memorandum of Law.

A copy of a proposed order granting this motion is attached hereto as Exhibit

A.

59

Respectfully submitted, this 29th day of September, 2003.

DUANE MORRIS LLP

John C. Herman, Esq.
   (Ga. Bar No. 348370)
Claus D. Melarti
   (Ga. Bar No. )
1180 West Peachtree Street
Suite 700
Atlanta, GA 30309-3448
(404) 253-6900 Phone
(404) 253-6901 Fax

OF COUNSEL:
John J. Soroko
Wayne A. Mack
Henry A. Lanman
DUANE MORRIS LLP
One Liberty Place
Philadelphia, PA 19103-7396
(215) 979-1000

Attorneys for Defendants
WMA SECURITIES, INC. and
WORLD MONEY GROUP, INC.



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JEFFREY L. JOHNSON,<br>on behalf of himself and all others<br>similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AEGON USA, INC., et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action File<br><br>No. 1:01-CV-2617-CAP |

## ORDER

AND NOW, this ___ day of _____, 2003, upon consideration of the Motion

of Defendants WMA Securities, Inc. and World Money Group, Inc. to Dismiss the

Amended Consolidated Complaint (the "Motion"), it is hereby

ORDERED that the Motion is Granted; and it is

FURTHER ORDERED that the Amended Consolidated Complaint in this

action is dismissed with prejudice.

_____
The Honorable Charles A. Pannell
Judge, United States District Court

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of the

foregoing Motion of Defendant WMA Securities, Inc. and World Money Group,

Inc. to Dismiss the Amended Consolidated Complaint upon plaintiffs by depositing

copies thereof in the United States Mail, addressed to plaintiffs' counsel of record

as follows:

Robert B. Weintraub
Wolf Haldenstein Adler
Freeman & Herz LLP
270 Madison Avenue
New York, NY 10016
*(via overnight delivery
by agreement of counsel)*

Michael J. Bowers
Balch & Bingham LLP
*formerly Meadows, Ichter & Bowers*
14 Piedmont Center, Suite 1100
3525 Piedmont Road, N.E.
Atlanta, GA 30305
*(via U.S. Mail)*

Jeffrey H. Konis
Chitwood & Harley
Promenade II, Suite 2900
1230 Peachtree Street, NE
Atlanta, GA 30309
*(via U.S. Mail)*

James J. Rohn
Conrad O'Brien
Gellman & Rohn
1515 Market Street, 16th Floor
Philadelphia, PA 19102
*(via U.S. Mail)*

This 29th day of September, 2003.

_____
Claus D. Melarti

ORIGINAL

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| JEFFREY L. JOHNSON,<br>on behalf of himself and all others<br>similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION FILE |
| v. | ) ) | NO. 1:01-CV-2617-CAP |
| AEGON USA, INC., et al., | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW OF DEFENDANTS
## WMA SECURITIES, INC. AND WORLD MONEY
## GROUP, INC. IN SUPPORT OF THEIR MOTION TO
## DISMISS PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT

DUANE MORRIS LLP

OF COUNSEL:                           John C. Herman, Esq.
John J. Soroko                            (Ga. Bar No. 348370)
Wayne A. Mack                        Claus D. Melarti, Esq.
Henry A. Lanman                        (Ga. Bar No. 501181)
Duane Morris LLP                     1180 West Peachtree Street
One Liberty Place                     Suite 700
Philadelphia, PA 19103             Atlanta, GA 30309-3448
(215) 979-1000                         (404) 253-6900 (Phone)
(215) 979-1200 (facsimile)       (404) 253-6901 (Fax)

Attorneys for Defendants
WMA SECURITIES, INC. AND
WORLD MONEY GROUP, INC.

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................ 1

II.   SUMMARY OF ARGUMENT.............................................. 7

III.  PROCEDURAL BACKGROUND .......................................... 9

IV.   THE IMPACT OF <u>DONOVAN V. AMERICAN SKANDIA</u>..................... 10

V.    ARGUMENT ................................................................... 13

      A.   The Amended Consolidated Complaint ............................ 14
           Should Be Dismissed As a "Shotgun" Pleading

      B.   Johnson's Section 12(2) Claim Must Be Dismissed........................... 16
           Because There Was No Omission In The WRL
           Prospectus Or Any Other Disclosure Materials

           1.   The Prospectus And Other Materials ....................................... 16
                That Plaintiff Received When He
                Purchased His Annuity Contained
                All Of The Information He Now
                Claims Was Not Disclosed To Him

           2.   There Is No Requirement That The .......................................... 20
                Prospectus Address The Implications Of
                Combining The Annuity With Other Investments

           3.   NASD Notice To Members 99-35 Does Not............................ 22
                Prescribe Any "Disclosure Requirements"
                For A Prospectus Employed In Connection
                With The Sale Of A Variable Annuity

           4.   SEC Form N-4 Does Not Require............................................. 27
                The Alleged "Disclosure" Plaintiff Seeks

C.   As a Matter Of Law, WMAS Did Not Act ........................................ 28
     Negligently In Using The WRL Prospectus
     In The Sale To Johnson Or Otherwise

D.   Plaintiff's Section 12(2) Claim Must.................................................. 30
     Be Dismissed Because It is Time-Barred

E.   Johnson's Section 12(2) Claim ........................................................... 35
     Must Be Dismissed Because As a
     Matter of Law He Has Suffered
     No Legally Cognizable Damages

F.   Plaintiff's Claim For Liability.............................................................. 38
     Under §15 Must Likewise Be Dismissed

VI.   CONCLUSION............................................................................................ 39

Defendants, WMA Securities, Inc. and World Money Group, Inc. (together, "WMAS"), by their undersigned counsel, respectfully submit this Memorandum of Law in support of their motion, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the Amended Consolidated Complaint. [1]

## I.   **INTRODUCTION**

Plaintiffs have filed their Amended Consolidated Complaint in response to this Court's August 18, 2003 Order striking plaintiffs' Consolidated Complaint. In its Order, the Court characterized the Consolidated Complaint as a "shotgun pleading" and specifically enumerated many of its pleading deficiencies. However, instead of correcting these deficiencies, the Amended Consolidated Complaint actually largely repeats the confused style of its predecessor original Complaint and Consolidated Complaint and, remarkably, then further compounds these deficiencies by the inclusion of yet more "shotgun" allegations.

---

[1] In addition to the reasons that are set forth below that require that the Amended Consolidated Complaint be dismissed, WMAS also adopts the arguments contained in the Memorandum of Law of AEGON USA, Inc. (and the other insurance company defendants) in Support of Their Motion to Dismiss the Amended Consolidated Complaint.

For instance, contrary to this Court's specific instructions, the Amended Consolidated Complaint continues to incorporate all of the paragraphs containing factual allegations into Count II, the only Count in which WMAS is a defendant, despite the manifest irrelevancy of many of these allegations. See Am. Cons. Compl. ¶ 206. As with the Consolidated Complaint, this again leaves the Court in the position of having to "'sift out the irrelevancies.'" Aug. 18, 2003 Order at 1 (citation omitted). Moreover, whereas the Consolidated Complaint contained 42 pages and 186 paragraphs, the Amended Consolidated Complaint is now 72 pages and 243 paragraphs. Where the Consolidated Complaint contained 136 paragraphs of factual allegations, the Amended Consolidated Complaint is now 172 paragraphs. As is set forth more fully below, the simple fact is that the Amended Consolidated Complaint remains an improper "shotgun" pleading and should be dismissed on this basis alone.

Moreover, substantively, despite the fact that the Amended Consolidated Complaint represents plaintiffs' third attempt to do so, the Amended Consolidated Complaint once again fails to state any legally viable cause of action against WMAS. In the Amended Consolidated Complaint, as in the Consolidated Complaint, plaintiff Johnson alleges that he was misled in connection with his

purchase of a variable annuity product.[2]  Plaintiff alleges that the prospectus and

the other written material that he received when he bought a variable annuity

through a WMAS registered representative failed to disclose adequately certain tax

features of his investment.  In actuality, the prospectus and related material that

accompanied Johnson's annuity contained full disclosure and, even more to the

point, included specific disclosures and cautionary language relating to the very

purported "tax issues" about which Johnson now complains.

The thrust of Johnson's complaint is that "defendants failed to disclose that

tax-deferred variable annuities are almost always inappropriate investments for

placement into the purchasers' tax-deferred qualified retirement plans."  Am. Con.

Compl. ¶ 114.  As is discussed below, there is no basis in law for the assertion that

such combinations are "almost always inappropriate."  However, in all events, the

prospectus informed potential purchasers that they should "carefully consider the

---

[2] The Amended Consolidated Complaint again purports to assert claims on behalf of two other named plaintiffs in addition to plaintiff Johnson, namely plaintiffs Hughes and Gerin.  Whatever the legal effect of adding these two plaintiffs after the Court has already appointed Johnson as lead plaintiff, the purported addition of these two "new plaintiffs" is legally irrelevant as regards WMAS because these two plaintiffs do not allege that they ever had any dealings with WMAS.  See Am. Con. Compl. ¶¶ 26-37.  See also Section 12(2) of the Securities Act of 1933, 15 U.S.C. §77(l) (a person who "offers or sells" a security may be liable "to the person purchasing such security from him.") (emphasis added).  Therefore, neither Hughes nor Gerin can advance any claim against WMAS.

3

costs and benefits" of purchasing an annuity through a tax-favored arrangement,

"since the tax-favored arrangement itself provides tax-sheltered growth." See

Prospectus at 7 (A copy of the prospectus is attached hereto as Exhibit A).

Moreover, the WRL prospectus also specifically informed potential purchasers

that:

> Because variable annuity contracts provide tax deferral whether
> purchased as a qualified Contract or nonqualified contract, you should
> consider whether the features and benefits unique to variable annuities
> are appropriate for your needs when purchasing a qualified Contract.

Id. at 28.

Potential purchasers were further cautioned by the WRL prospectus to

"consult your legal counsel or tax advisor if you are considering purchasing a

Contract for use with any retirement plan." Id. at 29.

Likewise, all purchasers, including plaintiff Johnson, received and signed

additional materials in which they were again specifically cautioned concerning the

purported tax issues that form the basis for the Amended Consolidated Complaint.

For example, the application for purchase, which became part of the contract of all

purchasers, contained a "Statement of Owner" in which purchasers made the

following acknowledgements:

> I agree that this application shall be part of the annuity contract. I
> have received a current Prospectus for the contract. I understand that
> I should consult my own tax advisor and/or legal counsel as to the

4

> consequences of using this product in conjunction with my own
> particular tax or financial plan. I understand that under the contract
> applied for values may increase or decrease depending upon
> investment experience. I also state that the contract is in accordance
> with my financial plan.

Variable Annuity Application of Jeffrey L. Johnson, at 2, attached hereto as

Exhibit B.[3]

Similarly, in a disclosure signed by all purchasers contemporaneously with

an annuity application (including Johnson here), purchasers acknowledged that

they had received copies of the prospectus, and confirmed "that the WMAS agent

may not and has not offered any tax advice, and I am (we are) responsible for the

tax consequences of this transaction." New Account Application, at 2, attached

hereto as Exhibit C.

In the face of this and other copious disclosure, Johnson here points

primarily to NASD Notice to Member 99-35 ("Notice 99-35"). The Amended

---

[3] As plaintiff's claims are based on the fact that they purchased variable annuity
contracts, consideration of these contracts by the Court is appropriate on a motion
to dismiss, and the Variable Annuity Application by its terms is part of plaintiff's
contract. See Harris v. Ivax Corp., 182 F.3d 799, 802 n. 2 (11th Cir. 1997) ("[A]
document central to the complaint that the defense appends to its motion to dismiss
is also properly considered.")

5

Consolidated Complaint is premised on a near-total reliance on Notice 99-35.[4]

However, Notice 99-35 simply will not bear the weight plaintiff seeks to make it

carry. That Johnson's reliance on Notice 99-35 is misplaced is demonstrated by,

among other things, Donovan v. American Skandia Life Assurance Corp., 2003

U.S. Dist. LEXIS 13129 (S.D.N.Y. July 31, 2003), as is discussed more fully

below. Donovan rejected a claim that was essentially identical to plaintiff's here

(and one that was in fact made by the same plaintiff's counsel), namely that

variable annuity offering documents violated the federal securities laws because

the documents did not include the specific language from Notice 99-35. In point of

fact, and as Donovan held in no uncertain terms, as a matter of law Notice 99-35

does not govern what disclosures, if any, must appear in a prospectus for a variable

annuity. Instead, NASD Notice 99-35 is directed only to the matter of such face-

to-face communications as may occur between a broker, such as WMAS, and a

customer, such as Johnson, attendant to the sale of a variable annuity. Importantly,

the Amended Consolidated Complaint does not allege, nor could it, that there were

---

[4] A Copy of Notice 99-35 is attached hereto as Exhibit D. While the Amended
Consolidated Complaint does mention in passing other NASD Rules and Notices
to Members, see, e.g., Am. Con. Compl. ¶¶ 85, 86, 89, the crux of its claims arise
from alleged failure to disclose information purportedly required by Notice 99-35.

any material misrepresentations or omissions in any face-to-face communications

between Johnson and WMAS.

Accordingly, Johnson again asks this Court to impose liability against

WMAS on the basis of what is an incoherent theory of liability.  Undaunted by the

inapplicability of Notice 99-35 to Johnson's purported "disclosure" claim, Johnson

yet argues that the prospectus that WMAS provided to him somehow did not meet

the alleged "disclosure requirements" of Notice 99-35.  In other words, Johnson

wants this Court to use Notice 99-35 not in an evaluation of WMAS's face-to-face

broker-to-customer communications, but instead to judge the disclosures in the

WRL prospectus, to which Notice 99-35 does not even apply.  Such a "theory" was

rejected in <u>Donovan</u> and, likewise, it should not be countenanced here.

## II.    <u>SUMMARY OF ARGUMENT</u>

For the following reasons, as discussed in full hereafter, Johnson's claim

must be dismissed:

<u>First</u>, the Amended Consolidated Complaint should be dismissed as an

impermissible "shotgun" pleading;

<u>Second</u>, there can be no liability under Section 12(2) or any other provision

of the securities laws where, as here, all of the allegedly material omissions on

which plaintiff sues are in fact plainly disclosed in the offering materials received by the investor;

Third, because the offering materials contained full disclosure and other cautionary language concerning the very issues about which plaintiff now complains, as a matter of law WMAS could not have acted negligently for purposes of § 12(a)(2) in employing those materials in connection with the sale to plaintiff;

Fourth, Johnson, who claims to have purchased his annuity on July 10, 2000, received a prospectus with his purchase that provided full disclosure.[5]  Am. Con. Compl. ¶ 22.  Johnson did not first file suit until October 2001, and he did not file his Consolidated Complaint until December 9, 2002 (in which World Money Group was first named as a defendant).  Both dates are well after the one-year statute of limitations had run for any claims under Section 12(2);

_____

[5] The July 10, 2000 date contradicts the assertion made in the Consolidated Complaint that Johnson purchased his variable annuity on June 16, 2000.  See Consolidated Complaint at ¶ 74.  The June 16, 2000 date is consistent with the documents Johnson signed at the time of his annuity purchase.  See Disclosure For Variable Annuity, dated June 16, 2000, attached as Exhibit 1 to the Amended Consolidated Complaint.  However, regardless of which date is correct, this discrepancy is immaterial for the purposes of WMAS' current motion, and, specifically, as is discussed below, Johnson's claims are time-barred using either date.

Fifth, because Johnson has suffered no legally cognizable damages, his Section 12(2) claim must be dismissed; and

Sixth, plaintiff's claim for "control person liability" under § 15 fails because, first, plaintiff has not established a predicate violation of the securities laws and, second, because World Money Group is not alleged to have been in a position of "control" over WMAS at the time of the acts described.

## III.   PROCEDURAL BACKGROUND

The procedural background of this action helps underscore the futility of Johnson's present claims.  Johnson first filed his original Complaint on October 1, 2001.  In that original Complaint, which was also styled as a purported class action, Johnson essentially advanced an "unsuitability claim," with Johnson arguing that defendants had sold to him an "unsuitable investment."  In connection with that claim, Johnson asserted, inter alia, a claim under Rule 10b-5 and a claim for breach of fiduciary duty.  It was manifest that such claims, raising as they did individual issues, were (irrespective of their merit or lack thereof) very unlikely to be certified for class treatment.  Thereafter, and despite the fact that no other claimant had ever instituted a competing action, plaintiff then filed a "Consolidated Complaint" (naming therein two additional plaintiffs who had never even filed their own actions) which significantly changed the theory of plaintiff's case.

9

Perhaps with an eye to future motion practice over the issue of class certification,

Johnson then eliminated any claim under Rule 10b-5 and any claim for breach of

fiduciary duty.  Instead, by his Consolidated Complaint Johnson attempted to

recast the action as a "disclosure case," even going to the lengths of advancing the

entirely circular contention that defendants did not provide full disclosure because

the WRL prospectus and other documents did not "disclose" to him that his

variable annuity was an "unsuitable" investment.  See, e.g., Con. Compl. ¶ 73.

As discussed in WMAS's Motion to Dismiss the Consolidated Complaint,

this revision in legal theory is futile because any disclosure-based theory

immediately runs head-long into the full and complete disclosure contained in the

prospectus and other documents.  The same futility exists with respect to Johnson's

Amended Consolidated Complaint.

## IV.   THE IMPACT OF DONOVAN V. AMERICAN SKANDIA

In two opinions, Senior Judge Milton Pollack of the United States District

Court for the Southern District of New York dismissed and denied leave to amend

a complaint, also brought by the present plaintiff's counsel, that was nearly

identical in substance and in theory to the complaints filed in this action.  See

Donovan v. American Skandia Life Assurance Corp., 2003 U.S. Dist. Lexis 13129

(S.D.N.Y. July 31, 2003) (Attached hereto as Exhibit E); 2003 U.S. Dist. Lexis

15169 (Sept. 2, 2003) (Exhibit F).  Preliminarily, it should be noted that while the

holdings of Judge Pollack in <u>Donovan</u> are fully applicable here, in <u>Donovan</u> the

same plaintiff's counsel apparently did not even <u>attempt</u> to name as defendants the

brokers, such as WMAS here, through whom plaintiffs bought their variable

annuities.

The crux of the complaint in <u>Donovan</u>, as in this action, was the claim that

offering documents for the variable annuities violated various provisions of the

federal securities law because they allegedly did not meet the claimed "disclosure

requirements" in Notice 99-35.  Additionally, the complaint in <u>Donovan</u>, like the

Amended Consolidated Complaint here, alleged that SEC Form N-4 required

disclosure in a prospectus that certain tax features of variable annuities are

allegedly "unnecessary" if the investment is purchased in or by an already tax-

advantaged account, like an IRA.  <u>Donovan</u>, 2003 U.S. Dist. Lexis 13129 at * 3-4.

In dismissing plaintiffs' claims with prejudice in <u>Donovan</u>, Judge Pollack

reached the following legal conclusions, all of which are fully applicable here:

- "NASD notices . . . are not law and noncompliance therewith cannot
  itself constitute a violation of the federal securities laws. . . . No duty
  of disclosure will arise directly from a NASD notice." <u>Donovan</u>,
  2003 U.S. Dist. LEXIS 13129, at *3.

- SEC Form N-4 does not require variable annuity prospectuses "to
  state that certain uses are 'unnecessary' or offer advice as to when, for

tax purposes or otherwise, to use a variable annuity in a retirement plan." Id. at *4

• The argument that variable annuities were "never appropriate" investments for qualified plans was simply incorrect, especially in light of the fact that NASD Notice 99-35 specifically envisioned precisely these types of combinations. Id. at *5.[6]

• The disclosures in the prospectus at issue in Donovan, like the disclosure in the prospectus at issue here, made plain that "both variable annuities and tax qualified retirement plans are tax deferrable." The Donovan court said of this disclosure: "That is enough to alert all reasonable investors to the fact that it is unnecessary, if solely for tax reasons, to use a variable annuity to fund a tax deferred retirement account." Id. (citing In re Ultimate Corp. Sec. Litig., 1989 WL 79372, at * 5 (S.D.N.Y. July 11, 1989) ("Liability does not arise from the failure to disclose that which should be obvious to the average investor."))

• The statute of limitations on Section 12(2) claims begins to run when the prospectus is issued. Id. at *6.

• In the absence of a primary securities law violation, claims for control person liability (such as, in the instant case, against World Money Group) must likewise fail. Id.

---

[6] Paralleling the shifting stance in this litigation as to whether variable annuities in qualified plans are "never appropriate," (Consolidated Complaint) "virtually never appropriate," (Opposition to Consolidated Complaint) or "generally not appropriate" (Amended Consolidated Complaint), plaintiffs in Donovan sought leave to amend their complaint upon its dismissal, in order to substitute a "generally not appropriate" theory for their discredited claim that variable annuities were "never appropriate" for qualified plans. The court described this change as "only a semantic difference" and rejected it, affirming its dismissal with prejudice. Donovan, 2003 U.S. Dist. Lexis at 15169 at *2-3.

As will be discussed more fully below, the grounds on which Judge Pollack dismissed plaintiffs' claims in <u>Donovan</u> are fully consistent with established Eleventh Circuit precedents. Both <u>Donovan</u> and those precedents require that this action be dismissed with prejudice as against WMAS.

## V.   **ARGUMENT**

A motion to dismiss a complaint under Fed. R. Civ. P. 12(b) (6) must be granted where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45, 2 L. ed. 2d 80, 78 S. Ct. 99 (1957). While a court must accept as true a plaintiff's factual allegations, a court will not accept "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." <u>Oxford Asset Mgmt., Ltd. v. Jaharis</u>, 297 F.3d 1182, 1188 (11th Cir. 2002). The Court may consider documents on which plaintiffs rely in their complaint, even if plaintiffs did not attach those documents, and any relevant documents, including prospectuses, which are legally required and publicly filed with the SEC. <u>See</u> <u>id</u>. If it is plain, as it is in this case, that plaintiff has not, and cannot, allege <u>facts</u> to support the claims in the complaint, then the complaint must be dismissed. <u>Id</u>. at 1188 (affirming dismissal with prejudice of claims under Sections 11, 12(a)(2) and 15).

## A.   The Amended Consolidated Complaint
### Should Be Dismissed As a "Shotgun" Pleading

As the Court made plain in its August 18, 2003 Order, a "shotgun"

complaint simply incorporates a mass of factual allegations into each count by

reference, forcing the court to "'sift out the irrelevancies.'"  Aug. 18, 2003 Order at

1 (citation omitted).  The Eleventh Circuit has repeatedly held that this is

impermissible.  In fact, each count must be pleaded with "clarity and precision,"

and it must identify the factual allegations that support each claim.  See, e.g.,

Anderson v. District Board of Trustees, 77 F.3d 364, 366-67 (11th Cir. 1996).  See

also Magluta v. Samples, 256 F.3d 1282, 1284 (11th Cir. 2001).  A complaint that

fails to meet this standard must be dismissed.  Id.  If a subsequent complaint also

suffers from the same deficiency, the court may dismiss the case.  Byrne v. Nezhat,

261 F.3d 1075, 1133 (11th Cir. 2001).

Rather than conforming his pleadings to the requirements of the law as this

Court specifically instructed in its August 18 Order, Johnson has simply used the

opportunity to submit yet a third complaint to add nearly 40 new paragraphs of

allegations.  This, coupled with his refusal to untangle the undifferentiated mass of

allegations that comprised the Consolidated Complaint, has led to the result that

the Amended Consolidated Complaint is even more obtuse and unwieldy than its

predecessors.

14

For instance, plaintiff Johnson remains unable to specify which factual allegations purportedly support which of his claims. Instead, Johnson incorporates all of his factual allegations into Count II (the only Count addressed to WMAS), despite the obvious irrelevancy to WMAS of many of these allegations. Moreover, Johnson purports to bring claims arising out of alleged "misrepresentations" and "omissions" in the offering documents. However, despite the fact that this is his third attempt, Johnson still has not even yet managed to identify those actual offering documents which governed the annuity he purchased. This alone demands dismissal of the Amended Consolidated Complaint. See Bresson v. Thomson McKinnon Securities, Inc., 641 F. Supp. 338, 342 (S.D.N.Y. 1986) ("[a]bsent some specification of the particular defective registration statement that formed the basis for the plaintiffs' purchases, the section 12(2) claim must be dismissed . . .") Remarkably, Johnson now even confuses things further by expanding his complaint to incorporate by reference a broad range of additional SEC filings, none of which is even alleged to have <u>anything to do with the transactions at issue in this action</u>. Am. Con. Compl. ¶¶ 120-27.

Indeed, a side-by-side comparison of the Amended Consolidated Complaint and its predecessors demonstrates that the only real distinguishing factor between them is the redundant and characteristically diffuse <u>additional</u> allegations contained

in the Amended Consolidated Complaint.  In blatant disregard of this Court's

August 18th Order, Johnson plainly has made no effort to impose any semblance

of order or "readability" onto his Amended Consolidated Complaint.  Instead, he

has chosen to simply restate his complaint, essentially its original form, and then to

add pages of irrelevant new allegations.[7]  Under such circumstances, the Amended

Consolidated Complaint should, like its predecessor, be struck.

**B.**   **Johnson's Section 12(2) Claim Must Be Dismissed Because There Was No Omission In The WRL Prospectus Or Any Other Disclosure Materials**

**1.**   **The Prospectus And Other Materials That Plaintiff Received When He Purchased His Annuity Contained All Of The Information He Now Claims Was Not Disclosed To Him**

---

[7] Most of the "new" factual allegations in the Amended Consolidated Complaint are only new in the sense that they were not earlier contained in the Consolidated Complaint.  In fact, these allegations were previously advanced in plaintiff's opposition to WMAS' motion to dismiss the Consolidated Complaint.  As was discussed in WMAS' reply memorandum in further support of their motion to dismiss, none of these factual allegations alter the plain legal deficiencies of any and all of the complaints which have been filed in this action.

As demonstrated below, none of the disclosures which Johnson claims were lacking were legally mandated, either under SEC Form N-4, Notice 99-35 or otherwise.[8]

Nevertheless, in all events, the WRL prospectus did make specific and adequate disclosures to Johnson regarding the very issues about which he now complains. As discussed above, passages in the WRL prospectus such as "[i]f you are purchasing the Contract through a tax-favored arrangement, you should consider carefully the costs and benefits of the Contract . . . before purchasing the Contract, since the tax-favored arrangement itself provides tax-sheltered growth," certainly disclosed to potential investors the fact that the variable annuity itself provides tax-sheltered growth. The WRL prospectus also specifically urged such purchasers to "carefully consider the costs and benefits" of purchasing it in an

---

[8] Section 12(2), §15 U.S.C. 77l, provides in relevant part:

> Any person who . . . offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made,   not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him . . . .

account that was itself already tax-favored, such as Johnson's alleged pre-existing IRA. See Prospectus at 7.

As Judge Pollack recognized in Donovan, these facts alone are entirely fatal to plaintiff's claim. Where, as is the case here, the fact that "both variable annuities and tax qualified retirement plans are tax deferrable" is disclosed, "[t]hat is enough to alert all reasonable investors to the fact that it is unnecessary, if solely for tax reasons, to use a variable annuity to fund a tax deferred retirement account." Donovan, 2003 U.S. Dist. Lexis 13129 at *5 (citing In re Ultimate Corp. Sec. Litig., 1989 WL 79372, at * 5 (S.D.N.Y. July 11, 1989) ("Liability does not arise from the failure to disclose that which should be obvious to the average investor."))

But the prospectus at issue in this litigation in fact provided significantly more than even this legally sufficient disclosure. The WRL prospectus specifically advised:

> Because variable annuity contracts provide tax deferral whether purchased as a qualified Contract or nonqualified contract, you should consider whether the features and benefits unique to variable annuities are appropriate for your needs when purchasing a qualified Contract.

Prospectus at 28.

Potential purchasers were then yet further cautioned by the WRL prospectus to "consult your legal counsel or tax advisor if you are considering purchasing a Contract for use with any retirement plan." Id. at 29.

Likewise, at the time that he purchased his variable annuity, Johnson

received and signed yet <u>additional</u> materials in which he was again <u>specifically</u>

<u>cautioned concerning the purported tax issues about which he now complains</u>.  For

example, the application for purchase, which became part of plaintiff's contract,

contained a "Statement of Owner" signed by Johnson in which he made the

following acknowledgements:

> I agree that this application shall be part of the annuity contract.  <u>I</u>
> <u>have received a current Prospectus for the contract.  I understand that</u>
> <u>I should consult my own tax advisor and/or legal counsel as to the</u>
> <u>consequences of using this product in conjunction with my own</u>
> <u>particular tax or financial plan.</u>  I understand that under the contract
> applied for values may increase or decrease depending upon
> investment experience.  I also state that the contract is in accordance
> with my financial plan.

(emphasis supplied).  Exhibit B at 2.

Similarly, in a disclosure signed contemporaneously with his application for

the variable annuity, Johnson, after again acknowledging that he had received a

copy of the WRL prospectus, initialed and signed a disclosure form in which he

stated that he understood "that the WMAS agent may not and has not offered any

tax advice, and I am (we are) responsible for the tax consequences of this

transaction."  Exhibit C at 2.

In view of the fact that Johnson received a copy of the WRL prospectus in

which he was specifically advised of the tax implications of his investment,

19

including very pointedly the fact that if the variable annuity was purchased through a "tax-favored account," such as his IRA, "tax-sheltered growth" would already be provided by that "tax-favored arrangement," and in view of the fact that Johnson was specifically urged to discuss the tax consequences of the annuity with his lawyer or tax adviser, and in view of the fact that plaintiff was specifically admonished to "carefully consider" the tax implications of purchasing an annuity through an IRA, Johnson cannot claim that the information he now says was withheld from him was not, in fact, disclosed.

### 2. There Is No Requirement That The Prospectus Address The Implications Of Combining The Annuity With Other Investments

In actuality, Johnson is not really complaining about a lack of "disclosure" regarding the variable annuity itself but, rather, about the disclosure surrounding the alleged sale of the variable annuity as purchased in or by a particular kind of account, in this case a pre-existing tax-deferred IRA. See, e.g., Am. Con. Compl. ¶114 ("Defendants failed to disclose that the tax-deferred variable annuities are almost always inappropriate investments for placement into the purchaser's tax-deferred qualified retirement plans.") Accordingly, this is not even truly a "disclosure" case, since it is not alleged that any facts regarding the variable annuity itself were not adequately disclosed. Instead, what Johnson is actually

20

complaining about, and which cannot be the basis for a § 12(2) claim, is the

alleged "unsuitability" of his investment under his own specific facts and

circumstances.

There is no obligation under the securities laws to provide disclosure in a

prospectus with respect to a potential <u>combination</u> a purchaser might make with a

product, nor could such disclosure as to all potential <u>combinations</u> possibly be

provided. <u>Dodds v. Cigna</u>, 12 F.3d 346, 351 (2d Cir. 1993) ("Issuers cannot be

expected to anticipate in their prospectuses or other offering papers the financial

needs of every potential investor [or] the investment alternatives before each

potential investor.") Significantly, Johnson is not claiming, nor could he, that the

WRL prospectus failed to disclose the fact that the variable annuity itself was tax-

deferred. Moreover, as a matter of law, Johnson himself is charged with

knowledge that his own alleged pre-existing IRA was tax-deferred and, at any rate,

the WRL prospectus itself certainly could have no disclosure obligations with

respect to that fact.

This disclosure more than satisfies the securities laws, which require

disclosure only of <u>firm-specific</u> information, <u>see</u> <u>Weilgos v. Commonwealth</u>

<u>Edison Co.</u>, 892 F.2d 509, 515 (7th Cir. 1989), such that

> outsiders may draw upon their own evaluative expertise in
> reaching their own investment decisions. . . . It is thus sufficient

if the company provides information as to material facts in a
format which a reasonable investor could reach his own
conclusions as to the risk of the transaction.

Consolidated Gold Fields v. Anglo Am. Corp., 713 F. Supp. 1457, 1470 (S.D.N.Y.

1989) (quoting SEC v. Texas Gulf Sulpher Co., 401 F.2d 833, 848-49 (2d Cir.

1968)).  As in Donovan, Johnson simply cannot show that the WRL prospectus

failed to meet this standard.  Donovan, 2003 U.S. Dist. Lexis 13129 at *5 (where

the fact that both "variable annuities and tax qualified retirement plans are tax

deferrable" is disclosed, "[t]hat is enough to alert all reasonable investors to the

fact that it is unnecessary, if solely for tax reasons, to use a variable annuity to fund

a tax deferred retirement account.")

### 3. NASD Notice To Members 99-35 Does Not Prescribe Any "Disclosure Requirements" For A Prospectus Employed In Connection With The Sale Of A Variable Annuity

In its current incarnation, Johnson's claim is apparently that the WRL

prospectus should have quoted verbatim from NASD Notice 99-35.  Johnson

claims that:

> Defendants failed to "disclose to the customer that the tax
> deferred accrual feature is provided by the tax-qualified
> retirement plan and that the tax deferred accrual feature of the
> variable annuity is unnecessary."

22

Am. Con. Compl. at 113 (quoting NASD Notice to Members 99-35); <u>see also id</u>. at ¶¶ 114-116 (listing other alleged omissions based on the language of Notice 99-35).

However, Notice 99-35 is wholly irrelevant to any claim regarding the WRL prospectus and its disclosures. First, the NASD regulates the conduct of securities brokers and dealers, such as WMAS, but not securities issuers, such as WRL. <u>See, e.g.</u>, <u>Riccard v. Prudential Ins. Co.</u>, 307 F.3d 1277, 1282 n.1 (11th Cir. 2002). As a result, the NASD does not even purport to regulate (and, indeed, cannot regulate) the contents of prospectuses created by issuers such as WRL which are thereafter used by brokers like WMAS. Accordingly, Notice 99-35 is specifically addressed only to the counseling and "suitability" determination <u>on the part of the broker</u> that is part of that broker's sale of a variable annuity. <u>However, such communications between broker (WMAS) and customer (Johnson) do not form the basis for any claim in this action.</u>

Second, Johnson's attempt to argue that the WRL prospectus omitted allegedly "required" disclosures, which disclosures are said to be based on Notice 99-35, just because the WRL prospectus did not <u>quote</u> verbatim the specific language of Notice 99-35, does not survive even a simple reading of the language of Notice 99-35 itself. Notice 99-35 sets forth guidelines for brokers that are

themselves stated to be "not mandatory." See Notice 99-35, at 229; see also id. ("The guidelines do not mandate any specific procedure.")  Thus Johnson's claim that liability can be imposed upon WMAS based on WMAS's use of a WRL prospectus which did not quote Notice 99-35 verbatim is without legal merit.

Moreover, in addition to lacking any legal merit, Johnson's claim is also entirely illogical.  As discussed above, Notice 99-35 is addressed to the matter of face-to-face communications between brokers, such as WMAS, and customers, such as Johnson, in connection with the sale of variable annuities.  However, as previously noted, in this case, Johnson is not pursuing any claim against WMAS based on any such face-to-face communications.  In addition, as previously discussed, by its very terms, nothing in Notice 99-35 is mandatory.  Instead, Notice 99-35 merely identifies issues for brokers to consider in the sale of variable annuities relating to the "suitability" of such investments where purchased in or by already tax-advantaged accounts.  Again, Johnson is not pursuing a "suitability claim" per se.  Instead, Johnson is pursuing, as regards WMAS, a purported "disclosure" claim under Section 12(2).  Lastly, nothing in Notice 99-35 requires that a broker even use a prospectus, such as the WRL prospectus here, in connection with the sale of a variable annuity, much less that a prospectus which is used contain any required "disclosures."

24

Therefore, in view of all of the foregoing, Johnson's apparent theory - that liability can somehow be imposed against WMAS under Section 12(2) because the WRL prospectus WMAS used in connection with its sale to Johnson of a variable annuity did not "conform" to the alleged "disclosure requirements" of Notice 99-35 - is entirely illogical. Notice 99-35 does not even require the use of a prospectus, much less delineate what it must contain and, more to the point, even in the area to which Notice 99-35 is addressed, i.e. face-to-face broker-customer communications, that which is contained in Notice 99-35 is not even mandatory. Accordingly, not only does Johnson's suggestion that Notice 99-35 can somehow provide the grounds for a "disclosure" claim under Section 12(2) against WMAS have no basis in the law, but it is equally without any basis in simple logic.

Beyond that, it has been repeatedly held not only that a plaintiff cannot assert a private cause of action for an alleged violation of an NASD Rule, see Thompson v. Smith Barney Harris Upham & Co., 704 F.2d 1413, 1419 (11th Cir. 1983), but courts have also specifically rejected the "alternative" argument, advanced by plaintiff here (see Am. Con. Compl. ¶ 97), that at the very least such rules should be evidence of "materiality." See In Re Verifone Sec. Litig., 11 F.3d 865, 870 (9th Cir. 1993) ("We decline to hold that a violation of exchange rules

governing disclosure may be imported as a surrogate for straight materiality analysis. . .")

Indeed, Judge Pollack in <u>Donovan</u> squarely rejected this very claim:

Plaintiffs note specifically that [NASD] Notice to Members 99-35, issued in May of 1999, requires members to disclose to the customer that the tax deferred accrual feature of the variable annuity is unnecessary where it is otherwise provided by a tax-qualified retirement plan. NASD notices, however, are not law and noncompliance therewith cannot itself constitute a violation of the federal securities laws. . . No duty of disclosure will arise directly from a NASD notice.

Therefore, Johnson's argument that Notice 99-35 is evidence of "materiality," or that it otherwise constitutes or implies any sort of disclosure requirement for a prospectus, should similarly be rejected in this case.

In fact, ironically, the mere existence of Notice 99-35, far from providing a legal basis for Johnson's claims, actually demonstrates that there is no basis for those claims. As previously discussed, putting semantics to one side, Johnson's claim is really that it is <u>always</u> improper for a variable annuity to be sold where it is purchased by or in an already tax-advantaged account, such as Johnson's IRA. If Notice 99-35 stands for anything, it stands for the <u>opposite</u> proposition. Indeed, Notice 99-35 provides to brokers, such as WMAS, guidelines to consider in their face-to-face communications with their customers as to when the purchase of a variable annuity by or in an already tax-advantaged account would be

26

advantageous for an investor and when it would not.  What Notice 99-35 most

certainly does not communicate to brokers such as WMAS is a flat prohibition on

such sales under all facts and circumstances (or what must be included in any

prospectus used by the broker.)

Johnson is not bringing a claim against WMAS relating solely to the alleged

"unsuitability" of his investment under his own specific facts and circumstances.

Instead, Johnson's claim is that, on a class-wide basis, such sales are always

improper, even without any consideration of each investor's specific circumstances.

Such a claim is not only not supported by Notice 99-35, Notice 99-35 itself makes

it clear that such a class-wide claim is entirely unsupportable.

### 4. SEC Form N-4 Does Not Require The Alleged "Disclosure" Plaintiff Seeks

Johnson alleges that in addition to Notice 99-35, "[d]efendants [including,

presumably, WMAS] had a second independent duty to disclose under SEC Form

N-4."  Am. Con. Compl. ¶ 98.  This is incorrect as a matter of law.

While Form N-4 specifies information that is to be included in a prospectus

for a variable annuity, Form N-4 does not require, as Johnson claims, that such

prospectuses state that the tax-deferred accrual features of variable annuities are

unnecessary when they are purchased by or in a tax-qualified retirement plan,

much less that Form N-4's requirements, such as they are, are applicable to a

broker, such as WMAS, as opposed to the actual issuer of the prospectus, like

WRL here.[9] See, e.g., Am. Con. Compl. ¶ 113

Indeed, Donovan summarily rejected this exact argument:

As for Plaintiffs' reference to SEC Form N-4, only variations in tax
consequences need be disclosed. The Prospectuses are not required to
state that certain uses are 'unnecessary' or offer advice as to when, for
tax purposes or otherwise, to use a variable annuity in a retirement
plan.

Donovan, 2003 U.S. Dist. Lexis 13129 at * 4.

Therefore, Johnson's claim that Form N-4 requires the disclosure that he

maintains was absent in the WRL prospectus is baseless, and it must similarly be

rejected here.

**C.    As a Matter Of Law, WMAS Did Not Act
Negligently In Using The WRL Prospectus
In The Sale To Johnson Or Otherwise**

Section 12(2) provides for liability on the part of the "seller" of securities

only if, first, the "seller" makes a material misstatement or omission and then,

---

[9] The portion of Form N-4 plaintiff points to as containing this requirement states:

Briefly describe the tax consequences to investors of an investment in the
variable annuity contracts being offered. . . . Instruction: . . . . If the tax
consequences vary depending on the use of the variable annuity contract
(i.e., to fund an individual retirement annuity or corporate plan), the
variations should be briefly described. Am. Con. Compl. ¶ 99.

second, the "seller" "cannot sustain the burden of proof that he did not know, and

in the exercise of reasonable care could not have known, of such untruth or

material omission." 15 § U.S.C. 77l(2).  Accordingly, "[t]he standard is essentially

one of negligence." Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co., 95-

CV-141, 1998 U.S. Dist LEXIS 11783 at *50 (W.D. Mich. Jun. 15, 1998).

"Federal courts agree that a showing by the seller that he made reasonable inquiries

. . . and discovered nothing wrong" defeats as a matter of law a plaintiff's claims

against a seller under §12(2). Sanders v. John Nuveen & Co., 619 F.2d 1222, 1228

(7th Cir. 1980).

Given the copious disclosures and warnings contained in the WRL

prospectus and other documents regarding the very issues about which plaintiff

now complains, WMAS cannot, as a matter of law, be held to have acted

negligently in using the WRL prospectus (which, of course, WMAS did not even

prepare) in selling the variable annuity to Johnson. The "reasonable inquiry"

required of WMAS under Section 12(2) into the issue of the adequacy of the tax

issues was, as a matter of law, satisfied in the present circumstances by the very

disclosures in the WRL prospectus and other disclosure documents. Therefore, as

a matter of law, WMAS could not have been negligent, because it was in all events

reasonable for WMAS to believe that, given these disclosures, the disclosures adequately apprised Johnson of the very risks of which he now complains.

**D.    Plaintiff's Section 12(2) Claim Must
Be Dismissed Because It Is Time-Barred**

In addition, Johnson's claim under §§ 12(a)(2) of the Securities Act must be dismissed because it was not asserted within the one-year period of limitations applicable to such claims.  See 15 U.S.C. § 77(m) ("No action shall be maintained to enforce any liability created under section [12] unless brought within one year after the discovery of the untrue statement or omission, or after the discovery should have been made by the exercise of reasonable diligence.")  According to the Amended Consolidated Complaint, Johnson bought the variable annuity on which this action is based on July 10, 2000.[10]  Am. Con. Compl. ¶ 22.  At that time, he was also provided with copies of the prospectus containing the disclosures regarding the tax features and costs of the variable annuities.  See Exhibit B at 2. Johnson then filed his initial complaint on October 1, 2001, well over one year later.  The routine application of established statute of limitation principles leads to the conclusion that Johnson's § 12(2) claim is time-barred because it was not brought within one year of his receipt of his prospectus.  See, e.g., Donovan, 2003

---

[10] But see footnote 5, supra.

U.S. Dist. Lexis 13129 at *6 (statute of limitations begins to run at issuance of prospectus). Johnson's claim against World Money Group is also time-barred.[11]

In an attempt to circumvent this obvious conclusion, Johnson alleges that his § 12(2) claim accrued not on July 10, 2000, the date when he claims that he purchased his annuity and received his disclosure materials, but rather on October 2, 2000, the date when he alleges he first consulted the Georgia Department of Insurance and was allegedly told that the investment was "inappropriate" for his needs. Am. Con. Compl. ¶¶ 167-168. Significantly, Johnson specifically alleges that the Georgia Department of Insurance gave him this purported advice on the basis of a review of "all of the documentation he had received from WRL and

---

[11] Defendant WMAS was first named in the complaint filed on October 1, 2001, 15 1/2 months after plaintiff received his prospectus. Defendant World Money Group, however, was first sued in the Consolidated Complaint, which was filed on December 9, 2002, nearly 30 full months after plaintiff received his prospectus. Plaintiff cannot avail himself of any "relation back" doctrine under Fed. R. Civ. P. 15(c) with respect to World Money Group, because the 11th Circuit has squarely held that where, as here, a plaintiff fails to allege "control person" liability despite knowledge of the existence of potentially controlling parties, the subsequent addition of an alleged controlling party does not "relate back" for statute of limitations purposes. See Powers v. Graff, 148 F. 3d 1223, 1227 (11th Cir. 1998). Plaintiff makes no allegation here that such knowledge was only necessarily discovered subsequent to the filing of the original Complaint. Thus in all events plaintiff's claim against World Money Group is time-barred.

WMAS," which was of course nothing other than the very information Johnson undisputedly received at the time of the purchase of his variable annuity. Id.

In fact, these additional allegations simply confirm the fact that Johnson had at least "inquiry notice" of his purported claim by July 10, 2000, well more than a year before he brought suit, and that on this basis any 12(2) claim against WMAS should be dismissed.

"Inquiry notice is the term used for knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights have been infringed." Theoharus v. Fong, 256 F.3d 1219, 1228 (11th Cir. 2001); see also Dodds, 12 F.3d at 349 ("The test as to when fraud should with reasonable diligence have been discovered is an objective one. 'The means of knowledge are the same thing in effect as knowledge itself.'") The ample disclosure contained in the WRL prospectus and other materials that Johnson received at the time of his purchase was at the very least sufficient to put him on such "inquiry notice." Language in the WRL prospectus, such as the following, was sufficient to alert a reasonable person of at least the possibility (which is the test for "inquiry notice") of the issues about which Johnson now complains:

> If you are purchasing the Contract through a tax-favored arrangement, including traditional IRAs and Roth IRAs, you should consider carefully the costs and benefits of the Contract (including annuity income benefits) before purchasing the

> Contract, <u>since the tax-favored arrangement itself provides tax-sheltered growth.</u>
>
> . . . .
>
> Because variable annuity contracts provide tax deferral whether purchased as a qualified Contract or nonqualified Contract, you should consider whether the features and benefits unique to variable annuities are appropriate for your needs when purchasing a qualified Contract.

Prospectus at 7, 28 (emphasis added).

Indeed, as discussed above, in <u>Donovan,</u> Judge Pollack ruled as a matter of law that disclosures such as these were not only sufficient to put a potential plaintiff on "inquiry notice," but that in addition they actually constituted <u>full disclosure.</u>  <u>Donovan,</u> 2003 U.S. Dist. Lexis 13129 at *5 ("That is enough to alert all reasonable investors to the fact that it is unnecessary, if solely for tax reasons, to use a variable annuity to fund a tax deferred retirement account.")

Thus, the alleged non-disclosure about which Johnson now complains was actually fully disclosed to him in the very prospectus he received when he purchased his variable annuity.  As a matter of law, Johnson is charged with the knowledge of the information contained in the prospectus as of the date he received it, regardless of whether or not he read it.  <u>See</u> <u>Franze v. Equitable Assurance Co.,</u> 296 F. 3d 1250, 1253 (11th Cir. 2002) (securities fraud plaintiffs held to be on "inquiry notice" of their claims as of the date they received a

33

prospectus detailing risks of their investment, "despite the fact that they . . . did not

read any of the documents."); Brumbaugh v. Princeton Partners, 985 F.2d 157, 163

(4th Cir. 1993) ("when a prospectus sufficiently discloses the risks inherent in an

investment, the investor is on inquiry notice of his claims.")  Therefore, Johnson's

argument that his claim did not accrue on the date he received his prospectus is

without merit.

In fact, Johnson's allegations regarding his communications with the

Georgia Department of Insurance only serve to demonstrate that, as a matter of

law, the disclosure materials provided to him at the time of his purchase more than

sufficed to put him on "inquiry notice."  As previously discussed, Johnson

acknowledges that the disclosure materials he received in connection with his

purchase, and nothing else, were the very materials he claims he gave to the

Georgia Department of Insurance.  Johnson alleges in the Amended Consolidated

Complaint that, on the basis of those very materials alone, employees of the

Insurance Department told him that his investment was inappropriate.  Am. Con.

Comp. ¶¶ 167-168 ("[h]e gave Messrs. Whalan and Gaddis [of the Georgia

Insurance Department] all the documentation he had received from WRL and

WMAS.  Messrs. Whalan and Gaddis reviewed this documentation and then told

him that . . . ")  Thus, it is plain that the information that Johnson complains was

allegedly not disclosed to him – information which Johnson claims would have

alerted him to the supposed unsuitability of his investment - was in fact contained

in the very disclosure materials themselves, since, according to Johnson himself,

the individuals from the Georgia Department of Insurance had no difficulty

identifying these issues in the materials which Johnson had received more than a

year before filing suit.

> **E.      Johnson's Section 12(2) Claim
> Must Be Dismissed Because As a
> Matter of Law He Has Suffered
> No Legally Cognizable Damages**

Johnson identifies the only two factors which, by his account, have allegedly

led to a decrease in the value of his investment.  These are the fees associated with

the investment, and the drop in the actual market value of his investment.  Am.

Con. Compl. ¶ 149 ("Part of the decrease in the value of Mr. Johnson's variable

annuity was caused by the fees and charges which WRL deducted from his

variable annuity account and part of the decrease was caused by the decrease in the

market value of the variable annuity portfolios.")  However, Johnson does not and

cannot allege that any information regarding the fees he was charged was not fully

disclosed to him.  Therefore, the Amended Consolidated Complaint itself

affirmatively establishes that plaintiff has suffered no damages of the sort which

are legally cognizable under § 12(2).  His § 12(2) claim must be dismissed on this

basis as well.[12]

The Private Securities Litigation Reform Act ("PSLRA") amended Section

12 to add a new Section 12(b), which provides as follows:

> (b) Loss Causation – In an action described in subsection (a)(2),
> if the person who offered or sold such security proves that any
> portion or all of the amount recoverable under subsection (a)(2)
> represents other than the depreciation in value of the subject
> security resulting from such part of the prospectus or oral
> communication, with respect to which the liability of that
> person is asserted, not being true or omitting to state a material
> fact required to be stated therein or necessary to make the
> statement not misleading, then such portion or amount, as the
> case may be, shall not be recoverable.

Therefore, after the PSLRA, damages for investment losses are not legally

recoverable to the extent that, as in the instant case, they do not result directly from

the misleading statement or omission on which liability is allegedly founded.  See

generally Federal Securities Litigation: Commentary and Forms, David M.

---

[12] While § 12(b) provides an affirmative defense, where, as here, a complaint
demonstrates on its face that such a defense exists, a motion to dismiss pursuant to
Rule 12(b)(6) on that basis is proper.  "A complaint is also subject to dismissal
under Rule 12(b)(6) when its allegations -- on their face -- show that an affirmative
defense bars recovery on the claim."  Marsh v. Butler County, 268 F.3d 1014, 1022
(11th Cir. 2001); see also Quiller v. Barclays American/Credit, Inc., 727 F.2d 1067,
1069 (11th Cir. 1984) (holding that complaint is "self-defeating" when complaint's
"own allegations show that the defense exists" which would preclude a pleader's
ability to recover.)

Brodsky and Daniel J. Kramer, at 2-13, 2-14; 5-29.  In other words, whereas prior to the PSLRA a defendant was liable under Section 12(2) for <u>any</u> decrease in the market value of a security once a misrepresentation or omission was established, even if that decrease was wholly unrelated to the claimed misstatement or omission, Section 12(b) was added to specifically change that result.  Now, under the PSLRA, legally cognizable loss under Section 12 is <u>only</u> that loss that is directly attributable to the misrepresentation or omission on which liability is said to be based.

No such loss is even alleged in this case.  Instead, Johnson has acknowledged, as he must, that <u>none of the loss in his investment</u> was related to any claimed disclosure or lack thereof on the so-called "tax issue."  Thus the claimed "loss" in Johnson's investment relates either to market loss, which has nothing to do with the alleged "tax issue," or to costs and fees, and there is no claim by Johnson that any information related to costs and fees was withheld from him.  Therefore, as a matter of law, Johnson cannot claim to have suffered damages of the sort recoverable under Section 12, given the amendment to Section

37

12(b) under the PSLRA. On this basis alone, Johnson's § 12(2) claim must be dismissed.[13]

**F.    Plaintiff's Claim For Liability
       Under §15 Must Likewise Be Dismissed**

Section 15 of the 1933 Act makes persons who "control" any person liable under § 11 or § 12 jointly and severally liable to the same extent as the controlled person, unless the alleged control person "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o.   Thus, two elements are required to establish a prima facie case of control person liability pursuant to §15: (1) an underlying primary violation of the securities laws by the controlled person; and (2) control over that controlled person at the time of the violation.   See In Re Deutsch Telekom A.G. Securities Litig., 00 Civ. 9475, 2002 U.S. Dist. LEXIS

---

[13] Johnson's claim that he suffered damages because, without the alleged omission regarding the tax issues, he simply would not have bought the variable annuity in the first place, and he therefore would not have been subject to the market loss (however unrelated to the "tax issue") and the fees (however fully disclosed), does not support a different result. Am. Con. Compl. ¶ 149. This is precisely the type of damage claim that Section 12(b) was enacted to preclude, as it plainly is not a claim that the "depreciation in value of the subject security result[ed] from such part of the prospectus or oral communication, with respect to which the liability . . . is asserted." Only such losses are recoverable under Section 12 and, as a matter of law, no such loss is even alleged by Johnson in this case.

2627 (S.D.N.Y. February 20, 2002); <u>Brown v. Enstar Group, Inc.</u>, 84 F.3d 393,
396 (11th Cir. 1996).

As demonstrated above, plaintiff cannot establish an underlying violation by
WMAS under Section 12. Plaintiff's claim for control person liability against
World Money Group under § 15 must therefore be dismissed. <u>Donovan</u>, 2003 U.S.
Dist. LEXIS 13129 at * 6.

Moreover, plaintiff has not and cannot plead any specific facts that would
show that World Money Group had the power to control WMAS at the <u>time of the
acts alleged in the complaint</u>. Thus, the merely conclusory allegation that World
Money Group "controlled" WMAS during the times complained of in the
complaint is without basis. <u>See, e.g.</u>, <u>Theoharous</u>, 256 F.3d at 1228 (conclusory
allegations do not state a claim for control person liability)

## VI.   **CONCLUSION**

For all the foregoing reasons, as well as for all the reasons set forth in the
Memorandum of AEGON USA, Inc., et al., defendants WMA Securities, Inc. and
World Money Group, Inc. respectfully request that the Amended Consolidated
Complaint be dismissed with prejudice.

This 29th day of September, 2003.

OF COUNSEL:                                    DUANE MORRIS LLP
John J. Soroko
Wayne A. Mack
Henry A. Lanman
Duane Morris LLP                               John C. Herman
One Liberty Place                                   (Ga. Bar No. 348370)
Philadelphia, PA 19103-7396                    Claus D. Melarti
(215) 979-1000                                      (Ga. Bar No. 501181)

                                               1180 West Peachtree Street
                                               Suite 700
                                               Atlanta, GA 30309-3448
                                               (404) 253-6900 Phone
                                               (404) 253-6901 Fax

                                               Attorneys for Defendants
                                               WMA SECURITIES, INC. AND
                                               WORLD MONEY GROUP, INC.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), this certifies that this Memorandum of Law

is in 14 point Times New Roman font in accordance with Local Rule 5.1(B).

Dated:  September 29, 2003.

Claus D. Melarti
(Ga. Bar No. 501181)

DUANE MORRIS LLP
1180 West Peachtree Street
Suite 700
Atlanta, GA 30309-3448
(404) 253-6900 Phone
(404) 253-6901 Fax

Attorneys for Defendants
WMA Securities, Inc. and
World Money Group, Inc.

41



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

# WRL FREEDOM WEALTH CREATOR®
## VARIABLE ANNUITY
Issued Through
WRL SERIES ANNUITY ACCOUNT
By
WESTERN RESERVE LIFE ASSURANCE CO. OF OHIO

**Prospectus**
**May 1, 2000**

This prospectus gives you important information about the WRL Freedom Wealth Creator®, a flexible payment variable accumulation deferred annuity contract. Please read this prospectus and the mutual fund prospectuses before you invest and keep them for future reference. This Contract is available to individuals as well as to certain groups and individual retirement plans.

You can put your money into 30 investment choices: a fixed account and 29 subaccounts of the WRL Series Annuity Account. Money you put in a subaccount is invested exclusively in a single mutual fund portfolio. Your investments in the portfolios are not guaranteed. You could lose your money. Money you direct into the fixed account earns interest at a rate guaranteed by Western Reserve.

The 29 portfolios we currently offer through the subaccounts under this Contract are:

| WRL SERIES FUND, INC. | |
|---|---|
| WRL VKAM Emerging Growth | WRL Great Companies — America ℠ |
| WRL J. Rowe Price Small Cap | WRL Salomon All Cap |
| WRL Goldman Sachs Small Cap | WRL C.A.S.E. Growth |
| WRL Pilgrim Baxter Mid Cap Growth | WRL Dreyfus Mid Cap |
| WRL Alger Aggressive Growth | WRL NWQ Value Equity |
| WRL Third Avenue Value | WRL T. Rowe Price Dividend Growth |
| WRL Value Line Aggressive Growth | WRL Dean Asset Allocation |
| WRL GE International Equity (formerly, WRL GE Scottish Equitable International Equity) | WRL LKCM Strategic Total Return |
| WRL Janus Global | WRL J.P. Morgan Real Estate Securities |
| WRL Great Companies — Technology | WRL Federated Growth & Income |
| WRL Janus Growth | WRL AEGON Balanced |
| WRL Goldman Sachs Growth | WRL AEGON Bond |
| WRL GE U.S. Equity | WRL J.P. Morgan Money Market |

| VARIABLE INSURANCE PRODUCTS FUND (VIP) |
|---|
| Fidelity VIP Equity-Income Portfolio — Service Class 2 |

| VARIABLE INSURANCE PRODUCTS FUND II (VIP II) |
|---|
| Fidelity VIP II Contrafund® Portfolio — Service Class 2 |

| VARIABLE INSURANCE PRODUCTS FUND III (VIP III) |
|---|
| Fidelity VIP III Growth Opportunities Portfolio — Service Class 2 |

If you would like more information about the WRL Freedom Wealth Creator®, you can obtain a free copy of the Statement of Additional Information ("SAI") dated May 1, 2000. Please call us at 1-800-851-9777 or write us at: Western Reserve, Administrative Office - Annuity Department, P.O. Box 9051, Clearwater, Florida 33758-9051. A registration statement, including the SAI, has been filed with the Securities and Exchange Commission ("SEC") and is incorporated herein by reference. The SEC maintains a web site (www.sec.gov) that contains the prospectus, the SAI, material incorporated by reference and other information. The table of contents of the SAI is included at the end of this prospectus.

Please note that the Contract and the funds:
* are not bank deposits
* are not federally insured
* are not endorsed by any bank or government agency
* are not guaranteed to achieve their goal
* involve risks, including possible loss of premium

The Securities and Exchange Commission has not approved or disapproved these securities or passed upon the adequacy of this prospectus. Any representation to the contrary is a criminal offense.

# Table of Contents

Definitions of Special Terms ................................................................... 1

Summary ...................................................................................... 3

Annuity Contract Fee Table ................................................................... 9

Examples ..................................................................................... 11

1.    The Annuity Contract ..................................................................... 12
     The Contract ........................................................................... 12
     Other Contracts ....................................................................... 13

2.    Annuity Payments (The Income Phase) .................................................... 13
     Annuity Payment Options Under the Contract ............................................ 13
     Fixed Annuity Payment Options........................................................... 14
     Variable Annuity Payment Options........................................................ 15

3.    Purchase ................................................................................. 16
     Contract Issue Requirements............................................................. 16
     Purchase Payments ..................................................................... 16
     Initial Purchase Requirements........................................................... 16
     Additional Purchase Payments ........................................................... 16
     Maximum Annual Purchase Payments....................................................... 17
     Allocation of Purchase Payments......................................................... 17
     Right to Cancel Period ................................................................. 17
     Annuity Value ......................................................................... 17
     Accumulation Units...................................................................... 18

4.    Investment Choices ....................................................................... 18
     The Separate Account ................................................................... 18
     The Fixed Account ..................................................................... 20
     Transfers............................................................................... 20
     Dollar Cost Averaging Program .......................................................... 21
     Asset Rebalancing Program .............................................................. 22
     Telephone or Fax Transactions .......................................................... 22
     Third Party Investment Services......................................................... 23

5.    Expenses ................................................................................. 23
     Mortality and Expense Risk Charge....................................................... 23
     Annual Contract Charge ................................................................. 24
     Transfer Charge ....................................................................... 24
     Loan Processing Fee .................................................................... 24
     Change in Purchase Payment Allocation Fee ............................................... 24
     Premium Taxes ......................................................................... 25
     Federal, State and Local Taxes......................................................... 25
     Withdrawal Charge ..................................................................... 25
     Portfolio Management Fees .............................................................. 27
     Reduced or Waived Charges and Expenses to Employees ..................................... 27

6.    Taxes ................................................................................... 28
     Annuity Contracts in General............................................................ 28
     Qualified and Nonqualified Contracts.................................................... 28
     Partial Withdrawals and Complete Surrenders — Nonqualified Contracts.................... 29
     Multiple Contracts..................................................................... 30

i

|  | Diversification and Distribution Requirements | 30 |
|  | Partial Withdrawals and Complete Surrenders — Qualified Contracts | 30 |
|  | Taxation of Death Benefit Proceeds | 31 |
|  | Annuity Payments | 31 |
|  | Transfers, Assignments or Exchanges of Contracts | 32 |
|  | Net Income Makeup Charitable Remainder Unitrusts (NIMCRUTs) | 32 |
|  | Possible Tax Law Changes | 32 |
| 7. | Access to Your Money | 32 |
|  | Partial Withdrawals and Complete Surrenders | 32 |
|  | Delay of Payment and Transfers | 34 |
|  | Systematic Partial Withdrawals | 34 |
|  | Contract Loans for Qualified Contracts | 34 |
| 8. | Performance | 36 |
| 9. | Death Benefit | 37 |
|  | When We Pay a Death Benefit | 37 |
|  | When We Do Not Pay a Death Benefit | 38 |
|  | Amount of Death Benefit During the Accumulation Period | 38 |
|  | Alternate Payment Elections Before the Maturity Date | 39 |
| 10. | Other Information | 39 |
|  | Ownership | 39 |
|  | Annuitant | 40 |
|  | Beneficiary | 40 |
|  | Assignment | 40 |
|  | Western Reserve Life Assurance Co. of Ohio | 40 |
|  | The Separate Account | 40 |
|  | Voting Rights | 41 |
|  | Distribution of the Contracts | 41 |
|  | Non-Participating Contract | 42 |
|  | Variations in Contract Provisions | 42 |
|  | IMSA | 42 |
|  | Legal Proceedings | 42 |
|  | Financial Statements | 42 |
| Table of Contents of the Statement of Additional Information | | 43 |
| Appendix A — Condensed Financial Information | | 44 |
| Appendix B — Historical Performance Data | | 53 |

# Definitions of Special Terms

| | |
|---|---|
|  | The period between the Contract date and the maturity date while the Contract is in force. |
| accumulation unit value | An accounting unit of measure we use to calculate subaccount values during the accumulation period. |
|  | Our administrative office and mailing address is P.O. Box 5068, Clearwater, Florida 33758-5068. Our street address is 570 Carillon Parkway, St. Petersburg, Florida 33716. Our phone number is 1-800-851-9777. |
| age | The issue age, which is annuitant's age on the birthday nearest the Contract date, plus the number of completed Contract years. When we use the term "age" in this prospectus, it has the same meaning as "attained age" in the Contract. |
| annuitant | The person you named in the application (or later changed), to receive annuity payments. The annuitant may be changed as provided in the Contract's death benefit provisions and annuity provision. |
| annuity unit value | An accounting unit of measure we use to calculate annuity payments from the subaccounts after the maturity date. |
|  | The sum of the separate account value and the fixed account value. |
| beneficiary(ies) | The person(s) you elect to receive the death benefit proceeds under the Contract. |
|  | The annuity value less any applicable premium taxes and any withdrawal charge. |
| Code | The Internal Revenue Code of 1986, as amended. |
|  | The later of the date on which the initial purchase payment is received or the date that the properly completed application is received at Western Reserve's administrative office. We measure Contract years, Contract months and Contract anniversaries from the Contract date. |
| death report day | The valuation date on which we have received both proof of annuitant's death and your beneficiary's election regarding payment. |
|  | An option to which you can direct your money under the Contract, other than the separate account. It provides a guarantee of principal and interest. The assets supporting the fixed account are held in the general account. The fixed account is not available in all states. |
| fixed account value | During the accumulation period, your Contract's value in the fixed account. |
| funds | Investment companies which are registered with the U.S. Securities and Exchange Commission. The Contract allows you to invest in the portfolios of the funds through our subaccounts. We reserve the right to add other registered investment companies to the Contract in the future. |
| in force | Condition under which the Contract is active and the owner is entitled to exercise all rights under the Contract. |

1

| | |
|---|---|
|  maturity date | The date on which the accumulation period ends and annuity payments begin. The latest maturity date is the annuitant's 90th birthday. For Contracts issued in conjunction with Net Income Makeup Charitable Remainder Unitrusts, the latest maturity date is the annuitant's 100th birthday. |
| NYSE | New York Stock Exchange. |
| nonqualified Contracts | Contracts issued other than in connection with retirement plans. |
| owner (you, your) | The person(s) entitled to exercise all rights under the Contract. The annuitant is the owner unless the application states otherwise, or unless a change of ownership is made at a later time. Joint owners may be named, provided the joint owners are husband and wife. Joint ownership is not available in all states. |
| portfolio | A separate investment portfolio of a fund. |
| purchase payments | Amounts paid by an owner or on the owner's behalf to Western Reserve as consideration for the benefits provided by the Contract. When we use the term "purchase payment" in this prospectus, it has the same meaning as "net purchase payment" in the Contract, which means the purchase payment less any applicable premium taxes. |
| qualified Contracts | Contracts issued in connection with retirement plans that qualify for special federal income tax treatment under the Code. |
| separate account | WRL Series Annuity Account, a separate account composed of subaccounts established to receive and invest purchase payments not allocated to the fixed account. |
| separate account value | During the accumulation period, your Contract's value in the separate account, which equals the total value in each subaccount. |
| subaccount | A subdivision of the separate account that invests exclusively in the shares of a specified portfolio and supports the Contracts. Subaccounts corresponding to each portfolio hold assets under the Contract during the accumulation period. Other subaccounts corresponding to each portfolio will hold assets after the maturity date if you select a variable annuity option. |
| surrender | The termination of a Contract at the option of the owner. |
| valuation date/ business day | Each day on which the NYSE is open for trading, except when a subaccount's corresponding portfolio does not value its shares. Western Reserve is open for business on each day that the NYSE is open. When we use the term "business day," it has the same meaning as valuation date. |
| valuation period | The period of time over which we determine the change in the value of the subaccounts in order to price accumulation units and annuity units. Each valuation period begins at the close of normal trading on the NYSE (currently 4:00 p.m. Eastern time on each valuation date) and ends at the close of normal trading of the NYSE on the next valuation date. |
| Western Reserve (we, us, our) | Western Reserve Life Assurance Co. of Ohio. |

2

# Summary

The sections in this summary correspond to sections in this prospectus, which discuss the topics in more detail. Please read the entire prospectus carefully.

## 1. The Annuity Contract

The WRL Freedom Wealth Creator® is a flexible payment variable accumulation deferred annuity contract (the "Contract") offered by Western Reserve. It is a contract between you, as the owner, and Western Reserve, a life insurance company. The Contract provides a way for you to invest on a tax-deferred basis in the subaccounts of the separate account and the fixed account. We intend the Contract to be used to accumulate money for retirement or other long-term investment purposes.

The Contract allows you to direct your money into any of the 29 subaccounts. Each subaccount invests exclusively in a single portfolio of a fund. The money you invest in the subaccounts will fluctuate daily based on the portfolio's investment results. The value of your investment in the subaccounts is not guaranteed and may increase or decrease. You bear the investment risk for amounts you invest in the subaccounts.

You can also direct money to the fixed account. Amounts in the fixed account earn interest annually at a fixed rate that is guaranteed by us never to be less than 3%, and may be more. We guarantee the interest, as well as principal, on money placed in the fixed account.

You can transfer money between any of the investment choices during the accumulation period, subject to certain limits on transfers from the fixed account.

The Contract, like all deferred annuity contracts, has two phases: the "accumulation period" and the "income phase." During the accumulation period, earnings accumulate on a tax-deferred basis and are taxed as ordinary income when you take them out of the Contract. The income phase starts on the maturity date when you begin receiving regular payments from your Contract. The money you can accumulate during the accumulation period, as well as the annuity payment option you choose, will largely determine the amount of any income payments you receive during the income phase.

## 2. Annuity Payments (The Income Phase)

The Contract allows you to receive income under one of five annuity payment options. You may choose from fixed payment options or variable payment options. If you select a variable payment option, the dollar amount of the payments you receive may go up or down depending on the investment results of the portfolios you invest in at that time. You cannot annuitize until your Contract's fifth anniversary.

## 3. Purchase

You can buy this Contract with $5,000 ($1,000 for traditional or Roth IRAs and $50 for other qualified Contracts) or more under most circumstances. You can add as little as $50 at any time during the accumulation period.

3

## 4.  Investment Choices

You can invest your money in any of the 29 fund portfolios by directing it to the corresponding subaccount. The portfolios are described in the fund prospectuses. The portfolios now available to you under the Contract are:

### WRL SERIES FUND, INC.

☐ WRL VKAM Emerging Growth
☐ WRL T. Rowe Price Small Cap
☐ WRL Goldman Sachs Small Cap
☐ WRL Pilgrim Baxter Mid Cap Growth
☐ WRL Alger Aggressive Growth
☐ WRL Third Avenue Value
☐ WRL Value Line Aggressive Growth
☐ WRL GE International Equity
☐ WRL Janus Global
☐ WRL Great Companies — Technology$^{SM}$
☐ WRL Janus Growth
☐ WRL Goldman Sachs Growth
☐ WRL GE U.S. Equity

☐ WRL Great Companies — America$^{SM}$
☐ WRL Salomon All Cap
☐ WRL C.A.S.E. Growth
☐ WRL Dreyfus Mid Cap
☐ WRL NWQ Value Equity
☐ WRL T. Rowe Price Dividend Growth
☐ WRL Dean Asset Allocation
☐ WRL LKCM Strategic Total Return
☐ WRL J.P. Morgan Real Estate Securities
☐ WRL Federated Growth & Income
☐ WRL AEGON Balanced
☐ WRL AEGON Bond
☐ WRL J.P. Morgan Money Market

### VARIABLE INSURANCE PRODUCTS FUND

Fidelity VIP Equity-Income Portfolio — Service Class 2

### VARIABLE INSURANCE PRODUCTS FUND II (VIP II)

Fidelity VIP II Contrafund® Portfolio — Service Class 2

### VARIABLE INSURANCE PRODUCTS FUND III (VIP III)

Fidelity VIP III Growth Opportunities Portfolio — Service Class 2

Depending upon market conditions, you can make or lose money in any of these subaccounts. We reserve the right to offer other investment choices in the future.

You can also allocate your purchase payments to the fixed account. The fixed account is not available in all states. Residents of Washington, Oregon, New Jersey, and Massachusetts may not direct or transfer any money to the fixed account.

Transfers. You have the flexibility to transfer assets within your Contract. At any time during the accumulation period you may transfer amounts among the subaccounts and between the subaccounts and the fixed account. Certain restrictions apply.

## 5.  Expenses

We do not take any deductions from purchase payments at the time you buy the Contract. You invest the full amount of each purchase payment in one or more of the investment choices.

During the accumulation period and the income phase, we deduct a daily mortality and expense risk charge of 1.40% each year from the money you have invested in the subaccounts. We intend to reduce this charge to 1.25% (during the accumulation period) after the first seven Contract years, although we do not guarantee that we will do so.

During the accumulation period, we deduct an annual Contract charge of $35 from the annuity value on each Contract anniversary and at the time of surrender. We currently waive

this charge if the total purchase payments, minus all partial withdrawals equals or exceeds $50,000 on the Contract anniversary when this charge is payable. However, we will deduct this charge from your annuity value if you surrender your Contract completely.

We impose a $25 charge per transfer if you make more than 12 transfers among the subaccounts per Contract year.

. We may deduct state premium taxes, which currently range from 0% to 3.50%, when you make your purchase payments, or if you surrender the Contract or partially withdraw its value, or if we pay out death benefit proceeds, or if you begin to receive regular annuity payments. We only charge you premium taxes in those states that require us to pay premium taxes.

If you make a partial withdrawal or surrender your Contract completely, we will deduct a withdrawal charge for purchase payments withdrawn within seven years after we receive a purchase payment. This charge is 8% of amount that must be withdrawn if the withdrawal occurs within 12 months or less of our receipt of the purchase payment, and then declines gradually to 7% - 13 through 24 months; 6% - 25 through 36 months; 5% - 37 through 48 months; 4% - 49 through 60 months; 3% - 61 through 72 months; 2% - 73 through 84 months; and no withdrawal charge - 85 months or more.

When we calculate withdrawal charges, we treat withdrawals as coming first from the oldest purchase payment, then the next oldest and so forth. For the first withdrawal you make in any Contract year, we will waive that portion of the withdrawal charge that is based on the first 10% of your Contract's annuity value at the time of the withdrawal. Amounts of the first withdrawal in excess of the first 10% of your Contract's annuity value and all subsequent withdrawals you make during the Contract year will be subject to a withdrawal charge. We deduct the full withdrawal charge if you surrender your Contract completely. We waive this charge under certain circumstances. See Expenses — Withdrawal Charge on page 25 for how we calculate the withdrawal charge waived.

The portfolios deduct management fees and expenses from amounts you have invested in the portfolios. Some portfolios also deduct 12b-1 fees from portfolio assets. These charges currently range from 0.44% to 1.20% annually, depending on the portfolio. See the Annuity Contract Fee Table on page 9 of this prospectus and the fund prospectuses.

## 6. Taxes

The Contract's earnings are generally not taxed until you take them out. For federal tax purposes, if you take money out during the accumulation period, earnings come out first and are taxed as ordinary income. If you are younger than 59½ when you take money out, you may be charged a 10% federal penalty tax on the earnings. The annuity payments you receive during the income phase are considered partly a return of your original investment so that part of each payment is not taxable as income until the "investment in the contract" has been fully recovered. Different tax consequences may apply for a Contract used in connection with a qualified retirement plan.

Death benefits are taxable and generally are included in the income of the recipient as follows: if received under an annuity payment option, death benefits are taxed in the same manner as annuity payouts; if not received under an annuity option (for instance, if paid out in a lump sum), death benefits are taxed in the same manner as a partial withdrawal or complete surrender.

## 7.  Access to Your Money

You can take some or all of your money out anytime during the accumulation period. However, you may not take a partial withdrawal if it reduces the cash value below $5,000. No partial withdrawals may be made from the fixed account without prior consent from us. Access to amounts held in qualified Contracts may be restricted or prohibited. Withdrawal charges may apply. You may also have to pay federal income tax and a penalty tax on any money you take out.

Patial withdrawals may reduce the death benefit by more than the amount withdrawn.

## 8.  Performance

The value of your Contract will vary up or down depending upon the investment performance of the subaccounts you choose and will be reduced by Contract fees and charges. We provide performance information in Appendix B and in the SAI. Past performance does not guarantee future results.

## 9.  Death Benefit

If you are both the owner and the annuitant and you die before the income phase begins, your beneficiary will receive a death benefit. Death benefit provisions may vary by state.

If you name different persons as owner and annuitant, you can affect whether the death benefit is payable and who would receive it. Use care when naming owners, annuitants and beneficiaries, and consult your agent if you have questions.

If the annuitant dies during the accumulation period, the death benefit will be the greatest of:

- the annuity value of your Contract on the death report day:
- the total purchase payments you make to the Contract, reduced by any partial withdrawals;
- the annuity value of your Contract on the seventh Contract anniversary, reduced by any partial withdrawals; or
- the highest annuity value of your Contract on any Contract anniversary between your Contract date (as shown on your Contract schedule page) and the earlier of:
  - the annuitant's date of death; or
  - the Contract anniversary nearest the annuitant's 80th birthday.

The highest annuity value will be increased by purchase payments made and decreased by adjusted partial withdrawals taken since the Contract anniversary with the highest annuity value.

6

The death benefit payable, if any, on or after the maturity date depends on the annuity payment option selected. See Fixed Annuity Payment Options and Variable Annuity Payment Options on pages 14 and 15 for a description of the annuity payment options. Please note that not all payment options provide for a death benefit.

## 10. Other Information

**Right to Cancel Period.** You may return your Contract for a refund within 10 days after you receive it. In most states, the amount of the refund will generally be the total purchase payments we have received, plus (or minus) any gains (or losses) in the amounts you invested in the subaccounts. You will keep any gains, and bear any losses, on amounts that you invested in the subaccounts. If state law requires, we will refund your original purchase payment(s). We determine the value of the refund as of the date we receive the returned Contract at our administrative office. We will pay the refund within 7 days after we receive your written notice of cancellation and the returned Contract. The Contract will then be deemed void. In some states you may have more than 10 days and/or receive a different refund amount.

**Who Should Purchase the Contract?** We have designed this Contract for people seeking long-term tax deferred accumulation of assets, generally for retirement. This includes persons who have maximized their use of other retirement savings methods, such as 401(k) plans and individual retirement accounts. The tax-deferred feature is most attractive to people in high federal and state tax brackets. You should not buy this Contract if you are looking for a short-term investment or if you cannot take the risk of getting back less money than you put in. If you are purchasing the Contract through a tax-favored arrangement, including traditional IRAs and Roth IRAs, you should consider carefully the costs and benefits of the Contract (including annuity income benefits) before purchasing the Contract, since the tax-favored arrangement itself provides tax-sheltered growth.

**Additional Features.** This Contract has additional features that might interest you. These include the following:

- **Reduced Minimum Initial Purchase Payment (for nonqualified Contracts)** — You may make a minimum initial purchase payment of $1,000, rather than $5,000, if you indicate on your application that you anticipate making minimum monthly payments of at least $100 by electronic funds transfer.
- **Systematic Partial Withdrawals** — You can arrange to have money automatically sent to you while your Contract is in the accumulation period. You may take systematic partial withdrawals monthly, quarterly, semi-annually or annually without paying withdrawal charges. Amounts you receive may be included in your gross income and, in certain circumstances, may be subject to penalty taxes.
- **Dollar Cost Averaging** — You can arrange to have a certain amount of money automatically transferred monthly from one or any combination of the fixed account, the WRL J.P. Morgan Money Market or WRL AEGON Bond subaccounts to your choice of subaccounts. Dollar cost averaging does not guarantee a profit and does not protect against a loss if market prices decline.

7

- **Asset Rebalancing** — We will, upon your request, automatically transfer amounts periodically among the subaccounts on a regular basis to maintain a desired allocation of the annuity value among the various subaccounts.

- **Telephone or Fax Transactions** — You may make transfers, withdrawals and/or change the allocation of additional purchase payments by telephone or fax.

- **Nursing Care Facility Waiver** — If you are confined to a nursing care facility, you may take partial withdrawals or surrender your Contract completely without paying the withdrawal charge, under certain circumstances.

- **Contract Loans** — If you own a qualified Contract, you may be eligible to take out Contract loans during the accumulation period, subject to certain restrictions. *See Contract Loans for Qualified Contracts on page 34 for details.*

These features are not available in all states and may not be suitable for your particular situation.

Certain states place restrictions on access to the fixed account, on the death benefit calculation, on the annuity payment options and on other features of the Contract. Consult your agent and the Contract form for details.

## 11. Inquiries

If you need additional information, please contact us at:

Western Reserve Life
Administrative Office
Attention: Annuity Department
P.O. Box 9051
Clearwater, FL 33758-9051
1-800-851-9777
www.westernreserve.com

8

# Annuity Contract Fee Table

| Owner Transaction Expenses | Separate Account Annual Expenses (as a percentage of average separate account value) |
|---|---|

**Owner Transaction Expenses**

Sales Load On Purchase Payments . . . . . . . . . . . . . . . . . .None

Maximum Withdrawal Charge[1][2]
(as a % of purchase payments). . . . . . . . . . . . . . . . . . . . . . 8%

Transfer Charge . . . . . . . . . . . . . . . . . . . . .$25 After 12 Per Year

Loan Processing Fee[3] . . . . . . . . . . . . . . . . . . . . . .$30 Per Loan

Change in Purchase Payment
Allocation Fee[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$25

*Annual Contract Charge*[2][5] . . . . . . . . . .$35 Per Contract Year

**Separate Account Annual Expenses**
**(as a percentage of average separate account value)**

Mortality and Expense Risk Charge[6] . . . . . . . . . . . . . . . 1.40%

Administrative Charge. . . . . . . . . . . . . . . . . . . . . . . . . . . None

TOTAL SEPARATE ACCOUNT
ANNUAL EXPENSES. . . . . . . . . . . . . . . . . . . . . . . 1.40%

## Portfolio Annual Expenses[7]
(as a percentage of average net assets and after expense reimbursements)

| Portfolio | Management Fees | Other Expenses | Rule 12b-1 Fees | Total Portfolio Annual Expenses |
|---|---|---|---|---|
| **WRL SERIES FUND, INC.**[8][9] | | | | |
| WRL VKAM Emerging Growth | 0.80% | 0.07% | N/A | 0.87% |
| WRL T. Rowe Price Small Cap[10] | 0.75% | 0.25% | N/A | 1.00% |
| WRL Goldman Sachs Small Cap[10] | 0.90% | 0.10% | N/A | 1.00% |
| WRL Pilgrim Baxter Mid Cap Growth[10] | 0.90% | 0.10% | N/A | 1.00% |
| WRL Alger Aggressive Growth | 0.80% | 0.09% | N/A | 0.89% |
| WRL Third Avenue Value | 0.80% | 0.20% | N/A | 1.00% |
| WRL Value Line Aggressive Growth[11] | 0.80% | 0.20% | N/A | 1.00% |
| WRL GE International Equity[12] | 1.00% | 0.20% | N/A | 1.20% |
| WRL Janus Global[13] | 0.80% | 0.12% | N/A | 0.92% |
| WRL Great Companies — Technology[SM][11] | 0.80% | 0.20% | N/A | 1.00% |
| WRL Janus Growth[14] | 0.80% | 0.05% | N/A | 0.85% |
| WRL Goldman Sachs Growth[10] | 0.90% | 0.10% | N/A | 1.00% |
| WRL GE U.S. Equity | 0.80% | 0.13% | N/A | 0.93% |
| WRL Great Companies — America[SM][11] | 0.80% | 0.20% | N/A | 1.00% |
| WRL Salomon All Cap[10] | 0.90% | 0.10% | N/A | 1.00% |
| WRL C.A.S.E. Growth | 0.80% | 0.20% | N/A | 1.00% |
| WRL Dreyfus Mid Cap[10] | 0.85% | 0.15% | N/A | 1.00% |
| WRL NWQ Value Equity | 0.80% | 0.10% | N/A | 0.90% |
| WRL T. Rowe Price Dividend Growth[10] | 0.90% | 0.10% | N/A | 1.00% |
| WRL Dean Asset Allocation | 0.80% | 0.07% | N/A | 0.87% |
| WRL LKCM Strategic Total Return | 0.80% | 0.06% | N/A | 0.86% |
| WRL J.P. Morgan Real Estate Securities | 0.80% | 0.20% | N/A | 1.00% |
| WRL Federated Growth & Income | 0.75% | 0.14% | N/A | 0.89% |
| WRL AEGON Balanced | 0.80% | 0.09% | N/A | 0.89% |
| WRL AEGON Bond | 0.45% | 0.08% | N/A | 0.53% |
| WRL J.P. Morgan Money Market | 0.40% | 0.04% | N/A | 0.44% |
| **VARIABLE INSURANCE PRODUCTS FUND (VIP)**[15] | | | | |
| Fidelity VIP Equity-Income Portfolio — Service Class 2[16] | 0.48% | 0.10% | 0.25% | 0.83% |
| **VARIABLE INSURANCE PRODUCTS FUND II (VIP II)** [15] | | | | |
| Fidelity VIP II Contrafund® Portfolio — Service Class 2[16] | 0.58% | 0.12% | 0.25% | 0.95% |
| **VARIABLE INSURANCE PRODUCTS FUND III (VIP III)** [15] | | | | |
| Fidelity VIP III Growth Opportunities Portfolio — Service Class 2[16] | 0.58% | 0.13% | 0.25% | 0.96% |

(1) The withdrawal charge decreases based on the number of years since the purchase payment was made, from 8% in the year in which the purchase payment was made to 0% in the seventh year after the purchase payment was made. To calculate withdrawal charges, the first purchase payment made is considered to come out first. This charge is waived under certain circumstances.

(2) We may reduce or waive the withdrawal charge and the annual Contract charge for Contracts sold to groups of employees with the same employer, including our directors, officers and full-time employees, or other groups where sales to the group reduce our administrative expenses.

(3) Loans are available for qualified Contracts only. This loan fee is not applicable in all states.

9

(4) Although we do not currently impose this charge, we reserve the right to impose a $25 charge each time you change your allocation of purchase payments among the subaccounts and the fixed account more than once each Contract quarter.

(5) We currently waive this charge if the total purchase payments, minus all partial withdrawals, equals or exceeds $50,000 on the Contract anniversary for which the charge is payable. However, we will deduct this charge from your annuity value if you surrender your Contract completely.

(6) This charge applies to each subaccount. It does not apply to the fixed account. This charge applies during the accumulation period and the income phase. We intend to reduce this charge to 1.25% after the first seven Contract years, but we do not guarantee that we will do so. If we reduce this charge during the accumulation period, we will restore it to 1.40% in the income phase.

(7) The fee table information relating to the portfolios was provided to Western Reserve by the funds. Western Reserve has not independently verified such information.

(8) Effective January 1, 1997, the Board of the WRL Series Fund Inc. (the "WRL Fund") authorized the WRL Fund to charge each portfolio of the WRL Fund an annual Rule 12b-1 fee of up to 0.15% of each portfolio's average daily net assets. However, the WRL Fund will not deduct the fee from any portfolio before April 30, 2001. You will receive advance written notice if a Rule 12b-1 fee is to be deducted. See the WRL Fund prospectus for more details.

(9) WRL Investment Management, Inc. ("WRL Management"), the investment adviser of the WRL Fund, has undertaken, until at least April 30, 2001, to pay expenses on behalf of the portfolios of the WRL Fund, to the extent normal total operating expenses of a portfolio exceed a stated percentage of the WRL portfolio's average daily net assets. The expense limit, the amount reimbursed by WRL Management during 1999, and the expense ratio without the reimbursement are listed below for each portfolio:

| | Expense Limit | Reimbursement Amount | Expense Ratio Without Reimbursement |
|---|---|---|---|
| WRL VKAM Emerging Growth | 1.00% | $ N/A | N/A |
| WRL T. Rowe Price Small Cap | 1.00% | 63,542 | 2.46% |
| WRL Goldman Sachs Small Cap | 1.00% | 60,555 | 5.57% |
| WRL Pilgrim Baxter Mid Cap Growth | 1.00% | 34,986 | 1.40% |
| WRL Alger Aggressive Growth | 1.00% | N/A | N/A |
| WRL Third Avenue Value | 1.00% | 10,734 | 1.06% |
| WRL Value Line Aggressive Growth | 1.00% | N/A | N/A |
| WRL GE International Equity | 1.20% | 112,088 | 1.84% |
| WRL Janus Global | 1.00% | N/A | N/A |
| WRL Great Companies — Technology℠ | 1.00% | N/A | N/A |
| WRL Janus Growth | 1.00% | N/A | N/A |
| WRL Goldman Sachs Growth | 1.00% | 49,677 | 2.68% |
| WRL GE U.S. Equity | 1.00% | N/A | N/A |
| WRL Great Companies — America℠ | 1.00% | N/A | N/A |
| WRL Salomon All Cap | 1.00% | 53,174 | 2.87% |
| WRL C.A.S.E. Growth | 1.00% | N/A | N/A |
| WRL Dreyfus Mid Cap | 1.00% | 34,541 | 4.89% |
| WRL NWQ Value Equity | 1.00% | N/A | N/A |
| WRL T. Rowe Price Dividend Growth | 1.00% | 46,989 | 2.35% |
| WRL Dean Asset Allocation | 1.00% | N/A | N/A |
| WRL LKCM Strategic Total Return | 1.00% | N/A | N/A |
| WRL J.P. Morgan Real Estate Securities | 1.00% | 51,924 | 2.69% |
| WRL Federated Growth & Income | 1.00% | N/A | N/A |
| WRL AEGON Balanced | 1.00% | N/A | N/A |
| WRL AEGON Bond | 0.70% | N/A | N/A |
| WRL J.P. Morgan Money Market | 0.70% | N/A | N/A |

(10) Because these portfolios commenced operations on May 3, 1999, the percentages set forth as "Other Expenses" and "Total Portfolio Annual Expenses" are annualized.

(11) Because these portfolios commenced operations on May 1, 2000, the percentages set forth as "Other Expenses" and "Total Portfolio Annual Expenses" are estimates.

(12) The fee table reflects estimated 2000 expenses because the expense limit for this portfolio will be reduced from 1.50% to 1.20% effective May 1, 2000.

(13) WRL Management currently waives 0.025% of its advisory fee on portfolio average daily net assets over $2 billion (net fee — 0.775%.) This waiver will be terminated on June 25, 2000.

(14) WRL Management currently waives 0.025% of its advisory fee for the first $3 billion of the portfolio's average daily net assets (net fee — 0.775%); and 0.05% for the portfolio's average daily net assets above $3 billion (net fee — 0.75%). The fee table reflects estimated 2000 expenses because of the termination of the fee waiver. This waiver will be terminated on June 25, 2000.

(15) The 12b-1 fee deducted for the Variable Insurance Products Fund (VIP), Variable Insurance Products Fund II (VIP II), and Variable Insurance Products Fund III (VIP III) (the "Fidelity VIP Funds") covers certain shareholder support services provided by companies selling variable contracts investing in the Fidelity VIP Funds. The 12b-1 fees assessed against the Fidelity VIP Funds shares held for the Contracts will be remitted to AFSG Securities Corporation ("AFSG"), the principal underwriter for the Contracts.

(16) Service Class 2 expenses are based on estimated expenses for year 2000.

## EXAMPLES

You would pay the following expenses on a $1,000 investment, assuming a hypothetical 5% annual return on assets, and assuming the entire $1,000 is invested in the subaccount listed.

| Subaccounts | If You Surrender the Contract at the End of the Applicable Time Period | | | | If You Annuitize or Remain Invested in the Contract at the End of the Applicable Time Period, or You Do Not Surrender or Annuitize Under the Contract | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 Year | 3 Years | 5 Years | 10 Years | 1 Year | 3 Years | 5 Years | 10 Years |
| **WRL SERIES FUND, INC.** | | | | | | | | |
| WRL VKAM Emerging Growth | $104 | $133 | $165 | $269 | $ 24 | $ 73 | $ 125 | $ 269 |
| WRL Goldman Sachs Small Cap | 105 | 137 | 172 | 282 | 25 | 77 | 132 | 282 |
| WRL T. Rowe Price Small Cap | 105 | 137 | 172 | 282 | 25 | 77 | 132 | 282 |
| WRL Pilgrim Baxter Mid Cap Growth | 105 | 137 | 172 | 282 | 25 | 77 | 132 | 282 |
| WRL Alger Aggressive Growth | 104 | 134 | 166 | 271 | 24 | 74 | 126 | 271 |
| WRL Third Avenue Value | 105 | 137 | 172 | 282 | 25 | 77 | 132 | 282 |
| WRL Value Line Aggressive Growth | 105 | 137 | 172 | 282 | 25 | 77 | 132 | 282 |
| WRL GE International Equity | 107 | 143 | 182 | 301 | 27 | 83 | 142 | 301 |
| WRL Janus Global | 104 | 135 | 168 | 274 | 24 | 75 | 128 | 274 |
| WRL Great Companies — Technology[SM] | 105 | 137 | 172 | 282 | 25 | 77 | 132 | 282 |
| WRL Janus Growth | 104 | 133 | 164 | 267 | 24 | 73 | 124 | 267 |
| WRL Goldman Sachs Growth | 105 | 137 | 172 | 282 | 25 | 77 | 132 | 282 |
| WRL GE U.S. Equity | 104 | 135 | 168 | 275 | 24 | 75 | 128 | 275 |
| WRL Great Companies — America[SM] | 105 | 137 | 172 | 282 | 25 | 77 | 132 | 282 |
| WRL Salomon All Cap | 105 | 137 | 172 | 282 | 25 | 77 | 132 | 282 |
| WRL C.A.S.E Growth | 105 | 137 | 172 | 282 | 25 | 77 | 132 | 282 |
| WRL Dreyfus Mid Cap | 105 | 137 | 172 | 282 | 25 | 77 | 132 | 282 |
| WRL NWQ Value Equity | 104 | 134 | 167 | 272 | 24 | 74 | 127 | 272 |
| WRL T. Rowe Price Dividend Growth | 105 | 137 | 172 | 282 | 25 | 77 | 132 | 282 |
| WRL Dean Asset Allocation | 104 | 133 | 165 | 269 | 24 | 73 | 125 | 269 |
| WRL LKCM Strategic Total Return | 104 | 133 | 165 | 268 | 24 | 73 | 125 | 268 |
| WRL J.P. Morgan Real Estate Securities | 105 | 137 | 172 | 282 | 25 | 77 | 132 | 282 |
| WRL Federated Growth & Income | 104 | 134 | 166 | 271 | 24 | 74 | 126 | 271 |
| WRL AEGON Balanced | 104 | 134 | 166 | 271 | 24 | 74 | 126 | 271 |
| WRL AEGON Bond | 100 | 123 | 148 | 234 | 20 | 63 | 108 | 234 |
| WRL J.P. Morgan Money Market | 99 | 120 | 144 | 224 | 19 | 60 | 104 | 224 |
| Fidelity VIP Equity-Income Portfolio — Service Class 2 | 103 | 132 | 163 | 264 | N/A | N/A | N/A | N/A |
| Fidelity VIP II Contrafund* Portfolio — Service Class 2 | 105 | 136 | 169 | 277 | 25 | 76 | 129 | 277 |
| Fidelity VIP III Growth Opportunities Portfolio — Service Class 2 | 105 | 136 | 170 | 278 | 25 | 76 | 130 | 278 |

* You cannot annuitize your Contract before your Contract's fifth anniversary.

The fee table and examples above will help you understand the costs of investing in the subaccounts. The fee table and examples reflect the 1999 expenses (except as noted in the footnotes) of the portfolios and the subaccount fees and charges but do not reflect premium taxes which may range up to 3.50%, depending on the jurisdiction.

**Please remember that the examples are illustrations and do not represent past or future expenses. Your actual expenses paid may be higher or lower than those shown. Similarly, your rate of return may be more or less than the 5% assumed in the examples.**

11

The examples above assume that no transfer charges have been assessed. In addition, the $35 annual Contract charge is reflected as a charge of 0.08% based on an average Contract size of $44,369.

Financial Information. We have included in Appendix A a financial history of the accumulation unit values for the subaccounts.

## 1. THE ANNUITY CONTRACT

### The Contract

This prospectus describes the WRL Freedom Wealth Creator® Variable Annuity Contract offered by Western Reserve.

An annuity is a contract between you, the owner, and an insurance company (in this case Western Reserve), where the insurance company promises to pay you an income in the form of annuity payments. These payments begin after the maturity date. (See Section 2 on page 13.) Until the maturity date, your annuity is in the accumulation period and the earnings are tax deferred. Tax deferral means you generally are not taxed on your annuity until you take money out of your annuity. After the maturity date, your annuity switches to the income phase.

The Contract is a flexible payment variable accumulation deferred annuity. You can use the Contract to accumulate funds for retirement or other long-term financial planning purposes.

It is a "flexible payment" Contract because after you purchase it, you can generally make additional investments of $50 or more at any time, until the maturity date. But you are not required to make any additional investments.

The Contract is a "variable" annuity because the value of your Contract can go up or down based on the performance of your investment choices. If you select the variable annuity portion of the Contract, the amount of money you are able to accumulate in your Contract during the accumulation period depends upon the performance of your investment choices. If you elect to receive variable annuity payments during the income phase of your Contract, the amount of your annuity payments will also depend upon investment performance.

The Contract also contains a fixed account. The fixed account offers an interest rate that is guaranteed by Western Reserve to equal at least 3% per year. There may be different interest rates for each payment or transfer you direct to the fixed account which are equal to or greater than the guaranteed rate. The interest rates we set will be credited for periods of at least one year measured from each payment or transfer date.

The fixed account is not available in all states. Residents of Washington, Oregon, New Jersey and Massachusetts may not direct or transfer any money to the fixed account.

12

**Other Contracts**

We offer other variable annuity contracts which also invest in the same portfolios of the funds. These contracts may have different charges that could affect subaccount performance and may offer different benefits more suitable to your needs. To obtain more information about these contracts, contact your agent, or call us at 1-800-851-9777.

## 2. ANNUITY PAYMENTS (THE INCOME PHASE)

You choose the date when annuity payments start under the Contract. This is the maturity date. You can change this date by giving us 30 days written notice. The maturity date cannot be earlier than the end of the fifth Contract year. The maturity date cannot be later than the annuitant's 90th birthday. The maturity date may be earlier for qualified Contracts.

Election of Annuity Payment Option. Before the maturity date, if the annuitant is alive, you may choose an annuity payment option or change your option. If you do not choose an annuity option by the maturity date, we will make payments under Option D (see below) as a Variable Life Income with 10 years of guaranteed payments. You cannot change the annuity payment option after the maturity date.

If you choose a variable payment option, you must specify how you want the annuity proceeds divided among the subaccounts as of the maturity date. If you do not specify, we will allocate the annuity proceeds in the same proportion as the annuity value is allocated among the investment options on the maturity date. After the maturity date, you may make transfers among the subaccounts, but you may not make transfers from or to the fixed account; we may limit subaccount transfers to one per Contract year.

Unless you specify otherwise, the annuitant named on the application will receive the annuity payments. You can change the annuitant or add a joint annuitant at any time before the maturity date, so long as we agree. If you do not choose an annuitant, we will consider you to be the annuitant.

Supplemental Contract. Once you annuitize and if you have selected a fixed payment option, the Contract will end and we will issue a supplemental Contract to describe the terms of the option you selected. The supplemental Contract will name who will receive the annuity payments and describe when the annuity payments will be made.

**Annuity Payment Options Under the Contract**

The Contract provides five annuity payment options that are described below. You may choose any annuity payment option under your Contract. You can choose to receive payments monthly, quarterly, semi-annually or annually.

We will use your "annuity proceeds" to provide these payments. The "annuity proceeds" is your annuity value on the maturity date, less any premium tax that may apply. If your annuity payment would be less than $100, then we will pay you the annuity proceeds in one lump sum.

13

Fixed Annuity Income Payments. If you choose annuity payment Option A, B or C, the dollar amount of each annuity payment will be fixed on the maturity date and guaranteed by us. The payment amount will depend on three things:

- The amount of the annuity proceeds on the maturity date;
- The interest rate we credit on those amounts (we guarantee a minimum annual interest rate of 3%); and
- The specific payment option you choose.

Variable Annuity Income Payments. If you choose variable annuity payment Option D or E, the dollar amount of the first variable payment will be determined in accordance with the annuity payment rates set forth in the applicable table contained in the Contract. The dollar amount of each additional variable payment will vary based on the investment performance of the subaccount(s) you invest in and the Contract's assumed investment return of 5%. The dollar amount of each variable payment after the first may increase, decrease or remain constant. If, after all charges are deducted, the actual investment performance exactly matches the Contract's assumed investment return of 5% at all times, then the dollar amount of the next variable annuity payment would remain the same. If actual investment performance, after all charges are deducted, exceeds the assumed investment return, then the amount of the variable annuity payments would increase. But, if actual investment performance, less charges, is lower than the 5% assumed investment return, then the amount of the variable annuity payments would decrease. The portfolio in which you are invested must grow at a rate at least equal to the 5% assumed investment return (plus the mortality and expense risk charge of 1.40% annually) in order to avoid a decrease in the dollar amount of variable annuity payments. For more information on how variable annuity income payments are determined, see the SAI.

The annuity payment options are explained below. Some of the annuity payment options may not be available in all states. Options A, B, and C are fixed only. Options D and E are variable only.

**Fixed Annuity Payment Options**

Payment Option A — Fixed Installments. We will pay the annuity in equal payments over a fixed period of 5, 10, 15 or 20 years or any other fixed period acceptable to Western Reserve.

Payment Option B — Life Income: Fixed Payments.

- No Period Certain — We will make level payments only during the annuitant's lifetime; or
- 10 Years Certain — We will make level payments for the longer of the annuitant's lifetime or 10 years; or
- Guaranteed Return of Annuity Proceeds — We will make level payments for the longer of the annuitant's lifetime or until the total dollar amount of payments we made to you equals the annuity proceeds.

14

Payment Option C — Joint and Survivor Life Income: Fixed Payments. We will make level payments during the joint lifetime of the annuitant and a joint annuitant of your choice. Payments will be made as long as either person is living.

**Variable Annuity Payment Options**

Payment Option D — Variable Life Income. The annuity proceeds are used to purchase variable annuity units in the subaccounts you select. You may choose between:

- No Period Certain - We will make variable payments only during the annuitant's lifetime; or
- 10 Years Certain - We will make variable payments for the longer of the annuitant's lifetime or 10 years.

Payment Option E - Variable Joint and Survivor Life Income. We will make variable payments during the joint lifetime of the annuitant and a joint annuitant of your choice. Payments will be made as long as either person is living.

Other annuity payment options may be arranged by agreement with us.

Note Carefully: The death benefit payable after the maturity date will be affected by the annuity option you choose.

If:

- you choose Life Income with No Period Certain or a Joint and Survivor Life Income (fixed or variable); and
- the annuitant(s) dies, for example, before the due date of the second annuity payment;

Then:

- we may make only one annuity payment and there will be no death benefit payable.

If:

- you choose Fixed Installments, Life Income with 10 Years Certain, Life Income with Guaranteed Return of Annuity Proceeds or Variable Life Income with 10 Years Certain; and
- the person receiving payments dies prior to the end of the guaranteed period;

Then:

- the remaining guaranteed payments will be continued to that person's beneficiary, or their value (determined at the date of death) may be paid in a single sum.

We will not pay interest on amounts represented by uncashed annuity payment checks if the postal or other delivery service is unable to deliver checks to the annuitant's address of record. The annuitant is responsible to keep Western Reserve informed of the annuitant's current address of record.

15

## 3. PURCHASE

### Contract Issue Requirements

Western Reserve will issue a Contract IF:
- *we receive the information we need* to issue the Contract;
- we receive a minimum initial purchase payment; and
- you (annuitant and any joint owner) are age 85 or younger.

### Purchase Payments

You should make checks or drafts for purchase payments payable only to "Western Reserve Life" and send them to our administrative office. Your check or draft must be honored in order for us to pay any associated payments and benefits due under the Contract.

### Initial Purchase Requirements

The initial purchase payment for nonqualified Contracts must be at least $5,000. However, you may make a minimum initial purchase payment of $1,000, rather than $5,000, if you indicate on your application that you anticipate making minimum monthly payments of at least $100 by electronic funds transfer. For traditional or Roth IRAs, the minimum initial purchase payment is $1,000 and for qualified Contracts other than traditional or Roth IRAs, the minimum initial purchase payment is $50.

We will credit your initial purchase payment to your Contract within two business days after the day we receive it at our administrative office and your complete Contract information. If we are unable to credit your initial purchase payment, we will contact you within five business days and explain why. We will also return your initial purchase payment at that time unless you tell us to keep it. We will credit your initial purchase payment as soon as we receive all necessary application information.

The date on which we credit your initial purchase payment to your Contract is the Contract date. The Contract date is used to determine Contract years, Contract months and Contract anniversaries.

If you wish to make purchase payments by bank wire, please instruct your bank to wire federal funds as follows:

> All First Bank of Baltimore
> ABA #: 052000113
> For credit to: Western Reserve Life
> Account #: 89539600
> Owner's Name:
> Contract Number:
> Attention: Annuity Accounting

We may reject any application or purchase payments for any reason permitted by law.

### Additional Purchase Payments

You are not required to make any additional purchase payments. However, you can make additional purchase payments as often as you like during the lifetime of the annuitant

16

and prior to the maturity date. We will accept purchase payments by bank wire or check. Additional purchase payments must be at least $50 ($100 monthly in the case of nonqualified Contracts with a $1,000 initial purchase payment and $1,000 if by wire). We will credit any additional purchase payments you make to your Contract at the accumulation unit value computed at the end of the business day on which we recieve them at our administrative office. Our business day closes at 4:00 p.m. Eastern Time. If we receive your purchase payments after the close of our business day, we will calculate and credit them as of the close of the next business day.

## Maximum Annual Purchase Payments

We allow purchase payments up to a total of $1,000,000 per Contract year without prior approval.

## Allocation of Purchase Payments

When you purchase a Contract, we will allocate your purchase payment to the investment choices you selected on your application. Your allocation must be in whole percentages and must total 100%. We will allocate additional purchase payments as you selected on your application, unless you request a different allocation.

You may change allocations for future additional purchase payments by writing or telephoning the administrative office, sending written instructions or by telephone, subject to the limitations described below under Telephone or Fax Transactions on page 22. The allocation change will apply to purchase payments received after the date we receive the change request. We reserve the right to impose a $25 charge each time you change your allocation of purchase payments among the subaccounts and the fixed account more than once each Contract quarter.

**You should review periodically how your payments are divided among the subaccounts because market conditions and your overall financial objectives may change.**

## Right to Cancel Period

You may return your Contract for a refund within 10 days after you receive it. In most states, the amount of the refund will generally be the total purchase payments we have received, plus (or minus) any gains (or losses) in the amounts you invested in the subaccounts. You will keep any gains, and bear any losses, on amounts that you invested in the subaccounts. If state law requires, we will refund your original purchase payment(s). We determine the value of the refund as of the date we receive the returned Contract at our administrative office. We will pay the refund within 7 days after we receive your written notice of cancellation and the returned Contract. The Contract will then be deemed void. In some states you may have more than 10 days, and/or receive a different refund amount.

## Annuity Value

You should expect your annuity value to change from valuation period to valuation period to reflect the investment performance of the portfolios, the interest credited to your

17

value in the fixed account, and the fees and charges we deduct. A valuation period begins at the close of business on each business day and ends at the close of business on the next succeeding valuation date. A valuation date is any day the NYSE is open. Our business day closes when the NYSE closes, usually 4:00 p.m. Eastern time. We observe the same holidays as the NYSE.

## Accumulation Units

We measure the value of your Contract during the accumulation period by using a measurement called an accumulation unit. During the income phase, we use a measurement called an annuity unit. When you direct money into a subaccount, we credit your Contract with accumulation units for that subaccount. We determine how many accumulation units to credit by dividing the dollar amount you direct to the subaccount by the subaccount's accumulation unit value as of the end of that valuation date. If you withdraw or transfer out of a subaccount, or if we assess a transfer charge, annual Contract charge or any withdrawal charge, we subtract accumulation units from the subaccounts using the same method.

Each subaccount's accumulation unit value was set at $10 when the subaccount started. We recalculate the accumulation unit value for each subaccount at the close of each valuation date. The new value reflects the investment performance of the underlying portfolio and the daily deduction of the mortality and expense risk charge. For a detailed discussion of how we determine accumulation unit values, see the SAI.

## 4. INVESTMENT CHOICES

## The Separate Account

The separate account currently consists of 29 subaccounts.

The Funds. Each subaccount invests exclusively in one portfolio of a fund. The portfolios and their advisers or sub-advisers are listed below.

| Portfolio | Adviser or Sub-Adviser |
|---|---|
| WRL VKAM Emerging Growth | Van Kampen Asset Management Inc. |
| WRL T. Rowe Price Small Cap | T. Rowe Price Associates, Inc. |
| WRL Goldman Sachs Small Cap | Goldman Sachs Asset Management |
| WRL Pilgrim Baxter Mid Cap Growth | Pilgrim Baxter & Associates, Ltd. |
| WRL Alger Aggressive Growth | Fred Alger Management, Inc. |
| WRL Third Avenue Value | EQSF Advisers, Inc. |
| WRL Value Line Aggressive Growth | Value Line, Inc. |
| WRL GE International Equity | GE Asset Management Incorporated* |
| WRL Janus Global | Janus Capital Corporation |
| WRL Great Companies — Technology[SM] | Great Companies, L.L.C. |
| WRL Janus Growth | Janus Capital Corporation |
| WRL Goldman Sachs Growth | Goldman Sachs Asset Management |
| WRL GE U.S. Equity | GE Asset Management Incorporated |
| WRL Great Companies — America[SM] | Great Companies, L.L.C. |
| WRL Salomon All Cap | Salomon Brothers Asset Management Inc |
| WRL C.A.S.E Growth | C.A.S.E Management, Inc. |
| WRL Dreyfus Mid Cap | The Dreyfus Corporation |
| WRL NWQ Value Equity | NWQ Investment Management Company, Inc. |
| WRL T. Rowe Price Dividend Growth | T. Rowe Price Associates, Inc. |
| WRL Dean Asset Allocation | Dean Investment Associates |
| WRL LKCM Strategic Total Return | Luther King Capital Management Corporation |
| WRL J.P. Morgan Real Estate Securities | J.P. Morgan Investment Management Inc. |
| WRL Federated Growth & Income | Federated Investment Counseling |
| WRL AEGON Balanced<br>WRL AEGON Bond | AEGON USA Investment Management, Inc. |
| WRL J.P. Morgan Money Market | J.P. Morgan Investment Management Inc. |
| Fidelity VIP Equity-Income Portfolio — Service Class 2<br>Fidelity VIP II Contrafund* Portfolio — Service Class 2<br>Fidelity VIP III Growth Opportunities Portfolio — Service Class 2 | Fidelity Management & Research Company |

* Effective May 1, 2000, GE Asset Management Incorporated is the sole sub-adviser.

The general public may not purchase these portfolios. Their investment objectives and policies may be similar to other portfolios and mutual funds managed by the same investment adviser or sub-adviser that are sold directly to the public. You should not expect that the investment results of the other portfolios and mutual funds would be similar to those portfolios offered by this prospectus.

There is no assurance that a portfolio will achieve its stated objective(s). More detailed information, including an explanation of each portfolio's investment objective, may be found in the fund prospectuses. You should read the fund prospectuses carefully before you invest.

**The Fixed Account**

Purchase payments you allocate to and amount you transfer to the fixed account become part of the general account of Western Reserve. Interests in the general account have not been registered under the Securities Act of 1933 (the "1933 Act"), nor is the general account registered as an investment company under the Investment Company Act of 1940, as amended (the "1940 Act"). Accordingly, neither the general account nor any interests therein are generally subject to the provisions of the 1933 Act or 1940 Act. Western Reserve has been advised that the staff of the SEC has not reviewed the disclosure in this prospectus which relate to the fixed account.

We guarantee that the interest credited to the fixed account will not be less than 3% per year. We have no formula for determining fixed account interest rates. We establish the interest rate, at our sole discretion, for each purchase payment or transfer into the fixed account. Rates are guaranteed for at least one year.

If you select the fixed account, your money will be placed with the other general assets of Western Reserve. All assets in our general account are subject to the general liabilities of our business operations. The amount of money you are able to accumulate in the fixed account during the accumulation period depends upon the total interest credited. The amount of annuity payments you receive during the income phase under a fixed annuity option will remain level for the entire income phase. You may not transfer money between the fixed account and the subaccounts during the income phase.

When you request a transfer or partial withdrawal from the fixed account, we will account for it on a first-in, first-out ("FIFO") basis, for purposes of crediting your interest. This means that we will take the deduction from the oldest money you have put in the fixed account. You may not make partial withdrawals from the fixed account unless we consent.

The fixed account may not be available in all states. Residents of Washington, Oregon, New Jersey and Massachusetts may not direct or transfer any money to the fixed account.

**Transfers**

During the accumulation period, you or your agent/registered representative of record may make transfers from any subaccount. However, if you elect the asset rebalancing program, you may not make any transfers if you want to continue in the program. A transfer would automatically cancel your participation in the asset rebalancing program. We may also limit "substantive" transfers as discussed below.

Transfers from the fixed account are allowed once each Contract year. We must receive written notice within 30 days after a Contract anniversary. The amount that may be transferred is the greater of: (1) 25% of the dollar amount in the fixed account, or (2) the amount you transferred out of the fixed account in the previous Contract year.

During the income phase of your Contract, you may transfer values from one subaccount to another. No transfers may be made to or from the fixed account. The

20

minimum amount that can be transferred during this phase is the lesser of $10 of monthly income, or the entire monthly income of the variable annuity units in the subaccount from which the transfer is being made. We may limit subaccount transfers to one per Contract year.

The fixed account may not be available in all states. Residents of Washington, Oregon, New Jersey and Massachusetts may not transfer any of their Contract value to the fixed account.

Transfers may be made by telephone or fax, subject to limitations described below under Telephone or Fax Transactions on page 22.

If you make more than 12 transfers from the subaccounts in any Contract year, we will charge you $25 for each additional transfer you make during that year. Currently, there is no charge for transfers from the fixed account.

Transfers to and from the subaccounts will be processed based on the accumulation unit values determined at the end of the business day on which we receive your written, telephoned, or faxed request at our administrative office, provided we receive your request at our administrative office before the close of our business day (usually 4:00 p.m. Eastern Time). If we receive your request after the close of our business day, we will process the transfer request using the accumulation unit value for the next business day.

The Contract's transfer privilege is not intended to afford owners a way to speculate on short-term movements in the market. Excessive use of the transfer privilege can potentially disrupt the management of the portfolios and increase transaction costs. Accordingly, we have established a policy of limiting excessive transfer activity. We will limit transfer activity to two substantive transfers (at least 30 days apart) from each portfolio, except from WRL J.P. Morgan Money Market, during any 12-month period. We interpret "substantive" to mean either a dollar amount large enough to have a negative impact on a portfolio's operations, or a series of movements between portfolios. We will not limit non-substantive transfers.

We may, at any time, discontinue transfer privileges, modify our procedures, or limit the number of transfers we permit.

**Dollar Cost Averaging Program**

Dollar cost averaging allows you to transfer systematically a specific amount each month from the fixed account, the WRL J.P. Morgan Money Market subaccount, the WRL AEGON Bond subaccount, or any combination of these accounts, to a different subaccount. You may specify the dollar amount to be transferred monthly; however, you must transfer a total of $100 monthly. To qualify, a minimum of $5,000 must be in each subaccount from which we make transfers. There is no charge for this program. These transfers do count towards the 12 free transfers allowed during each Contract year.

If you make dollar cost averaging transfers from the fixed account, each month you may transfer no more than $1/10^{th}$ of the dollar amount in the fixed account on the date you start dollar cost averaging.

By transferring a set amount on a regular schedule instead of transferring the total amount at one particular time, you may reduce the risk of investing in the portfolios only when the price is high. Dollar cost averaging does not guarantee a profit and it does not protect you from loss if market prices decline.

We reserve the right to discontinue offering dollar cost averaging 30 days after we send notice to you. Dollar cost averaging is not available if you have elected the asset rebalancing program or if you elect to participate in any asset allocation service provided by a third party.

## Asset Rebalancing Program

During the accumulation period you can instruct us to rebalance automatically the amounts in your subaccounts to maintain your desired asset allocation. This feature is called asset rebalancing and can be started and stopped at any time free of charge. However, we will not rebalance if you are in the dollar cost averaging program, you elect to participate in any asset allocation service provided by a third party or if you request any other transfer. Asset rebalancing ignores amounts in the fixed account. You can choose to rebalance quarterly, semi-annually, or annually.

To qualify for asset rebalancing, a minimum annuity value of $5,000 for an existing Contract, or a minimum initial purchase payment of $5,000 for a new Contract, is required. Asset rebalancing does not guarantee gains, nor does it assure that any subaccount will not have losses.

There is no charge for this program. Each reallocation which occurs under asset rebalancing will be counted towards the 12 free transfers allowed during each Contract year.

We reserve the right to discontinue, modify or suspend the asset rebalancing program at any time.

## Telephone or Fax Transactions

You may make transfers, request partial withdrawals and change the allocation of additional purchase payments by telephone. Telephone withdrawals are not allowed in the following situations:

- for qualified Contracts (except IRAs);
- if the amount you want to withdraw is greater than $50,000; or
- if the address of record has been changed within the past 10 days.

Upon instructions from you, the registered representative/agent of record for your Contract may also make telephone transfers or withdrawals for you. If you do not want the ability to make transfers or withdrawals by telephone, you should notify us in writing.

You may make telephone transfers or withdrawals by calling our toll-free number: 1-800-851-9777. You will be required to provide certain information for identification

22

purposes when you request a transaction by telephone. We may also require written confirmation of your request. We will not be liable for following telephone requests that we believe are genuine.

Please use the following fax numbers for the following types of transactions:

- To request a transfer, please fax your request to us at 727-299-1648. **We will not be responsible for same-day processing of transfers if you fax your transfer request to a number other than this fax number; and**
- To request a partial withdrawal, please fax your request to us at 727-299-1620.

We will not be responsible for transmittal problems which are not reported to us within five business days. Any reports must be accompanied by proof of the faxed transmittal.

Telephone or fax requests must be received before 4:00 p.m. Eastern time to assure same-day pricing of the transaction. We may discontinue this option at any time.

**Third Party Investment Services**

Western Reserve or an affiliate may provide administrative or other support services to independent third parties you authorize to conduct transfers on your behalf, or who provide recommendations as to how your subaccount values should be allocated. This includes, but is not limited to, transferring subaccount values among subaccounts in accordance with various investment allocation strategies that these third parties employ. Such independent third parties may or may not be appointed Western Reserve agents for the sale of Contracts.

**Western Reserve does not engage any third parties to offer investment allocation services of any type, so that persons or firms offering such services do so independent from any agency relationship they may have with Western Reserve for the sale of Contracts. Western Reserve therefore takes no responsibility for the investment allocations and transfers transacted on your behalf by such third parties or any investment allocation recommendations made by such parties.**

Western Reserve does not currently charge you any additional fees for providing these support services. Western Reserve reserves the right to discontinue providing administrative and support services to owners utilizing independent third parties who provide investment allocation and transfer recommendations.

**5. EXPENSES**

There are charges and expenses associated with your Contract that reduce the return on your investment in the Contract. Unless we indicate otherwise, the expenses described below apply only during the accumulation period.

**Mortality and Expense Risk Charge**

We charge a fee as compensation for bearing certain mortality and expense risks under the Contract. Examples include a guarantee of annuity rates, the death benefits, certain

Contract expenses, and assuming the risk that the current charges will be insufficient in the future to cover costs of administering the Contract. The mortality and expense risk charge is equal, on an annual basis, to 1.40% of the average daily net assets that you have invested in each subaccount. We intend to reduce this charge to 1.25% (during the accumulation period) after the first seven Contract years, although we do not guarantee that we will do so. This charge is deducted daily from the subaccounts during both the accumulation period and the income phase. If we reduce this charge during the accumulation period, we will restore it to 1.40% in the income phase.

If this charge does not cover our actual mortality and expense risk costs, we absorb the loss. Conversely, if the charge covers more than actual costs, the excess is added to our surplus. We expect to profit from this charge. We may use any profits to cover distribution costs.

## Annual Contract Charge

We deduct an annual Contract charge of $35 from your annuity value on each Contract anniversary and at surrender. We deduct this charge from the fixed account and each subaccount in proportion to the amount of annuity value in each account. We deduct the charge to cover our costs of administering the Contract. We currently waive this charge if the total purchase payments, minus all partial withdrawals, equals or exceeds $50,000 on the Contract anniversary for which the charge is payable.

## Transfer Charge

You are allowed to make 12 free transfers per Contract year. If you make more than 12 transfers per Contract year, we charge $25 for each additional transfer. We deduct the charge from the amount transferred. Dollar cost averaging transfers and asset rebalancing are considered transfers. All transfer requests made on the same day are treated as a single request. We deduct the charge to compensate us for the cost of processing the transfer.

## Loan Processing Fee

If you take a Contract loan, we will impose a $30 loan processing fee. You have the option either to send us a $30 check for this fee or to have us deduct the $30 from the loan amount. This fee is not applicable in all states. This fee covers loan processing and other expenses associated with establishing and administering the loan reserve. Only qualified Contracts can take Contract loans.

## Change in Purchase Payment Allocation Fee

During the accumulation period, you may allocate a percentage of your purchase payments to one or more subaccounts, the fixed account, or a combination of both. If, in any Contract quarter, you change the way you allocate your purchase payments more than once, we reserve the right to impose a $25 charge for the second and each additional change in allocation you make during that Contract quarter. If in the future we impose this charge, we will deduct the charge from the subaccounts on a pro rata basis.

**Premium Taxes**

Some states assess premium taxes on the purchase payments you make. A premium tax is a regulatory tax that some states assess on the purchase payments made into a contract. If we should have to pay any premium tax, we may deduct the tax from each purchase payment or from the accumulation unit value as we incur the tax. We may deduct the total amount of premium taxes, if any, from the annuity value when:

- you elect to begin receiving annuity payments;
- you surrender the Contract;
- you request a partial withdrawal; or
- a death benefit is paid.

As of the date of this prospectus, the following states assess a premium tax on all initial and subsequent purchase payments:

| State | Qualified Contracts | Nonqualified Contracts |
|---|---|---|
| South Dakota | 0.00% | 1.25% |
| Wyoming | 0.00% | 1.00% |

As of the date of this prospectus, the following states assess a premium tax against the accumulation unit value if you choose an annuity payment option instead of receiving a lump sum distribution:

| State | Qualified Contracts | Nonqualified Contracts |
|---|---|---|
| California | 0.50% | 2.35% |
| Kentucky | 2.00% | 2.00% |
| Maine | 0.00% | 2.00% |
| Nevada | 0.00% | 3.50% |
| West Virginia | 1.00% | 1.00% |

**Federal, State and Local Taxes**

We may in the future deduct charges from the Contract for any taxes we incur because of the Contract. However, no deductions are being made at the present time.

**Withdrawal Charge**

During the accumulation period, you may withdraw part or all of the Contract's annuity value. We impose a withdrawal charge to help us recover sales expenses, including broker/dealer compensation and printing, sales literature and advertising costs. We expect to profit from this charge. We deduct this charge from your annuity value at the time you request the withdrawal.

If you take a partial withdrawal or if you surrender your Contract completely, we will deduct a withdrawal charge of up to 8.0% of purchase payments withdrawn within seven

25

years after we receive a purchase payment. We calculate the withdrawal charge on the full amount that must be withdrawn from your annuity value in order to pay the withdrawal amount, including the withdrawal charge. To calculate withdrawal charges, we treat withdrawals as coming first from the oldest purchase payment, then the next oldest and so forth.

For the first withdrawal you make in any Contract year, we waive that portion of the withdrawal charge that is based on the first 10% of your Contract's annuity value on the time of the withdrawal. Amounts of the first withdrawal in excess of the first 10% of your Contract's annuity value and all subsequent withdrawals you make during the Contract year will be subject to a withdrawal charge. We will deduct the full withdrawal charge if you surrender your Contract completely. We do not assess withdrawal charges when you annuitize. We waive the withdrawal charge under certain circumstances (see below).

The following schedule shows the withdrawal charges that apply during the seven years following each purchase payment:

| Number of Months Since Purchase Payment Date | Withdrawal Charge |
|---|---|
| 12 or less | 8% |
| 13 through 24 | 7% |
| 25 through 36 | 6% |
| 37 through 48 | 5% |
| 49 through 60 | 4% |
| 61 through 72 | 3% |
| 73 through 84 | 2% |
| 85 or more | 0% |

For example, assume your Contract's annuity value is $100,000 at the end of the 13th month since your initial purchase payment and you withdraw $30,000 as your first withdrawal of the Contract year. Because the $30,000 is more than 10% of your Contract's annuity value ($10,000), you would pay a withdrawal charge of $1,505.37 on the remaining $20,000 (7% of $21,505.37, which is $20,000 plus the $1,505.37 withdrawal charge).

Keep in mind that withdrawals may be taxable, and if made before age 59½, may be subject to a 10% federal penalty tax. For tax purposes, withdrawals are considered to come from earnings first.

Systematic Partial Withdrawals. During any Contract year, you may make systematic partial withdrawals on a monthly, quarterly, semi-annual or annual basis without paying withdrawal charges. Systematic partial withdrawals must be at least $200 ($50 if by direct deposit). The amount of the systematic partial withdrawals may not exceed 10% of the annuity value at the time the withdrawal is made, divided by the number of withdrawals made per calendar year. We reserve the right to discontinue systematic partial withdrawals if any surrender would reduce your annuity value below $5,000.

You may elect to begin or discontinue systematic partial withdrawals at any time. However, we must receive written notice at least 30 days prior to the date systematic partial withdrawals are to be discontinued. (See Systematic Partial Withdrawals on page 34.)

Nursing Care Facility Waiver. If your Contract contains a nursing care facility waiver, we will waive the withdrawal charge, provided:

- you (or any joint owner) have been confined to a nursing care facility for 30 consecutive days or longer;
- your confinement began after the Contract date; and
- you provide us with written evidence of your confinement within two months after your confinement ends.

We will waive the withdrawal charge under the endorsement only for partial withdrawals and complete surrenders made during your confinement or within two months after your confinement ends. This waiver is not available in all states.

NIMCRUT Contracts. The Contract may be utilized to fund a Net Income Makeup Charitable Remainder Unitrust (NIMCRUT). If an owner of a NIMCRUT takes a partial withdrawal from a NIMCRUT Contract, we will deduct withdrawal charges. However, once each calendar quarter, the NIMCRUT owner may withdraw from the NIMCRUT Contract any portion of the annuity value that is greater than the total purchase payments made, then we will not deduct withdrawal charges on such withdrawals.

If the NIMCRUT owner surrenders the Contract completely within the withdrawal charge period, we will deduct withdrawal charges as specified above. The withdrawal charges will be applied to total purchase payments made, less any previous withdrawals on which you paid withdrawal charges. For important information regarding ownership of a Contract by a NIMCRUT see Taxes — Net Income Makeup Charitable Remainder Unitrusts (NIMCRUTs) on page 32.

## Portfolio Management Fees

The value of the assets in each subaccount is reduced by the management fees and expenses paid by the portfolios. Some portfolios also deduct 12b-1 fees from portfolio assets. A description of these fees and expenses is found in the Annuity Contract Fee Table section on page 9 of this prospectus and in the fund prospectuses.

Our affiliate, AFSG, the principal underwriter for the Contracts, will receive the 12b-1 fees deducted from portfolio assets for providing shareholder support services to the portfolios. We and our affiliates, including the principal underwriter for the Contracts, may receive compensation from the investment advisers, administrators, and/or distributors (and an affiliate thereof) of the portfolios in connection with administrative or other services and cost savings experienced by the investment advisers, administrators or distributors. It is anticipated that such compensation will be based on assets of the particular portfolios attributable to the Contract and may be significant. Some advisers, administrators, distributors or portfolios may pay us (and our affiliates) more than others.

## Reduced or Waived Charges and Expenses to Employees

We may reduce or waive the withdrawal charge and annual Contract charge for Contracts sold to large groups of full-time employees of the same employer, including

directors, officers and full-time employees of Western Reserve or its affiliates, or other groups where sales to the group reduce our administrative expenses.

## 6. TAXES

**Note:** Western Reserve has prepared the following information on federal income taxes as a general discussion of the subject. It is not intended as tax advice to any individual. You should consult your own tax advisor about your own circumstances. We believe that the Contract qualifies as an annuity contract for federal income tax purposes and the following discussion assumes it so qualifies. We have included an additional discussion regarding taxes in the SAI.

### Annuity Contracts in General

Deferred annuity contracts are a way of setting aside money for future needs like retirement. Congress recognized how important saving for retirement is and provided special rules in the Code for annuities.

Simply stated, these rules provide that you will not be taxed on the earnings, if any, on the money held in your annuity Contract until you take the money out. This is referred to as tax deferral. There are different rules as to how you will be taxed depending on how you take the money out and the type of Contract – qualified or nonqualified (discussed below).

You will generally not be taxed on increases in the value of your Contract until a distribution occurs - either as a partial withdrawal, complete surrender or as annuity payments.

When a non-natural person (e.g., corporations or certain other entities other than tax-qualified trusts) owns a nonqualified Contract, the Contract will generally not be treated as an annuity for tax purposes.

### Qualified and Nonqualified Contracts

If you purchase the Contract under an individual retirement annuity, a 403(b) plan, 457 plan, or pension or profit sharing plan, your Contract is referred to as a qualified Contract.

If you purchase the Contract as an individual and not under a qualified Contract, your Contract is referred to as a nonqualified Contract.

Because variable annuity contracts provide tax deferral whether purchased as a qualified Contract or nonqualified Contract, you should consider whether the features and benefits unique to variable annuities are appropriate for your needs when purchasing a qualified Contract.

A qualified Contract may be used in connection with the following plans:

- Individual Retirement Annuity (IRA): A traditional IRA allows individuals to make contributions, which may be deductible, to the Contract. A Roth IRA also allows individuals to make contributions to the Contract, but it does not allow a deduction for contributions. Roth IRA distributions may be tax-free if the owner meets certain rules.

- Tax-Sheltered Annuity (403(b) Plan): A 403(b) plan may be made available to employees of certain public school systems and tax-exempt organizations and permits contributions to the Contract on a pre-tax basis.

- Corporate Pension and Profit-Sharing and H.R. 10 Plans: Employers and self-employed individuals can establish pension or profit-sharing plans for their employees or themselves and make contributions to the Contract on a pre-tax basis.

- Deferred Compensation Plan (457 Plan): Certain governmental and tax-exempt organizations can establish a plan to defer compensation on behalf of their employees through contributions to the Contract.

There are limits on the amount of annual contributions you can make to these plans. Other restrictions may apply. The terms of the plan may limit your rights under a qualified Contract. You should consult your legal counsel or tax advisor if you are considering purchasing a Contract for use with any retirement plan. We have provided more detailed information on these plans and the tax consequences associated with them in the SAI.

### Partial Withdrawals and Complete Surrenders — Nonqualified Contracts

In general, if you make a withdrawal (partial or systematic) from your Contract, the Code treats that withdrawal as first coming from earnings and then from your purchase payments. When you make a withdrawal you are taxed on the amount of the withdrawal that is earnings. When you make a complete surrender you are generally taxed on the amount that your surrender proceeds exceeds your total purchase payments. Loans, pledges and assignments are taxed in the same manner as partial withdrawals and complete surrenders. Different rules apply for annuity payments.

In the event of a partial withdrawal or systematic partial withdrawal from, or complete surrender of, a nonqualified Contract, we will withhold for tax purposes the minimum amount required by law, unless the owner affirmatively elects, before payments begin, to have either nothing withheld or a different amount withheld.

The Code also provides that withdrawn earnings may be subject to a penalty. The amount of the penalty is equal to 10% of the amount that is includable in income. Some withdrawals will be exempt from the penalty. They include any amounts:

- paid on or after the taxpayer reaches age 59½;
- paid after the owner dies;
- paid if the taxpayer becomes totally disabled (as that term is defined in the Code);

- paid in a series of substantially equal payments made annually (or more frequently) under a lifetime annuity;
- paid under an immediate annuity; or
- which come from purchase payments made prior to August 14, 1982.

## Multiple Contracts

All nonqualified, deferred annuity contracts entered into after October 21, 1988 that we issue (or our affiliates issue) to the same owner during any calendar year are to be treated as one annuity contract for purposes of determining the amount includable in an individual's gross income. There may be other situations in which the Treasury may conclude that it would be appropriate to aggregate two or more annuity contracts purchased by the same owner. You should consult a competent tax advisor before purchasing more than one Contract or other annuity contracts.

## Diversification and Distribution Requirements

The Code provides that the underlying investments for a nonqualified variable annuity must satisfy certain diversification requirements in order to be treated as an annuity contract. Qualified and nonqualified Contracts must meet certain distribution requirements upon an owner's death in order to be treated as an annuity contract. A qualified Contract (except a Roth IRA) must also meet certain distribution requirements during the owner's life. These diversification and distribution requirements are discussed in the SAI. Western Reserve may modify the Contract to attempt to maintain favorable tax treatment.

## Partial Withdrawals and Complete Surrenders — Qualified Contracts

The above information describing the taxation of nonqualified Contracts does not apply to qualified Contracts. There are special rules that govern qualified Contracts, including rules restricting when amounts can be paid from the Contracts and providing that a penalty tax may be assessed on amounts distributed from the Contract prior to the date you reach age 59½, unless you meet one of the exceptions to this rule. We have provided more information in the SAI.

In the case of a partial withdrawal, systematic partial withdrawal, or complete surrender distributed to a participant or beneficiary under a qualifed Contract (other than a Roth IRA or a qualified Contract under Section 457 of the Code as to which there are special rules), a ratable portion of the amount received is taxable, generally based on the ratio of the investment in the Contract to the total annuity value. The "investment in the contract" generally equals the portion, if any, of any purchase payments paid by or on behalf of an individual under a Contract which is not excluded from the individual's gross income. For Contracts issued in connection with qualified plans, the "investment in the contract" can be zero.

The Code limits the distribution of purchase payments from certain 403(b) Contracts. Distributions generally can only be made when an owner:

- reaches age 59½;

30

- leaves his/her job;
- dies;
- becomes disabled (as that term is defined in the Code); or
- in the case of hardship. However, in the case of hardship, the owner can only withdraw the purchase payments and not any earnings.

Loans, pledges and assignments of qualified Contracts are taxed in the same manner as withdrawals from such Contracts.

## Taxation of Death Benefit Proceeds

We may distribute amounts from the Contract because of the death of an owner or the annuitant. Generally, such amounts are includable in the income of the recipient:

- if distributed in a lump sum, these amounts are taxed in the same manner as a full surrender; or

- if distributed under an annuity payment option, these amounts are taxed in the same manner as annuity payments.

For these purposes, the "investment in the contract" is not affected by the owner's or annuitant's death. That is, the "investment in the contract" remains generally the total purchase payments, less amounts received which were not includable in gross income.

## Annuity Payments

Although the tax consequences may vary depending on the annuity payment option you select, in general, for nonqualified and certain qualified Contracts (other than a Roth IRA as to which there are special rules), only a portion of the annuity payments you receive will be includable in your gross income.

The excludable portion of each annuity payment you receive generally will be determined as follows:

- Fixed payments - by dividing the "investment in the contract" on the maturity date by the total expected value of the annuity payments for the term of the payments. This is the percentage of each annuity payment that is excludable.
- Variable payments - by dividing the "investment in the contract" on the maturity date by the total number of expected periodic payments. This is the amount of each annuity payment that is excludable.

The remainder of each annuity payment is includable in gross income. Once the "investment in the contract" has been fully recovered, the full amount of any additional annuity payments is includable in gross income.

If we permit you to select more than one annuity payment option, special rules govern the allocation of the Contract's entire "investment in the contract" to each such option, for

31

purposes of determining the excludable amount of each payment received under that option. We advise you to consult a competent tax advisor as to the potential tax effects of allocating amounts to any particular annuity payment option.

If, after the maturity date, annuity payments stop because of an annuitant's death, the excess (if any) of the "investment in the contract" as of the maturity date over the aggregate amount of annuity payments received that was excluded from gross income is generally allowable as a deduction for your last tax return.

### Transfers, Assignments or Exchanges of Contracts

If you transfer your ownership or assign a Contract, designate an annuitant or other beneficiary who is not also the owner, select certain maturity dates, or change annuitants, you may trigger certain income or gift tax consequences that are beyond the scope of this discussion. If you contemplate any such transfer, assignment, selection, or change, you should contact a competent tax advisor with respect to the potential tax effects of such a transaction.

### Net Income Makeup Charitable Remainder Unitrusts (NIMCRUTs)

Issues arising in connection with the ownership of certain annuity products by charitable remainder trusts are currently under extensive study by the Internal Revenue Service. You should consult a competent legal or tax advisor before you purchase a Contract by, or transfer a Contract to, a charitable remainder trust.

### Possible Tax Law Changes

Although the likelihood of legislative changes is uncertain, there is always the possibility that the tax treatment of the Contracts could change by legislation or otherwise. You should consult a tax advisor with respect to legal developments and their effect on the Contract.

## 7. ACCESS TO YOUR MONEY

### Partial Withdrawals and Complete Surrenders

You can have access to the money in your Contract in several ways:

- by making a withdrawal (either a partial withdrawal or complete surrender); or
- by taking annuity payments.

If you want to surrender your Contract completely, you will receive cash value, which equals the annuity value of your Contract minus:

- any withdrawal charges;
- any premium taxes;
- any loans; and

- the annual Contract charge.

The cash value will be determined at the accumulation unit value next determined as of the end of the business day (usually 4:00 p.m. Eastern Time) on which we receive your request for partial withdrawal or complete surrender at our administrative office, unless you specify a later date in your request.

No partial withdrawal is permitted if the withdrawal would reduce the cash value below $5,000. You may not make partial withdrawals from the fixed account unless we consent. Unless you tell us otherwise, we will take the withdrawal from each of the investment choices in proportion to the cash value.

Remember that any withdrawal you make will reduce the annuity value. Under some circumstances, a partial withdrawal will reduce the death benefit by more than the dollar amount of the withdrawal. See Section 9, Death Benefit, and the SAI for more details.

Income taxes, federal tax penalties and certain restrictions may apply to any partial withdrawals or any complete surrender you make.

We must receive a properly completed surrender request which must contain your original signature. If you live in a community property state, your spouse must also sign the surrender request. We will accept fax or telephone requests for partial withdrawals as long as the withdrawal proceeds are being sent to the address of record. The maximum withdrawal amount you may request by fax or telephone is $50,000.

When we incur extraordinary expenses, such as overnight mail expenses, for expediting delivery of your partial withdrawal or complete surrender payment, we will deduct that charge from the payment. We charge $20 for an overnight delivery ($30 for Saturday delivery).

For your protection, we will require a signature guarantee for:

- all requests for partial withdrawals or surrenders over $500,000; or
- where the partial withdrawal or surrender proceeds will be sent to an address other than the address of record.

All signature guarantees must be made by:

- a national or state bank;
- a member firm of a national stock exchange; or
- any institution that is an eligible guarantor under SEC rules and regulations.

Notarization is not an acceptable form of signature guarantee.

If the Contract's owner is not an individual, additional information may be required. If you own a qualified Contract, the Code may require your spouse to consent to any withdrawal. Other restrictions will apply to Section 403(b) qualified Contracts and Texas Optional Retirement Program Contracts. For more information, call us at 1-800-851-9777.

**Delay of Payment and Transfers**

Payment of any amount due from the separate account for a partial withdrawal, a complete surrender, a death benefit, or the death of the owner of a nonqualified Contract, will generally occur within seven business days from the date all required information is received by us. We may be permitted to defer such payment from the separate account if:

- the NYSE is closed for other than usual weekends or holidays or trading on the NYSE is otherwise restricted; or
- an emergency exists as defined by the SEC or the SEC requires that trading be restricted; or
- the SEC permits a delay for the protection of owners.

In addition, transfers of amounts from the subaccounts may be deferred under these circumstances.

Pursuant to the requirements of certain state laws, we reserve the right to defer payment of transfers, partial withdrawals, complete surrenders and loan amounts from the fixed account for up to six months.

**Systematic Partial Withdrawals**

You can elect to receive regular payments from your Contract without paying withdrawal charges by using systematic partial withdrawals. You can withdraw up to 10% of your cash value annually (or up to 10% of your initial purchase payment if a new Contract), in equal monthly, quarterly, semi-annual or annual payments of at least $200 ($50 if by direct deposit). Your initial purchase payment, if a new Contract, or your cash value, if an existing Contract, must equal at least $25,000. We will not process a systematic partial withdrawal if the cash value for the entire Contract would be reduced below $5,000. No systematic partial withdrawals are permitted from the fixed account.

You may stop systematic partial withdrawals at any time, but we must receive written notice at least 30 days prior to the date systematic partial withdrawals are to be discontinued. We reserve the right to discontinue offering systematic partial withdrawals 30 days after we send you written notice.

Income taxes, federal tax penalties and other restrictions may apply to any systematic partial withdrawal you receive.

**Contract Loans for Qualified Contracts**

You can take Contract loans during the accumulation period when the Contract:

- is used in connection with a tax-sheltered annuity plan under Section 403(b) of the Code (limit of one Contract loan per calendar year);
- is purchased by a pension, profit-sharing, or other similar plan qualified under section 401(a) of the Code (including Section 401(k) plans - please contact your plan administrator); and

- has been in force for at least 10 days.

The maximum amount you may borrow against the Contract is the lesser of:

- 50% of the annuity value; or
- $50,000 reduced by the highest outstanding loan balance during the one-year period immediately prior to the loan date. However, if the annuity value is less than $20,000, the maximum you may borrow against the Contract is the lesser of 80% of the annuity value or $10,000.

The minimum loan amount is $1,000 (unless otherwise required by state law). You are responsible for requesting and repaying loans that comply with applicable tax requirements, and other laws, such as the Employment Retirement Income Security Act of 1974 ("ERISA"). Accordingly, you should consult a competent tax advisor before requesting a Contract loan.

The loan amount will be withdrawn from your investment choices and transferred to the loan reserve. The loan reserve is part of the fixed account and is used as collateral for all Contract loans. We reserve the right to postpone distributing the loan amount from the fixed account for up to six months, if required.

On each Contract anniversary we will compare the amount of the Contract loan to the amount in the loan reserve. If all Contract loans and unpaid interest due on the loan exceed the amount in the loan reserve, we will withdraw the difference and transfer it to the loan reserve. If the amount of the loan reserve exceeds the amount of the outstanding Contract loan, we will withdraw the difference from the loan reserve and transfer it in accordance with your current purchase payment allocation. We reserve the right to transfer the excess to the fixed account if the amount used to establish the loan reserve was transferred from the fixed account.

If all Contract loans and unpaid interest due on the loan exceed the cash value, we will mail to your last known address and to any assignee of record a notice stating the amount due in order to reduce the loan amount so that the loan amount no longer exceeds the cash value. If the excess amount is not paid within 31 days after we mail the notice, the Contract will terminate without value.

You can repay any Contract loan in full:

- while the Contract is in force; and
- during the accumulation period.

Note Carefully: If you do not repay your Contract loan, we will subtract the amount of the unpaid loan plus interest from:

- the amount of any death benefit proceeds; or
- the amount we pay upon a partial withdrawal or complete surrender; or
- the amount we apply on the maturity date to provide annuity payments.

You must pay interest on the loan at the rate of 6% per year. We deduct interest in arrears. Amounts in the loan reserve will earn interest at a minimum guaranteed effective annual interest rate of 4%. Principal and interest must be repaid:

35

- in level quarterly or monthly payments over a 5-year period; or
- over a 10, 15 or 20-year period, if the loan is used to buy your principal residence.

An extended repayment period cannot go beyond the year you turn 70½.

If:

- a repayment is not received within 31 days from the original due date;

Then:

- a distribution of all Contract loans and unpaid accrued interest, and any applicable charges, including any withdrawal charge, will take place.

This distribution will be reported as taxable to the Internal Revenue Service, may be subject to income and penalty tax, and may cause the Contract to not qualify under Section 403(b) of the Code.

You may fax your loan request to us at 727-299-1620.

The loan date is the date we process the loan request. We impose a $30 fee to cover loan processing and expenses associated with establishing and administering the loan reserve (not applicable in all states). We reserve the right to limit the number of Contract loans made to one per Contract year.

Contract loans may not be available in all states.

## 8. PERFORMANCE

We periodically advertise performance of the subaccounts and investment portfolios. We may disclose at least four different kinds of performance.

First, we may disclose standardized total return figures for the subaccounts that reflect the deduction of all charges assessed during the accumulation period under the Contract, including the mortality and expense charge, the annual Contract charge and the withdrawal charge. *These figures are based on the actual historical performance of the subaccounts investing in the underlying portfolios since since their inception, adjusted to reflect current Contract charges.*

Second, we may disclose total return figures on a non-standardized basis. This means that the data may be presented for different time periods and different dollar amounts. The data will not be reduced by the withdrawal charge currently assessed under the Contract. We will only disclose non-standardized performance data if it is accompanied by standardized total return data.

Third, we may present historic performance data for the portfolios since their inception reduced by some or all fees and charges under the Contract. Such adjusted historic

performance includes data that precedes the inception dates of the subaccounts, but is designed to show the performance that would have resulted if the Contract had been available during that time.

Fourth, we may include in our advertising and sales materials, tax-deferred compounding charts and other hypothetical illustrations, which may include comparisons of currently taxable and tax-deferred investment programs, based on selected tax brackets.

The WRL Fund prospectus presents the total return of certain existing SEC-registered funds that are managed by sub-advisers to the WRL portfolios. These funds have investment objectives, policies and strategies that are substantially similar to those of certain portfolios. We call these funds the "Similar Sub-Adviser Funds." None of the fees and charges under the Contract has been deducted from the performance data of the Similar Sub-Adviser Funds. If Contract fees and charges were deducted, the investment returns would be lower. The Similar Sub-Adviser Funds are not available for investment under the Contract.

Appendix B contains performance information that you may find useful. It is divided into various parts, depending upon the type of performance information shown. Future performance will vary and future results will not be the same as the results shown.

## 9. DEATH BENEFIT

We will pay a death benefit to the beneficiary, under certain circumstances, if you are both the owner and the annuitant and you die during the accumulation period. (If you are not the annuitant, a death benefit may or may not be paid. See below.) The beneficiary may choose an annuity payment option or may choose to receive a lump sum.

### When We Pay a Death Benefit

Before the Maturity Date. We will pay a death benefit to your beneficiary:

If:
- you are both the annuitant and the owner of the Contract; and
- you die before the maturity date.

If:
- you are not the annuitant; and
- you die prior to the maturity date; and
- there is no surviving joint owner.

If the only beneficiary is your surviving spouse, then he or she may elect to continue the Contract as the new annuitant and owner, instead of receiving the death benefit.

Federally prescribed mandatory distribution requirements apply to the annuity value upon the death of any owner or annuitant. These restrictions are detailed in the SAI.

After the Maturity Date. The death benefit payable, if any, on or after the maturity date depends on the annuity payment option selected. See Fixed Annuity Payment Options

and Variable Annuity Payment Options on pages 15 and 16 for a description of the annuity payment options. Please note that not all payment options provide for a death benefit.

If:
- you are not the annuitant; and
- you die on or after the maturity date; and
- the entire interest in the Contract has not been paid to you;

Then:
- any remaining value in the Contract will be distributed at least as rapidly as under the method of distribution being used as of the date of the owner's death.

**When We Do Not Pay a Death Benefit**

No death benefit is paid in the following cases:

If:
- you are not the annuitant; and
- the annuitant dies prior to the maturity date;

Then:
- you will become the new annuitant and the Contract will continue. In the case of joint owners, the younger joint owner will automatically become the annuitant.

If:
- you are not the annuitant; and
- you die prior to the maturity date;

Then:
- if there is a surviving joint owner, then the Contract will continue with the surviving joint owner as sole owner;
- if the beneficiary is alive and is your spouse, the Contract will continue with the spouse as the new owner; or
- if the beneficiary is alive and is not your spouse, the beneficiary will become the new owner. This new owner generally must surrender the Contract for the cash value within five years of your death.

**Note Carefully:** If the surviving owner does not name a beneficiary or if no beneficiary is alive, the owner's estate will become the new owner. The Contract's cash value must generally be distributed within five years of your death. If no probate estate is opened because the owner has precluded the opening of a probate estate by means of a trust or other instrument, unless we receive written notice of the trust as a successor owner signed prior to the owner's death, that trust may not exercise ownership rights to the Contract. It may be necessary to open a probate estate in order to exercise ownership rights to the Contract if no successor owner is named in a written notice received by us.

**Amount of Death Benefit During the Accumulation Period**

Death benefit provisions may differ from state to state. The death benefit may be paid as a lump sum or as annuity payments but in all events will be paid in accordance with any applicable federal and state laws, rules and regulations.

*If the annuitant dies during the accumulation period and if a death benefit is payable,* the death benefit will be the greatest of the following:

- the annuity value of your Contract on the death report day;
- the total purchase payment you make to the Contract, reduced by any partial withdrawals;
- the annuity value of your Contract on the seventh Contract anniversary, reduced by any partial withdrawals; or
- the highest annuity value of your Contract on any Contract anniversary between your Contract date (as shown on your Contract schedule page) and the earlier of:
  - the annuitant's date of death; or
  - the Contract anniversary nearest the annuitant's 80th birthday.

The highest annuity value will be increased by purchase payments made and decreased by adjusted partial withdrawals taken following the Contract anniversary date with the highest annuity value. The adjusted partial withdrawal is equal to (a) times (b) where:

- (a) is the ratio of the death benefit to the annuity value, calculated on the date the partial withdrawal is processed, but prior to the processing; and
- (b) is the amount of the partial withdrawal.

**Alternate Payment Elections Before the Maturity Date**

The beneficiary may elect to receive the death benefit in a lump sum payment, or (if not your surviving spouse) to receive payment:

1. within 5 years of the date of the annuitant's death;
2. over a specific number of years, not to exceed the beneficiary's life expectancy, with payments starting within one year of the annuitant's death; or
3. under a life annuity payout option, with payments starting within one year of the annuitant's death.

Multiple beneficiaries may choose individually among any of the three options.

If the beneficiary chooses 1 or 2 above, this Contract remains in effect and remains in the accumulation period until it terminates at the end of the elected period. The death benefit becomes the new annuity value. If the beneficiary chooses 3 above, the Contract remains in effect, but moves into the annuity phase with the beneficiary receiving payments under a life annuity payout option. *Special restrictions apply to 1 above. See the SAI for more details.*

## 10. OTHER INFORMATION

### Ownership

You, as owner of the Contract, exercise all rights under the Contract, including the right to transfer ownership (subject to any assignee or irrevocable beneficiary's consent). You can change the owner at any time by notifying us in writing. An ownership change may be a taxable event. Joint owners may be named provided they are husband and wife. Joint ownership is not available in all states.

**Annuitant**

The annuitant is the person named in the application to receive annuity payments. If no person is named, the owner will be the annuitant. As of the maturity date, and upon our agreement, the owner may change the annuitant or, if either annuity Option C or Option E has been selected, add a co-annuitant. On the maturity date, the annuitant(s) will become the payee(s) and receive the annuity payments.

**Beneficiary**

The beneficiary is the person who receives the death benefit upon the death of the annuitant when the owner is the annuitant. The beneficiary will become the new owner when the owner is not the same person as the annuitant and the owner dies before the annuitant. You may change the beneficiary during the lifetime of the annuitant, subject to the rights of any irrevocable beneficiary. Any change must be made in writing and received by us at our administrative office and, if accepted, will be effective as of the date on which the request was signed by the owner. Prior to the maturity date, if no owner or beneficiary survives the annuitant, the owner's estate will be the beneficiary. In the case of certain qualified Contracts, the Treasury Regulations prescribe certain limitations on the designation of a beneficiary. See the SAI for more details on the beneficiary.

**Assignment**

You can also assign the Contract any time prior to the maturity date. Western Reserve will not be bound by the assignment until we receive written notice of the assignment. Western Reserve will not be liable for any payment or other action we take in accordance with the Contract before we receive notice of the assignment. An assignment may be a taxable event. There may be limitations on your ability to assign a qualified Contract and such assignments may be subject to tax penalties and taxed as distributions under the Code.

**Western Reserve Life Assurance Co. of Ohio**

Western Reserve was incorporated under the laws of Ohio on October 1, 1957. It is engaged in the business of writing life insurance policies and annuity contracts. Western Reserve is wholly-owned by First AUSA Life Insurance Company, a stock life insurance company which is wholly-owned indirectly by AEGON USA, Inc. ("AEGON USA"), which conducts most of its operations through subsidiary companies engaged in the insurance business or in providing non-insurance financial services. All of the stock of AEGON USA is indirectly owned by AEGON N.V. of the Netherlands, the securities of which are publicly traded. AEGON N.V., a holding company, conducts its business through subsidiary companies engaged primarily in the insurance business. Western Reserve is licensed in the District of Columbia, Guam, Puerto Rico and in all states except New York.

**The Separate Account**

Western Reserve established a separate account, called the WRL Series Annuity Account, under the laws of the State of Ohio on April 12, 1988. The separate account is divided into subaccounts, each of which invests exclusively in shares of a mutual fund portfolio. Currently, there are 29 subaccounts offered through this Contract. Western Reserve

may add, delete or substitute subaccounts or investments held by the subaccounts, and reserves the right to change the investment objective of any subaccount, subject to applicable law as described in the SAI. In addition, the separate account may be used for other variable annuity contracts issued by Western Reserve.

The separate account is registered with the SEC as a unit investment trust under the 1940 Act. However, the SEC does not supervise the management, the investment practices, or the Contracts of the separate account or Western Reserve.

The assets of the separate account are held in Western Reserve's name on behalf of the separate account and belong to Western Reserve. However, the assets underlying the Contracts are not chargeable with liabilities arising out of any other business Western Reserve may conduct. The income, gains and losses, realized and unrealized, from the assets allocated to each subaccount are credited to and charged against that subaccount without regard to the income, gains and losses from any other of our accounts or subaccounts.

Information about the separate account can be reviewed and copied at the SEC's Public Reference Room in Washington, D.C. You may obtain information about the operation of the public reference room by calling the SEC at 1-800-SEC-0330. In addition, the SEC maintains a web site (www.sec.gov) that contains other information regarding the separate account.

**Voting Rights**

Western Reserve will vote all shares of the portfolios in accordance with instructions we receive from you and other owners that have voting interests in the portfolios. We will send you and other owners written requests for instructions on how to vote those shares. When we receive those instructions, we will vote all of the shares in accordance with those instructions. We will vote shares for which no timely instructions were received in the same proportion as the voting instructions we received. However, if we determine that we are permitted to vote the shares in our own right, we may do so. Each person having a voting interest will receive proxy material, reports, and other materials relating to the appropriate portfolio. More information on voting rights is provided in the SAI.

**Distribution of the Contracts**

AFSG is the principal underwriter of the Contracts. Like Western Reserve, it is an indirect wholly-owned subsidiary of AEGON USA. It is located at 4333 Edgewood Road N.E., Cedar Rapids, IA 52499-0001. AFSG is registered as a broker/dealer under the Securities Exchange Act of 1934. It is a member of the National Association of Securities Dealers, Inc.

AFSG will receive the 12b-1 fees assessed against the Fidelity VIP Funds' shares held for the Contracts as compensation for providing certain shareholder support services. AFSG will also receive an additional fee based on the value of shares of the Fidelity VIP Funds held for the Contracts as compensation for providing certain recordkeeping services.

The Contracts are offered to the public through broker/dealers licensed under the federal securities laws and state insurance laws and who have entered into written sales agreements with AFSG, including InterSecurities, Inc., Transamerica Capital, Inc. and Transamerica Financial Resources, Inc., all affiliates of Western Reserve. Western Reserve will generally pay broker/dealers sales commissions in an amount equal to 6% of purchase payments. In addition, broker/dealers may receive trail commissions of 0.20% of the annuity

value in each Contract year, starting at the end of the first quarter of the second Contract year, provided the Contract has an annuity value of $5,000 or more in the subaccounts. These commissions are not deducted from purchase payments. Certain production, persistency and managerial bonuses may also be paid. Subject to applicable federal and state laws and regulations, Western Reserve may also pay compensation to banks and other financial institutions for their services in connection with the sale and servicing of the Contracts. The level of such compensation will not exceed that paid to broker/dealers for their sale of the Contracts. The offering of the Contracts is continuous and Western Reserve does not anticipate discontinuing the offering of the Contracts. However, Western Reserve reserves the right to do so.

### Non-Participating Contract

The Contract does not participate or share in the profits or surplus earnings of Western Reserve. No dividends are payable on the Contract.

### Variations in Contract Provisions

Certain provisions of the Contracts may vary from the descriptions in this prospectus in order to comply with different state laws. See your Contract for variations since any such state variations will be included in your Contract or in riders or endorsements attached to your Contract.

The fixed account is not available in all states. Residents of Washington, Oregon, New Jersey and Massachusetts may not direct or transfer any money to the fixed account.

### IMSA

We are a member of the Insurance Marketplace Standards Association ("IMSA"). IMSA is an independent, voluntary organization of life insurance companies. It promotes high ethical standards in the sales and advertising of individual life insurance and annuity products. Companies must undergo a rigorous self and independent assessment of their practices to become a member of IMSA. The IMSA logo in our sales literature shows our ongoing commitment to these standards.

### Legal Proceedings

Western Reserve, like other life insurance companies, is involved in lawsuits. We are not aware of any class lawsuits naming us as a defendant or involving the separate account. In some lawsuits involving other insurers, substantial damages have been sought and/or material settlement payments have been made. Although the outcome of any litigation cannot be predicted with certainty, we believe that at the present time there are no pending or threatened lawsuits that are reasonably likely to have a material adverse impact on the separate account, AFSG, or Western Reserve.

### Financial Statements

The financial statements of Western Reserve and the separate account are included in the SAI.

# TABLE OF CONTENTS OF THE STATEMENT OF ADDITIONAL INFORMATION

Definitions of Special Terms
The Contract — General Provisions
Certain Federal Income Tax Consequences
Investment Experience
Historical Performance Data
Published Ratings
Administration
Records and Reports
Distribution of the Contracts
Other Products
Custody of Assets
Legal Matters
Independent Accountants
Other Information
Financial Statements

Inquiries and requests for an SAI should be directed to:

Western Reserve Life
Administrative Office
Attention: Annuity Department
P.O. Box 9051
Clearwater, Florida 33758-9051
1-800-851-9777

43

# Appendix A
# Condensed Financial Information

The accumulation unit values and the number of accumulation units outstanding for each subaccount from the date of inception are shown in the following tables. The number of accumulation units combines the units outstanding for four variable annuity contracts issued by Western Reserve through the subaccount.

| WRL J.P. MORGAN MONEY MARKET SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 12/3/1992[1] – 12/31/1992 | $10.000 | $10.009 | 10,000 |
| 12/31/1993 | $10.009 | $10.110 | 869,019 |
| 12/31/1994 | $10.110 | $10.319 | 2,765,589 |
| 12/31/1995 | $10.319 | $10.728 | 2,658,931 |
| 12/31/1996 | $10.728 | $11.119 | 5,253,582 |
| 12/31/1997 | $11.119 | $11.546 | 5,382,846 |
| 12/31/1998 | $11.546 | $11.989 | 7,839,228 |
| 12/31/1999 | $11.989 | $12.396 | 21,724,144 |

| WRL AEGON BOND SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 12/3/1992[1] – 12/31/1992 | $10.000 | $10.136 | 10,000 |
| 12/31/1993 | $10.136 | $11.330 | 1,524,761 |
| 12/31/1994 | $11.330 | $10.400 | 1,693,632 |
| 12/31/1995 | $10.400 | $12.613 | 2,598,178 |
| 12/31/1996 | $12.613 | $12.455 | 3,055,305 |
| 12/31/1997 | $12.455 | $13.407 | 4,801,744 |
| 12/31/1998 | $13.407 | $14.452 | 6,350,826 |
| 12/31/1999 | $14.452 | $13.832 | 6,280,541 |

| WRL JANUS GROWTH SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 12/3/1992[1] – 12/31/1992 | $10.000 | $10.240 | 10,000 |
| 12/31/1993 | $10.240 | $10.499 | 8,326,400 |
| 12/31/1994 | $10.499 | $ 9.493 | 11,839,096 |
| 12/31/1995 | $ 9.493 | $13.771 | 14,387,637 |
| 12/31/1996 | $13.771 | $16.019 | 19,832,582 |
| 12/31/1997 | $16.019 | $18.568 | 23,272,252 |
| 12/31/1998 | $18.568 | $30.116 | 27,434,976 |
| 12/31/1999 | $30.116 | $47.419 | 32,275,260 |

45

| WRL JANUS GLOBAL SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 12/3/1992[(1)] – 12/31/1992 | $10.000 | $10.151 | 25,000 |
| 12/31/1993 | $10.151 | $13.518 | 2,212,212 |
| 12/31/1994 | $13.518 | $13.364 | 7,170,632 |
| 12/31/1995 | $13.364 | $16.217 | 6,903,573 |
| 12/31/1996 | $16.217 | $20.428 | 11,159,128 |
| 12/31/1997 | $20.428 | $23.921 | 15,530,666 |
| 12/31/1998 | $23.921 | $30.669 | 17,104,721 |
| 12/31/1999 | $30.669 | $51.748 | 18,875,171 |

| WRL LKCM STRATEGIC TOTAL RETURN SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 3/1/1993[(1)] – 12/31/1993 | $10.000 | $11.243 | 2,518,263 |
| 12/31/1994 | $11.243 | $11.027 | 6,504,999 |
| 12/31/1995 | $11.027 | $13.555 | 7,498,916 |
| 12/31/1996 | $13.555 | $15.372 | 12,770,554 |
| 12/31/1997 | $15.372 | $18.471 | 15,124,297 |
| 12/31/1998 | $18.471 | $19.969 | 16,461,563 |
| 12/31/1999 | $19.969 | $22.069 | 16,136,973 |

| WRL VKAM EMERGING GROWTH SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 3/1/1993[1] – 12/31/1993 | $10.000 | $12.354 | 2,059,530 |
| 12/31/1994 | $12.354 | $11.286 | 5,547,915 |
| 12/31/1995 | $11.286 | $16.337 | 6,434,051 |
| 12/31/1996 | $16.337 | $19.152 | 9,376,917 |
| 12/31/1997 | $19.152 | $22.938 | 11,279,603 |
| 12/31/1998 | $22.938 | $31.063 | 12,278,821 |
| 12/31/1999 | $31.063 | $62.846 | 14,178,995 |

| WRL ALGER AGGRESSIVE GROWTH SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 3/1/1994[1] – 12/31/1994 | $10.000 | $ 9.782 | 1,165,716 |
| 12/31/1995 | $ 9.782 | $13.313 | 4,538,244 |
| 12/31/1996 | $13.313 | $14.500 | 6,954,084 |
| 12/31/1997 | $14.500 | $17.766 | 9,141,315 |
| 12/31/1998 | $17.766 | $26.048 | 10,807,100 |
| 12/31/1999 | $26.048 | $43.416 | 13,252,453 |

| WRL AEGON BALANCED SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 3/1/1994[1] – 12/31/1994 | $10.000 | $ 9.339 | 849,727 |
| 12/31/1995 | $ 9.339 | $11.032 | 1,456,512 |
| 12/31/1996 | $11.032 | $12.045 | 2,385,500 |
| 12/31/1997 | $12.045 | $13.909 | 3,156,354 |
| 12/31/1998 | $13.909 | $14.666 | 4,024,017 |
| 12/31/199 | $14.666 | $14.900 | 4,467,001 |

| WRL FEDERATED GROWTH & INCOME SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 3/1/1994[1] – 12/31/1994 | $10.000 | $ 9.453 | 400,544 |
| 12/31/1995 | $ 9.453 | $11.676 | 863,789 |
| 12/31/1996 | $11.676 | $12.853 | 1,553,811 |
| 12/31/1997 | $12.853 | $15.799 | 2,315,992 |
| 12/31/1998 | $15.799 | $16.055 | 3,248,069 |
| 12/31/1999 | $16.055 | $15.127 | 3,023,724 |

48

| WRL DEAN ASSET ALLOCATION SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 1/3/1995[1] – 12/31/1995 | $10.000 | $11.843 | 6,104,685 |
| 12/31/1996 | $11.843 | $13.363 | 9,397,631 |
| 12/31/1997 | $13.363 | $15.363 | 12,633,177 |
| 12/31/1998 | $15.363 | $16.411 | 14,496,370 |
| 12/31/1999 | $16.411 | $15.270 | 10,938,985 |

| WRL C.A.S.E. GROWTH SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 5/1/1996[1] – 12/31/1996 | $10.000 | $10.773 | 1,164,233 |
| 12/31/1997 | $10.773 | $12.220 | 2,618,284 |
| 12/31/1998 | $12.220 | $12.348 | 3,043,446 |
| 12/31/1999 | $12.348 | $16.297 | 3,137,092 |

| WRL NWQ VALUE EQUITY SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 5/1/1996[1] – 12/31/1996 | $10.000 | $11.213 | 2,118,820 |
| 12/31/1997 | $11.213 | $13.827 | 7,035,132 |
| 12/31/1998 | $13.827 | $12.983 | 7,102,945 |
| 12/31/1999 | $12.983 | $13.820 | 5,579,088 |

49

| WRL GE INTERNATIONAL EQUITY SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 1/2/1997[1] – 12/31/1997 | $10.000 | $10.601 | 1,050,984 |
| 12/31/1998 | $10.601 | $11.797 | 1,642,437 |
| 12/31/1999 | $11.797 | $14.536 | 1,407,842 |

| WRL GE U.S. EQUITY SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 1/2/1997[1] – 12/31/1997 | $10.000 | $12.526 | 2,141,414 |
| 12/31/1998 | $12.526 | $15.177 | 4,840,127 |
| 12/31/1999 | $15.177 | $17.721 | 6,781,197 |

| WRL THIRD AVENUE VALUE SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 1/2/1998[1] – 12/31/1998 | $10.000 | $9.187 | 1,025,234 |
| 12/31/1999 | $9.187 | $10.483 | 968,035 |

| WRL J.P. MORGAN REAL ESTATE SECURITIES SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 5/1/1998[1] – 12/31/1998 | $10.000 | $8.427 | 157,193 |
| 12/31/1999 | $8.427 | $7.996 | 203,365 |

| WRL GOLDMAN SACHS GROWTH SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 5/3/1999[1] – 12/31/1999 | $10.000 | $11.640 | 503,875 |

| WRL GOLDMAN SACHS SMALL CAP SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 5/3/1999[1] – 12/31/1999 | $10.000 | $11.631 | 166,378 |

| WRL T. ROWE PRICE DIVIDEND GROWTH SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 5/3/1999[1] – 12/31/1999 | $10.000 | $9.173 | 691,875 |

| WRL T. ROWE PRICE SMALL CAP SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 5/3/1999[1] – 12/31/1999 | $10.000 | $13.719 | 359,295 |

| WRL SALOMON ALL CAP SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 5/3/1999[1] – 12/31/1999 | $10.000 | $11.449 | 425,168 |

| WRL PILGRIM BAXTER MID CAP GROWTH SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 5/3/1999[1] – 12/31/1999 | $10.000 | $17.633 | 1,452,014 |

| WRL DREYFUS MID CAP SUBACCOUNT | | | |
|---|---|---|---|
| | Accumulation Unit Value at Beginning of Period | Accumulation Unit Value at End of Period | Number of Accumulation Units Outstanding at End of Period |
| 5/3/1999[1] – 12/31/1999 | $10.000 | $10.620 | 209,699 |

(1) Commencement of operations of these subaccounts.

Because the WRL Value Line Aggressive Growth, WRL Great Companies — America[SM] and WRL Great Companies — Technology[SM] portfolios did not commence operations until May 1, 2000, and because the Fidelity VIP Equity-Income Portfolio — Service Class 2, Fidelity VIP II Contrafund® Portfolio — Service Class 2 and Fidelity VIP III Growth Opportunities Portfolio — Service Class 2 were not offered under this prospectus until May 1, 2000, there is no condensed financial information for these subaccounts for the year ended December 31, 1999.

52

# Appendix B
# Historical Performance Data

**Standardized Performance Data**

Western Reserve may advertise historical yields and total returns for the subaccounts of the separate account. These figures are based on historical earnings and will be calculated according to guidelines from the SEC. They do not indicate future performance.

**WRL J.P. Morgan Money Market Subaccount.** The yield of the WRL J. P. Morgan Money Market subaccount is the annualized income generated by an investment in the subaccount over a specified seven-day period. The yield is calculated by assuming that the income generated for that seven-day period, not including capital changes or income other than investment income, is generated each seven-day period over a 52-week period and is shown as a percentage of the investment. The effective yield is calculated similarly but we assume that the income earned is reinvested. The effective yield will be slightly higher than the yield because of the compounding effect of this assumed reinvestment. For the seven days ended December 31, 1999, the yield of the WRL J.P. Morgan Money Market subaccount was 3.74% and the effective yield was 3.81%.

**Other Subaccounts.** The **yield** of a subaccount, other than the WRL J.P. Morgan Money Market subaccount, refers to the annualized income generated by an investment in the subaccount over a specified 30-day period. The yield is calculated by assuming that the income generated by the investment during that 30-day period is generated each 30-day period over a 12-month period and is shown as a percentage of the investment.

The **total return** of a subaccount assumes that an investment has been held in a subaccount for various periods of time including a period measured from the date the first subaccount investing in the underlying portfolios began operations. When the first subaccount investing in the underlying portfolios has been in operation for 1, 5, and 10 years, the total return for these periods will be provided, adjusted to reflect current subaccount charges. The total return quotations will represent the average annual compounded rates of return of investment of $1,000 in the subaccount as of the last day of each period.

The yield and total return calculations for a subaccount are not reduced by any premium taxes. For additional information regarding yields and total returns, please refer to the SAI.

Based on the method of calculation described in the SAI, the standardized average annual total returns of the subaccounts for periods from inception of the subaccounts investing in the underlying portfolios to December 31, 1999, and for the one, five and ten year periods ended December 31, 1999 are shown in Table 1 below. Total returns shown in Table 1 reflect deductions of 1.40% for the mortality and expense risk charge and $35 for the annual Contract charge. (Based on an average Contract size of $44,369, the annual Contract charge translates into a charge of 0.08%.) Total returns also assume a complete surrender of the Contract at the end of the period; therefore, the withdrawal charge is deducted.

| TABLE 1 Standardized Average Annual Total Returns of the Subaccounts (Assumes Surrender) | | | | | |
|---|---|---|---|---|---|
| Subaccount | 1 Year Ended 12/31/99 | 5 Years Ended 12/31/99 | 10 Years Ended 12/31/99 | Inception of the Subaccount to 12/31/99 | Subaccount Inception Date** |
| WRL J.P. Morgan Money Market* | -4.69% | 3.02% | 3.25% | 3.52% | 02/24/1989 |
| WRL AEGON Bond | -12.36% | 5.21% | 5.78% | 6.47% | 02/24/1989 |
| WRL Janus Growth | 49.33% | 37.70% | 21.88% | 23.27% | 02/24/1989 |
| WRL Janus Global | 60.60% | 30.80% | N/A | 26.12% | 12/03/1992 |
| WRL LKCM Strategic Total Return | 2.43% | 14.40% | N/A | 12.11% | 03/01/1993 |
| WRL VKAM Emerging Growth | 94.16% | 40.75% | N/A | 30.75% | 03/01/1993 |
| WRL Alger Aggressive Growth | 58.54% | 34.46% | N/A | 28.41% | 03/01/1994 |
| WRL AEGON Balanced | -6.49% | 9.22% | N/A | 6.68% | 03/01/1994 |
| WRL Federated Growth & Income | -13.86% | 9.29% | N/A | 6.96% | 03/01/1994 |
| WRL Dean Asset Allocation | -15.03% | N/A | N/A | 8.26% | 01/03/1995 |
| WRL C.A.S.E. Growth | 23.88% | N/A | N/A | 16.60% | 05/01/1995 |
| WRL NWQ Value Equity | -1.64% | N/A | N/A | 8.10% | 05/01/1996 |
| WRL GE International Equity | 15.12% | N/A | N/A | 11.71% | 01/02/1997 |
| WRL GE U.S. Equity | 8.67% | N/A | N/A | 19.67% | 01/02/1997 |
| WRL Third Avenue Value | 6.02% | N/A | N/A | -1.14% | 01/02/1998 |
| WRL J.P. Morgan Real Estate Securities | -13.19% | N/A | N/A | -17.24% | 05/01/1998 |
| WRL Goldman Sachs Growth | N/A | N/A | N/A | 8.34% | 05/03/1999 |
| WRL Goldman Sachs Small Cap | N/A | N/A | N/A | 8.24% | 05/03/1999 |
| WRL T. Rowe Price Dividend Growth | N/A | N/A | N/A | -16.32% | 05/03/1999 |
| WRL T. Rowe Price Small Cap | N/A | N/A | N/A | 29.12% | 05/03/1999 |
| WRL Salomon All Cap | N/A | N/A | N/A | 6.43% | 05/03/1999 |
| WRL Pilgrim Baxter Mid Cap Growth | N/A | N/A | N/A | 68.24% | 05/03/1999 |
| WRL Dreyfus Mid Cap | N/A | N/A | N/A | -1.86% | 05/03/1999 |
| WRL Value Line Aggressive Growth | N/A | N/A | N/A | N/A | 05/01/2000 |
| WRL Great Companies — America[SM] | N/A | N/A | N/A | N/A | 05/01/2000 |
| WRL Great Companies — Technology[SM] | N/A | N/A | N/A | N/A | 05/01/2000 |
| Fidelity VIP Equity-Income Portfolio — Service Class 2 | N/A | N/A | N/A | N/A | 05/01/2000 |
| Fidelity VIP II Contrafund® Portfolio — Service Class 2 | N/A | N/A | N/A | N/A | 05/01/2000 |
| Fidelity VIP III Growth Opportunities Portfolio — Service Class 2 | N/A | N/A | N/A | N/A | 05/01/2000 |

* Yield more closely reflects the current earnings of the WRL J.P. Morgan Money Market subaccount than its total return.

** Refers to the date when the separate account first invested in the underlying portfolios.

**Non-Standardized Performance Data**

In addition to the standardized data discussed above, similar performance data for other periods may also be shown.

We may from time to time also disclose average annual total return or other performance data in non-standardized formats for the subaccounts. The non-standardized performance data may make different assumptions regarding the amount invested, the time periods shown, or the effect of partial withdrawals or annuity payments.

All non-standardized performance data will be advertised only if the standardized performance data as shown in Table 1 is also disclosed. For additional information regarding the calculation of other performance data, please refer to the SAI.

Based on the method of calculation described in the SAI, the non-standardized average annual total returns for periods from inception of the subaccounts to December 31, 1999, and for the one, five and ten-year periods ended December 31, 1999 are shown in Table 2 below. Total returns shown in Table 2 reflect deductions of 1.40% for the mortality and expense risk charge and $35 for the annual Contract charge. (Based on an average Contract size of $44,369, the annual Contract charge translates into a charge of 0.08%.) Total returns assume that the Contract is not surrendered and therefore the withdrawal charge is not deducted.

| TABLE 2<br>Non-Standardized Average Annual Total Returns of the Subaccounts<br>(Assumes No Surrender) | | | | | |
|---|---|---|---|---|---|
| Subaccount | 1 Year<br>Ended<br>12/31/99 | 5 Years<br>Ended<br>12/31/99 | 10 Years<br>Ended<br>12/31/99 | Inception of the<br>Subaccount to<br>12/31/99** | Subaccount<br>Inception<br>Date** |
| WRL J.P Morgan Money Market* | 3.31% | 3.72% | 3.25% | 3.52% | 02/24/1989 |
| WRL AEGON Bond | -4.36% | 5.85% | 5.78% | 6.47% | 02/24/1989 |
| WRL Janus Growth | 57.33% | 37.93% | 21.88% | 23.27% | 02/24/1989 |
| WRL Janus Global | 68.60% | 31.08% | N/A | 26.12% | 12/03/1992 |
| WRL LKCM Strategic Total Return | 10.43% | 14.87% | N/A | 12.26% | 03/01/1993 |
| WRL VKAM Emerging Growth | 102.16% | 40.95% | N/A | 30.81% | 03/01/1993 |
| WRL Alger Aggressive Growth | 66.54% | 34.70% | N/A | 28.57% | 03/01/1994 |
| WRL AEGON Balanced | 1.51% | 9.78% | N/A | 7.05% | 03/01/1994 |
| WRL Federated Growth & Income | -5.86% | 9.84% | N/A | 7.33% | 03/01/1994 |
| WRL Dean Asset Allocation | -7.03% | N/A | N/A | 8.84% | 01/03/1995 |
| WRL C.A.S.E. Growth | 31.88% | N/A | N/A | 17.08% | 05/01/1995 |
| WRL NWQ Value Equity | 6.36% | N/A | N/A | 9.19% | 05/01/1996 |
| WRL GE International Equity | 23.12% | N/A | N/A | 13.30% | 01/02/1997 |
| WRL GE U.S. Equity | 16.67% | N/A | N/A | 21.06% | 01/02/1997 |
| WRL Third Avenue Value | 14.02% | N/A | N/A | 2.36% | 01/02/1998 |
| WRL J.P. Morgan Real Estate Securities | -5.19% | N/A | N/A | -12.57% | 05/01/1998 |
| WRL Goldman Sachs Growth | N/A | N/A | N/A | 16.34% | 05/03/1999 |
| WRL Goldman Sachs Small Cap | N/A | N/A | N/A | 16.24% | 05/03/1999 |
| WRL T. Rowe Price Dividend Growth | N/A | N/A | N/A | -8.32% | 05/03/1999 |
| WRL T. Rowe Price Small Cap | N/A | N/A | N/A | 37.12% | 05/03/1999 |
| WRL Salomon All Cap | N/A | N/A | N/A | 14.43% | 05/03/1999 |
| WRL Pilgrim Baxter Mid Cap Growth | N/A | N/A | N/A | 76.24% | 05/03/1999 |
| WRL Dreyfus Mid Cap | N/A | N/A | N/A | 6.14% | 05/03/1999 |
| WRL Value Line Aggressive Growth | N/A | N/A | N/A | N/A | 05/01/2000 |
| WRL Great Companies — America[SM] | N/A | N/A | N/A | N/A | 05/01/2000 |
| WRL Great Companies — Technology[SM] | N/A | N/A | N/A | N/A | 05/01/2000 |
| Fidelity VIP Equity-Income Portfolio —<br>Service Class 2 | N/A | N/A | N/A | N/A | 05/01/2000 |
| Fidelity VIP II Contrafund® Portfolio —<br>Service Class 2 | N/A | N/A | N/A | N/A | 05/01/2000 |
| Fidelity VIP III Growth Opportunities<br>Portfolio — Service Class 2 | N/A | N/A | N/A | N/A | 05/01/2000 |

\*   Yield more closely reflects the current earnings of the WRL J.P. Morgan Money Market subaccount than its total return.
\*\* Refers to the date when the separate account first invested in the underlying portfolios.

**Adjusted Historical Performance Data.** We may disclose historic performance data for the portfolios since their inception reduced by some or all of the fees and charges under the Contract. Such adjusted historic performance would include data that precedes the inception dates of the subaccounts investing in the underlying portfolios. This data is designed to show the performance that would have resulted if the Contract had been in existence during that time, based on the portfolio's performance. This data assumes that the subaccounts available under the Contract were in existence for the same period as the portfolio with a level of charges equal to those currently assessed under the Contract. This data is not intended to indicate future performance.

Because the separate account has been invested in portfolio shares since the inception of the class of portfolio shares held by the separate account, the adjusted historic portfolio data for the Contract corresponds to the performance data displayed in Tables 1 and 2 of Appendix B.

THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

# Variable Annuity Application

Western Reserve Life Assurance Co. of Ohio
P.O.Box 9051, Clearwater, Florida 33758

**ANNUITY SELECTION (Check one)**

☐ WRL Freedom Attainer   ☐ WRL Freedom Bellwether   ☑ WRL Freedom Wealth Creator   ☐ Other _____

## 1   ANNUITANT

Johnson   Jeffery   L.
Last / First / MI   ☑ Male ☐ Female

1884 Watercrest Circle
Address

Lawrenceville   GA   30043
City / State / Zip

-89a1
Social Security Number

67
Date of Birth (mm/dd/yyyy)

(770) 519-8742
Daytime Telephone

E-Mail Address (optional)

## 2   CONTRACT OWNER (If other than annuitant)

☐ Male ☐ Female

Last / First / MI

Address

City / State / Zip

Social Security Number

Date of Birth (mm/dd/yyyy)
(   )
Daytime Telephone

E-Mail Address (optional)

## 3   JOINT CONTRACT OWNER (Optional) WEALTH CREATOR ONLY

☐ Male ☐ Female

Last / First / MI

Address

City / State / Zip

Social Security Number

Date of Birth (mm/dd/yyyy)
(   )
Daytime Telephone

**REDACTED Pursuant to
N.D.Ga Standing Order**

## 4   BENEFICIARY DESIGNATION

**Primary Beneficiary**
Name                    Relationship to Annuitant

Mayumi Johnson   Wife
First / Last

**Contingent Beneficiary**
Name                    Relationship to Annuitant

First / Last

*(If more than one Primary or Contingent Beneficiary is
designated, proceeds will be divided equally among the survivors
within the classification unless otherwise indicated.)*

## 5   REPLACEMENT

**REQUIRED: Will this Annuity replace or change any existing
Annuity or Life Insurance?**

☐ Yes ☑ No   If Yes, give name of company and policy
number below:

Company Name

Policy Number

## 6   TYPE OF PLAN

☐ Non-Qualified   ☐ SEP/IRA   ☐ SIMPLE IRA
☐ Roth IRA   ☑ Traditional IRA
☐ Other _____

*(Indicate the source of the IRA below)*
☐ Transfer   ☐ Conduit
☑ Rollover/Direct Rollover
☐ Contributory: tax year _____

## 7   PURCHASE PAYMENTS

Make Check Payable to "Western Reserve Life"

Initial Purchase Payment $_____

☐ Automatic Monthly Investing
   (Complete preauthorization section)

# Variable Annuity Application

Western Reserve Life Assurance Co. of Ohio
P.O. Box 9051, Clearwater, Florida 33758

---

**ANNUITY SELECTION (Check one)**

☐ WRL Freedom Attainer    ☐ WRL Freedom Bellwether    ☒ WRL Freedom Wealth Creator    ☐ Other _____

---

**1    ANNUITANT**

Johnson    Jeffery    L.
Last    First    MI    ☒ Male  ☐ Female

1884 Watercrest Circle
Address

Lawrenceville    GA    30043
City    State    Zip

Social Security Number    -89ol

Date of Birth (mm/dd/yyyy)    67

770 159-8742
Daytime Telephone

E-Mail Address (optional)

---

**2    CONTRACT OWNER (If other than annuitant)**

☐ Male  ☐ Female
Last    First    MI

Address

City    State    Zip

Social Security Number

Date of Birth (mm/dd/yyyy)
(    )
Daytime Telephone

E-Mail Address (optional)

---

**3    JOINT CONTRACT OWNER (Optional) WEALTH CREATOR ONLY**

☐ Male  ☐ Female
Last    First    MI

Address

City    State    Zip

Social Security Number

Date of Birth (mm/dd/yyyy)
(    )
Daytime Telephone

---

**4    BENEFICIARY DESIGNATION**

**Primary Beneficiary**
Name    Relationship to Annuitant

Mayumi Johnson    Wife
First    Last

**Contingent Beneficiary**
Name    Relationship to Annuitant

First    Last

*(If more than one Primary or Contingent Beneficiary is designated, proceeds will be divided equally among the survivors within the classification unless otherwise indicated.)*

---

**5    REPLACEMENT**

REQUIRED: Will this Annuity replace or change any existing Annuity or Life Insurance?

☐ Yes  ☒ No    If Yes, give name of company and policy number below:

Company Name

Policy Number

---

**6    TYPE OF PLAN**

☐ Non-Qualified    ☐ SEP/IRA    ☐ SIMPLE IRA
☐ Roth IRA    ☒ Traditional IRA
☐ Other _____

*(Indicate the source of the IRA below)*
☐ Transfer    ☐ Conduit
☒ Rollover/Direct Rollover
☐ Contributory: tax year _____

---

**7    PURCHASE PAYMENTS**

Make Check Payable to "Western Reserve Life"

Initial Purchase Payment $ _____

☐ Automatic Monthly Investing
(Complete preauthorization section)

---

**REDACTED Pursuant to
N.D.Ga Standing Order**



# EXHIBIT / ATTACHMENT

C

**(To be scanned in place of tab)**

**REDACTED Pursuant to**
**N.D.Ga Standing Order**

**WMA** SECURITIES, INC.

# NEW ACCOUNT APPLICATION
## COMPLETE ALL APPLICABLE AREAS

OWNER OR CUSTODIAN _Jeffrey L. Johnson_ (FIRST NAME, MIDDLE INITIAL, LAST NAME) (CIRCLE ONE) SSN/TIN ___-__-8901 DOB __ 67

JOINT OWNER OR MINOR _____ (FIRST NAME, MIDDLE INITIAL, LAST NAME) (CIRCLE ONE) SSN/TIN _____ DOB __/__/__

INSURED NAME _____ (IF NOT OWNER - FIRST NAME, MIDDLE INITIAL, LAST NAME) SSN/TIN __-__-__ DOB __/__/__

OWNER ADDRESS _1884 Lakecrest Circle Lawrenceville GA 30043_ (STREET OR P.O. BOX) (CITY) (STATE) (ZIP) STATE OF SALE _GA_

OWNER'S DAYTIME TELEPHONE # (___) _____ WRITING AGENT'S DAYTIME TELEPHONE # _770-668-8995_

---

## INVESTMENT INFORMATION *Mutual Funds* - Make check payable to WMA Securities, Inc.

| Product/Fund Name | Investment Amount | Client Investment Objective *(Only one per fund)* | | | | |
|---|---|---|---|---|---|---|
| | | AGGRESSIVE GROWTH OR INT'L/GLOBAL | LONG-TERM GROWTH | GROWTH & INCOME | FIXED INCOME | PRESERVATION OF CAPITAL |
| | | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ | ☐ |

NOTE: ONE NEW ACCOUNT APPLICATION PER MUTUAL FUND FAMILY APPLICATION.

### OR

## INVESTMENT INFORMATION *Variable Contracts* - Make check payable to Insurance Company.

| Product | Annualized Premium or Investment Amount | Client Investment Objective | | | | |
|---|---|---|---|---|---|---|
| | | AGGRESSIVE GROWTH OR INT'L/GLOBAL | LONG-TERM GROWTH | GROWTH & INCOME | FIXED INCOME | PRESERVATION OF CAPITAL |
| WRL-FWC | Approx. $50K | ☐ | ☒ | ☐ | ☐ | ☐ |

NOTE: ONE NEW ACCOUNT APPLICATION PER INSURANCE CARRIER APPLICATION. UNDERSTAND THAT MONIES ARE FOR PREMIUMS OF A LIFE INSURANCE POLICY, NOT AN INVESTMENT DIRECTLY INTO A MUTUAL FUND COMPANY.

---

## SUITABILITY INFORMATION *Completion of all sections required.*

### A. Financial Information

| | ANNUAL GROSS INCOME | VALUE OF PORTFOLIO | NET WORTH |
|---|---|---|---|
| LESS THAN $25,000 | ☐ | ☐ | ☐ |
| $25,000 TO $50,000 | ☐ | ☐ | ☐ |
| $50,000 TO $100,000 | ☒ | ☒ | ☐ |
| $100,000 TO $200,000 | ☐ | ☐ | ☒ |
| $200,000 TO $500,000 | ☐ | ☐ | ☐ |
| $500,000 OR MORE | ☐ | ☐ | ☐ |

### B. Investment Source
*Investment amount derived from:*

☐ MUTUAL FUND - (MUTUAL FUND SWITCH LETTER ATTACHED)
☐ DEATH BENEFIT PROCEEDS
☐ DISCRETIONARY INCOME
☒ RETIREMENT PLAN ASSETS
☐ VARIABLE ANNUITY - (SWITCH LETTER ATTACHED - 1035)
☐ VARIABLE LIFE POLICY
☐ OTHER: _____ *(Be specific)*

### C. Regulatory Information

SOLICITED   YES ☒   NO ☐
RETIREMENT ACCOUNT   YES ☒   NO ☐
CLIENT IS A WIDOW/WIDOWER   YES ☐   NO ☒
CLIENT IS REGISTERED. REP.   YES ☐   NO ☒
NAME/ADDRESS OF EMPLOYER
_Urban Media_
_Alpharetta, GA_
OCCUPATION _Network Engineer_

---

## CLIENT ACKNOWLEDGMENT/AGREEMENT/DISCLOSURE

I (WE) UNDERSTAND AND AGREE TO THE TERMS & CONDITIONS OF THE CLIENT ACKNOWLEDGMENT/AGREEMENT/DISCLOSURE LOCATED ON THE BACK OF THIS APPLICATION.

OWNER OR CUSTODIAN X _[signature]_ DATE _6-18-00_

JOINT OWNER _____ DATE _____

---

## CLIENT RECEIPT/AGENT PRINCIPAL SIGNATURE(S)

☐ CHECK ATTACHED

I acknowledge receipt from the above referenced customer _[illegible]_ to be invested in _WILL-FWC_
(CHECK AMOUNT) (DATE) (INVESTMENT PRODUCT CARRIER)

AGENT SIGNATURE _[signature]_ CODE # _34970_ DATE _6-18-00_

PRINCIPAL SIGNATURE _[signature]_ CODE # _36890_ DATE _6-19-00_

White - WMAS Copy   Yellow - Branch Office   Pink - Client   (over)   1990/10.9

## IMPORTANT NOTICE TO CUSTOMERS

Before you invest any money, you should have a copy of the investment product's most current prospectus. Please read the prospectus carefully and make your checks payable according to its instructions. Within two weeks of this purchase, you will receive a confirmation mailed (i.e., postmarked) from the location shown in the prospectus. If you need additional information, please call 1-770-453-9300.

## CLIENT ACKNOWLEDGMENT/AGREEMENT/DISCLOSURE

I (we), the undersigned Client(s):

Understand that I (we) may incur a second sales charge by redeeming shares of one loaded mutual fund and reinvesting the proceeds in another loaded fund. (However, if I (we) so redeem and reinvest, I (we) believe this switch to be in my (our) best interest.) Understand that monies are for premiums of a life insurance policy, not an investment directly into a mutual fund company.

Understand that additional sales charges, fees and penalties may be incurred by investing in more than one product family. However, if I so invest in more than one product family, I believe such a strategy best meets my (our) personal investment objectives.

Authorize WMA Securities, Inc. (WMAS) to act on my (our) behalf in purchasing the investment as described on the attached form.

Acknowledge receipt of the current prospectus applicable to the investment being purchased, have read and understood such prospectus, and am aware of the sales charge, surrender charges, fees and other pertinent information as outlined in the prospectus.

Understand how the sales charge can be reduced through the use of any combination of a Letter of Intent, Rights of Accumulation or Concurrent Purchases and, if applicable, the required forms are attached or proper identification has been made in order to benefit from a reduced sales charge.

Understand that orders are not fully consummated until processed by WMAS, and received, processed and executed by the Investment Product Company.

Acknowledge that the suitability information provided herein is true and accurate.

Represent that this investment is not made using the proceeds of any credit extended by WMAS or any affiliate thereof.

Understand that the WMAS agent may not and has not offered any tax advice, and I am (we are) responsible for the tax consequences of this transaction.

## CLIENT PRE-DISPUTE ARBITRATION

I (we) agree that unless unenforceable due to federal or state law, any controversy arising out of or related to my (our) accounts, the transactions with WMAS, its officers, directors, agents, registered representatives and/or employees for me (us), or related to this agreement or breach thereof, shall be settled by arbitration in accordance with the rules then in effect of the National Association of Securities Dealers, Inc. (NASD). Such arbitration shall follow the procedures as set forth by a national arbitration committee of the NASD. Judgement upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

I (we) understand that:

(1) ARBITRATION IS FINAL AND BINDING ON THE PARTIES (I.E., YOU AND WMAS).

(2) YOU AND WMAS ARE WAIVING RIGHTS TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.

(3) PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS.

(4) THE ARBITRATORS' AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING, AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED.

(5) THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.

(over)



# EXHIBIT / ATTACHMENT

## D

**(To be scanned in place of tab)**

# NASD Notice to Members 99-35

The NASD Reminds Members Of Their Responsibilities Regarding The Sales Of Variable Annuities

## Suggested Routing

- ■ Senior Management
- ☐ Advertising
- ☐ Continuing Education
- ☐ Corporate Finance
- ■ Executive Representatives
- ☐ Government Securities
- ■ Institutional
- ■ Insurance
- ■ Internal Audit
- ■ Legal & Compliance
- ☐ Municipal
- ☐ Mutual Fund
- ■ Operations
- ☐ Options
- ■ Registered Representatives
- ☐ Registration
- ☐ Research
- ☐ Syndicate
- ■ Systems
- ■ Trading
- ☐ Training
- ■ Variable Contracts

## Executive Summary

National Association of Securities Dealers, Inc. (NASD®) Rule 3010 requires each member to establish and maintain a system to supervise the activities of each registered representative and associated person in order to achieve compliance with the securities laws, regulations, and NASD rules. Variable life insurance and variable annuities are securities and their distribution is subject to NASD rules. This *Notice* focuses on deferred variable annuity sales and provides a set of guidelines that are intended to assist members in developing appropriate procedures relating to variable annuity sales to customers.

*The guidelines identify areas of concern that NASD Regulation, Inc. (NASD Regulation®) would expect to be addressed in the procedures of members that offer and sell variable annuities. Although the specific procedures described are not mandatory, members should consider supplementing their procedures to ensure that they will be adequately designed to achieve compliance with legal and regulatory requirements.*

Questions concerning this *Notice* may be directed to Thomas M. Selman, Vice President, Investment Companies/Corporate Financing, NASD Regulation, at (240) 386-4533; Lawrence Kosciulek, Assistant Director, Advertising/Investment Companies, NASD Regulation, at (202) 728-8329; or Elliot R. Curzon, Assistant General Counsel, Office of General Counsel, NASD Regulation, at (202) 728-8451.

## Background

A variable annuity is an insurance contract that is subject to regulation under state insurance and securities laws. Although variable annuities offer investment features similar in many respects to mutual funds, a typical variable annuity offers three basic features not commonly found in *mutual funds:* (1) tax-deferred treatment of earnings; (2) a death benefit; and (3) annuity payout options that can provide guaranteed income for life.

A customer's premium payments to purchase a variable annuity are allocated to underlying investment portfolios, often termed subaccounts. The variable annuity contract may also include a guaranteed fixed interest subaccount *that is part of the* general account of the insurer. The general account is composed of the assets of the insurance company issuing the contract. The value of the underlying subaccounts that are not guaranteed will fluctuate in response to market changes and other factors. *Because the contract owners* assume these investment risks, variable annuities are securities and generally must be registered under the Securities Act of 1933.

The underlying subaccounts that are not guaranteed are funded by a separate account of a *life insurance* company that, absent an exemption, is required to be registered as an investment company under the Investment Company Act of 1940. Variable annuities assess various fees including fees related to insurance features, *e.g.,* lifetime annuitization and the death benefit. The fees are typically deducted from customer assets in the separate account.

*A distributor of variable annuity contracts to individuals is required to register as a broker/dealer under the Securities Exchange Act of 1934 and become a member of the NASD. The distribution of variable annuity contracts is subject to NASD rules.*

Typically, variable annuities are designed to be long-term

investments for retirement. Withdrawals before a customer reaches the age of 59 1/2 are generally subject to a 10 percent penalty under the Internal Revenue Code. In addition, many variable annuities assess surrender charges for withdrawals within a specified time period after purchase.

Generally, variable annuities have two phases: the "accumulation" phase when customer contributions are allocated among the underlying investment options and earnings accumulate; and the "distribution" phase when the customer withdraws money, typically as a lump-sum or through various annuity payment options.

The myriad features of variable insurance products make the suitability analysis required under NASD rules particularly complex. NASD Regulation has addressed suitability issues in variable insurance products sales in *Notice to Members 96-86*. In that *Notice*, NASD Regulation stated that when recommending variable annuities or variable life insurance, the member and its registered representatives are required to make reasonable efforts to obtain information concerning the customer's financial and tax status, investment objectives, and such information used or considered reasonable in making recommendations to the customer.[1] In addition, a recent NASD disciplinary action discussed members' responsibilities under Rule 2310 (Suitability Rule) as they apply to the sale of variable life insurance. (*See* In the Matter of DBCC No. 8 v. Miguel Angel Cruz.[2])

## Discussion

NASD Regulation has developed the following guidelines that represent a compilation of industry practices in the supervision of the sale of variable annuities. The guidelines do not

mandate any specific procedure. Rather, they are designed to assist members in developing appropriate procedures relating to variable annuity sales practices. The guidelines are not comprehensive and are not intended as a substitute for the member's responsibilities under NASD Rule 3010. Moreover, the Suitability Rule requires an associated person of a member to make an independent determination whether an investment is suitable for a particular customer, taking into account the customer's investment objectives and financial needs.

## Customer Information

The Suitability Rule requires members and their registered representatives to make reasonable efforts to obtain information concerning a customer's financial and tax status, investment objectives, and such other information used or considered in making recommendations to the customer.

1. When recommending a variable annuity, members and their registered representatives should make reasonable efforts to obtain comprehensive customer information, including the customer's occupation, marital status, age, number of dependents, investment objectives, risk tolerance, tax status, previous investment experience, liquid net worth, other investments and savings, and annual income. Retention of this customer information can be made in conjunction with the maintenance of basic customer account information that is required in NASD Rule 3110.

2. A registered representative should discuss all relevant facts with the customer, including liquidity issues such as potential surrender charges and the Internal Revenue Service (IRS) penalty; fees, including mortali-

ty and expense charges, administrative charges, and investment advisory fees; any applicable state and local government premium taxes; and market risk.

3. The registered representative should seek to ensure that the variable annuity application and any other information provided by the customer to the member is complete and accurate, and promptly forwarded to a registered principal for review.

4. When a variable annuity transaction is recommended to a customer, the registered representative and a registered principal should review the customer's investment objectives, risk tolerance, and other information to determine that the variable annuity contract as a whole and the underlying subaccounts recommended to the customer are suitable. The registered principal should compare the information in the account application with other relevant information sources, *e.g.*, an account information form, to check for apparent accuracy and consistency prior to approving the transaction.

## Product Information

5. The registered representative should have a thorough knowledge of the specifications of each variable annuity that is recommended, including the death benefit, fees and expenses, subaccount choices, special features, withdrawal privileges, and tax treatment.

6. To the extent practical, a current prospectus should be given to the customer when a variable annuity is recommended. Prospectus information about important factors, such as fees and expenses and the illiquidity of the product, should be discussed with the customer.

**7.** Under NASD Rule 2210, the registered representative may only use sales material that is approved by a registered principal of the member.

## Liquidity And Earnings Accrual

Lack of liquidity, which may be caused by surrender charges or penalties for early withdrawal under the Internal Revenue Code, may make a variable annuity an unsuitable investment for customers who have short-term investment objectives. Moreover, although a benefit of a variable annuity investment is that earnings accrue on a tax-deferred basis, a minimum holding period is often necessary before the tax benefits are likely to outweigh the often higher fees imposed on variable annuities relative to alternative investments, such as mutual funds.

**8.** The registered representative should inquire about whether the customer has a long-term investment objective and typically should recommend a variable annuity only if the answer to that question, with consideration of other product attributes, is affirmative. In general, the registered representative should make sure that the customer understands the effect of surrender charges on redemptions and that a withdrawal prior to the age of 59 1/2 could result in a withdrawal tax penalty. In addition, the registered representative should make sure that customers who are 59 1/2 or older are informed when surrender charges apply to withdrawals.

**9.** The member should develop special procedures to screen for any customer whose age may make a long-term investment inappropriate, such as any customer over a specific age. Based on certain contract features, some customers of advanced age may be unsuitable for a variable annuity investment.

## Income, Net Worth, And Contract Size Thresholds

**10.** Members should establish procedures to require a principal's careful review of variable annuity investments that exceed a stated percentage of the customer's net worth, and any contract in which a customer is investing more than a stated dollar amount.

## Investment In Tax Qualified Accounts

Some tax-qualified retirement plans (e.g., 401(k) plans) provide customers with an option to make investment choices only among several variable annuities. While these variable annuities provide most of the same benefits to investors as variable annuities offered outside of a tax-qualified retirement plan, they do not provide any additional tax deferred treatment of earnings beyond the treatment provided by the tax-qualified retirement plan itself.

**11.** When a registered representative recommends the purchase of a variable annuity for any tax-qualified retirement account (e.g., 401(k) plan, IRA), the registered representative should disclose to the customer that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary. The registered representative should recommend a variable annuity only when its other benefits, such as lifetime income payments, family protection through the death benefit, and guaranteed fees, support the recommendation.

**12.** A member should conduct an especially comprehensive suitability analysis prior to approving the sale of a variable annuity with surrender charges to a customer in a tax-qualified account subject to plan minimum distribution requirements.

## Variable Annuity Replacements

**13.** The member firm may decide to develop an exchange or replacement analysis document or utilize an existing form authorized by a state insurance commission or other regulatory agency. If such a document is used, then (consistent with the requirements of various states) it should be completed for all variable annuity replacements and should include an explanation of the benefits of replacing one contract for another variable contract. The document also should be signed by the customer, the registered representative, and the registered principal.

**14.** The registered representative and the registered principal should determine, based on the information provided by the customer and their own knowledge of the product features, that replacing the existing contract with a new contract is suitable for the customer. Consideration should be given to such matters as product enhancements and improvements, lower cost structures, and surrender charges.

**15.** The member firm should consider developing compliance systems, such as computer programs, when available, that can monitor and identify those registered representatives whose clients have a particularly high rate of variable annuity replacements or rollovers. These compliance systems should provide the firm with "red flags" that

the firm can investigate to determine whether some of these replacements are unsuitable.

**16.** A retail member should adopt other measures reasonably designed to ensure that replacement sales activity by its registered representatives complies with NASD rules. Members that "wholesale" variable annuities are reminded that they are also subject to NASD rules, and that they should avoid marketing strategies that are designed primarily to encourage inappropriate replacement sales. Upon reasonable request and to the extent practical, wholesale members should assist retail broker/dealers in monitoring the replacement activity of their customers.

## Endnote

[1] *Notice to Members 96-86* also listed specific factors that could be considered when recommending variable annuities and variable life insurance contracts. These factors are:

- a representation by a customer that his or her life insurance needs were already met;
- the customer's express preference for an investment other than an insurance product, the customer's inability to appreciate fully how much of the purchase payment or premium is allocated to cover insurance or their costs, and a customer's ability to understand the complexity of variable products generally;
- the customer's willingness to invest a set amount on a yearly basis;
- the customer's need for liquidity and short-term investment;
- the customer's immediate need for retirement income; and
- the customer's investment sophistication and whether he or she is able to monitor the investment experience of the separate account.

[2] Complaint No. C8A930048 (NBCC Oct. 31, 1997)

© 1999, National Association of Securities Dealers, Inc. (NASD). All rights reserved.



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

LEXSEE 2003 U.S. DIST. LEXIS 13129

**DIANE C. DONOVAN, on behalf of herself and all others similarly situated, Plaintiff, - against - SKANDIA INVESTMENT HOLDING CORPORATION, ABC CORP., INC. 1 through ABC CORP., INC. 99 and LMN CORP., INC. 1 through LMN CORP., INC. 99, Defendants.**

**02 CV 9859(MP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 13129; Fed. Sec. L. Rep. (CCH) P92,488*

**July 31, 2003, Decided**
**July 31, 2003, Filed**

**SUBSEQUENT HISTORY:** Motion denied by *Donovan v. Am. Skandia Life Assur. Corp., 2003 U.S. Dist. LEXIS 15169 (S.D.N.Y., Sept. 2, 2003)*

**DISPOSITION:** Defendants' motion to dismiss with prejudice was granted.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** [*1] For Diane C Conovan, on Behalf of Herself and All Others Similarly Situated Lead, Jay Hendrickson Lead, Rose Hendrickson Lead, Kathleen O'Brien Lead, PLAINTIFFS: Robert B Weintraub, Daniel W Krasner, Wolf, Haldenstein, Adler, Freeman & Herz LLP, New York, NY USA.

For American Skandia Life Assurance Corporation, DEFENDANT: James A Lico, Clifford Chance US LLP, New York, NY USA.

For American Skandia Marketing Incorporated, American Skandia Investment Holding Corporation, ABC Corp, Inc, ABC Corp, Inc 1 Through ABC Corp, Inc 99, LMN Corp, Inc 1 Through LMN Corp, Inc 99, DEFENDANTS: Catherine Duden-Kevane, James A Lico, Clifford Chance US LLP, New York, NY USA.

**JUDGES:** MILTON POLLACK, Senior United States District Judge.

**OPINIONBY:** MILTON POLLACK

**OPINION:**

**DECISION AND ORDER**

**I. PARTIES**

Lead Plaintiffs are citizens and residents of the State of Utah who purchased deferred variable annuity products from the American Skandia Defendants in January and February of 2000. Plaintiffs seek to bring this action as members of a class consisting of all persons who, between December 13, 1997 and October 22, 2000, were parties to a deferred annuity contract issued, underwritten, marketed [*2] or sold by defendants.

Defendant American Skandia Life Assurance Corp. ("American Skandia") is one of the largest insurance and variable annuity companies in the United States and the world. The other defendants (together with American Skandia, the "American Skandia Defendants") are holding companies or subsidiaries of American Skandia which develop, market and underwrite fixed and variable annuities.

**II. FACTS**

Plaintiffs bring this action individually and on behalf of all other persons similarly situated pursuant to the Securities and Exchange Act of 1934, *15 U.S.C. § § 78j(b) and 78t(a)*, and *Rule 10b-5, 17 C.F.R. § 240.10b-5*, promulgated thereunder; the Securities Act of 1933,

2003 U.S. Dist. LEXIS 13129, *; Fed. Sec. L. Rep. (CCH) P92,488

15 U.S.C. §§ 77k, 77l and 77o; and the Investment Company Act of 1940, 15 U.S.C. § 80a-33(b).

According to Plaintiffs, the American Skandia Defendants misled prospective customers into believing that deferred annuities would be appropriate investments for placement into qualified retirement plans, while failing to disclose the alleged inappropriateness and unsuitability of such a combination. [*3]

Plaintiffs are not, however, bringing any charges against the broker from whom they purchased the variable annuity. Instead, Plaintiffs bring claims against the American Skandia Defendants allegedly involved in creating the Prospectuses through which the annuities were ultimately sold.

Plaintiffs contend that as a result of defendants' misrepresentations, plaintiffs and other members of the class have incurred commissions, fees and charges in excess of what they would have paid for appropriate and suitable investments in an already tax qualified retirement plan.

## III. DISCUSSION

Plaintiffs note specifically that National Association of Securities Dealers ("NASD") Notice to Members 99-35, issued in May of 1999, requires members to disclose to the customer that the tax deferred accrual feature of the variable annuity is unnecessary where it is otherwise provided by a tax-qualified retirement plan. NASD notices, however, are not law and noncompliance therewith cannot itself constitute a violation of the federal securities laws. See Max Marx Color & Chemical Co. Employees' Profit Sharing Plan v. Barnes, 37 F. Supp. 2d 248, 253 (S.D.N.Y. 1999); Merit Ins. Co. v. Leatherby, 714 F.2d 673, 680 [*4] (7th Cir.), cert. denied, 464 U.S. 1009, 104 S. Ct. 529, 78 L. Ed. 2d 711 (1983). No duty of disclosure will arise directly from a NASD notice. See e.g., Resnik v. Swartz, 303 F.3d 147 (2d Cir. 2002) ("omission of information . . . will violate these provisions if either the SEC regulations specifically require disclosure . . . or the omission makes other statements . . . materially false or misleading") (emphasis added). Plaintiffs do not contend that the SEC requirements call for NASD mandated disclosures. As for Plaintiffs' reference to SEC Form N-4, only variations in tax consequences need be disclosed. The Prospectuses are not required to state that certain uses are "unnecessary" or offer advice as to when, for tax purposes or otherwise, to use a variable annuity in a retirement plan.

To be actionable, therefore, the omissions complained of must make other statements in the prospectus misleading and there must be a substantial likelihood that the disclosure of the omitted facts would have been viewed by the reasonable investor to have significantly altered the total mix of information made available. See Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988). [*5]

Although the Prospectuses undeniably indicate that a variable annuity may be used as an investment vehicle for a qualified retirement plan, it is not true, as Plaintiffs state, that this is never appropriate. NASD Notice 99-35 itself states that a registered representative may recommend a variable annuity for a tax-qualified retirement account "when its other benefits, such as lifetime income payments, family protection through the death benefit, and guaranteed fees" support the recommendation.

Nor do the allegedly omitted facts significantly alter the total mix of information made available. The Prospectuses clearly state that both variable annuities and tax qualified retirement plans are tax deferrable. That is enough to alert all reasonable investors to the fact that it is unnecessary, if solely for tax reasons, to use a variable annuity to fund a tax-deferred retirement account. n1 See In re NBTY, Inc. Sec. Litig., 224 F. Supp. 2d 482, 495 (E.D.N.Y. 2002); In re Ultimate Corp. Sec. Litig., 1989 U.S. Dist. LEXIS 8330, No. 86 CIV. 5944 (CSH), 1989 WL 79372, at *5 (S.D.N.Y. July 11, 1989) ("Liability does not arise from the failure to disclose that which should be obvious [*6] to the average investor."). The other benefits of variable annuities are also clearly set forth, as well as the fee structure for purchase of the annuities.

n1 The Prospectuses further warn Plaintiffs that "before purchasing an Annuity for use in a qualified plan, you should obtain competent tax advice, both as to the tax treatment and suitability of such an investment." Gross Decl., Ex. B at 41.

The disclosures in the Prospectuses, taken in context, conclusively disprove the materiality of the alleged omissions and are thus fatal to the Plaintiffs' claims. Moreover, as the Prospectuses were issued more than two years before the filing of this suit, the disclosures therein also put the Plaintiffs on inquiry notice of their claims such that the statute of limitations bars their action. n2 And, having failed to allege a primary violation of the securities laws, Plaintiffs' claims of control person liability will also fail.

n2 The claims of Diane C. Donovan, one of the four lead plaintiffs in this action, are further barred by the statute of limitations because Ms. Donovan appears to have been actually aware of

2003 U.S. Dist. LEXIS 13129, *; Fed. Sec. L. Rep. (CCH) P92,488

the alleged fraud more than two years before the first complaint was filed on December 13, 2002. Her claim was voluntarily withdrawn by a letter to this Court received on July 29, 2003.

[*7]

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss with prejudice is granted.

**SO ORDERED.**

Dated: July 31, 2003

MILTON POLLACK

Senior United States District Judge



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

LEXSEE 2003 U.S. DIST. LEXIS 15169

**DIANE C. DONOVAN, on behalf of herself and all others similarly situated,
Plaintiff, - against - AMERICAN SKANDIA LIFE ASSURANCE CORPORATION,
AMERICAN SKANDIA MARKETING, INCORPORATED, AMERICAN
SKANDIA INVESTMENT HOLDING CORPORATION, ABC CORP., INC. 1
through ABC CORP., INC. 99 and LMN CORP., INC. 1 through LMN CORP.,
INC. 99, Defendants.**

**02 CV 9859(MP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2003 U.S. Dist. LEXIS 15169; Fed. Sec. L. Rep. (CCH) P92,498*

**September 2, 2003, Decided
September 2, 2003, Filed**

**PRIOR HISTORY:** *Donovan v. Skandia Inv. Holding Corp., 2003 U.S. Dist. LEXIS 13129 (S.D.N.Y., July 31, 2003)*

**DISPOSITION:** [*1] Plaintiffs' motion to alter judgment and amend complaint denied.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For AMERICAN SKANDIA LIFE ASSURANCE CORPORATION, AMERICAN SKANDIA MARKETING INCORPORATED, AMERICAN SKANDIA INVESTMENT HOLDING CORPORATION, ABC CORP., INC., ABC CORP., INC. 1 THROUGH ABC CORP., INC. 99, LMN CORP., INC. 1 THROUGH LMN CORP., INC. 99, *defendants*: James A. Lico, Clifford Chance US LLP, New York, NY.

For AMERICAN SKANDIA MARKETING INCORPORATED, AMERICAN SKANDIA INVESTMENT HOLDING CORPORATION, ABC CORP., INC., ABC CORP., INC. 1 THROUGH ABC CORP., INC. 99, LMN CORP., INC. I THROUGH LMN CORP., INC. 99, defendants: Catherine Duden-Kevane, Clifford Chance US LLP, New York, NY.

For DIANE C. DONOVAN, JAY HENDRICKSON, ROSE HENDRICKSON, KATHLEEN O'BRIEN, lead plaintiffs: Robert B. Weintraub, Daniel W. Krasner, Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., New York, NY.

**JUDGES:** MILTON POLLACK, Senior United States District Judge.

**OPINIONBY:** MILTON POLLACK

**OPINION:**

ON MOTION TO ALTER JUDGMENT AND AMEND COMPLAINT

POLLACK, *Senior District Judge*

**DECISION AND ORDER**

Where a proposed amended complaint cannot itself survive a motion to dismiss, leave to amend would be futile and may clearly be [*2] denied. See *In re American Exp. Co. Shareholder Litig., 39 F.3d 395, 402 (2d Cir. 1994)* ("leave to amend may be denied if the amendment would be futile"); see also *Emergent Capital Inv. Management, LLC v. Stonepath Group, Inc., 195 F. Supp. 2d 551, 563 n.4 (S.D.N.Y. 2002)* (where plaintiff was given the opportunity to amend its complaint and submitted substantially the same complaint, the Court found no need to grant subsequent motion to submit yet another non-viable complaint). Plaintiffs themselves admit that "should the motion be granted, any motion to dismiss likely would present precisely the same

2003 U.S. Dist. LEXIS 15169, *; Fed. Sec. L. Rep. (CCH) P92,498

arguments made in the first motion to dismiss." Plaintiff's Memo of Law in Support of Motion at 5

For the reasons set forth herein and in this Court's decision and order dated July 31, 2003, Plaintiffs' motion to alter the judgment and amend the complaint is denied. Plaintiffs' main amendment would be to retract their hasty statement that it is "never appropriate" to fund a retirement savings account with a variable annuity. Instead, plaintiffs propose a formulation that is admittedly only a semantic difference. Plaintiffs' proposed amended complaint [*3] would now allege that it is "generally not appropriate" to fund a retirement savings account with a variable annuity. Nothing in plaintiffs' proposed amendment, however, does anything to challenge this Court's findings: (1) that NASD notices are not law and do not take the place of federal securities laws; (2) that SEC Form N-4 does not require a prospectus to state that certain uses of variable annuities are unnecessary or require a prospectus to offer advice as to when, for tax purposes or otherwise, to use a variable

annuity in a retirement plan; (3) that the disclosures in the prospectus already served to alert all reasonable investors to the fact that it is unnecessary, if solely for tax reasons, to use a variable annuity to fund a tax-deferred retirement account; or (4) that because the prospectuses were issued more than two years before the filing of the suit, the disclosures therein also put the plaintiffs on inquiry notice of their claims such that the statute of limitations bars their action.

The motion to alter the judgment and amend the complaint is denied.

**SO ORDERED.**

Dated: September 2, 2003

MILTON POLLACK

Senior United States District Judge

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

JEFFREY L. JOHNSON,     )
on behalf of himself and all others )
similarly situated,      )
             )
      Plaintiffs, )  CIVIL ACTION FILE
             )
   v.        )  NO. 1:01-CV-2617-CAP
             )
AEGON USA, INC., et al.,   )
             )
      Defendants. )

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing Memorandum of Law of Defendants WMA Securities, Inc. and World Money Group, Inc. in Support of Their Motion to Dismiss the Amended Consolidated Complaint was served on the following counsel on September 29, 2003, by the following means:

Robert B. Weintraub
Wolf Haldenstein Adler
Freeman & Herz LLP
270 Madison Avenue
New York, NY 10016
*(via overnight delivery
by agreement of counsel)*

Michael J. Bowers
Balch & Bingham LLP
*formerly Meadows, Ichter & Bowers*
14 Piedmont Center, Suite 1100
3525 Piedmont Road, N.E.
Atlanta, GA 30305
*(via U.S. Mail)*

Jeffrey H. Konis
Chitwood & Harley
Promenade II, Suite 2900
1230 Peachtree Street, NE
Atlanta, GA 30309
*(via U.S. Mail)*

James J. Rohn
Conrad O'Brien
Gellman & Rohn
1515 Market Street, 16th Floor
Philadelphia, PA 19102
*(via U.S. Mail)*

Dated: September 29, 2003

Respectfully Submitted,

Claus D. Melarti

OF COUNSEL:
John J. Soroko
Wayne A. Mack

DUANE MORRIS LLP
1180 West Peachtree Street, Suite 700
Atlanta, GA 30309-3448
(404) 253-6900 Phone
(404) 253-6901 Fax

Henry A. Lanman
Duane Morris LLP
One Liberty Place
Philadelphia, PA 19103-7396
(215) 979-1000

Attorneys for Defendants
WMA Securities, Inc. and World
Money Group, Inc.