## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JEFFERY L. JOHNSON,
on behalf of himself and all others
similarly situated,

      Plaintiff,

v.

AEGON USA, INC., WMA
SECURITIES, INC., et al.

      Defendants.

Civil Action No.
1:01-CV-2617-CAP

## MOTION BY DEFENDANTS AEGON, USA, INC., AEGON FINANCIAL SERVICES GROUP, INC., AFSG SECURITIES CORPORATION, PFL LIFE INSURANCE COMPANY, AUSA LIFE INSURANCE COMPANY, INC., WESTERN RESERVE LIFE ASSURANCE CO. OF OHIO, AND BANKERS UNITED LIFE ASSURANCE COMPANY FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' FIRST CAUSE OF ACTION

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1,

Defendants Aegon Financial Services Group, Inc., AFSG Securities Corporation,

PFL Life Insurance Company, AUSA Life Insurance Company, Inc., Western

Reserve Life Assurance Co. of Ohio, and Bankers United Life Assurance Company

move for summary judgment on Plaintiffs' First Cause of Action.

The grounds for the Motion are that the First Cause of Action, which asserts

a claim under Section 11 of the Securities Act of 1933, is time-barred. Claims

under Section 11 must be brought within three years of the date the issuing

company first offered the security in question to the public. Here, Defendant Western Reserve Life Assurance Co. of Ohio first offered the WRL Freedom Wealth Creator Variable Annuity to the public on July 22, 1997. Plaintiff Jeffery Johnson purchased a WRL Freedom Wealth Creator Variable Annuity, and that purchase is the subject of his claims in this case. Johnson sued on October 1, 2001, more than four years after WRL was first permitted to sell the WRL Freedom Wealth Creator. Johnson's claims under Section 11 thus were filed fifteen months too late, and the moving Defendants are entitled to summary judgment.

In support of the Motion, Defendants submit the accompanying Memorandum of Law, the Declaration of Priscilla I. Hechler, and such other arguments and evidence as they may later present.

A copy of the proposed Order granting this Motion is attached as Exhibit 1.

Dated:   February 11, 2005.

Respectfully submitted,


_____/s/ David A. Jones_____
David A. Jones
Daniel McNeel Lane, Jr.
AKIN GUMP STRAUSS HAUER & FELD LLP
300 Convent Street, Suite 1500
San Antonio, Texas 78205
Telephone:  (210) 281-7000
Telecopier:  (210) 224-2035

Tony G. Powers
Georgia Bar No. 586586
Kimberly L. Myers
Georgia Bar No. 533257
ROGERS & HARDIN LLP
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia  30303-601
Telephone:  (404) 420-4632
Telecopier:  (404) 525-2224

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of February, 2005 a true and correct copy of DEFENDANTS AEGON, USA, INC., AEGON FINANCIAL SERVICES GROUP, INC., AFSG SECURITIES CORPORATION, PFL LIFE INSURANCE COMPANY, AUSA LIFE INSURANCE COMPANY, INC., WESTERN RESERVE LIFE ASSURANCE CO. OF OHIO, AND BANKERS UNITED LIFE ASSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S FIRST CAUSE OF ACTION was served via certified mail, return receipt requested, to the following counsel of record:

| | |
|---|---|
| Robert B. Weintraub<br>WOLF HALDENSTEIN ADLER<br>FREEMAN & HERZ<br>270 Madison Avenue<br>New York, NY 10016 | John J. Soroko<br>Wayne A. Mack<br>DUANE MORRIS, LLP<br>One Liberty Place<br>Philadelphia, PA 19103 |
| John C. Herman<br>Matthew C. Gaudet<br>James P. Ferguson, Jr.<br>DUANE MORRIS, LLP<br>1180 West Peachtree St., Suite 700<br>Atlanta, GA 30309 | David A. Bain<br>CHITWOOD & HARLEY<br>Promenade II, Suite 2300<br>1230 Peachtree Street, NE<br>Atlanta, GA 30309 |

/s/ David A. Jones
David A. Jones

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

JEFFERY L. JOHNSON,
on behalf of himself and all others
similarly situated,

      Plaintiff,

v.

AEGON USA, INC., WMA
SECURITIES, INC., et al.

      Defendants.

Civil Action No.
1:01-CV-2617-CAP

## [PROPOSED] ORDER GRANTING
## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
## ON PLAINTIFFS' FIRST CAUSE OF ACTION

The Court, based upon a review of the pleadings supporting and opposing the Motion for Partial Summary Judgment on Plaintiffs' First Cause of Action, the applicable statutes and authorities, and the relevant and admissible summary judgment evidence, rules as follows:

This Court finds no genuine issues of material fact on Plaintiffs' Section 11 claim, therefore IT IS ORDERED, ADJUDGED AND DECREED that Defendants' Motion for Partial Summary Judgment on Plaintiffs' First Cause of Action is GRANTED in its entirety on all issues asserted in the Motion. Plaintiffs'

1

claim based on violations of Section 11 of the Securities Act of 1933 claim asserted in this case against Defendants is barred as a matter of law.

THEREFORE, IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiffs take nothing on their Section 11 claim against Defendants, and Plaintiffs' Section 11 claim is hereby DISMISSED WITH PREJUDICE.

DATED _____, 2005.

_____
Charles A. Pannell
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

**JEFFERY L. JOHNSON,**
**on behalf of himself and all others**
**similarly situated,**

     **Plaintiff,**

v.

**AEGON USA, INC., WMA**
**SECURITIES, INC., et al.**

     **Defendants.**

Civil Action No.
1:01-CV-2617-CAP

## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS'[1] MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' FIRST CAUSE OF ACTION

Pursuant to Local Rule 56.1B(1), Defendants Aegon USA, Inc.,

Aegon Financial Services Group, Inc., AFSG Securities Corporation, PFL

Life Insurance Company, AUSA Life Insurance Company, Inc., Western

Reserve Life Assurance Co. of Ohio ("WRL"), and Bankers United Life

Assurance Company, by and through their counsel submit this Statement of

Undisputed Facts in Support of their Motion for Summary Judgment on

Plaintiffs' First Cause of Action.

---

[1] Defendants Aegon, USA, Inc., Aegon Financial Services Group, Inc., AFSG Securities Corporation, PFL Life Insurance Company, AUSA Life Insurance Company, Inc., Western Reserve Life Assurance Co. of Ohio, and Bankers United Life Assurance Company all join in this Rule 56 Motion. Plaintiffs did not assert their first cause of action against WMA Securities, Inc.

## STATEMENT OF UNDISPUTED FACTS

| 1 | Plaintiff Jeffery Johnson purchased a WRL Freedom Wealth Creator variable annuity. | *See* Complaint ¶ 22; Bell Dec. ¶ 2 |
|---|---|---|
| 2 | Western Reserve Life first offered the WRL Freedom Wealth Creator to the public July 22, 1997. | Hechler Dec. ¶ 5 |
| 3 | Johnson filed this suit on October 1, 2001. | *See* Court's Docket no. 1. |

Dated:  February 11, 2005.

Respectfully submitted,

_____ /s/ David A. Jones _____
David A. Jones
Daniel McNeel Lane, Jr.
AKIN GUMP STRAUSS HAUER & FELD LLP
300 Convent Street, Suite 1500
San Antonio, Texas 78205
Telephone:  (210) 281-7000
Telecopier:  (210) 224-2035

Tony G. Powers
Georgia Bar No. 586586
Kimberly L. Myers
Georgia Bar No. 533257
ROGERS & HARDIN LLP
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia  30303-601
Telephone:  (404) 420-4632
Telecopier:  (404) 525-2224

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of February, 2005 a true and correct copy of the Statement Of Undisputed Facts In Support Of Defendants' Motion For Partial Summary Judgment On Plaintiffs' First Cause Of Action was served via certified mail, return receipt requested, to the following counsel of record:

| | |
|---|---|
| Robert B. Weintraub<br>WOLF HALDENSTEIN ADLER FREEMAN & HERZ<br>270 Madison Avenue<br>New York, NY 10016 | John J. Soroko<br>Wayne A. Mack<br>DUANE MORRIS, LLP<br>One Liberty Place<br>Philadelphia, PA 19103 |
| John C. Herman<br>Matthew C. Gaudet<br>James P. Ferguson, Jr.<br>DUANE MORRIS, LLP<br>1180 W. Peachtree St., Suite 700<br>Atlanta, GA 30309 | David A. Bain<br>CHITWOOD & HARLEY<br>Promenade II, Suite 2300<br>1230 Peachtree Street, NE<br>Atlanta, GA 30309 |

/s/ David A. Jones
David A. Jones

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JEFFERY L. JOHNSON,
on behalf of himself and all others
similarly situated,

      Plaintiff,

v.

AEGON USA, INC., WMA
SECURITIES, INC., et al.

      Defendants.

Civil Action No.
1:01-CV-2617-CAP

MEMORANDUM OF LAW IN SUPPORT OF MOTION BY
DEFENDANTS[1] AEGON, USA, INC., AEGON FINANCIAL
SERVICES GROUP, INC., AFSG SECURITIES CORPORATION, PFL
LIFE INSURANCE COMPANY, AUSA LIFE INSURANCE
COMPANY, INC., WESTERN RESERVE LIFE ASSURANCE CO. OF
OHIO, AND BANKERS UNITED LIFE ASSURANCE COMPANY
FOR PARTIAL SUMMARY JUDGMENT
ON PLAINTIFFS' FIRST CAUSE OF ACTION

*Preliminary Statement*

Plaintiffs' claims under Section 11 of the Securities Act of 1933 (the

"1933 Act") should be dismissed because they are barred by limitations.

Claims seeking relief for violations of Section 11 must be brought within

three years of the date the security is first offered to the public, irrespective

---

[1] Defendant WMA Securities, Inc. is the only Defendant not joining this motion. Plaintiffs did not assert their first cause of action against WMA Securities, Inc.

of when the plaintiff "discovers" his claim. In this case, Defendant Western
Reserve Life Assurance Co. of Ohio first offered the WRL Freedom Wealth
Creator variable annuity purchased by Plaintiff Jeffery Johnson to the public
in July 1997. Johnson did not file suit until October 2001—more than
fifteen months too late.

Partial summary judgment is appropriate at this point because further
discovery cannot salvage Johnson's Section 11 claim. Furthermore,
discovery related to Johnson's Section 11 claim is likely to be broader in
scope than the discovery required for his Section 12 claim, which would
remain unaffected by this motion. Granting partial summary judgment will
avoid causing the Defendants to engage in wasteful and unnecessary
discovery.

### Background Facts

The WRL Freedom Wealth Creator variable annuity that Plaintiff
purchased is a registered security under federal law. To sell the variable
annuity to investors like Johnson, Western Reserve Life was required to
obtain approval from the SEC in accordance with procedures established by
the 1933 Act, and regulations promulgated thereunder. In particular,
Western Reserve Life was required to file a ***registration statement*** with the
SEC. *See* 15 U.S.C §§ 77d, 77e.

2

A registration statement provides investors a variety of information about the company and the specific security it is issuing.  The SEC determines the form and content of the registration statement, but invariably it must include a ***prospectus***.  The prospectus is the basic offering document provided to potential investors by the issuer or registered representative making the sale.  The prospectus is required to disclose facts that a potential purchaser might find material to his purchase decision.

In securities law parlance, a registration statement "becomes effective" 20 days after it is filed, or on a specific date the issuer requests, so long as the SEC does not reject the filing.  15 U.S.C. § 77h.  The issuer may not offer the security to the public until the registration statement becomes effective, at which point it becomes a ***registered security*** and the security is ***bona fide offered*** to the public.[2]

The registration statement for the WRL Freedom Wealth Creator became effective on July 22, 1997.[3]  The three-year limitations period for claims under Section 11 began to run on that date, irrespective of when the security was purchased by any particular person.

---

[2] *See* 15 U.S.C. §§ 77d, 77c.

[3] *See* Hechler Dec. ¶ 5.  The initial registration statement and all subsequent amendments to the registration statement for the WRL Freedom Wealth Creator Variable Annuity are available at www.sec.gov.  The specific address to obtain a listing of all registration statements and amendments for the WRL Freedom Wealth Creator is www.sec.gov/cgi-bin/browse-edgar?company=&CIK=&filenum=333-24959&State=&SIC=&owner=include&action=getcompany.

Plaintiff Jeffery Johnson filed suit, alleging the registration statement was defective under Section 11, on October 1, 2001, more than four years after the registration statement became effective and fifteen months after any possible Section 11 claim expired.

### Argument

Section 13 of the 1933 Act sets forth the statute of repose for claims arising under Section 11 of that Act:

> In no event shall any such action be brought to enforce a liability created under section 11 or section 12(a)(1) **more than three years after the security was bona fide offered to the public,** or under section 12(a)(2) more than three years after the sale.

15 U.S.C. § 77m (emphasis added).[4] A security is "bona fide offered" to the public as of the date a registration statement first becomes effective with respect to the security at issue. *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 185 (S.D.N.Y. 2003). Section 11 claims differ from other securities law claims in that Section 11 focuses exclusively on the documents that existed when the security is first offered to the public. Other provisions, such as Section 12, provide remedies for oral misstatements and for misstatements in updated or revised prospectuses created after the initial offering of the security. *See* 15 U.S.C. § 77l.

---

[4] The application of a statute of repose is a question of law, as to which summary judgment is appropriate. *Atl. Land & Improvement Co. v. United States*, 790 F.2d 853, 857 (11th Cir. 1986).

Like other statutes of repose, the three-year time limit on Section 11

claims is not subject to tolling or a discovery rule. *Lampf, Pleva, Lipkind,*

*Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363-63 (1991) (holding that

the three year repose periods for Section 10(b) and other securities claims

serve as an absolute cutoff). Congress included statutes of repose in federal

securities laws with the intent that they are an absolute bar to recovery.

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 704 (2d

Cir. 1994) (holding Section 13 absolutely barred plaintiffs' Section 11 claim

and noting that, "to find otherwise would put the court in conflict with

Congress's evident intent not to permit underwriter and issuer liability to

extend beyond the three-year horizon"); *see also* H.R. Conf. Rep. No. 1838,

73d Cong., 2d Sess. 32, 36, 42 (1934); 78 Cong. Rec. 8198-8203 (May 7,

1934).

The limitations period on Section 11 claims differs from limitations

periods for claims under other provisions because it runs from the original

effective date, rather than from the date of purchase. For example,

Johnson's claim under Section 12(a)(2) of the 1933 Act expired three years

after his purchase of the annuity.[5] 15 U.S.C. § 77m (quoted above on page

---

[5] In 2003, as part of the Sarbanes-Oxley reforms, Congress amended the one-year-three year limitations period. 28 U.S.C. § 1658(b) For claims filed after July 30, 2002, the new limitations period is two years from discovery, and/or either five years

4). Similarly, had Johnson asserted claims for violations of Section 10(b) of the Securities Exchange Act of 1934, these claims would have been subject to a limitations period that expires one year after discovery of the alleged wrongdoing, or three years after purchase.

The limitations period for claims under Section 11 runs from the original effective date of the registration statement because the cause of action is directed at misstatements and omissions in that registration statement. By contrast, claims under Section 12 are directed at misstatements or omissions at the time of sale, so the limitations period runs from the time of discovery of the misrepresentation or the sale. Accordingly, in this case, Johnson's Section 11 claim is time-barred, but his Section 12 claim may not be.

Other courts have held that the statute of repose bars Section 11 claims filed more than three years after the sale of a variable annuity, even where subsequent registration statements have been filed with respect to the security. In *Miller v. Nationwide Life Insurance Co.*,[6] the plaintiff received a May 2001 prospectus at the time he purchased several Nationwide variable

---

from the date security is first offered to the public (for '33 Act Section 11 claims) or from the date of the Plaintiffs' purchase or sale (for '33 Act Section 12(a)(2) and '34 Act Section 10(b)) of the security. The amendment is not relevant to this case.

[6] No. Civ.A. 03-1236, 2003 WL 22466236 (E.D. La. Oct. 29, 2003), *aff'd*, 391 F.3d 698 (5th Cir. 2004).

annuities in June and July 2001. *Id.* at *1. The prospectus stated that Nationwide could not unilaterally modify the rights granted to annuity purchasers to transfer assets among the different investments options offered in the annuity, and that annuity owners had a right to transfer assets among these investment options at no charge. *Id.* In May 2002, Miller made a series of such transfers within his variable annuity, and Nationwide imposed transaction fees for some of those trades despite the statements in the prospectus. *Id.*

Miller filed suit under Section 11 in May 2003, claiming that Nationwide's prospectus misled him on the trading fees Nationwide charged. *Id.* Nationwide moved to dismiss on grounds that the three-year statue of repose barred Miller's Section 11 claim, because it had first bona fide offered the annuities to the public in October 1997. Miller countered that the statute of repose did not bar his claim because trading fees were not collected from him until after he purchased the variable annuity, and those fees were not disclosed in a prospectus until January 2002 at the earliest. *Id.* at *4-5.

The Court held that Miller's Section 11 claim was time-barred because Nationwide first bona fide offered the annuity in October 1997, more than three years before Miller filed suit. *Id.* at *6. The <u>original</u>

registration date was thus controlling. *See also In re Alliance,* 279 F. Supp. 2d at 183 (relevant date for determining repose period on plaintiff's Section 11 claim was date registration statement became effective); *Laven v. Price Waterhouse,* 1989 WL 129287 at *3 (D.N.J. June 28, 1989) (three-year repose period for Section 11 claim alleging omissions in registration statement commences on the date that the original registration statement became effective).

Here, the statute of repose on Plaintiffs' Section 11 claim began to run on July 22, 1997, the original effective date of the registration statement for the WRL Freedom Wealth Creator. The repose period expired before Johnson filed his complaint in October 2001, more than four years later. Therefore, summary judgment is appropriate on Plaintiffs' Section 11 claim.

### *Conclusion*

The Court should grant Summary Judgment in favor of the Defendants on Plaintiffs' First Cause of Action for violation of Section 11.

Dated:   February 11, 2005.

Respectfully submitted,


_____/s/ David A. Jones_____
David A. Jones
Daniel McNeel Lane, Jr.
AKIN GUMP STRAUSS HAUER & FELD LLP
300 Convent Street, Suite 1500
San Antonio, Texas 78205
Telephone:  (210) 281-7000
Telecopier:  (210) 224-2035

Tony G. Powers
Georgia Bar No. 586586
Kimberly L. Myers
Georgia Bar No. 533257
ROGERS & HARDIN LLP
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia  30303-601
Telephone:  (404) 420-4632
Telecopier:  (404) 525-2224

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), the undersigned counsel certifies that this filing complies with the type-volume limitations set forth in Rule 5.1B of the Local Rules of the United States District Court for the Northern District of Georgia.  Counsel certifies that this filing has been typed in Times New Roman 14 font.

<u>    /s/ Tony G. Powers    </u>
Tony G. Powers
Georgia Bar No. 586586
Kimberly L. Myers
Georgia Bar No. 533257
ROGERS & HARDIN LLP
2700 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia  30303-601
Telephone:  (404) 420-4632
Telecopier:  (404) 525-2224

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of February, 2005 a true and

correct copy of was served via certified mail, return receipt requested, to the

following counsel of record:

Robert B. Weintraub
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ
270 Madison Avenue
New York, NY 10016

John J. Soroko
Wayne A. Mack
DUANE MORRIS, LLP
One Liberty Place
Philadelphia, PA 19103


John C. Herman
Matthew C. Gaudet
James P. Ferguson, Jr.
DUANE MORRIS, LLP
1180 West Peachtree St., Suite 700
Atlanta, GA 30309

David A. Bain
CHITWOOD & HARLEY
Promenade II, Suite 2300
1230 Peachtree Street, NE
Atlanta, GA 30309


_____/s/ David A. Jones_____
David A. Jones

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **JEFFERY L. JOHNSON,**<br>**on behalf of himself and all others**<br>**similarly situated,**<br><br>      **Plaintiff,**<br>**v.**<br><br>**AEGON USA, INC., WMA**<br>**SECURITIES, INC., et al.**<br><br>      **Defendants.** | **Civil Action No.**<br>**1:01-CV-2617-CAP** |

**DECLARATION OF PRISCILLA I. HECHLER IN SUPPORT OF
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
ON PLAINTIFFS' FIRST CAUSE OF ACTION**

**COUNTY OF PINELLAS**    §
                             §
**STATE OF FLORIDA**          §

I, Priscilla I. Hechler, declare as follows:

    1.    I am over the age of 21, I have never been convicted of a felony or a crime involving moral turpitude, and I am otherwise competent to make this Declaration.

2.      I am Assistant Vice President, Assistant Secretary and Compliance Manager of Western Reserve Life Assurance Co. of Ohio ("WRL"), and am authorized to make this Declaration for and on behalf of WRL.

3.      As such, I have personal knowledge of the facts set forth in this Declaration relating to the registration of the WRL Freedom Wealth Creator variable annuity.

4.      WRL first filed the Registration Statement for the WRL Freedom Wealth Creator variable annuity under the Securities Act of 1933 with the Securities and Exchange Commission ("SEC") on April 11, 1997.

5.      The Registration Statement for WRL's Freedom Wealth Creator variable annuity first became effective on July 22, 1997 and was filed with the SEC on July 23, 1997.

6.      All of the facts in this Declaration are personally known to me and if called upon to do so, I am competent to testify to such facts.  I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

EXECUTED this 10th day of February, 2005 at St. Petersburg,  Florida.

Priscilla I. Hechler

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JEFFERY L. JOHNSON, on behalf of himself and all others similarly situated, <br><br> **Plaintiff,** <br><br> v. <br><br> AEGON USA, INC., WMA SECURITIES, INC., et al. <br><br> **Defendants.** | Civil Action No. 1:01-CV-2617-CAP |

**DECLARATION OF PAMELA M. BELL IN SUPPORT OF
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
ON PLAINTIFFS' FIRST CAUSE OF ACTION**

COUNTY OF BEXAR      §
                            §
STATE OF TEXAS         §

I, Pamela M. Bell, declare as follows:

    1.    I am an Associate in the law firm of Akin Gump Strauss Hauer & Feld, L.L.P. which represents Aegon, USA, Inc., Aegon Financial Services Group, Inc., AFSG Securities Corporation, PFL Life Insurance Company, AUSA Life Insurance Company, Inc., Western Reserve Life Assurance Co. of Ohio, and Bankers United Life Assurance Company.  I am authorized to make this

declaration for and on behalf of the Defendants. I have personal knowledge of all the facts stated herein.

2. A true and correct copy of Plaintiff Jeffery L. Johnson's Freedom Wealth Creator variable annuity contract, as produced by Johnson in discovery in this case, is attached as Exhibit A to this declaration.

3. All the facts in this declaration are personally known to me and if called upon to do so, I am competent to testify to such facts.

I declare upon penalty of perjury, under the laws of the United States of America, that the foregoing statements made in this declaration are true and correct.

PAMELA M. BELL

Signed on the __11th__ day of February, 2005, in San Antonio, Texas.

2

**EXHIBIT "A"**

**QPD_____    DISCLOSURE STATEMENT AND APPLICATION SUPPLEMENT FOR**
**INDIVIDUAL RETIREMENT ANNUITY**
**FLEXIBLE PAYMENT VARIABLE ACCUMULATION DEFERRED ANNUITY CONTRACT**

I have applied for an Individual Retirement Annuity in an application from Western Reserve Life Assurance Co. of Ohio. I understand that this Individual Retirement Annuity may be revoked within seven days of receipt of this Disclosure Statement only by my written notice of revocation mailed or delivered to: IRA Administrator, Western Reserve Life Assurance Co. of Ohio, P.O. Box 5068, Clearwater, Florida 33758. In the event I so revoke this Individual Retirement Annuity, I am entitled to a return of the amount set forth under the Right to Examine Contract provision of the annuity.

By accepting this application supplement in conjunction with the contract, I am requesting that the contract be treated as an Individual Retirement Annuity under Section 408(b) of the Internal Revenue Code (hereafter referred to as the Code).

An IRA is an annuity contract that meets the following requirements: (1) the contract must be issued by an insurance company qualified to do business in the state in which the contract was sold; (2) the contract may not be transferable by the owner to any person other than the company selling the product; (3) except in the case of contributions to a simplified employee pension plan ("SEP"), a SIMPLE plan, or rollover contributions (described below), the annual premium for the annuity contract cannot exceed $2,000; (4) the premium must not be fixed; (5) any refund of premiums must be applied toward the payment of future premiums or the purchase of additional benefits before the close of the calendar year following the year of the refund; (6) the entire interest of the owner in the contract must be nonforfeitable; and (7) the contract must comply with certain minimum distribution requirements.

I understand payments must be paid in cash. Payments may be treated as deductions (except in the case of a Rollover or a Transfer) from my gross income for Federal Income tax purposes. I must also file IRS Form 5329 with my Federal Income tax return if tax is payable because of excess contributions, premature distributions or excess accumulations.

If I receive total distribution from my IRA and from any tax-qualified retirement plans and tax-sheltered annuities in excess of $150,000 for a calendar year, I may be subject to a 15% excise tax on such excess distribution. This excise tax is suspended during the 1997, 1998, and 1999 calendar years.

A distribution to the beneficiary of my IRA will be included in my gross estate for federal estate tax purposes. My designation of a beneficiary to receive distributions from my IRA on or after my death will not be considered a transfer for federal gift tax purposes.

I also understand that:

1. In general, during any taxable year, I am allowed a deduction from my gross income for the amount of my contributions to my individual retirement program, up to the least of the following amounts:
   (a) for contributions that are not made under a savings incentive match plan for employees (SIMPLE), described in Code Section 408(p):
      (1)  $2,000; or
      (2)  100% of compensation;
   (b)  for contributions made under a SIMPLE plan, a percentage of compensation, as provided in Code Section 408(p)(2)(A), up to a maximum amount of $6,000, indexed for inflation under Code Section 415(d). See Code Section 408(p)(2)(E).

2. In general, if I do not qualify for a SIMPLE IRA and if I make a contribution to a separate individual retirement program for my unemployed spouse (or my employed spouse, if he or she elects to being treated as having no compensation), the total deduction is limited to the least of the following amounts:
   (a)  $4,000 - - a maximum of $2,000 per person; or
   (b)  100% of compensation.

   It is my further understanding (except in the case of a Rollover or a transfer) that if I do not qualify for a SIMPLE IRA, no more than $2,000 can be contributed to the account of either spouse during any tax year and that a joint tax return must be filed to receive the full deduction.

3. (a)  If I am not married, and not an active participant in an employer-sponsored retirement plan, I may make a fully-deductible contribution to my individual retirement program, up to the limit described in Item 1 above. If I am married and neither I nor my spouse is an active participant in an employer-sponsored retirement plan, I may make a fully-deductible contribution to my individual retirement program, up to the limits described in Item 1 or 2, whichever is applicable. If I (or my spouse, if I file a joint return) am covered by an employer-sponsored retirement plan, my contribution to my individual retirement program will be deductible only to the extent permitted by Item 4 below.

JLJ0240

(b) An employer-sponsored retirement plan includes any of the following:
  * a qualified pension, profit-sharing or stock bonus plan described in Code Section 401(a) or 401(k);
  * a qualified annuity plan described in Code Section 403(a);
  * a tax-sheltered annuity or custodial account described in Code Section (403)(b);
  * a savings incentive match plan for employees (SIMPLE) described in Code Section 408(p);
  * a plan established for its employees by the United States, by a State or political subdivision thereof, or an employee or instrumentality of any of the foregoing;
  * a Simplified Employed Pension (SEP) (established prior to January 1, 1997)

(c) Whether I am an active participant in an employer-sponsored retirement plan depends on the type of plan that is sponsored. Generally, if my employer sponsored a defined benefit (pension) plan, I am considered to be an active participant if I am eligible to accrue a benefit under the plan. It does not matter for this purpose whether or not I actually do accrue a benefit. If my employer maintains a defined contribution plan, I am generally considered to be an active participant if an employer contribution or forfeiture is credited to my account during the year. I am also considered to be an active participant if I make either voluntary or mandatory contributions to a 401(k) plan or any other employer-sponsored retirement plan, whether or not such contribution is made on a pre-tax or after-tax basis and whether or not my employer contributes to that plan.

4. (a) If I (or my spouse, if we file a joint return) am an active participant in an employer-sponsored retirement plan, my ability to deduct the contribution to my individual retirement program will be limited if my adjusted gross income exceeds (determined for IRA purpose) the "applicable amount". The "applicable amount" depends on my marital status and how I file my tax return. If:
  * I am single, the applicable amount is $25,000.
  * I am married filing jointly, the applicable amount is $40,000.
  * I am married filing separately, the applicable amount is $0.

(b) If my adjusted gross income exceeds the "applicable amount" by not more than $10,000 I may still make a deductible contribution to my individual retirement program. However, the deductible amount will be less than $2,000 (or $4,000, if item 2 is applicable). I will consult my tax advisor for details as to how to determine the deductible portion of my contribution.

(c) If my adjusted gross income is less than $35,000 if I am single, $50,000 if I am married filing jointly, or $10,000 if I am married filing separately, then I may make a minimum deductible contribution to my individual retirement program of $200, regardless of the amount calculated above.

5. Even if my deductible contribution to my individual retirement program is limited, I may still contribute up to the limits described in items 1 or 2. The difference between those limits and the deductible amount will not be deductible. However, all earnings on my non-deductible contribution will be tax-deferred until distribution.

6. Contributions to my individual retirement program will be reported on my Form 1040 or 1040A. I must designate the deductible and non-deductible portion of my distribution on that return, as well as the distributions received from my individual retirement programs during the year and the aggregate account balance of all of my individual retirement programs as of the end of the year. If I overstate on my tax return the non-deductible amount, a penalty of $100 will be imposed on each overstatement, unless I can show that the overstatement was due to reasonable cause.

7. The contribution to my individual retirement program (whether or not deductible) must be made by the due date of my tax return, without regard to extensions.

8. For purposes of determining the size of the payments into this contract, only my compensation and earned income for personal services actually rendered may be used (including wages, salaries and professional fees and other amounts received as compensation). If I received alimony or income from a separate maintenance agreement which is includable in my gross income, I may include these amounts as compensation. Earnings from property such as interest, rents and dividends may not be used; neither may compensation not includable in gross income as income earned from sources outside the United States.

9. No deduction from gross income is allowed in respect to a payment in my taxable year in which I attain age 70 1/2 or thereafter.

10. If I make a contribution in excess of the amount that may be contributed to an individual retirement program for any taxable year, an excise tax of 6% of the amount of the excess contribution will be levied on me, unless the excess is refunded to me on or before that date (including any extensions) for filing my income tax return for that taxable year; the 6% excise tax will be levied in each subsequent taxable year as long as the excess contribution remains in the Annuity unless and until the excess is applied to a subsequent year's contribution.

11. This contract must be for the exclusive benefit of me and my beneficiary or beneficiaries. The contract shall be nonforfeitable.

rev. 01/97

JLJ0241

12. This contract is being purchased primarily for retirement purposes at or after my age 59 1/2, but I have the right to surrender it for its cash value prior to retirement.

13. (a) Any benefit payable under the contract will be treated as taxable income includable in gross income under the provisions of the Code, and any distribution prior to my attaining age 59 1/2 will be subject to an additional penalty tax of 10% of the amount of the distribution.  If this is a SIMPLE IRA, the penalty tax for any distribution prior to age 59 1/2 will be increased to a total of 25% for distributions during the two year period beginning on the date I first participated in any qualified salary reduction arrangement maintained by my employer to fund the SIMPLE IRA.  However, the distributions prior to age 59 1/2 under one of the following circumstances will not be subject to the 10% or 25% additional penalty tax.  These include:
* distributions after my death;
* distributions made because of my disability;
* distributions which are part of a scheduled series of substantially equal periodic payments for my life or life expectancy, or the joint lives (or life expectancies) of me and a beneficiary;
* distributions for medical expenses in excess of 7 1/2% of Adjusted Gross Income for the tax year;
* distributions for medical care insurance premiums for me and my spouse and my dependents. (To qualify, I must be separated from employment and have received unemployment compensation under any federal or state unemployment compensation law for 12 consecutive weeks.)
(b) Distributions of my non-deductible contributions are not subject to the 10% additional penalty tax, but this tax will be assessed on the earnings on the non-deductible contributions.
(c) To the extent permitted by applicable law, tax-free rollovers can be made from one SIMPLE IRA into:
(1) another SIMPLE IRA; or
(2) an IRA, after a two-year period has expired since I first participated in a SIMPLE IRA.
(d) For contributions not made under a SIMPLE IRA, the entire proceeds from my contract can be transferred into an Individual Retirement Account at any time without tax penalty (but no more frequently than once a year, if I obtain possession of the funds and redeposit the funds in an IRA within the 60 day time period).

14. The contract and the benefits provided by it cannot be sold, assigned, alienated or pledged as collateral for a loan or as security for the performance of an obligation or for any other purpose to any person, provided that, if I should take any one of these actions (which are prohibited transactions under the Code), my Individual Retirement Annuity will be disqualified and the full value of it will be treated as taxable income under Item 13 above as of the beginning of my taxable year in which the action occurs.  In addition, the additional 10% penalty tax may be applicable.

15. Notwithstanding the contents of item 14, the contract can be transferred to a former spouse under a divorce decree or written instrument incidental to such divorce, without such action being considered to be a prohibited transaction resulting in disqualification.

16. Notwithstanding any provision of this agreement to the contrary, the distribution of my interest shall be made in accordance with the minimum distribution requirements of section 408(a)(6) or section 408(b)(3) of the Code and the regulations thereunder, including the incidental death benefit provisions of section 1.401(a)(9)-2 of the proposed regulations, all of which are herein incorporated by reference.

17. My entire interest in the account  must be distributed, or begin to be distributed, by my required beginning date, which is the April 1 following the calendar year in which I reach age 70 1/2. For each succeeding year, distribution must be made on or before December 31.  By the required beginning date I may elect to have the balance in the account distributed in one of the following forms:
(a) a single sum payment;
(b) equal or substantially equal payments over my life;
(c) equal or substantially equal payments over my life and the life of my designated beneficiary;
(d) equal or substantially equal payments over a specified period that may not be longer than my life expectancy;
(e) equal or substantially equal payments over a specified period that may not be longer than the joint life and last survivor expectancy of me and my designated beneficiary.

18. If I die before my entire interest is distributed, the entire remaining interest will be distributed as follows:
(a) If I die on or after distributions have begun under Paragraph 17, the entire remaining interest must be distributed at least as rapidly as provided under Paragraph 17.
(b) If I die before distributions have begun under Paragraph 17, the entire remaining interest must be distributed as elected by me or, if I have not so elected, as elected by the beneficiary or beneficiaries, as follows:
(1) by December 31st of the year containing the fifth anniversary of my death; or
(2) in equal or substantially equal payments over the life or life expectancy of the designated beneficiary or beneficiaries starting by December 31st of the year following the year of my death.  If, however, the beneficiary is my surviving spouse, then this distribution is not required to begin before December 31st of the year in which I would have turned 70 1/2.

19. Unless otherwise elected by me prior to the commencement of distributions under Paragraph 17, or, if applicable, by my surviving spouse where I die before distributions have commenced, life expectancies of me or my spouse as beneficiary shall be recalculated annually for the purpose of distributions under Paragraphs 17 and 18. An election not to recalculate shall be irrevocable and shall apply to all subsequent years. The life expectancy of my nonspouse beneficiary shall not be recalculated.

20. I may satisfy the minimum distribution requirements under section 408(a)(6) and 408(b)(3) of the Code by receiving a distribution from one IRA that is equal to the amount required to satisfy the minimum distribution requirements for two or more IRAs. For this purpose, as the owner of two or more IRAs I may use the "alternative method" described in Notice 88-38, 1988-1 C.B.24, to satisfy the minimum distribution requirements described above.

21. To the extent that a distribution to me constitutes a return of my non-deductible individual retirement program contributions, such amount will not be includable in income. I will consult my tax advisor for information as to how to determine the taxable portion of my distribution.

22. Taxable distributions from my annuity will be taxed as ordinary income in the year received regardless of their source. I will have Federal income tax withheld from an individual retirement program distribution unless I elect otherwise. Generally, if the distribution is to be delivered outside the United States, a 30% tax withholding must be applied.

23. The contract will be amended as and when necessary in order to comply with the provisions of the Code and regulations thereunder.

24. The value of my IRA is based upon the value of the Accumulation Units allocated to me, which depends on the amount of my Purchase Payment. The minimum initial Purchase Payment is the minimum initial purchase price as stated in the Prospectus. The Accumulation Unit value will vary from one Valuation Period to the next depending on the investment results experienced by each Sub-Account to which I have allocated Purchase Payments within the Series Account. The value of an Accumulation Unit per each Sub-Account at the close of a Valuation Period is determined by multiplying the Accumulation Unit Value for that Sub-Account at the close of the immediately preceding Valuation Period by the experience factor for that Sub-Account for the current Valuation Period. In calculating a Sub-Account's experience factor, the net asset value for each share of the Portfolio of the Fund at the end of the current Valuation Period is increased by the amount per Portfolio share of any dividend or capital gain distribution declared by the Portfolio during the current Valuation Period, and decreased by a per Portfolio share charge for taxes, if any. The total is divided by the net asset value per Portfolio share at the end of the preceding Valuation Period and decreased by a per Portfolio share charge for taxes, if any. A charge equal to either 1.25% or 1.40% as declared in the Contract, on an annual basis, of the net assets for each day in the Valuation Period is subtracted to compensate Western Reserve Life for certain mortality and expense risks. Earnings or growth in the value of my IRA, however, can neither be guaranteed nor projected.

25. A Contingent Deferred Sales Charge ("CDSC") may be imposed upon withdrawal from or Surrender of my IRA. The charge is a percentage of the amount withdrawn or surrendered and is stated in the Prospectus and the Variable Annuity Contract. The Prospectus includes an example of how to calculate the CDSC. (WRL Freedom Bellwether Variable Annuity has no CDSC.)

26. State premium taxes, if any, will be deducted from either the gross purchase payment, the amount surrendered or withdrawn, or from the annuity purchase value at distribution, as required by state law. Unless waived by Western Reserve Life, a collection fee of $1.25 will be deducted from purchase payments under payment modes other than annual or single pay plans. An administration fee of $30 will be deducted annually on the anniversary of the annuity or upon surrender of the annuity. After 12 free transfers of contract values from a Sub-Account each year, there will be a $10 transfer charge for additional transfers. The values of the annuity held in the Series Account can be neither guaranteed nor projected.

27. The WESTERN RESERVE LIFE Individual Retirement Annuity has not been filed with Internal Revenue Service for approval. A determination as to the form of the IRA Annuity does not represent a determination by the IRS of the merits of the annuity as an investment.

28. Additional information in respect to Individual Retirement annuities, accounts and bonds, may be obtained from any district office of the Internal Revenue Service (in the form of Publication 590 particularly).

**WESTERN RESERVE LIFE
ASSURANCE CO. OF OHIO**
(A STOCK COMPANY)

Home Office: Columbus, Ohio
Administrative Office: P.O. Box 5068
Clearwater, Florida 33758-5068
727-299-1800

---

IN THIS CONTRACT Western Reserve Life Assurance Co. Of Ohio will be referred to as *WE, OUR* or *US*. *OFFICE* refers to Our Administrative Office located in Clearwater, Florida.

---

WE agree to pay the benefits of this Contract in accordance with its provisions. **CONTRACT VALUES DURING THE ACCUMULATION PERIOD WILL INCREASE OR DECREASE IN ACCORDANCE WITH THE CONTRACT VALUE PROVISIONS AND THE INVESTMENT EXPERIENCE OF THE APPLICABLE SUB-ACCOUNTS IN THE SEPARATE ACCOUNT. CONTRACT VALUES, WHEN BASED ON THE INVESTMENT EXPERIENCE OF A SUB-ACCOUNT OF THE SEPARATE ACCOUNT, ARE VARIABLE AND ARE NOT GUARANTEED AS TO FIXED DOLLAR AMOUNT.**

THE CONSIDERATION for this Contract is the application and the payment of the Initial Payment.

THE ANNUITANT, OWNER, AND BENEFICIARY are as shown in the application unless changed in accordance with the provisions of this Contract.

THE PROVISIONS on the following pages are part of this Contract.

IN WITNESS WHEREOF, We have signed this Contract at Our Office in Clearwater, Florida as of the Contract Date.

*Willis M. Design*

Secretary

*John R. Kenney*

President

---

RIGHT TO EXAMINE CONTRACT - The Owner may cancel this Contract at any time within ten days after receipt by returning it to Us at P.O. Box 5068, Clearwater, Florida 33758. If the Contract is returned within this period, We will pay to the Owner the sum of the purchase payments received.

---

FLEXIBLE PAYMENT VARIABLE ACCUMULATION DEFERRED ANNUITY

Death Benefit Prior to Maturity
Monthly Annuity Commencing on Maturity Date
Non-Participating - No Dividends

VA16AA

JLJ0244

# CONTRACT GUIDE

ENDORSEMENTS ................................................................................................................. 2

CONTRACT SCHEDULE ..................................................................................................... 3

DEFINITIONS ...................................................................................................................... 5

GENERAL PROVISIONS ...................................................................................................... 6

SEPARATE ACCOUNT PROVISIONS ................................................................................... 8

PURCHASE PAYMENT PROVISIONS .................................................................................. 9

CONTRACT VALUE PROVISIONS ...................................................................................... 9

DEATH BENEFIT PROVISIONS ......................................................................................... 12

ANNUITY PROVISIONS ..................................................................................................... 13

FIXED ACCOUNT ANNUITY PAYMENTS .......................................................................... 14

VARIABLE ACCOUNT ANNUITY PAYMENTS .................................................................... 15

# ENDORSEMENTS

JLJ0245

**WESTERN RESERVE LIFE ASSURANCE CO. OF OHIO**
**CLEARWATER, FLORIDA**

**CONTRACT SCHEDULE**

Owner:              JEFFERY L JOHNSON

Annuitant:          JEFFERY L JOHNSON

Annuity Option:     D - 10 Year Certain        Contract Number:    15S3164004

Initial Payment:    $48,863.75                 Contract Date:      JULY 10, 2000

                                               Maturity Date:      DECEMBER 13, 2057

Anticipated Purchase Payment Pattern*

MODE

SINGLE PAY

\* The anticipated purchase payment pattern is based upon selection made in the application. The amount and mode may be changed in accordance with the purchase payment provisions on page 9.

Separate Account Provisions

    Separate Account:                    WRL Series Annuity Account

    Mortality and Expense Charge:        1.40% (Annually)

Purchase Payment Provisions

    Maximum Additional Payment:          $1,000,000

    Minimum Additional Payment:          $50

Contract Value Provisions

    Annual Contract Charge:              $35

    Minimum Balance:                     $5,000

    Withdrawal Charge Period:            84 Months from the date of each
                                         purchase payment

Withdrawal charge percentage (as a percentage of each respective purchase payment):

| Months Since Date of Payment | Percentage |
|---|---|
| 12 Months or Less | 8% |
| 13 Months Through 24 Months | 7% |
| 25 Months Through 36 Months | 6% |
| 37 Months Through 48 Months | 5% |
| 49 Months Through 60 Months | 4% |
| 61 Months Through 72 Months | 3% |
| 73 Months Through 84 Months | 2% |
| 85 Months Or More | 0% |

VA16                          Page 3

JLJ0246

**THIS PAGE INTENTIONALLY LEFT BLANK**

VA16

JLJ0247

## DEFINITIONS

ACCOUNTS.  Allocation options including the Fixed Account and the Sub-Accounts of the Separate Account.

ACCUMULATION PERIOD.  The period between the Contract Date and the Maturity Date while the Contract is in force.

ACCUMULATION UNIT VALUE.  An accounting unit of measure used to calculate Sub-Account values for the Contract during the Accumulation Period.

AGE.  Issue Age refers to the age of the Annuitant's birthday nearest the Contract Date.  Attained Age refers to the Issue Age plus the number of Completed Contract years.

ANNUITANT.  The person named on the application, or as subsequently changed, to receive annuity payments.  The Annuitant may be changed as provided in the Death Benefit Provisions and Annuity Provisions.

ANNUITY PROCEEDS.  The amount applied to purchase periodic annuity payments.  Such amount is the Annuity Value on the Maturity Date, less any applicable Premium Tax.

ANNUITY UNIT VALUE.  An accounting unit of measure used to calculate annuity payments from a Sub-Account after the Maturity Date.

ANNUITY VALUE.  The value as described in the Annuity Value section of the Contract Value Provisions.

CASH VALUE.  The value as described in the Cash Value section of the Contract Value Provisions.

CONTINGENT BENEFICIARY.  The new Beneficiary upon the current Beneficiary's death.

CONTRACT DATE.  The later of the date on which payments are first received and the date the properly completed application is received by Us at Our Office.

DEATH BENEFIT PROCEEDS.  The value as described in the Death Benefit Proceeds section of the Death Benefit Provisions.

DEATH REPORT DAY.  The Valuation Date coincident with or next following the day on which We have received both (1) due proof of death and (2) a Written Notice for an election of:

    a) a single sum payment; or
    b) an alternative election as described under the Death Benefit Provisions.

FIXED ACCOUNT.  An allocation option other than the Separate Account.

MATURITY DATE.  The date on which the Accumulation Period ends and annuity payments are to commence.  The date may be changed as provided in the Annuity Provisions.

JLJ0248

PREMIUM TAX.  Premium Tax levied by a state or other government entity.  The Premium Tax will be paid when due and charged either against the purchase payment or the contract value.

SEC.  The Securities and Exchange Commission

SEPARATE ACCOUNT.  A separate investment account composed of several Sub-Accounts established to receive and invest net payments under the Contract and under other variable annuity contracts issued by the Company.

SERIES FUND.  A designated mutual fund from which a Sub-Account of the Separate Account will buy shares.

SUB-ACCOUNT.  A Separate Account allocation option that is made available under this Contract.

SURRENDER.  The termination of the Contract at the option of the Owner.

VALUATION DATE.  Each day on which the New York Stock Exchange is open for business.

VALUATION PERIOD.  The period commencing at the end of one Valuation Date and continuing to the end of the next succeeding Valuation Date.

WITHDRAWAL CHARGE PERIOD.  The period of time during which a withdrawal charge may be imposed as shown on Page 3.  For each purchase payment, the period begins on the date the payment is received by Us.

WRITTEN NOTICE.  Written Notice means a notice by the Owner to Us requesting or exercising a right of the Owner as provided in the Contract provisions.  In order for a notice to be considered a Written Notice, it must: be in writing, signed by the Owner; be in a form acceptable to Us; and contain the information and documentation, as determined in Our sole discretion, necessary for Us to take the action requested or for the Owner to exercise the right specified.  A Written Notice will not be considered complete until all necessary supporting documentation required or requested by Us has been received by Us at Our Administrative Office.

---

## GENERAL PROVISIONS

THE CONTRACT.  This Contract and the application, if any, constitute the entire Contract.  No Contract provision can be waived or changed except by endorsement.  Such endorsement must be signed by Our President or Secretary.  We reserve the right to amend the Contract to meet the requirements of any applicable Federal or state laws or regulations.

OWNERSHIP.  This Contract belongs to the Owner.  The Owner as shown on Page 3, or as subsequently changed, may exercise all rights under this Contract including the right to transfer ownership.  These rights may be subject to the consent of any assignee or irrevocable beneficiary.  Joint owners may be named, provided the Joint Owners are husband and wife.

JLJ0249

CHANGE OF OWNERSHIP UPON REQUEST. We will not be bound by any requested change in the ownership designation unless it is made by Written Notice. The change will be effective on the date the Written Notice is accepted by Us. If We request, this Contract must be returned to Our Office for endorsement.

Changing the Owner cancels any prior Ownership designation, but it does not change the Beneficiary or the Annuitant.

CHANGE OF OWNERSHIP UPON DEATH OF OWNER. Should the Owner die during the Accumulation Period, We will be bound by the following:

1. In the event of death of one Joint Owner, this Contract will continue with the surviving Joint Owner as sole Owner.
2. If the Owner is the Annuitant, then the Death Benefit Proceeds are payable as provided in the Death Benefit Provisions.
3. If the Owner is not the Annuitant and dies before the Annuitant:
   a. If no Beneficiary is named and alive, the Owner's estate will become the new Owner. The Cash Value must be distributed within five years of the former Owner's death;
   b. If the Beneficiary is alive and is the Owner's spouse, this Contract will continue with the spouse as the new Owner; or
   c. If the Beneficiary is alive and is not the Owner's spouse, the Beneficiary will become the new Owner. The Cash Value must be distributed either:
      1) within five years of the former Owner's death; or
      2) over the lifetime of the new Owner, if a natural person, with payments beginning within one year of the former Owner's death; or
      3) over a period that does not exceed the life expectancy (as defined by the Internal Revenue Code and Regulations adopted under the Code) of the new Owner, if a natural person, with payments beginning within one year of the former Owner's death.

BENEFICIARY. The Beneficiary, as named in the application or subsequently changed, is entitled to receive the Death Benefit Proceeds, if any, as provided in the Death Benefit Provisions of this Contract, or the Cash Value, if any, as provided in 3.c above. If no Beneficiary is alive, the benefits payable to the Beneficiary will be paid to the Owner's estate.

CHANGE OF BENEFICIARY. We will not be bound by any change in the Beneficiary designation unless it is made by Written Notice. The change will be effective on the date the Written Notice was signed; however, no change will apply to any payment We made before the Written Notice is received. If We request, this Contract must be returned to Our Office for endorsement.

ASSIGNMENT. This Contract may be assigned prior to the Maturity Date. We will not be bound by any assignment unless made by Written Notice. The assignment will be effective on the date the Written Notice is received at Our Office and accepted by Us. We assume no responsibility for the validity of any assignment.

INCONTESTABILITY. This Contract is incontestable from the Contract Date.

AGE AND SEX. If a date of birth or sex has been misstated, any amount payable will be adjusted to conform to the correct date of birth and sex.

CONTRACT YEARS. Contract years, quarters and anniversaries are measured from the Contract Date.

JLJ0250

REPORTS. During the Accumulation Period, We will send a report to the Owner at least once each year. It will show the activity that occurred during the year and the value of the Contract as of the date of the report.

CONTRACT PAYMENT. All payments from the Fixed Account will be paid in one sum unless otherwise elected under the Annuity Provisions of this Contract. We have the right to postpone payments and transfers from the Fixed Account for up to six months. All payments and transfers from the Sub-Accounts will be processed as provided in this Contract unless one of the following situations exists:

1. The New York Stock Exchange is closed; or
2. The SEC requires that trading be restricted or declares an emergency; or
3. The SEC allows Us to defer payments to protect Our contract owners.

PROTECTION OF PROCEEDS. Unless the Owner directs by filing Written Notice, no Beneficiary may assign any payments under this Contract before the same are due. To the extent permitted by law, no payments under this Contract will be subject to the claims of creditors of any Beneficiary.

## SEPARATE ACCOUNT PROVISIONS

The variable benefits under this Contract are provided through the Separate Account referenced on Page 3. The assets of the Separate Account are Our property. Assets equal to the liabilities of the Separate Account will not be charged with liabilities arising out of any other business We may conduct. If the assets of the Separate Account exceed the liabilities arising under the contracts supported by the Separate Account, then the excess may be used to cover the liabilities of Our general account. The assets of the Separate Account shall be valued as often as any Contract benefits vary, but at least monthly.

SUB-ACCOUNTS. The Separate Account has various Sub-Accounts. Each Sub-Account invests exclusively in shares of one of the portfolios of an underlying Series Fund. Assets invested after the Maturity Date may be invested in different Sub-Accounts than assets invested during the Accumulation Period. We reserve the right to add or remove any Sub-Account of the Separate Account. Income and realized and unrealized gains and losses from assets in each Sub-Account are credited to, or charged against, that Sub-Account without regard to income, gains, or losses in other Sub-Accounts. Any amount charged against the Contract value for federal or state income taxes will be deducted from that Sub-Account.

TRANSFERS AMONG SUB-ACCOUNTS. During the Accumulation Period, the Owner may transfer all or a portion of this Contract's value in its Sub-Accounts to other Sub-Accounts or the Fixed Account. We reserve the right to charge a $25 fee for each transfer in excess of one per Contract month, or twelve per Contract year. This charge will be deducted from the funds transferred. We must be notified in a manner satisfactory to Us. The transfer ordinarily will take effect on the first Valuation Date on or following the date notice is received at Our Office.

ADDITION, DELETION OR SUBSTITUTION OF INVESTMENTS. We reserve the right to transfer assets of the Separate Account, which We determine to be associated with the class of contracts to which this Contract belongs, to another Separate Account. If this type of transfer is made, the term "Separate Account", as used in this Contract, shall then mean the Separate Account to which the assets were transferred. We also reserve the right to add, delete, or substitute investments held by any Sub-Account.

We reserve the right, when permitted by law, to:

JLJ0251

1. Deregister the Separate Account under the Investment Company Act of 1940;
2. Manage the Separate Account under the direction of a committee at any time;
3. Restrict or eliminate any voting privileges of contract owners or other persons who have voting privileges as to the Separate Account; and
4. Combine the Separate Account or any Sub-Account(s) with one or more other separate accounts or sub-accounts.

CHANGE OF INVESTMENT OBJECTIVES. We reserve the right to change the investment objective of any Sub-Account. If required by law or regulation, an investment objective of the Separate Account, or of a Series Fund portfolio designated for a Sub-Account, will not be materially changed unless a statement of the change is filed with and approved by the appropriate insurance official of the state of Our domicile or deemed approved in accordance with such law or regulation.  If required, approval or change of any investment objective will be filed with the Insurance Department of the state where this Contract is delivered.

ACCUMULATION UNIT VALUE. Some of the Contract values fluctuate with the investment results of the Sub-Accounts.  In order to determine how investment results affect the Contract values, an Accumulation Unit Value is determined for each Sub-Account.  The Accumulation Unit Value may increase or decrease from one Valuation Period to the next.  Accumulation Unit Values also will vary between Sub-Accounts.

The Accumulation Unit Value of any Sub-Account at the end of a Valuation Period is the result of:

1. The total value of the assets held in the Sub-Account.  This value is determined by multiplying the number of shares of the designated Series Fund portfolio owned by the Sub-Account times the net asset value per share; minus
2. The accrued charge for adverse mortality and expense experience.  The daily amount of this charge is equal to the daily net assets of the Sub-Account multiplied by the daily Mortality and Expense Charge.  The maximum annual factor for the Mortality and Expense Charge is shown on Page 3; minus
3. The accrued amount of reserve for any taxes that are determined by Us to have resulted from the investment operations of the Sub-Account; and the result divided by
4. The number of outstanding units in the Sub-Account.

The use of the Accumulation Unit Value in determining Contract values is described in the Contract Value Provisions.

## PURCHASE PAYMENT PROVISIONS

PURCHASE PAYMENTS.  Payments after the first are payable at Our Office.  The amount of payment which may be paid during any Contract year may not exceed the Maximum Additional Payment shown on Page 3 without Our consent.  Payments will not be accepted in an amount less than the Minimum Additional Payment shown on Page 3 without Our consent.  Our acceptance of any payment shall not constitute a waiver of these limits  with respect to subsequent payments.

## CONTRACT VALUE PROVISIONS

NET PURCHASE PAYMENT.  The net payment will be the payment received less Premium Tax, if any.

JLJ0252

ALLOCATION OF NET PURCHASE PAYMENTS. Net payments will be allocated to the Accounts on the first Valuation Date on or following the date the payment is received at Our Office. With respect to the Initial Payment, the allocation will take place on the Contract Date.

We reserve the right to limit any allocaton to any Account to no less than 10% of each net purchase payment. No fractional percentages are permitted. The allocation of future net purchase payments may be changed by the Owner. We reserve the right to charge a fee of $25 for each change of allocation in excess of one per Contract quarter. The request for change of allocations must be in a manner satisfactory to Us. The allocation change will be effective the date the request for change is recorded by Us.

SUB-ACCOUNT VALUE. At the end of any Valuation Period, the Sub-Account value is equal to the number of units that the Contract has in the Sub-Account, multiplied by the Accumulation Unit Value of that Sub-Account.

The number of units that the Contract has in each Sub-Account is equal to:

1. The initial units purchased on the Contract Date; plus
2. Units purchased at the time additional net purchase payments are allocated to the Sub-Account; plus
3. Units purchased through transfers from another Account; minus
4. Any units that are redeemed to pay for partial withdrawals; minus
5. Any units that are redeemed as part of a transfer to another Account; minus
6. Any units that are redeemed to pay the Annual Contract Charge, Premium Tax and transfer fees, if any.

FIXED ACCOUNT. At the end of any Valuation Period, the Fixed Account value is equal to:

1. The sum of all net purchase payments allocated to the Fixed Account; plus
2. Any amounts transferred from a Sub-Account to the Fixed Account; plus
3. Total interest credited to the Fixed Account; minus
4. Any amounts withdrawn from the Fixed Account to pay for partial withdrawals; minus
5. Any amounts transferred to a Sub-Account from the Fixed Account; minus
6. Any amounts charged to pay the Annual Contract Charge, Premium Tax and transfer fees, if any.

Interest on the Fixed Account will be compounded daily at a minimum guaranteed effective annual interest rate of 3% per year. We may declare from time to time higher current interest rates. The interest rates We set will be credited for increments of at least one year measured from each purchase payment or transfer date.

On transfers from the Fixed Account to a Sub-Account, unless We otherwise consent:

1. Written Notice must be within 30 days after a Contract anniversary.
2. The transfer will ordinarily take place on the first Valuation Date on or following the date We receive such Written Notice.
3. The amount that may be transferred is the greater of (a) 25% of the amount in the Fixed Account; or (b) the amount transferred in the prior Contract year from the Fixed Account.

We reserve the right to defer payment of any amounts from the Fixed Account for no longer than six months after We receive such Written Notice.

JLJ0253

ANNUAL CONTRACT CHARGE. During the Accumulation Period, the Annual Contract Charge shown on Page 3 will be made once a year on each Contract anniversary from the Annuity Value. This charge will be deducted from each Sub-Account and the Fixed Account in proportion to the value each bears to the Annuity Value. If the Contract is Surrendered on other than a Contract anniversary, the charge will also be made on the date of Surrender.

The Annual Contract Charge will be waived if the sum of all Net Purchase Payments received, minus all withdrawals, exceeds $50,000 as of the Contract anniversary for which the charge is payable. However, We reserve the right to discontinue such waiver of the Annual Contract Charge at any time and to assess the charge as it becomes payable.

ANNUITY VALUE. At the end of any Valuation Period, the Annuity Value is equal to the sum of the Account values.

PARTIAL WITHDRAWAL. Prior to the Maturity Date, a partial withdrawal may be made by the Owner without Surrender of this Contract. Unless We otherwise consent:

1. The request must be made by Written Notice.
2. The partial withdrawal may not reduce the Cash Value to less than the Minimum Balance shown on Page 3.

The amount payable will be the partial withdrawal less any applicable withdrawal charge and Premium Tax. The Sub-Account(s) for the withdrawal may be specified. If not specified, withdrawals will be deducted from each Sub-Account and the Fixed Account in proportion to the value each bears to the Annuity Value.

CASH VALUE. This Contract may be Surrendered by the Owner for its Cash Value upon Written Notice at any time prior to the then current Maturity Date. The Cash Value at any time equals the Annuity Value on the Valuation Date coincident with or next following the date We receive Written Notice of Surrender less any applicable withdrawal charge and Premium Tax. Payment will usually be made within seven days of Written Notice subject to the Contract Payment section of the General Provisions and the Fixed Account section of these provisions.

WITHDRAWAL CHARGE. On the Surrender or partial withdrawal of purchase payments paid beyond the Withdrawal Charge Period shown on Page 3, no withdrawal charge will be imposed.

On the partial withdrawal of purchase payments within the Withdrawal Charge Period, the withdrawal charge will equal the purchase payment paid within the Withdrawal Charge Period times the applicable Withdrawal Charge Percentage shown on Page 3. However, for the first partial withdrawal during each contract year, any withdrawal charge will be waived on the first 10% of the Annuity Value withdrawn.

On the Surrender of purchase payments within the Withdrawal Charge Period, the withdrawal charge will equal the purchase payment paid within the Withdrawal Charge Period times the applicable Withdrawal Charge Percentage shown on Page 3. No waiver of a withdrawal charge will be made for any portion of a Surrender.

BASIS OF COMPUTATION. A detailed statement of the method of computation of values has been filed with the insurance supervisory official of the jurisdiction in which this Contract is delivered. All values for this Contract are equal to or greater than the values required by statutes in such jurisdiction.

JLJ0254

## DEATH BENEFIT PROVISIONS

DEATH OF ANNUITANT DURING THE ACCUMULATION PERIOD.  If the Annuitant dies during the Accumulation Period and the Owner is a natural person other than the Annuitant, the Owner will automatically become the Annuitant and the Contract will continue.  In the event of Joint Owners, the younger Joint Owner will automatically become the Annuitant and the Contract will continue.

If the Annuitant dies during the Accumulation Period and the Owner is either (1) the same individual as the Annuitant, or (2) other than a natural person, then the Death Benefit Proceeds as calculated below are payable to the Beneficiary.  However, in the event of Joint Owners, if the Annuitant dies during the Accumulation Period and is the same individual as one of the Joint Owners, the surviving Joint Owner will automatically become the Annuitant and the Contract will continue.

DEATH BENEFIT PROCEEDS.  If the Annuitant dies during the Accumulation Period, and (a) prior to the end of the seventh Contract year, or (b) after the Annuitant's Attained Age 79, the Death Benefit Proceeds, if payable, will be the greater of:

1.  The Annuity Value as of the Death Report Day; or
2.  The excess of (a) the amount of purchase payments paid as of the Death Report Day less (b) any amounts withdrawn from the Contract to pay for partial withdrawals.

If the Annuitant dies during the Accumulation Period and after the seventh Contract year but prior to the Annuitant's attained age 80, the Death Benefit Proceeds, if payable, will be the greater of:

1.  The Annuity Value as of the Death Report Day;
2.  The excess of (a) the amount of purchase payments paid as of the Death Report Day less (b) any amounts withdrawn from the Contract to pay for partial withdrawals; or
3.  The Annuity Value as of the seventh Contract anniversary, less any amounts withdrawn from the Contract after the seventh Contract year to pay for partial withdrawals.

ALTERNATIVE ELECTION.  If the Beneficiary is entitled to receive the Death Benefit Proceeds, the Beneficiary may elect, in lieu of a lump sum payment, one of the following options that provides for complete distribution and termination of this Contract at the end of the distribution period:

1.  Within five years of the date of death of the Annuitant; or
2.  Over the lifetime of the Beneficiary; or
3.  Over a period that does not exceed the life expectancy (as defined by the Internal Revenue Code and Regulations adopted under the Code) of such Beneficiary.

Multiple beneficiaries may choose individually among any of the three options.

For subparagraphs (1) and (3), the Annuity Value as of the Death Report Day will be adjusted to equal the Death Benefit Proceeds and this Contract will remain in force as a deferred annuity until the end of the elected distribution period.  For subparagraph (2), the Maturity Date will be changed to the Death Report Day and the Death Benefit Proceeds will be used to purchase annuity payments under the Annuity Provisions of this Contract.

For elections made under subparagraph (1), We will:

JLJ0255

a. at the time of election, allow one partial withdrawal, without a withdrawal charge, and one transfer of all or a portion of the Contract's value among Sub-Accounts or the Fixed Account without a transfer charge. Additional partial withdrawals and transfers are not permitted;

b. not deduct the Annual Contract Charge nor assess the Withdrawal Charge upon complete distribution;

c. not permit payment of the Death Benefit Proceeds under the Annuity Provisions of this Contract upon complete distribution.

The Beneficiary may not name a Beneficiary for payment of the Death Benefit Proceeds. In the event the Beneficiary dies prior to distribution of all Death Benefit Proceeds, we will pay the remaining value of the Death Benefit Proceeds to the Contingent Beneficiary, if named by the Owner. If no Contingent Beneficiary is named, such payment will be made to the Beneficiary's estate.

Subparagraphs (2) and (3) may be elected only if the Beneficiary is a natural person and payments start within one year of the date of death of the Annuitant.

Except in the event of Joint Owners, as provided in the Death of Annuitant During the Accumulation Period provision, if the Beneficiary is entitled to receive the Death Benefit Proceeds and is the spouse of the deceased Annuitant, then the Beneficiary may elect to become the new Annuitant and Owner and keep the Contract in force in lieu of receiving the Death Benefit Proceeds. However, if the spouse is also a Joint Owner of this Contract, the terms of the Death of Annuitant During the Accumulation Period provision shall apply.

---

## ANNUITY PROVISIONS

COMMENCEMENT OF ANNUITY PAYMENTS. Monthly annuity payments will begin as of the Maturity Date shown on Page 3, unless another Maturity Date has been elected as provided in these provisions.

MATURITY DATE. The Maturity Date shown on Page 3 may be changed to a different Maturity Date, subject to all of the following:

1. Written Notice is received at Our Office prior to the Maturity Date.
2. The new Maturity Date is at least 5 years after the Contract Date.
3. The Attained Age of the Annuitant as of the new Maturity Date is not greater than 90.

ANNUITY OPTION. The Annuity Option shown on Page 3 may be changed to any other option available upon Written Notice prior to the Maturity Date. If a variable account annuity payment option is chosen, the Owner must include in the Written Notice the Sub-Account allocation of the Annuity Proceeds as of the Maturity Date.

CHANGE OF ANNUITANT. As of the Maturity Date and upon agreement with us, the Owner may elect a different Annuitant or add a joint annuitant who will be a joint payee under either Option C or Option E.

PAYEE. The Annuitant(s) on the Maturity Date will become the payee(s) and receive the annuity payments.

AVAILABILITY. If the payee is not a natural person, an Annuity Option is only available with our permission. No Annuity Option is available if:

1. The payee is an assignee; or
2. The periodic payment is less than $100.

VA16                                            Page 13

JLJ0256

AGE. Age, when required, means age nearest birthday on the effective date of the option. We will furnish rates for ages or combination of ages not shown upon request.

PROOF OF AGE AND SEX. Prior to making the first monthly annuity payment under this Contract, we reserve the right to require satisfactory evidence of the birthdate and the sex of any payee. If required by law to ignore differences in sex of any payee, annuity payments will be determined using unisex rates.

PROOF OF SURVIVAL. Prior to making any payment under this Contract, we reserve the right to require satisfactory evidence that the payee is:

1. Alive on the due date of such payment; and
2. Legally qualified to receive such payment.

DEATH BENEFIT AFTER THE MATURITY DATE. The death benefit after the Maturity Date and after the commencement of annuity payments depends upon the annuity option selected. If a payee dies on or after the commencement of annuity payments, the remaining portion of any interest in the Contract will be distributed at least as rapidly as under the method of distribution being used as of the date of the payee's death.

RESTRICTIONS. After the Maturity Date, no additional purchase payments, partial withdrawals, transfers, full Surrenders, change of Annuitants or Annuity Options may be made under this Contract.

---

## FIXED ACCOUNT ANNUITY PAYMENTS

INTEREST AND MORTALITY. All Fixed Account annuity option payments are based on a guaranteed interest rate of 3%. Mortality is based on the "1983 Table a" mortality table with projection. Gender based mortality tables will be used unless prohibited by law.

AMOUNT OF MONTHLY FIXED ACCOUNT ANNUITY PAYMENT. The amount of each monthly annuity payment will be determined by multiplying:

1. The appropriate rate based on the guaranteed interest rate and, for Options B and C, the mortality table for Fixed Account annuity payments; times
2. The Annuity Proceeds as of the Maturity Date.

FIXED ACCOUNT ANNUITY OPTIONS. The following options are available for payment of Fixed Account monthly annuity payments. The rates shown are the guaranteed rates for each $1,000 of Annuity Proceeds at selected ages. Any guaranteed rates not shown for the options below will be available upon request. Higher current rates may be available at the Maturity Date.

Option A - Fixed Period. The Annuity Proceeds will be paid in equal installments. The installments will be paid over a fixed period determined from the following table:

| Fixed Period (in Months) | Rate |
| --- | --- |
| 60 | 17.91 |
| 120 | 9.61 |
| 180 | 6.87 |
| 240 | 5.51 |

Option B - Life Income. The Annuity Proceeds will be paid in equal installments determined from the following table. Such installments are payable:

JLJ0257

1. During the payee's lifetime only (Life Annuity); or
2. During a 10 Year fixed period certain and for the payee's remaining lifetime (Certain Period); or
3. Until the sum of installments paid equals the Annuity Proceeds applied and for the payee's remaining lifetime (Installment Refund).

| Payee's Age | Life Annuity | | | Certain Period | | | Installment Refund | | |
|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | Unisex | Male | Female | Unisex | Male | Female | Unisex |
| 55 | 4.20 | 3.81 | 4.01 | 4.15 | 3.79 | 3.98 | 4.00 | 3.71 | 3.85 |
| 60 | 4.67 | 4.17 | 4.43 | 4.59 | 4.14 | 4.37 | 4.37 | 4.02 | 4.19 |
| 65 | 5.33 | 4.68 | 5.01 | 5.17 | 4.61 | 4.90 | 4.84 | 4.42 | 4.62 |
| 70 | 6.26 | 5.39 | 5.82 | 5.89 | 5.24 | 5.58 | 5.45 | 4.94 | 5.18 |
| 75 | 7.53 | 6.42 | 6.97 | 6.75 | 6.06 | 6.42 | 6.24 | 5.64 | 5.91 |
| 80 | 9.33 | 7.95 | 8.63 | 7.66 | 7.04 | 7.37 | 7.25 | 6.57 | 6.88 |
| 85 | 11.84 | 10.21 | 11.02 | 8.48 | 8.04 | 8.27 | 8.55 | 7.78 | 8.14 |
| 90 | 15.31 | 13.49 | 14.40 | 9.08 | 8.81 | 8.96 | 10.21 | 9.30 | 9.74 |

Option C - Joint and Survivor Life Income.  The Annuity Proceeds will be paid in equal installments during the joint lifetime of two payees and continuing upon the death of the first payee for the remaining lifetime of the survivor.

## VARIABLE ACCOUNT ANNUITY PAYMENTS

ANNUITY UNIT VALUE.  The Annuity Proceeds will be used to purchase variable annuity units in the chosen Sub-Account(s).  The Annuity Unit Value in any Sub-Account will increase or decrease reflecting the investment experience of that Sub-Account.

The Annuity Unit Value of any Sub-Account at the end of a Valuation Period is equal to (a) multiplied by (b) multiplied by (c), where:

    (a) is the Annuity Unit Value for that Sub-Account at the end of the immediately preceding Valuation Period;
    (b) is the net investment factor for the Sub-Account for the Valuation Period; and
    (c) is the Assumed Investment Return adjustment factor for the Valuation Period.

The Assumed Investment Return adjustment factor for the Valuation Period is the product of discount factors of .99986634 per day to recognize the 5.0% effective annual Assumed Investment Return.

The net investment factor used to calculate the value of the Annuity Unit Value in each Sub-Account for the Valuation Period is determined by dividing (d) by (e) and subtracting (f) from the result, where:

    (d) is the net result of:
        (1) the net asset value of a Series Fund share held in that Sub-Account determined as of the end of the current Valuation Period; plus
        (2) the per share amount of any dividend or capital gain distributions made by the Series Fund for shares held in that Sub-Account if the ex-dividend date occurs during the Valuation Period; plus or minus
        (3) a per share charge or credit for any taxes reserved for, which we determine to have resulted from the investment operations of the Sub-Account.
    (e) is the net asset value of a Series Fund share held in the Sub-Account determined as of the end of the immediately preceding Valuation Period.
    (f) is a factor representing the mortality and expense risk charge.  This factor is equal, on an annual basis, to 1.40% of the daily net asset value of a Series Fund share held in the Separate Account for that Sub-Account.

JLJ0258

DETERMINATION OF THE FIRST VARIABLE PAYMENT.  The amount of the first variable payment is determined by multiplying the Annuity Proceeds times the appropriate rate from the variable option selected.  The tables are based on the "1983 Table a" mortality table with projection with a 5% effective annual Assumed Investment Return and assuming a Maturity Date in the year 2000.  Gender based mortality tables will be used unless prohibited by law.

The amount of the first payment depends upon the adjusted age of the Annuitant.  The adjusted age is the Annuitant's actual age nearest birthday at the Maturity Date, adjusted as follows:

| Maturity Date | Adjusted Age |
|---|---|
| Before 2001 | Actual Age |
| 2001 - 2010 | Actual Age minus 1 |
| 2011 - 2020 | Actual Age minus 2 |
| 2021 - 2030 | Actual Age minus 3 |
| 2031 - 2040 | Actual Age minus 4 |

After the year 2040 as determined by us.

DETERMINATION OF SUBSEQUENT VARIABLE PAYMENTS.  The amount of variable annuity payments after the first will increase or decrease according to the Annuity Unit Value which reflects the investment experience of the selected Sub-Account(s).  Each variable annuity payment after the first will be equal to the number of variable annuity units in each selected Sub-Account multiplied by the Annuity Unit Value of that Sub-Account on the date the payment is processed.  The number of variable annuity units in any selected Sub-Account is determined by dividing the first variable annuity payment allocated to that Sub-Account by the variable Annuity Unit Value of that Sub-Account on the date the first annuity payment is processed.

VARIABLE ACCOUNT ANNUITY OPTIONS.  The following options are available for payment of Variable Account monthly annuity payments.  The rates shown are the guaranteed rates for each $1,000 of Annuity Proceeds at selected ages.  These rates are used to determine the first variable payment under each option.  Any guaranteed rates not shown for the options below will be available upon request.

Option D - Variable Life Income.  The Annuity Proceeds will be paid in installments determined from the following table.  Such installments are payable:

1.  during the payee's lifetime only (Variable Life Annuity); or
2.  during a 10 year fixed period certain and for the payee's remaining lifetime (Variable Certain Period).

| Adjusted Payee's Age | Variable Life Annuity | | | Variable Certain Period | | |
|---|---|---|---|---|---|---|
| | Male | Female | Unisex | Male | Female | Unisex |
| 55 | 5.39 | 4.98 | 5.19 | 5.33 | 4.95 | 5.14 |
| 60 | 5.88 | 5.36 | 5.63 | 5.77 | 5.31 | 5.55 |
| 65 | 6.57 | 5.88 | 6.23 | 6.35 | 5.78 | 6.07 |
| 70 | 7.53 | 6.61 | 7.08 | 7.05 | 6.41 | 6.75 |
| 75 | 8.84 | 7.68 | 8.25 | 7.86 | 7.21 | 7.54 |
| 80 | 10.69 | 9.26 | 9.97 | 8.71 | 8.15 | 8.44 |
| 85 | 13.27 | 11.62 | 12.44 | 9.48 | 9.07 | 9.29 |
| 90 | 16.82 | 15.02 | 15.89 | 10.03 | 9.79 | 9.93 |

Option E - Variable Joint and Survivor Life Income.  The Annuity Proceeds will be paid in installments during the joint lifetime of two payees and continuing upon the death of the first payee for the remaining lifetime of the survivor.

VA16

JLJ0259

THIS PAGE INTENTIONALLY LEFT BLANK

VA16

JLJ0260

**WESTERN RESERVE LIFE
ASSURANCE CO. OF OHIO**

FLEXIBLE PAYMENT VARIABLE ACCUMULATION DEFERRED ANNUITY

Death Benefit Prior to Maturity
Monthly Annuity Commencing on Maturity Date
Non-Participating - No Dividends

VA16

JLJ0261

## WESTERN RESERVE LIFE ASSURANCE CO. OF OHIO

### ENDORSEMENT

This endorsement amends the attached Annuity Contract (the "Contract") as follows:

If you are confined to a nursing care facility (as defined below) for thirty (30) consecutive days or longer, we will waive all withdrawal charges on surrenders or partial withdrawals from the contract, as follows. Such confinement must begin after the contract date. We must receive satisfactory written evidence of such confinement within two (2) months after the confinement ends. We will waive withdrawal charges under this endorsement only for surrenders and withdrawals made during such confinement or within two (2) months after the confinement ends.

"You" means the owner or a joint owner of the Contract. "We" or "Us" means Western Reserve Life Assurance Co. of Ohio.

"Nursing Care Facility" means a skilled or intermediate care facility which meets all of these tests: (1) It must be legally operated to provide skilled or intermediate nursing care to patients at their expense. (2) It must provide licensed nursing care by a registered, licensed practical or vocational nurse (RN, LPN, or LVN); it must do so 24 hours a day under the direction of a physician or registered nurse (RN). (3) It must keep daily medical records for each patient. (4) It is not: a custodial care facility; a home for the aged; an adult congregate living facility; an adult day care center; nor a place mainly for rest, retirement care, or the treatment of alcoholism, mental illness, or drug abuse. It is not a hospital but it may be part of a hospital. A bed, ward, unit or wing not meeting all of the above tests is not considered part of such Nursing Care Facility.

"Skilled or Intermediate Nursing Care" means care using professional nursing methods and procedures administered by licensed health care personnel. Such care includes: post-hospital care; rehabilitation nursing care; maintenance therapy; administration of medications which cannot be self-administered; injections; and catheterization.

Signed for the Company at its Administrative Office as of the Contract Date set forth in the Contract, unless a different date is shown here.

_Willi. M. Denja_                          _John R. Kenney_

Secretary                                          President

Form END.88.07.90

JLJ0262

# WESTERN RESERVE LIFE ASSURANCE CO. OF OHIO

## INDIVIDUAL RETIREMENT ANNUITY ENDORSEMENT

This Endorsement is part of the Contract. The Contract as amended is intended to qualify as an individual retirement annuity under Section 408(b) of the Internal Revenue Code of 1986, as amended (the "Code"). The following provisions apply and replace any contrary provisions of the Contract. The Owner will be responsible for determining that contributions and distributions under this Contract comply with the following provisions:

(1)    The Owner must be the Annuitant. Any provision of the Contract that would allow joint ownership, or that would allow more than 1 person to share distributions, is deleted.

(2)    The Contract is not transferable or assignable (other than pursuant to a divorce decree in accordance with applicable law) and is established for the exclusive benefit of the Owner and the Owner's beneficiaries. It may not be sold, assigned, alienated, or pledged as collateral for a loan or as security.

(3)    The Owner's entire interest in the Contract shall be nonforfeitable.

(4)    Purchase payments shall be in cash. Except for purchase payments that are rollover contributions described in Sections 402(a)(5), 402(a)(6)(F), 402 (a)(7), 403(a)(4), 403(b)(8) and 408(d)(3) of the Code, purchase payments for any calendar year may not exceed $2,000 (or other applicable limit specified in the Code).

(5)    Distributions must commence no later than April 1 of the calendar year following the calendar year in which the Owner attains age 70 1/2 and shall be payable in substantially equal amounts, no less frequently than annually, in a form and manner that accords with Code section 408(b)(3) and the regulations thereunder; provided that distributions are not required to commence under this Contract so long as distributions in the required form and amount are received from any other individual retirement plans maintained by the Owner.

(6)    (a)    If the Owner dies after distribution of the Owner's interest in the Contract has commenced, the remaining interest in the Contract will continue to be distributed at least as rapidly as under the method of distribution being used prior to the Owner's death.

(b) If the Owner dies before distribution has begun, the entire interest in the Contract must be distributed at a time and in a form and manner that accords with Code section 408(b)(3) and the regulations thereunder.

(7)    We reserve the right to amend this Contract or Endorsement to the extent necessary to qualify as an individual retirement annuity for federal income tax purposes.

(8)    This Endorsement is effective as of the Contract Date.

Form END00101

JLJ0263

Except as otherwise set forth above, this Endorsement is subject to the exclusions, definition, and provisions of the Contract.

Signed for us at our Office in Clearwater, Florida.

Secretary                                          President

JLJ0264

## WESTERN RESERVE LIFE ASSURANCE CO. OF OHIO

### ENDORSEMENT

This endorsement is attached to and forms a part of the Contract.

The Death Benefit Proceeds provision of the Death Benefit Provisions is hereby expanded by adding the following:

If the Annuitant dies during the Accumulation Period, the Death Benefit Proceeds, if payable, will be the greater of:

1. the Death Benefit Proceeds as determined under the existing Death Benefit Proceeds provision; or

2. the highest Annuity Value as of any Contract Anniversary occurring between the effective date of this endorsement and the earlier of (a) the date of death of the Annuitant, or (b) the Contract Anniversary nearest the 80th birthday of the Annnuitant. The highest Annuity Value will be increased for purchase payments made and decreased for adjusted partial withdrawals taken following the date of the Contract Anniversary on which the highest Annuity Value occurred.

The adjusted partial withdrawal is equal to (a) times (b) where:

(a)  is the ratio of the Death Benefit Proceeds to the Annuity Value, calculated on the date the partial withdrawal is processed, but prior to the processing; and

(b)  is the amount of the partial withdrawal.

EFFECTIVE DATE.  This endorsement is effective as of the Contract Date unless a different Effective Date is shown here.

Signed for Us at Our Administrative Office in Clearwater, Florida on the Effective Date.

Secretary                                              President

EA128



*A History of Performance*®

**WRL**®

INSURANCE • ANNUITIES

*Western Reserve Life Assurance Co. of Ohio*

## OFFICIAL ANNUITY CONTRACT DELIVERY RECEIPT

PDR:   JULY 10, 2000

Contract Number:   15S3164004
Owner:                   JEFFERY L JOHNSON

**All checks must be made payable to the company.**
**Do not make checks payable to the agent or leave payee blank.**

I have received from my Registered Representative my annuity contract and current prospectuses, and I understand my benefits under this contract.

_____
Applicant - Owner - Signature

_____
Date Signed

I certify that the above numbered contract and, if requested, a Statement of Additional Information was delivered to the Owner on the above date, and that I received the sum of $_____, payable to Western Reserve Life Assurance Co. of Ohio, from the applicable owner/applicant.

I further certify that current prospectuses for the contract and the fund were previously delivered to the owner prior to or at the time of application.

_____
Registered Representative's Signature

_____
Registered Representative's Printed Name

9 - 9 - 00
_____
Date Signed

P.O. Box 9051 Clearwater, Florida 33758-9051
- Applicant Copy -

VAPDRA

JLJ0266

# Variable Annuity Application

Western Reserve Life Assurance Co. of Ohio
P.O. Box 9051, Clearwater, Florida 33758

## ANNUITY SELECTION (Check one)

☐ WRL Freedom Attainer   ☐ WRL Freedom Bellwether   ☒ WRL Freedom Wealth Creator   ☐ Other _____

**1   ANNUITANT**

Johnson        Jeffery
First ☒ Male ☐ Female
1884 Watercrest Circle
Address
Lawrenceville    GA    30043
City             State  Zip
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
Social Security Number
12-13-67
Date of Birth (mm/dd/yyyy)
770 519-8742
Daytime Telephone

E-Mail Address (optional)

**2   CONTRACT OWNER (if other than annuitant)**

☐ Male ☐ Female

Last          First         MI

Address

City          State   Zip

Social Security Number

Date of Birth (mm/dd/yyyy)
(   )
Daytime Telephone

E-Mail Address (optional)

**3   JOINT CONTRACT OWNER (Optional) WEALTH CREATOR ONLY**

☐ Male ☐ Female

Last          First         MI

Address

City          State   Zip

Social Security Number

Date of Birth (mm/dd/yyyy)
(   )
Daytime Telephone

**4   BENEFICIARY DESIGNATION**

**Primary Beneficiary**
Name                          Relationship to Annuitant

Mayumi Johnson        Wife
First      Last

**Contingent Beneficiary**
Name                          Relationship to Annuitant

First      Last

*(If more than one Primary or Contingent Beneficiary is designated, proceeds will be divided equally among the survivors within the classification unless otherwise indicated.)*

**5   REPLACEMENT**

**REQUIRED:** Will this Annuity replace or change any existing Annuity or Life Insurance?

☐ Yes ☒ No   If Yes, give name of company and policy number below:

Company Name

Policy Number

**6   TYPE OF PLAN**

☐ Non-Qualified      ☐ SEP/IRA        ☐ SIMPLE IRA
☐ Roth IRA           ☒ Traditional IRA
☐ Other _____

*(Indicate the source of the IRA below)*
☐ Transfer    ☐ Conduit
☒ Rollover/Direct Rollover  *will come directly*
☐ Contributory: tax year _____ *to WRL*

*therefore no transfer paperwork is necessary*

**7   PURCHASE PAYMENTS**

Make Check Payable to "Western Reserve Life"

Initial Purchase Payment $ _____

☐ Automatic Monthly Investing
   (Complete preauthorization section)

AA00300                    1

JLJ0267

**8    ALLOCATION OF PURCHASE PAYMENTS***

| | |
|---|---|
| WRL Janus Growth | 25 % |
| WRL Janus Global | 25 % |
| WRL Alger Aggressive Growth | 25 % |
| WRL VKAM Emerging Growth | 25 % |
| WRL AEGON Bond | % |
| WRL AEGON Balanced | % |
| WRL LKCM Strategic Total Return | % |
| WRL Federated Growth & Income | % |
| WRL J.P. Morgan Money Market | % |
| WRL J.P. Morgan Real Estate Securities | % |
| WRL Dean Asset Allocation | % |
| WRL GE U.S. Equity | % |
| WRL GE/Scottish Equitable International Equity | % |
| WRL Third Avenue Value | % |
| WRL NWQ Value Equity | % |
| WRL C.A.S.E. Growth | % |
| WRL Goldman Sachs Growth | % |
| WRL Goldman Sachs Small Cap | % |
| WRL T. Rowe Price Dividend Growth | % |
| WRL T. Rowe Price Small Cap | % |
| WRL Salomon All Cap | % |
| WRL Pilgrim Baxter Mid Cap Growth | % |
| WRL Dreyfus Mid Cap | % |
| Fixed Account | % |
| Other | % |
| Other | % |
| | Total 100% |

* In some states the initial premium payment will be allocated to the WRL J.P.Morgan Money Market sub-account during the right to examine period.

**9    STATEMENT OF OWNER**
**(If applicable, complete the state specific fraud warning)**

I hereby represent my answers to the above questions are true to the best of my knowledge and belief. I agree that this application shall be a part of the annuity contract. I have received a current Prospectus for the contract. I understand that I should consult my own tax advisor and/or legal counsel as to the consequences of using this product in conjunction with my own particular tax or financial plan. I understand that under the contract applied for values may increase or decrease depending upon investment experience. I also state that the contract is in accordance with my financial objectives.

The standard maturity date is the anniversary nearest Annuitant's age 90. The standard annuity option is variable account life annuity with 120 monthly payments guaranteed. Option to change election is permitted by the contract.

Under penalty of perjury, I (the owner) certify that my Taxpayer I.D. # is correct as it appears on the application and that I am not subject to backup withholding.

Signed in (State)  GA

Date Signed  6-16-00

Signature of Owner

Signature of Joint Owner (if any, Wealth Creator only)

**10    BROKER/DEALER INFORMATION (Registered Representative use only)**

I certify that (1) the Applicant signed this completed Application in my presence; (2) I am authorized and qualified to discuss the contract herein applied for.

Registered Representative Signature    Date  6-16-00

Print RR Name, Agent Number, Production %, State License (If Applicable)  Marcella H. Clodowiak  3481w  100%

Name of Broker/Dealer  WMAS

Dealer Number  770-668-8975    Dealer Branch  770-668-8062

Phone Number    Fax #

Split RR (Interviewed) (if applicable)  N/A

Print RR Name, Agent Number, Production %, State License (if Applicable)  N/A

Phone Number  N/A    Fax #

RR Number

RR Number    HIGH  MID  LEVEL  (Wealth Creator only)
(circle one)

Required: Will this contract replace or change any existing life insurance or annuity in this or any other company?  ☐ Yes  ☑ No
If Yes, explain

JLJ0268